# Exhibit

# F

**EXCERPTS OF DEPOSITION OF LAYNE DREXEL**

1  relevant, where do you have those?

2      A.    Just things for the given properties.

3      Q.    If I requested production of those

4  folders you would still have them and provide

5  them?

6      A.    For the individual units?

7      Q.    Yes, individual units.

8      A.    Yeah.  I could provide the documentation

9  that I have.

10      Q.    Let me go back.  You said you received

11  your insurance policy from them, I assume S.T.

12  Good, copy being fowarded to you on or about June

13  4 or June 7, 2004?

14      A.    Yes.

15      Q.    Did that document that you received from

16  S.T. Good state the premium?

17      A.    I'm not sure.  I believe so.

18      Q.    Do you recall if it stated the due date?

19      A.    It was with the policy and it was a cover

20  that said it had been written at a premium of I

21  believe -- it quoted a number.

22      Q.    Did it tell you when that premium was

23  due?

24      A.    It was a bill for a premium.  It was the

Layne Drexel
17

1    to call Ocwen and got no other response from them

2    and to be on hold for lengthy periods of time.

3    BY MR. CASARINO:

4        Q.    Let me go back.    I showed you earlier a

5    document which has been marked as Exhibit 3,

6    premium invoice. You indicated you never received

7    a copy of that?

8        A.    That's correct.

9        Q.    Let me go to the next sentence in your

10    letter.  You said you teach school.  And just

11    after school ended June 17th you went for a

12    two-week vacation to the Pocono's; is that

13    correct?

14        A.    Yes.

15        Q.    Do you recall when you left to go to the

16    Pocono's?

17        A.    It was after school ended.  I don't

18    recall.

19        Q.    You said school ended on June 17th.  Did

20    you go on June 17th?

21        A.    I don't recall.

22        Q.    I have a calender here and that would

23    have been a Thursday?

24        A.    This was several years ago.  I remember

Layne Drexel
21

1    girlfriend's mother and father and fire company.

2         Q.    Who did you talk to?

3         A.    The secretary I believe at S.T. Good.

4         Q.    Do you recall what you told the

5    secretary?

6         A.    That I had had a fire.

7         Q.    What instructions, if any, were given to

8    you?

9         A.    I'm not sure exactly.  I believe that she

10   told me someone would be getting in touch with

11   me.  They would investigate or go to see what

12   happened and get in touch with me.

13        Q.    Just to make sure I understand.  You

14   decided based upon your conversation with your

15   girlfriend's mother or father that you didn't have

16   to come back?

17        A.    Correct.

18        Q.    Did you speak to anyone after that from

19   S.T. Good or Harleysville Insurance Company while

20   you were still in the Pocono's?

21        A.    Spoke to George Powell.

22        Q.    Who did you understand George Powell to

23   be?

24        A.    He was an adjuster.

Layne Drexel

24

1      A.    I don't think so.

2                    MR. CASARINO:    Let's mark that as

3  an exhibit.

4                    (Whereupon, Exhibit Drexel 4 was

5  marked for identification.)

6  BY MR. CASARINO:

7      Q.    Do you have a copy of the letter you had

8  waiting for you from Harleysville Insurance

9  Company?

10     A.    I sent it with the premium notice -- I

11 thought it was that and I sent it in with that

12 check.

13     Q.    Are you saying you sent it back to

14 Harleysville with the check?

15     A.    Yes.

16     Q.    You didn't keep a part of it?

17     A.    No.

18     Q.    You are under oath and you are saying

19 that is not a copy of the document you received?

20     A.    Right.

21                    MR. BESTE:    Objection.

22 BY MR. CASARINO:

23     Q.    You think you received something else

24 saying you owned $283 --

Layne Drexel

1    A.    Yes.

2    Q.    Check number 4359?

3    A.    Yes.

4    Q.    That is dated June 7, 2004?

5    A.    Yes.

6    Q.    What date did you write that check, sir?

7    A.    I don't recall.

8    Q.    You did not write it on June 7, 2004, did

9  you?

10   A.    Correct.

11   Q.    It would have been around July 1st of

12  2004?

13   A.    Yes.

14        MR. BESTE:    Objection.

15  BY MR. CASARINO:

16   Q.    At that date or --

17   A.    Yes.

18   Q.    Why did you put June 7, 2004 date on it?

19   A.    The notice that I had gotten was dated I

20  believe the 8th or 10th.

21   Q.    What do you mean by that?

22   A.    The paper that I sent back to

23  Harleysville with the check for $283 had a date on

24  it of June 8th or 10th.

Layne Drexel    30

```
 1        Q.    Did that document that you received --
 2  and that was a document from Harleysville you
 3  said; correct?
 4                  MR. BESTE:    Objection.
 5                  THE WITNESS:    Yes.
 6  BY MR. CASARINO:
 7        Q.    Did that tell you that the effective date
 8  of your policy, the expiration of your policy was
 9  June 8, 2004?
10        A.    I don't recall that.  I think that it was
11  just a late notice.
12        Q.    Well it may have been a late notice but
13  didn't it tell the effective dates of your policy
14  and the termination date was June 8, 2004?
15        A.    I don't recall.
16        Q.    Isn't that why you dated it June 7th to
17  be in front of that date?
18        A.    No.
19        Q.    Why did you date it June 7th?
20        A.    Because the letter stated June 8th to
21  June 10th.
22        Q.    The letter stated what on June 8th,
23  that's what I don't understand?
24        A.    I think if we receive your payment on
```

Layne Drexel                                        52

1    this so there is no confusion.

2                  (Whereupon, Exhibit Drexel 7 was

3    marked for identification.)

4    BY MR. CASARINO:

5         Q.    Is that your signature at the bottom?

6         A.    Yes.

7         Q.    And when did you sign that document?

8         A.    I don't remember.  It says here 7-16-04.

9         Q.    So it's dated 7-16-04?

10        A.    Yes.

11        Q.    Was that your authorization to have Booth

12   do the work?

13        A.    Yes.

14        Q.    Did you read it?

15        A.    No.

16        Q.    Just signed it without reading it?

17        A.    I thought you meant just now.

18        Q.    I mean when you signed it.

19        A.    Yes.

20        Q.    The third paragraph says I/we understand

21   that if the insurance co., for whatever reason

22   doesn't pay for the repairs accomplished, then

23   I/we will assume the responsibility for all the

24   payments to G.S. Booth Associates, Inc.  Do you

Layne Drexel

1   remember seeing that?

2       A.   Yes.

3       Q.   Did you understand if the insurance

4   company didn't pay for Booth you would?

5       A.   I don't remember having read that.  But I

6   understand I signed it.  Yes.

7       Q.   Did you authorize Booth to do the work?

8       A.   Yes.

9       Q.   What did you tell Booth to do?

10      A.   Actually Mark told me that he would deal

11  directly with George.  He said I will only contact

12  you should the need arise.

13      Q.   So who did you authorize to do the work,

14  George Powell or this guy Mark from Booth?

15      A.   George Powell was the adjuster and he was

16  the one that was going to determine ultimately how

17  much the insurance company was going to pay to

18  repair.

19      Q.   I understand that.  But no matter what

20  the insurance company was going to pay didn't you

21  want the work to be done?

22      A.   Yes.  Had the insurance company not paid

23  it I would have done the majority of the work

24  myself.  Much of the cost of repair was clean up

.

**<u>EXCERPTS OF DEPOSITION OF MILDRED D. ALDERFER</u>**

```
1                    MILDRED D. ALDERFER,
2            the deponent herein, having first been
3            duly sworn on oath, was examined and
4            testified as follows:
5                          EXAMINATION
6    BY MR. BESTE:
7      Q.    Could you state your name and date of birth for
8    the record, please?
9      A.    Mildred Alderfer.  July 26, '49.
10     Q.    How long have you been an employee of
11   Harleysville Insurance Company?
12     A.    40 years.
13     Q.    Do you know approximately when you started?
14     A.    July 31, '67.
15     Q.    What position do you currently hold with
16   Harleysville?
17     A.    I'm a manager in the policy support services
18   area.
19     Q.    Is that part of underwriting?
20     A.    No.
21     Q.    That's separate from underwriting?
22     A.    Correct.
23     Q.    What's the name of it?
24     A.    Policy support services.
```

Mildred D. Alderfer

13

1    agent document.  It's very similar.  There's a little

2    bit more info in the internal one that we didn't have

3    in the agent's document.

4              MR. BESTE:  Can we mark this one?

5              MR. CASARINO:  Yes.  I thought that was

6    the one I sent over to you in the last couple of days.

7              MR. BESTE:  I thought this (indicating)

8    was the one that you sent me.

9              MR. CASARINO:  I don't think so.  I think

10   you got this one before, but in any event --

11             MR. BESTE:  Well, let's mark that as H-27.

12             MR. CASARINO:  I would appreciate a copy

13   of it so I can have a copy.

14             (H Deposition Exhibit No. 27 was marked

15   for identification.)

16   BY MR. BESTE:

17    Q.   I've marked Exhibit H-27.  This is the

18   corporate direct bill criteria that establishes

19   essentially how you should do your job?

20    A.   How we should do our job, a lot of which it is

21   automated, but it's the processes that we do

22   associated with the automated system.

23    Q.   In 2004 where was the remittance processing

24   part of Harleysville located?

Mildred D. Alderfer

14

1    A.    In Harleysville, Pennsylvania, where it is now.

2    Q.    And any employees handling premium payments

3    from an insured would fall in your department?

4    A.    That's correct.

5    Q.    Can you explain to me practically the task of

6    Harleysville employees who actually receive the

7    premium payment envelopes from an insured?

8    A.    Mm-hmm.  The premium payments come into our

9    department.  They're opened on Opex opening equipment.

10   They're run through NCR remittance processing

11   equipment which captures an image of the stub and the

12   check.

13          If the payment comes in with a scannable

14   stub, the data is captured from the stub.  It is run

15   into our billing system that evening and if the master

16   is active, the payment is applied.

17          If the master is not active or can't be

18   matched for one reason, it could be an incorrect

19   policy number, it could be paid in full, any of those

20   type of situations, that comes out on a report for us

21   to look at the following day to determine what we need

22   to do with that payment.

23   Q.    What do you mean by "master"?

24   A.    Billing master.  It's an electronic view that

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Mildred D. Alderfer

15

1    we have of our activity that occurs on a direct bill

2    policy.

3    Q.    So am I correct that if the computer system

4    doesn't flag a particular payment that comes in it's

5    sent off to the bank and deposited?

6    A.    The payments are processed, are opened and run

7    through the NCR equipment and deposited to the bank

8    the same day.

9         The payment activity is then run into our

10   billing system in the overnight cycle and that's where

11   they're then applied or they go into suspense if they

12   can't be applied to be researched the following day.

13   Q.    Does that mean in all circumstances the checks

14   are deposited and then if there's an issue you deal

15   with that the next day?

16   A.    That's correct.

17   Q.    So there's no mechanism to stop a check from

18   being cashed or deposited by Harleysville prior to

19   some type of analysis by a Harleysville employee?

20   A.    That's correct.  All checks are deposited

21   first.

22   Q.    And your department gets a report every morning

23   on any issues that arose with respect to the prior

24   day's payment processing?

Mildred D. Alderfer

16

1    A.    That's correct.

2    Q.    Do you know what happened when your department

3    received the premium payment at issue in this case?

4    A.    Yes.

5    Q.    Can you explain to me what happened?

6    A.    We received a premium payment.  It came in with

7    a scannable document.  It was opened and run through

8    our equipment just like I explained.  The following

9    morning it showed up on a report for us because the

10   policy was terminated.

11        The remittance processor would have looked

12   at the billing master to see if there were any

13   messages there from the underwriter authorizing

14   reinstatement.  If there were no messages there, and

15   in this case there were not, the payment was returned

16   to the insured and reinstatement was denied because

17   the payment was late.

18   Q.    Do you know when Mr. Drexel's premium in this

19   case was received by Harleysville?

20   A.    Yes.  It was received on July 13th.  That's the

21   date it was imaged.

22   Q.    And how do you know that?

23   A.    Because of the date that it shows up in our

24   image file.

Mildred D. Alderfer

18

1    policy -- I should say it's actually terminated.  The

2    policy expired.  The renewal was not accepted.

3        Q.    Can you explain to me the difference between

4    the terms termination, cancellation and expiration?

5        A.    When we issue a renewal policy we ask for

6    premium by the due date of that renewal term.  If the

7    premium is not received, we send out an expiration

8    notice.  If payment is not received, the policy

9    terminates or expires as of the expiration date of

10   that prior term.

11             When you use the term cancellation, that's

12   midterm, somebody falls short in payments throughout

13   the policy term, that becomes a cancellation.  But in

14   this case it's a termination because no payment was

15   received on the renewal.

16       Q.    And that is Harleysville's analysis with

17   respect to Mr. Drexel's claim?

18       A.    That's correct.

19       Q.    So what you just said applies equally to

20   Mr. Drexel's policy in this case?

21       A.    Correct.

22       Q.    Are those differences between cancellation,

23   expiration and termination set forth in Mr. Drexel's

24   policy of insurance?

Mildred D. Alderfer

19

1    A.    I would not be able to answer that without

2  looking into the policy content, and I do not do that.

3    Q.    So you have no knowledge of whether the

4  distinctions that you've drawn between policy

5  cancellation and expiration are set forth in

6  Mr. Drexel's policy?

7    A.    When you refer to Mr. Drexel's policy, I'm not

8  quite sure what you're referring to.  I do know that

9  the renewal policy has a message on it that says the

10 policy will continue if payment is received by the

11 expiration date, so that is mentioned in there.

12   Q.    In where?

13   A.    On the policy declarations page.

14   Q.    And that is sent to the insured by your

15 division?

16   A.    We issue a copy of that for both the insured

17 and the agent, yes.

18   Q.    Have you reviewed the document that was sent

19 out to Mr. Drexel in this case?

20   A.    I did look at the dec. page, yes.

21   Q.    I'm going to hand you what's been marked as --

22 I don't think I marked the policy yet, did I?

23           MR. CASARINO:  No.

24           MR. BESTE:  I'm going to have this marked

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Mildred D. Alderfer

20

1    as Exhibit 28, please.

2              (H Deposition Exhibit No. 28 was marked

3    for identification.)

4    BY MR. BESTE:

5      Q.    Are you able to identify this document?

6      A.    Yes.

7      Q.    What is it?

8      A.    It is the dec. or declaration page for the

9    commercial package policy.

10     Q.    You're referring to the second page?

11     A.    Yes.

12     Q.    Is this the document that you were referring

13   to?

14     A.    Yes.  It's a multipage document so, yes, it is.

15   This is page 1.

16     Q.    And by looking at the first page of H-28, are

17   you able to identify the package as a whole?

18     A.    Yes.

19     Q.    It appears to be Mr. Drexel's policy at issue

20   in this case?

21     A.    I think this is actually a certified policy.

22   And when a renewal policy is issued, the only forms

23   that are issued with the policy are anything that has

24   been changed or has a new expiration date.  He would

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters