# Exhibit
# F
# Part 2

Mildred D. Alderfer

21

1   not receive a complete package like this at every

2   renewal.

3      Q.    Is the certified policy that you're looking at,

4   is that generated by your department as far as you

5   know?

6      A.    It could be.

7      Q.    You can't tell?

8      A.    I can't tell.  There's no name on here that

9   really lets me know who did it.

10          I do know that in our output distribution

11  unit there are times that we do put policies together,

12  but from here I can't tell if this is one that we did

13  or not.

14     Q.    If I asked you to locate in that policy where

15  the distinctions between expiration, termination and

16  cancellation are or are not spelled out, would you be

17  able to do that?

18     A.    I would be able to show you the message I was

19  referring to on the declarations page.

20     Q.    But beyond that, you couldn't?

21     A.    I would have to have someone go through it.

22          No, that's not something that I would do.

23     Q.    And you don't have any expertise in reading the

24  policy language in that regard?

Mildred D. Alderfer

22

1    A.    No, I would not.

2    Q.    What language were you referring to?

3    A.    I was referring to this message right here

4    (indicating) which says the renewal insuring

5    agreement.

6    Q.    And that's on page 472?

7    A.    Page 2 of the declaration page.

8    Q.    Okay.  During the course of processing

9    payments, does your department have any discretion

10   whatsoever as to how late premium payments are handled

11   by Harleysville?

12   A.    No.  Our guidelines are given to us by the

13   underwriting department.

14   Q.    And you report facts to underwriting and the

15   decisions regarding those facts are made exclusively

16   by the underwriting department?

17   A.    They're made by the underwriting department,

18   yes.

19   Q.    Were any notices generated in this case after

20   your department generated the premium payment at

21   issue?

22   A.    After we generated the premium payment at

23   issue?

24   Q.    I'm sorry.



Mildred D. Alderfer

23

1          Were any notices sent to Mr. Drexel by

2    your department after the premium payment at issue was

3    processed by your department?

4      A.    When we processed that late payment, yes, we

5    did send a reinstatement denied letter.

6      Q.    Have you seen that letter recently?

7      A.    Yes.

8      Q.    And it was sent to Mr. Drexel?

9      A.    That's correct.

10          MR. BESTE:  Do you know where that

11   document is, Steve?

12          MR. CASARINO:  I think it's in that

13   package.  It might be the last document there.

14          Is this (indicating) what you're referring

15   to?

16          THE WITNESS:  Yes.

17          MR. BESTE:  Which letter you just sent us,

18   Steve?  This is the letter of September 7th?  Is that

19   right?

20          THE WITNESS:  I think that's the one, yes.

21   I think that's the one it's in.  I think it's right

22   before this (indicating).

23          MR. CASARINO:  I'm not sure.  Probably.

24          THE WITNESS:  Right there (indicating).

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Mildred D. Alderfer

24

1          MR. CASARINO:  Yes.

2          MR. BESTE:  I'm going to have this entire

3   letter and its contents marked as H-29.

4          MR. CASARINO:  The entire package?

5          MR. BESTE:  Yes.  It might make it easier

6   to go through.

7          MR. CASARINO:  That includes the guideline

8   too, right?

9          MR. BESTE:  I believe it did, yes.

10         (H Deposition Exhibit No. 29 was marked

11   for identification.)

12   BY MR. BESTE:

13   Q.    Now I'm showing you what's been marked as H-29.

14         And you're referring to page 11 of 14 from

15   the fax line, correct?

16   A.    Correct.  Yes.

17   Q.    If you could explain to me what this letter is.

18   A.    This letter is advising the insured that the

19   policy has not been reinstated and there is no

20   coverage.

21   Q.    And once this letter was generated by your

22   department, your department no longer had any

23   authority to change the status of this policy?

24   A.    That's correct.

Mildred D. Alderfer

28

1    A.    Correct.

2    Q.    Do you think that should be changed?

3          MR. CASARINO:    Objection.

4    A.    I wouldn't have the authority to say that.

5    Q.    All right.  This is page 6 of 14 in the same

6    exhibit.  This is your signature at the bottom?

7    A.    Printed by the computer.

8    Q.    You don't have to sign hundreds of these every

9    day?

10   A.    No, I don't.  Thank goodness.

11   Q.    This is titled Confirmation of Termination?

12   A.    Correct.

13   Q.    Correct?

14   A.    Mm-hmm.

15   Q.    And this was issued by your department on July

16   7th.  Is that correct?

17   A.    It actually was issued on the 6th, again by the

18   automated system generated automatically.  No one had

19   to initiate it.  It was issued on the 6th and it was

20   mailed on the 7th.

21   Q.    How can you prove or show that it was mailed?

22   A.    We have no postal returns.  This particular

23   document I do not have a Gunther inserter log because

24   at that time it was not 2D bar coded to run through

Mildred D. Alderfer

29

1    the equipment because some of these notices are

2    handled with proof of mail and others are not, so back

3    in 2004 these were mailed manually.  They were put in

4    envelopes and mailed manually.

5        Q.    So you cannot point me to any proof of mailing

6    with respect to the notices sent to Mr. Drexel in this

7    case?

8        A.    Correct.

9        Q.    Can you explain to me why your department

10   issued both the June 14th notice of policy expiration

11   and the July 6th confirmation of termination?

12       A.    The expiration notice is a courtesy notice

13   reminding the insured that their payment is late.  If

14   they pay by what we're giving a grace period or an

15   extended due date, coverage will be continued without

16   lapse.

17            When you get to the extended due date,

18   plus a grace period if payment still is not received,

19   we send a notice confirming that the policy has

20   terminated and there is no coverage as of the

21   expiration date of the policy.

22       Q.    Looking at the June 14th notice of expiration,

23   can you tell me what the grace period was?

24       A.    We gave him an extended due date of June 30th.

Mildred D. Alderfer

30

1    Q.    I thought you said there was --

2    A.    In addition to that, we have a five-day grace

3    period before we truly confirm for those insureds who

4    might mail very close to that date to give mail time

5    and process time for us to handle that payment.

6    Q.    And that's why this confirmation of termination

7    was mailed on July 6th?

8    A.    That's correct.

9    Q.    Now, the July 6th confirmation of termination

10   does not appear to be a computer-generated document in

11   its entirety.  Is that correct?

12   A.    No.  That is computer-generated.

13   Q.    So the fact that the third box is checked and

14   it looks like the type is different than the type of

15   the rest of the document does not mean it was not

16   generated by a computer?

17   A.    That's correct.  This notice is used for

18   different types of cancellations and terminations and

19   depending upon the type that it is, there's a special

20   message that is put in here.  This (indicating) is all

21   preprinted information or canned information that

22   shows on every notice.

23        This is specific to the condition but,

24   again, because this matches this (indicating), it's

Mildred D. Alderfer

34

1   notice.

2           Here you can see that it issued on the

3   14th, was mailed on the 15th.  It's the bottom portion

4   of the expiration notice that we had sent to him.

5       Q.    And page 10 represents Mr. Drexel's check?

6       A.    That's correct.

7       Q.    If you could kind of remind me what page 11 is.

8       A.    That's our notice denying reinstatement which

9   we sent out when we returned his payment.

10      Q.    Now, the June 14th notice is titled a notice

11  policy expiration.  The July 6th notice is titled

12  confirmation of termination, but yet in this page 11

13  it just says, and I'll quote it, "This policy is

14  canceled and will not be reinstated."

15          Can you tell me why the word "canceled" is

16  used in that document?

17      A.    This is a document that's used for all

18  situations where we're denying reinstatement and we do

19  not change the wording on here to fit the various

20  situations.

21          And I think your insureds probably

22  understand canceled as well as terminated or expired,

23  but it's a notice that's used in all those situations.

24      Q.    Mr. Drexel's policy was not in any type of

Mildred D. Alderfer

39

1    occurs?

2    A.    Yes.

3    Q.    If you could turn to page 5 of H-26.

4         Can you explain to me the language

5    regarding Notice of Cancellation for Non Payment of

6    Premium section?

7    A.    We again have built within our automated system

8    a cancellation process for mid-term cancellations

9    where our system checks for policy equity and looks at

10   the premium that has been paid and for the amount of

11   time that we have provided coverage for that premium

12   payment.

13        Whenever we get into state required number

14   of days and equity, we will send out a midterm notice

15   of cancellation for non-payment of premium giving

16   state required number of days notice and again a

17   five-day grace period.

18   Q.    Can you explain to me the difference between

19   what happened to Mr. Drexel's policy and a

20   cancellation for non-payment of premium?

21   A.    A cancellation for non-payment of premium

22   occurs in the middle of a policy term.  It's midterm.

23        Mr. Drexel's was at the beginning of his

24   policy term.  He had not accepted the renewal.

Mildred D. Alderfer

40

1    Q.    So the cancellation for non-payment of premium

2   can only occur during the course of an active policy

3   period as opposed to a renewal date?

4    A.    That's correct.

5    Q.    Are you aware of any language in Mr. Drexel's

6   policy that delineates that distinction?

7    A.    I would not be aware of that, no.

8    Q.    And who at Harleysville would be able to

9   testify regarding such language or provisions?

10    A.    That would have to be the underwriting

11   department.

12    Q.    Does your department have any discretion

13   whatsoever in identifying a particular event as either

14   an expiration or a cancellation for non-payment of

15   premium?

16    A.    Again, that's all within the automated system.

17   There's logic built into the system for when a policy

18   will expire versus non-pay.

19    Q.    Aside from adjustments to the system's logic,

20   there is no human input?

21    A.    That's correct.

22    Q.    How frequently do you adjust the logic of the

23   system?  Is it just as needed?

24    A.    Correct.

Mildred D. Alderfer

41

1   Q.   Can you tell me roughly how frequently that is

2   needed?

3   A.   It's infrequent and it depends on when we get

4   new guidelines from various states, rules, regulations

5   change, number of days notice change, wording for

6   forms require a change.  We might go in and make those

7   changes, but that's again all associated with the

8   non-pay, the legal notice of non-pay, notice of

9   cancellation for non-payment of premium.

10  Q.   Is Harleysville required to give notice of

11  expiration or cancellation prior to the effective date

12  of a policy's cancellation or expiration?

13  A.   You're required to give notice for a

14  cancellation for non-payment of premium.

15          There is no requirement that I'm aware of

16  for notice of expiration.  That's a courtesy notice,

17  something that we extend to our customers.

18          MR. BESTE:  Can I have this marked as

19  Exhibit 30, please?

20          (H Deposition Exhibit No. 30 was marked

21  for identification.)

22  BY MR. BESTE:

23  Q.   Are you able to identify H-30?

24  A.   Yes.



Mildred D. Alderfer

42

1    Q.    What is it?

2    A.    It's a renewal invoice.

3    Q.    Is this the renewal invoice sent to Mr. Drexel

4    by your department on March 26th, 2004?

5    A.    This particular invoice was mailed with the

6    policy.  The agent had the agent's mail option, so the

7    invoice and the insured's copy of the policy would

8    have been delivered to the agent for him to forward to

9    the insured.

10    Q.    What steps does Harleysville take to ensure

11    that the agent fulfills his responsibility by

12    forwarding the policy materials to the insured?

13    A.    The agent is a representative of our company

14    and that's his responsibility.  If he elects the

15    mailing option, it's his responsibility to deliver it

16    to the customer.

17    Q.    Are you able to verify whether or not

18    Mr. Drexel's agent forwarded his policy materials to

19    him in March of 2004?

20    A.    I would not be able to do that, no.

21    Q.    Does your department control the actual

22    language that is placed on this premium notice?

23    A.    There again, that would be my area along with

24    our law department and underwriting.  It's an

Mildred D. Alderfer

55

1    A.    The policy system is your system that shows

2    your policy detail, your coverages, your premiums and

3    that type of thing.   That's the policy system.

4              Then we also have a billing system.   This

5    particular activity took place in the billing system.

6    Q.    All right.   Now let's go to the policy system.

7              The policy system is a system that an

8    agent would look at?  Not an agent but an adjuster?

9    A.    Adjuster would look at it.   They can look at

10   either system.   I do think they more regularly look at

11   the policy system because they're also looking for the

12   types of coverages associated with that policy.

13   Q.    Would the policy system indicate that the

14   policy was active if they looked at it, for instance,

15   on June 22nd?

16   A.    Yes.

17   Q.    And when would that system be changed to

18   inactive?

19   A.    July 6th when our confirmation of termination

20   was issued.

21              MR. CASARINO:   I have nothing else.

22   BY MR. BESTE:

23   Q.    Just to follow up on that last question, so as

24   early as July 6th, 2004 claims employees would have

**EXCERPTS OF DEPOSITION OF SHERRY CLODFELTER**

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

10

1    A.  Yes, sir.
2    Q.  In 2004 did you have any connection with
3  Harleysville's acceptance or processing of premium
4  payments?
5    A.  No, sir.
6    Q.  Where is that handled?
7    A.  It would have been in the underwriting
8  department.
9    Q.  The underwriting department handles payment
10  processing?
11    A.  I'm assuming.
12    Q.  You don't know?
13    A.  I honestly don't know.
14    Q.  Does Harleysville's Nashville office have an
15  underwriting department in it or is that somewhere
16  else?
17    A.  Somewhere else.
18    Q.  Where is the underwriting facility?
19    A.  I don't know.
20       MR. CASARINO:  Let's go off the record for
21  a minute.
22       (Discussion off the record.)
23  BY MR. BESTE:
24    Q.  But there are no underwriting employees in

11

1  Nashville.  Is that right?
2    A.  I don't know.
3    Q.  Okay.  Fair enough.
4       Can you give me the general steps that you
5  would take in 2004 when you were first assigned to a
6  fire damage claim?
7    A.  The first step I would take would be to confirm
8  coverage.
9    Q.  How do you go about confirming coverage?
10    A.  I would go on Harleysville's system and I would
11  look to see if the property involved is what we're
12  showing.  I would put the limits on the policy, how
13  much their deductible was and the forms that would be
14  involved and the effective dates, if the loss fell
15  within the effective dates of the policy.
16    Q.  When you say, "Harleysville's system," what are
17  you referring to?
18    A.  Our computer system.  I would go in with the
19  policy number.  I would enter it into the system and
20  it would pull up that individual.
21    Q.  Who at Harleysville has access to that system?
22  I mean, is it a company-wide computer system?
23    A.  I'm not sure.  I mean, it is a company-wide
24  system, but, you know, who all has access, I don't

12

1  know.
2    Q.  Do the various Harleysville employees use the
3  system for communication amongst each other?
4    A.  (Pause.)
5    Q.  Let me try this way.
6       MR. BESTE:  Can we have this marked as
7  Exhibit 1?
8       (H Deposition Exhibit No. 1 was marked for
9  identification.)
10  BY MR. BESTE:
11    Q.  I'm going to show you what's been marked as
12  H-1.  Can you identify what this is that I'm showing
13  you?
14    A.  These are adjuster remarks that are put into
15  Harleysville's system.
16    Q.  Now, this is part of the system that you're
17  referring to?
18    A.  Well, no.  This would be the claims file.  This
19  would be what would be going in the part of the
20  claims.
21    Q.  Okay.  This is a separate computer system?  Is
22  this typed out?  How is this written out?
23    A.  This is where I go into the part of the claims
24  system of Harleysville and I enter my conversations,

13

1  enter notes, enter coverage.  This is how we put our
2  notes in, you know, to the file.
3    Q.  And the employees and the claims adjusters can
4  communicate using this adjuster remark system by
5  leaving each other notes?
6    A.  The claims department.
7    Q.  Okay.  I'm a little confused because at first
8  you said you went into Harleysville's system.
9    A.  Yes, sir.
10    Q.  Do you have essentially a computer terminal at
11  your desk that allows you to go into the Harleysville
12  system?
13    A.  I have a, you know, just -- well, I can't
14  think.  I'm sorry.  I'm drawing a blank.
15       A personal computer in front of me that's
16  linked up to Harleysville.
17    Q.  Is that how you access these adjuster remarks,
18  the claim file?
19    A.  Yes, sir.
20    Q.  Are there separate systems that you can log
21  into, separate recordkeeping systems?
22    A.  There's an area that you can go into and put a
23  policy number in and pull -- I'm assuming it's part of
24  underwriting's where they go in, but they just put in

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

## 14

1 where there's coverage there.
2    Q. When you go about confirming that coverage is
3 in place when you initially get a claim as you
4 testified before, where do you do that? Do you do
5 that through your computer system?
6    A. Yes, sir.
7    Q. Do you go into this adjuster remark system?
8    A. No.
9    Q. What do you go into?
10    A. I go into another area. I'm not exactly sure
11 where, what it's called, but --
12    Q. I don't need a name. I'm just trying to get a
13 feeling for what physically you're doing in the
14 computer, what system you're accessing.
15    A. I guess, I guess I'm confused. It's just
16 Harleysville's system that they have. I'm not sure
17 what they call it, you know. It's a way that I go in
18 and I can confirm coverage.
19    Q. When you go to your computer in the morning are
20 there a number of options that you can open up? You
21 can open up the adjuster remarks? You can open up
22 other things?
23    A. Yes, sir.
24    Q. What are the various things, areas of the

## 16

1    Q. What other manuals are available?
2    A. At the time of this loss, we had a best
3 practices manual.
4    Q. And what is in the best practices manual?
5    A. It would be just the timeliness of, you know,
6 getting in contact with an insured, when you should
7 raise reserve, put your coverage analysis in the file,
8 things that would be required of that file.
9    Q. To your knowledge, do underwriting employees
10 have separate manuals?
11    A. I have no idea.
12    Q. Are there any manuals that you know exist that
13 you don't use or that you haven't discussed here
14 today, to your knowledge?
15    A. None that I'm aware of, no, sir.
16    Q. So you basically had two manuals, in 2004 you
17 had two manuals available to you as a reference in
18 adjusting this claim?
19    A. Yes, sir.
20    Q. Once you initially verify coverage with respect
21 to a given claim, does Harleysville require you to
22 re-verify coverage at a later point?
23    A. No, sir.
24    Q. So as long as there's coverage in place the

## 15

1 Harleysville system that you can access from your
2 computer?
3    A. I can go in and put a policy number in and pull
4 up to see if a policy is active. I can go in and put
5 a claim number in and it will bring up an area to
6 where I find my claim and then I can enter file notes
7 in that claim.
8    Q. So you would first access the policy and then
9 there could be various claim numbers associated with
10 the policy, right?
11    A. I'm not sure I understand that question. That
12 would be -- I can do that, but the only time that I
13 would do that is on the initial claim.
14    Q. Are there any policies or procedures or manuals
15 that you are guided by in adjusting a claim?
16    A. Yes, sir.
17    Q. Tell me about those policies and procedures or
18 manuals. What are they?
19    A. Well, again, we, Harleysville has a link that
20 they, it's a link that they go in and you can pull up
21 the claims manual on the link.
22    Q. It's called a claims manual?
23    A. I believe that's what it's called. I'm not
24 absolutely sure.

## 17

1 first time the claim adjuster reviews a claim, that
2 claim adjuster would not be required to re-verify
3 coverage?
4    A. No, sir.
5    Q. Throughout the life of the claim?
6    A. Not that I'm aware of.
7    Q. And that was the case in 2004?
8    A. Yes, sir.
9    Q. Has that changed since 2004?
10    A. Not that I'm aware of.
11    Q. Do you know who inputs or controls the
12 information that a claims adjuster would check to
13 verify coverage?
14    A. No, sir.
15    Q. Is it done by the underwriting employees
16 somewhere?
17    A. I don't know.
18    Q. How do you document that coverage is in place
19 when you first get a claim?
20    A. In my file notes.
21    Q. So it would be in your adjuster notes for this
22 claim?
23    A. Yes, sir.
24    Q. I'm going to show you H-1 again. Could you

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

---

**22**

1    MR. BESTE: I'm asking her in her
2  experience as a claims adjuster.
3    MR. CASARINO: That's different.
4    A.  We can send a letter certified.
5    Q.  Certified mail?
6    A.  Yes, sir.
7    Q.  Are there any other means of verifying that a
8  letter was sent that Harleysville uses in 2004, used
9  in 2004?
10    A.  Just in general? I mean, I'm not sure what
11  you're asking me.
12      There's occasions where we might send
13  someone a FedEx and you can track a FedEx, but I'm not
14  sure what you're asking me as far as verifying.
15    Q.  You still have H-1 in front of you. Could you
16  look at those remarks? I have seen a number of them
17  have the notation at the beginning of them SCLODFEL.
18      Do you see one or a few of those entries?
19    A.  Yes, sir.
20    Q.  Are those your entries?
21    A.  Yes, sir.
22      MR. BESTE: I'm going to have this marked
23  as H-2, please.
24      (H Deposition Exhibit No. 2 was marked for

---

**23**

1  identification.)
2  BY MR. BESTE:
3    Q.  Can you identify the document marked as H-2?
4    A.  It's a loss accord.
5    Q.  Is this something that you completed, this
6  document?
7    A.  That's something that was presented to me with
8  a new claim.
9    Q.  Who presented it to you?
10    A.  My supervisor.
11    Q.  So you're basically handed this notice and
12  that's your assignment to adjust the claim?
13    A.  Yes, sir.
14    Q.  Now, it's a little bit difficult to read. But
15  are there policy effective dates on that form?
16    A.  Yes, sir. There should be.
17    Q.  When you receive this form, do you take
18  additional steps to verify the policy effective
19  information on this notice?
20    A.  Yes, sir.
21    Q.  And it's at that point you're responsible to
22  verify coverage in Harleysville's system?
23    A.  Yes, sir.
24    Q.  Is this a paper file? Is this in an actual

---

**24**

1  claims file or is this just a computer document that
2  you have?
3    A.  It will go in a claims file.
4    Q.  You do have physical claims files that you
5  handle as a claims adjuster?
6    A.  In 2004?
7    Q.  Yes.
8    A.  Yes.
9    Q.  Has that changed?
10    A.  Yes, sir.
11    Q.  Are you all electronic now?
12    A.  Yes, sir.
13    Q.  When did that change occur? Roughly. I don't
14  need --
15    A.  This year. A few months.
16      MR. BESTE: If we can have this marked as
17  H-3, please.
18      (H Deposition Exhibit No. 3 was marked for
19  identification.)
20  BY MR. BESTE:
21    Q.  I'm handing you what's been marked as H-3.
22      Can you identify that document?
23    A.  It's the first report and acknowledgment from
24  Tower Insurance Services.

---

**25**

1    Q.  Is that a document that goes to you?
2    A.  Yes, sir.
3    Q.  What exactly is Tower Insurance acknowledging?
4    A.  That they had received the claim from us.
5    Q.  So it basically confirms that you assigned
6  Tower Insurance Services to adjust your claim as an
7  independent adjuster?
8    A.  Yes, sir.
9    Q.  Do you essentially hire Tower to investigate
10  and adjust the claim?
11    A.  Not investigate. He's only to adjust the
12  claim.
13    Q.  But Harleysville hired Tower to adjust the
14  claim?
15    A.  Yes, sir.
16    Q.  And you specifically hired Tower to adjust this
17  claim?
18    A.  Yes, sir.
19    Q.  Can you explain to me the relationship between
20  Harleysville Insurance Company, in particular to this
21  claim, can you explain to me the relationship between
22  Harleysville Insurance Company and Tower Insurance
23  Services?
24    A.  Harleysville hires Tower Insurance Services to

---

7 (Pages 22 to 25)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

---

26

1  go out and scope the damage and eventually obtain an
2  agreed cost to repair the damages.
3      Q.  An agreed cost between whom?
4      A.  An agreed cost between either the insured's
5  contractor of choice or if the insured doesn't have a
6  contractor to a local contractor who would be able to
7  do the work for a certain amount of money.
8      Q.  When you assigned this claim to Tower Insurance
9  Services, did Harleysville give Tower the authority to
10  reach an agreed price with a contractor?
11      A.  I'm not sure what you mean by "authority." My
12  instructions to Tower were to obtain an agreed cost to
13  repair.
14      Q.  Does Harleysville retain the final say on the
15  agreed cost?
16      A.  Yes, sir.
17      Q.  So correct me if I'm wrong.  But Tower
18  Insurance's role is to go out, reach an agreed cost
19  with the contractor or contractors and then get
20  approval from Harleysville on that price that they
21  agreed to.  Is that right?
22      A.  They submit that to Harleysville and then we
23  decide from there whether we agree with that.
24      Q.  Who actually hires the contractor -- I'm sorry.

---

27

1      Who actually hired the contractor with
2  respect to this claim to perform the repairs?
3      A.  I don't know.
4      Q.  Well, you understood that the repairs
5  eventually happened.  Is that right?
6      A.  I'm not sure that I did know that the repairs
7  actually happened.
8      Q.  You were not aware that G. S. Booth performed
9  any repairs on Mr. Drexel's property in this claim?
10      A.  To be honest with you, I don't remember.
11      Q.  You handle a lot of claims?
12      A.  I do.
13          MR. BESTE:  Can I have this marked as H-4?
14          (H Deposition Exhibit No. 4 was marked for
15  identification.)
16  BY MR. BESTE:
17      Q.  There's a copy for Mr. Casarino as well.
18  Sorry.
19          Can you identify the document marked as
20  H-4?
21      A.  This would be a report from Tower Insurance.
22      Q.  A report to whom?
23      A.  To me.
24      Q.  H-4?

---

28

1      A.  Wait a minute.  I'm sorry.
2          This would be our independent sending this
3  to Mr. Drexel about an attempt to contact him.
4      Q.  This would be a letter that Tower Insurance
5  Services sent to Mr. Drexel?
6      A.  Yes, sir.
7      Q.  Do you recall ever seeing that document or
8  receiving it?
9      A.  I don't remember.
10      Q.  When you're adjusting a claim and going through
11  the process of reaching an agreed cost between the
12  contractor, the independent adjuster and Harleysville,
13  what steps do you take to bring the insured into that
14  process?  Again, this is in 2004.
15          Is the insured typically involved in that
16  at all?
17      A.  Well, if the insured -- we give the insured an
18  opportunity to hire his own contractor and the best
19  scenario is to have the insured's contractor and our
20  independent adjuster come to an agreed cost of the
21  repairs.
22          If the insured doesn't have a contractor,
23  then that's when we'll solicit the opinion of a
24  reputable contractor and the independent and the other

---

29

1  contractor will get an agreed cost of repairs.
2      Q.  When an agreed cost is reached between
3  Harleysville's independent adjuster and the
4  contractor, does Harleysville take any steps to get
5  final approval for the repair work from the insured?
6      A.  I'm not sure what you're asking.
7      Q.  Hypothetically, you have in 2004 a claim and
8  you've talked to the independent adjuster.  The
9  independent adjuster says, "I have an agreed cost with
10  the contractor."
11          Would you reach out to the insured and
12  say, "We have an agreed cost; do we have authority to
13  proceed with making the repairs to your property"?
14      A.  I would get in contact with the insured and
15  say, "This is the numbers that we have come up with."
16      Q.  Do you have any specific recollection of the
17  process in Mr. Drexel's, in this claim of reaching an
18  agreed cost?
19      A.  No, sir, I don't remember.
20      Q.  Can you explain to me why you would reach out
21  to an insured when you have an agreed cost to run that
22  by him?
23      A.  Well, you would want them to know what they can
24  expect and also if by chance the insured says that he

---

8 (Pages 26 to 29)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

---

**30**

1  doesn't have his own contractor and we have an agreed
2  cost with an independent contractor, then we would
3  want to run those numbers by the insured in the event
4  that he doesn't agree and then we can go back to the
5  table and say, "Okay, why don't you agree with this?"
6         MR. BESTE: Can I have this marked as H-5,
7  please?
8         (H Deposition Exhibit No. 5 was marked for
9  identification.)
10 BY MR. BESTE:
11    Q.  Are you able to identify this document, H-5?
12    A.  No, sir.
13    Q.  Do you know who Brooke Beauman is?
14    A.  No, sir.
15    Q.  Do you know who Marc Good is?
16    A.  No, sir.
17    Q.  Have you ever heard the name S. T. Good
18 Insurance or S. T. Good?
19    A.  I don't recall.
20    Q.  Do you know whether Brooke Beauman is an
21 employee of Harleysville?
22    A.  I don't know.
23         MR. BESTE: Could I have this marked as
24 H-6, please?

---

**31**

1         (H Deposition Exhibit No. 6 was marked for
2  identification.)
3  BY MR. BESTE:
4     Q.  Are you able to identify this document?
5     A.  No, sir.
6     Q.  It's a Harleysville document, is it not?
7     A.  It has Harleysville's name on there.
8     Q.  Have you ever seen a document like this before?
9     A.  Not that I recall.
10    Q.  Are you able to tell whether this document
11 pertains to the claim or policy that we're discussing
12 today, Mr. Drexel's fire?
13    A.  Will you repeat the question?
14    Q.  Are you able to tell me whether this document
15 pertains in any way to the claim we're discussing,
16 Mr. Drexel's fire?
17    A.  I don't know.
18    Q.  Does it have a policy number on it?
19    A.  It does.
20    Q.  Are you able to look at any of the other
21 documents that I have given you today and determine
22 whether it's the same policy number that we're
23 discussing today, Mr. Drexel's fire?
24    A.  Nothing that -- you know, as far as my claim.

---

**32**

1  You've handed me this other piece of paper that I have
2  never seen before that has the same policy number on
3  it.
4     Q.  Does H-1, the adjuster remarks, contain a
5  policy number in it anywhere?
6     A.  (Reviewing document) I don't see the policy
7  number.
8     Q.  Do you know who Robert Southard is or Bob
9  Southard?
10    A.  No, sir.
11    Q.  Does Harleysville have a Chesapeake office?
12    A.  I'm not sure.
13    Q.  You've never heard anyone at Harleysville refer
14 to a Chesapeake office or anything of that sort?
15    A.  They may have.
16    Q.  So you've never seen a document such as H-6
17 before?
18    A.  Not that I recall.
19    Q.  Are you familiar with what happens within
20 Harleysville when a policy is canceled?
21    A.  No, sir.
22    Q.  If a policy were to be canceled at any time,
23 does that get entered into Harleysville's computer
24 system?

---

**33**

1     A.  Honestly, I don't know.
2         MR. BESTE: I think we're on H-7.
3         (H Deposition Exhibit No. 7 was marked for
4  identification.)
5  BY MR. BESTE:
6     Q.  Are you able to identify the document marked as
7  H-7?
8     A.  No, sir.
9     Q.  Have you ever seen a document like this before?
10    A.  Not that I recall.
11    Q.  Are you able to tell what department or office
12 at Harleysville generated this notice?
13    A.  I can't tell you what department other than it
14 looks like it's coming out of Harleysville,
15 Pennsylvania.
16         MR. BESTE: Can I have this marked as H-8?
17         (H Deposition Exhibit No. 8 was marked for
18 identification.)
19 BY MR. BESTE:
20    Q.  Are you able to identify the document marked as
21 H-8?
22    A.  This would have been my appraiser's report to
23 me.
24    Q.  And by your appraiser you mean --

---

9 (Pages 30 to 33)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

34

1    A.  Tower Insurance Services.
2    Q.  -- George Powell?
3    A.  Yes, sir.
4    Q.  Do you work with George Powell a lot?
5    A.  Not a lot.
6    Q.  During your tenure at Harleysville have you
7    handled a lot of fire claims in Delaware?
8    A.  Not a lot.
9    Q.  Are we talking two or three, twenty?  Can you
10   give me a very rough estimate?
11   A.  Two or three.
12   Q.  Can you give me a rough estimate of how many
13   times you've worked with Tower Insurance or George
14   Powell on claims?
15   A.  I can't recall.
16   Q.  Do you have any recollection of receiving this
17   interim report from Mr. Powell and Tower Insurance?
18   A.  I'm sorry.  In 2004, you know, I'm sure I did,
19   but I don't remember.
20   Q.  That's fine.  I just need to determine whether
21   you do or not.  That's all.
22        Are you able to look at this document and
23   tell me what the status of the claim was on July 30,
24   2004?

35

1    A.  It appears to be his initial estimate and he
2    was still trying to obtain an agreed cost of repairs.
3    Q.  And by "he," you're referring to Tower
4    Insurance, George Powell?
5    A.  Yes, sir.
6    Q.  Are you able to tell who he was negotiating
7    with?
8    A.  It appears G. S. Booth & Associates.
9    Q.  Do you know who G. S. Booth & Associates is?
10   A.  No, sir.
11   Q.  Are they the contractor on this claim?
12   A.  I don't know.
13   Q.  Are you able to tell from this document?
14   A.  It appears so.
15   Q.  At least at this time it appears that
16   Mr. Powell was negotiating with G. S. Booth regarding
17   an agreed price for this claim?
18   A.  It appears so.
19   Q.  Is this a document that you would have reviewed
20   during the claims process?
21   A.  Yes, sir.
22   Q.  Would you turn to the page marked DR 0432 about
23   two-thirds of the way through?  It's a letter from
24   Tower.

36

1    A.  I'm sorry.  DR 0?
2    Q.  432.
3         MR. CASARINO:  The letter to Booth?
4         MR. BESTE:  Yes.
5    BY MR. BESTE:
6    Q.  It's a letter dated August 1st to Booth
7    Insurance Restorations.
8         MR. CASARINO:  I'm a little confused here.
9    That letter is dated August 1st, but the interim
10   report is dated July 30th.
11        MR. BESTE:  He's very quick.
12        I noticed that too.  I don't know what the
13   discrepancy is.
14        MR. CASARINO:  Are you suggesting it went
15   with that package?
16        MR. BESTE:  I am suggesting that this is
17   an entire package, but I don't think that's important.
18        MR. CASARINO:  I don't know.  It may be.
19   BY MR. BESTE:
20   Q.  Have you ever seen the letter to Booth
21   Insurance Restorations marked DR 0432 and 0433?
22   A.  I don't recall.
23   Q.  With respect to this claim though, Mr. Powell
24   at Tower Insurance was adjusting the claim on

37

1    Harleysville's behalf, correct?
2         MR. CASARINO:  That's been asked and
3    answered.
4    Q.  You can answer.
5    A.  Yes.
6    Q.  And this letter was written to Booth Insurance
7    Restorations, the contractor on the job.  Is that
8    correct?
9    A.  It appears so.
10        MR. BESTE:  Can I have this marked as H-9,
11   please?
12        (H Deposition Exhibit No. 9 was marked for
13   identification.)
14   BY MR. BESTE:
15   Q.  Can you review the document marked H-9 and tell
16   me what that is?
17        MR. CASARINO:  You're asking her what her
18   understanding is about this?  Obviously it's not
19   addressed to her or from her.
20        MR. BESTE:  Yes.
21        MR. CASARINO:  Okay.
22   A.  It's a letter to Booth Insurance Restorations
23   from George Powell at Tower.
24   Q.  Is this the same letter we were just discussing

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

38

1  as far as you can tell?
2    A. I would have to go back and look at that other
3  letter.
4    Q. As of August 1st, 2004 Tower Insurance was
5  adjusting Mr. Drexel's fire damage claim on behalf of
6  Harleysville. Is that correct?
7    A. It appears that way.
8       MR. BESTE: Can I have this marked as
9  H-10, please?
10      (H Deposition Exhibit No. 10 was marked
11  for identification.)
12  BY MR. BESTE:
13    Q. Are you able to identify this document?
14    A. Final report from George Powell of Tower
15  Insurance Services.
16    Q. Do you have any recollection of receiving this
17  letter?
18    A. (Pause).
19       MR. CASARINO: Why don't you check your
20  log notes and see if it's in there?
21    A. Yes.
22    Q. And why do you say yes? What are you looking
23  at?
24    A. I'm looking on the 13th of August log entry.

39

1    Q. What time?
2    A. 11:15.
3    Q. 11:15:29?
4    A. Yes, sir.
5    Q. So the log entry on H-1 marked 8-13 at 11:15 is
6  basically your reaction to this letter marked as H-10,
7  Mr. Powell's final report?
8    A. I'm sorry. Repeat that.
9       My entry of 8-13 is my acknowledgment of
10  this (indicating) H-10?
11    Q. Yes.
12    A. Correct.
13       MR. CASARINO: You should understand there
14  is an hour difference in time.
15       MR. BESTE: I know. It makes it very
16  confusing, actually. There are some e-mails that
17  pre-date other e-mails.
18  BY MR. BESTE:
19    Q. Are you able to tell from H-10 whether Tower
20  Insurance on Harleysville's behalf had reached an
21  agreement with Booth Restorations to repair
22  Mr. Drexel's property at an agreed price?
23    A. That appears so.
24    Q. And this is essentially Mr. Powell's report to

40

1  Harleysville that an agreement had been reached
2  between Tower Insurance and Booth Restorations
3  regarding the repair price?
4    A. Yes, sir.
5    Q. What steps did you take upon receiving the
6  letter, the final report marked as H-10? Feel free to
7  refer to your notes and tell me what occurred next.
8    A. I acknowledged his report, that the estimate is
9  revised. I placed a call to him to ask if this was an
10  agreed estimate.
11    Q. You called Mr. Powell?
12    A. Yes, sir.
13    Q. Can you tell the result of that conversation?
14    A. He confirmed that he had gotten this estimate
15  agreed.
16    Q. Did you approve payment of the claim at that
17  point?
18    A. I requested approval.
19    Q. From whom do you request approval?
20    A. My supervisor.
21    Q. Mr. Riddle?
22    A. Yes, sir.
23    Q. Did you receive that approval?
24    A. Yes, sir.

41

1    Q. How can you tell that you received the
2  approval?
3    A. On 8-13-2004 at 1335 Danny has an entry note in
4  here.
5    Q. And you can tell that because of the letters
6  DRIDDLE on that particular entry?
7    A. Yes, sir.
8    Q. Again, you're referring to an entry on H-1?
9    A. Yes, sir.
10    Q. At this point in time and in particular to this
11  claim did Mr. Riddle have final authority within
12  Harleysville to authorize the repairs to Mr. Drexel's
13  property?
14    A. No one in the claims department gives authority
15  to authorize the repairs.
16    Q. Can you explain that to me?
17    A. We don't authorize repairs. We leave that to
18  the insured. It's the insured's property. If he
19  wants the repairs, he has to authorize it.
20    Q. So are you telling me that no one had authority
21  to instruct either Tower Insurance or G. S. Booth to
22  proceed with these repairs aside from Mr. Drexel?
23    A. Exactly. That's what I'm telling you. It's
24  Mr. Drexel's property. He's the only person that can

11 (Pages 38 to 41)

**EXCERPTS OF DEPOSITION OF AMBER STATON**

Amber Staton

5

1    up as canceled.  Therefore, I notified the adjuster.

2      Q.    Do you know when that occurred?

3      A.    That was in August of '04.

4      Q.    And you said you received a suffix of 02?

5      A.    Yes.

6      Q.    What does that mean?

7      A.    There's one suffix and then another suffix was

8    on the claim.

9      Q.    Does that mean that there was a new suffix

10   created?

11     A.    Yes.

12     Q.    Do you know what the suffix referenced or

13   pertained to?

14     A.    Suffix 2 is for business interruption.

15     Q.    Did you review documents before the deposition

16   today?

17     A.    No.

18     Q.    You just remember all of this?

19     A.    Yes.  Well, I did pull up the claim and

20   reviewed my suffix.  That was it.

21     Q.    And you did that yesterday or recently?

22     A.    When I first heard that I was supposed to be

23   here.

24     Q.    What were you doing when you received this

Amber Staton

7

1    Q.   And what did you learn regarding coverage and

2    whether it was in place on the date of loss when you

3    went to verify?

4    A.   When I went to verify it, it was canceled.

5    Q.   Were you able to -- do you remember when this

6    occurred?

7              MR. CASARINO:   When she looked?

8              MR. BESTE:   Yes.

9    A.   When I looked?   August.

10   Q.   Of 2004?

11   A.   Yes.

12   Q.   What specific information were you able to

13   determine about the policy at that time?

14   A.   That it was canceled a certain date.   I don't

15   remember the date.   And that's it.

16   Q.   Do you remember why it was canceled?

17   A.   Because a payment was not received on a

18   renewal.

19   Q.   And after you learned the coverage was not in

20   place on the date of loss, what did you do at that

21   point?

22   A.   Notified the adjuster.

23   Q.   That being Sherry Clodfelter?

24   A.   Yes.



Amber Staton

8

1    Q.    Do you recall when that notice to

2    Ms. Clodfelter occurred?

3    A.    In August of '04.

4    Q.    Do you remember how you did it, how you

5    notified her?

6    A.    Through e-mail.

7    Q.    I'm going to show you what's been marked as

8    H-13, which is an e-mail chain, and if you look at the

9    last e-mail on the second page.

10    A.    Yes.

11    Q.    That's your e-mail to Ms. Clodfelter?

12    A.    Yes.

13    Q.    And you sent that on August 11th?

14    A.    Correct.

15    Q.    Why were you telling Ms. Clodfelter that the

16    policy was canceled?

17    A.    It was part of my job.

18    Q.    But what was the purpose of notifying

19    Ms. Clodfelter?  To stop her from paying the claim?

20    A.    No.  Just to let her know that there was no

21    coverage.

22    Q.    Now, you used the phrase the policy was

23    canceled effective 6-8-04 for non-payment of premium.

24    A.    Right.

