# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LAYNE DREXEL,                          :
                                       :
    Plaintiff,                   :
                                       :    C.A. No. 05-00428 (JJF)
    v.                           :
                                       :    Jury Trial Demanded
HARLEYSVILLE INSURANCE CO.,            :
                                       :
    Defendant.                   :

---

### *Plaintiff's Opening Brief in Support of his Motion for Summary Judgment*

---

SMITH, KATZENSTEIN & FURLOW LLP

   */s/    Robert K. Beste*
Kathleen M. Miller (No. 2898)
Robert K. Beste, III (No. 3931)
Post Office Box 410
Wilmington, Delaware 19899
Telephone:    (302) 652-8400
Facsimile:    (302) 652-8405
Email:    rkb@skfdelaware.com

*Attorneys for plaintiff*

October 31, 2007

## *Table of Contents*

Page

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Nature and Stage of the Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    i.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    ii.     Delaware Substantive Law Governs this Dispute . . . . . . . . . . . . . . . . . . 9

    iii.    The Policy Is Clear and Unambiguous—Harleysville
              Failed to Comply with the Nonpayment Provisions's
              Ten Day Advance Notice Language . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    iv.    Even if Harleysville Can Set Forth Another Reasonable
              Interpretation of the Policy or the Nonpayment Provision,
              Drexel Is Entitled to Summary Judgment Under the
              Principle of *Contra Proferentem* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    v.      Even if the Court Holds that the Policy "Expired," Delaware
              Law Precludes the Court from Giving Effect to the Hidden
              Trap Created by the Nonpayment Provision . . . . . . . . . . . . . . . . . . . . . 20

    vi.    If the Court Determines Harleysville Insurance Failed to
              Cancel Drexel's Coverage Prior to the Fire, Drexel Is
              Entitled to Recover Attorneys' Fees, the Costs of this Suit,
              and Prejudgment Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Table of Authorities*

Cases                                                                                                      Page

*DCV Holdings, Inc. v. ConAgra, Inc.*,
    889 A.2d 954 (Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Delmarva Health Plan, Inc. v. Aceto*,
    750 A.2d 1213 (Del. Ch. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hallowell v. State Farm Mutual Automobile Insurance Co.*,
    443 A.2d 925 (Del. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-18, 20-21

*Hudson v. State Farm Mutual Automobile Insurance Co.*,
    569 A.2d 1168 (Del. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Knight v. International Longshoremen's Association*,
    286 F. Supp. 2d 360 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Little v. MGIC Indemnity Corp.*,
    836 F.2d 789 (3rd Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Moore v. Travelers Indemnity Insurance Co.*,
    408 A.2d 298 (Del. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13

*New Castle County v. National Union Fire Insurance Co.*,
    174 F. 3d 338 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12, 15, 17-18

*New Castle County v. National Union Fire Insurance Co.*,
    243 F.3d 744 (3rd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20

*Phillips Home Builders, Inc. v. Travelers Insurance Co.*,
    700 A.2d 127 (Del. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*State Farm Mutual Automobile Insurance Co. v. O'Brien*,
    535 P.2d 46 (Ariz. Ct. App. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19

*State Farm Mutual Automobile Insurance Co. v. Mundorf*,
    659 A.2d 215 (Del. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 17, 19

*Whistman v. West American of the Ohio Casualty Group of Insurance Cos.*,
    686 P. 2d 1086 (Wash. Ct. App. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

Other Authorities

6 *Del. C.* § 2301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22

18 *Del. C.* § 904 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18 *Del. C.* § 4102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

### Nature and Stage of the Proceedings

Plaintiff, Layne Drexel ("***Drexel***"), filed this action in the Superior Court of the State of Delaware, In and For New Castle County, on May 29, 2005.  The dispute centers around a policy of property insurance issued by Harleysville Mutual Insurance Company ("***Harleysville***") which provided coverage for property owned by Drexel at all relevant times, 1740 West Fourth Street in Wilmington, Delaware.  As the result of a June 22, 2004 fire, that property sustained heavy damage.  Harleysville refuses to provide insurance coverage for this damage under its policy of insurance.

Drexel's complaint sets forth four separate claims against Harleysville.  First, Drexel avers that Harleysville breached the insurance contract by refusing to provide coverage for the property damage sustained during the fire.  The second count asserts promissory estoppel and alleges that, due to its actions and the actions of its agents, Harleysville should be estopped from refusing coverage for the fire damage.  Third, Drexel avers that Harleysville Insurance had no reasonable justification to deny the fire damage claim, that it denied the claim in bad faith and, accordingly, that Harleysville breached the implied covenant of good faith and fair dealing.  If successful, that claim would permit Drexel to recover punitive damages.  Drexel also seeks attorneys' fees, costs, and prejudgment interest.  Harleysville removed the matter to this Court on June 24, 2005 on the basis of diversity of citizenship.

This is Drexel's opening brief in support of his motion for summary judgment.

*Summary of Argument*

1.    Drexel is entitled to summary judgment on his breach of contract claim, because the language of Harleysville's property insurance policy expressly requires ten days advance notice when the policy is cancelled for "nonpayment of premium."  Since Harleysville did not provide ten days advance notice of cancellation, coverage under the policy remained intact and Harleysville must provide coverage for the damage caused by the fire at issue.

2.    Drexel's interpretation of the policy language set forth in argument 1, *supra*, is a reasonable interpretation of that language.  As such, even if Harleysville manages to provide some other reasonable interpretation of the language (which it cannot), the principle of *contra proferentem* requires that the Court give effect to Drexel's reasonable interpretation of the policy language.

3.    Even if the Court Holds that the Policy "Expired," Delaware Law Precludes the Court from Giving Effect to the Hidden Trap Created by the Nonpayment Provision.

4.    If Drexel succeeds on any argument listed above, he also is entitled to attorneys' fees and other costs under 18 *Del. C.* § 4102 and pre-judgment interest pursuant to 6 *Del. C.* § 2301.

### Statement of Facts

Drexel is a Delaware resident who owned 1740 West Fourth Street in Wilmington, Delaware (the "***Property***") at all relevant times.[1]  Harleysville insured the Property against certain losses as specified in its Commercial Package Policy No. MPA 812988 (the "***Policy***").[2]  Drexel first insured the Property with Harleysville in June 1999.[3]  The Policy required Drexel to pay annual premiums in each successive year, as demonstrated by Harleysville's annual premium invoices from 2002, 2003, and 2004.[4]  Thus, commencing in 1999, Harleysville continuously insured the Property and Drexel continued to pay annual premiums.[5]  The crux of this dispute centers on the implications of Drexel's late premium payment in 2004.

The Policy contains a specific provision mandating how Harleysville can cancel coverage in the event that Drexel fails to pay his annual premium in a timely fashion (the "***Nonpayment Provision***"):

> We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation *at least*:
> a.      *10 days before the effective date of cancellation* if we cancel *for nonpayment of premium* . . . .[6]

No other provisions of the Policy detail alternate methods of policy cancellation, termination, or expiration based on Drexel's nonpayment of premium, and the Policy does not directly

---

[1]      Compl., ¶ 3 (Ex. A).

[2]      Ex. B.

[3]      *See* Ex. A, ¶ 4; Answer, ¶ 4 ("Harleysville Insurance insured Drexel's property . . . from June 1999 . . . . ") (Ex. C)).

[4]      *See* Exs. D, E, & F, respectively.

[5]      *See*, *e.g.*, *id.*

[6]      Ex. B at 481.

address the consequences of late premium payments (aside from the Nonpayment Provision).
Importantly, the Policy also does not differentiate between any types of premium
"nonpayment," such as between a renewal and a mid-year premium.   Nonetheless,
Harleysville argues here that the Policy "expired" for nonpayment of premium, as opposed
to a "cancellation" for nonpayment of premium, and that the annual premium payment should
be treated differently than mid-year premiums.  Specifically, Harleysville argues that the
Nonpayment Provision applies to mid-term premiums, but not annual premiums.  Harleysville
cannot, however, point to any language in the Policy differentiating between such events or
premiums.

On March 26, 2004, Harleysville issued its annual policy form to Drexel.[7]  In
conjunction therewith, Harleysville advised Drexel that "[w]e renew this policy for the period
[of June 8, 2004 to June 8, 2005] in return for your payment of the premium."[8]  The policy
package, however, does not expressly condition the Policy renewal on Harleysville's receipt
of the premium payment prior to the renewal date.[9]

Separately (but also on March 26), Harleysville issued its annual premium invoice for
2004 (the "***Annual Invoice***") and requested that Drexel pay his premium by June 8.[10]  In
language mirroring the Nonpayment Provision, the Annual Invoice details the *potential*
consequences of a late premium payment:

---

[7]     *Id.* at 471.
[8]     *Id.* at 472.
[9]     *Id.*
[10]    Ex. F.

**LATE PAYMENTS:**
Minimum due shown on the front of this invoice must be received by the company on or before the due date shown *to avoid issuance of a notice of cancellation for nonpayment of premium. If a cancellation notice issues*, all amounts past due plus the current installment must be paid to reinstate your policy. . . .  The company must receive this payment *before the cancellation effective date*.[11]

This language confirms the impact of the Nonpayment Provision, which requires Harleysville to provide written notice of cancellation to Drexel at least ten days before the effective date of cancellation when the cancellation is based on "nonpayment of premium" (as here).[12] Further, when a "nonpayment of premium" occurs, the Policy does not automatically expire, although the Nonpayment Provision does give Harleysville the right to cancel the Policy with sufficient advance notice.

It is undisputed that Harleysville did not receive Drexel's annual premium payment before the date listed on the Annual Invoice.  Harleysville did, however, receive and deposit Drexel's premium payment on July 13.[13]

On June 22, 2004, a fire caused heavy damage to the Property.  From Drexel's perspective, Harleysville must cover his losses from the fire because it failed to cancel the insurance coverage with at least ten days advance written notice.  This result is mandated by the language of Harleysville's own Nonpayment Provision, and Drexel's late premium payment does not change the result under the Nonpayment Provision.

Harleysville did issue notices to Drexel before and after the fire, most of which contradict Harleysville's argument that the policy "expired" for nonpayment of premium.

---

[11]     *Id.* at 2.

[12]     Ex. B at 481.

[13]     Tr. of Sept. 11, 2007 Dep. of Mildred D. Alderfer, at p. 15, lines 3–16; p. 16, lines 18–24 (Ex. G).

Harleysville issued a "Notice of Policy Expiration" on June 15, the only notice given before the fire, which indicates "we have not received your premium . . . ."[14]  Harleysville then issued a "Confirmation of Termination" on July 6, which indicates: "[t]he interest of the Loss Payee/Mortgagee will cease at the above cancellation or termination date, or 15 days from the issue date of this notice, *whichever is later*."[15]  After cashing Drexel's premium payment on July 13,[16] Harleysville then attempted to refund Drexel's premium payment with a letter indicating "this policy is cancelled and will not be reinstated"[17] (Drexel has not cashed or deposited this attempted premium refund and Harleysville continues to hold the premium payment at issue).  On September 14, Harleysville sent Drexel another letter indicating that his "policy was cancelled for non-payment of premium."[18]  Other records from Harleysville's file confirm that Harleysville cancelled the Policy for nonpayment of premium.[19]

Despite these notices, however, coverage under the Policy remained intact on the day of the fire, because Harleysville failed to provide Drexel with ten days advance notice of cancellation on or before June 12 (ten days before the fire).  This result is driven by the express terms of the Nonpayment Provision's ten day advance notice provision.[20]  As such, unless Harleysville can present evidence that it gave Drexel notice of cancellation on or

---

[14]     Ex. H.

[15]     Ex. I (emphasis added).

[16]     Ex. G at 15, lines 3–16; 16, lines 18–24.

[17]     Ex. J.

[18]     Ex. K.

[19]     Ex. L ("The policy confirmed cancellation on 7/6/04 effective for 6/30/04."); Ex. M ("The captioned policy was cancelled for non-payment of premium and we have no intention of reinstating coverage."); Ex. N ("[I] told him according to the info we have, [the] policy was cancelled due to non payment.").

[20]     Ex. B at 481 ("We may cancel this policy by mailing or delivering . . . written notice of cancellation at least: a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium.").

before June 12 (which it cannot), it failed to effectively cancel the policy prior to the fire at

issue.  Without such evidence, there are no disputes as to any material fact and summary

judgment is appropriate.

### *Argument*

As Drexel will demonstrate, the language of the Nonpayment Provision lends itself to straightforward application under the facts of this case. Alternatively, if the Court finds that Drexel's interpretation of the Nonpayment Provision is a reasonable one—even if Harleysville comes forth with another reasonable interpretation—Delaware law mandates that the Court apply Drexel's interpretation under the principle of *contra proferentem*.

### *i.      Standard of Review*

This Court articulated the standard of review applicable to Drexel's motion for summary judgment as follows:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 . . . . Thus, to properly consider all of the evidence, the "court should give credence to the evidence favoring the non-movant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-251 . . . (1986)).

> To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to show that there is more than "some metaphysical doubt as to the material facts . . . . In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 . . . (1986) (quoting Fed. R. Civ. P. 56(c)). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a

court to deny summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 252 . . . (1986).

*Knight v. Int'l Longshoremen's Assoc.*, 286 F. Supp. 2d 360, 363–64 (D. Del. 2003).

As Drexel demonstrates herein, he is entitled to summary judgment because all
material facts are undisputed and Delaware law dictates that the Court should interpret the
Policy as a matter of law.

### ii. *Delaware Substantive Law Governs this Dispute*

Harleysville, a Pennsylvania corporation, removed this action from Delaware's
Superior Court based on diversity of citizenship.[21]  The suit involves a property insurance
policy covering commercial property situated in Delaware and owned at all relevant times by
Drexel, a Delaware resident.[22]  This Court, therefore, should apply the law of the State where
the dispute arose and the Property is situated—Delaware.  *See, e.g.*, *New Castle County v.
Nat'l Union Fire Ins. Co.*, 174 F.3d 338, 342 (3rd Cir. 1999) (holding Delaware substantive
law applies to a dispute between a Pennsylvania insurer and New Castle County arising out
of policies issued to New Castle County and insuring activities in Delaware); *New Castle
County v. Nat'l Union Fire Ins. Co.*, 243 F.3d 744, 749 (3rd Cir. 2001) (same).

In these circumstances, Delaware law dictates that the interpretation of a disputed
contract is for the Court to decide as a matter of law.  *See, e.g.*, *Hudson v. State Farm Mut.
Auto. Ins. Co.*, 569 A.2d 1168, 1170 (Del. 1990) ("A court's interpretation of an insurance
policy is a determination of law.") (citation omitted).

---

[21]        D.I. 1, ¶¶ 4–6.

[22]        Ex. A, ¶¶ 1–4.

04343\BRF\10033013.WPD

### iii. *The Policy Is Clear and Unambiguous—Harleysville Failed to Comply with the Nonpayment Provisions's Ten Day Advance Notice Requirement*

On March 26, 2004, Harleysville issued the 2004 policy package and advised Drexel that "[w]e renew this policy for the period [of June 8, 2004 to June 8, 2005] in return for your payment of the premium."[23] Harleysville did not, however, condition the renewal on Drexel's payment of the premium by any specific date.[24] Although Drexel's 2004 premium payment arrived late, Harleysville nonetheless accepted that payment, deposited the check, withdrew the funds from Drexel's checking account,[25] and continues to hold those funds.

The Nonpayment Provision is clear and the Court should enforce its plain meaning. Under the Nonpayment Provision, Harleysville must provide written notice of cancellation at least ten days prior to the effective date of cancellation. The specific language provides:

> We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation *at least*:
> a.     *10 days before the effective date of cancellation* if we cancel *for nonpayment of premium* . . . .[26]

This language, by its explicit terms, applies to any "nonpayment of premium" event, and the Policy fails to exclude any types of "nonpayment of premium" from its purview.

In other words, the Policy contains no language drawing a distinction between a "cancellation" for nonpayment of premium and an "expiration" for nonpayment of premium, which is the position Harleysville takes here.[27] Further, the Policy contains no language stating (or even suggesting) that the Nonpayment Provision applies to mid-term premium

---

[23]     Ex. B at 472.

[24]     *Id.*

[25]     Ex. G at p. 15, lines 3–16; p. 16, lines 18–24.

[26]     Ex. B at 481 (emphasis added).

[27]     *Id.*, *passim*.

payments, but not annual premium payments.  Despite the complete lack of language supporting either position, Harleysville argues both that the Policy "expired" for nonpayment of premium (outside of the purview of the Nonpayment Provision) and that the Nonpayment Provision does not apply to annual premium payments.  Nonetheless, the Nonpayment Provision expressly requires Harleysville to provide ten days advance notice of cancellation when the cancellation is based upon Drexel's "nonpayment of premium,"[28] which it failed to do here.

Regardless of whether Harleysville describes the end in coverage as a "cancellation" or an "expiration," it cannot dispute that it cancelled Drexel's claim based on his "nonpayment" of the 2004 premium (or, more precisely, his failure to pay in a timely fashion).  Harleysville's own documents repeatedly confirm that this fact.  For example, Harleysville issued a "Cancellation Memorandum" on July 6, 2004, which indicates "This policy has been cancelled Flat Rate for the following reason: Non-Payment."[29]  Harleysville also wrote Drexel on September 14, 2004:

> According to our records *your policy was cancelled for non-payment of premium*.  The effective date of cancellation was 6/8/04.  Since the fire loss of 6/22/04 occurred after the cancellation date we are unable to afford you coverage under the policy.[30]

Other portions of Harleysville's claim file confirm that it cancelled the Policy based on Drexel's "nonpayment" of the 2004 annual premium.[31]  As such, Harleysville cannot seriously

---

[28]    Ex. B at 481.

[29]    Ex. O.

[30]    Ex. K.

[31]    Ex. L ("The policy confirmed cancellation on 7/6/04 effective for 6/30/04."); Ex. M ("The captioned policy was cancelled for non-payment of premium and we have no intention of reinstating coverage."); Ex. N ("[I] told him according to the info we have, [the] policy was cancelled due to non payment.").

maintain that it cancelled Drexel's policy for any reason other than his "nonpayment of premium."

When interpreting the Policy, Delaware law mandates that this Court utilize a plain meaning, common sense approach, and that it read the language in the context of the entire Policy. *See*, *e.g.*, *National Union*, 174 F.3d at 343 (applying principles of contract interpretation under Delaware law) (citations omitted). Here, there can be no dispute that Harleysville denied the claim based on Drexel's "nonpayment of premium." The Nonpayment Provision, and the Nonpayment Provision alone, identifies the *possible* consequences of such a failure—Harleysville "*may*" cancel coverage with 10 days advance notice *prior to the effective date*.[32]

No other Policy provisions are implicated here, and the Nonpayment Provision expressly requires that Harleysville give Drexel ten days advance notice when the policy is cancelled for any "nonpayment of premium." Because Harleysville failed to give Drexel such notice prior to June 12 (ten days before the fire), Drexel's insurance coverage remained in place on the day of the fire. Of course, the Court must apply the actual language of the Policy. *See National Union*, 174 F.3d at 343. In doing so, the Court should recognize that the Policy contains one, *and only one*, provision detailing the potential consequences of Drexel's "nonpayment of premium." Straightforward application of that language shows that the Policy remained in full force and effect on the date of the fire.

In attempting to draw a distinction between policy "expiration" and "cancellation," Harleysville relied upon *Moore v. Travelers Indemnity Insurance Co.*, 408 A.2d 298 (Del.

---

[32]     *See* Ex. B at 481.

1979).[33]   The *Moore* decision, however, is inapposite because it is based on Delaware's uninsured motorist statute, a statute which expressly differentiates between "cancellations" and "nonrenewals."  The *Moore* court expressly based its decision on that clear statutory distinction, a distinction which the Policy at issue here does not set forth.  *Id.* at 300 ("Title 18 *Del. C.* § 3905(a) provides . . . that: ' . . . where *cancellation* is for nonpayment of premium, at least 10 days notice of cancellation . . . shall be given.'  If absence of coverage is not the result of 'cancellation,' Section 3905(a) does not apply.  This case concerns the nonrenewal for nonpayment of a premium—not cancellation.  18 *Del. C.* § 3905(b) sets forth notice requirements in cases of 'nonrenewals.'") (citations omitted, emphasis in original).

Of greater importance, the Delaware Supreme Court specifically refused to apply the reasoning of *Moore* in a context strikingly similar to the facts here—*and it rejected the precise argument made by Harleysville.*  In *State Farm Mutual Automobile Insurance Co. v. Mundorf*, 659 A.2d 215 (Del. 1995), the court considered a policy cancellation provision set forth in Delaware's assigned risk automobile insurance plan.  That provision is substantively identical to the Nonpayment Provision:

> If the premium is not received by the company by the due date specified, the policy may be cancelled by mailing . . . a notice of cancellation *to be effective no sooner than the tenth day* following the date of notice.

*Id.* at 219 (emphasis added, citation omitted).[34]

---

[33]    *See* D.I. 41 at 6.

[34]    *See also* Ex. B at 481 ("We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least . . . 10 days before the effective date of cancellation if we cancel for nonpayment of premium . . . .").

In *State Farm v. Mundorf*, State Farm used the *Moore* decision (as Harleysville did[35]) to argue that the court should read the "cancellation" and "nonrenewal" provisions of the uninsured motorist statute into the assigned risk policy, even though the statutes were not controlling. State Farm "argue[d] that the policy was deemed 'non-renewed' for nonpayment of premium . . ." and invited the court to hold that the policy lapsed prior to the date of loss because the insured failed to pay the premium prior to the due date. *Id.* at 219. State Farm's argument in *Mundorf* matches Harleysville's argument here almost identically.

The Delaware Supreme Court rejected Harleysville's argument in unmistakable language:

> [W]e conclude that the Plan *clearly and unambiguously* mandates that an insurer send its insured a notice of cancellation when the insured *fails to renew by nonpayment of premium*. Whereas Section 3905(b) specifically excepts the insurer from its duty to give notice to the insured when the insured fails to renew for nonpayment of premium, *the Plan makes no such exception. In fact, the Plan makes no distinction between "cancellations" and "nonrenewals*." The decision to omit a provision is deemed to be purposeful. . . .
>
> If the Insurance Commissioner intended such a distinction with respect to assigned risk policies, she could have easily so provided. *The distinction may not be drawn judicially, however, in the absence of such a clearly expressed intention by the Insurance Commissioner*. . . .
>
> *The Plan states that any attempt by an insurer to terminate an assigned risk policy for nonpayment of premium will be ineffective "unless notice of cancellation for nonpayment is mailed to the named insured*." It is not the function of the court to read into, or carve out, exceptions to a clearly-worded legislative or regulatory enactment.

*Id.* at 220 (emphasis added). The reasoning behind *Mundorf* applies with equal force to Harleysville's Policy—because only one provision details the potential consequences of

---

[35] D.I. 41 at 6–7.

Drexel's "nonpayment of premium," that provision controls any cessation in coverage regardless of whether Harleysville considers the event a "cancellation" or an "expiration." In essence, because the Policy fails to distinguish between different types of nonpayment, this Court should refuse to rewrite the Policy under the guise of construing it, and apply the Nonpayment Provision as written under the plain meaning rule. *See*, *e.g.*, *National Union*, 174 F.3d at 343. Further, because the Policy fails to distinguish between nonpayment of annual and mid-term premiums, the Nonpayment Provision applies to any "nonpayment of premium," including the nonpayment at issue. *See Mundorf*, 659 A.2d at 220.

The Washington Court of Appeals interpreted substantively identical language in *Whistman v. West American of the Ohio Casualty Group of Insurance Cos.*, 686 P.2d 1086 (Wash. Ct. App. 1984). The policy at issue in *Whistman* provided: "'When you have not paid the premium . . . we may cancel at any time by notifying you at least 10 days before the date cancellation takes effect.'" *Id.* at 1088.[36] Interpreting that language, the court held:

> The reference to "premium" *is not limited to premiums paid during the term of insurance and reasonably could be read as including premiums due in order to effect renewal. . . .*
>
> [W]e construe the policy language here as requiring West to give 10 days notice prior to cancellation for failure to pay a renewal premium. Since West's notice of cancellation was not effective prior to the date of the fire loss, that loss is covered by the policy.

*Id.* at 1088–89 (emphasis added). As in *Whistman*, the Nonpayment Provision governs the impact of Drexel's nonpayment of *any* premium, and it fails to provide for differing treatment of annual premiums and mid-term premiums. The Court, therefore, should enforce the

---

[36]    *See also* Ex. B at 481 ("We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least . . . 10 days before the effective date of cancellation if we cancel for nonpayment of premium . . . .").

express language of the Nonpayment Provision and hold that Harleysville failed to cancel

Drexel's insurance coverage with the required ten days advance notice.

Prior to learning of the extensive damage to the Property, Harleysville itself

interpreted the Nonpayment Provision in the manner Drexel advances here.  In the Annual

Invoice at issue, Harleysville explained:

> **LATE PAYMENTS:**
> Minimum due shown on the front of this invoice must be received by the
> company on or before the due date shown *to avoid issuance of a notice of
> cancellation for nonpayment of premium.*[37]

As Harleysville explained, Drexel's nonpayment of premium gives Harleysville the right to

issue a cancellation notice, but does not cause automatic cancellation (or "expiration").

Lastly, the Policy contains one—*and only one*—provision detailing the impact of a

"nonpayment of premium."  Even if Harleysville Insurance could fashion an "expiration"

argument from a hodgepodge of language in the Policy (which it cannot), Delaware law

requires that Court give effect to the specific language of the Nonpayment Provision:

> Well-settled rules of contract construction require that a contract be construed
> as a whole, giving effect to the parties' intentions.  *Specific language in a
> contract controls over general language, and where specific and general
> provisions conflict, the specific provisions ordinarily qualifies the meaning of
> the general one.*

*DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) (citations omitted,

emphasis added).  *See also Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 927

(Del. 1982) ("[T]he Court will look to the reasonable expectations of the insured . . ." and

refused to enforce a policy that "contains a hidden trap or pitfall, or if the fine print takes

---

[37]      Ex. F.  *See also* Ex. I ("The interest of the Loss Payee/Mortgagee will cease at the above cancellation
or termination date, or 15 days from the issue date of this notice, whichever is later.").

away that which has been given by the large print."); *Delmarva Health Plan, Inc. v. Aceto*, 750 A.2d 1213, 1216 (Del. Ch. 1999) ("Because the procedure fits so easily within the policy's definition of covered services, an exclusion should not be lightly inferred but must rest on a 'limitation' or 'exclusion' deriving from a natural and unrestrained reading of other language in the policy.").

Here, the Nonpayment Provision specifically details the possible consequences of the "nonpayment of premium" at issue, and the Court should enforce that language as written. *See also National Union*, 174 F.3d at 343 ("'Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it,' . . . because 'creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties ha[ve] not assented.'") (citations omitted, alteration in original).

> ### iv. Even if Harleysville Can Set Forth Another Reasonable Interpretation of the Policy or the Nonpayment Provision, Drexel Is Entitled to Summary Judgment Under the Principle of Contra Proferentem

Based on the straightforward interpretation detailed above, Drexel respectfully submits that his interpretation of the Nonpayment Provision, and the Policy as a whole, is a reasonable interpretation of the language at issue. *See, e.g., Hallowell*, 443 A.2d at 926 ("[A] doctrine has emerged in insurance law which, in essence, states that an insurance policy should be construed 'to effectuate the reasonable expectations of the average member of the public who buys it . . . .'") (citation omitted).  The reasonableness of Drexel's interpretation is demonstrated not only by the language of the Policy, but also by the *Mundorf* and *Whistman* decisions explained above, both of which accepted his argument.  Moreover,

Harleysville's own pre- and post-fire interpretations of the Nonpayment Provision buttresses the reasonableness of that interpretation.[38]

If the Court agrees that Drexel's interpretation is reasonable, the principle of *contra proferentem* requires the Court to give effect to his interpretation—even if Harleysville presents another reasonable interpretation. Any alternative interpretation would demonstrate only that the Policy is ambiguous, which would require the Court to give effect to Drexel's interpretation. Under Delaware law, "'[t]he settled test for ambiguity is whether the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'" *National Union*, 174 F.3d at 344 (quoting *Phillips Home Builders, Inc. v. Travelers Ins. Co.*, 700 A.2d 127, 129 (Del. 1997)). If the Policy is susceptible to more than one reasonable interpretation:

> [D]ue to the insurer's dominant position, when an ambiguity is found in an insurance policy language, [the Court] must construe the language against the insurer as a matter of Delaware law. And therefore, unlike other types of contracts, [the Court] need not inquire into the parties' actual intent.

*National Union*, 174 F.3d at 343–44 (citations omitted). *See also Hallowell*, 443 A.2d at 926 ("[A]n ambiguity exists when the language in a contract permits two or more reasonable interpretations.") (citation omitted). Thus, as a matter of Delaware law, even if Harleysville demonstrates an alternate interpretation of the Policy is reasonable, the Court should hold that the Policy continued to provide coverage on the date of the fire.

In *State Farm Mut. Auto. Ins. Co. v. O'Brien*, 535 P.2d 46 (Ariz. Ct. App. 1975), the Arizona Court of Appeals held that substantively identical language is ambiguous and

---

[38]    Ex. F at 2 ("Minimum due shown on the front of this invoice must be received by the company on or before the due date shown to avoid issuance of a notice of cancellation for nonpayment of premium.").

susceptible to more that one reasonable interpretation.  The *O'Brien* court considered a cancellation provision which provided that: "notice of cancellation for non-payment shall be mailed to the named insured not less than 10 days prior to the effective date thereof."  *Id.* at 48, n.1.  The Court held:

> In reviewing the various policy provisions, we find that the trial court was justified in holding that the provisions are ambiguous and therefore should be construed in a manner most favorable to the insured.  *The appellant's contention that the policy automatically expired at the end of the policy period is clouded by that clause which states that cancellation for nonpayment shall not occur without prior notice.*

*Id.* at 48 (emphasis added).  The *Whistman* court, in part, also based its holding on ambiguity in substantively identical language.  *See Whistman*, 686 P.2d at 1088 ("It is a well-settled rule of construction that ambiguities in insurance policies are resolved in favor of the interpretation which provides coverage. . . . Accordingly, we construe the policy language here as requiring West to give 10 days notice prior to cancellation.") (citation omitted).

It also is noteworthy that the Nonpayment Provision sets the Policy apart from other types of insurance policies, which may naturally "expire" when not renewed.  The *O'Brien* court explained the distinction:

> Thus, it reasonably appears that appellant's policy has imposed a duty to give the insured notice that he is no longer covered.  *This point is a significant distinction because it sets the instant policy apart from the ordinary term policy which could expire without notice and makes reference to cases interpreting the usual term policy inappropriate.*

*O'Brien*, 535 P.2d at 49 (citation omitted, emphasis added).  Here, as in *O'Brien* and *Mundorf*, the Policy required that Harleysville provide *advance* notice of cancellation when coverage ceases for any "nonpayment of premium."

The *O'Brien* decision is noteworthy in another respect—the opinion was subject to a strong dissent.  The existence of dissent lends support for the conclusion that the Policy language is ambiguous (and that the Court must apply Drexel's interpretation).  *See New Castle County*, 243 F.3d at 754 ("[S]ome courts have held the language at issue is ambiguous simply because of the wide variance among judicial decisions.") (citation omitted); *Little v. MGIC Indem. Corp.*, 836 F.2d 789, 796 (3rd Cir. 1987) ("We also believe that the case law supports our reading of the policy in a somewhat different respect: that different courts have arrived at conflicting interpretations of the policy is strongly indicative of the policy's essential ambiguity.") (citation omitted).

Consequently, the principle of *contra proferentem* requires the Court to apply Drexel's interpretation of the Policy even if Harleysville comes forward with an alternate interpretation.

> ### v.    Even if the Court Holds that the Policy "Expired," Delaware Law Precludes the Court from Giving Effect to the Hidden Trap Created by the Nonpayment Provision

In the event the Court concludes the Policy "expired," then the Nonpayment Provision constitutes an unenforceable "hidden trap or pitfall."  Delaware precedent demonstrates a long history of reading insurance policies to give effect to any reasonable interpretation that the average member of the public would give its provisions.  *See, e.g., Hallowell*, 443 A.2d at 926 ("In recent decades, a doctrine has emerged in insurance law which, in essence, states that an insurance policy should be construed 'to effectuate the reasonable expectations of the average member of the public who buys it . . . .'") (citation omitted); *id.* ("As a general rule, . . . an

insurance contract is construed strongly against the insurer, and in favor of the insured, because the insurer drafted the language that is interpreted.").

This authority also requires courts to refuse to enforce policy provisions to the extent they create a "hidden trap or pitfall." *Id.* at 928 ("Therefore, we hold that the doctrine of reasonable expectations is applicable in Delaware to a policy of insurance only if the terms thereof are ambiguous or conflicting, or if the policy contains a hidden trap or pitfall, or if the fine print purports to take away what is written in large print.).  In this case, the  Policy's language expressly informed Drexel that Harleysville will provide ten days advance notice if the Policy is cancelled for "nonpayment of premium."  Further, Harleysville's Annual Invoice expressly informed Drexel that late payments gave Harleysville only the right to cancel, with advance notice.[39]  Moreover, the Policy fails to distinguish any "nonpayment of premium" from those subject to the Nonpayment Provision.  As such, the natural interpretation of the Nonpayment Provision is that, when coverage ceases for any "nonpayment of premium," Harleysville must first give advance notice.  And even if the Court were to determine the Policy can "expire" outside of the Nonpayment Provision, the Nonpayment Provision constitutes a "hidden trap or pitfall" that Delaware law refuses to enforce.  *Id.* at 927–28.

> **vi.    *If the Court Determines Harleysville Insurance Failed to Cancel Drexel's Coverage Prior to the Fire, Drexel Is Entitled to Recover Attorneys' Fees, the Costs of this Suit, and Prejudgment Interest***

If the Court determines Harleysville must provide coverage at the time of the fire, Drexel is entitled, as a matter of Delaware law, to recover the  attorneys' fees and other costs

---

[39]      Ex. F.

incurred in prosecuting this action, as a matter of law.  *See* 18 *Del. C.* § 4102 ("The court upon rendering judgment against any insurer upon any policy of property insurance, as 'property' insurance is defined in § 904 of this title, shall allow the plaintiff a reasonable sum as attorney's fees to be taxed as part of the costs."); 18 *Del. C.* § 904 ("Property insurance is insurance on real or personal property of every kind and of every interest therein against loss or damage from any and all hazard or cause, and against loss consequential upon such loss or damage, other than noncontractual legal liability for any such loss or damage.").  Further, Drexel is entitled to recover prejudgment interest under 6 *Del. C.* § 2301(a).

Drexel respectfully requests that the Court award him the attorneys' fees, the costs of suit, and prejudgment interest (from the date of denial).

### *Conclusion*

The plain, unambiguous language of Harleysville's insurance policy requires that it give Drexel ten days advance notice when his insurance coverage is cancelled based on any "nonpayment of premium." Because Harleysville failed to cancel the coverage at issue at least ten days prior to the fire, the Policy continued to provide coverage on the day of the fire, and Harleysville must cover the loss.

Moreover, even if Harleysville Insurance comes forward with an alternate, but reasonable, interpretation of the language at issue, the Court should apply the principle of *contra proferentem* and construe the policy in Drexel's favor.