# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LAYNE DREXEL,                          )
                                       )
                Plaintiff,             )
                                       ) Civil Action
v.                                     ) No. 05-428(JJF)
                                       )
HARLEYSVILLE INSURANCE CO.,            )
                                       )
                Defendant.             )


          Deposition of Harleysville Insurance Company
taken pursuant to Federal Rule of Civil Procedure
30(b)(6) through its designee MILDRED D. ALDERFER at
the law offices of Smith, Katzenstein & Furlow LLP,
800 Delaware Avenue, 10th Floor, Wilmington, Delaware,
beginning at 2:40 p.m. on Tuesday, September 11, 2007,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.


APPEARANCES:

          ROBERT K. BESTE, III, ESQ.
          SMITH KATZENSTEIN & FURLOW
            800 Delaware Avenue - 10th Floor
            Wilmington, Delaware  19899
            For the Plaintiff

          STEPHEN P. CASARINO, ESQ.
          CASARINO CHRISTMAN & SHALK
            800 North King Street - Suite 200
            Wilmington, Delaware  19801
            For the Defendant



              WILCOX & FETZER
   1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters



1              MILDRED D. ALDERFER,

2        the deponent herein, having first been

3        duly sworn on oath, was examined and

4        testified as follows:

5                    EXAMINATION

6   BY MR. BESTE:

7     Q.    Could you state your name and date of birth for

8   the record, please?

9     A.    Mildred Alderfer.  July 26, '49.

10     Q.    How long have you been an employee of

11   Harleysville Insurance Company?

12     A.    40 years.

13     Q.    Do you know approximately when you started?

14     A.    July 31, '67.

15     Q.    What position do you currently hold with

16   Harleysville?

17     A.    I'm a manager in the policy support services

18   area.

19     Q.    Is that part of underwriting?

20     A.    No.

21     Q.    That's separate from underwriting?

22     A.    Correct.

23     Q.    What's the name of it?

24     A.    Policy support services.

Mildred D. Alderfer

3

1    Q.    What does policy support services do?

2    A.    We have two areas of responsibility.    We handle

3    the direct bill premium payments.    There's a

4    remittance processing unit and an output distribution

5    unit.

6         We also handle the work when it comes off

7    the computer and mail it out.

8    Q.    Say, for example, if a claims agent wanted a

9    check mailed, your office would mail the physical

10    check?

11    A.    We do mail claims checks, yes.

12    Q.    Is the policy support services part of

13    Harleysville the division of the company that made the

14    decision in this case that this claim should not be

15    paid?

16    A.    We're not part of the claims department.    The

17    claims department is a different department, but in

18    the services area our system is set up that policies

19    will terminate or cancel for non-payment of premium,

20    so we do get involved from that aspect.

21    Q.    Was the policy support services part of

22    Harleysville responsible for the decision in this case

23    that this policy ceased to exist at a certain point or

24    whatever word we use for it?

Mildred D. Alderfer

4

1    A.    The criteria that was set up in the system that

2  if a payment is late the policy would cancel was part

3  of our responsibility.

4              For consideration for reinstatement on

5  late payment is not our responsibility, but the

6  initial notices that went out for non-payment of

7  premium would have been from work that we're

8  responsible for.

9    Q.    What part of Harleysville would be responsible

10  for reinstatement?

11    A.    It would be underwriting.

12    Q.    Are you here today to testify on behalf of the

13  underwriting parts of Harleysville?

14    A.    No.

15    Q.    Just the policy support services part?

16    A.    That's correct.

17              MR. BESTE:  Will Ms. Staton be testifying

18  on behalf of the company with respect to underwriting?

19              MR. CASARINO:  No.

20              MR. BESTE:  So we don't have an

21  underwriting person to testify today?

22              MR. CASARINO:  No.  Because when we looked

23  at your notice of deposition, these are not

24  underwriting.  They're basically policy, they're

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mildred D. Alderfer

5

1    basically policy support services.  Nothing in there

2    is underwriting as far as I can tell.

3            MR. BESTE:  So your position is that the

4    30(b)(6) deposition notice does not call for any

5    testimony from underwriting employees?

6            MR. CASARINO:  No.  That's my

7    understanding.  Originally I thought it was because

8    everybody seemed to think underwriting, but this is

9    really not underwriting.  It's all dealing with policy

10   support.

11           MR. BESTE:  Okay.

12   BY MR. BESTE:

13   Q.   I'm going to show you what's been marked as

14   H-23.  I think you already have a copy of that.

15           MR. CASARINO:  That's that one there

16   (indicating).

17   Q.   Have you seen this document before?

18   A.   Yes.

19   Q.   Can you tell me when you have seen it?

20   A.   Well, I saw it today, but I also saw it prior

21   to today.  I think it was in my file and I know I

22   started the file back in May.  I'm not sure when I had

23   this put in the file.

24           I don't recall specifically when I got

Mildred D. Alderfer

6

1    this particular notice.

2       Q.   Do you know when you first became aware of this

3    claim or lawsuit?

4       A.   I was asked to pull some things together early

5    spring.

6       Q.   Of 2007?

7       A.   Mm-hmm.  Yes.

8       Q.   By "some things together," you mean various

9    things that were part of your repertoire --

10      A.   Correct.

11      Q.   -- or area?

12      A.   Mm-hmm.

13      Q.   Why don't I go through the topics listed on

14   that deposition notice?  Let's go through them one by

15   one.

16           Did you have any meetings separate and

17   apart from meetings with any attorneys --

18      A.   No.

19      Q.   -- regarding today's deposition?

20      A.   No.

21      Q.   One rule as we go forward.  It would be a lot

22   easier for the court reporter to take down testimony

23   if you try to let me finish the questions.  And I tend

24   to hesitate a lot, so I know it can be confusing, but

Mildred D. Alderfer

7

1    it just makes it easier.  It's the most broken rule,

2    so don't worry about it.

3               You didn't have any meetings with

4    management employees or other employees of

5    Harleysville regarding your testimony today?

6    A.    No, I did not.

7    Q.    You met with Mr. Casarino immediately before

8    the deposition today.  Is that right?

9    A.    Yes.

10   Q.    Did you meet with him at any other time?

11   A.    I did not meet with him.  I had a telephone

12   conversation with him.

13   Q.    Did you have any telephone conversation with

14   other employees of Harleysville regarding this

15   deposition?

16   A.    No.

17   Q.    All right.  Let's start with topic number 1 on

18   H-23.

19               Can you tell me whether you're authorized

20   to speak on that subject?

21   A.    With respect to coverage termination for

22   non-payment of premium, yes.

23   Q.    How about the second topic?

24   A.    Again, with the payment collection, yes.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Mildred D. Alderfer

8

1    Q.    Third topic?

2    A.    With respect to, again, non-payment of premium

3    or non-payment -- canceling for non-payment of

4    premium, yes.

5    Q.    How about the fourth topic?

6    A.    Yes, again for non-payment of premium.

7    Q.    How about the fifth topic?

8    A.    Claims?  No, I would not get involved with

9    that.

10    Q.    How about the sixth topic?

11    A.    No.

12    Q.    The seventh topic?

13    A.    No.

14    Q.    The eighth topic?

15    A.    No.

16    Q.    And finally the ninth topic?

17    A.    Yes.

18    Q.    All right.  In your current position, do you

19    have any employees under your supervision?

20    A.    Yes.

21    Q.    How many employees do you supervise?

22    A.    I have five people that report to me directly

23    and two of them are supervisors who have an additional

24    22 employees reporting to them.



Mildred D. Alderfer

9

1    Q.    Who are the two supervisors that work for you?

2    A.    Joanne Brooks and Linda Ebright.

3    Q.    And who do you report to?

4    A.    Steve Crone.

5    Q.    Steve Crone is your supervisor?

6    A.    He's my manager, yes.

7    Q.    Do you know what his title is?

8    A.    Assistant vice president of agency and field

9  services.  It's just changed, but I think that's what

10  it is.

11    Q.    What position did you hold in 2004?

12    A.    Services manager position that I hold now.

13    Q.    How long have you held that position?

14    A.    About 25 years.

15    Q.    Can you give me a general description of your

16  primary responsibilities?

17    A.    Responsibilities would be overseeing the

18  remittance processing unit and output distribution

19  units, as well as I have business analysis

20  responsibilities for our corporate direct bill system

21  and our Documerge or output system that generates the

22  output that's handled in the output distribution unit.

23    Q.    You said Documerge?

24    A.    Yes.



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Mildred D. Alderfer

10

1   Q.   What's that?

2   A.   That's a system that's used to print the style

3   of paper, the style of form content that we print out.

4   It's a system.

5   Q.   The policy support services, is it a division?

6   Is it a section?  What is it?  What is it called?

7   A.   It's a department within the services division.

8   Q.   So the policy support services division is

9   where you work?

10   A.   Correct.

11   Q.   What involvement -- how about I refer to it as

12   the policy support division?  Is that fair?

13   A.   Sure.

14   Q.   What involvement does the policy support

15   division have with interpreting policy provisions?

16   A.   We would be responsible for those provisions

17   that are associated with collecting premium and

18   canceling for non-payment of premium.

19         We would not have responsibility for

20   coverages associated with a policy and that type of

21   thing.

22   Q.   But when we're talking about premium receipts,

23   your department has the final say regarding how a

24   particular policy provision applies to that aspect of

Mildred D. Alderfer

11

1   a claim?

2   A.   No.   We do not get involved with any type of

3   coverage verification for claims.

4   Q.   Well, there are provisions in Harleysville's

5   policy that deal with the impact of late premium

6   payments.   Is that correct?

7   A.   Correct.   Yes.

8   Q.   Does your division have final authority with

9   respect to the application of those provisions?

10  A.   We have provisions set up or procedures set up

11  that we follow under strict guidelines.   Anything over

12  and above that, we have to have underwriting approval

13  for us to handle beyond the specific guidelines that

14  are set up for us.

15  Q.   What guidelines do you have access to or to

16  guide your work?

17  A.   It's guidelines that tell us we can accept a

18  premium payment provided it is received by a due date

19  or an extended due date.

20  Q.   Does that have a title?   Is that a document?

21  A.   It's in our corporate direct bill procedure

22  guideline.

23  Q.   Corporate direct bill procedure guideline?

24  A.   I think it's actually called corporate direct

Mildred D. Alderfer

12

1  bill criteria.

2  Q.   Now, do you know whether that's the same

3  document that's been produced in this litigation?

4  A.   Yes.  Yes.

5         MR. CASARINO:  It may even have been the

6  last document that was marked.

7  Q.   I'm going to show you H-26.  Is that what

8  you're referring to?

9  A.   Yes.

10  Q.   Are there any other written policies or

11  procedures or manuals or anything like that that you

12  refer to in carrying out your duties for Harleysville?

13  A.   Not that I refer to, no.

14  Q.   Is H-26 a fair representation of the direct

15  bill criteria in effect in 2004?

16  A.   Yes.

17  Q.   Even though it has a date of May 2006 below it?

18  A.   Actually, this is the agent's document.

19  There's also one that was internal which is dated

20  March of 2005.  We did not have a copy from 2004, but

21  our procedures had not changed.

22         MR. CASARINO:  Are these two documents

23  different?

24         THE WITNESS:  This (indicating) is the

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Mildred D. Alderfer

13

1    agent document.  It's very similar.  There's a little

2    bit more info in the internal one that we didn't have

3    in the agent's document.

4              MR. BESTE:  Can we mark this one?

5              MR. CASARINO:  Yes.  I thought that was

6    the one I sent over to you in the last couple of days.

7              MR. BESTE:  I thought this (indicating)

8    was the one that you sent me.

9              MR. CASARINO:  I don't think so.  I think

10   you got this one before, but in any event --

11             MR. BESTE:  Well, let's mark that as H-27.

12             MR. CASARINO:  I would appreciate a copy

13   of it so I can have a copy.

14             (H Deposition Exhibit No. 27 was marked

15   for identification.)

16   BY MR. BESTE:

17    Q.   I've marked Exhibit H-27.  This is the

18   corporate direct bill criteria that establishes

19   essentially how you should do your job?

20    A.   How we should do our job, a lot of which it is

21   automated, but it's the processes that we do

22   associated with the automated system.

23    Q.   In 2004 where was the remittance processing

24   part of Harleysville located?

Mildred D. Alderfer

14

1    A.    In Harleysville, Pennsylvania, where it is now.

2    Q.    And any employees handling premium payments

3    from an insured would fall in your department?

4    A.    That's correct.

5    Q.    Can you explain to me practically the task of

6    Harleysville employees who actually receive the

7    premium payment envelopes from an insured?

8    A.    Mm-hmm.   The premium payments come into our

9    department.   They're opened on Opex opening equipment.

10   They're run through NCR remittance processing

11   equipment which captures an image of the stub and the

12   check.

13         If the payment comes in with a scannable

14   stub, the data is captured from the stub.   It is run

15   into our billing system that evening and if the master

16   is active, the payment is applied.

17         If the master is not active or can't be

18   matched for one reason, it could be an incorrect

19   policy number, it could be paid in full, any of those

20   type of situations, that comes out on a report for us

21   to look at the following day to determine what we need

22   to do with that payment.

23   Q.    What do you mean by "master"?

24   A.    Billing master.   It's an electronic view that

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Mildred D. Alderfer

15

1   we have of our activity that occurs on a direct bill

2   policy.

3     Q.    So am I correct that if the computer system

4   doesn't flag a particular payment that comes in it's

5   sent off to the bank and deposited?

6     A.    The payments are processed, are opened and run

7   through the NCR equipment and deposited to the bank

8   the same day.

9           The payment activity is then run into our

10  billing system in the overnight cycle and that's where

11  they're then applied or they go into suspense if they

12  can't be applied to be researched the following day.

13    Q.    Does that mean in all circumstances the checks

14  are deposited and then if there's an issue you deal

15  with that the next day?

16    A.    That's correct.

17    Q.    So there's no mechanism to stop a check from

18  being cashed or deposited by Harleysville prior to

19  some type of analysis by a Harleysville employee?

20    A.    That's correct.  All checks are deposited

21  first.

22    Q.    And your department gets a report every morning

23  on any issues that arose with respect to the prior

24  day's payment processing?

Mildred D. Alderfer

16

1    A.    That's correct.

2    Q.    Do you know what happened when your department

3    received the premium payment at issue in this case?

4    A.    Yes.

5    Q.    Can you explain to me what happened?

6    A.    We received a premium payment.  It came in with

7    a scannable document.  It was opened and run through

8    our equipment just like I explained.  The following

9    morning it showed up on a report for us because the

10    policy was terminated.

11         The remittance processor would have looked

12    at the billing master to see if there were any

13    messages there from the underwriter authorizing

14    reinstatement.  If there were no messages there, and

15    in this case there were not, the payment was returned

16    to the insured and reinstatement was denied because

17    the payment was late.

18    Q.    Do you know when Mr. Drexel's premium in this

19    case was received by Harleysville?

20    A.    Yes.  It was received on July 13th.  That's the

21    date it was imaged.

22    Q.    And how do you know that?

23    A.    Because of the date that it shows up in our

24    image file.

W&F

WILCOX & FETZER LTD.

Registered Professional Reporters

Mildred D. Alderfer

17

1    Q.    And you undertook some effort to verify that

2  fact before you came for a deposition today?

3    A.    Yes.

4    Q.    After that event occurred, does your department

5  retain any authority with respect to policy

6  reinstatement?

7    A.    No.

8    Q.    That, in fact, resides with the underwriting

9  department?

10    A.    That's correct.

11    Q.    Does Harleysville have an official position

12  regarding what happened to Mr. Drexel's policy at the

13  point that this premium payment was received by

14  Harleysville?

15           MR. CASARINO:   I'm not sure I understand

16  your question.   What do you mean by does it have an

17  official position?

18    A.    I don't understand.

19    Q.    Harleysville's received Mr. Drexel's premium

20  payment in July of 2004, correct?

21    A.    Correct.

22    Q.    What then happened to Mr. Drexel's policy?

23    A.    His policy was canceled and it remained

24  canceled because the payment was late.   So the

Mildred D. Alderfer

18

1  policy -- I should say it's actually terminated.  The

2  policy expired.  The renewal was not accepted.

3     Q.   Can you explain to me the difference between

4  the terms termination, cancellation and expiration?

5     A.   When we issue a renewal policy we ask for

6  premium by the due date of that renewal term.  If the

7  premium is not received, we send out an expiration

8  notice.  If payment is not received, the policy

9  terminates or expires as of the expiration date of

10 that prior term.

11          When you use the term cancellation, that's

12 midterm, somebody falls short in payments throughout

13 the policy term, that becomes a cancellation.  But in

14 this case it's a termination because no payment was

15 received on the renewal.

16    Q.   And that is Harleysville's analysis with

17 respect to Mr. Drexel's claim?

18    A.   That's correct.

19    Q.   So what you just said applies equally to

20 Mr. Drexel's policy in this case?

21    A.   Correct.

22    Q.   Are those differences between cancellation,

23 expiration and termination set forth in Mr. Drexel's

24 policy of insurance?

Mildred D. Alderfer

19

1    A.    I would not be able to answer that without

2  looking into the policy content, and I do not do that.

3    Q.    So you have no knowledge of whether the

4  distinctions that you've drawn between policy

5  cancellation and expiration are set forth in

6  Mr. Drexel's policy?

7    A.    When you refer to Mr. Drexel's policy, I'm not

8  quite sure what you're referring to.   I do know that

9  the renewal policy has a message on it that says the

10  policy will continue if payment is received by the

11  expiration date, so that is mentioned in there.

12    Q.    In where?

13    A.    On the policy declarations page.

14    Q.    And that is sent to the insured by your

15  division?

16    A.    We issue a copy of that for both the insured

17  and the agent, yes.

18    Q.    Have you reviewed the document that was sent

19  out to Mr. Drexel in this case?

20    A.    I did look at the dec. page, yes.

21    Q.    I'm going to hand you what's been marked as --

22  I don't think I marked the policy yet, did I?

23                MR. CASARINO:   No.

24                MR. BESTE:   I'm going to have this marked

Mildred D. Alderfer

20

1    as Exhibit 28, please.

2              (H Deposition Exhibit No. 28 was marked

3    for identification.)

4    BY MR. BESTE:

5      Q.    Are you able to identify this document?

6      A.    Yes.

7      Q.    What is it?

8      A.    It is the dec. or declaration page for the

9    commercial package policy.

10     Q.    You're referring to the second page?

11     A.    Yes.

12     Q.    Is this the document that you were referring

13   to?

14     A.    Yes.  It's a multipage document so, yes, it is.

15   This is page 1.

16     Q.    And by looking at the first page of H-28, are

17   you able to identify the package as a whole?

18     A.    Yes.

19     Q.    It appears to be Mr. Drexel's policy at issue

20   in this case?

21     A.    I think this is actually a certified policy.

22   And when a renewal policy is issued, the only forms

23   that are issued with the policy are anything that has

24   been changed or has a new expiration date.  He would

Mildred D. Alderfer

21

1  not receive a complete package like this at every

2  renewal.

3    Q.    Is the certified policy that you're looking at,

4  is that generated by your department as far as you

5  know?

6    A.    It could be.

7    Q.    You can't tell?

8    A.    I can't tell.  There's no name on here that

9  really lets me know who did it.

10          I do know that in our output distribution

11  unit there are times that we do put policies together,

12  but from here I can't tell if this is one that we did

13  or not.

14    Q.    If I asked you to locate in that policy where

15  the distinctions between expiration, termination and

16  cancellation are or are not spelled out, would you be

17  able to do that?

18    A.    I would be able to show you the message I was

19  referring to on the declarations page.

20    Q.    But beyond that, you couldn't?

21    A.    I would have to have someone go through it.

22          No, that's not something that I would do.

23    Q.    And you don't have any expertise in reading the

24  policy language in that regard?

Mildred D. Alderfer

22

1    A.    No, I would not.

2    Q.    What language were you referring to?

3    A.    I was referring to this message right here

4    (indicating) which says the renewal insuring

5    agreement.

6    Q.    And that's on page 472?

7    A.    Page 2 of the declaration page.

8    Q.    Okay.  During the course of processing

9    payments, does your department have any discretion

10   whatsoever as to how late premium payments are handled

11   by Harleysville?

12   A.    No.  Our guidelines are given to us by the

13   underwriting department.

14   Q.    And you report facts to underwriting and the

15   decisions regarding those facts are made exclusively

16   by the underwriting department?

17   A.    They're made by the underwriting department,

18   yes.

19   Q.    Were any notices generated in this case after

20   your department generated the premium payment at

21   issue?

22   A.    After we generated the premium payment at

23   issue?

24   Q.    I'm sorry.



Mildred D. Alderfer

23

1           Were any notices sent to Mr. Drexel by

2    your department after the premium payment at issue was

3    processed by your department?

4    A.    When we processed that late payment, yes, we

5    did send a reinstatement denied letter.

6    Q.    Have you seen that letter recently?

7    A.    Yes.

8    Q.    And it was sent to Mr. Drexel?

9    A.    That's correct.

10           MR. BESTE:  Do you know where that

11    document is, Steve?

12           MR. CASARINO:  I think it's in that

13    package.  It might be the last document there.

14           Is this (indicating) what you're referring

15    to?

16           THE WITNESS:  Yes.

17           MR. BESTE:  Which letter you just sent us,

18    Steve?  This is the letter of September 7th?  Is that

19    right?

20           THE WITNESS:  I think that's the one, yes.

21    I think that's the one it's in.  I think it's right

22    before this (indicating).

23           MR. CASARINO:  I'm not sure.  Probably.

24           THE WITNESS:  Right there (indicating).

Mildred D. Alderfer

24

1               MR. CASARINO:  Yes.

2               MR. BESTE:  I'm going to have this entire

3   letter and its contents marked as H-29.

4               MR. CASARINO:  The entire package?

5               MR. BESTE:  Yes.  It might make it easier

6   to go through.

7               MR. CASARINO:  That includes the guideline

8   too, right?

9               MR. BESTE:  I believe it did, yes.

10              (H Deposition Exhibit No. 29 was marked

11   for identification.)

12   BY MR. BESTE:

13   Q.    Now I'm showing you what's been marked as H-29.

14              And you're referring to page 11 of 14 from

15   the fax line, correct?

16   A.    Correct.  Yes.

17   Q.    If you could explain to me what this letter is.

18   A.    This letter is advising the insured that the

19   policy has not been reinstated and there is no

20   coverage.

21   Q.    And once this letter was generated by your

22   department, your department no longer had any

23   authority to change the status of this policy?

24   A.    That's correct.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Mildred D. Alderfer

25

1    Q.    And this letter informs Mr. Drexel that the

2    policy was canceled?

3    A.    That the policy has expired, it was terminated.

4          Mr. Drexel also got a termination notice

5    from us advising him that the policy had terminated.

6    This was a follow-up after that termination notice

7    advising him that we could not reinstate.

8    Q.    This letter uses the word cancellation though,

9    does it not?

10   A.    Yes, it does.

11   Q.    Was there another letter sent to Mr. Drexel

12   indicating something aside from cancellation had

13   occurred?

14   A.    These were the notices he would have received

15   advising him of notice of policy expiration.

16   Q.    And you're referring to page 4 of this exhibit?

17   A.    Correct.

18   Q.    H-29.

19          Is this notice of policy expiration

20   generated by your department?

21   A.    It's generated by our automated system.

22   Q.    Without human input?

23   A.    Correct.

24   Q.    Can you tell when this was generated?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mildred D. Alderfer

26

1    A.    This was generated on June 14th of '04 with a

2    mailing date of June 15th, '04.

3    Q.    And how can you verify that this letter was

4    sent to Mr. Drexel?

5    A.    We mailed this type of notice through our

6    Gunther automated inserting equipment.  We have a log

7    in that equipment that shows us the documents that

8    have been mailed on a particular day.  And we do have

9    the log for this showing that it was mailed on the

10   15th.

11   Q.    Does your system notify Harleysville's claims

12   employees of this event?

13   A.    No.  Not specifically, no.

14   Q.    Who at Harleysville does your department notify

15   when an event such as this occurs?

16   A.    This is generated by our automated system.  Our

17   automated system at that point goes into an expiration

18   status.  Anybody looking at the billing master can see

19   that there's an expiration notice out on that policy.

20   Q.    Who has access to the billing master?

21   A.    All employees in the company have access to

22   inquiry.  Not all have access to entry but they all

23   have access to inquiry.

24   Q.    So any Harleysville employee could have

Mildred D. Alderfer

27

1    ascertained as early as June 14th, 2004 that the

2    policy had expired?

3      A.    Yes.

4      Q.    But your department does not take any

5    affirmative steps to ensure the claims part of

6    Harleysville is aware of such an event?

7      A.    It happens automatically in the system.  The

8    system updates the billing master and again anybody

9    who has access can see that.  We do not send out any

10   kind of notification separate from what's updated in

11   the billing system.

12     Q.    Are there any safeguards or procedures that

13   prevent a claim from being paid or adjusted after an

14   event of expiration or termination?

15     A.    Since I don't work in the claims area, I cannot

16   answer that.

17     Q.    From your perspective though, your department

18   does not take any affirmative steps to prevent payment

19   of a claim after an event such expiration or

20   termination occurs?

21     A.    Correct.

22     Q.    And that was the case in 2004?

23     A.    Correct.

24     Q.    And it's the case today?

Mildred D. Alderfer

28

1    A.    Correct.

2    Q.    Do you think that should be changed?

3          MR. CASARINO:   Objection.

4    A.    I wouldn't have the authority to say that.

5    Q.    All right.  This is page 6 of 14 in the same

6    exhibit.  This is your signature at the bottom?

7    A.    Printed by the computer.

8    Q.    You don't have to sign hundreds of these every

9    day?

10   A.    No, I don't.  Thank goodness.

11   Q.    This is titled Confirmation of Termination?

12   A.    Correct.

13   Q.    Correct?

14   A.    Mm-hmm.

15   Q.    And this was issued by your department on July

16   7th.  Is that correct?

17   A.    It actually was issued on the 6th, again by the

18   automated system generated automatically.  No one had

19   to initiate it.  It was issued on the 6th and it was

20   mailed on the 7th.

21   Q.    How can you prove or show that it was mailed?

22   A.    We have no postal returns.  This particular

23   document I do not have a Gunther inserter log because

24   at that time it was not 2D bar coded to run through

Mildred D. Alderfer

29

1   the equipment because some of these notices are

2   handled with proof of mail and others are not, so back

3   in 2004 these were mailed manually.  They were put in

4   envelopes and mailed manually.

5       Q.    So you cannot point me to any proof of mailing

6   with respect to the notices sent to Mr. Drexel in this

7   case?

8       A.    Correct.

9       Q.    Can you explain to me why your department

10  issued both the June 14th notice of policy expiration

11  and the July 6th confirmation of termination?

12      A.    The expiration notice is a courtesy notice

13  reminding the insured that their payment is late.  If

14  they pay by what we're giving a grace period or an

15  extended due date, coverage will be continued without

16  lapse.

17              When you get to the extended due date,

18  plus a grace period if payment still is not received,

19  we send a notice confirming that the policy has

20  terminated and there is no coverage as of the

21  expiration date of the policy.

22      Q.    Looking at the June 14th notice of expiration,

23  can you tell me what the grace period was?

24      A.    We gave him an extended due date of June 30th.

Mildred D. Alderfer

30

1    Q.    I thought you said there was --

2    A.    In addition to that, we have a five-day grace

3    period before we truly confirm for those insureds who

4    might mail very close to that date to give mail time

5    and process time for us to handle that payment.

6    Q.    And that's why this confirmation of termination

7    was mailed on July 6th?

8    A.    That's correct.

9    Q.    Now, the July 6th confirmation of termination

10   does not appear to be a computer-generated document in

11   its entirety.  Is that correct?

12   A.    No.  That is computer-generated.

13   Q.    So the fact that the third box is checked and

14   it looks like the type is different than the type of

15   the rest of the document does not mean it was not

16   generated by a computer?

17   A.    That's correct.  This notice is used for

18   different types of cancellations and terminations and

19   depending upon the type that it is, there's a special

20   message that is put in here.  This (indicating) is all

21   preprinted information or canned information that

22   shows on every notice.

23         This is specific to the condition but,

24   again, because this matches this (indicating), it's

Mildred D. Alderfer

31

1    all the same print by the computer.

2    Q.    Can you tell me what page 7 of H-29 shows?

3    A.    This is a screen print from our inquiry, direct

4    bill inquiry system and this shows the payments that

5    we have received from this particular insured.    It

6    shows the last twelve payments.

7         In this case we had only received seven

8    payments, but it shows the payment, the date it was

9    received and the amount and then if there were any

10    associated refunds.

11    Q.    Is there any question that Harleysville cashed

12    Mr. Drexel's $283 check on June 14th?

13    A.    No.  It was cashed.  It was cashed actually on

14    the 13th, applied to the billing master on the 14th.

15    Q.    This page here, in essence, represents the

16    final word on payment receipts and processing and that

17    type of thing?

18    A.    Yes.

19    Q.    And the second page is an additional part of

20    that same printout.  Is that correct?

21    A.    That's correct.

22    Q.    Now, on that second page starting from the

23    bottom, the column showing dates, am I correct that

24    that indicates when certain events occurred?

Mildred D. Alderfer

32

1    A.    That's correct.

2    Q.    So, for example, on March 14th, 2002 a renewal

3    notice was sent to Mr. Drexel?

4    A.    Correct.

5    Q.    Are you able to tell from this document when

6    the due date was for that premium?

7    A.    Yes.  The due date is right over here.  It was

8    June 8th.  Your renewal and your invoice is issued the

9    same day.

10    Q.    So, for example, the June 11, 2003 renewal

11    invoice was sent to Mr. Drexel on June 11th?

12    A.    Correct.

13    Q.    And it showed a due date of July 8th?

14    A.    Correct.

15    Q.    Now, it looks like Harleysville received

16    payment on July 10, 2003?

17    A.    Correct.

18    Q.    And that event did not lead to any policy

19    termination or cancellation?

20    A.    That's correct.  The renewal was issued late.

21    I don't know why.  But because the renewal was issued

22    late, you still give the insured 20 days to pay, so he

23    had his 20 days, plus our grace period.  That payment

24    was received on time.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mildred D. Alderfer

33

1    Q.    So that July 10th, 2003 payment was received

2    after the due date but within the grace period?

3    A.    That's correct.

4    Q.    And the entry for June 14th, 2004 is the

5    confirmation of termination?

6    A.    That's actually the expiration notice.

7    Q.    I'm sorry.  The expiration notice?

8    A.    Yes.

9    Q.    And then the July 6th entry shows the

10   confirmation of -- I don't know what word to use with

11   you -- the confirmation of termination?

12   A.    Correct.

13   Q.    And what is the entry marked C554-3?

14   A.    That's actually the form number.  You don't

15   have it printed on here.

16         Oh, yes, we do.  Over here.  Sorry.  C54

17   is the actual form number.

18   Q.    So the two entries, the topmost entries for

19   July 6th represent an event, the cancellation and the

20   notice sent out to Mr. Drexel?

21   A.    Correct.

22   Q.    Can you identify page 9 of H-29?

23   A.    This is the stub that Mr. Drexel sent in with

24   his payment.  It's the stub from the expiration

Mildred D. Alderfer

34

1    notice.

2              Here you can see that it issued on the

3    14th, was mailed on the 15th.  It's the bottom portion

4    of the expiration notice that we had sent to him.

5    Q.    And page 10 represents Mr. Drexel's check?

6    A.    That's correct.

7    Q.    If you could kind of remind me what page 11 is.

8    A.    That's our notice denying reinstatement which

9    we sent out when we returned his payment.

10   Q.    Now, the June 14th notice is titled a notice

11   policy expiration.  The July 6th notice is titled

12   confirmation of termination, but yet in this page 11

13   it just says, and I'll quote it, "This policy is

14   canceled and will not be reinstated."

15             Can you tell me why the word "canceled" is

16   used in that document?

17   A.    This is a document that's used for all

18   situations where we're denying reinstatement and we do

19   not change the wording on here to fit the various

20   situations.

21             And I think your insureds probably

22   understand canceled as well as terminated or expired,

23   but it's a notice that's used in all those situations.

24   Q.    Mr. Drexel's policy was not in any type of

Mildred D. Alderfer

35

1  electronic payment situation, was it?

2     A.   No, it was not.

3     Q.   You were receiving paper checks from

4  Mr. Drexel?

5     A.   Yes.

6     Q.   Can you tell me whether that's the case for the

7  entire life of the policy?

8     A.   That we received checks?

9     Q.   Yes.

10    A.   Yes, we did.

11    Q.   Was there a point in time when Mr. Drexel's

12 premium was being paid out of an escrow account

13 associated with the mortgage as far as you know?

14    A.   Not that I'm aware of.  I did not go back to

15 2002 to look at that.  Not that I'm aware of.

16    Q.   During the time period when a policy is being

17 paid out of an escrow account associated with a

18 mortgage, how does that change who Harleysville gives

19 notice to of policy events?

20    A.   If there's another payer on the policy, they

21 would get copies of all associated invoices, notices

22 of expiration, confirmation.  They would receive all

23 the same notices that the insured receives.

24    Q.   Are there any circumstances where notices would

Mildred D. Alderfer

36

1  be sent to the mortgage company or escrow agent and

2  not the insured?

3    A.    No.

4    Q.    Now I'm going to ask you a question about the

5  tolerance section of the corporate direct criteria.

6  I'm sorry.  I think I'm going to have to show you

7  H-27.

8            I take that back.  H-26.  It's page 3 of 7

9  on H-26.  There's a section labeled Tolerances.

10 Within that section there's a paragraph entitled

11 Reinstatement.

12           Can you explain to me what that paragraph

13 states?

14   A.    When we issue an invoice, the insured is billed

15 for an amount of premium and also for installment

16 fees.  There are times when a payment is late, but it

17 crosses in the mail with our expiration notice or

18 non-pay notice and we will reinstate the policy with a

19 payment if it's short just the fee amount.

20   Q.    In other words, the installment fee amount?

21   A.    That's correct.

22   Q.    Does your department have any discretion

23 otherwise or is that what it is instructed to do?

24   A.    That's actually in the automated system.  The

Mildred D. Alderfer

37

1   system will automatically reinstate if the payment is

2   on time and it's within the premium, less the fee

3   amount.   That's logic that's built into the system.

4      Q.    And the employees of your department don't have

5   the ability or authority to change that aspect of the

6   system?

7      A.    That's correct.

8      Q.    If you look further down on that page, it's the

9   last sentence.   Can you explain that?   It says, "If

10  renewal is issued late, multiple installments may be

11  due at initial due date."

12              Can you explain what that sentence means?

13     A.    We always give our insureds 20 days to pay

14  their premium.   If the policy -- and your first

15  installment is due on the renewal effective date. If

16  you're, say, on a nine pay or ten pay, your second

17  installment is due the second month, the third

18  installment the third month.

19              If your renewal is issued late and you're

20  already into the first month, in order to give a

21  20-day due date you may have to bill for two

22  installments due initially or three depending on how

23  late your renewal is issued.

24     Q.    Does your department actually issue premium

Mildred D. Alderfer

38

1  invoices to the insured?

2    A.   It's all within the automated system.  It's all

3  automated.  There's logic built into the system.

4    Q.   Who controls the logic with respect to language

5  on premium invoices sent to insureds?

6    A.   That would be my area along with underwriting

7  and our law department.

8    Q.   Are there many different forms that can go out

9  to an insured when you send a premium payment or is

10  there one master form that Harleysville sends out to

11  all homeowner's policies in a given year?

12           Do you understand what I'm asking you?

13    A.   The invoice is the same for all insureds.  Now,

14  your renewal invoice might have a different message on

15  it than your interim invoice would have, but it's all

16  on the same form.

17    Q.   But all of the interim renewal notices or

18  renewal notices or premium invoices would be the same

19  collectively?

20    A.   Correct.  All printed on the same form.

21    Q.   How frequently does Harleysville, in particular

22  your department, change the content of those forms?

23    A.   Not often at all.

24    Q.   And you do take part in that process when it

Mildred D. Alderfer

39

1    occurs?

2    A.    Yes.

3    Q.    If you could turn to page 5 of H-26.

4              Can you explain to me the language

5    regarding Notice of Cancellation for Non Payment of

6    Premium section?

7    A.    We again have built within our automated system

8    a cancellation process for mid-term cancellations

9    where our system checks for policy equity and looks at

10   the premium that has been paid and for the amount of

11   time that we have provided coverage for that premium

12   payment.

13             Whenever we get into state required number

14   of days and equity, we will send out a midterm notice

15   of cancellation for non-payment of premium giving

16   state required number of days notice and again a

17   five-day grace period.

18   Q.    Can you explain to me the difference between

19   what happened to Mr. Drexel's policy and a

20   cancellation for non-payment of premium?

21   A.    A cancellation for non-payment of premium

22   occurs in the middle of a policy term.    It's midterm.

23             Mr. Drexel's was at the beginning of his

24   policy term.    He had not accepted the renewal.

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Mildred D. Alderfer

40

1    Q.    So the cancellation for non-payment of premium

2    can only occur during the course of an active policy

3    period as opposed to a renewal date?

4    A.    That's correct.

5    Q.    Are you aware of any language in Mr. Drexel's

6    policy that delineates that distinction?

7    A.    I would not be aware of that, no.

8    Q.    And who at Harleysville would be able to

9    testify regarding such language or provisions?

10    A.    That would have to be the underwriting

11    department.

12    Q.    Does your department have any discretion

13    whatsoever in identifying a particular event as either

14    an expiration or a cancellation for non-payment of

15    premium?

16    A.    Again, that's all within the automated system.

17    There's logic built into the system for when a policy

18    will expire versus non-pay.

19    Q.    Aside from adjustments to the system's logic,

20    there is no human input?

21    A.    That's correct.

22    Q.    How frequently do you adjust the logic of the

23    system?  Is it just as needed?

24    A.    Correct.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mildred D. Alderfer

41

1    Q.    Can you tell me roughly how frequently that is

2    needed?

3    A.    It's infrequent and it depends on when we get

4    new guidelines from various states, rules, regulations

5    change, number of days notice change, wording for

6    forms require a change.  We might go in and make those

7    changes, but that's again all associated with the

8    non-pay, the legal notice of non-pay, notice of

9    cancellation for non-payment of premium.

10    Q.    Is Harleysville required to give notice of

11    expiration or cancellation prior to the effective date

12    of a policy's cancellation or expiration?

13    A.    You're required to give notice for a

14    cancellation for non-payment of premium.

15            There is no requirement that I'm aware of

16    for notice of expiration.  That's a courtesy notice,

17    something that we extend to our customers.

18            MR. BESTE:  Can I have this marked as

19    Exhibit 30, please?

20            (H Deposition Exhibit No. 30 was marked

21    for identification.)

22    BY MR. BESTE:

23    Q.    Are you able to identify H-30?

24    A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mildred D. Alderfer

42

1    Q.    What is it?

2    A.    It's a renewal invoice.

3    Q.    Is this the renewal invoice sent to Mr. Drexel

4    by your department on March 26th, 2004?

5    A.    This particular invoice was mailed with the

6    policy.    The agent had the agent's mail option, so the

7    invoice and the insured's copy of the policy would

8    have been delivered to the agent for him to forward to

9    the insured.

10    Q.    What steps does Harleysville take to ensure

11    that the agent fulfills his responsibility by

12    forwarding the policy materials to the insured?

13    A.    The agent is a representative of our company

14    and that's his responsibility.    If he elects the

15    mailing option, it's his responsibility to deliver it

16    to the customer.

17    Q.    Are you able to verify whether or not

18    Mr. Drexel's agent forwarded his policy materials to

19    him in March of 2004?

20    A.    I would not be able to do that, no.

21    Q.    Does your department control the actual

22    language that is placed on this premium notice?

23    A.    There again, that would be my area along with

24    our law department and underwriting.    It's an

Mildred D. Alderfer

43

1   associated effort.

2      Q.    How involved are you with the selection and

3   placement of language in premium invoices such as

4   this?

5      A.    I can make the recommendation but, again, it's

6   a group that would actually look at it and decide what

7   changes we did want to make or not make.

8      Q.    Your department makes a recommendation to legal

9   and underwriting?

10     A.    Right.  Marketing may even get involved.  It

11  just depends on what type of wording anybody has

12  recommended that we change where that's being looked

13  at.

14     Q.    If you look at page 2 of H-30, there's a

15  paragraph there entitled Late Payments.

16             Can you explain to me what that paragraph

17  means from the perspective of your department?

18     A.    Again, it's emphasizing that payment must be

19  received by the due date for continuous coverage.  If

20  not, we could be issuing notices of cancellation.

21     Q.    Why does this language speak about a notice of

22  cancellation for non-payment of premium versus a

23  notice of expiration or something to that effect?

24     A.    It's just a standard message that's on the back

Mildred D. Alderfer

44

1    of our notices.

2        Q.    But this is, in fact, a policy renewal notice,

3    is it not?

4        A.    Yes, it is.

5        Q.    So the paragraph labeled Late Payments was

6    instructing Mr. Drexel what the potential consequences

7    of him not paying this March 26th, 2004 premium

8    invoice in a timely manner?

9        A.    Correct.    It's telling him that he may not have

10   coverage if he doesn't pay on time.

11       Q.    But it's telling him that the policy may be

12   canceled for non-payment of premium.    Isn't that

13   correct?

14       A.    Right.

15       Q.    And it does not draw any distinction between

16   cancellation or expiration?

17       A.    No, it does not.

18       Q.    Again, this was a renewal premium invoice sent

19   to Mr. Drexel?

20       A.    Yes, it was.

21       Q.    I'm going to show you page 481 of H-28.

22            MR. CASARINO:    You call it page 481?    I'm

23   sorry?

24            MR. BESTE:    That's the Bates number.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Mildred D. Alderfer

45

1             MR. CASARINO:   What's the actual number?

2             Okay.

3    BY MR. BESTE:

4      Q.    Can you explain paragraph A to me, please?

5      A.    I'm not sure that I should be interpreting

6    this.  This is not my area of responsibility.

7      Q.    That would be underwriting's responsibility?

8      A.    Right.  I mean, it says the insured can request

9    cancellation of the policy.

10     Q.    Comparing that language with the late payment

11   paragraph on the March 26th, 2004 renewal notice, is

12   it fair to say that those two paragraphs appear to

13   coincide or match one another?

14     A.    Well, your paragraph A is the customer

15   requesting cancellation.

16     Q.    A2.

17     A.    Okay.  A2 is referring to midterm cancellation.

18   I don't know that it's referring to expiration, but

19   again I should not be interpreting that.  It's not my

20   area of responsibility.

21     Q.    Again, that's underwriting's responsibility?

22     A.    That's correct.

23     Q.    Are you familiar with the term non-pay status?

24     A.    Yes.



Mildred D. Alderfer

46

1    Q.    What does that mean to you?

2    A.    A non-pay status is when a policy is in the

3    status of non-payment.

4    Q.    And that essentially prevents a payment from

5    being issued on a claim under that policy?

6    A.    Correct.

7    Q.    Does your department control under any

8    circumstances when a policy is put into non-payment?

9    A.    That's, again, generated by the system.  You

10   send out an invoice.  You have a due date.  If it's

11   not paid on time, it goes into a non-pay status and

12   then that's all generated by the system.

13   Q.    But it's your department's system that you're

14   referring to?

15   A.    Yes.

16   Q.    So in the first instance at least it's

17   controlled by your department?

18   A.    The logic that we have in the system, yes.

19   Q.    And the only people with authority to override

20   that logic is underwriting?

21   A.    Correct.

22   Q.    Does your department's computer system control

23   the effective dates of termination and cancellation

24   and expiration as well?

Mildred D. Alderfer

47

1    A.    That's underwriting providing information for

2   us from the various insurance departments that give us

3   the state required number of days notice so, again, we

4   work along with underwriting in making sure that our

5   system has the appropriate time frames.

6    Q.    But, again, that work with underwriting is

7   built into the logic of your computer system at any

8   given time?

9    A.    That's correct.

10    Q.    There's no case-by-case interaction between

11   your department and underwriting with respect to

12   processing a particular payment?

13    A.    No.  No.  That is all in the system.

14    Q.    Going back to this, let me show you what's been

15   marked as H-6.

16            Are you able to identify that document?

17    A.    No.  It's not a document that my area works

18   with.

19    Q.    It's not a document that your area processes?

20    A.    No.

21    Q.    And you have never seen a document such as

22   this?

23    A.    No.

24    Q.    Do you know who Robert Southard or Bob Southard

Mildred D. Alderfer

48

1    is?

2    A.    I believe he works in one of our field offices.

3    Q.    Do you know in what department or division?

4    A.    No, I'm sorry, I don't.

5    Q.    Do you know whether he works for underwriting?

6    A.    I would not be positive.  He's not someone that

7    I work with regularly.

8    Q.    Do you have any involvement with notices or

9    correspondence sent by the claims department to an

10   insured?

11   A.    No, I do not.

12   Q.    I'm going to show you what's been marked as

13   Exhibit H-19.

14            Are you able to identify that document?

15   A.    That's a policy system audit trail which I

16   occasionally look at.

17   Q.    Is that something that's controlled by your

18   department?

19   A.    No, it is not.

20   Q.    Do you have access to that information?

21   A.    I can look at it on inquiry, yes.

22   Q.    Do you know who else at Harleysville has access

23   to that data?

24   A.    Anyone in the underwriting or services area

Mildred D. Alderfer

49

1    would have access to inquiry of that data if they

2    would need to.

3        Q.   Do you know who controls this information

4    reflected in H-19?

5        A.   That would have to be between underwriting and

6    the commercial lines services and IT areas.

7        Q.   And as far as you know, the employees in your

8    department did not control or change any of the

9    information shown on this document?

10       A.   No.  We do not have access to change that.  We

11   only have access to inquiry.

12       Q.   When you say that, that just means to get more

13   information about certain subjects?

14       A.   We can view the data that's there, but we

15   cannot go in and change anything.

16       Q.   As far as your department is concerned, can

17   Harleysville retroactively terminate coverage or allow

18   it to expire?

19            MR. CASARINO:  I'm not sure I understand

20   your question.

21       A.   I'm trying to think how to answer that.  I'm

22   not sure I understand that.

23       Q.   Well, in this case the renewal date was June

24   8th.  Is that correct?



Mildred D. Alderfer

50

1    A.    Yes.

2    Q.    And your department did not receive

3  Mr. Drexel's premium payment until July 13th.  Is that

4  correct?

5    A.    That's correct.

6    Q.    Can you explain to me the status of

7  Mr. Drexel's policy between those two events?

8    A.    It would have been in expiration status.

9    Q.    And what does that mean?

10    A.    That means that notice has gone out that no

11  payment has been received and we have offered an

12  extended due date.

13    Q.    And if you do not get premium payment prior to

14  the expiration of the grace period following the

15  expiration or the due date, then the policy is

16  automatically canceled?

17    A.    Correct.

18    Q.    Or terminated?

19    A.    It's terminated, right.

20         MR. BESTE:  Okay.  That's all I have.

21         MR. CASARINO:  I have a couple of

22  questions for you.

23  BY MR. CASARINO:

24    Q.    Let's deal with the premium invoice that is

Mildred D. Alderfer

51

1    marked twice.  We will look at the one that's marked

2    as H-30.

3             It has on the front due dates for partial

4    payments for the entire policy period.  Is that

5    correct?

6    A.    That's correct.

7    Q.    So this premium notice, if I'm reading it

8    correctly, tells the insured the total amount of his

9    premium, how much must be paid by June 6, '04?

10            MR. BESTE:  Objection.

11   A.    It's June 8th.

12   Q.    June 8th, '04.  And then it has a schedule of

13   when payments are made or to be made?

14   A.    Correct.

15   Q.    I notice the document behind that where it

16   talks about late payments, does that refer also to

17   these various payments that are to be made?

18            MR. BESTE:  Objection.

19            MR. CASARINO:  What's the objection?

20            MR. BESTE:  Well, I think it calls for a

21   legal conclusion about the effect of that clause.

22            MR. CASARINO:  Okay.

23   BY MR. CASARINO:

24   Q.    Is that also included?



Mildred D. Alderfer

52

1          MR. BESTE:   I'm just noting it for the

2   record.

3      A.   This message prints on the back of all invoices

4   that go out so, yes, it would be on each individual

5   invoice.

6      Q.   Now let me ask you about the notice of policy

7   expiration to make sure I understand it.

8               You said your review of the document

9   indicates that this actually went out to Mr. Drexel?

10     A.   That's correct.

11     Q.   And do we know that he got it?

12     A.   That we would not know, other than we have no

13  postal return so we have to assume that he received

14  it, yes.

15     Q.   But you also mentioned earlier that your system

16  is set up so that when a check and receipt are

17  received, they go into a system that makes a copy?

18     A.   Correct.

19     Q.   Now, you have produced as document 914 the

20  bottom portion of this document that's called notice

21  of policy expiration?

22     A.   That's correct.

23     Q.   Where did you get this?

24     A.   He sent it to us, so I guess he received it.

Mildred D. Alderfer

53

1 Q. All right.  So, in other words, the bottom

2 portion of this notice called the notice of policy

3 expiration was sent back to Harleysville with

4 Mr. Drexel's check that's dated 6-7-04?

5 A. That's correct.

6 Q. So in order for you to have this in your file

7 it had to have been returned to you by Mr. Drexel?

8 A. That's correct.

9 Q. Are there any other types of documents that

10 would have been sent to Mr. Drexel advising him of his

11 premium that is due other than the documents that you

12 sent out?

13 A. Not that would have been sent by Harleysville,

14 no.

15 Q. You're saying the agent might have sent

16 something?

17 A. He could have sent something.  That would have

18 been all Harleysville would have sent.  The agent

19 could have sent him something else.  That was all that

20 Harleysville would have sent.

21 Q. So if Mr. Drexel testified that he received a

22 document telling him that his premium was due, it's

23 going to be one of the documents that you sent to him

24 or perhaps the premium invoice?

Mildred D. Alderfer

54

1          MR. BESTE:   Objection.

2    Q.    Is that correct?

3    A.    Correct.

4    Q.    And we know that he got the notice of policy

5    expiration because he sent the bottom portion back?

6          MR. BESTE:   Objection.

7    A.    Correct.

8    Q.    Now let me ask you about the extended date of

9    June 30, 2004.

10          What is the reason for extending the date?

11    A.    It's a reminder notice to the customer and

12    we're giving them a second opportunity to pay their

13    renewal premium.

14    Q.    Now, what does your computer state between June

15    8, 2004 and June 30, 2004?

16    A.    If you look at that policy on our billing

17    system, it will say that it's in expiration status.

18    Q.    Expiration status?

19    A.    Yes.

20    Q.    I believe that there's been testimony by Sherry

21    Clodfelter that when she checked the computer it said

22    active.

23    A.    She probably looked in the policy system.

24    Q.    What is the policy system?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mildred D. Alderfer

55

1    A.    The policy system is your system that shows

2    your policy detail, your coverages, your premiums and

3    that type of thing.  That's the policy system.

4              Then we also have a billing system.  This

5    particular activity took place in the billing system.

6    Q.    All right.  Now let's go to the policy system.

7              The policy system is a system that an

8    agent would look at?  Not an agent but an adjuster?

9    A.    Adjuster would look at it.  They can look at

10   either system.  I do think they more regularly look at

11   the policy system because they're also looking for the

12   types of coverages associated with that policy.

13   Q.    Would the policy system indicate that the

14   policy was active if they looked at it, for instance,

15   on June 22nd?

16   A.    Yes.

17   Q.    And when would that system be changed to

18   inactive?

19   A.    July 6th when our confirmation of termination

20   was issued.

21             MR. CASARINO:  I have nothing else.

22   BY MR. BESTE:

23   Q.    Just to follow up on that last question, so as

24   early as July 6th, 2004 claims employees would have

Mildred D. Alderfer

56

1   been able to tell if they looked in the right place of

2   their computer system that this policy had been

3   terminated or expired or canceled?

4      A.   That's correct.

5      Q.   The notice of expiration that we were just

6   talking about, was this issued directly by

7   Harleysville or was this issued by an agent?

8      A.   That's by Harleysville.

9      Q.   And it's issued directly to the insured and the

10  agent?

11     A.   Yes.

12     Q.   Mr. Casarino asked you a few questions about

13  the late payments paragraph on the second page of

14  H-30.  Is that correct?

15     A.   Correct.

16     Q.   And he asked you whether it applied to the

17  various installment dates listed on the first page.

18          Do you see anything in this document that

19  draws a distinction between the first due date of June

20  8, 2004 and any subsequent due dates listed on the

21  document?

22     A.   I'm sorry.  I don't understand your question.

23     Q.   I believe you testified that the late payments

24  provision applies to these due dates listed on the

Mildred D. Alderfer

57

1    front page?

2      A.    It prints on all invoices.  So when we send an

3    invoice out for any subsequent installments on a

4    particular policy, that same message would print on

5    the back of the invoice.

6      Q.    But did you testify that that paragraph applies

7    to the various dates listed here?

8      A.    What I meant to say was that it prints on all

9    premium invoices.  So when you send a premium invoice

10   out for any subsequent installment, that same message

11   is there.

12     Q.    Do you have any reason to believe that this

13   late payment provision did not apply to the payment

14   purportedly due on June 8th, 2004?

15     A.    I'm not sure I understand your question, again.

16   Sorry.

17     Q.    Do you have any reason to believe that the late

18   payments paragraph on page 2 does not apply to the

19   premium due on June 8, 2004?

20     A.    To me the late payment message applies to any

21   invoice that goes out that if you don't pay by the due

22   date there's going to be a consequence.

23     Q.    And in this case this notice informs Mr. Drexel

24   that it would be a cancellation for non-payment of

Mildred D. Alderfer

58

1   premium, correct?

2     A.    It does say that, yes.

3             MR. BESTE:  That's all I have.

4             MR. CASARINO:  We would like to waive.

5             (Deposition concluded at 4:05 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Mildred D. Alderfer

59

1                    I N D E X

2   DEPONENT:  MILDRED D. ALDERFER            PAGE

3       Examination by Mr. Beste              2
        Examination by Mr. Casarino           50
4       Examination by Mr. Beste              55

5

6                  E X H I B I T S

7   H DEPOSITION EXHIBITS                     MARKED

8   27 Three-page document captioned "Corporate
       Direct Bill Criteria March 2005"       13

9   28 Document Bates stamp numbered DR0470-
       0561                                   20

10

11  29 Letter to Robert K. Beste, III, Esq.
       from Stephen P. Casarino dated
       September 7, 2007                      24

12

13  30 Document Bates stamp numbered DR0609-
       0611                                   41

14

15  CERTIFICATE OF REPORTER            PAGE 60

16

17

18

19

20

21

22

23

24

Mildred D. Alderfer

60

```
 1   State of Delaware    )
                          )
 2   New Castle County    )

 3
                   CERTIFICATE OF REPORTER
 4
          I, Kurt A. Fetzer, Registered Diplomate
 5   Reporter and Notary Public, do hereby certify that
     there came before me on Tuesday, September 11, 2007,
 6   the deponent herein, MILDRED D. ALDERFER, who was duly
     sworn  by me and thereafter examined by counsel for
 7   the respective parties; that the questions asked of
     said deponent and the answers given were taken down by
 8   me in Stenotype notes and thereafter transcribed by
     use of computer-aided transcription and computer
 9   printer under my direction.

10        I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
11   examination of said witness.

12        I further certify that reading and signing of
     the deposition were waived by the deponent and
13   counsel.

14        I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
15   interested in the event of this suit.

16

17

18                  Kurt A. Fetzer, RDR, CRR

19                  Certification No. 100-RPR

20                  (Expires January 31, 2008)

21

22   DATED:

23

24
```



WILCOX & FETZER LTD.
Registered Professional Reporters

