# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LAYNE DREXEL,                          :
                                       :
    Plaintiff,                     :
                                       :    C.A. No. 05-00428 (JJF)
    v.                             :
                                       :    Jury Trial Demanded
HARLEYSVILLE INSURANCE CO.,            :
                                       :
    Defendant.                     :

---

### *Plaintiff's Answering Brief Opposing Harleysville's Motion for Summary Judgment*

---

SMITH, KATZENSTEIN & FURLOW LLP

Kathleen M. Miller (No. 2898)
Robert K. Beste, III (No. 3931)
Post Office Box 410
Wilmington, Delaware 19899
Telephone:    (302) 652-8400
Facsimile:    (302) 652-8405
Email:        rkb@skfdelaware.com

*Attorneys for plaintiff*

November 19, 2007

## *Table of Contents*

Page:

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Nature and Stage of the Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.       Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    II.     Drexel is Entitled to Summary Judgment as a Matter of
           Law on Count One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

           a.      The Policy Is Clear and Unambiguous—Harleysville
                   Failed to Comply with the Nonpayment Provisions's
                   Ten Day Advance Notice Requirement . . . . . . . . . . . . . . . . . . . . 12

           b.      The Impact of *Contra Proferentem* . . . . . . . . . . . . . . . . . . . . . . . 17

    III.    Summary Judgment Is not Appropriate for Drexel's
           Promissory Estoppel, Estoppel, and Waiver Claims Due to
           Material Issues of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           a.      Promissory Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

           b.      Equitable Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

           c.      Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Table of Authorities*

Cases:                                                                                    Page:

*Billops v. Magness Construction Co.*,
    391 A.2d 196 (Del. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Blackwell v. Farmers Insurance Exchange*,
    2005 WL 1595246 (Ohio Ct. App.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Borish v. Granam*,
    655 A.2d 831 (Del. Super. Ct. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Chrysler Corp. v. Chaplake Holdings, Ltd.*,
    822 A.2d 1024 (Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Dial v. Astropower, Inc.*,
    2000 WL 1211135 (Del. Super. Ct.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Dimenco v. Selective Insurance Co. of America*,
    833 A.2d 984 (Del. Super. Ct. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16–17

*Finnegan Construction Co. v. Robino-Ladd Co.*,
    354 A.2d 142 (Del. Super. Ct. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Fogle v. Le Mars Mutual Insurance Co. of Iowa*,
    2001 WL 709905 (Iowa Ct. App.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*George v. Frank A. Robino, Inc.*,
    334 A.2d 223  (Del. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hallowell v. State Farm Mutual Automobile Insurance Co.*,
    443 A.2d 925 (Del. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Iagar v. Transportation Insurance Co.*,
    2003 WL 22849756 (Mich. Ct. App.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Knight v. International Longshoremen's Association*,
    286 F. Supp. 2d 360 (D. Del. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Konitzer v. Carpenter*,
    1993 WL 562194 (Del. Super. Ct.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20–21

*Little v. MGIC Indemnity Corp.*,
    836 F.2d 789 (3rd Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lord v. Peninsula United Methodist Homes, Inc.*,
    2001 WL 392237 (Del. Super. Ct.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lord v. Souder*,
    748 A.2d 393 (Del. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Mauck v. Merchants' & Manufacturers' Fire Insurance Co.*,
    54 Atl. 952 (Del. Super. Ct. 1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Moore v. Travelers Indemnity Insurance Co.*,
    408 A.2d 298 (Del. Super. Ct. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*New Castle County v. National Union Fire Insurance Co.*,
    174 F.3d 338 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Progressive Northerwestern Insurance Co. v. Torres*,
    1999 WL 956693 (Conn. Super. Ct.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ralston v. American Family Mutual Insurance Co.*,
    2004 WL 2952677 (Iowa Ct. App.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*State Farm Mutual Automobile Insurance Co. v. O'Brien*,
    535 P.2d 46 (Ariz. Ct. App. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 18

*State Farm Mutual Automobile Insurance Co. v. Mundorf*,
    659 A.2d 215 (Del. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13–15, 18

*Vanaman v. Milford Memorial Hospital, Inc.*,
    272 A.2d 718 (Del. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Waggoner v. Laster*,
    581 A.2d 1127 (Del. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wahl v. Country Mutual Insurance Co.*,
    640 N.W.2d 689 (N.D. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Whistman v. West America of the Ohio Casualty Group of Insurance Cos.*,
    686 P.2d 1086 (Wash. Ct. App. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14–15, 18

Other Authorities:

Federal Rule of  Civil Procedure 56(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

### Nature and Stage of the Proceedings

Plaintiff, Layne Drexel ("***Drexel***"), filed this action in the Superior Court of the State of Delaware on May 29, 2005.  Harleysville removed the matter to this Court on June 24, 2005, based of diversity of citizenship.  The dispute centers around a policy of property insurance issued by Harleysville Mutual Insurance Company ("***Harleysville***") which provided coverage for property owned by Drexel, 1740 West Fourth Street in Wilmington, Delaware.  As the result of a June 22, 2004 fire, that property sustained heavy damage. Harleysville refuses to provide insurance coverage for the damage under its policy of insurance.

Drexel's complaint sets forth four separate claims against Harleysville.  First, Drexel avers that Harleysville breached the insurance contract by refusing to provide coverage (the "***breach of contract claim***").  The second count asserts promissory estoppel and alleges that, due to its actions and the actions of its agent, Harleysville should be estopped from refusing coverage for the fire damage (the "***promissory estoppel claim***").  Third, Drexel avers that Harleysville Insurance had no reasonable justification to deny the fire damage claim, that it denied the claim in bad faith and, accordingly, that Harleysville breached the implied covenant of good faith and fair dealing.  If successful, that claim would permit Drexel to recover punitive damages.  Drexel also seeks attorneys' fees, costs, and prejudgment interest.

On October 31, 2007, Drexel filed his Opening Brief in Support of His Motion for Summary Judgment.  The parties agree that summary judgment with respect to the breach of contract claim is appropriate.  For the breach of contract claim, the only fact that must be established for Drexel to succeed on his summary judgment application is that Harleysville

failed to provide ten days advance notice before cancelling Drexel's policy for nonpayment of premium.  Harleysville has never asserted it gave such notice and, as such, summary judgment is appropriate.

Nonetheless, Harleyville separately moved for summary judgment on Drexel's promissory estoppel, estoppel, and waiver claims.[1]  This is Drexel's Answering Brief Opposing Harleysville's Motion for Summary Judgment.  As will be explained herein, the facts surrounding the promissory estoppel, estoppel, and waiver claims are disputed by the parties, preventing summary judgment.  Because it is unclear from Harleysville's argument and brief precisely which of these assertions it is seeking summary judgment on, Drexel will address all three claims herein.

---

[1]      D.I. 60.

### *Summary of Argument*

1.     The Policy at issue required Harleysville to provide advance notice of cancellation before terminating Drexel's coverage based on a "nonpayment of premium."  Because Harleysville failed to provide that advance notice, it must cover the fire loss at issue.

2.     At a minimum, the Nonpayment Provision is ambiguous, which requires the Court to apply Drexel's interpretation of that provision.

3.     Material issues of fact prevent summary judgment on Drexel's claims of promissory estoppel, estoppel, and waiver.

### *Statement of Facts*

Drexel is a Delaware resident who owned 1740 West Fourth Street in Wilmington, Delaware (the "***Property***").[2]  Harleysville insured the Property against certain losses as specified in its Commercial Package Policy No. MPA 812988 (the "***Policy***").[3]  Drexel first insured the Property with Harleysville in June 1999.[4]  Between 1999 and the fire at issue, Harleysville continuously insured the Property and Drexel paid annual premiums.[5]  This litigation centers on the implications of, under the terms of the Policy, Drexel's late premium payment in 2004.

The Policy contains a provision which permits Harleysville to cancel coverage if Drexel fails to pay a premium in a timely fashion (the "***Nonpayment Provision***"):

> We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation *at least*:
> a.    *10 days before the effective date of cancellation* if we cancel *for nonpayment of premium . . . .*[6]

No other provisions of the Policy addresses policy renewal, cancellation, termination, or expiration.  No other provision of the Policy addresses the consequences of a late premium payment.  Importantly, the Policy also does not differentiate between any types of premium "nonpayment," such as between a renewal and a mid-year premium.

Nonetheless, Harleysville argues here that the Policy "expired" for nonpayment of premium, and that the Nonpayment Provision does not apply to annual premiums payments.

---

[2]      Compl. at ¶ 3 (Ex. A).

[3]      Ex. B.

[4]      *See* Ex. A at ¶ 4; Answer at ¶ 4 ("Harleysville Insurance insured Drexel's property . . . from June 1999 . . . . ") (Ex. C)).

[5]      *See*, *e.g.*, *id.*

[6]      Ex. B at 481.

Despite a complete absence of language in the Policy supporting its argument, Harleysville argues that the Nonpayment Provision applies only to mid-term premiums.

On March 26, 2004, Harleysville issued its annual policy form to Drexel and advised him that "[w]e renew this policy for the period [of June 8, 2004 to June 8, 2005] in return for your payment of the premium."[7]  The policy package does not expressly condition the renewal on Harleysville's receipt of the premium payment prior to the renewal date.[8]  Also on March 26, Harleysville issued a separate annual premium invoice for 2004 (the "***Annual Invoice***") and requested that Drexel pay his premium by June 8 (again, coverage is not explicitly dependent on timely receipt of a premium payment).[9]  In language mirroring the Nonpayment Provision, the Annual Invoice details the *potential* consequences of a late premium payment:

> **LATE PAYMENTS:**
> Minimum due shown on the front of this invoice must be received by the company on or before the due date shown *to avoid issuance of a notice of cancellation for nonpayment of premium.  If a cancellation notice issues*, all amounts past due plus the current installment must be paid to reinstate your policy. . . .  The company must receive this payment *before the cancellation effective date*.[10]

This language confirms the impact of the Nonpayment Provision, which requires Harleysville to provide written notice of cancellation to Drexel at least ten days before the effective date of cancellation when the cancellation is based on "nonpayment of premium" (as here).[11]  Further, when a "nonpayment of premium" occurs, the Policy does not

---

[7]     *Id.* at 471–72.

[8]     *Id.*

[9]     Ex. D.

[10]    *Id.* at 2 (emphasis added).

[11]    Ex. B at 481.

automatically expire, although the Nonpayment Provision does give Harleysville the right to cancel the Policy with sufficient advance notice. It is undisputed that Harleysville did not receive Drexel's annual premium payment before the date listed on the Annual Invoice.

On June 22, 2004, a fire caused heavy damage to the Property. From Drexel's perspective, Harleysville must cover his losses because it failed to cancel the insurance coverage with at least ten days advance written notice. This result is mandated by the Nonpayment Provision, and the late premium payment does not change the result. Thus, unless Harleysville can show that it notified Drexel of the coverage cancellation before June 12, which is ten days before the June 22 fire, the Policy remained active at the time of the fire. Without such evidence, and because none of the foregoing facts are disputed by Harleysville, summary judgment is appropriate with respect to the breach of contract claim.

Harleysville also seeks summary judgment with respect to Drexel's promissory estoppel, estoppel, and waiver claims. The following facts are relevant to those issues, and those issues alone.

After receiving notice of the fire at issue, Harleysville assigned one of its employees, Sherry Clodfelter ("***Clodfelter***"), to manage claims brought by Drexel.[12] Clodfelter's first step in managing the claim was to verify that Drexel's insurance coverage was active as of the date of loss, which she did on June 23, 2004.[13] Once Clodfelter initially confirmed

---

[12]    Tr. of Aug. 30, 2007 Dep. of Sherry Clodfelter, at p. 23, lines 11–13 (Ex. E).

[13]    Ex. E at p. 11, 16–18; Tr. of Carey D. Riddle, at p. 20–21 (Ex. F); Tr. of Theodore G. Parker, at p. 27 (Ex. G).

coverage was in place on the date of loss, Harleysville's employees are never required to again verify coverage was active on the date of loss.[14]

Next, Clodfelter hired an independent claims adjuster to adjust the claim, George Powell ("***Powell***") of Tower Insurance Services ("***Tower Services***").  Through Clodfelter, Harleysville retained Tower to "go out and scope the damage and eventually obtain an agreed cost to repair the damages" with a contractor.[15]  On June 29, 2004, Tower formally notified Drexel that "[o]ur firm has been assigned by your insurance company, The Harleysville Insurance Company, for investigation and adjustment of the insurance claim that you have presented, for damages that you have experienced at the above property."[16]

Drexel was visiting the Pocono Mountains when the June 22, 2004 fire occurred,[17] and Powell contacted him by telephone after Harleysville hired him to adjust the claim.[18] When Drexel returned from his trip, he received a payment notice from Harleysville and sent Harleyville check number 4359 to cover the premium.[19]  Although Harleysville claims it sent other notices to Drexel, he was not aware of any problems with his insurance coverage until August 12 or 13, when the repairs to the property were almost complete.[20]  More importantly, none of Harleysville's claims employees were aware of any purported problems

---

[14]     Ex. E at 16–17; Ex. F at 18; Ex. G at 30.

[15]     Ex. E at 25–26, 36–37; Ex. F at 24; Ex. G at 42–43.

[16]     Ex. H.

[17]     Tr. of Aug. 15, 2007 Dep. of Layne Drexel, at 17 (Ex. I).

[18]     Ex. I at 21–22.

[19]     Ex. J; Ex. I at 24–25.

[20]     Ex. I at 42.

with Drexel's policy until August 13, and they continued to adjust the claim during that period.[21]

Unknown to Harleysville's claims department (and Drexel), Harleysville's payment processing division became aware of Drexel's late premium payment long before anyone at Harleysville notified its claims employees. As early as June 14, Harleysville's computer generated and (purportedly[22]) issued a "Notice of Policy Expiration" based on the fact that Drexel's premium payment was late.[23] It then issued and (purportedly) sent a "Confirmation of Termination" on July 6 based on Drexel's nonpayment of premium.[24] These events were logged into Harleysville's computer system, and any Harleysville employee could have accessed that information as early as July 6.[25] Despite these events, Harleysville never notified Clodfelter or the claims department of the cancellation and she continued to manage the claim through August 13.[26] Even so, Harleysville immediately deposited Drexel's late premium payment when it arrived on July 13.[27] To date, Harleysville retains the premium payment at issue.[28]

Early in the claim process, Drexel identified G. S. Booth & Associates ("**_G. S. Booth_**") as the contractor who would repair his property.[29] As the claim and repair process was explained to Drexel by Powell and G. S. Booth, they would handle all aspects of the

---

[21]    Ex. G at 28, 30–31.

[22]    Drexel does not recall receiving any such notice. Ex. I at 42.

[23]    D.I. 60 at Ex. B.

[24]    Ex. K.

[25]    Tr. of Sept. 11, 2007 Dep. of Mildred D. Alderfer at 55–56 (Ex. L).

[26]    Ex. E at 39; Ex. L at 26.

[27]    Ex. L at 16.

[28]    Ex. M.

[29]    Ex. I at 50.

repairs, and Powell would determine how much Harleysville would pay to repair the damages.[30]  According to Drexel's paraphrasing, G. S. Booth told him "we'll take care of everything, you don't have to do anything.  It won't cost you any money . . . ."[31]  Harleysville, through Tower Services, immediately offered to pay Drexel approximately $10,000 for the clean-up costs and his estimated lost rent while the repairs were underway.[32]  Moreover, Harleysville's claims department directly promised Drexel that it would pay for the repairs to the Property.[33]

As promised, Tower Services and Booth handled all aspects of the negotiations surrounding the "agreed price" that Harleysville would pay for the repairs.[34]  During July 2004, Tower Services and Booth discussed certain issues surrounding the repair cost and attempted to reach an agreed price.[35]  In the interim, Drexel gave Booth permission to perform the necessary repairs on the property,[36] and Tower notified Harleysville of that consent on July 30.[37]  As of July 30, however, Tower Services and Booth had not finalized the agreed price.[38]  Nonetheless, on August 1, Tower Services directed Booth to begin the repairs even without a final agreement as to price:

> *Certainly, Mr. Drexel is encouraged to begin repair activity for this fire* that occurred over one month ago and both Mr. Drexel and tenant Patel are very anxious to begin however, as we do not have an agreed price for repair nor

---

[30]    *Id.* at 53.

[31]    *Id.* at 51.

[32]    *Id.* at 45–46.

[33]    *Id.* at 64, 74.

[34]    *Id.* at 61–62.

[35]    Ex. N at 371.

[36]    Ex. O.

[37]    Ex. N at 371.

[38]    *Id.*

a response to our questions, we can not recommend at this time that an advance be issued.[39]

With that consent, Booth began the repairs.

By August 13, Booth and Tower Services reached a final agreement on the "agreed price" for the repairs, which were nearly complete at that time. Tower Services notified Harleysville of the agreed price and requested payment.[40] In conjunction therewith, Tower Services issued its final invoice and report to Harleysville.[41] In response, Clodfelter and her supervisor, Danny Riddle, authorized payment of the repair costs on August 13.[42] Later that day (but after the repairs were nearly complete), Harleysville's claims department suddenly realized that Harleysville's payment processing division purportedly had cancelled Drexel's policy on July 6.[43] Clodfelter's supervisor instructed her to stop payment on the check.[44]

Again, neither Tower Services nor Harleysville notified Drexel that Harleysville would refuse to pay this claim until August 13, when the repairs were nearly complete.[45] The timing of this notice is critical, because Drexel would have performed the vast majority of the needed repairs himself—were it not for the payment promises made by Tower Services and Harleysville that Harleysville would pay for the repair costs.[46]

To date, Harleysville refuses to pay the agreed cost of the repairs.

---

[39]    Ex. P (emphasis added). *See also* Ex. G at 106.

[40]    Ex. Q.

[41]    *Id.*

[42]    Ex. F at 25, 37.

[43]    Ex. G at 55.

[44]    Ex. E at 59.

[45]    Ex. I at 42.

[46]    *Id.* at 53, 55–60.

*Argument* [47]

As explained in Drexel's Opening Brief in Support of his Motion for Summary Judgment,[48] Drexel seeks summary judgement with respect to Count I (breach of contract) and Court IV (attorneys' fees).[49]  As such, Drexel agrees with Harleysville that the Court should decide the breach of contract claim as a matter of law.  Harleysville, however, also seeks summary judgment on Count II, which asserts Harleysville is estopped from denying coverage for the loss at issue under the doctrine of promissory estoppel.  Several issues of material fact prevent summary judgment on that issue.  To the extent Harleysville seeks summary judgment on Drexel's assertions of waiver and estoppel (its brief is not clear), factual disputes also prevent summary judgment on these issues.

## I.    Standard of Review

This Court articulated the standard of review applicable to Harleysville's motion for summary judgment as follows:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976).  However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 . . . .  Thus, to

---

[47]    In its brief, Harleysville does not address the choice of law issue and, as such, Drexel assumes that Harleysville agrees that Delaware law governs all aspects of this dispute.  To the extent the Court considers that issue, Drexel incorporates the arguments supporting his motion for summary judgment on that issue.  *See* D.I. 63 at 9.

[48]    D.I. 63.

[49]    Ex. A.

properly consider all of the evidence, the "court should give credence to the evidence favoring the non-movant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-251 . . . (1986)).

To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to show that there is more than "some metaphysical doubt as to the material facts . . . . In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 . . . (1986) (quoting Fed. R. Civ. P. 56(c)). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 . . . (1986).

*Knight v. Int'l Longshoremen's Assoc.*, 286 F. Supp. 2d 360, 363–64 (D. Del. 2003).

## II.    Drexel is Entitled to Summary Judgment as a Matter of Law on Count One

### a.    The Policy Is Clear and Unambiguous—Harleysville Failed to Comply with the Nonpayment Provisions's Ten Day Advance Notice Requirement

As explained fully in Drexel's Opening Brief in Support of his Motion for Summary Judgement,[50] the insurance policy at issue required Harleysville to give ten days advance notice if it cancels Drexel's policy for any "nonpayment of premium." This Nonpayment Provision is clear and the Court should enforce its plain meaning:

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation *at least*:
a.    *10 days before the effective date of cancellation* if we cancel *for nonpayment of premium* . . . .[51]

By the explicit terms of this provision, which is the only provision impacting the dispute, Harleysville must show that it delivered written notice of cancellation on or before June 12,

---

[50]    D.I. 63.

[51]    Ex. B at 481 (emphasis added).

2004 (ten days before the fire at issue) in order to survive Drexel's motion for summary judgment. It cannot make that showing.

To avoid confusing the record and restating his arguments, Drexel incorporates his arguments set forth in the Opening Brief in their entirely herein.[52] Drexel will, by way of rebuttal, address the legal arguments set forth by Harleysville in its brief supporting its motion for summary judgment.

First, Harleysville argues that *State Farm Mutual Automobile Insurance Co. v. Mundorf*, 659 A.2d 215 (Del. 1995) impacts the question before the Court (which it does but for different reasons, *see* D.I. 63 at 13–15). In doing so, Harleysville cites *Mundorf* for the proposition that "[u]nless there is a policy or statutory direction to the contrary, an insurer is not under a legal duty to give the insured notice of the expiration of an insurance policy, and the insurer is not obligated to renew the policy automatically." *Id.* at 217-18 (citations omitted). This is a sound statement of Delaware law and, in a vacuum, an insurer writing homeowner policies in Delaware is not required to give advance notice before a policy expires, at least where there are no policy provisions or statutes requiring such notice.

Harleysville's problem here, however, is that Drexel's policy *does contain* "a policy . . . direction to the contrary"—the Nonpayment Provision. *Id. See also State Farm Mut. Auto. Ins. Co. v. O'Brien*, 535 P.2d 46, 49 (Ariz. Ct. App. 1975) ("Thus, it reasonably appears that appellant's policy has imposed a duty to give the insured notice that he is no longer covered. This point is a significant distinction because it sets the instant policy apart from the ordinary term policy which could expire without notice and makes reference to

---

[52]    D.I. 63 at 10–21.

cases interpreting the usual term policy inappropriate.) (citation omitted, emphasis added).

The Nonpayment Provision, which fails to distinguish between renewal and mid-term

premiums, required Harleysville to give advance notice of cancellation in all circumstances

where coverage ends based on "nonpayment of premium."

In *Mundorf*, the existence of a provision comparable to the Nonpayment Provision

caused the Delaware Supreme Court to reject the very argument Harleysville advances here:

> [W]e conclude that the Plan clearly and unambiguously mandates that an
> insurer send its insured a notice of cancellation when the insured *fails to
> renew by nonpayment of premium*.  Whereas Section 3905(b) specifically
> excepts the insurer from its duty to give notice to the insured when the
> insured fails to renew for nonpayment of premium, *the Plan makes no such
> exception.  In fact, the Plan makes no distinction between "cancellations"
> and "nonrenewals.*"  The decision to omit a provision is deemed to be
> purposeful. . . .
>
> If the Insurance Commissioner intended such a distinction with respect to
> assigned risk policies, she could have easily so provided.  *The distinction
> may not be drawn judicially, however, in the absence of such a clearly
> expressed intention* by the Insurance Commissioner. . . .
>
> *The Plan states that any attempt by an insurer to terminate an assigned risk
> policy for nonpayment of premium will be ineffective "unless notice of
> cancellation for nonpayment is mailed to the named insured*."  It is not the
> function of the court to read into, or carve out, exceptions to a clearly-worded
> legislative or regulatory enactment.

*Mundorf*, 659 A.2d at 220 (emphasis added).  Of course, Harleysville failed to mention this

critical aspect of the *Mundorf* decision.   The result here, however, should be no different

than in *Mundorf*—the Policy requires advance notice of cancellation when the cancellation

is based on *any* "nonpayment of premium," regardless of whether Harleysville calls it a

"cancellation" or an "expiration."  *Id.*  Other courts have reached holdings nearly identical

to the result sought by Drexel.  *See Whistman v. W. Am. of the Ohio Cas. Group of Ins. Cos.,*

686 P.2d 1086, 1088–89 (Wash. Ct. App. 1984) ("The reference to 'premium' is not limited to premiums paid during the term of insurance and reasonably could be read as including premiums due in order to effect renewal."); *O'Brien*, 535 P.2d at 48 ("The appellant's contention that the policy automatically expired at the end of the policy period is clouded by that clause which states that cancellation for nonpayment shall not occur without prior notice.").  Because Harleysville is unable to show it gave Drexel notice of cancellation at least ten days before the fire, summary judgment in Drexel's favor is appropriate here.

Harleysville also cites *Moore v. Travelers Indemnity Insurance Co.*, 408 A.2d 298 (Del. Super. Ct. 1979) to argue that the Nonpayment Provision does not apply to policy renewal premiums.[53]  The *Moore* decision, however, should not impact the Court's decision because that decision applied a statutory scheme that specifically mandated different treatment of "cancellations" and "nonrenewals." *Moore*, 408 A.2d at 300 ("It is apparent that the General Assembly did not intend for the terms 'nonrenewal' and 'cancellation' to be synonymous.  Indeed, throughout Chapter 39 of Title 18, the terms are referred to in the alternative.").  *See also Mundorf*, 659 A.2d at 218 (Section 3905 "specifically excepts . . . those cases in which a policy is not renewed because of the insured's failure to pay the renewal premium . . . .  In such cases, no notice to the insured is required.").  In this case, however, only one provision of the Policy details the impact of a "nonpayment of premium." Accordingly, that provision governs all policy "terminations," "expirations," or "cancellations" when those events are based on "nonpayment of premium." *See*, *e.g.*, *Mundorf*, 659 A.2d at 220; *Whistman*, 686 P.2d at 1088–89; *O'Brien*, 535 P.2d at 48.

---

[53]      *See* D.I. 60 at 7–8.

Many of the cases cited by Harleysville are distinguishable and do not directly apply to this case. For example, the policies in several cases contained a specific "nonrenewal" provision which is not present in the Policy at issue here. *See Wahl v. Country Mut. Ins. Co.*, 640 N.W.2d 689, 693 (N.D. 2002) ("If we elect not to renew this policy, we will mail to the . . . Insured . . . a notice of intention not to renew at least 30 days prior to the expiration date of the policy."); *Blackwell v. Farmers Ins. Exchange*, 2005 WL 1595246, at *5 (Ohio Ct. App.) ("Its policy contains both a cancellation provision and a non-renewal provision.) (Ex. R); *Ralston v. Am. Family Mut. Ins. Co.*, 2004 WL 2952677, at *3 (Iowa Ct. App.) ("This policy will automatically terminate at the end of the policy period if you or your representative do not accept our offer to renew it. Your failure to pay the required renewal premium when due means that you have declined our offer.") (Ex. S); *Fogle v. Le Mars Mut. Ins. Co. of Iowa*, 2001 WL 709905, at *2 (Iowa Ct. App.) ("If we offer to renew or continue and you . . . do not accept, this policy will automatically terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due shall mean that you have not accepted our offer.") (incorrectly cited as *Adams v. Lemars* by Harleysville) (Ex. T). Other cases cited by Harleysville lack relevance because the policies did not contain a provision comparable to the Nonpayment Provision. *See Mauck v. Merchs.' & Mfrs.' Fire Ins. Co.*, 54 Atl. 952 (Del. Super. Ct. 1903); *Iagar v. Transp. Ins. Co.*, 2003 WL 22849756 (Mich. Ct. App.) (Ex. U); *Progressive Nw. Inc. Co. v. Torres*, 1999 WL 956693 (Conn. Super. Ct.) (Ex. V). Finally, *Dimenco v. Selective Insurance* fails to change the result here because the insurer actually complied with an advance notice requirement that is similar to the Nonpayment Provision by providing advance notice of cancellation.

*Dimenco v. Selective Ins. Co. of Am.*, 833 A.2d 984, 989 (Del. Super. Ct. 2002) ("Not less than 10 days' written notice shall be mailed to the insured at the insured's last known address of the intent of the premium finance company to cancel the insurance contract . . . .").

In sum, the Nonpayment Provision mandated that Harleysville give Drexel advance notice of policy termination when the termination was based on "nonpayment of premium." Because Harleysville failed to provide such notice ten days before the fire at issue, Drexel's coverage continued and Harleysville must cover the fire loss under the insurance policy at issue.

    **b.**  ***The Impact of Contra Proferentem***

As explained in Drexel's Opening Brief,[54] Delaware law requires that the Court give effect to Drexel's interpretation of the Policy when he offers a reasonable interpretation (even where another reasonable interpretation exists). *See, e.g.*, *New Castle County v. Nat'l Union Fire Ins. Co.*, 174 F.3d 338, 343–44 ("[D]ue to the insurer's dominant position, when an ambiguity is found in an insurance policy language, [the Court] must construe the language against the insurer as a matter of Delaware law. And therefore, unlike other types of contracts, [the Court] need not inquire into the parties' actual intent."); *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982) ("[A] doctrine has emerged in insurance law which, in essence, states that an insurance policy should be construed 'to effectuate the reasonable expectations of the average member of the public who buys it . . . .'") (citation omitted). *See also id.* at 926 ("[A]n ambiguity exists when the language in a contract permits two or more reasonable interpretations.") (citation omitted). Thus, if the

---

[54]   D.I. 63 at 17–20.

Court agrees that Drexel's interpretation of the Nonpayment Provision is a reasonable one, that reasonable interpretation controls the result.

Admittedly, Harleysville cites two opinions which accepted its argument regarding the Nonpayment Provision's application to a renewal premium.[55] Under *contra proferentem*, however, that authority disagreeing with the holdings of *Mundorf*, *Whistman*, and *O'Brien*[56] actually bolsters Drexel's argument that the Nonpayment Provision, at a minimum, is ambiguous. That is because judicial disagreement in interpreting policy language is "strongly indicative" of ambiguity in the language being considered. *Little v. MGIC Indem. Corp.*, 836 F.2d 789, 796 (3rd Cir. 1987) ("We also believe that the case law supports our reading of the policy in a somewhat different respect: that different courts have arrived at conflicting interpretations of the policy is strongly indicative of the policy's essential ambiguity.") (citation omitted). *See also New Castle County v. Nat'l Union Fire Ins. Co.*, 243 F.3d 744, 754 (3d Cir. 2001) ("[S]ome courts have held the language at issue is ambiguous simply because of the wide variance among judicial decisions.") (citation omitted). If the Court reaches that issue, the fact that the *O'Brien* opinion was subject to a strong dissent lends further support for the conclusion that the Nonpayment Provision is ambiguous. *See O'Brien*, 535 P.2d at 50–51.

---

[55]    *See* D.I. 60 at 7 (citing *Sitto Enters., Inc. v. Badger Mut. Ins. Co.*, 414 F. Supp. 2d 700 (E.D. Mich 2006)) and 9 (citing *Luedke v. Audubon Ins. Co.*, 874 So.2d 1029 (Miss. Ct. App. 2004)). The *Sitto* opinion also can be distinguished because the insurer sent notices to its insured informing him the policy would expire. *See id.* at 701–02).

[56]    *See Mundorf*, 659 A.2d at 220; *Whistman*, 686 P.2d at 1088–89; *O'Brien*, 535 P.2d at 48.

### III.    Summary Judgment Is not Appropriate for Drexel's Promissory Estoppel, Estoppel, and Waiver Claims Due to Material Issues of Fact

Turning to Drexel's claims of promissory estoppel, estoppel, and waiver, Drexel can present sufficient evidence on each claim to survive Harleysville's motion for summary judgment.  In fact, the evidence supporting all three claims is nearly identical.  To wit:

(1)    As the claim and repair process was explained to Drexel by Powell (Harleysville's agent) and G. S. Booth, they would handle all aspects of the repairs, and that Powell would determine how much Harleysville would pay to repair the damages;[57]

(2)    For all purposes relating to the fire damage claim, Tower Services acted as the agent for Harleysville;[58]

(3)    Harleysville, through Tower Services, immediately offered to pay Drexel approximately $10,000 for the clean-up costs and his estimated lost rent while the repairs were underway;[59]

(4)    Harleysville directly promised Drexel that it would cover the losses;[60]

(5)    Tower Services and Booth handled all aspects of the negotiations surrounding the "agreed price" that Harleysville would pay for the repairs;[61]

(6)    On August 1 Tower Services directed Booth to begin repairs before they reached an "agreed price" ("Certainly, Mr. Drexel is encouraged to begin repair activity for this fire that occurred over one month ago . . . .");[62]

(7)    On August 13, Booth and Tower Services reached a final agreement on the "agreed price" for the repairs, and Tower Services notified Harleysville of this fact and requested payment;[63]

---

[57]    Ex. I at 53.

[58]    Ex. E at 25–26, 36–37; Ex. F at 24; Ex. G at 42–43; Ex. H.

[59]    Ex. I at 45–46.

[60]    Ex. I at 64, 74.

[61]    Ex. I at 61–62.

[62]    Ex. P. *See also* Ex. G at 106.

[63]    Ex. Q.

(8)     Clodfelter and her supervisor, Danny Riddle, authorized payment of the repair costs on August 13;[64]

(9)     Harleysville accepted and cashed Drexel's late premium payment and retains those funds to date.[65]

Despite all of this evidence, Harleysville moved for summary judgment; yet it failed to explain in what respect Drexel cannot satisfy the standards of a promissory estoppel claim. Nonetheless, Drexel will explain how these facts present fact questions rendering summary judgment inappropriate.

> a.     *Promissory Estoppel*

Under Delaware law, the elements of a promissory estoppel claim are: (1) that Harleysville promised to pay the fire damage claim; (2) that Harleysville reasonably should expect that its promise would induce action or forbearance by Drexel; (3) that Drexel reasonably relied on the promise and took action to his detriment; and (4) that the promise is binding because injustice can be avoided only by enforcement of the promise. *See*, *e.g.*, *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000) (citation omitted). Only the fourth element presents a question of law for the Court to decide. *See*, *e.g.*, *Chrysler Corp. v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1034 (Del. 2003) ("The avoidance of injustice element is, however, a legal concept and not a question of fact to be submitted to the jury.") (citation omitted). Conversely, elements one through three are facts questions for the jury's consideration. *See*, *e.g.*, *Konitzer v. Carpenter*, 1993 WL 562194, at *7 (Del. Super. Ct.) ("'[A]ny application for [summary] judgment must be denied if there is a reasonable

---

[64]      Ex. F at 25, 37.

[65]      Ex. L at 16.

04343|BRF|10033784.WPD                    20

hypothesis by which the opposing party can recover . . . .'") (Ex. W) (quoting *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)).

A fact dispute plainly exists with respect to the first element, whether Harleysville promised to pay for the fire damage. Harleysville's claims department expressly told Drexel it would pay for the repairs to the property.[66] Tower Services, Harleysville's agent,[67] handled the negotiations with G. S. Booth,[68] reached an agreed price with G. S. Booth,[69] and instructed G. S. Booth to begin repairs before the "agreed price" was finalized by Tower Services and G. S. Booth.[70] Tower Services and Harleysville even offered to pay a $10,000 on the repair costs and lost rents when Drexel first presented his claim.[71]

Even standing alone, many of the these facts present sufficient evidence to overcome Harleysville's motion for summary judgment. *See*, *e.g.*, *Lord v. Peninsula United Methodist Homes, Inc.*, 2001 WL 392237, at *3 (Del. Super. Ct.) ("'Whether such a promise was made, however, is a question of fact necessarily determined by a jury.'") (Ex. X) (quoting *Konitzer*, 1993 WL 562194, at *7); *Dial v. Astropower, Inc.*, 2000 WL 1211135, at *6 (Del. Super. Ct.) ("[I]t appears best to let the jury determine whether or not there was a definitive

---

[66]     Ex. I at 64, 74.

[67]     Ex. E at 25–26, 36–37; Ex. F at 24; Ex. G at 42–43; Ex. H. Harleysville cannot dispute that Tower Services acted as its agent with, at a minimum, apparent authority to bind Harleysville to pay this claim. *See*, *e.g.*, *Billops v. Magness Const. Co.*, 391 A.2d 196, 197 (Del. 1978) ("Actual authority is that authority which a principal expressly or implicitly grants to an agent.") (citation omitted); *Finnegan Const. Co. v. Robino-Ladd Co.*, 354 A.2d 142, 144 (Del. Super. Ct. 1976) ("Apparent authority may be defined as that authority which, though not actually granted, the principal knowingly or negligently permits the 'agent' to exercise or which he holds him out as possessing."). If Harleysville does dispute agency, that dispute also presents a question of fact for trial, rendering summary judgment inappropriate. *See*, *e.g.*, *Billops*, 391 A.2d at 199 ("Questions of apparent authority are questions of fact and are, therefore, for the jury to determine.").

[68]     Ex. I at 61–62.

[69]     Ex. Q.

[70]     Ex. P. *See also* Ex. G at 106.

[71]     Ex. I at 45–46.

assurance or an implied promise made . . . .") (Ex. Y).  Together, these facts unquestionably present an issue of fact.

Ample evidence also exists on the remaining factual elements of a promissory estoppel claim.  First, based on the facts showing that Harleysville promised to pay for the repairs listed above, Harleysville should have expected that those promises would induce action or forbearance by Drexel.  This plainly is a factual dispute—whether Harleysville reasonably should expect these promises, statements, and events to cause Drexel to change his position in some way.  Further, it is clear that these promises did, in fact, lead Drexel to refrain from performing the repairs himself, which shows actual forbearance by Drexel.[72]

Based on this evidence of record, Drexel respectfully requests that the Court deny Harleysville's motion for summary judgment as it pertains to his promissory estoppel claim.

### b.    *Equitable Estoppel*

The requirements under Delaware law for an equitable estoppel claim are similar to those supporting Drexel's promissory estoppel claim.  *See*, *e.g.*, *Waggoner v. Laster*, 581 A.2d 1127, 1136 (Del. 1990) ("The doctrine of equitable estoppel may be invoked 'when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment.'") (citation omitted); *Borish v. Granam*, 655 A.2d 831, 834 (Del. Super. Ct. 1994) (same).

In this case, the evidence supporting Drexel's claims that Harleysville promised to pay for the fire damage would allow a jury to conclude that those statements and events

---

[72]    Ex. I at 53, 55–60.

caused detrimental reliance—Drexel asserts that he incurred substantial additional cost by allowing Booth to repair the property.[73]  At a minimum, factual issues surround that issue.

    *c.*     *Waiver*

As with promissory estoppel and estoppel, Drexel's assertion that Harleysville, through its actions, waived any right it had to insist on timely premium payments presents questions of fact which are for the jury to consider.  *See, e.g.*, *George v. Frank A. Robino, Inc.*, 334 A.2d 223, 224  (Del. 1975) ("It is for the jury to say whether . . . conduct under the circumstances of this case evidenced an intentional, conscious and voluntary abandonment of his claim or right. . . .  Summary judgment is inappropriate where, as here, the inference or ultimate fact to be established concerns intent or other subjective reactions.") (citation omitted).

Here, Harleysville's payment processing division attempted to cancel Drexel's insurance coverage as early as June 14, 2004,[74] and any claims employee immediately had access to that fact through Harleysville's computer system.[75]  Despite that fact, Harleysville and its agent Tower Service continued to adjust the claim until August 13, 2004 (even authorizing payment)[76] when the repairs were nearly complete.[77]  Finally, Harleysville cashed Drexel's premium payment and retains those funds.[78]  Accordingly, a fact question exists regarding whether Harleysville, through its actions and the actions of its agent, waived

---

[73]    *Id.* at 53, 55–60.

[74]    D.I. 60 at Ex. B.

[75]    Ex. L at 55–56.

[76]    Ex. F at 25, 37.

[77]    Ex. Q.

[78]    Ex. L at 16.

any right it had to insist that Drexel pay his insurance premium by June 8, 2004.  *See*, *e.g.*,

*George*, 334 A.2d at 224.

*Conclusion*

As explained herein, the unambiguous language of Harleysville's insurance policy requires that it give Drexel ten days advance notice when his insurance coverage is cancelled based on any "nonpayment of premium."  Because it failed to do so, the Policy continued to provide coverage on the day of the fire, and Harleysville must cover the loss.

Moreover, even if Harleysville Insurance comes forward with an alternate reasonable interpretation of the Nonpayment Provision, the Court should apply the principle of *contra proferentem* and construe the Policy in Drexel's favor.  Judicial disagreement surrounding the proper interpretation of the Nonpayment Provision shows that, at a minimum, the Nonpayment Provision is ambiguous in the circumstances presented in this matter.  If the Court so concludes, Delaware law requires that Drexel's interpretation of that provision controls the result.

Finally, summary judgment is inappropriate with respect to Drexel's assertions of promissory estoppel, estoppel, and waiver.

SMITH, KATZENSTEIN & FURLOW LLP

    */s/    Robert K. Beste*
Kathleen M. Miller (No. 2898)
Robert K. Beste, III (No. 3931)
Post Office Box 410
Wilmington, Delaware 19899
Telephone:    (302) 652-8400
Facsimile:    (302) 652-8405
Email:         rkb@skfdelaware.com

*Attorneys for plaintiff*

November 19, 2007