**EXHIBIT E**



WILCOX & FETZER LTD.

## In the Matter Of:

# Drexel

## v.

# Harleysville Insurance Co.

## C.A. # 05-428 (JJF)

---

## Transcript of:

## Sherry Clodfelter

## August 30, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


LAYNE DREXEL,                      )
                             )
        Plaintiff,         )
                             ) Civil Action
v.                         ) No. 05-428(JJF)
                             )
HARLEYSVILLE INSURANCE CO.,   )
                             )
        Defendant.        )


        Deposition of SHERRY CLODFELTER taken
pursuant to notice at the law offices of Smith,
Katzenstein & Furlow LLP, 800 Delaware Avenue, 10th
Floor, Wilmington, Delaware, beginning at 10:05 a.m.,
on Thursday, August 30, 2007, before Kurt A. Fetzer,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

      ROBERT K. BESTE, III, ESQ.
      SMITH KATZENSTEIN & FURLOW
        800 Delaware Avenue - 10th Floor
        Wilmington, Delaware  19899
        For the Plaintiff

      STEPHEN P. CASARINO, ESQ.
      CASARINO CHRISTMAN & SHALK
        800 North King Street - Suite 200
        Wilmington, Delaware  19801
        For the Defendant

ALSO PRESENT:
      CAREY DANIEL RIDDLE


              WILCOX & FETZER
   1330 King Street -  Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com

Drexel v. Harleysville Insurance Co.

2

1    SHERRY CLODFELTER,
2    the deponent herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    EXAMINATION
6  BY MR. BESTE:
7    Q.  Good morning, Ms. Clodfelter.  Am I
8  pronouncing that right?
9    A.  Yes, sir.
10    Q.  My name is Rob Beste.  I represent the
11  plaintiff, Layne Drexel, in this matter.
12        Have you ever had your deposition taken
13  before?
14    A.  Yes, sir.
15    Q.  What circumstances led to your prior
16  depositions?
17    A.  It was an insurance claim.
18    Q.  Have you had it taken once?  Is that right?  Or
19  has it been more than once?
20    A.  More than once.
21    Q.  How many times?
22    A.  Twice before.
23    Q.  Do you know what years those depositions
24  occurred?

3

1    A.  No, sir.
2    Q.  Can you recall what the two cases were about?
3    A.  The first case was a personal injury where I
4  was involved as a pedestrian.  I was hit, struck by a
5  car.  That was the first.
6    Q.  So you were a plaintiff in that suit?
7    A.  I was a plaintiff.
8    Q.  What state was that lawsuit brought in?
9    A.  Tennessee.
10    Q.  And the second deposition?
11    A.  That was an insurance claim and you, know, it
12  was a property claim that I handled.
13    Q.  Do you know how long ago that was?
14    A.  I don't recall.
15    Q.  You don't recall any of the specifics of that
16  claim?
17    A.  Well, I do.  I don't know how much you want me
18  to get into.
19    Q.  Just a general understanding of what kind of
20  case it was.
21    A.  It was supposedly a theft claim where someone
22  had stolen some parts out of computers and these
23  computers belonged to a small business school and they
24  alleged that the school went under because of the

4

1  theft of a couple of parts from two computers.
2    Q.  I really only have one ground rule as we go
3  forward.  I'm going to be asking you a series of
4  questions, obviously.  If at any time you do not
5  understand the question I'm asking you, I would ask
6  you to let me know that.
7        I probably will ask a lot of bad questions
8  here this morning, but if you don't understand me,
9  just let me know and I'll try to clarify what I'm
10  asking you.  Okay?
11    A.  Okay.
12    Q.  Can you give me your name, age and date of
13  birth?
14    A.  Sherry Nolia Clodfelter.
15    Q.  Could you spell your middle and last names?
16    A.  N-o-l-i-a C-l-o-d-f-e-l-t-e-r.
17        My birth date is 3-23-1958.  I'm 49 years
18  old.
19    Q.  Where do you presently live?
20    A.  Mount Juliet, Tennessee.
21    Q.  Where do you work?
22    A.  Harleysville Insurance Company.
23    Q.  Is that in Mount Juliet?
24    A.  No, sir.  That's in Nashville, Tennessee.

5

1    Q.  Nashville.  How long have you worked at the
2  Nashville facility for Harleysville?
3    A.  I worked for Harleysville from 1986 to 2005 and
4  went back in 2007, this year.
5    Q.  Why did you have the gap in employment?
6    A.  I wanted to seek other avenues in the insurance
7  industry.
8    Q.  Did it have anything to do with this claim
9  or --
10    A.  No, sir.
11    Q.  You were pursuing other opportunities
12  basically?
13    A.  Yes.
14    Q.  Have you been at the Nashville facility of
15  Harleysville the whole time?
16    A.  Yes, sir.
17    Q.  What positions have you held over the course of
18  that employment?
19    A.  From 1996 to 2005, I was a property claims
20  specialist.
21    Q.  Are you still a property claims specialist?
22    A.  No, sir.
23    Q.  What's your position now?
24    A.  Material damage specialist.

2  (Pages 2 to 5)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

**6**

1  Q.  What does a material damage specialist do?
2  A.  Handle auto claims.
3  Q.  Can you tell me who your present supervisor is?
4  A.  Jonathan Duncan.
5  Q.  And he's at the Nashville office?
6  A.  Yes, sir.
7  Q.  Do you have any people that you supervise?
8  A.  No, sir.
9  Q.  In the summer of 2004, can you tell me who your
10  supervisor was?
11  A.  Danny Riddle.
12  Q.  Mr. Riddle is in the room?
13  A.  Yes, sir.
14  Q.  And that would be throughout the entire period
15  of May 2004 through December 2004.  Is that right?
16  A.  Yes, sir.
17  Q.  What was your official title in June of 2004?
18  A.  Property claims specialist.
19  Q.  What were your primary responsibilities in that
20  role in 2004?  Let me ask you this before.
21        Were there any changes in your job
22  position or duties during the year 2004?
23  A.  No, sir.
24  Q.  So if I ask you what you were doing in 2004,

**7**

1  you could give a consistent answer throughout the
2  year?
3  A.  Yes, sir.
4  Q.  Can you tell me what your job responsibilities
5  were in 2004?
6  A.  My job was to handle property damage claims.
7  Q.  Approximately how many claims would you have at
8  any given moment during 2004?  I just want a range.
9  A.  I'm going to be guessing.  Anywhere from 80
10  claims but possibly up to 120 suffixes.
11  Q.  Can you explain that to me, "suffixes"?
12  A.  Say a claim has, one claim has a building and
13  then it has contents in the building.  The building
14  would be one suffix.  The contents would be another
15  suffix.
16  Q.  And you essentially put 01, 02 onto the end of
17  a claim number?
18  A.  Yes.
19  Q.  Is that right?
20  A.  Yes.
21  Q.  Did you supervise any employees during 2004?
22  A.  No, sir.
23  Q.  How did you prepare for today's deposition?
24  Did you meet with anyone?

**8**

1  A.  I met with counsel here briefly.
2  Q.  You met with Mr. Casarino?
3  A.  Yes.
4  Q.  Was anyone else present during that meeting?
5  A.  Danny Riddle.
6  Q.  Did you meet with any other employees of
7  Harleysville or representatives of Harleysville
8  outside of the presence of counsel to prepare for this
9  deposition today?
10  A.  No, sir.
11  Q.  Were you shown any documents to prepare for the
12  deposition today?
13  A.  The log notes as you have before you, I
14  believe.
15  Q.  The log notes that you produced today?
16  A.  Yes, sir.
17  Q.  And Mr. Riddle and yourself brought those today
18  with you?
19  A.  Yes, sir.
20  Q.  Is Mr. Riddle also in Nashville?
21  A.  Yes, sir.
22  Q.  Can you give me a general understanding of the
23  corporate structure of Harleysville and where you fit
24  into it?

**9**

1        MR. CASARINO:  I'm not sure I understand
2  your question.
3  Q.  Well, you're in the claims department of
4  Harleysville, right?
5  A.  Yes, sir.
6  Q.  And in 2004 you were in the claims department?
7  A.  Yes, sir.
8  Q.  What other major departments did Harleysville
9  have during 2004?
10  A.  A claims department, an underwriting
11  department.  I'm not sure, you know, all of the
12  departments of Harleysville.
13  Q.  Does the Nashville office of Harleysville
14  operate independently or does it report to another
15  office?  And this is in 2004.
16  A.  I'm not sure I understand what you're saying.
17  Q.  People refer to the home office.
18  A.  Yes, sir.
19  Q.  What does that refer to?
20  A.  I'm not sure.
21  Q.  Where's the home office?
22  A.  The home office is Harleysville, Pennsylvania.
23  Q.  And that's where Harleysville's main site is?
24  Is that its primary facility?

3  (Pages 6 to 9)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

10

1    A.  Yes, sir.
2    Q.  In 2004 did you have any connection with
3    Harleysville's acceptance or processing of premium
4    payments?
5    A.  No, sir.
6    Q.  Where is that handled?
7    A.  It would have been in the underwriting
8    department.
9    Q.  The underwriting department handles payment
10   processing?
11   A.  I'm assuming.
12   Q.  You don't know?
13   A.  I honestly don't know.
14   Q.  Does Harleysville's Nashville office have an
15   underwriting department in it or is that somewhere
16   else?
17   A.  Somewhere else.
18   Q.  Where is the underwriting facility?
19   A.  I don't know.
20       MR. CASARINO:  Let's go off the record for
21   a minute.
22       (Discussion off the record.)
23   BY MR. BESTE:
24   Q.  But there are no underwriting employees in

11

1    Nashville.  Is that right?
2    A.  I don't know.
3    Q.  Okay.  Fair enough.
4        Can you give me the general steps that you
5    would take in 2004 when you were first assigned to a
6    fire damage claim?
7    A.  The first step I would take would be to confirm
8    coverage.
9    Q.  How do you go about confirming coverage?
10   A.  I would go on Harleysville's system and I would
11   look to see if the property involved is what we're
12   showing.  I would put the limits on the policy, how
13   much their deductible was and the forms that would be
14   involved and the effective dates, if the loss fell
15   within the effective dates of the policy.
16   Q.  When you say, "Harleysville's system," what are
17   you referring to?
18   A.  Our computer system.  I would go in with the
19   policy number.  I would enter it into the system and
20   it would pull up that individual.
21   Q.  Who at Harleysville has access to that system?
22   I mean, is it a company-wide computer system?
23   A.  I'm not sure.  I mean, it is a company-wide
24   system, but, you know, who all has access, I don't

12

1    know.
2    Q.  Do the various Harleysville employees use the
3    system for communication amongst each other?
4    A.  (Pause.)
5    Q.  Let me try this way.
6        MR. BESTE:  Can we have this marked as
7    Exhibit 1?
8        (H Deposition Exhibit No. 1 was marked for
9    identification.)
10   BY MR. BESTE:
11   Q.  I'm going to show you what's been marked as
12   H-1.  Can you identify what this is that I'm showing
13   you?
14   A.  These are adjuster remarks that are put into
15   Harleysville's system.
16   Q.  Now, this is part of the system that you're
17   referring to?
18   A.  Well, no.  This would be the claims file.  This
19   would be what would be going in the part of the
20   claims.
21   Q.  Okay.  This is a separate computer system?  Is
22   this typed out?  How is this written out?
23   A.  This is where I go into the part of the claims
24   system of Harleysville and I enter my conversations

13

1    enter notes, enter coverage.  This is how we put our
2    notes in, you know, to the file.
3    Q.  And the employees and the claims adjusters can
4    communicate using this adjuster remark system by
5    leaving each other notes?
6    A.  The claims department.
7    Q.  Okay.  I'm a little confused because at first
8    you said you went into Harleysville's system.
9    A.  Yes, sir.
10   Q.  Do you have essentially a computer terminal at
11   your desk that allows you to go into the Harleysville
12   system?
13   A.  I have a, you know, just -- well, I can't
14   think, I'm sorry.  I'm drawing a blank.
15       A personal computer in front of me that's
16   linked up to Harleysville.
17   Q.  Is that how you access these adjuster remarks,
18   the claim file?
19   A.  Yes, sir.
20   Q.  Are there separate systems that you can log
21   into, separate recordkeeping systems?
22   A.  There's an area that you can go into and put a
23   policy number in and pull -- I'm assuming it's part of
24   underwriting's where they go in, but they just put in

4  (Pages 10 to 13)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

14

1  where there's coverage there.
2    Q.  When you go about confirming that coverage is
3  in place when you initially get a claim as you
4  testified before, where do you do that?  Do you do
5  that through your computer system?
6    A.  Yes, sir.
7    Q.  Do you go into this adjuster remark system?
8    A.  No.
9    Q.  What do you go into?
10    A.  I go into another area.  I'm not exactly sure
11  where, what it's called, but --
12    Q.  I don't need a name.  I'm just trying to get a
13  feeling for what physically you're doing in the
14  computer, what system you're accessing.
15    A.  I guess, I guess I'm confused.  It's just
16  Harleysville's system that they have.  I'm not sure
17  what they call it, you know.  It's a way that I go in
18  and I can confirm coverage.
19    Q.  When you go to your computer in the morning are
20  there a number of options that you can open up?  You
21  can open up the adjuster remarks?  You can open up
22  other things?
23    A.  Yes, sir.
24    Q.  What are the various things, areas of the

15

1  Harleysville system that you can access from your
2  computer?
3    A.  I can go in and put a policy number in and pull
4  up to see if a policy is active.  I can go in and put
5  a claim number in and it will bring up an area to
6  where I find my claim and then I can enter file notes
7  in that claim.
8    Q.  So you would first access the policy and then
9  there could be various claim numbers associated with
10  the policy, right?
11    A.  I'm not sure I understand that question.  That
12  would be -- I can do that, but the only time that I
13  would do that is on the initial claim.
14    Q.  Are there any policies or procedures or manuals
15  that you are guided by in adjusting a claim?
16    A.  Yes, sir.
17    Q.  Tell me about those policies and procedures or
18  manuals.  What are they?
19    A.  Well, again, we, Harleysville has a link that
20  they, it's a link that they go in and you can pull up
21  the claims manual on the link.
22    Q.  It's called a claims manual?
23    A.  I believe that's what it's called.  I'm not
24  absolutely sure.

16

1    Q.  What other manuals are available?
2    A.  At the time of this loss, we had a best
3  practices manual.
4    Q.  And what is in the best practices manual?
5    A.  It would be just the timeliness of, you know,
6  getting in contact with an insured, when you should
7  raise reserve, put your coverage analysis in the file,
8  things that would be required of that file.
9    Q.  To your knowledge, do underwriting employees
10  have separate manuals?
11    A.  I have no idea.
12    Q.  Are there any manuals that you know exist that
13  you don't use or that you haven't discussed here
14  today, to your knowledge?
15    A.  None that I'm aware of, no, sir.
16    Q.  So you basically had two manuals, in 2004 you
17  had two manuals available to you as a reference in
18  adjusting this claim?
19    A.  Yes, sir.
20    Q.  Once you initially verify coverage with respect
21  to a given claim, does Harleysville require you to
22  re-verify coverage at a later point?
23    A.  No, sir.
24    Q.  So as long as there's coverage in place the

17

1  first time the claim adjuster reviews a claim, that
2  claim adjuster would not be required to re-verify
3  coverage?
4    A.  No, sir.
5    Q.  Throughout the life of the claim?
6    A.  Not that I'm aware of.
7    Q.  And that was the case in 2004?
8    A.  Yes, sir.
9    Q.  Has that changed since 2004?
10    A.  Not that I'm aware of.
11    Q.  Do you know who inputs or controls the
12  information that a claims adjuster would check to
13  verify coverage?
14    A.  No, sir.
15    Q.  Is it done by the underwriting employees
16  somewhere?
17    A.  I don't know.
18    Q.  How do you document that coverage is in place
19  when you first get a claim?
20    A.  In my file notes.
21    Q.  So it would be in your adjuster notes for this
22  claim?
23    A.  Yes, sir.
24    Q.  I'm going to show you H-1 again.  Could you

5 (Pages 14 to 17)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

|  | 18 |
|---|---|
| 1 | look at your notation from June 23rd, 2004 at 11:45? |
| 2 | A. Yes, sir. |
| 3 | Q. Why don't we use this one? This is a little |
| 4 | different. |
| 5 | Is that essentially what that notation is, |
| 6 | you're verifying coverage? |
| 7 | A. Yes, sir. |
| 8 | Q. A few lines down the line mortgagee appears. |
| 9 | A. Yes, sir. |
| 10 | Q. Do you see that? It says Ocwen Federal Bank? |
| 11 | A. Yes, sir. |
| 12 | Q. What does that information represent? What is |
| 13 | that? |
| 14 | A. What I have seen on the policy information it's |
| 15 | showing that there's a mortgagee and this is the |
| 16 | mortgagee that it's showing. |
| 17 | Q. So on June 23rd, 2004 Harleysville's records |
| 18 | showed that Ocwen was the mortgagee on the property |
| 19 | where the loss occurred? |
| 20 | A. That's -- yes, sir. |
| 21 | Q. How does that affect or impact your claims |
| 22 | handling when there's another interest aside from the |
| 23 | direct insured? |
| 24 | A. Well, we try to make sure that they have an |

|  | 19 |
|---|---|
| 1 | interest in the claim and that they would be added to |
| 2 | the check when it was issued. |
| 3 | Q. Do you have any recollection of reaching out to |
| 4 | Ocwen or Mr. Drexel with respect to this particular |
| 5 | interest? |
| 6 | A. No, sir. |
| 7 | Q. A few more lines down it says, "Determine if |
| 8 | C&O needed." |
| 9 | Can you explain that to me? |
| 10 | A. That would be a cause and origin person. |
| 11 | Q. What role does a cause and origin person |
| 12 | function as? |
| 13 | A. They determine the cause of loss. |
| 14 | Q. Is that an independent investigator? |
| 15 | A. Yes, sir. |
| 16 | Q. Somebody you send out to the scene? |
| 17 | A. Yes, sir. |
| 18 | Q. As a claims handler in 2004, were you ever |
| 19 | involved in discussions of policy language or whether |
| 20 | coverage applies with respect to any claim? |
| 21 | A. Policy language and how it applies? |
| 22 | Q. Yes. |
| 23 | A. Is that the question? Yes, sir. |
| 24 | Q. As a claims handler do you have authority to |

|  | 20 |
|---|---|
| 1 | make decisions on policy language and the application |
| 2 | of it or is that authority with the underwriting |
| 3 | department? |
| 4 | A. I'm not sure what you're asking me. |
| 5 | Q. As a claims handler do you have final authority |
| 6 | to say this policy language covers the loss? |
| 7 | A. I do. |
| 8 | Q. In all circumstances? |
| 9 | A. No, sir. |
| 10 | Q. Can you give me a general feel in 2004 where |
| 11 | the line was, where your authority stopped? |
| 12 | A. If there were any question as to whether a |
| 13 | claim were covered under these particular forms, then |
| 14 | I would go to the advice of my supervisor and discuss |
| 15 | it with him. |
| 16 | Q. By "these particular forms" you mean the policy |
| 17 | at issue. Is that right? |
| 18 | A. I'm referring to these forms, CP0010 and |
| 19 | CP1030. |
| 20 | Q. What are those forms? |
| 21 | A. Those are this particular policy's policy form. |
| 22 | Q. That's essentially where the policy language |
| 23 | comes from, the forms? |
| 24 | A. Yes, sir. |

|  | 21 |
|---|---|
| 1 | Q. When you are adjusting a claim, do you commonly |
| 2 | send notices or things of that sort to your insured? |
| 3 | A. I'm sorry? |
| 4 | Q. When you're adjusting a claim, do you send a |
| 5 | lot of correspondence, letters to the insured? |
| 6 | A. I wouldn't say I send a lot, but I do send |
| 7 | some. |
| 8 | Q. What steps do you take when you do send |
| 9 | correspondence to an insured to verify that letters go |
| 10 | out, notices get sent, that type of thing, that things |
| 11 | are actually mailed? |
| 12 | A. (Pause.) |
| 13 | Q. Do you physically mail letters to insureds? |
| 14 | A. Yes, on some occasions. Some I don't. |
| 15 | Q. Have you ever completed or participated in a |
| 16 | proof of mailing? |
| 17 | A. I'm not sure I understand the question. |
| 18 | Q. Do you know what a proof of mailing is? Have |
| 19 | you ever seen one? |
| 20 | A. I don't think so. |
| 21 | Q. How does Harleysville verify in its file that a |
| 22 | letter or a notice was sent to one of its insureds? |
| 23 | MR. CASARINO: I'm going to object to that |
| 24 | question. She's not here to speak for Harleysville. |

6 (Pages 18 to 21)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

22

1      MR. BESTE: I'm asking her in her
2  experience as a claims adjuster.
3      MR. CASARINO: That's different.
4   A.  We can send a letter certified.
5   Q.  Certified mail?
6   A.  Yes, sir.
7   Q.  Are there any other means of verifying that a
8  letter was sent that Harleysville uses in 2004, used
9  in 2004?
10   A.  Just in general?  I mean, I'm not sure what
11  you're asking me.
12      There's occasions where we might send
13  someone a FedEx and you can track a FedEx, but I'm not
14  sure what you're asking me as far as verifying.
15   Q.  You still have H-1 in front of you.  Could you
16  look at those remarks?  I have seen a number of them
17  have the notation at the beginning of them SCLODFEL.
18      Do you see one or a few of those entries?
19   A.  Yes, sir.
20   Q.  Are those your entries?
21   A.  Yes, sir.
22      MR. BESTE: I'm going to have this marked
23  as H-2, please.
24      (H Deposition Exhibit No. 2 was marked for

23

1  identification.)
2  BY MR. BESTE:
3   Q.  Can you identify the document marked as H-2?
4   A.  It's a loss accord.
5   Q.  Is this something that you completed, this
6  document?
7   A.  That's something that was presented to me with
8  a new claim.
9   Q.  Who presented it to you?
10   A.  My supervisor.
11   Q.  So you're basically handed this notice and
12  that's your assignment to adjust the claim?
13   A.  Yes, sir.
14   Q.  Now, it's a little bit difficult to read.  But
15  are there policy effective dates on that form?
16   A.  Yes, sir.  There should be.
17   Q.  When you receive this form, do you take
18  additional steps to verify the policy effective
19  information on this notice?
20   A.  Yes, sir.
21   Q.  And it's at that point you're responsible to
22  verify coverage in Harleysville's system?
23   A.  Yes, sir.
24   Q.  Is this a paper file?  Is this in an actual

24

1  claims file or is this just a computer document that
2  you have?
3   A.  It will go in a claims file.
4   Q.  You do have physical claims files that you
5  handle as a claims adjuster?
6   A.  In 2004?
7   Q.  Yes.
8   A.  Yes.
9   Q.  Has that changed?
10   A.  Yes, sir.
11   Q.  Are you all electronic now?
12   A.  Yes, sir.
13   Q.  When did that change occur?  Roughly.  I don't
14  need --
15   A.  This year.  A few months.
16      MR. BESTE: If we can have this marked as
17  H-3, please.
18      (H Deposition Exhibit No. 3 was marked for
19  identification.)
20  BY MR. BESTE:
21   Q.  I'm handing you what's been marked as H-3.
22      Can you identify that document?
23   A.  It's the first report and acknowledgment from
24  Tower Insurance Services.

25

1   Q.  Is that a document that goes to you?
2   A.  Yes, sir.
3   Q.  What exactly is Tower Insurance acknowledging?
4   A.  That they had received the claim from us.
5   Q.  So it basically confirms that you assigned
6  Tower Insurance Services to adjust your claim as an
7  independent adjuster?
8   A.  Yes, sir.
9   Q.  Do you essentially hire Tower to investigate
10  and adjust the claim?
11   A.  Not investigate.  He's only to adjust the
12  claim.
13   Q.  But Harleysville hired Tower to adjust the
14  claim?
15   A.  Yes, sir.
16   Q.  And you specifically hired Tower to adjust this
17  claim?
18   A.  Yes, sir.
19   Q.  Can you explain to me the relationship between
20  Harleysville Insurance Company, in particular to this
21  claim, can you explain to me the relationship between
22  Harleysville Insurance Company and Tower Insurance
23  Services?
24   A.  Harleysville hires Tower Insurance Services to

7  (Pages 22 to 25)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

26

1  go out and scope the damage and eventually obtain an
2  agreed cost to repair the damages.
3      Q.  An agreed cost between whom?
4      A.  An agreed cost between either the insured's
5  contractor of choice or if the insured doesn't have a
6  contractor to a local contractor who would be able to
7  do the work for a certain amount of money.
8      Q.  When you assigned this claim to Tower Insurance
9  Services, did Harleysville give Tower the authority to
10 reach an agreed price with a contractor?
11     A.  I'm not sure what you mean by "authority."  My
12 instructions to Tower were to obtain an agreed cost to
13 repair.
14     Q.  Does Harleysville retain the final say on the
15 agreed cost?
16     A.  Yes, sir.
17     Q.  So correct me if I'm wrong.  But Tower
18 Insurance's role is to go out, reach an agreed cost
19 with the contractor or contractors and then get
20 approval from Harleysville on that price that they
21 agreed to.  Is that right?
22     A.  They submit that to Harleysville and then we
23 decide from there whether we agree with that.
24     Q.  Who actually hires the contractor -- I'm sorry.

27

1          Who actually hired the contractor with
2  respect to this claim to perform the repairs?
3      A.  I don't know.
4      Q.  Well, you understood that the repairs
5  eventually happened.  Is that right?
6      A.  I'm not sure that I did know that the repairs
7  actually happened.
8      Q.  You were not aware that G. S. Booth performed
9  any repairs on Mr. Drexel's property in this claim?
10     A.  To be honest with you, I don't remember.
11     Q.  You handle a lot of claims?
12     A.  I do.
13          MR. BESTE:  Can I have this marked as H-4?
14          (H Deposition Exhibit No. 4 was marked for
15 identification.)
16 BY MR. BESTE:
17     Q.  There's a copy for Mr. Casarino as well.
18 Sorry.
19          Can you identify the document marked as
20 H-4?
21     A.  This would be a report from Tower Insurance.
22     Q.  A report to whom?
23     A.  To me.
24     Q.  H-4?

28

1      A.  Wait a minute.  I'm sorry.
2          This would be our independent sending this
3  to Mr. Drexel about an attempt to contact him.
4      Q.  This would be a letter that Tower Insurance
5  Services sent to Mr. Drexel?
6      A.  Yes, sir.
7      Q.  Do you recall ever seeing that document or
8  receiving it?
9      A.  I don't remember.
10     Q.  When you're adjusting a claim and going through
11 the process of reaching an agreed cost between the
12 contractor, the independent adjuster and Harleysville,
13 what steps do you take to bring the insured into that
14 process?  Again, this is in 2004.
15          Is the insured typically involved in that
16 at all?
17     A.  Well, if the insured -- we give the insured an
18 opportunity to hire his own contractor and the best
19 scenario is to have the insured's contractor and our
20 independent adjuster come to an agreed cost of the
21 repairs.
22          If the insured doesn't have a contractor,
23 then that's when we'll solicit the opinion of a
24 reputable contractor and the independent and the other

29

1  contractor will get an agreed cost of repairs.
2      Q.  When an agreed cost is reached between
3  Harleysville's independent adjuster and the
4  contractor, does Harleysville take any steps to get
5  final approval for the repair work from the insured?
6      A.  I'm not sure what you're asking.
7      Q.  Hypothetically, you have in 2004 a claim and
8  you've talked to the independent adjuster.  The
9  independent adjuster says, "I have an agreed cost with
10 the contractor."
11          Would you reach out to the insured and
12 say, "We have an agreed cost; do we have authority to
13 proceed with making the repairs to your property"?
14     A.  I would get in contact with the insured and
15 say, "This is the numbers that we have come up with."
16     Q.  Do you have any specific recollection of the
17 process in Mr. Drexel's, in this claim of reaching an
18 agreed cost?
19     A.  No, sir, I don't remember.
20     Q.  Can you explain to me why you would reach out
21 to an insured when you have an agreed cost to run that
22 by him?
23     A.  Well, you would want them to know what they can
24 expect and also if by chance the insured says that he

8 (Pages 26 to 29)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

30

1   doesn't have his own contractor and we have an agreed
2   cost with an independent contractor, then we would
3   want to run those numbers by the insured in the event
4   that he doesn't agree and then we can go back to the
5   table and say, "Okay, why don't you agree with this?"
6        MR. BESTE:  Can I have this marked as H-5,
7   please?
8        (H Deposition Exhibit No. 5 was marked for
9   identification.)
10  BY MR. BESTE:
11       Q.   Are you able to identify this document, H-5?
12       A.   No, sir.
13       Q.   Do you know who Brooke Beauman is?
14       A.   No, sir.
15       Q.   Do you know who Marc Good is?
16       A.   No, sir.
17       Q.   Have you ever heard the name S. T. Good
18  Insurance or S. T. Good?
19       A.   I don't recall.
20       Q.   Do you know whether Brooke Beauman is an
21  employee of Harleysville?
22       A.   I don't know.
23       MR. BESTE:  Could I have this marked as
24  H-6, please?

32

1   You've handed me this other piece of paper that I have
2   never seen before that has the same policy number on
3   it.
4        Q.   Does H-1, the adjuster remarks, contain a
5   policy number in it anywhere?
6        A.   (Reviewing document) I don't see the policy
7   number.
8        Q.   Do you know who Robert Southard is or Bob
9   Southard?
10       A.   No, sir.
11       Q.   Does Harleysville have a Chesapeake office?
12       A.   I'm not sure.
13       Q.   You've never heard anyone at Harleysville refer
14  to a Chesapeake office or anything of that sort?
15       A.   They may have.
16       Q.   So you've never seen a document such as H-6
17  before?
18       A.   Not that I recall.
19       Q.   Are you familiar with what happens within
20  Harleysville when a policy is canceled?
21       A.   No, sir.
22       Q.   If a policy were to be canceled at any time,
23  does that get entered into Harleysville's computer
24  system?

31

1        (H Deposition Exhibit No. 6 was marked for
2   identification.)
3   BY MR. BESTE:
4        Q.   Are you able to identify this document?
5        A.   No, sir.
6        Q.   It's a Harleysville document, is it not?
7        A.   It has Harleysville's name on there.
8        Q.   Have you ever seen a document like this before?
9        A.   Not that I recall.
10       Q.   Are you able to tell whether this document
11  pertains to the claim or policy that we're discussing
12  today, Mr. Drexel's fire?
13       A.   Will you repeat the question?
14       Q.   Are you able to tell me whether this document
15  pertains in any way to the claim we're discussing,
16  Mr. Drexel's fire?
17       A.   I don't know.
18       Q.   Does it have a policy number on it?
19       A.   It does.
20       Q.   Are you able to look at any of the other
21  documents that I have given you today and determine
22  whether it's the same policy number that we're
23  discussing today, Mr. Drexel's fire?
24       A.   Nothing that -- you know, as far as my claim.

33

1        A.   Honestly, I don't know.
2        MR. BESTE:  I think we're on H-7.
3        (H Deposition Exhibit No. 7 was marked for
4   identification.)
5   BY MR. BESTE:
6        Q.   Are you able to identify the document marked as
7   H-7?
8        A.   No, sir.
9        Q.   Have you ever seen a document like this before?
10       A.   Not that I recall.
11       Q.   Are you able to tell what department or office
12  at Harleysville generated this notice?
13       A.   I can't tell you what department other than it
14  looks like it's coming out of Harleysville,
15  Pennsylvania.
16       MR. BESTE:  Can I have this marked as H-8?
17       (H Deposition Exhibit No. 8 was marked for
18  identification.)
19  BY MR. BESTE:
20       Q.   Are you able to identify the document marked as
21  H-8?
22       A.   This would have been my appraiser's report to
23  me.
24       Q.   And by your appraiser you mean --

9  (Pages 30 to 33)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

34

1    A.  Tower Insurance Services.
2    Q.  -- George Powell?
3    A.  Yes, sir.
4    Q.  Do you work with George Powell a lot?
5    A.  Not a lot.
6    Q.  During your tenure at Harleysville have you
7  handled a lot of fire claims in Delaware?
8    A.  Not a lot.
9    Q.  Are we talking two or three, twenty?  Can you
10  give me a very rough estimate?
11   A.  Two or three.
12   Q.  Can you give me a rough estimate of how many
13  times you've worked with Tower Insurance or George
14  Powell on claims?
15   A.  I can't recall.
16   Q.  Do you have any recollection of receiving this
17  interim report from Mr. Powell and Tower Insurance?
18   A.  I'm sorry.  In 2004, you know, I'm sure I did,
19  but I don't remember.
20   Q.  That's fine.  I just need to determine whether
21  you do or not.  That's all.
22       Are you able to look at this document and
23  tell me what the status of the claim was on July 30,
24  2004?

35

1    A.  It appears to be his initial estimate and he
2  was still trying to obtain an agreed cost of repairs.
3    Q.  And by "he," you're referring to Tower
4  Insurance, George Powell?
5    A.  Yes, sir.
6    Q.  Are you able to tell who he was negotiating
7  with?
8    A.  It appears G. S. Booth & Associates.
9    Q.  Do you know who G. S. Booth & Associates is?
10   A.  No, sir.
11   Q.  Are they the contractor on this claim?
12   A.  I don't know.
13   Q.  Are you able to tell from this document?
14   A.  It appears so.
15   Q.  At least at this time it appears that
16  Mr. Powell was negotiating with G. S. Booth regarding
17  an agreed price for this claim?
18   A.  It appears so.
19   Q.  Is this a document that you would have reviewed
20  during the claims process?
21   A.  Yes, sir.
22   Q.  Would you turn to the page marked DR 0432 about
23  two-thirds of the way through?  It's a letter from
24  Tower.

36

1    A.  I'm sorry.  DR 0?
2    Q.  432.
3        MR. CASARINO:  The letter to Booth?
4        MR. BESTE:  Yes.
5  BY MR. BESTE:
6    Q.  It's a letter dated August 1st to Booth
7  Insurance Restorations.
8        MR. CASARINO:  I'm a little confused here.
9  That letter is dated August 1st, but the interim
10  report is dated July 30th.
11       MR. BESTE:  He's very quick.
12       I noticed that too.  I don't know what the
13  discrepancy is.
14       MR. CASARINO:  Are you suggesting it went
15  with that package?
16       MR. BESTE:  I am suggesting that this is
17  an entire package, but I don't think that's important.
18       MR. CASARINO:  I don't know.  It may be.
19  BY MR. BESTE:
20   Q.  Have you ever seen the letter to Booth
21  Insurance Restorations marked DR 0432 and 0433?
22   A.  I don't recall.
23   Q.  With respect to this claim though, Mr. Powell
24  at Tower Insurance was adjusting the claim on

37

1  Harleysville's behalf, correct?
2        MR. CASARINO:  That's been asked and
3  answered.
4    Q.  You can answer.
5    A.  Yes.
6    Q.  And this letter was written to Booth Insurance
7  Restorations, the contractor on the job.  Is that
8  correct?
9    A.  It appears so.
10       MR. BESTE:  Can I have this marked as H-9,
11  please?
12       (H Deposition Exhibit No. 9 was marked for
13  identification.)
14  BY MR. BESTE:
15   Q.  Can you review the document marked H-9 and tell
16  me what that is?
17       MR. CASARINO:  You're asking her what her
18  understanding is about this?  Obviously it's not
19  addressed to her or from her.
20       MR. BESTE:  Yes.
21       MR. CASARINO:  Okay.
22   A.  It's a letter to Booth Insurance Restorations
23  from George Powell at Tower.
24   Q.  Is this the same letter we were just discussing

10  (Pages 34 to 37)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

---

**38**

1  as far as you can tell?
2      A.  I would have to go back and look at that other
3  letter.
4      Q.  As of August 1st, 2004 Tower Insurance was
5  adjusting Mr. Drexel's fire damage claim on behalf of
6  Harleysville. Is that correct?
7      A.  It appears that way.
8          MR. BESTE:  Can I have this marked as
9  H-10, please?
10         (H Deposition Exhibit No. 10 was marked
11  for identification.)
12  BY MR. BESTE:
13     Q.  Are you able to identify this document?
14     A.  Final report from George Powell of Tower
15  Insurance Services.
16     Q.  Do you have any recollection of receiving this
17  letter?
18     A.  (Pause).
19         MR. CASARINO:  Why don't you check your
20  log notes and see if it's in there?
21     A.  Yes.
22     Q.  And why do you say yes?  What are you looking
23  at?
24     A.  I'm looking on the 13th of August log entry.

---

**39**

1      Q.  What time?
2      A.  11:15.
3      Q.  11:15:29?
4      A.  Yes, sir.
5      Q.  So the log entry on H-1 marked 8-13 at 11:15 is
6  basically your reaction to this letter marked as H-10,
7  Mr. Powell's final report?
8      A.  I'm sorry.  Repeat that.
9          My entry of 8-13 is my acknowledgment of
10  this (indicating) H-10?
11     Q.  Yes.
12     A.  Correct.
13         MR. CASARINO:  You should understand there
14  is an hour difference in time.
15         MR. BESTE:  I know.  It makes it very
16  confusing, actually.  There are some e-mails that
17  pre-date other e-mails.
18  BY MR. BESTE:
19     Q.  Are you able to tell from H-10 whether Tower
20  Insurance on Harleysville's behalf had reached an
21  agreement with Booth Restorations to repair
22  Mr. Drexel's property at an agreed price?
23     A.  That appears so.
24     Q.  And this is essentially Mr. Powell's report to

---

**40**

1  Harleysville that an agreement had been reached
2  between Tower Insurance and Booth Restorations
3  regarding the repair price?
4      A.  Yes, sir.
5      Q.  What steps did you take upon receiving the
6  letter, the final report marked as H-10?  Feel free to
7  refer to your notes and tell me what occurred next.
8      A.  I acknowledged his report, that the estimate is
9  revised.  I placed a call to him to ask if this was an
10  agreed estimate.
11     Q.  You called Mr. Powell?
12     A.  Yes, sir.
13     Q.  Can you tell the result of that conversation?
14     A.  He confirmed that he had gotten this estimate
15  agreed.
16     Q.  Did you approve payment of the claim at that
17  point?
18     A.  I requested approval.
19     Q.  From whom do you request approval?
20     A.  My supervisor.
21     Q.  Mr. Riddle?
22     A.  Yes, sir.
23     Q.  Did you receive that approval?
24     A.  Yes, sir.

---

**41**

1      Q.  How can you tell that you received the
2  approval?
3      A.  On 8-13-2004 at 1335 Danny has an entry note in
4  here.
5      Q.  And you can tell that because of the letters
6  DRIDDLE on that particular entry?
7      A.  Yes, sir.
8      Q.  Again, you're referring to an entry on H-1?
9      A.  Yes, sir.
10     Q.  At this point in time and in particular to this
11  claim did Mr. Riddle have final authority within
12  Harleysville to authorize the repairs to Mr. Drexel's
13  property?
14     A.  No one in the claims department gives authority
15  to authorize the repairs.
16     Q.  Can you explain that to me?
17     A.  We don't authorize repairs.  We leave that to
18  the insured.  It's the insured's property.  If he
19  wants the repairs, he has to authorize it.
20     Q.  So are you telling me that no one had authority
21  to instruct either Tower Insurance or G. S. Booth to
22  proceed with these repairs aside from Mr. Drexel?
23     A.  Exactly.  That's what I'm telling you.  It's
24  Mr. Drexel's property.  He's the only person that can

---

11  (Pages 38 to 41)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

---

**42**

1    authorize the repairs.
2    Q.  Well, didn't Tower Insurance reach an agreement
3    with G. S. Booth directly?
4    A.  I mean, I don't know that for a fact.  I'm
5    assuming that G. S. Booth was representing Mr. Drexel.
6    Q.  Why are you assuming that they were
7    representing Mr. Drexel?
8    A.  To be honest, I don't know.  I don't know.
9    Q.  Are you able to tell from your claims notes
10   whether you personally or anyone at Harleysville
11   reached out to Mr. Drexel to get approval for the
12   repairs?
13   A.  Again, it's up to him to authorize the
14   approval.
15   Q.  Did you take any steps to determine whether
16   Mr. Drexel had authorized the repairs to the property?
17   A.  I'm not sure I understand what you're asking.
18   Any steps to?
19   Q.  Well, I believe you've testified that
20   Mr. Riddle authorized payment of this claim.
21   A.  Yes, sir.
22   Q.  So he authorized Harleysville to pay for the
23   repairs to Drexel's property?
24   A.  Authorized to pay Mr. Drexel.

**43**

1    Q.  Did Harleysville communicate that authority to
2    Mr. Drexel?
3    A.  On 8-13-2004 at 11:31:42 I placed a phone call
4    to Mr. Drexel and left him a voice mail to contact me
5    to go over our figures.
6    Q.  What was the time of that call?
7    A.  11:31.
8    Q.  Are you able to determine whether Mr. Drexel
9    returned that phone call or whether you spoke to him?
10   A.  I don't recall.
11   Q.  Can you tell from your log whether you did?
12   A.  It doesn't appear that I did.
13   Q.  Reviewing this log, can you tell me the next
14   time when you did speak to Mr. Drexel was?
15   A.  I don't see where I spoke with him again.
16   Q.  Is there anything in these adjuster remarks
17   that leads you to believe that Mr. Drexel authorized
18   the repairs?
19   A.  Do you mind repeating your question?
20   Q.  Is there anything in the adjuster notes that
21   leads you to believe that Mr. Drexel authorized the
22   repairs to the property?
23   A.  I don't see where he authorized repairs.
24   Q.  Your testimony today is that Harleysville only

**44**

1    authorizes Mr. Drexel to go ahead with repairs?
2    A.  No, sir.
3        MR. CASARINO:  I don't think she said
4    that.
5    Q.  Can you explain why I'm wrong?
6    A.  It's Mr. Drexel's property.  We don't authorize
7    anyone to start repairs.  We come upon an agreed cost
8    of repairs and that's what we base our payment on and
9    then it's the insured's duty to authorize his own
10   repairs.  We don't do that.
11   Q.  But in this case isn't it fair to say that you
12   as the Harleysville claims adjuster negotiated with
13   Tower Insurance and G. S. Booth regarding the agreed
14   price?
15   A.  The agreed price, yes, sir.
16   Q.  And that Harleysville, yourself and Mr. Riddle,
17   approved the agreed price?
18   A.  Yes.
19   Q.  Did you explain to Mr. Drexel that only he
20   could authorize the repairs to the property?
21   A.  I don't recall.  I don't recall.
22   Q.  Are you able to tell from your adjuster remarks
23   or any of the documents that you've seen whether you
24   explained to Mr. Drexel that Harleysville was not

**45**

1    hiring a contractor, that he was, that Mr. Drexel was?
2    A.  I'm sorry.  Repeat the question again.
3    Q.  Are you able to tell from your adjuster remarks
4    whether you explained to Mr. Drexel that Harleysville
5    was not hiring G. S. Booth directly through its
6    adjuster to make the repairs?
7    A.  I don't see where that was explained.
8    Q.  Are you required by Harleysville to explain
9    that to an insured?
10   A.  It's normal procedure that we explain that he
11   hires his own contractor.
12   Q.  Is that normal procedure written down anywhere
13   in Harleysville's documents or policies?
14   A.  I'm not sure.
15   Q.  Are you able to tell whether you followed that
16   normal procedure in this case?
17   A.  I don't know if I did or not.
18   Q.  In your tenure at Harleysville have you ever
19   explained that to an insured by letter?
20   A.  I don't recall.
21   Q.  Well, what is the normal procedure that we have
22   been discussing?  Is it to do it by letter or to do it
23   by --
24   A.  By telephone.

---

12 (Pages 42 to 45)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

46

1    Q.   By telephone.
2         Would it also be normal procedure to
3    document that advice or instruction in the file
4    somewhere?
5    A.   Not necessarily.
6    Q.   So the normal procedure is just to tell the
7    insured but not to document that conversation?
8    A.   Sometimes you document it and sometimes you
9    don't. I'm sorry.
10        MR. BESTE:  Can I have this marked as
11   H-11?
12        (H Deposition Exhibit No. 11 was marked
13   for identification.)
14   BY MR. BESTE:
15   Q.   Before we get to H-11, and referring to your
16   adjuster remarks, are you able to tell whether
17   Harleysville ever actually physically issued the check
18   in this case?
19   A.   (Pause)
20   Q.   You might want to look at the entry August 13
21   at 13:49.
22   A.   It appears there was a check that was issued.
23   Q.   By reviewing that entry, are you able to
24   determine whether the check was physically mailed?

47

1    A.   I can't tell you that.  I don't know.
2    Q.   Are you able to tell from the adjuster remarks
3    who the payee of that check was, who it was addressed
4    to?
5    A.   It was addressed to Layne Drexel.
6    Q.   Anyone else?
7    A.   No, sir.
8    Q.   How can you tell that it was only Layne Drexel
9    and not someone else?
10   A.   Well, I don't know who the payment was made out
11   to.  I'm just saying that it was sent to Layne Drexel.
12   Q.   There's an entry at 15:21 on August 13 by
13   JSULLIV.
14        Are you able to tell me who that is?
15   A.   Julie Sullivan.
16   Q.   Are you able to tell me what office Julie
17   Sullivan works out of?
18   A.   The Nashville Harleysville.
19   Q.   And can you explain this entry at 15:21 to me?
20   A.   That we requested that the system check be
21   voided.
22   Q.   Let's get back to H-11.
23        Can you identify that document?
24   A.   It's a statement of loss.

48

1    Q.   And did you prepare this document on August
2    13th, 2004?
3    A.   Yes, sir.
4    Q.   Can you tell me what the purpose of the
5    document is?
6    A.   To show the insured, Mr. Drexel, the amount of
7    the estimate, the amount of depreciation being
8    withheld, the amount of his deductible and the net
9    payment.
10   Q.   Why was depreciation being withheld?
11   A.   Harleysville takes depreciation until the
12   repairs are complete.
13   Q.   Until the repairs are complete?
14   A.   Yes, sir.  He had a replacement cost policy,
15   but we take depreciation based on the age of, say,
16   paint or the wear and tear until such repairs are
17   actually completed.
18   Q.   And Harleysville does that in a replacement
19   cost, when there's replacement cost coverage as well?
20   A.   Yes, sir, until it's actually repaired and then
21   he would be -- the depreciation is recoverable.
22   Q.   Okay.  So once the repairs were complete,
23   Mr. Drexel would have been, would have been paid for
24   this depreciation value?

49

1    A.   If he submitted paperwork documenting that
2    these costs were incurred and that he had to pay that
3    amount of money, yes.
4    Q.   What documents must he submit?
5    A.   A completion notice by his contractor, invoices
6    to show how much money was spent, canceled checks to
7    show that this is how much money he paid.
8    Q.   What do you do with this document after you
9    prepare it?
10   A.   I send a copy to the insured and then I put a
11   copy in the file.
12   Q.   Do you do anything else with it?
13   A.   No, sir.
14        MR. BESTE:  Let's make this H-12, please.
15        (H Deposition Exhibit No. 12 was marked
16   for identification.)
17        (Discussion off the record.)
18   BY MR. BESTE:
19   Q.   Are you able to identify this document?
20   A.   It's a letter I sent to Mr. Drexel.
21   Q.   On August 13, 2004?
22   A.   Yes, sir.
23   Q.   What is the purpose of the letter?
24        MR. CASARINO:  Let's make sure.  I'm not

13  (Pages 46 to 49)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

---

**50**

1  sure this is a document that the enclosure went with
2  it.
3          MR. BESTE: I'll ask her that.
4  BY MR. BESTE:
5      Q.  I'm not sure if you answered my question.
6          You sent this letter to Layne Drexel on
7  August 13, 2004?
8      A.  Yes, sir.
9      Q.  Are you able to tell me whether the documents
10  stapled to the letter are or were enclosures that you
11  sent with the letter?
12      A.  I'm assuming it was.
13      Q.  Do you have any reason to doubt that it was?
14      A.  No, sir.
15      Q.  And are you, in fact, advising Mr. Drexel in
16  this letter that he can recover the depreciation cost?
17      A.  Yes, sir.
18      Q.  Is there a difference between what you term in
19  this letter recoverable depreciation and the
20  depreciation figure in the statement of loss which was
21  H-11?
22      A.  I'm sorry. Repeat the question.
23      Q.  If you could look at H-11 again, which is the
24  statement of loss, that document shows depreciation in

---

**52**

1      Q.  And you don't make a copy of the original and
2  put that in your file?
3      A.  No, sir.
4      Q.  You just print out from a computer system the
5  document and put that in the file?
6      A.  I would make two copies of that letter. The
7  original would have went to Mr. Drexel and a copy
8  would be put in the file.
9      Q.  But you would make copies before you signed it?
10      A.  Yes, sir.
11      Q.  So you would send one out signed and the other
12  one would stay in the file unsigned?
13      A.  Yes, sir.
14      Q.  Do you document it in any way that a letter was
15  actually sent?
16      A.  Normally I would, yes.
17      Q.  Did you document whether this letter was sent?
18      A.  I documented that I sent the proof of loss
19  that's attached to it.
20      Q.  And how do you know that? Where do you
21  document it?
22      A.  On the 8-13-2004 at 11:31:42 sending proof of
23  loss.
24      Q.  And you sent this proof of loss and the letter

---

**51**

1  the amount of $10,762 and change. Is that correct?
2      A.  That's correct.
3      Q.  Is there any difference between that figure and
4  what you refer to in your August 13 letter, H-12, as
5  recoverable depreciation?
6      A.  There's no difference.
7      Q.  Are you able to tell whether this letter was
8  sent to Mr. Drexel physically?
9      A.  I'm not. No, sir, I don't know for a fact that
10  it went.
11      Q.  Do you know whether you ever signed this
12  letter?
13      A.  I don't know.
14      Q.  If you had to find out whether you did, what
15  would you do?
16      A.  I don't know. I don't know. If I signed it
17  and it went out, I'm assuming that it went to
18  Mr. Drexel. I don't know.
19      Q.  Well, I'll represent to you that this is a copy
20  of the letter produced by Harleysville.
21          Can you explain to me why there would be
22  an unsigned copy of a letter in Harleysville's file?
23      A.  The copy that I keep I don't sign. The
24  original is the only one that's signed.

---

**53**

1  indicating that a payment would issue out of the
2  accounting department before you spoke to Mr. Drexel
3  on August 13th? Is that correct?
4      A.  I'm assuming I sent it.
5      Q.  You have no reason to think in looking at your
6  notes that you did speak to Mr. Drexel before you
7  ordered the check be issued?
8      A.  I left him a voice mail.
9      Q.  On August 13th when Harleysville approved the
10  agreed price, did you speak with anyone aside from
11  Mr. Powell or other representatives of Tower
12  Insurance?
13      A.  On August 13?
14      Q.  Yes.
15      A.  I received an e-mail from Amber, who would have
16  been in Harleysville, Pennsylvania, that the policy
17  had been canceled.
18      Q.  We'll get to that e-mail in a second.
19          Did you speak to anyone aside from other
20  Harleysville employees and Tower Insurance?
21      A.  Before receiving that e-mail?
22      Q.  On August 13th before having the check sent
23  from the accounting department, did you speak to any
24  non-Harleysville employees aside from Tower Insurance?

---

14 (Pages 50 to 53)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

54

1    A.  Not that I recall.  No, sir.
2    Q.  And you've reviewed your adjuster notes from
3  that day and you still believe that you didn't speak
4  to anyone aside from Mr. Powell that does not work for
5  Harleysville?
6    A.  I'm going to have you repeat the question one
7  more time.
8        Did I speak with anyone?
9    Q.  On August 13th, 2004 prior to having the check
10  issued, did you speak to any non-Harleysville
11  employees aside from representatives of Tower
12  Insurance?
13    A.  Not that I recall.
14    Q.  And is there anywhere documented in your
15  adjuster notes that you spoke with anyone aside from
16  Tower Insurance?
17    A.  Not that I see, no, sir.
18    Q.  Now, the document marked as H-12 included a
19  proof of loss.  Is that correct?
20    A.  Yes, sir.
21    Q.  In 2004 was it Harleysville's practice to send
22  out a check before receiving this signed release back
23  from the, the signed proof of loss back from an
24  insured?

55

1    A.  We would do it both ways, but we would send a
2  proof of loss before sending the check or along with
3  the check.
4    Q.  Is it accurate that Harleysville had not
5  received a signed proof of loss by the time it issued
6  the check in this case?
7    A.  Yes.
8    Q.  And you know that because you just sent it to
9  them on the same day that the check was issued?
10    A.  Yes, sir.
11        MR. BESTE:  Can I have this marked as
12  H-13?
13        (H Deposition Exhibit No. 13 was marked
14  for identification.)
15  BY MR. BESTE:
16    Q.  Are you able to identify this document marked
17  as H-13?
18    A.  It's an e-mail addressed to me from Amber
19  Staton.
20    Q.  And you're referring to the most recent e-mail
21  in what is an e-mail chain.  Is that right?
22    A.  Yes, sir.
23    Q.  Could you look at the last e-mail on the chain?
24        Is that, in fact, an e-mail sent from

56

1  Amber Staton to you on August 11th, 2004?
2    A.  Yes, sir.
3    Q.  Are you able to tell me when you received that
4  e-mail?
5    A.  When I received it or when I read it?
6    Q.  Both.
7    A.  It appears I received it on the 11th.
8    Q.  And it was essentially in your in box?
9    A.  Yes, sir.
10    Q.  Your e-mail in box.  Are you able to tell me
11  when you read it?
12    A.  I'm not able to tell you when I read it.
13    Q.  Is it accurate to say that you had access to
14  this e-mail at the time you approved the agreed price
15  for the repairs?
16    A.  Yes.  Yes, sir.
17    Q.  Is it your guess that you did not receive it
18  before or you did not read it before issuing the
19  check?
20    A.  That's what it appears.
21    Q.  And you know that because you would never have
22  sent the check if you had read the e-mail, right?
23    A.  Exactly.
24    Q.  Can you explain to me what -- sometimes the

57

1  questions are very simple.
2        Can you explain to me what the first
3  sentence means, "I have received suffix 02 to coverage
4  verify"?
5    A.  It would appear to me, and I'm guessing, that I
6  opened a second suffix for whatever reason and when
7  the second suffix went through the system to be
8  opened, that's when --
9    Q.  Someone checked the policy coverage?
10    A.  -- someone checked the policy coverage.
11    Q.  It looks like when you opened a second suffix
12  Amber Staton verified coverage at that point?
13    A.  Yes, sir.
14    Q.  How would she do that?
15    A.  I don't know.
16    Q.  How would you do it if you had to do it?
17    A.  How would I do it?
18    Q.  Yes.
19    A.  If I were verifying coverage?
20    Q.  Right.  If you got a new suffix and had to
21  verify coverage as per the procedure, how would you do
22  that?
23        I'm sorry.  That was a bad question.
24        Every time you get a new suffix you have

15 (Pages 54 to 57)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

58

1  to verify policy periods and coverage. Is that right?
2  A. No, sir. When you get a new claim, you verify
3  coverage and forms.
4  Q. Why would Ms. Staton be verifying coverage when
5  she got a new suffix?
6  A. I don't know what their procedures are.
7  Q. She's in underwriting?
8  A. I don't know what department she's in.
9  Q. Do you know why you created a new suffix on the
10 claim number?
11 A. I don't.
12 Q. Do you think you did it because of the expected
13 depreciation claim?
14 A. No, sir.
15 Q. What other possibilities are there?
16 A. Loss of income.
17 Q. Mr. Drexel did have a loss of rental income
18 aspect of this claim. Is that right?
19 A. I don't recall, but I'm basing this on that
20 original file notes that he had business interruption
21 coverage.
22 Q. And business interruption coverage would cover
23 lost rent?
24 A. Yes, sir.

59

1  Q. If you needed to determine why you created a
2  new suffix, what would you need to look at? What
3  would you need to do, if you could do it at all?
4  A. If I needed to create a new suffix?
5  Q. No. If I said to you why did you create this
6  02 suffix -- you obviously don't remember, right?
7  A. Exactly.
8  Q. Are there any documents or materials that you
9  could review to answer that question why you created
10 the suffix?
11 A. On the loss screen, on the first page of our
12 loss screen, it shows the suffixes and I could look at
13 that and see what suffix that I opened.
14 Q. Do you know what's at the top when you look at
15 the loss screen, what does it say?
16 A. I don't recall.
17 Q. Can you explain to me the e-mail from
18 Mr. Riddle to yourself on August 13th, 2004 at 2:25?
19 A. The one at 2:25?
20 Q. Yes, ma'am.
21 A. Danny is telling me to stop payment on the
22 check and review the coverage.
23 Q. How do you go about reviewing the coverage?
24 A. The same as when I would get a new claim, I

60

1  would put the policy number in and would pull up the
2  coverage screen.
3  Q. Can you explain to me the sentence in his
4  e-mail that says, "This policy may be canceled prior
5  to effective date"?
6  A. I'm not sure what you want me to explain. He's
7  telling me that it looks like it's canceled prior to
8  the effective date.
9  Q. Well, he's telling you that it may be canceled
10 prior to the effective date. Is that right?
11 A. That's correct.
12 Q. What governs that? What is the information
13 that Harleysville needs to determine whether a policy
14 may be canceled prior to effective date or not?
15     Do you understand the question?
16 A. No.
17 Q. Can you explain to me when policies can be
18 canceled prior to the effective date?
19 A. No, sir, I can't.
20 Q. Can you explain to me when they cannot be
21 canceled prior to the effective date?
22 A. I cannot.
23 Q. Can you explain to me what the phrase
24 "effective date" means?

61

1  A. Effective date means the date that the policy
2  begins when the premium is paid until expiration date,
3  effective to.
4  Q. Are you able to tell me what the effective date
5  with respect to Mr. Drexel's policy in 2004 was?
6  A. When I confirmed coverage, and I can't see
7  this (indicating), but I'm assuming it was 6-8-04 to
8  6-8-05, but I'm assuming that.
9  Q. But you're referring to H-2. Is that correct?
10 I think it's H-2.
11 A. Yes, sir.
12 Q. I forgot a question about Ms. Staton's August
13 11th e-mail to you.
14     What is direct bill?
15 A. I don't know what direct bill is.
16 Q. You have no idea?
17 A. No, sir.
18 Q. Do you have any knowledge of Harleysville's
19 billing practices or software or systems?
20 A. As far as the claims?
21 Q. Yes.
22 A. I do on claims, but not --
23 Q. How about as far as policy renewal and that
24 type of thing?

16 (Pages 58 to 61)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

62

1    A.  No, sir.
2    Q.  When you're adjusting a claim, do you have
3    access to a direct bill system?
4    A.  I'm not exactly sure what the direct bill is on
5    Harleysville system.
6    Q.  In 2004 did you have access to any systems or
7    collections of information on a computer that could be
8    termed a direct bill system, anything that fits that
9    description?
10   A.  Possibly.  You know, I don't know what the
11   direct bill is.
12   Q.  As a claims adjuster in 2004, did you have
13   access to any billing information if you needed it?
14   A.  Not the billing information, no, sir.
15   Q.  Would you have access to any information
16   regarding when premium payments were received by
17   Harleysville?
18   A.  No, sir.
19   Q.  Do you know who has access to that information?
20   A.  I would assume our underwriting department.
21   Q.  To your knowledge, when Harleysville issues a
22   check for a loss is the underwriting department or any
23   underwriting employees involved in that decision?
24   A.  Not that I'm aware of.

63

1    Q.  Are the claims handlers required to notify any
2    underwriting employees prior to issuing a check?
3    A.  No, sir.
4    Q.  Are claims handlers required to notify anyone
5    else in Harleysville outside of the claims department
6    when they issue a check before they issue a check?
7    A.  No, sir.
8    Q.  The most recent e-mail on H-13 is an e-mail
9    from Amber Staton to you dated August 17 at 8:10 a.m.
10   Is that correct?
11   A.  Yes, sir.
12   Q.  Can you explain Ms. Staton's comments to you?
13   A.  She's read some of the adjuster notes and
14   trying to explain why it took so long to determine
15   there was no coverage.
16   Q.  Do you have an understanding of why it took so
17   long to determine that there was no coverage in this
18   case?
19   A.  No.
20   Q.  You have no idea why it took so long?
21   A.  No.
22   Q.  You understood, however, that Mr. Drexel was
23   asking why it took so long.  Isn't that right?
24   A.  Understood from home.  I mean, are you asking

64

1    me did I understand that he asked me?
2    Q.  Do you have any recollection of speaking to
3    Mr. Drexel about why it took so long?
4    A.  I don't recall.
5    Q.  Do you have any recollection after this claim
6    was denied and Harleysville canceled the check
7    speaking with anyone about the denial?
8         MR. CASARINO:  Let me back up a little
9    bit.  You made a comment that they canceled the check.
10   I don't think that's accurate.
11   Q.  Could you refer to your adjuster notes at
12   August 13th at 15:21 that we were discussing a few
13   moments ago?
14   A.  System check was voided.
15   Q.  Harleysville canceled the check?
16   A.  Voided.
17        MR. CASARINO:  Voided.
18   Q.  What's the difference?
19   A.  Well, voided is that -- I don't know how they
20   do it.  It's voided in the system.  The check never --
21   well, I don't know if the check went out or not, to be
22   honest with you.  I don't know.
23   Q.  What's the difference between voiding a check
24   and canceling a check?  You just drew some

65

1    distinction.  I'm asking you what the distinction is.
2    A.  I'm assuming that if the check goes out, you
3    cancel it.
4         If it's still pending --
5    Q.  But if you catch it before it goes, it's
6    voided?
7    A.  It's voided.
8    Q.  So Harleysville voided the check in this case
9    on August 13th?
10   A.  Yes, sir.
11   Q.  And they voided the check and canceled the
12   claim because of what?
13   A.  Because of this e-mail that we were notified
14   that the policy had been canceled for non-payment.
15   Q.  The policy was canceled for non-payment?
16   A.  According to this e-mail.
17   Q.  Canceled for non-payment of what?
18   A.  Premium.
19   Q.  Now, you said according to this e-mail.  Do you
20   have any reason to doubt the e-mail or the fact that
21   the policy was canceled for non-payment of premium?
22   A.  No.
23        MR. CASARINO:  I'm not sure.  What are you
24   asking her?  That the e-mail was accurate or that the

17  (Pages 62 to 65)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

66

1  policy was, in fact, canceled?
2          MR. BESTE: Can you read back the
3  question, please?
4          MR. CASARINO: I want to object if it's
5  something that she didn't do.
6          MR. BESTE: It's a pretty straightforward
7  question.
8          MR. CASARINO: I'm still going to object
9  to it if you're asking her if she knows. If she
10  didn't do it, how does she know? She can tell you
11  what the e-mail says.
12          (The reporter read back the pending
13  question.)
14          MR. CASARINO: That's two questions. What
15  are you asking her?
16          MR. BESTE: Does she have any reason to
17  doubt that the policy was canceled for non-payment of
18  premium?
19          MR. CASARINO: Well, I'm going to object
20  to that.
21          MR. BESTE: That's fine. What's the
22  basis?
23          MR. CASARINO: The basis is you emphasized
24  when you said that cancellation and, as you know,

67

1  Harleysville's position is it was not canceled.
2          MR. BESTE: I don't want a speaking
3  objection here, Mr. Casarino, and that's exactly what
4  you're doing and I don't want to hear it.
5          If you have an objection to the form of
6  the question, you can note it and I don't want
7  speaking objections and I won't tolerate it.
8          MR. CASARINO: You can tolerate what you
9  want. I'm putting my objection on the record.
10          MR. BESTE: What is the objection?
11          MR. CASARINO: And my objection on the
12  record is you're trying to make a legal conclusion out
13  of it and that's where I have a problem with it.
14          If you're asking her understanding that's
15  one thing.
16          MR. BESTE: I'm asking her a question. Of
17  course I'm asking her understanding.
18          MR. CASARINO: Okay. That's different
19  because you asked what Harleysville did. Now, her
20  understanding --
21          MR. BESTE: I asked her, Mr. Casarino,
22  whether she had any reason to doubt that the policy
23  was canceled for non-payment of premium.
24          Do you have an objection to that question?

68

1          MR. CASARINO: I have an objection to that
2  question.
3          MR. BESTE: What is it?
4          MR. CASARINO: The objection is that
5  you're asking her to give her understanding of what
6  happened and she didn't do it.
7          MR. BESTE: Fine.
8          MR. CASARINO: That's the objection.
9  BY MR. BESTE:
10      Q.  Please answer the question.
11      A.  All I can tell you is based on this e-mail. I
12  mean, I have no reason to doubt that what they're
13  telling me is not true.
14      Q.  Reviewing H-1, your adjuster notes, are you
15  able to tell me why the policy was canceled?
16          MR. CASARINO: Objection. The policy was
17  not canceled.
18          MR. BESTE: Maybe you would just like to
19  speak to her out in the hall?
20          MR. CASARINO: I'm not going to speak to
21  her out in the hall. You can't use this person who is
22  not underwriting to explain something --
23          MR. BESTE: It's a very simple question.
24  If you could please refrain from your speaking

69

1  objections, I would appreciate it. You're obviously
2  coaching the witness.
3          MR. CASARINO: I'm not coaching the
4  witness. I'm telling you right now our position is it
5  was not canceled and --
6          MR. BESTE: Your position is irrelevant to
7  her testimony. If you have an objection, state the
8  objection.
9          MR. CASARINO: I just did.
10          MR. BESTE: You're coaching her.
11          MR. CASARINO: I'm not coaching her. I'm
12  telling you what my objection is. I don't want you to
13  be using her testimony for a legal conclusion if she
14  didn't do it. It's that simple.
15          Her understanding is one thing. What the
16  term means is something totally different. You can
17  ask her understanding, unless she's the one that
18  actually did what happened.
19  BY MR. BESTE:
20      Q.  Can you please review your notes from August
21  13th in H-1 and tell me why the claim was not paid?
22      A.  We were notified from the home office,
23  Harleysville, Pennsylvania, that the policy had been
24  canceled or was no longer in effect. I don't -- you

18 (Pages 66 to 69)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

70

1  know, they weren't going to reinstate it.
2      Q.  And what are you referring to when you say
3  that?
4      A.  I'm referring to an entry on 8-13-2004 at
5  15:36:06, "received e-mail from Amber that policy had
6  been canceled."
7      Q.  Can you tell me why you called underwriting to
8  see if they were going to reinstate the policy?
9      A.  Because sometimes on occasion people pay their
10  premium late and sometimes underwriting will accept
11  it, a late premium, and reinstate it.  I'm assuming.
12      Q.  You're assuming that's why you called?
13      A.  I called to make sure that underwriting was
14  indeed not reinstating this policy.
15      Q.  Do you know why underwriting does and does not
16  reinstate policies?
17      A.  No, sir, I don't.
18      Q.  Do you have any involvement in that decision?
19      A.  No, sir, I don't.
20      Q.  Can you explain the sentence "The claim was
21  coverage verified on June 23, 2004 by claims entry
22  which at the time was in non-pay"?
23      A.  I'm sorry.  Where are you?
24      Q.  This is Ms. Staton's August 17th e-mail to you.

71

1      A.  You're going to have to repeat the question.
2  I'm sorry.
3      Q.  Do you see the sentence that begins "The claim
4  was coverage verified on June 23rd"?
5      A.  Yes, sir.
6      Q.  And you received that e-mail?
7      A.  Yes, sir.
8      Q.  What does that sentence mean to you?  What does
9  it mean?
10      A.  That sentence means to me that at the time I
11  verified coverage that it was showing active.
12      Q.  And you say that because of the
13  phrase "coverage verified on June 23rd"?
14      A.  Yes.
15      Q.  Can you explain to me the last part of the
16  sentence which says, "which at the time was in
17  non-pay"?
18      A.  No, sir, I can't explain that.
19      Q.  What does the phrase "non-pay" mean to you?
20      A.  That means that the premium wasn't paid, to my
21  understanding.
22      Q.  When you were adjusting this claim would you
23  have access to any information or files or computer
24  systems that would have told you whether a particular

72

1  policy was in non-pay?
2      A.  Again, at the time I verified coverage I'm
3  looking at a coverage screen and it showed the policy
4  as being active.  I don't see anything that says
5  non-pay.
6          I don't, I don't have access to something
7  that says non-pay that I'm aware of.
8      Q.  Now, the second-to-last sentence in
9  Ms. Staton's e-mail says, and I'll read it to you, the
10  policy confirmed canceled on July 7, 2004 effective
11  for June 30, 2004.
12          MR. CASARINO:  I think you may have
13  misread that.
14      Q.  Do you know the sentence I'm referring to?
15      A.  Yes, sir.
16      Q.  Can you please read it and explain it to me?
17      A.  "The policy confirmed cancellation on 7/6/04
18  effective for 6/30/04."  I cannot explain that to you.
19      Q.  What does the phrase "effective for 6/30/04"
20  mean?
21      A.  It would have been effective on 6-30-04.
22      Q.  What would have been effective on 6-30-04?
23      A.  The policy.
24      Q.  The policy cancellation?

73

1      A.  I don't know.  She's sending this to me.  I
2  don't know what she's telling me, to be honest with
3  you.  I don't have anything to do with underwriting.
4  I don't know how they do it.  What their terms -- I
5  don't know.
6      Q.  Is June 30th, 2004 after the loss in this case?
7      A.  I believe it is.
8          MR. BESTE:  Can I have this marked as 14?
9          (H Deposition Exhibit No. 14 was marked
10  for identification.)
11  BY MR. BESTE:
12      Q.  Are you able to identify that document marked
13  as H-14?
14      A.  Not really, no.
15      Q.  Have you ever seen a document or a computer
16  screen that looks like H-14?
17      A.  Not that I recall.
18      Q.  Are you able to tell me whether the information
19  reflected on H-14 pertains to the loss at issue or
20  Mr. Drexel's policy?
21      A.  Maybe if I could see this policy number I could
22  tell you, but it doesn't have his name on here so --
23          MR. CASARINO:  The policy number is on the
24  second page.

19  (Pages 70 to 73)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

74

1    Q.  You can tell what the policy number is by
2  looking at this document, correct?
3    A.  Yes, sir.
4    Q.  But you can't tell whether it pertains to
5  Mr. Drexel's claim?
6    A.  Correct.
7    Q.  But the policy or account number is M, as in
8  Mary, P, as in Peter, A, as in Adam, 812988?
9    A.  That's correct.
10   Q.  And to your knowledge, you don't have access to
11 any computer information at Harleysville that would
12 show you this information?
13   A.  No, sir, not that I'm aware of.
14       MR. BESTE:  H-15.
15       (H Deposition Exhibit No. 15 was marked
16 for identification.)
17 BY MR. BESTE:
18   Q.  Are you able to identify this document?
19   A.  It's an e-mail sent to me.
20   Q.  By whom?
21   A.  Robert Southard.
22   Q.  Who is Mr. Southard?
23   A.  I don't know.
24   Q.  Do you recall getting this e-mail?

75

1    A.  No, sir, I don't.
2    Q.  Would you please review your adjuster remark
3  from August 13 at 15:36?  The last sentence in
4  particular.
5    A.  (Reviewing document)  I asked Brooke to have
6  the underwriting manager to e-mail me to confirm that
7  they weren't going to reinstate this policy.
8    Q.  Was that Brooke Beauman, to your knowledge?
9    A.  I'm assuming, yes.
10   Q.  Are you able to tell from your adjuster notes
11 whether you ever received an e-mail confirming
12 anything?
13   A.  Other than Danny's entry here that underwriting
14 has provided us their official position on this policy
15 that they're not going to reinstate.
16   Q.  Do you think that this e-mail from Mr. Southard
17 is an e-mail from the underwriting department?
18   A.  Yes, sir.
19   Q.  Do you recall reading this e-mail?
20   A.  I'm sure I did, but I don't know.
21   Q.  Can you tell me what this e-mail meant to you?
22 What were you being told?
23   A.  I was being told that the policy was not going
24 to be reinstated and that Harleysville had not

76

1  received any payment since I sent a cancellation
2  notice to the insured.
3    Q.  And the e-mail, the exact words are "The
4  captioned policy was canceled for non-payment."  Is
5  that right?
6    A.  That's what it says.
7        MR. CASARINO:  I think it might be time
8  for a short break.
9        MR. BESTE:  Sure.
10       (A brief recess was taken.)
11       MR. BESTE:  Can we have this marked as
12 H-16?
13       (H Deposition Exhibit No. 16 was marked
14 for identification.)
15       MR. BESTE:  Do you know what?  I'm going
16 to add a page to Exhibit 16.  It's actually, I
17 believe, another copy of the same letter.  Let me grab
18 a staple.
19       MR. CASARINO:  That's okay.  I just want
20 to see what it is.
21       This is Harleysville's copy.  Okay.
22       MR. BESTE:  Let me staple them together
23 just so they don't get separated.
24       Sorry about that.

77

1  BY MR. BESTE:
2    Q.  Are you able to identify the document marked as
3  H-16?
4    A.  It looks like a letter I sent to Layne Drexel.
5    Q.  And in that letter you informed Mr. Drexel that
6  his, quote, policy was canceled for non-payment of
7  premium, unquote?
8    A.  Yes, sir.
9    Q.  How did you choose that language, that
10 particular language?
11   A.  I don't recall.
12   Q.  Are you able to tell when Harleysville canceled
13 for non-payment of premium as you indicate in the
14 letter, when the actual cancellation occurred?
15   A.  It looks like they went back to his effective
16 date of 6-8-04.
17   Q.  I'm asking you when did Harleysville cancel the
18 policy?
19       MR. CASARINO:  I object to that.  She's
20 not underwriting.
21   A.  I don't...
22   Q.  You can't tell from your adjuster note what
23 date that occurred?
24   A.  (Reviewing document)  You obviously know

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

### 78

1    something I don't. I don't see where exactly it says
2    what date.
3        Q. Isn't it true that Harleysville determined not
4    to pay this claim on August 13, 2004?
5        A. That's correct.
6        Q. Why did you not send a letter to Mr. Drexel
7    until September 14th?
8        A. I don't know.
9        Q. What caused you to send a letter on September
10   14th?
11           You can look at your notes, if you would
12   like.
13       A. From the e-mail I received from underwriting.
14       Q. What are you looking at, what note?
15       A. 9-14-2004 12:13:36 received an e-mail from
16   underwriting.
17       Q. Is that the August 13 e-mail from Mr. Southard
18   that you're referring to?
19       A. I believe so. I probably sent this letter
20   based on actually the entry of 9-14-2004, Danny's
21   entry, now that we know underwriting's position.
22       Q. I'm sorry. What note are you referring to?
23       A. 9-14-2004 14:12:34.
24       Q. From Danny Riddle. Can you explain the note

### 79

1    from September 7th at 13:38 to me?
2        A. (Pause.)
3        Q. Particularly the sentence "I am awaiting on
4    PLRB response."
5            What does that mean?
6        A. PLRB is the Property Loss Research Bureau.
7    It's a group of attorneys that do research on
8    insurance claims and I had e-mailed them. Obviously,
9    I was waiting for them to respond to me.
10       Q. Does that entity or group of attorneys serve as
11   Harleysville's attorneys?
12       A. No, sir. It's just a group out there. It's
13   not an official attorney rep. It's that you ask them
14   a property question and they do research and...
15       Q. Okay. So you sent -- what's the name of the
16   entity?
17       A. PLRB, Property Loss Research Bureau.
18       Q. You sent the Property Loss Research Bureau an
19   e-mail on September 3rd, 2004?
20       A. According to my adjuster remarks, yes, sir.
21       Q. And that is not Harleysville's attorneys?
22       A. No, sir. That's a research bureau that we use
23   to ask a question.
24           MR. BESTE: Do you know why that document

### 80

1    wasn't produced, Mr. Casarino?
2            MR. CASARINO: What document?
3            MR. BESTE: The e-mail that she sent to
4    the Public Research Bureau.
5            MR. CASARINO: No.
6            MR. BESTE: Yet again documents turn up.
7            MR. CASARINO: That's nonsense. We have
8    given you everything that we could possibly find in
9    this case. There might be an e-mail buried someplace,
10   but you certainly got everything that we have.
11           So don't make a comment like that. If it
12   exists, I'll try to find it. A wise-ass comment like
13   that is just totally unnecessary when we have given
14   you just about everything we have.
15           MR. BESTE: You obviously haven't. It's
16   not the first document that wasn't produced.
17           MR. CASARINO: You're dealing with a large
18   corporation. Who knows where it is?
19           MR. BESTE: I'm sure that's all it is.
20           MR. CASARINO: It's probably privileged
21   anyway.
22   BY MR. BESTE:
23       Q. Did you receive an e-mail response from PLRB on
24   September 8th?

### 81

1        A. I received an e-mail saying that they were
2    still researching my question.
3        Q. Are you able to tell from your adjuster notes
4    whether you ever received a response from PLRB?
5        A. No, sir, I can't.
6        Q. Do you have any reason to believe after
7    reviewing your adjuster notes that you received a
8    response?
9        A. It doesn't appear that I did.
10       Q. Can you go back to H-15, please?
11           Does H-15 contain a policy number
12   pertaining to Mr. Drexel's policy with Harleysville
13   Insurance?
14       A. Yes, sir.
15       Q. And what is that number?
16       A. MPA 812988.
17       Q. Could you please compare H-16 and that policy
18   number with the documents marked H-6 and H-14 and tell
19   me whether those documents pertain to the same policy
20   number that we're discussing here today?
21       A. H-6 and H-14?
22       Q. 6 and 14, please.
23       A. It appears to be the same.
24       Q. Getting back to H-16, your letter of September

21  (Pages 78 to 81)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

82

1    14th, the sentence "The effective date of cancellation
2    was 6/8/04," are you able to tell me from where you
3    took that date?
4        A.  I don't recall.
5        Q.  If you had to determine when an effective date
6    of cancellation was, what would you look at, what
7    part of the claim file or Harleysville computer
8    system?
9        A.  I would have gotten that date from our
10   underwriting department.
11       Q.  In what manner?  How would you have --
12       A.  Possibly by e-mail.
13       Q.  And you say that because that decision is made
14   by underwriting, correct?
15       A.  Yes, sir.
16       Q.  Does the claims department have any authority
17   to determine when the effective date of the
18   cancellation is?
19       A.  No, sir.
20           MR. BESTE:  Can I have this marked as
21   H-17, please?
22           (H Deposition Exhibit No. 17 was marked
23   for identification.)
24

83

1    BY MR. BESTE:
2        Q.  Can you tell me what this document is, please?
3        A.  It's an e-mail addressed to me.
4        Q.  From?
5        A.  Vincent Bracco.
6        Q.  B-r-a-c-c-o?
7        A.  Yes, sir.
8        Q.  Can you tell me what the purpose of this e-mail
9    is?
10       A.  I don't recall.  I don't recall.
11       Q.  Does the phrase "remittance processing" mean
12   anything to you?
13       A.  No, sir.
14       Q.  To your knowledge, does Harleysville have a
15   remittance processing department or other structure?
16       A.  I would assume so by this e-mail.
17       Q.  But you're not sure?
18       A.  No, sir.
19       Q.  Can you tell me why you and Mr. Bracco were
20   discussing the issues reflected in that e-mail?
21       A.  It appears I was asking him something about an
22   envelope.
23       Q.  Do you know why you were asking him about that?
24       A.  No, sir.

84

1           MR. BESTE:  Can I have this marked as
2    H-18, please?
3           (H Deposition Exhibit No. 18 was marked
4    for identification.)
5    BY MR. BESTE:
6        Q.  Can you identify this document?
7        A.  No, sir.
8        Q.  Have you ever seen a document like that before?
9        A.  No, sir.
10       Q.  Does it appear to be a Harleysville document?
11       A.  Yes, sir.
12       Q.  Does it appear to pertain to Mr. Drexel's
13   policy?
14       A.  (Pause).
15       Q.  Just to speed things along, there's a policy
16   number right under the phrase Notice Of Reinstatement
17   about halfway down.
18       A.  Oh, okay.  Yes.
19       Q.  It's hard to find.
20       A.  Yes.  I was looking for it.  Yeah.
21       Q.  Are you able to tell when this document was
22   sent by Harleysville?
23       A.  No.  No, sir.
24           MR. CASARINO:  There's a date, there's a

85

1    date that appears there.  Is that what you want?
2           MR. BESTE:  Sure.
3    BY MR. BESTE:
4        Q.  It bears a date of June 8, 2000.  Is that
5    correct?
6        A.  Yes.
7        Q.  Although that June 8th date has other
8    significance with respect to Mr. Drexel's policy,
9    doesn't it?
10          MR. CASARINO:  June 8th of 2000?
11          MR. BESTE:  Yes.
12   BY MR. BESTE:
13       Q.  Isn't that, in fact, his annual renewal date,
14   June 8th?
15       A.  I would assume so, June 8th.
16       Q.  Have you ever heard the phrase non-payment
17   provision?
18       A.  I don't recall.
19       Q.  Are you aware of any provisions that
20   Harleysville uses in its policy forms regarding
21   whether advanced notice of cancellation is required
22   when Harleysville cancels a policy?
23       A.  I don't know.
24       Q.  It's fair to say with respect to Mr. Drexel's

22 (Pages 82 to 85)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

## 86

1  claim that Harleysville has refused to pay the claim?
2  Is that accurate?
3      A.  Yes, sir.
4      Q.  At any time that you can recall did you attempt
5  to determine whether that refusal was justified under
6  the language of Mr. Drexel's policy?
7      A.  When you refer to "the language of Mr. Drexel's
8  policy," are you referring to his policy forms?  I'm
9  not sure I understand your question because in the
10  claims department I refer to policy forms.
11      Q.  What would you have to do as a claims
12  representative in 2004 to get a copy of the actual
13  insurance contract between Harleysville and its
14  insured as opposed to the forms?
15      A.  I would have to request it from underwriting.
16      Q.  To your knowledge, did you ever review any of
17  the policy terms in this case, in this claim?
18      A.  As far as the underwriting file?
19      Q.  No.  As far as your involvement in the claim as
20  a claims adjuster, to your knowledge did you ever
21  review any policy provisions to determine whether
22  Harleysville's refusal to pay the claim was justified
23  or authorized by the language?
24      A.  No, sir.

## 87

1      Q.  Do you ever do that?
2      A.  No, sir.
3      Q.  And to your knowledge, you never have as long
4  as you have been employed at Harleysville?
5      A.  Not that I recall.
6      Q.  The last document.
7          MR. BESTE:  I believe it's H-19, please.
8          (H Deposition Exhibit No. 19 was marked
9  for identification.)
10  BY MR. BESTE:
11      Q.  Are you able to identify that document?
12      A.  I think it's just -- not really.  I mean, it's
13  not something that I would look at in the claims
14  department.
15      Q.  Do you know what a commercial lines system is?
16      A.  I know what a commercial package is.
17  Commercial lines writes commercial policies.
18      Q.  Is that your handwriting on the first page?
19      A.  Maybe.
20      Q.  It could be?
21      A.  I think it is, yeah.
22      Q.  You think it is?
23      A.  Uh-huh.
24      Q.  Do you have access to this information?  You

## 88

1  must have if your handwriting was on it.  Isn't that
2  true?
3      A.  Yes, sir.
4      Q.  Okay.  But you don't remember writing on this
5  document or reviewing this document?
6      A.  No, sir.
7      Q.  Is there anything in here that would allow you
8  to tell me when you made those notations on H-19?
9      A.  I don't recall.
10      Q.  My name is on there.  Is that correct?
11      A.  Yes, sir.
12      Q.  Is that your handwriting also?  All of it is
13  your handwriting?
14      A.  I think so, yes.
15      Q.  So it's safe to say that that handwriting
16  post-dates my involvement in the case?
17      A.  Yes, sir.
18      Q.  Are you able to tell me whether these five
19  pages pertain to the claim at issue in this case?
20      A.  The claim issue?
21      Q.  The claim at issue here, Mr. Drexel's file.
22      A.  It appears so, yes, sir.
23      Q.  You can tell that because of the policy number
24  in the top left-hand corner?

## 89

1      A.  Yes, sir.
2      Q.  Now, on the first page do you see the entries
3  are listed by number, 01, 02, 03, 04, 05?
4      A.  Yes, sir.
5      Q.  Number 01, can you tell me what that entry is?
6      A.  Are you looking at the top here (indicating)?
7      Q.  Yes.  The first line, 01, the date is July 7,
8  '04.
9      A.  Can I tell you what that is?  This appears to
10  be an audit trail, but I can't tell you what that
11  means.
12      Q.  Do you have access to audit trails as a claims
13  representative?
14      A.  I have access, yes, sir.
15      Q.  Why would you, in 2004 why would you go into an
16  audit trail with respect to a policy or claim?
17      A.  I don't recall.
18      Q.  There's an entry here from July 7th, 2004.  Is
19  that correct?
20      A.  July 7th?
21      Q.  July 6th.  I'm sorry.  Sorry.
22      A.  Yes, sir.
23      Q.  As a claims representative working for
24  Harleysville on July 7th, 2004, July 6th, 2004, would

23  (Pages 86 to 89)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

90

1  you have had access to this audit trail that we're
2  looking at?
3      A.  On July 6th?
4      Q.  Yes.
5      A.  Would I have had access?  I don't know.
6      Q.  Why do you say you don't know?
7      A.  I don't know when they enter this.  I don't
8  know if it would have appeared on that date, July 6th.
9      Q.  Do you know how long it takes an entry to
10  appear on an audit trail?
11      A.  No, sir, I don't.
12      Q.  Does it take a couple of days at most or are we
13  talking weeks?
14      A.  I have no idea how long.
15      Q.  Are you able to tell when the entry was
16  actually made into the audit trail?
17      A.  To be honest with you, no.  No.
18      Q.  Doesn't it appear that it was made on July 6th,
19  2004?
20      A.  It appears.
21      Q.  And if you go all the way to the right there,
22  it says CNISS.  Is that right?
23      A.  That's correct.
24      Q.  What does that grouping of letters mean to you?

91

1      A.  I don't know.
2      Q.  If you would please look at page 4 and tell me
3  what the box in the middle of that page is.
4      A.  It says, "Cancellation Issue."
5      Q.  So that box, in fact, shows that the group of
6  letters CNISS means cancellation issue?
7          MR. CASARINO:  Objection.
8      Q.  You can answer.
9          You can answer.
10      A.  That appears so, yes.
11      Q.  Going back to page 1, there's a column marked
12  OPER-ID.
13          Do you see that?
14      A.  Yes.
15      Q.  Do you know what those numbers represent?  I'm
16  sorry.  Those numbers and letters represent?
17      A.  No, sir, I don't.
18      Q.  Do they look like employee numbers?
19      A.  I don't know.
20      Q.  During the process of adjusting a claim in
21  2004, is there any reason you would have been required
22  by Harleysville to look at an audit trail?
23      A.  No, sir.
24      Q.  Do you recall having any conversations with

92

1  representatives of Tower Insurance or Booth
2  Restorations after Harleysville refused to pay for the
3  damage in this case?
4      A.  I don't recall conversations.
5      Q.  So you don't recall any conversations with
6  George Powell after Harleysville refused to pay?
7      A.  No, sir.
8      Q.  And you don't recall any conversations with
9  Mr. Booth or any representative of Booth Associates
10  after Harleysville refused to pay?
11      A.  I don't recall speaking with them at all.
12      Q.  You were the primary claims handler on this
13  claim for Harleysville?
14      A.  Yes, sir.
15      Q.  Do you think that it's likely that you would
16  have spoken to representatives of the independent
17  adjuster or the contractor after Harleysville refused
18  to pay the claim?
19      A.  As I said, I don't recall speaking to the
20  contractor at all.
21      Q.  Do you recall crying on the telephone when
22  speaking to anyone about this particular claim?
23      A.  No, sir.
24      Q.  Do you recall being upset about Harleysville's

93

1  refusal to pay this particular claim?
2      A.  I'm going to answer that I wasn't upset at
3  Harleysville's refusal to pay the claim.
4      Q.  Can you explain that to me?
5      A.  I was upset that -- I don't know.
6      Q.  I understand that you're in a tough position to
7  answer that question, but if you could please try to
8  explain what you mean, I would appreciate it.  You
9  were upset about something.
10      A.  I was upset that I was not notified that the
11  policy was going to be non-renewed, not reinstated
12  until the point that I was ready to pay.  That's what
13  I was upset about.
14      Q.  And you were upset because other people at
15  Harleysville had knowledge of the cancellation or
16  expiration, whatever you want to term it, long before
17  you were informed of that?
18      A.  I don't know that for a fact if they knew it
19  long before.
20      Q.  But you do know that they knew it before you
21  knew?
22      A.  I know that they told me, they notified me that
23  the policy was no longer in effect and this was after
24  the fact that I had confirmed coverage in the

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

94

1  beginning.
2     Q.  Do you know when that occurred, when they told
3  you that?
4     A.  Around the 13th of August.
5     Q.  You verified coverage right after the fire when
6  you got the claim, correct?
7     A.  Yes, sir.
8     Q.  And you were notified on August 13th that
9  Harleysville would not pay the claim, correct?
10    A.  Yes, sir.
11    Q.  I don't understand why you were upset.  Can you
12 explain that to me in a little bit more detail?
13    A.  No, sir.
14    Q.  Were you upset that the Harleysville computer
15 system told you that coverage was in place when you
16 first verified it when you got the claim?
17    A.  Possibly, yes.
18    Q.  Did you feel that you should have been aware
19 that Harleysville had not received the premium payment
20 while you were adjusting this claim?
21    A.  Yes, sir.
22    Q.  Do you know when Harleysville first became
23 aware that the premium had not been received?
24    A.  No, sir.

95

1     Q.  You only know that you were not notified until
2  August 13th.  Is that correct?
3     A.  That's correct.
4     Q.  Was anyone else at Harleysville upset about
5  anything regarding this claim?
6     A.  Not that I'm aware of.
7     Q.  Did you express any of your sentiment to any of
8  your supervisors?
9     A.  I don't recall.
10    Q.  Are there any steps that you take now to
11 prevent this from happening again?
12    A.  No, sir.
13    Q.  Two more questions I forgot to ask you when I
14 went through these.
15       I'm going to show you H-2 again.  There is
16 some handwriting on H-2.  Are you able to identify any
17 of that handwriting?
18    A.  This is my handwriting that says "100 percent
19 co-insurance."
20       The "R/C "would be replacement cost.
21    Q.  What does the phrase "100 percent co-insurance"
22 mean to you?
23    A.  He's insured to value at 100 percent.  He has
24 to be insured to value at 100 percent.

96

1     Q.  Are any of the other notations your
2  handwriting?
3     A.  The name of the bank is my handwriting.
4     Q.  Do you have any recollection of why you were
5  writing the name of the bank there?
6     A.  No, sir.
7     Q.  Did I hand you both of them?  I'm sorry.
8       Here it is.  I'm going to show you H-16,
9  the second page of it.  Are you able to identify any
10 of the handwriting on the postal card?
11    A.  No, sir.
12    Q.  You don't think that these digits at the bottom
13 starting with 7002 is your handwriting?
14    A.  No, sir.
15    Q.  If you give me one minute, I think that's all I
16 have.
17       I lied.  I'm going to hand you H-5, if you
18 can tell me whether that's your handwriting, please.
19    A.  It looks like this claim number is my
20 handwriting, yes, this SO530739.
21    Q.  Is that the claim number that we have been
22 discussing today, Mr. Drexel's fire?
23    A.  I think so, yes.
24    Q.  Are you able to identify the handwriting on

97

1  H-14?
2     A.  No, sir.
3     Q.  I'm sorry.  It was no?
4     A.  No.
5     Q.  How about H-15?
6     A.  It looks like my handwriting.
7       MR. BESTE:  That's all I have.  Thank you
8  very much.
9       THE WITNESS:  Thank you.
10 BY MR. CASARINO:
11    Q.  Sherry, just a couple of questions.
12       When you first got the assignment and you
13 said you checked on the computer, what exactly were
14 you told about the policy?  You used the word "active"
15 before.
16    A.  There's a coverage screen and there will be the
17 effective dates across the top and then to the bottom
18 left of the screen, the coverage screen, on the very
19 first page it will have if the policy is active, it
20 will have active.  If it's non-renewed, it will say
21 non-renewed.
22       If it's -- you know.
23    Q.  If it's canceled, will it say canceled?
24    A.  It will say canceled.

25  (Pages 94 to 97)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

98

1  Q. And in this case it said active?
2  A. It said active.
3  Q. Now, you were asked about an agreed price
4  between Harleysville and a contractor, but you said
5  you don't authorize the repairs; repairs have to be
6  done by the insured.
7  A. Yes, sir.
8  Q. When the check goes out, is it made payable to
9  the insured?
10  A. Yes, sir.
11  Q. Do you put the contractor on the check?
12  A. If we have an authorization to add their name,
13  we'll put them on the check.
14  Q. Otherwise, you don't?
15  A. Right, we don't.
16  Q. You don't care if the insured has the property
17  repaired or not, do you?
18  A. That's correct. I don't care.
19  Q. Now, you said that the check was issued. I'm
20  not sure exactly what you do when you authorize the
21  check be issued.
22    Do you send the check out?
23  A. On this one I would have, because it's over my
24  authority, I would have put a check request in and it

99

1  would have had to have been approved by Danny and then
2  entered into the system by one of our clerical people.
3  Q. But then what happens? Do you sign the check?
4  A. No. It generates out of Harleysville,
5  Pennsylvania's processing center.
6  Q. So you just put in an authorization for it, but
7  you don't actually do the sending yourself?
8  A. Exactly.
9  Q. Now, the letter that you sent to Mr. Drexel,
10  the one dated September 14, 2004, I think you
11  indicated that was because of the note from
12  Mr. Riddle?
13  A. Yes, sir.
14  Q. Now, his note doesn't say canceled on it,
15  unless I'm looking at it wrong, and you used the word
16  canceled.
17    In particular, is there a reason why you
18  used that word?
19  A. Canceled is it's canceled. It's just a
20  generic. You know, I don't know if it wasn't
21  reinstated or -- you know.
22  Q. It's a word that you --
23  A. We use cancel just like cancel the check, you
24  know, where we actually voided the check. We didn't

100

1  cancel the check.
2  Q. It's a word you use in the adjusting
3  department?
4  A. Yes, sir.
5  Q. Is that what you're saying?
6  A. Yes, sir.
7  Q. But the reason that Harleysville may have
8  terminated this policy is something that comes out of
9  underwriting?
10  A. Yes, sir.
11    MR. CASARINO: I have nothing else.
12  BY MR. BESTE:
13  Q. I promise only a few follow-up questions.
14    If you could look at -- I'm not sure what
15  exhibit it is.
16    I'm going to hand you H-8. I believe we
17  have identified this as an interim report from Tower
18  Insurance to you at Harleysville. Is that correct?
19  A. Yes.
20  Q. Will you please turn to page 412?
21    Can you identify that document?
22  A. That's an authorization to include G. S. Booth
23  on the check.
24  Q. And it appears to be signed by Mr. Drexel,

101

1  correct?
2  A. Yes.
3  Q. And this authorizes Harleysville to write a
4  check to G. S. Booth & Associates, Inc., correct?
5  A. No, sir. It's an authorization to make the
6  check payable to Layne Drexel and G. S. Booth &
7  Associates.
8  Q. Jointly?
9  A. Yes, sir.
10  Q. And you received this authorization from
11  Mr. Powell?
12  A. Yes, sir.
13  Q. You mentioned a moment ago that above a certain
14  amount you have to get authority from Mr. Riddle to
15  pay a claim?
16  A. Yes, sir.
17  Q. In 2004 what was that amount?
18  A. I believe it was 25,000.
19    MR. BESTE: That's all I have.
20  BY MR. CASARINO:
21  Q. Even if the check were within your limits of
22  25,000, do you still write that check or does it go to
23  Harleysville, Pennsylvania?
24  A. I would have entered the check in the system

26 (Pages 98 to 101)

Drexel v. Harleysville Insurance Co.
Sherry Clodfelter

---

**102**

1  the same as the clerical people. It would have been
2  sent the same way.
3  Q. So it would have gone up to Harleysville,
4  someone would have signed it and sent it from there?
5  A. It would have come out of our processing
6  center, our accounting center in Harleysville,
7  Pennsylvania.
8      MR. CASARINO: Okay. We'll read.
9      (Deposition concluded at 1:10 p.m.)
10
11          INDEX
12  DEPONENT: SHERRY CLODFELTER        PAGE
13    Examination by Mr. Beste        2
      Examination by Mr. Casarino     97
14    Examination by Mr. Beste        100
      Examination by Mr. Casarino     101
15
16        E X H I B I T S
17  H DEPOSITION EXHIBITS            MARKED
18  1 Document Bates stamp numbered DR 0203-
      0207                12
19
    2 Document Bates stamp numbered DR 0161-
20    0162                22
21  3 Document Bates stamp numbered DR 0463-
      0464                24
22
    4 Document Bates stamp numbered P000086    27
23
    5 Document Bates stamp numbered DR 0167    30
24

---

**104**

1
2
3      REPLACE THIS PAGE
4      WITH THE ERRATA SHEET
5      AFTER IT HAS BEEN
6      COMPLETED AND SIGNED
7      BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**103**

1  H DEPOSITION EXHIBITS            MARKED
2  6 Document Bates stamp numbered DR 0185    31
3  7 Document captioned "Confirmation Of
     Termination" with attachment      53
4
   8 Document Bates stamp numbered DR 0368-
5    0455                33
6  9 Document Bates stamp numbered PO000016-
     18                  37
7
   10 Document Bates stamp numbered DR 0214-
8    0223                38
9  11 Document Bates stamp numbered DR 0346    46
10 12 Document Bates stamp numbered DR 0331-
     0333                49
11
   13 Document Bates stamp numbered DR 0209-
12   0210                55
13 14 Document Bates stamp numbered DR 0563-
     0564                73
14
   15 Document Bates stamp numbered DR 0211    74
15
   16 Document Bates stamp numbered P000021 and
16   DR0208              76
17 17 Document Bates stamp numbered DR 0465    82
18 18 Document Bates stamp numbered P000139    84
19 19 Document Bates stamp numbered DR 0195-
     0199                87
20
   ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 104
21
   CERTIFICATE OF REPORTER          PAGE 105
22
23
24

---

**105**

1  State of Delaware )
              )
2  New Castle County )
3
4      CERTIFICATE OF REPORTER
5
      I, Kurt A. Fetzer, Registered Diplomate
6  Reporter and Notary Public, do hereby certify that
   there came before me on Thursday, August 30, 2007, the
7  deponent herein, SHERRY CLODFELTER, who was duly sworn
   by me and thereafter examined by counsel for the
8  respective parties; that the questions asked of said
   deponent and the answers given were taken down by me
9  in Stenotype notes and thereafter transcribed by use
   of computer-aided transcription and computer printer
10 under my direction.
11     I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12 examination of said witness.
13     I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.
15
16
17   Kurt A. Fetzer, RDR, CRR
     Certification No. 100-RPR
18   (Expires January 31, 2008)
19
   DATED:
20
21
22
23
24

---

27 (Pages 102 to 105)

Drexel v. Harleysville Insurance Co.

106

| A | | | | |
|---|---|---|---|---|
| **able** 26:6 30:11 31:4,10,14,20 33:6,11,20 34:22 35:6,13 38:13 39:19 42:9 43:8 44:22 45:3,15 46:16,23 47:2 47:14,16 49:19 50:9 51:7 55:16 56:3,10 56:12 61:4 68:15 73:12,18 74:18 75:10 77:2,12 81:3 82:2 84:21 87:11 88:18 90:15 95:16 96:9,24 | **active** 15:4 71:11 72:4 97:14,19,20 98:1,2 | **agree** 26:23 30:4 30:5 | 85:1 88:22 89:9 90:20 91:10 100:24 | 101:4,7 |
| | **actual** 23:24 77:14 86:12 | **agreed** 26:2,3,4 26:10,12,15,18 26:21 28:11,20 29:1,2,9,12,18 29:21 30:1 35:2,17 39:22 40:10,15 44:7 44:13,15,17 53:10 56:14 98:3 | **application** 20:1 | **assume** 62:20 83:16 85:15 |
| | **Adam** 74:8 | | **applies** 19:20,21 | **assuming** 10:11 13:23 42:5,6 50:12 51:17 53:4 61:7,8 65:2 70:11,12 75:9 |
| | **add** 76:16 98:12 | | **appraiser** 33:24 | |
| | **added** 19:1 | | **appraiser's** 33:22 | |
| | **additional** 23:18 | | **appreciate** 69:1 93:8 | **attached** 52:19 |
| | **addressed** 37:19 47:3,5 55:18 83:3 | | **approval** 26:20 29:5 40:18,19 40:23 41:2 42:11,14 | **attachment** 103:3 |
| | | **agreement** 39:21 40:1 42:2 | | **attempt** 28:3 86:4 |
| | **adjust** 23:12 25:6,10,11,13 25:16 | **ahead** 44:1 | **approve** 40:16 | **attorney** 79:13 105:13 |
| **absolutely** 15:24 | | **alleged** 3:24 | **approved** 44:17 53:9 56:14 99:1 | **attorneys** 79:7 79:10,11,21 |
| **accept** 70:10 | **adjuster** 12:14 13:4,17 14:7 14:21 17:1,2 17:12,21 22:2 24:5 25:7 28:12,20 29:3 29:8,9 32:4 43:16,20 44:12 44:22 45:3,6 46:16 47:2 54:2,15 62:12 63:13 64:11 68:14 75:2,10 77:22 79:20 81:3,7 86:20 92:17 | **allow** 88:7 | | **audit** 89:10,12 89:16 90:1,10 90:16 91:22 |
| **acceptance** 10:3 | | **allows** 13:11 | **Approximately** 7:7 | **August** 1:11 36:6,9 38:4,24 46:20 47:12 48:1 49:21 50:7 51:4 53:3 53:9,13,22 54:9 56:1 59:18 61:12 63:9 64:12 65:9 69:20 70:24 75:3 78:4,17 94:4,8 95:2 105:6 |
| **access** 11:21,24 13:17 15:1,8 56:13 62:3,6 62:13,15,19 71:23 72:6 74:10 87:24 89:12,14 90:1 90:5 | | **Amber** 53:15 55:18 56:1 57:12 63:9 70:5 | **area** 13:22 14:10 15:5 | |
| | | **amount** 26:7 48:6,7,8 49:3 51:1 101:14,17 | **areas** 14:24 | |
| | | **analysis** 16:7 | **aside** 18:22 41:22 53:10,19 53:24 54:4,11 54:15 | |
| | | **annual** 85:13 | | |
| | | **answer** 7:1 37:4 59:9 68:10 91:8,9 93:2,7 | **asked** 37:2 64:1 67:19,21 75:5 98:3 105:8 | |
| **accessing** 14:14 | | **answered** 37:3 50:5 | **asking** 4:3,5,10 20:4 22:1,11 22:14 29:6 37:17 42:17 63:23,24 65:1 65:24 66:9,15 67:14,16,17 68:5 77:17 83:21,23 | **authority** 19:24 20:2,5,11 26:9 26:11 29:12 41:11,14,20 43:1 82:16 98:24 101:14 |
| **accord** 23:4 | **adjusters** 13:3 | | | |
| **account** 74:7 | **adjusting** 15:15 16:18 21:1,4 28:10 36:24 38:5 62:2 71:22 91:20 94:20 100:2 | **answers** 105:8 | | |
| **accounting** 53:2 53:23 102:6 | | **anyway** 80:21 | | |
| | | **appear** 43:12 57:5 81:9 84:10,12 90:10 90:18 | | |
| **accurate** 55:4 56:13 64:10 65:24 86:2 | | | | |
| **acknowledged** 40:8 | **advanced** 85:21 | **APPEARANC...** 1:13 | **aspect** 58:18 | **authorization** 98:12 99:6 100:22 101:5 101:10 |
| **acknowledging** 25:3 | **advice** 20:14 46:3 | **appeared** 90:8 | **assigned** 11:5 25:5 26:8 | |
| | | **appears** 18:8 35:1,8,14,15 35:18 37:9 38:7 39:23 46:22 56:7,20 81:23 83:21 | **assignment** 23:12 97:12 | |
| **acknowledgm...** 24:23 39:9 | **advising** 50:15 | | | |
| **Action** 1:5 | **affect** 18:21 | | **associated** 15:9 | **authorize** 41:12 41:15,17,19 42:1,13 44:6,9 |
| | **age** 4:12 48:15 | | **Associates** 35:8 35:9 92:9 | |
| | **ago** 3:13 64:13 101:13 | | | |

Drexel v. Harleysville Insurance Co.

107

44:20 98:5,20
**authorized**
42:16,20,22,24
43:17,21,23
86:23
**authorizes** 44:1
101:3
**auto** 6:2
**available** 16:1
16:17
**Avenue** 1:10,15
**avenues** 5:6
**awaiting** 79:3
**aware** 16:15
17:6,10 27:8
62:24 72:7
74:13 85:19
94:18,23 95:6
**a.m** 1:11 63:9

**B**

**B** 102:16
**back** 5:4 30:4
38:2 47:22
54:22,23 64:8
66:2,12 77:15
81:10,24 91:11
**bad** 4:7 57:23
**bank** 18:10 96:3
96:5
**base** 44:8
**based** 48:15
68:11 78:20
**basically** 5:12
16:16 23:11
25:5 39:6
**basing** 58:19
**basis** 66:22,23
**Bates** 102:18,19
102:21,22,23
103:2,4,6,7,9
103:10,11,13
103:14,15,17
103:18,19
**bears** 85:4
**Beaumann** 30:13
30:20 75:8

**beginning** 1:11
22:17 94:1
**begins** 61:2 71:3
**behalf** 37:1 38:5
39:20
**believe** 8:14
15:23 42:19
43:17,21 54:3
73:7 76:17
78:19 81:6
87:7 100:16
101:18
**belonged** 3:23
**best** 16:2,4 28:18
**Beste** 1:14 2:6
2:10 10:23
12:6,10 22:1
22:22 23:2
24:16,20 27:13
27:16 30:6,10
30:23 31:3
33:2,5,16,19
36:4,5,11,16
36:19 37:10,14
37:20 38:8,12
39:15,18 46:10
46:14 49:14,18
50:3,4 55:11
55:15 66:2,6
66:16,21 67:2
67:10,16,21
68:3,7,9,18,23
69:6,10,19
73:8,11 74:14
74:17 76:9,11
76:15,22 77:1
79:24 80:3,6
80:15,19,22
82:20 83:1
84:1,5 85:2,3
85:11,12 87:7
87:10 97:7
100:12 101:19
102:13,14
**bill** 61:14,15
62:3,4,8,11
**billing** 61:19

62:13,14
**birth** 4:13,17
**bit** 23:14 64:9
94:12
**blank** 13:14
**Bob** 32:8
**Booth** 27:8 35:8
35:9,16 36:3,6
36:20 37:6,22
39:21 40:2
41:21 42:3,5
44:13 45:5
92:1,9,9
100:22 101:4,6
**bottom** 96:12
97:17
**box** 56:8,10 91:3
91:5
**Bracco** 83:5,19
**break** 76:8
**brief** 76:10
**briefly** 8:1
**bring** 15:5 28:13
**Brooke** 30:13,20
75:5,8
**brought** 3:8 8:17
**building** 7:12,13
7:13
**bureau** 79:6,17
79:18,22 80:4
**buried** 80:9
**business** 3:23
58:20,22
**B-r-a-c-c-o** 83:6

**C**

**call** 14:17 40:9
43:3,6,9
**called** 14:11
15:22,23 40:11
70:7,12,13
**cancel** 65:3
77:17 99:23,23
100:1
**canceled** 32:20
32:22 49:6
53:17 60:4,7,9

60:14,18,21
64:6,9,15
65:11,14,15,17
65:21 66:1,17
67:1,23 68:15
68:17 69:5,24
70:6 72:10
76:4 77:6,12
97:23,23,24
99:14,16,19,19
**canceling** 64:24
**cancellation**
66:24 72:17,24
76:1 77:14
82:1,6,18
85:21 91:4,6
93:15
**cancels** 85:22
**captioned** 76:4
103:3
**car** 3:5
**card** 96:10
**care** 98:16,18
**CAREY** 1:20
**Casarino** 1:17
1:17 8:2 9:1
10:20 21:23
22:3 27:17
36:3,8,14,18
37:2,17,21
38:19 39:13
44:3 49:24
64:8,17 65:23
66:4,8,14,19
66:23 67:3,8
67:11,18,21
68:1,4,8,16,20
69:3,9,11
72:12 73:23
76:7,19 77:19
80:1,2,5,7,17
80:20 84:24
85:10 91:7
97:10 100:11
101:20 102:8
102:13,14
**case** 3:3,20 17:7

44:11 45:16
46:18 55:6
63:18 65:8
73:6 80:9
86:17 88:16,19
92:3 98:1
**cases** 3:2
**Castle** 105:2
**catch** 65:5
**cause** 19:10,11
19:13
**caused** 78:9
**center** 99:5
102:6,6
**certain** 26:7
101:13
**certainly** 80:10
**CERTIFICATE**
103:21 105:4
**Certification**
105:17
**certified** 22:4,5
**certify** 105:6,11
105:13
**chain** 55:21,23
**chance** 29:24
**change** 24:13
51:1
**changed** 17:9
24:9
**changes** 6:21
**check** 17:12 19:2
38:19 46:17,22
46:24 47:3,20
53:7,22 54:9
54:22 55:2,3,6
55:9 56:19,22
59:22 62:22
63:2,6,6 64:6,9
64:14,15,20,21
64:23,24 65:2
65:8,11 98:8
98:11,13,19,21
98:22,24 99:3
99:23,24 100:1
100:23 101:4,6
101:21,22,24

Drexel v. Harleysville Insurance Co.

108

checked 57:9,10
97:13
checks 49:6
Chesapeake
32:11,14
choice 26:5
choose 77:9
CHRISTMAN
1:17
circumstances
2:15 20:8
Civil 1:5
claim 2:17 3:11
3:12,16,21 5:8
7:12,12,17
11:6 13:18
14:3 15:5,6,7,9
15:13,15 16:18
16:21 17:1,1,2
17:5,19,22
19:1,20 20:13
21:1,4 23:8,12
25:4,6,10,12
25:14,17,21
26:8 27:2,9
28:10 29:7,17
31:11,15,24
34:23 35:11,17
36:23,24 38:5
40:16 41:11
42:20 58:2,10
58:13,18 59:24
62:2 64:5
65:12 69:21
70:20 71:3,22
74:5 78:4 82:7
86:1,1,17,19
86:22 88:19,20
88:21 89:16
91:20 92:13,18
92:22 93:1,3
94:6,9,16,20
95:5 96:19,21
101:15
claims 5:19,21
6:2,18 7:6,7,10
9:3,6,10 12:18

12:20,23 13:3
13:6 15:21,22
17:12 18:21
19:18,24 20:5
22:2 24:1,3,4,5
27:11 34:7,14
35:20 41:14
42:9 44:12
61:20,22 62:12
63:1,4,5 70:21
79:8 82:16
86:10,11,20
87:13 89:12,23
92:12
clarify 4:9
clerical 99:2
102:1
Clodfelter 1:9
2:1,7 4:14
102:12 105:7
CNISS 90:22
91:6
coaching 69:2,3
69:10,11
collections 62:7
column 91:11
come 28:20
29:15 44:7
102:5
comes 20:23
100:8
coming 33:14
comment 64:9
80:11,12
comments 63:12
commercial
87:15,16,17,17
commonly 21:1
communicate
13:4 43:1
communication
12:3
Company 4:22
25:20,22
company-wide
11:22,23
compare 81:17

complete 48:12
48:13,22
completed 21:15
23:5 48:17
104:6
completion 49:5
computer 11:18
11:22 12:21
13:10,15 14:5
14:14,19 15:2
24:1 32:23
52:4 62:7
71:23 73:15
74:11 82:7
94:14 97:13
105:9
computers 3:22
3:23 4:1
computer-aided
105:9
concluded 102:9
conclusion
67:12 69:13
confirm 11:7
14:18 75:6
Confirmation
103:3
confirmed 40:14
61:6 72:10,17
93:24
confirming 11:9
14:2 75:11
confirms 25:5
confused 13:7
14:15 36:8
confusing 39:16
connection 10:2
consistent 7:1
contact 16:6
28:3 29:14
43:4
contain 32:4
81:11
contents 7:13,14
contract 86:13
contractor 26:5
26:6,6,10,19

26:24 27:1
28:12,18,19,22
28:24 29:1,4
29:10 30:1,2
35:11 37:7
45:1,11 49:5
92:17,20 98:4
98:11
contractors
26:19
controls 17:11
conversation
40:13 46:7
conversations
12:24 91:24
92:4,5,8
copies 52:6,9
copy 27:17
49:10,11 51:19
51:22,23 52:1
52:7 76:17,21
86:12
corner 88:24
corporate 8:23
corporation
80:18
correct 26:17
37:1,8 38:6
39:12 51:1,2
53:3 54:19
60:11 61:9
63:10 74:2,6,9
78:5 82:14
85:5 88:10
89:19 90:23
94:6,9 95:2,3
98:18 100:18
101:1,4 105:11
correspondence
21:5,9
cost 26:2,3,4,12
26:15,18 28:11
28:20 29:1,2,9
29:12,18,21
30:2 35:2 44:7
48:14,19,19
50:16 95:20

costs 49:2
counsel 8:1,8
105:7,13
County 105:2
couple 4:1 90:12
97:11
course 5:17
67:17
COURT 1:1
cover 58:22
coverage 11:8,9
13:1 14:1,2,18
16:7,20,22,24
17:3,13,18
18:6 19:20
23:22 48:19
57:3,9,10,12
57:19,21 58:1
58:3,4,21,22
59:22,23 60:2
61:6 63:15,17
70:21 71:4,11
71:13 72:2,3
93:24 94:5,15
97:16,18
covered 20:13
covers 20:6
co-insurance
95:19,21
CP0010 20:18
CP1030 20:19
create 59:4,5
created 58:9
59:1,9
CRR 105:17
crying 92:21
C&O 19:8
C-l-o-d-f-e-l-t-...
4:16

_____
**D**

D 102:11
damage 5:24 6:1
7:6 11:6 26:1
38:5 92:3
damages 26:2
DANIEL 1:20

Case 1:05-cv-00428-JJF    Document 65-7    Filed 11/19/2007    Page 35 of 45
Drexel v. Harleysville Insurance Co.

109

**Danny** 6:11 8:5
41:3 59:21
78:24 99:1
**Danny's** 75:13
78:20
**date** 4:12,17
60:5,8,10,14
60:18,21,24
61:1,1,2,4
77:16,23 78:2
82:1,3,5,9,17
84:24 85:1,4,7
85:13 89:7
90:8
**dated** 36:6,9,10
63:9 99:10
105:19
**dates** 11:14,15
23:15 97:17
**day** 54:3 55:9
**days** 90:12
**dealing** 80:17
**December** 6:15
**decide** 26:23
**decision** 62:23
70:18 82:13
**decisions** 20:1
**deductible** 11:13
48:8
**Defendant** 1:8
1:19
**Delaware** 1:2,10
1:11,15,15,18
1:23 34:7
105:1
**denial** 64:7
**denied** 64:6
**department** 9:3
9:6,10,11 10:8
10:9,15 13:6
20:3 33:11,13
41:14 53:2,23
58:8 62:20,22
63:5 75:17
82:10,16 83:15
86:10 87:14
100:3

**departments** 9:8
9:12
**deponent** 2:2
102:12 104:7
105:7,8
**deposition** 1:9
2:12 3:10 7:23
8:9,12 12:8
22:24 24:18
27:14 30:8
31:1 33:3,17
37:12 38:10
46:12 49:15
55:13 73:9
74:15 76:13
82:22 84:3
87:8 102:9,17
103:1
**depositions** 2:16
2:23
**depreciation**
48:7,10,11,15
48:21,24 50:16
50:19,20,24
51:5 58:13
**description** 62:9
**desk** 13:11
**detail** 94:12
**determine** 19:7
19:13 31:21
34:20 42:15
43:8 46:24
59:1 60:13
63:14,17 82:5
82:17 86:5,21
**determined** 78:3
**difference** 39:14
50:18 51:3,6
64:18,23
**different** 18:4
22:3 67:18
69:16
**difficult** 23:14
**digits** 96:12
**Diplomate** 1:12
105:5
**direct** 18:23

61:14,15 62:3
62:4,8,11
**direction** 105:10
**directly** 42:3
45:5
**discrepancy**
36:13
**discuss** 20:14
**discussed** 16:13
**discussing** 31:11
31:15,23 37:24
45:22 64:12
81:20 83:20
96:22
**Discussion**
10:22 49:17
**discussions**
19:19
**distinction** 65:1
65:1
**DISTRICT** 1:1
1:2
**document** 17:18
23:3,6 24:1,22
25:1 27:19
28:7 30:11
31:4,6,8,10,14
32:6,16 33:6,9
33:20 34:22
35:13,19 37:15
38:13 46:3,7,8
47:23 48:1,5
49:8,19 50:1
50:24 52:5,14
52:17,21 54:18
55:16 73:12,15
74:2,18 75:5
77:2,24 79:24
80:2,16 83:2
84:6,8,10,21
87:6,11 88:5,5
100:21 102:18
102:19,21,22
102:23 103:2,3
103:4,6,7,9,10
103:11,13,14
103:15,17,18

103:19
**documented**
52:18 54:14
**documenting**
49:1
**documents** 8:11
31:21 44:23
45:13 49:4
50:9 59:8 80:6
81:18,19
**doing** 6:24 14:13
67:4
**doubt** 50:13
65:20 66:17
67:22 68:12
**DR** 35:22 36:1
36:21 102:18
102:19,21,23
103:2,4,7,9,10
103:11,13,14
103:17,19
**drawing** 13:14
**drew** 64:24
**Drexel** 1:4 2:11
19:4 28:3,5
41:22 42:5,7
42:11,16,24
43:2,4,8,14,17
43:21 44:1,19
44:24 45:1,4
47:5,8,11 48:6
48:23 49:20
50:6,15 51:8
51:18 52:7
53:2,6 58:17
63:22 64:3
77:4,5 78:6
99:9 100:24
101:6
**Drexel's** 27:9
29:17 31:12,16
31:23 38:5
39:22 41:12,24
42:23 44:6
61:5 73:20
74:5 81:12
84:12 85:8,24

86:6,7 88:21
96:22
**DRIDDLE** 41:6
**DR0208** 103:16
**duly** 2:3 105:7
**Duncan** 6:4
**duties** 6:22
**duty** 44:9

_____

**E**
**E** 102:11,16
**effect** 69:24
93:23
**effective** 11:14
11:15 23:15,18
60:5,8,10,14
60:18,21,24
61:1,3,4 72:10
72:18,19,21,22
77:15 82:1,5
82:17 97:17
**either** 26:4
41:21 105:13
**electronic** 24:11
**emphasized**
66:23
**employed** 87:4
**employee** 30:21
91:18
**employees** 7:21
8:6 10:24 12:2
13:3 16:9
17:15 53:20,24
54:11 62:23
63:2
**employment** 5:5
5:18
**enclosure** 50:1
**enclosures** 50:10
**enter** 11:19
12:24 13:1,1
15:6 90:7
**entered** 32:23
99:2 101:24
**entire** 6:14
36:17
**entity** 79:10,16

Drexel v. Harleysville Insurance Co.

| | | | | |
|---|---|---|---|---|
| entries 22:18,20 89:2 | EXHIBITS 102:17 103:1 | **F** | 96:22 | generates 99:4 |
| entry 38:24 39:5 | exist 16:12 | facility 5:2,14 | first 2:2 3:3,5 | generic 99:20 |
| 39:9 41:3,6,8 | exists 80:12 | 9:24 10:18 | 11:5,7 13:7 | George 34:2,4 |
| 46:20,23 47:12 | expect 29:24 | fact 42:4 50:15 | 15:8 17:1,19 | 34:13 35:4 |
| 47:19 70:4,21 | expected 58:12 | 51:9 55:24 | 24:23 57:2 | 37:23 38:14 |
| 75:13 78:20,21 | experience 22:2 | 65:20 66:1 | 59:11 80:16 | 92:6 |
| 89:5,18 90:9 | expiration 61:2 | 85:13 91:5 | 87:18 89:2,7 | getting 16:6 |
| 90:15 | 93:16 | 93:18,24 | 94:16,22 97:12 | 74:24 81:24 |
| envelope 83:22 | Expires 105:18 | fair 11:3 44:11 | 97:19 | give 4:12 7:1 |
| ERRATA | explain 7:11 | 85:24 | fit 8:23 | 8:22 11:4 |
| 103:20 104:4 | 19:9 25:19,21 | familiar 32:19 | fits 62:8 | 20:10 26:9 |
| ESQ 1:14,17 | 29:20 41:16 | far 22:14 31:24 | five 88:18 | 28:17 34:10,12 |
| essentially 7:16 | 44:5,19 45:8 | 38:1 61:20,23 | Floor 1:11,15 | 68:5 96:15 |
| 13:10 18:5 | 45:10 47:19 | 86:18,19 | followed 45:15 | given 7:8 16:21 |
| 20:22 25:9 | 51:21 56:24 | Federal 18:10 | follows 2:4 | 31:21 80:8,13 |
| 39:24 56:8 | 57:2 59:17 | FedEx 22:13,13 | follow-up | 105:8,11 |
| estimate 34:10 | 60:3,6,17,20 | feel 20:10 40:6 | 100:13 | gives 41:14 |
| 34:12 35:1 | 60:23 63:12,14 | 94:18 | foregoing | go 4:2 10:20 |
| 40:8,10,14 | 68:22 70:20 | feeling 14:13 | 105:11 | 11:9,10,18 |
| 48:7 | 71:15,18 72:16 | fell 11:14 | forgot 61:12 | 12:23 13:11,22 |
| event 30:3 | 72:18 78:24 | Fetzer 1:11,22 | 95:13 | 13:24 14:2,7,9 |
| 105:14 | 93:4,8 94:12 | 105:5,17 | form 20:21 | 14:10,17,19 |
| eventually 26:1 | explained 44:24 | figure 50:20 | 23:15,17 67:5 | 15:3,4,20 |
| 27:5 | 45:4,7,19 | 51:3 | forms 11:13 | 20:14 21:9 |
| exact 76:3 | express 95:7 | figures 43:5 | 20:13,16,18,20 | 24:3 26:1,18 |
| exactly 14:10 | e-mail 53:15,18 | file 12:18 13:2 | 20:23 58:3 | 30:4 38:2 43:5 |
| 25:3 41:23 | 53:21 55:18,20 | 13:18 15:6 | 85:20 86:8,10 | 44:1 59:23 |
| 56:23 59:7 | 55:21,23,24 | 16:7,8 17:20 | 86:14 | 81:10 89:15 |
| 62:4 67:3 78:1 | 56:4,10,14,22 | 21:21 23:24 | forward 4:3 | 90:21 101:22 |
| 97:13 98:20 | 59:17 60:4 | 24:1,3 46:3 | free 40:6 | goes 25:1 65:2,5 |
| 99:8 | 61:13 63:8,8 | 49:11 51:22 | front 13:15 | 98:8 |
| examination 2:5 | 65:13,16,19,20 | 52:2,5,8,12 | 22:15 | going 4:3 7:9 |
| 102:13,13,14 | 65:24 66:11 | 58:20 82:7 | function 19:12 | 12:11,19 17:24 |
| 102:14 105:12 | 68:11 70:5,24 | 86:18 88:21 | Furlow 1:10,14 | 21:23 22:22 |
| examined 2:3 | 71:6 72:9 | files 24:4 71:23 | further 105:11 | 28:10 54:6 |
| 105:7 | 74:19,24 75:6 | final 20:5 26:14 | 105:13 | 66:8,19 68:20 |
| exhibit 12:7,8 | 75:11,16,17,19 | 29:5 38:14 | | 70:1,8 71:1 |
| 22:24 24:18 | 75:21 76:3 | 39:7 40:6 | **G** | 75:7,15,23 |
| 27:14 30:8 | 78:13,15,17 | 41:11 | G 27:8 35:8,9,16 | 76:15 91:11 |
| 31:1 33:3,17 | 79:19 80:3,9 | find 15:6 51:14 | 41:21 42:3,5 | 93:2,11 95:15 |
| 37:12 38:10 | 80:23 81:1 | 80:8,12 84:19 | 44:13 45:5 | 96:8,17 100:16 |
| 46:12 49:15 | 82:12 83:3,8 | fine 34:20 66:21 | 100:22 101:4,6 | Good 2:7 30:15 |
| 55:13 73:9 | 83:16,20 | 68:7 | gap 5:5 | 30:17,18 |
| 74:15 76:13,16 | e-mailed 79:8 | fire 11:6 31:12 | general 3:19 | gotten 40:14 |
| 82:22 84:3 | e-mails 39:16,17 | 31:16,23 34:7 | 8:22 11:4 | 82:9 |
| 87:8 100:15 | | 38:5 94:5 | 20:10 22:10 | governs 60:12 |
| | | | generated 33:12 | grab 76:17 |

Drexel v. Harleysville Insurance Co.

111

ground 4:2
group 79:7,10
  79:12 91:5
grouping 90:24
guess 14:15,15
  56:17
guessing 7:9
  57:5
guided 15:15

_____

**H**

H 12:8 22:24
  24:18 27:14
  30:8 31:1 33:3
  33:17 37:12
  38:10 46:12
  49:15 55:13
  73:9 74:15
  76:13 82:22
  84:3 87:8
  102:16,17
  103:1
halfway 84:17
hall 68:19,21
hand 96:7,17
  100:16
handed 23:11
  32:1
handing 24:21
handle 6:2 7:6
  24:5 27:11
handled 3:12
  10:6 34:7
handler 19:18
  19:24 20:5
  92:12
handlers 63:1,4
handles 10:9
handling 18:22
handwriting
  87:18 88:1,12
  88:13,15 95:16
  95:17,18 96:2
  96:3,10,13,18
  96:20,24 97:6
happened 27:5,7
  68:6 69:18

happening
  95:11
happens 32:19
  99:3
hard 84:19
Harleysville 1:7
  4:22 5:2,3,15
  8:7,7,23 9:4,8
  9:12,13,22
  11:21 12:2,24
  13:11,16 15:1
  15:19 16:21
  21:21,24 22:8
  25:13,20,22,24
  26:9,14,20,22
  28:12 29:4
  30:21 31:6
  32:11,13,20
  33:12,14 34:6
  38:6 40:1
  41:12 42:10,22
  43:1,24 44:12
  44:16,24 45:4
  45:8,18 46:17
  47:18 48:11,18
  51:20 53:9,16
  53:20 54:5
  55:4 60:13
  62:5,17,21
  63:5 64:6,15
  65:8 67:19
  69:23 74:11
  75:24 77:12,17
  78:3 81:12
  82:7 83:14
  84:10,22 85:20
  85:22 86:1,13
  87:4 89:24
  91:22 92:2,6
  92:10,13,17
  93:15 94:9,14
  94:19,22 95:4
  98:4 99:4
  100:7,18 101:3
  101:23 102:3,6
Harleysville's
  9:23 10:3,14

  11:10,16 12:15
  13:8 14:16
  18:17 23:22
  29:3 31:7
  32:23 37:1
  39:20 45:13
  51:22 54:21
  61:18 67:1
  76:21 79:11,21
  86:22 92:24
  93:3
hear 67:4
heard 30:17
  32:13 85:16
held 5:17
hire 25:9 28:18
hired 25:13,16
  27:1
hires 25:24
  26:24 45:11
hiring 45:1,5
hit 3:4
home 9:17,21,22
  63:24 69:22
honest 27:10
  42:8 64:22
  73:2 90:17
honestly 10:13
  33:1
hour 39:14
Hypothetically
  29:7
H-1 12:12 17:24
  22:15 32:4
  39:5 41:8
  68:14 69:21
H-10 38:9 39:6
  39:10,19 40:6
H-11 46:11,15
  47:22 50:21,23
H-12 49:14 51:4
  54:18
H-13 55:12,17
  63:8
H-14 73:13,16
  73:19 81:18,21
  97:1

H-15 74:14
  81:10,11 97:5
H-16 76:12 77:3
  81:17,24 96:8
H-17 82:21
H-18 84:2
H-19 87:7 88:8
H-2 22:23 23:3
  61:9,10 95:15
  95:16
H-3 24:17,21
H-4 27:13,20,24
H-5 30:6,11
  96:17
H-6 30:24 32:16
  81:18,21
H-7 33:2,7
H-8 33:16,21
  100:16
H-9 37:10,15

_____

**I**

idea 16:11 61:16
  63:20 90:14
identification
  12:9 23:1
  24:19 27:15
  30:9 31:2 33:4
  33:18 37:13
  38:11 46:13
  49:16 55:14
  73:10 74:16
  76:14 82:23
  84:4 87:9
identified
  100:17
identify 12:12
  23:3 24:22
  27:19 30:11
  31:4 33:6,20
  38:13 47:23
  49:19 55:16
  73:12 74:18
  77:2 84:6
  87:11 95:16
  96:9,24 100:21
III 1:14

impact 18:21
important 36:17
include 100:22
included 54:18
income 58:16,17
incurred 49:2
independent
  19:14 25:7
  28:2,12,20,24
  29:3,8,9 30:2
  92:16
independently
  9:14
indicate 77:13
indicated 99:11
indicating 39:10
  53:1 61:7 89:6
individual 11:20
industry 5:7
information
  17:12 18:12,14
  23:19 60:12
  62:7,13,14,15
  62:19 71:23
  73:18 74:11,12
  87:24
informed 77:5
  93:17
initial 15:13
  35:1
initially 14:3
  16:20
injury 3:3
inputs 17:11
instruct 41:21
instruction 46:3
instructions
  26:12
insurance 1:7
  2:17 3:11 4:22
  5:6 24:24 25:3
  25:6,20,22,22
  25:24 26:8
  27:21 28:4
  30:18 34:1,13
  34:17 35:4
  36:7,21,24

Drexel v. Harleysville Insurance Co.

37:6,22 38:4
38:15 39:20
40:2 41:21
42:2 44:13
53:12,20,24
54:12,16 79:8
81:13 86:13
92:1 100:18
**Insurance's**
26:18
**insured** 16:6
18:23 21:2,5,9
26:5 28:13,15
28:17,17,22
29:5,11,14,21
29:24 30:3
41:18 45:9,19
46:7 48:6
49:10 54:24
76:2 86:14
95:23,24 98:6
98:9,16
**insureds** 21:13
21:22
**insured's** 26:4
28:19 41:18
44:9
**interest** 18:22
19:1,5
**interested**
105:14
**interim** 34:17
36:9 100:17
**interruption**
58:20,22
**investigate** 25:9
25:11
**investigator**
19:14
**invoices** 49:5
**involved** 3:4
11:11,14 19:19
28:15 62:23
**involvement**
70:18 86:19
88:16
**irrelevant** 69:6

**issue** 20:17 53:1
63:6,6 73:19
88:19,20,21
91:4,6
**issued** 19:2
46:17,22 53:7
54:10 55:5,9
98:19,21
**issues** 62:21
83:20
**issuing** 56:18
63:2

— **J** —
**January** 105:18
**job** 6:21 7:4,6
37:7
**Jointly** 101:8
**Jonathan** 6:4
**JSULLIV** 47:13
**Julie** 47:15,16
**Juliet** 4:20,23
**July** 34:23 36:10
72:10 89:7,18
89:20,21,24,24
90:3,8,18
**June** 6:17 18:1
18:17 70:21
71:4,13 72:11
73:6 85:4,7,10
85:14,15
**justified** 86:5,22

— **K** —
**K** 1:14
**Katzenstein**
1:10,14
**keep** 51:23
**kind** 3:19
**King** 1:18,23
**knew** 93:18,20
93:21
**know** 2:23 3:11
3:13,17 4:6,9
9:11 10:12,13
10:19 11:2,24
12:1 13:2,13

14:17 16:5,12
17:11,17 21:18
27:3,6 29:23
30:13,15,20,22
31:17,24 32:8
33:1 34:18
35:9,12 36:12
36:18 39:15
42:4,8,8 45:17
47:1,10 51:9
51:11,13,16,16
51:18 52:20
55:8 56:21
57:15 58:6,8,9
59:14 61:15
62:10,10,19
64:19,21,22
66:10,24 70:1
70:15 72:14
73:1,2,4,5
74:23 75:20
76:15 77:24
78:8,21 79:24
83:23 85:23
87:15,16 90:5
90:6,7,8,9 91:1
91:15,19 93:5
93:18,20,22
94:2,22 95:1
97:22 99:20,20
99:21,24
**knowledge** 16:9
16:14 61:18
62:21 74:10
75:8 83:14
86:16,20 87:3
93:15
**knows** 66:9
80:18
**Kurt** 1:11 105:5
105:17

— **L** —
**language** 19:19
19:21 20:1,6
20:22 77:9,10
86:6,7,23

**large** 80:17
**late** 70:10,11
**law** 1:10
**lawsuit** 3:8
**Layne** 1:4 2:11
47:5,8,11 50:6
77:4 101:6
**leads** 43:17,21
**leave** 41:17
**leaving** 13:5
**led** 2:15
**left** 43:4 53:8
97:18
**left-hand** 88:24
**legal** 67:12
69:13
**letter** 21:22 22:4
22:8 28:4
35:23 36:3,6,9
36:20 37:6,22
37:24 38:3,17
39:6 40:6
45:19,22 49:20
49:23 50:6,10
50:11,16,19
51:4,7,12,20
51:22 52:6,14
52:17,24 76:17
77:4,5,14 78:6
78:9,19 81:24
99:9
**letters** 21:5,9,13
41:5 90:24
91:6,16
**Let's** 10:20
47:22 49:14,24
**lied** 96:17
**life** 17:5
**limits** 11:12
101:21
**line** 18:8 20:11
89:7
**lines** 18:8 19:7
87:15,17
**link** 15:19,20,21
**linked** 13:16
**listed** 89:3

**little** 13:7 18:3
23:14 36:8
64:8 94:12
**live** 4:19
**LLP** 1:10
**local** 26:6
**log** 8:13,15
13:20 38:20,24
39:5 43:11,13
**long** 3:13 5:1
16:24 63:14,17
63:20,23 64:3
87:3 90:9,14
93:16,19
**longer** 69:24
93:23
**look** 11:11 18:1
22:16 31:20
34:22 38:2
46:20 50:23
55:23 59:2,12
59:14 78:11
82:6 87:13
91:2,18,22
100:14
**looking** 38:22,24
53:5 72:3 74:2
78:14 84:20
89:6 90:2
99:15
**looks** 33:14
57:11 60:7
73:16 77:4,15
96:19 97:6
**loss** 11:14 16:2
18:19 19:13
20:6 23:4
47:24 50:20,24
52:18,23,24
54:19,23 55:2
55:5 58:16,17
59:11,12,15
62:22 73:6,19
79:6,17,18
**lost** 58:23
**lot** 4:7 21:5,6
27:11 34:4,5,7

Drexel v. Harleysville Insurance Co.

113

34:8

**M**

**M** 74:7
**mail** 21:13 22:5
  43:4 53:8
**mailed** 21:11
  46:24
**mailing** 21:16,18
**main** 9:23
**major** 9:8
**making** 29:13
**manager** 75:6
**manner** 82:11
**manual** 15:21,22
  16:3,4
**manuals** 15:14
  15:18 16:1,10
  16:12,16,17
**Marc** 30:15
**marked** 12:6,8
  12:11 22:22,24
  23:3 24:16,18
  24:21 27:13,14
  27:19 30:6,8
  30:23 31:1
  33:3,6,16,17
  33:20 35:22
  36:21 37:10,12
  37:15 38:8,10
  39:5,6 40:6
  46:10,12 49:15
  54:18 55:11,13
  55:16 73:8,9
  73:12 74:15
  76:11,13 77:2
  81:18 82:20,22
  84:1,3 87:8
  91:11 102:17
  103:1
**Mary** 74:8
**material** 5:24
  6:1
**materials** 59:8
**matter** 2:11
**ma'am** 59:20
**mean** 11:22,23

20:16 22:10
  26:11 33:24
  42:4 63:24
  68:12 71:8,9
  71:19 72:20
  79:5 83:11
  87:12 90:24
  93:8 95:22
**means** 22:7 57:3
  60:24 61:1
  69:16 71:10,20
  89:11 91:6
**meant** 75:21
**meet** 7:24 8:6
**meeting** 8:4
**mentioned**
  101:13
**met** 8:1,2
**middle** 4:15 91:3
**mind** 43:19
**minute** 10:21
  28:1 96:15
**misread** 72:13
**moment** 7:8
  101:13
**moments** 64:13
**money** 26:7 49:3
  49:6,7
**months** 24:15
**morning** 2:7 4:8
  14:19
**mortgagee** 18:8
  18:15,16,18
**Mount** 4:20,23
**MPA** 81:16

**N**

**N** 102:11
**name** 2:10 4:12
  14:12 30:17
  31:7 73:22
  79:15 88:10
  96:3,5 98:12
**names** 4:15
**Nashville** 4:24
  5:1,2,14 6:5
  8:20 9:13

10:14 11:1
  47:18
**necessarily** 46:5
**need** 14:12
  24:14 34:20
  59:2,3
**needed** 19:8
  59:1,4 62:13
**needs** 60:13
**negotiated** 44:12
**negotiating** 35:6
  35:16
**net** 48:8
**never** 32:2,13,16
  56:21 64:20
  87:3
**new** 23:8 57:20
  57:24 58:2,5,9
  59:2,4,24
  105:2
**Nolia** 4:14
**nonsense** 80:7
**non-Harleysvi...**
  53:24 54:10
**non-pay** 70:22
  71:17,19 72:1
  72:5,7
**non-payment**
  65:14,15,17,21
  66:17 67:23
  76:4 77:6,13
  85:16
**non-renewed**
  93:11 97:20,21
**normal** 45:10,12
  45:16,21 46:2
  46:6
**Normally** 52:16
**North** 1:18
**Notary** 1:12
  105:6
**notation** 18:1,5
  22:17
**notations** 88:8
  96:1
**note** 41:3 67:6
  77:22 78:14,22

78:24 99:11,14
**notes** 8:13,15
  13:1,2,5 15:6
  17:20,21 38:20
  40:7 42:9
  43:20 53:6
  54:2,15 58:20
  63:13 64:11
  68:14 69:20
  75:10 78:11
  81:3,7 105:9
**notice** 1:10
  21:22 23:11,19
  33:12 49:5
  76:2 84:16
  85:21
**noticed** 36:12
**notices** 21:2,10
**notified** 65:13
  69:22 93:10,22
  94:8 95:1
**notify** 63:1,4
**number** 7:17
  11:19 13:23
  14:20 15:3,5
  22:16 31:18,22
  32:2,5,7 58:10
  60:1 73:21,23
  74:1,7 81:11
  81:15,18,20
  84:16 88:23
  89:3,5 96:19
  96:21
**numbered**
  102:18,19,21
  102:22,23
  103:2,4,6,7,9
  103:10,11,13
  103:14,15,17
  103:18,19
**numbers** 15:9
  29:15 30:3
  91:15,16,18
**N-o-l-i-a** 4:16

**O**

**oath** 2:3

**object** 21:23
  66:4,8,19
  77:19
**objection** 67:3,5
  67:9,10,11,24
  68:1,4,8,16
  69:7,8,12 91:7
**objections** 67:7
  69:1
**obtain** 26:1,12
  35:2
**obviously** 4:4
  37:18 59:6
  69:1 77:24
  79:8 80:15
**occasion** 70:9
**occasions** 21:14
  22:12
**occur** 24:13
**occurred** 2:24
  18:19 40:7
  77:14,23 94:2
**Ocwen** 18:10,18
  19:4
**office** 6:5 9:13
  9:15,17,21,22
  10:14 32:11,14
  33:11 47:16
  69:22
**offices** 1:10
**official** 6:17
  75:14 79:13
**Oh** 84:18
**okay** 4:10,11
  11:3 12:21
  13:7 30:5
  37:21 48:22
  67:18 76:19,21
  79:15 84:18
  88:4 102:8
**old** 4:18
**once** 2:18,19,20
  16:20 48:22
**open** 14:20,21
  14:21
**opened** 57:6,8
  57:11 59:13

Drexel v. Harleysville Insurance Co.

operate 9:14
OPER-ID 91:12
opinion 28:23
opportunities
  5:11
opportunity
  28:18
opposed 86:14
options 14:20
ordered 53:7
origin 19:10,11
original 51:24
  52:1,7 58:20
outside 8:8 63:5

_____

P
P 1:17 74:8
package 36:15
  36:17 87:16
page 35:22
  59:11 73:24
  76:16 87:18
  89:2 91:2,3,11
  96:9 97:19
  100:20 102:12
  103:20,21
  104:3
pages 88:19
paid 48:23 49:7
  61:2 69:21
  71:20
paint 48:16
paper 23:24
  32:1
paperwork 49:1
part 12:16,19,23
  13:23 71:15
  82:7
participated
  21:15
particular 19:4
  20:13,16,21
  25:20 41:6,10
  71:24 75:4
  77:10 92:22
  93:1 99:17
Particularly

79:3
parties 105:8
parts 3:22 4:1
party 105:13
Pause 12:4
  21:12 38:18
  46:19 79:2
  84:14
pay 42:22,24
  49:2 70:9 78:4
  86:1,22 92:2,6
  92:10,18 93:1
  93:3,12 94:9
  101:15
payable 98:8
  101:6
payee 47:3
payment 10:9
  40:16 42:20
  44:8 47:10
  48:9 53:1
  59:21 76:1
  94:19
payments 10:4
  62:16
pedestrian 3:4
pending 65:4
  66:12
Pennsylvania
  9:22 33:15
  53:16 69:23
  101:23 102:7
Pennsylvania's
  99:5
people 6:7 9:17
  70:9 93:14
  99:2 102:1
percent 95:18,21
  95:23,24
perform 27:2
performed 27:8
period 6:14
periods 58:1
person 19:10,11
  41:24 68:21
personal 3:3
  13:15

personally 42:10
pertain 81:19
  84:12 88:19
pertaining 81:12
pertains 31:11
  31:15 73:19
  74:4
Peter 74:8
phone 43:3,9
phrase 60:23
  71:13,19 72:19
  83:11 84:16
  85:16 95:21
physical 24:4
physically 14:13
  21:13 46:17,24
  51:8
piece 32:1
place 14:3 16:24
  17:18 94:15
placed 40:9 43:3
plaintiff 1:5,16
  2:11 3:6,7
please 22:23
  24:17 30:7,24
  37:11 38:9
  49:14 66:3
  68:10,24 69:20
  72:16 75:2
  81:10,17,22
  82:21 83:2
  84:2 87:7 91:2
  93:7 96:18
  100:20
PLRB 79:4,6,17
  80:23 81:4
point 16:22
  23:21 40:17
  41:10 57:12
  93:12
policies 15:14,17
  45:13 60:17
  70:16 87:17
policy 11:12,15
  11:19 13:23
  15:3,4,8,10
  18:14 19:19,21

20:1,6,16,21
  20:22 23:15,18
  31:11,18,22
  32:2,5,6,20,22
  48:14 53:16
  57:9,10 58:1
  60:1,4,13 61:1
  61:5,23 65:14
  65:15,21 66:1
  66:17 67:22
  68:15,16 69:23
  70:5,8,14 72:1
  72:3,10,17,23
  72:24 73:20,21
  73:23 74:1,7
  75:7,14,23
  76:4 77:6,18
  81:11,12,17,19
  84:13,15 85:8
  85:20,22 86:6
  86:8,8,10,17
  86:21 88:23
  89:16 93:11,23
  97:14,19 100:8
policy's 20:21
position 5:23
  6:22 67:1 69:4
  69:6 75:14
  78:21 93:6
positions 5:17
possibilities
  58:15
possibly 7:10
  62:10 80:8
  82:12 94:17
postal 96:10
post-dates 88:16
Powell 34:2,4,14
  34:17 35:4,16
  36:23 37:23
  38:14 40:11
  53:11 54:4
  92:6 101:11
Powell's 39:7,24
PO000016 103:6
practice 54:21
practices 16:3,4

61:19
premium 10:3
  61:2 62:16
  65:18,21 66:18
  67:23 70:10,11
  71:20 77:7,13
  94:19,23
prepare 7:23 8:8
  8:11 48:1 49:9
presence 8:8
present 1:20 6:3
  8:4
presented 23:7,9
presently 4:19
pretty 66:6
prevent 95:11
pre-date 39:17
price 26:10,20
  35:17 39:22
  40:3 44:14,15
  44:17 53:10
  56:14 98:3
primary 6:19
  9:24 92:12
print 52:4
printer 105:9
prior 2:15 54:9
  60:4,7,10,14
  60:18,21 63:2
privileged 80:20
probably 4:7
  78:19 80:20
problem 67:13
procedure 45:10
  45:12,16,21
  46:2,6 57:21
procedures
  15:14,17 58:6
proceed 29:13
  41:22
process 28:11,14
  29:17 35:20
  91:20
processing 10:3
  10:10 83:11,15
  99:5 102:5
produced 8:15

Drexel v. Harleysville Insurance Co.

115

51:20 80:1,16
**promise** 100:13
**pronouncing** 2:8
**proof** 21:16,18
52:18,22,24
54:19,23 55:2
55:5
**property** 3:12
5:19,21 6:18
7:6 11:11
18:18 27:9
29:13 39:22
41:13,18,24
42:16,23 43:22
44:6,20 79:6
79:14,17,18
98:16
**provided** 75:14
**provision** 85:17
**provisions** 85:19
86:21
**Public** 1:12 80:4
105:6
**pull** 11:20 13:23
15:3,20 60:1
**purpose** 48:4
49:23 83:8
**pursuant** 1:10
**pursuing** 5:11
**put** 7:16 11:12
12:14 13:1,22
13:24 15:3,4
16:7 49:10
52:2,5,8 60:1
98:11,13,24
99:6
**putting** 67:9
**p.m** 102:9
**P000021** 103:15
**P000086** 102:22
**P000139** 103:18

——— Q ———
**question** 4:5 9:2
15:11 19:23
20:12 21:17,24
31:13 43:19

45:2 50:5,22
54:6 57:23
59:9 60:15
61:12 66:3,7
66:13 67:6,16
67:24 68:2,10
68:23 71:1
79:14,23 81:2
86:9 93:7
**questions** 4:4,7
57:1 66:14
95:13 97:11
100:13 105:8
**quick** 36:11
**quote** 77:6

——— R ———
**raise** 16:7
**range** 7:8
**RDR** 105:17
**reach** 26:10,18
29:11,20 42:2
**reached** 29:2
39:20 40:1
42:11
**reaching** 19:3
28:11 29:17
**reaction** 39:6
**read** 23:14 56:5
56:11,12,18,22
63:13 66:2,12
72:9,16 102:8
**reading** 75:19
**ready** 93:12
**really** 4:2 73:14
87:12
**reason** 50:13
53:5 57:6
65:20 66:16
67:22 68:12
81:6 91:21
99:17 100:7
**recall** 3:2,14,15
28:7 30:19
31:9 32:18
33:10 34:15
36:22 43:10

44:21,21 45:20
54:1,13 58:19
59:16 64:4
73:17 74:24
75:19 77:11
82:4 83:10,10
85:18 86:4
87:5 88:9
89:17 91:24
92:4,5,8,11,19
92:21,24 95:9
**receive** 23:17
40:23 56:17
80:23
**received** 25:4
41:1 53:15
55:5 56:3,5,7
57:3 62:16
70:5 71:6
75:11 76:1
78:13,15 81:1
81:4,7 94:19
94:23 101:10
**receiving** 28:8
34:16 38:16
40:5 53:21
54:22
**recess** 76:10
**recollection** 19:3
29:16 34:16
38:16 64:2,5
96:4
**record** 10:20,22
49:17 67:9,12
**recordkeeping**
13:21
**records** 18:17
**recover** 50:16
**recoverable**
48:21 50:19
51:5
**refer** 9:17,19
32:13 40:7
51:4 64:11
86:7,10
**reference** 16:17
**referring** 11:17

12:17 20:18
35:3 41:8
46:15 55:20
61:9 70:2,4
72:14 78:18,22
86:8
**reflected** 73:19
83:20
**refrain** 68:24
**refusal** 86:5,22
93:1,3
**refused** 86:1
92:2,6,10,17
**regarding** 35:16
40:3 44:13
62:16 85:20
95:5
**Registered** 1:12
105:5
**reinstate** 70:1,8
70:11,16 75:7
75:15
**reinstated** 75:24
93:11 99:21
**Reinstatement**
84:16
**reinstating**
70:14
**relationship**
25:19,21
**relative** 105:13
**release** 54:22
**remark** 13:4
14:7 75:2
**remarks** 12:14
13:17 14:21
22:16 32:4
43:16 44:22
45:3 46:16
47:2 79:20
**remember** 27:10
28:9 29:19
34:19 59:6
88:4
**remittance**
83:11,15
**renewal** 61:23

85:13
**rent** 58:23
**rental** 58:17
**rep** 79:13
**repair** 26:2,13
29:5 39:21
40:3
**repaired** 48:20
98:17
**repairs** 27:2,4,6
27:9 28:21
29:1,13 35:2
41:12,15,17,19
41:22 42:1,12
42:16,23 43:18
43:22,23 44:1
44:7,8,10,20
45:6 48:12,13
48:16,22 56:15
98:5,5
**repeat** 31:13
39:8 45:2
50:22 54:6
71:1
**repeating** 43:19
**REPLACE**
104:3
**replacement**
48:14,18,19
95:20
**report** 9:14
24:23 27:21,22
33:22 34:17
36:10 38:14
39:7,24 40:6,8
100:17
**reporter** 1:12
66:12 103:21
105:4,6
**represent** 2:10
18:12 51:19
91:15,16
**representative**
86:12 89:13,23
92:9
**representatives**
8:7 53:11

Drexel v. Harleysville Insurance Co.

54:11 92:1,16
**representing**
42:5,7
**reputable** 28:24
**request** 40:19
86:15 98:24
**requested** 40:18
47:20
**require** 16:21
**required** 16:8
17:2 45:8 63:1
63:4 85:21
91:21
**research** 79:6,7
79:14,17,18,22
80:4
**researching** 81:2
**reserve** 16:7
**respect** 16:20
19:4,20 27:2
36:23 61:5
85:8,24 89:16
**respective** 105:8
**respond** 79:9
**response** 79:4
80:23 81:4,8
**responsibilities**
6:19 7:4
**responsible**
23:21
**Restorations**
36:7,21 37:7
37:22 39:21
40:2 92:2
**result** 40:13
**retain** 26:14
**returned** 43:9
**review** 37:15
59:9,22 69:20
75:2 86:16,21
**reviewed** 35:19
54:2
**reviewing** 32:6
43:13 46:23
59:23 68:14
75:5 77:24
81:7 88:5

**reviews** 17:1
**revised** 40:9
**re-verify** 16:22
17:2
**Riddle** 1:20 6:11
6:12 8:5,17,20
40:21 41:11
42:20 44:16
59:18 78:24
99:12 101:14
**right** 2:8,18 6:15
7:19 9:4 11:1
15:10 20:17
26:21 27:5
55:21 56:22
57:20 58:1,18
59:6 60:10
63:23 69:4
76:5 84:16
90:21,22 94:5
98:15
**Rob** 2:10
**Robert** 1:14
32:8 74:21
**role** 6:20 19:11
26:18
**room** 6:12
**rough** 34:10,12
**Roughly** 24:13
**rule** 4:2
**run** 29:21 30:3
**R/C** 95:20

—————————
**S**
S 27:8 30:17,18
35:8,9,16
41:21 42:3,5
44:13 45:5
100:22 101:4,6
102:16
**safe** 88:15
**saying** 9:16
47:11 81:1
100:5
**says** 18:10 19:7
29:9,24 60:4
66:11 71:16

72:4,7,9 76:6
78:1 90:22
91:4 95:18
**scenario** 28:19
**scene** 19:16
**school** 3:23,24
**SCLODFEL**
22:17
**scope** 26:1
**screen** 59:11,12
59:15 60:2
72:3 73:16
97:16,18,18
**second** 3:10
53:18 57:6,7
57:11 73:24
96:9
**second-to-last**
72:8
**see** 11:11 15:4
18:10 22:18
32:6 38:20
43:15,23 45:7
54:17 59:13
61:6 70:8 71:3
72:4 73:21
76:20 78:1
89:2 91:13
**seeing** 28:7
**seek** 5:6
**seen** 18:14 21:19
22:16 31:8
32:2,16 33:9
36:20 44:23
73:15 84:8
**send** 19:16 21:2
21:4,6,6,8 22:4
22:12 49:10
52:11 54:21
55:1 78:6,9
98:22
**sending** 28:2
52:22 55:2
73:1 99:7
**sent** 21:10,22
22:8 28:5
47:11 49:20

50:6,11 51:8
52:15,17,18,24
53:4,22 55:8
55:24 56:22
74:19 76:1
77:4 78:19
79:15,18 80:3
84:22 99:9
102:2,4
**sentence** 57:3
60:3 70:20
71:3,8,10,16
72:8,14 75:3
79:3 82:1
**sentiment** 95:7
**separate** 12:21
13:20,21 16:10
**separated** 76:23
**September** 78:7
78:9 79:1,19
80:24 81:24
99:10
**series** 4:3
**serve** 79:10
**Services** 24:24
25:6,23,24
26:9 28:5 34:1
38:15
**SHALK** 1:17
**SHEET** 104:4
**SHEET/DEP…**
103:20
**Sherry** 1:9 2:1
4:14 97:11
102:12 105:7
**short** 76:8
**show** 12:11
17:24 48:6
49:6,7 74:12
95:15 96:8
**showed** 18:18
72:3
**showing** 11:12
12:12 18:15,16
71:11
**shown** 8:11
**shows** 50:24

59:12 91:5
**sign** 51:23 99:3
**SIGNATURE**
103:20
**signed** 51:11,16
51:24 52:9,11
54:22,23 55:5
100:24 102:4
104:6
**significance**
85:8
**simple** 57:1
68:23 69:14
**sir** 2:9,14 3:1
4:24 5:10,16
5:22 6:6,8,13
6:16,23 7:3,22
8:10,16,19,21
9:5,7,18 10:1,5
13:9,19 14:6
14:23 15:16
16:15,19,23
17:4,8,14,23
18:2,7,9,11,20
19:6,15,17,23
20:9,24 22:6
22:19,21 23:13
23:16,20,23
24:10,12 25:2
25:8,15,18
26:16 28:6
29:19 30:12,14
30:16 31:5
32:10,21 33:8
34:3 35:5,10
35:21 39:4
40:4,12,22,24
41:7,9 42:21
44:2,15 47:7
48:3,14,20
49:13,22 50:8
50:14,17 51:9
52:3,10,13
54:1,17,20
55:10,22 56:2
56:9,16 57:13
58:2,14,24

Drexel v. Harleysville Insurance Co.

117

60:19 61:11,17
62:1,14,18
63:3,7,11
65:10 70:17,19
71:5,7,18
72:15 74:3,13
75:1,18 77:8
79:12,20,22
81:5,14 82:15
82:19 83:7,13
83:18,24 84:7
84:9,11,23
86:3,24 87:2
88:3,6,11,17
88:22 89:1,4
89:14,22 90:11
91:17,23 92:7
92:14,23 94:7
94:10,13,21,24
95:12 96:6,11
96:14 97:2
98:7,10 99:13
100:4,6,10
101:5,9,12,16
**site** 9:23
**small** 3:23
**Smith** 1:10,14
**software** 61:19
**solicit** 28:23
**Somebody** 19:16
**someplace** 80:9
**sorry** 13:14 21:3
26:24 27:18
28:1 34:18
36:1 39:8 45:2
46:9 50:22
57:23 70:23
71:2 76:24
78:22 89:21,21
91:16 96:7
97:3
**sort** 21:2 32:14
**Southard** 32:8,9
74:21,22 75:16
78:17
**SO530739** 96:20
**speak** 21:24

43:14 53:6,10
53:19,23 54:3
54:8,10 68:19
68:20
**speaking** 64:2,7
67:2,7 68:24
92:11,19,22
**specialist** 5:20
5:21,24 6:1,18
**specific** 29:16
**specifically**
25:16
**specifics** 3:15
**speed** 84:15
**spell** 4:15
**spent** 49:6
**spoke** 43:9,15
53:2 54:15
**spoken** 92:16
**stamp** 102:18,19
102:21,22,23
103:2,4,6,7,9
103:10,11,13
103:14,15,17
103:18,19
**staple** 76:18,22
**stapled** 50:10
**start** 44:7
**starting** 96:13
**state** 3:8 69:7
105:1
**statement** 47:24
50:20,24
**STATES** 1:1
**Staton** 55:19
56:1 57:12
58:4 63:9
**Staton's** 61:12
63:12 70:24
72:9
**status** 34:23
**stay** 52:12
**Stenotype** 105:9
**step** 11:7
**STEPHEN** 1:17
**steps** 11:4 21:8
23:18 28:13

29:4 40:5
42:15,18 95:10
**stolen** 3:22
**stop** 59:21
**stopped** 20:11
**straightforward**
66:6
**Street** 1:18,23
**struck** 3:4
**structure** 8:23
83:15
**submit** 26:22
49:4
**submitted** 49:1
**suffix** 7:14,15
57:3,6,7,11,20
57:24 58:5,9
59:2,4,6,10,13
**suffixes** 7:10,11
59:12
**suggesting** 36:14
36:16
**suit** 3:6 105:14
**Suite** 1:18
**Sullivan** 47:15
47:17
**summer** 6:9
**supervise** 6:7
7:21
**supervisor** 6:3
6:10 20:14
23:10 40:20
**supervisors** 95:8
**supposedly** 3:21
**sure** 9:1,11,16
9:20 11:23
14:10,16 15:11
15:24 18:24
20:4 21:17
22:10,14 26:11
27:6 29:6
32:12 34:18
42:17 45:14
49:24 50:1,5
60:6 62:4
65:23 70:13
75:20 76:9

80:19 83:17
85:2 86:9
98:20 100:14
**sworn** 2:3 105:7
**system** 11:10,16
11:18,19,21,22
11:24 12:3,15
12:16,21,24
13:4,8,12 14:5
14:7,14,16
15:1 23:22
32:24 47:20
52:4 57:7 62:3
62:5,8 64:14
64:20 82:8
87:15 94:15
99:2 101:24
**systems** 13:20
13:21 61:19
62:6 71:24

---

**T**

**T** 30:17,18
102:16
**table** 30:5
**take** 11:5,7 21:8
23:17 28:13
29:4 40:5
42:15 48:15
90:12 95:10
**taken** 1:9 2:12
2:18 76:10
105:8
**takes** 48:11 90:9
**talked** 29:8
**talking** 34:9
90:13
**tear** 48:16
**telephone** 45:24
46:1 92:21
**tell** 6:3,9 7:4
15:17 31:10,14
33:11,13 34:23
35:6,13 37:15
38:1 39:19
40:7,13 41:1,5
42:9 43:11,13

44:22 45:3,15
46:6,16 47:1,2
47:8,14,16
48:4 50:9 51:7
56:3,10,12
61:4 66:10
68:11,15 69:21
70:7 73:18,22
74:1,4 75:10
75:21 77:12,22
81:3,18 82:2
83:2,8,19
84:21 88:8,18
88:23 89:5,9
89:10 90:15
91:2 96:18
**telling** 41:20,23
59:21 60:7,9
68:13 69:4,12
73:2
**Tennessee** 3:9
4:20,24
**tenure** 34:6
45:18
**term** 50:18
69:16 93:16
**termed** 62:8
**terminal** 13:10
**terminated**
100:8
**Termination**
103:3
**terms** 73:4 86:17
**testified** 2:4 14:4
42:19
**testimony** 43:24
69:7,13 105:11
**Thank** 97:7,9
**theft** 3:21 4:1
**thing** 21:10
61:24 67:15
69:15
**things** 14:22,24
16:8 21:2,10
84:15
**think** 13:14
21:20 33:2

36:17 44:3
53:5 58:12
61:10 64:10
72:12 75:16
76:7 87:12,21
87:22 88:14
92:15 96:12,15
96:23 99:10
**three** 34:9,11
**Thursday** 1:11
  105:6
**time** 4:4 5:15
  15:12 16:2
  17:1 32:22
  35:15 39:1,14
  41:10 43:6,14
  54:7 55:5
  56:14 57:24
  70:22 71:10,16
  72:2 76:7 86:4
**timeliness** 16:5
**times** 2:21 34:13
**title** 6:17
**today** 8:9,12,15
  8:17 16:14
  31:12,21,23
  43:24 81:20
  96:22
**today's** 7:23
**told** 71:24 75:22
  75:23 93:22
  94:2,15 97:14
**tolerate** 67:7,8
**top** 59:14 88:24
  89:6 97:17
**totally** 69:16
  80:13
**tough** 93:6
**Tower** 24:24
  25:3,6,9,13,16
  25:22,24 26:8
  26:9,12,17
  27:21 28:4
  34:1,13,17
  35:3,24 36:24
  37:23 38:4,14
  39:19 40:2

41:21 42:2
44:13 53:11,20
53:24 54:11,16
92:1 100:17
**track** 22:13
**trail** 89:10,16
  90:1,10,16
  91:22
**trails** 89:12
**transcribed**
  105:9
**transcript**
  105:11
**transcription**
  105:9
**true** 68:13 78:3
  88:2 105:11
**try** 4:9 12:5
  18:24 80:12
  93:7
**trying** 14:12
  35:2 63:14
  67:12
**turn** 35:22 80:6
  100:20
**twenty** 34:9
**Twice** 2:22
**two** 3:2 4:1
  16:16,17 34:9
  34:11 52:6
  66:14 95:13
**two-thirds** 35:23
**type** 21:10 61:24
**typed** 12:22
**typically** 28:15

___ U ___

**Uh-huh** 87:23
**understand** 4:5
  4:8 9:1,16
  15:11 21:17
  39:13 42:17
  60:15 64:1
  86:9 93:6
  94:1
**understanding**
  3:19 8:22

37:18 63:16
67:14,17,20
68:5 69:15,17
71:21
**understood** 27:4
  63:22,24
**underwriting**
  9:10 10:7,9,15
  10:18,24 16:9
  17:15 20:2
  58:7 62:20,22
  62:23 63:2
  68:22 70:7,10
  70:13,15 73:3
  75:6,13,17
  77:20 78:13,16
  82:10,14 86:15
  86:18 100:9
**underwriting's**
  13:24 78:21
**UNITED** 1:1
**unnecessary**
  80:13
**unquote** 77:7
**unsigned** 51:22
  52:12
**upset** 92:24 93:2
  93:5,9,10,13
  93:14 94:11,14
  95:4
**use** 12:2 16:13
  18:3 68:21
  79:22 99:23
  100:2 105:9
**uses** 22:8 85:20

___ V ___

**v** 1:6
**value** 48:24
  95:23,24
**various** 12:2
  14:24 15:9
**verified** 57:12
  70:21 71:4,11
  71:13 72:2
  94:5,16
**verify** 16:20

17:13 21:9,21
23:18,22 57:4
57:21 58:1,2
**verifying** 18:6
  22:7,14 57:19
  58:4
**Vincent** 83:5
**voice** 43:4 53:8
**voided** 47:21
  64:14,16,17,19
  64:20 65:6,7,8
  65:11 99:24
**voiding** 64:23

___ W ___

**Wait** 28:1
**waiting** 79:9
**want** 3:17 7:8
  29:23 30:3
  46:20 60:6
  66:4 67:2,4,6,9
  69:12 76:19
  85:1 93:16
**wanted** 5:6
**wants** 41:19
**wasn't** 71:20
  80:1,16 93:2
  99:20
**way** 12:5 14:17
  31:15 35:23
  38:7 52:14
  90:21 102:2
**ways** 55:1
**wear** 48:16
**weeks** 90:13
**went** 3:24 5:4
  13:8 36:14
  50:1 51:10,17
  51:17 52:7
  57:7 64:21
  77:15 95:14
**weren't** 70:1
  75:7
**we'll** 28:23
  53:18 98:13
  102:8
**we're** 11:11

31:11,15,22
33:2 81:20
90:1
**WILCOX** 1:22
**Wilmington**
  1:11,15,18,23
**wise-ass** 80:12
**withheld** 48:8,10
**witness** 69:2,4
  97:9 105:12
**word** 97:14
  99:15,18,22
  100:2
**words** 76:3
**work** 4:21 26:7
  29:5 34:4 54:4
**worked** 5:1,3
  34:13
**working** 89:23
**works** 47:17
**wouldn't** 21:6
**write** 101:3,22
**writes** 87:17
**writing** 88:4
  96:5
**written** 12:22
  37:6 45:12
**wrong** 26:17
  44:5 99:15
**www.wilfet.com**
  1:24

___ X ___

**X** 102:11,16

___ Y ___

**yeah** 84:20
  87:21
**year** 5:4 6:22 7:2
  24:15
**years** 2:23 4:17

___ $ ___

**$10,762** 51:1

___ 0 ___

**0** 36:1

Drexel v. Harleysville Insurance Co.

119

| | | | | |
|---|---|---|---|---|
| **01** 7:16 89:3,5,7 | **105** 103:21 | **19899** 1:15 | 105:6 | **8th** 80:24 85:7 |
| **0161** 102:19 | **11** 46:12 103:9 | **1996** 5:19 | **30th** 36:10 73:6 | 85:10,14,15 |
| **0162** 102:20 | **11th** 56:1,7 | | **302** 1:23 | **8-13** 39:5,9 |
| **0167** 102:23 | 61:13 | **2** | **31** 103:2 105:18 | **8-13-2004** 41:3 |
| **0185** 103:2 | **11:15** 39:2,5 | **2** 22:24 102:13 | **33** 103:5 | 43:3 52:22 |
| **0195** 103:19 | **11:15:29** 39:3 | 102:19 | **37** 103:6 | 70:4 |
| **0199** 103:19 | **11:31** 43:7 | **2:25** 59:18,19 | **38** 103:8 | **8:10** 63:9 |
| **02** 7:16 57:3 | **11:31:42** 43:3 | **200** 1:18 | | **80** 7:9 |
| 59:6 89:3 | 52:22 | **2000** 85:4,10 | **4** | **800** 1:10,15,18 |
| **0203** 102:18 | **11:45** 18:1 | **2004** 6:9,15,15 | **4** 27:14 91:2 | **812988** 74:8 |
| **0207** 102:18 | **12** 49:15 102:18 | 6:17,20,22,24 | 102:22 | 81:16 |
| **0209** 103:11 | 103:10 | 7:5,8,21 9:6,9 | **412** 100:20 | **82** 103:17 |
| **0210** 103:12 | **12:13:36** 78:15 | 9:15 10:2 11:5 | **432** 36:2 | **84** 103:18 |
| **0211** 103:14 | **120** 7:10 | 16:16 17:7,9 | **46** 103:9 | **87** 103:19 |
| **0214** 103:7 | **13** 46:20 47:12 | 18:1,17 19:18 | **49** 4:17 103:10 | |
| **0223** 103:8 | 49:21 50:7 | 20:10 22:8,9 | | **9** |
| **03** 89:3 | 51:4 53:13 | 24:6 28:14 | **5** | **9** 37:12 103:6 |
| **0331** 103:10 | 55:13 75:3 | 29:7 34:18,24 | **5** 30:8 102:23 | **9-14-2004** 78:15 |
| **0333** 103:10 | 78:4,17 103:11 | 38:4 48:2 | **53** 103:3 | 78:20,23 |
| **0346** 103:9 | **13th** 38:24 48:2 | 49:21 50:7 | **55** 103:12 | **97** 102:13 |
| **0368** 103:4 | 53:3,9,22 54:9 | 54:9,21 56:1 | | |
| **04** 89:3,8 | 59:18 64:12 | 59:18 61:5 | **6** | |
| **0432** 35:22 | 65:9 69:21 | 62:6,12 70:21 | **6** 31:1 81:22 | |
| 36:21 | 94:4,8 95:2 | 72:10,11 73:6 | 103:2 | |
| **0433** 36:21 | **13:38** 79:1 | 78:4 79:19 | **6th** 89:21,24 | |
| **0455** 103:5 | **13:49** 46:21 | 86:12 89:15,18 | 90:3,8,18 | |
| **0463** 102:21 | **1330** 1:23 | 89:24,24 90:19 | **6-30-04** 72:21,22 | |
| **0464** 102:21 | **1335** 41:3 | 91:21 99:10 | **6-8-04** 61:7 | |
| **0465** 103:17 | **14** 73:8,9 81:22 | 101:17 | 77:16 | |
| **05** 89:3 | 99:10 103:13 | **2005** 5:3,19 | **6-8-05** 61:8 | |
| **05-428(JJF)** 1:6 | **14th** 78:7,10 | **2007** 1:11 5:4 | **6/30/04** 72:18,19 | |
| **0563** 103:13 | 82:1 | 105:6 | **6/8/04** 82:2 | |
| **0564** 103:13 | **14:12:34** 78:23 | **2008** 105:18 | **655-0477** 1:23 | |
| | **15** 74:15 103:14 | **22** 102:20 | | |
| **1** | **15:21** 47:12,19 | **23** 70:21 | **7** | |
| **1** 12:7,8 91:11 | 64:12 | **23rd** 18:1,17 | **7** 33:3 72:10 | |
| 102:18 | **15:36** 75:3 | 71:4,13 | 89:7 103:3 | |
| **1st** 36:6,9 38:4 | **15:36:06** 70:5 | **24** 102:21 | **7th** 79:1 89:18 | |
| **1:10** 102:9 | **16** 76:13,16 | **25,000** 101:18,22 | 89:20,24 | |
| **10** 38:10 103:7 | 103:15 | **27** 102:22 | **7/6/04** 72:17 | |
| **10th** 1:10,15 | **17** 63:9 82:22 | | **7002** 96:13 | |
| **10:05** 1:11 | 103:17 | **3** | **73** 103:13 | |
| **100** 95:18,21,23 | **17th** 70:24 | **3** 24:18 102:21 | **74** 103:14 | |
| 95:24 102:14 | **18** 84:3 103:6,18 | **3rd** 79:19 | **76** 103:16 | |
| **100-RPR** 105:17 | **19** 87:8 103:19 | **3-23-1958** 4:17 | | |
| **101** 102:14 | **19801** 1:18,23 | **30** 1:11 34:23 | **8** | |
| **104** 103:20 | **1986** 5:3 | 72:11 102:23 | **8** 33:17 85:4 | |
| | | | 103:4 | |