**EXHIBIT F**



**WILCOX & FETZER LTD.**



RKB
SEP 10 2007

## In the Matter Of:

# Drexel

## v.

# Harleysville Insurance Co.

## C.A. # 05-428 (JJF)

---

## Transcript of:

## Carey Daniel Riddle

## August 30, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LAYNE DREXEL,                          )
                                       )
            Plaintiff,                 )
                                       ) Civil Action
v.                                     ) No. 05-428(JJF)
                                       )
HARLEYSVILLE INSURANCE CO.,            )
                                       )
            Defendant.                 )


            Deposition of CAREY DANIEL RIDDLE taken
pursuant to notice at the law offices of Smith,
Katzenstein & Furlow LLP, 800 Delaware Avenue, 10th
Floor, Wilmington, Delaware, beginning at 1:35 p.m. on
Thursday, August 30, 2007, before Kurt A. Fetzer,
Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        ROBERT K. BESTE, III, ESQ.
        SMITH KATZENSTEIN & FURLOW
          800 Delaware Avenue - 10th Floor
          Wilmington, Delaware  19899
          For the Plaintiff

        STEPHEN P. CASARINO, ESQ.
        CASARINO CHRISTMAN & SHALK
          800 North King Street - Suite 200
          Wilmington, Delaware  19801
          For the Defendant

ALSO PRESENT:
        SHERRY CLODFELTER



                WILCOX & FETZER
    1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

Drexel v. Harleysville Insurance Co.

**2**

1    CAREY DANIEL RIDDLE,
2    the deponent herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5                EXAMINATION
6    BY MR. BESTE:
7    Q.  Good afternoon, Mr. Riddle.  My name is Rob
8    Beste.
9         Am I pronouncing your last name right?
10   A.  Riddle, yes.
11   Q.  Riddle.  My name is Rob Beste.  I represent the
12   plaintiff, Layne Drexel, in this matter.
13        Have you ever had your deposition taken
14   before?
15   A.  I have not.
16   Q.  As we move through the deposition, I'll be
17   asking you a number of questions.  If you don't
18   understand any of the questions, please let me know.
19   A.  Okay.
20   Q.  And if you don't let me know, I'll assume that
21   you do understand the question I'm asking you.
22        Fair enough?
23   A.  Fair enough.
24   Q.  Can you state your name, age and date of birth

**3**

1    for the record?
2    A.  Carey Daniel Riddle.  I'm 35 years old.  Date
3    of birth, 10-19-71.
4    Q.  Are you currently the claims adjuster
5    supervising Mr. Drexel's claim that we're here about
6    today?
7    A.  Yes.  It has a different file handler, but I'm
8    still the supervisor on the claim.
9    Q.  And by "file handler," that's the role that
10   Ms. Clodfelter previously filled?
11   A.  Correct.
12   Q.  And was that transferred essentially because
13   she's a witness in the case?
14   A.  No.  My recollection is that it was originally
15   transferred because she left the company.
16   Q.  Okay.  Who is currently the adjuster under you?
17   A.  Christopher Logan.
18   Q.  Is he in Nashville?
19   A.  He is.
20   Q.  And you're in Nashville as well?
21   A.  Yes.
22   Q.  How long have you been working for Harleysville
23   Insurance Company?
24   A.  Since August 2001.

**4**

1    Q.  Is that after you graduated from college?
2    A.  No.  I worked for another insurance company
3    before that.
4    Q.  Just one between college and Harleysville?
5    A.  Yes.
6    Q.  What insurance company was that?
7    A.  Federated Mutual Insurance.
8    Q.  What office did you work out of?
9    A.  Nashville.
10   Q.  What was your position with that company?
11   A.  I began with Federated Insurance as an auto
12   property adjuster, auto material damage.
13   Q.  Did that change while you were there?
14   A.  It did.  I did that for approximately two years
15   and then became a field adjuster doing multi-line
16   claims, did that for a couple of years, became a
17   supervisor for about one year and then the claims
18   office closed.
19   Q.  What do you mean by multi-line?
20   A.  As opposed to doing just first party property
21   or just bodily injury or just work comp or whatever,
22   it encompassed a little bit of everything.
23   Q.  What was the first position you took with
24   Harleysville?  What was the title?

**5**

1    A.  Senior claims specialist.
2    Q.  Is that the position that you hold now?
3    A.  No.
4    Q.  What position do you hold now?
5    A.  Claims supervisor.
6    Q.  Can you explain the hierarchy in the claims
7    department and where you fit into it?
8    A.  There are claims specialists that are the
9    primary file handlers.  They report to a claims
10   supervisor, who then reports to a unit manager, who
11   then would report to a regional vice president in
12   charge of each claims office, and there are other
13   levels above that.
14   Q.  Do you currently have authority over resolving
15   this claim or do you need to go to someone else to do
16   that?
17   A.  I do not.
18   Q.  You do not have authority?
19   A.  No.
20   Q.  Who does have authority?
21   A.  It would be at the home office level because
22   it's in litigation.
23   Q.  Once it gets into litigation, it's transferred
24   to the home office?

2 (Pages 2 to 5)

Drexel v. Harleysville Insurance Co.
Carey Daniel Riddle

### 6

1    A.  Ultimate authority would be, yes.
2    Q.  So do you have any current responsibilities
3  with respect to this claim?
4    A.  General oversight of the primary file handler
5  is all.
6    Q.  Is the primary file handler still active on
7  Mr. Drexel's claim?
8    A.  Yes.
9    Q.  What exactly is being done with respect to
10  Mr. Drexel's claim currently?
11    A.  It is in litigation, so the primary file
12  handler would be dealing with this type of issue.  He
13  would work with Mr. Casarino on scheduling
14  depositions, going through discovery and that type of
15  thing.
16    Q.  That's not done out of the home office?
17    A.  The scheduling and that kind of stuff, no.
18    Q.  So it's just the overall authority on
19  resolution that's taken to the home office, more or
20  less?
21    A.  Yes.  They have ultimate responsibility on the
22  litigation files for decisions.
23    Q.  Who at the home office is overseeing this
24  claim?  I think I asked you.  I'm sorry if I did.

### 7

1    A.  That's all right.
2        Grant Parker.  And his title is, I believe
3  it's property consultant, but he would be the first
4  home office level person involved here.  And I think
5  he has authority over first party property in
6  litigated files.  I'm sure he has some sort of
7  monetary limit over which it would go to somebody
8  else.
9    Q.  What is your understanding of why Harleysville
10  will not pay Mr. Drexel's claim?
11    A.  My understanding is that he did not pay his
12  premium and, therefore, his policy expired at renewal
13  and that's why we did not pay the claim.
14    Q.  What is your understanding of what Harleysville
15  specifically did when it made that decision?  What did
16  it do to the policy?
17    A.  I can only speak to the claims side.
18    Q.  Sure, your understanding.  I just want to know
19  what you understand.
20    A.  And as far as the claims side of the house
21  goes, my understanding is we checked coverage
22  initially upon receipt of the claim.  It was in effect
23  at that time, at least the claims, the underwriting
24  coverage screen shows that it was.

### 8

1        We investigated the claim, came to an
2  agreed number on the damages with the contractor of
3  Mr. Drexel's choice and in the process of issuing the
4  check were notified by the underwriting side of the
5  house that there was no policy in effect.
6    Q.  Do you have an understanding of why there was
7  no policy in effect on the date of the loss?
8    A.  My understanding is that he didn't pay his
9  premium and, therefore, the policy expired.  There's
10  no policy in effect because he didn't pay for it.
11    Q.  And you're drawing a distinction between a
12  policy expiring and what?  A policy being canceled?
13    A.  Yes.  I mean, those are more underwriting type
14  of questions.  From the claims side of the house, all
15  we know is it's either in effect or it's not.
16    Q.  The claims department has no authority to make
17  those decisions?
18    A.  We do not.
19    Q.  Harleysville has a claims department that you
20  work in?
21    A.  Yes.
22    Q.  It has an underwriting department?
23    A.  Yes.
24    Q.  Which you work closely with, I assume?

### 9

1    A.  (Pause.)
2    Q.  Bad question.
3        Harleysville has an underwriting
4  department?
5    A.  Correct.
6    Q.  What other major departments or structure does
7  Harleysville have aside from claims and underwriting?
8    A.  There is an actuarial department.  I believe
9  there is a loss control department.
10    Q.  Can you explain what the loss control
11  department is?
12    A.  I don't know that I have had any dealings with
13  them, but my understanding of what a loss control
14  department is is they go out to investigate potential
15  risks at the time that an agent sends an application
16  over for a policy to determine if it's something that
17  is acceptable to the company.  And they also go to
18  current policyholders' places of business and put on
19  safety seminars, that type of thing.
20    Q.  Do they sometimes inspect current insured
21  premises for problems from the insurer's perspective?
22    A.  I can only guess, but I would guess that's part
23  of their responsibility, yes.
24    Q.  To your knowledge, was anyone from that

3  (Pages 6 to 9)

Drexel v. Harleysville Insurance Co.
Carey Daniel Riddle

---

**10**

1  department sent to Mr. Drexel's property prior to the
2  loss at issue in this case?
3      A.  Not to my knowledge.
4      Q.  Aside from underwriting claims, actuary and
5  loss control, does Harleysville have any major
6  structure to it?
7      A.  Not that I'm aware of.  They may separate out
8  things like accounting.  If that's its own department,
9  I don't know.
10     Q.  Do you know what department handles payment,
11  premium payment process, remittance processing?
12     A.  I would assume it's either underwriting or some
13  offshoot of underwriting.  I can only say it's not
14  claims.
15     Q.  Do you have any connection or knowledge
16  regarding the remittance processing system or
17  processes?
18     A.  I do not.
19     Q.  How did you prepare for the deposition today?
20     A.  I met with Mr. Casarino this morning before the
21  deposition to discuss the claim.
22     Q.  Did you look at any documents during that?
23     A.  Only the log notes from the claim file that you
24  have here.

---

**11**

1      Q.  You're referring to the ones that were
2  produced?
3      A.  That we brought with us this morning, yes.
4      Q.  Do you know what?  Let's make that H-20.
5      A.  Sure.
6      Q.  Just to have a record of it.
7          (H Deposition Exhibit No. 20 was marked
8  for identification.)
9  BY MR. BESTE:
10     Q.  Did you discuss the case with anyone else aside
11  from Mr. Casarino before your deposition today?
12     A.  Yes.  Me and Ms. Clodfelter flew up here
13  together yesterday on the same airplane and rode from
14  the airport to here in the same rental car, so I'm
15  sure we had some brief discussions about it, yes.
16     Q.  Anyone else aside from Ms. Clodfelter?
17     A.  Mr. Logan, the primary, the current file
18  handler would have been the one that informed us that
19  we were being deposed and asked us for the dates when
20  we would be available, so I would have had a
21  discussion with him as well.
22     Q.  Did you discuss the substance of the case or
23  the claims, anything like that with him?
24     A.  With Mr. Logan?

---

**12**

1      Q.  Yes.
2      A.  I -- my recollection is that I asked him to
3  refresh my memory as to what this claim was about just
4  briefly, yes.
5      Q.  What did he tell you?
6      A.  I don't remember the specifics.
7      Q.  Roughly.
8      A.  Something to the effect of this is the case
9  with the premium issue where there was a non-payment
10  and cancellation around the time that we were trying
11  to cut a check on the claim.
12     Q.  Do you have an independent recollection of this
13  claim?
14     A.  Vague, sure.  I mean, it was three years ago.
15  So because I was -- the primary handler was three
16  years ago.  Because I am still Mr. Logan's supervisor,
17  I'm aware that this claim is in litigation and that
18  he's handling it.
19     Q.  Do you have a specific recollection of the
20  events of the summer of 2004 with respect to this
21  claim?
22     A.  Only from reviewing the notes.  I can see what
23  happened and have some vague memory of this claim.
24          I'm not going to remember specific

---

**13**

1  conversations, no.
2      Q.  But you can't sitting here today without
3  looking at documents remember any aspect of adjusting
4  this claim?
5      A.  No.
6      Q.  I think I asked you this.  I apologize.
7          Where is payment processing or remittance
8  processing handled within Harleysville?
9      A.  I don't know.  I know where the claims checks
10  are printed out of and mailed from, but that would
11  probably be a separate deal.
12     Q.  And they're mailed from the home office in
13  Harleysville, Pennsylvania?
14     A.  Correct.
15     Q.  In the summer of 2004 when this claim came in
16  at the end of June, can you explain to me logistically
17  what your role was at Harleysville?
18     A.  As it pertains to the handling of claims?
19     Q.  Yes.  What would you have done when this claim
20  came in?  Start with how it came to your attention and
21  what you did from there.
22     A.  The insured or the agent or whoever would
23  report the claim by calling it into our call center in
24  Pennsylvania.  Somebody there would enter the

---

4 (Pages 10 to 13)

Drexel v. Harleysville Insurance Co.
Carey Daniel Riddle

14

1    information into the claims computer system and
2    electronically send that to our claims office in
3    Nashville, where a clerical person would
4    electronically forward it to the supervisor over that
5    line of business.
6        In our case in property there were at the
7    time and are two supervisors, myself and Mr. Duncan,
8    who you may see referred to in the notes. And one of
9    us would have seen the claim on the screen and
10   forwarded it to a file handler specialist.
11       Q.   And in this case you referred it to
12   Ms. Clodfelter?
13       A.   I think Mr. Duncan I believe is the one that
14   actually did it, but yes.
15       Q.   I want to hand you H-1. Does the June 22nd at
16   12:46 entry confirm that Mr. Duncan was the first --
17   I'm sorry -- was the person who assigned the claim to
18   Ms. Clodfelter?
19       A.   That is correct, yes.
20       Q.   Can you explain to me the entry before that,
21   the very first entry on H-1?
22       A.   The June 22nd 10:50?
23       Q.   Yes, sir.
24       A.   That appears to be the note entered by the call

15

1    center employee who took the phone call from
2    Mr. Drexel.
3        Q.   Is that K Slonake a call center employee do you
4    think?
5        A.   Yes.
6            Yeah.
7        Q.   Are you aware that if Mr. Drexel is successful
8    in his contractual claim under the policy that he can
9    recover, possibly recover his attorney's fees?
10       A.   I was not specifically aware of that.
11       Q.   When a claim comes into Harleysville, what are
12   the adjusters' primary responsibilities?
13       A.   The first responsibility would be to look at
14   the underwriting computer system to see if there's
15   coverage there and, if so, what the policy forms were,
16   the limits of insurance, et cetera.
17           And then after that, the specialist's next
18   responsibility would be to contact the policyholder to
19   discuss the claim.
20       Q.   The claims handler acts as the underwriting
21   department's computer system?
22       A.   There are -- there's a claims computer system
23   where these log notes are inputted and generated from.
24   There's a separate side of the system that we can see

16

1    but not do anything to. In claims parlance, we can't
2    add information to it or take information out of it.
3        Q.   It's static?
4        A.   It's static for us. I guess we would have read
5    only access, if you want to call it that.
6        Q.   And the underwriting department has control, if
7    you will, of that information?
8        A.   I assume it's them or processing. If there's
9    some step in between, I don't know. But it's what I
10   would in the claims department refer to as the
11   underwriting system.
12       Q.   What other systems aside from the claims system
13   and the underwriting system does a Harleysville claims
14   agent have access to when they're adjusting the claim?
15       A.   The claim adjusters? Obviously, they have an
16   e-mail system. They have access to the Internet.
17           But as far as company systems in 2004,
18   those are the main systems.
19       Q.   E-mail, claims and underwriting?
20       A.   Yes.
21       Q.   To your knowledge, are there any other systems
22   that claims representatives have access to or had
23   access to in 2004?
24       A.   In 2004, not to my knowledge. There are now.

17

1        Q.   Are there any other systems that you as a
2    supervisor have access to that a claims handler would
3    not have access to?
4        A.   No. It would be the same access.
5        Q.   Who has the primary responsibility at
6    Harleysville to verify the effectiveness of the
7    coverage when a claim comes in?
8        A.   The file handler would have the primary
9    responsibility to verify that upon receipt of a claim.
10       Q.   And that was in 2004?
11       A.   Yes.
12       Q.   What responsibility does the file handler's
13   supervisor bear in verifying that all claims that are
14   being processed are from effective policy time
15   periods?
16       A.   I don't know of any procedure that states that
17   a supervisor is to go back and check it again, if
18   that's what you're asking.
19       Q.   So from a claims perspective, Ms. Clodfelter
20   would have been the only one responsible for checking
21   that, checking that the policy was in effect at the
22   date of the loss?
23       A.   Yes.
24       Q.   And to do that she relies on the underwriting

5 (Pages 14 to 17)

Drexel v. Harleysville Insurance Co.
Carey Daniel Riddle

---

**18**

1  system information?
2    A.  Yes.  I don't know if it's technically a
3  processing system or an underwriting system.  Yes, the
4  policy information that we can see but not enter
5  anything into.  Yes, I would call it the underwriting
6  system.
7    Q.  So whatever that underwriting system tells her,
8  that's what she goes by?
9    A.  Yes.
10    Q.  And her responsibilities only include verifying
11  coverage through that system and do not include any
12  other means of verifying coverage.  Is that right?
13    A.  That's correct.  She can only assume that that
14  coverage is accurate.
15    Q.  And she's instructed to rely on that
16  information?
17    A.  Yes.
18    Q.  Do you know how frequently the underwriting
19  system is updated?
20    A.  I have no idea.
21    Q.  Do you have any knowledge regarding how long it
22  takes a change in that information to be accessible to
23  the claims department?
24    A.  I do not.

**19**

1    Q.  I mean, do you have any reason to believe it's
2  an extended period of time?  More than a day?
3    A.  I don't have any reason to believe it is
4  anything at all.  I mean, I have no clue.  I wouldn't
5  know.
6    Q.  Do you have any experience or recollection of
7  speaking to the underwriting department about a change
8  to their information and then seeing it later in the
9  system?
10    A.  I'm sure there have been instances where we
11  have called underwriting and asked if an endorsement
12  was added or not and usually they would just if we had
13  some specific question they would e-mail us a
14  response.  I don't have any reason to believe that
15  once they enter the information into the system that
16  it takes any serious length of time for it to show up.
17    Q.  How about the claims system, do you know how
18  frequently that information is updated?  I'm sorry.
19  Bad question.
20        With respect to the claims system, how
21  frequently is that information updated?
22    A.  It depends on the claim, but these log notes
23  that we're looking at, for example, are updated almost
24  on a daily basis.  As a phone call is made or a piece

**20**

1  of mail is received, a note is put into the log.
2    Q.  And you're referring to H-1?
3    A.  I am.
4    Q.  Say, for example, in June of 2004
5  Ms. Clodfelter made a note at 11:45:35 on June 23rd,
6  how long would it take before other users of the claim
7  system would have access to her notes?
8    A.  Other claims employees would have access to
9  that note immediately upon her entering the note.
10    Q.  She hits enter and everybody can access it?
11    A.  That's correct.
12    Q.  Do you have any reason to believe that the
13  underwriting system functions differently than the
14  claims system in that respect?
15    A.  I do not.
16    Q.  Where does the claims handler document whether
17  the coverage was effective?
18    A.  In the claims system log notes as we see here,
19  H-1.
20    Q.  And you're referring to Ms. Clodfelter's note
21  on June 23rd at 11:45?
22    A.  Yes, sir.
23    Q.  And that note tells you that Ms. Clodfelter
24  performed her responsibility and checked the

**21**

1  underwriting system regarding the effective dates of
2  coverage?
3    A.  Upon writing that note, yes, that would be my
4  assumption, that she got that information from the
5  underwriting system.
6    Q.  And she recorded it in the notes that we
7  already discussed?
8    A.  Yes.
9    Q.  It doesn't appear that that note references any
10  effective dates of coverage.  Is that correct?
11    A.  I don't see them, no, that's correct.
12    Q.  So that's just a note that coverage was in
13  effect at the date of loss?
14    A.  It doesn't specifically say that, but my
15  assumption would be that had coverage not, had the
16  screen not shown coverage in effect when she looked at
17  it, she would have noted that information.
18    Q.  Because from her prior entries you can tell she
19  was aware that the date of loss was June 22nd, 2004?
20    A.  Yes.
21    Q.  Is the claims handler required at any time
22  subsequent to the initial processing of a claim to
23  check whether the policy was effective on the date of
24  loss?

---

6 (Pages 18 to 21)

Drexel v. Harleysville Insurance Co.
Carey Daniel Riddle

22

```
 1      A.  After they initially do that, I am not aware of
 2   any requirement that they do it again, no.
 3      Q.  Are you aware that any employee or
 4   representative of Harleysville is again required to
 5   check that information after the initial processing of
 6   a claim?
 7      A.  I'm not.
 8      Q.  During the processing of a claim in 2004, what
 9   materials, aside from the computer systems we have
10   discussed, does a claim handler have access to to
11   assist them?
12      A.  I'm not sure I understand the question.
13      Q.  Are there any books or policies or manuals or
14   anything like that that a claims handler would have
15   access to in 2004 when processing a claim?
16      A.  There would be a property manual which is a
17   manual of procedures for first party property claims.
18   At that time there may have been what was referred to
19   as a best practices manual.  I don't know what years
20   or dates that was in effect.  There was one at one
21   point.
22      Q.  How would you find that out if I asked you to,
23   when it was in effect?
24      A.  I'm sure I could contact somebody in our home
```

23

```
 1   office to ask that question.
 2      Q.  Anything else besides the property manual and
 3   the best practices manual?
 4      A.  Not that I'm aware of.
 5      Q.  So aside from the Internet, the e-mail system,
 6   the claims and underwriting computer systems, the
 7   property manual and the best practices manual, if that
 8   was in place in 2004, what other resources would a
 9   claims handler have when processing a claim?
10      A.  In 2004?  I think at that time there would be a
11   scene access system which is nothing more than a
12   portal to send and receive assignments to independent
13   adjusters.
14          MR. BESTE:  Could we have this marked as
15   H-21, please?
16          (H Deposition Exhibit No. 21 was marked
17   for identification.)
18   BY MR. BESTE:
19      Q.  I'm sorry.  I only have one copy of that.
20          Is this document part of the scene access
21   system?  I refer you to the top left-hand corner.
22      A.  It appears to be, yes.
23      Q.  And is that the initial means that Harleysville
24   hired or notified independent adjusters to adjust the
```

24

```
 1   claim?
 2      A.  Not always.  Some vendors are on the system and
 3   some are not.  But it looks like in Mr. Powell's case
 4   that he was and that would have been how the
 5   assignment was sent to him.
 6      Q.  Okay.  So Harleysville assigned Mr. Powell to
 7   do what with respect to this claim?
 8      A.  My -- let's see.
 9          The assignment and instructions are left
10   blank on this document, but the normal course of
11   action would be that he would be assigned to inspect
12   the loss, to take photos and to assess the damages, to
13   write an estimate of repair and to attempt to obtain
14   an agreed price with the insured's choice of
15   contractor.
16      Q.  So Harleysville hired Mr. Powell and Tower
17   Insurance to do that in this case?
18      A.  It would appear so, yes.
19      Q.  What authority did Harleysville give Mr. Powell
20   in this case as far as adjusting the claim?
21      A.  I don't see where any explicit authority was
22   given to him.  I mean, he would have no authority to
23   make final decisions.
24      Q.  Who has that authority to make a final
```

25

```
 1   decision?
 2      A.  As to what?  Final decision as to what?
 3      Q.  As to payment of a claim.
 4      A.  Mr. Powell would have sent an estimate with the
 5   report to Ms. Clodfelter.  If she was in agreement
 6   with it, she would -- if it were an amount within her
 7   authority, she could have made that decision.
 8          If it were over her authority, she would
 9   ask my permission to send that check.
10      Q.  And she asked for your permission in this case?
11      A.  She did.
12      Q.  What specifically did you authorize?  What
13   agreement was reached, if any?
14      A.  According to the log notes, Mr. Powell reached
15   an agreement with the contractor on the cost of the
16   potential repairs of $49,877.20.
17          And Ms. Clodfelter requested authority to
18   pay that amount, less $10,762.56 in recoverable
19   depreciation until such time these were made.
20      Q.  Authorized to pay who?
21      A.  The insured, I would assume.
22      Q.  Now, was there an agreement reached between
23   Tower Insurance and the contractor?  Let me ask it
24   this way.
```

7  (Pages 22 to 25)

Drexel v. Harleysville Insurance Co.
Carey Daniel Riddle

26

1    It's your understanding that somewhere
2  among the insured, the independent adjuster and the
3  contractor and Harleysville there was a contract to
4  repair the property, an agreement to repair the
5  property?
6    A.  No.  Harleysville's job is to assess the
7  damages and pay the insured for the cost of those
8  repairs.  What he does with that money is completely
9  up to him.
10    Q.  In your understanding, who actually hires the
11  contractor to do the work?
12    A.  It would have to be the insured, the person
13  that owns the property.
14    Q.  Should a claims adjuster get the insured's
15  permission prior to issuing the check made payable to
16  a contractor directly and not exclusively?
17    A.  If we were sending the check to the insured, he
18  was going to get the check, I don't see where there
19  would be anything wrong with going ahead and issuing
20  it.  It would be normal procedure for the adjuster to
21  speak with the insured about a payment being made.
22    Q.  And the check would be issued to the insured
23  and jointly with whoever the insured instructed
24  Harleysville to put on the check?

27

1    A.  Yes.  And it would also be normal procedure to
2  include the mortgage company if there was one.
3    Q.  Was there a mortgage company in June of 2004
4  when this claim was adjusted?
5    A.  I can only look at this, at the log entry of
6  June 23, 2004 at 11:45 where Ms. Clodfelter listed the
7  coverage information and she listed Ocwen Federal Bank
8  as the mortgage company.
9    Q.  How is a claim processed or handled differently
10  when there is a mortgage company with an interest?
11    A.  The reason that matters to the claims
12  department is that we have an obligation to include
13  them on a payment for a piece of property that they
14  have a financial interest in.  That would be the
15  extent.
16    Q.  When Harleysville is aware there is a mortgage
17  company with an interest in a property, in 2004 did
18  that cause Harleysville to send notices or
19  correspondence to the mortgage company as well as the
20  insured?
21    A.  It would not cause Ms. Clodfelter or myself or
22  anybody in the claims department to do so, no.
23    Q.  Do you have any knowledge of how a mortgage
24  company's interest in a property would affect where

28

1  premium invoices were sent?
2    A.  I have no knowledge whatsoever, no.
3    Q.  So aside from the Internet, e-mail system, the
4  claims and underwriting computer systems, property
5  manual, the best practices manual, if it was in place
6  then, and the scene access system, what other
7  resources does a claims adjuster have at their
8  disposal in 2004?
9    A.  Nothing company specific that I'm aware of.
10  There are manuals -- there are not manuals but books
11  that contain pricing information on the cost of a
12  sheet of drywall or paint or that type of thing, but
13  nothing else from the company.
14    Q.  Are there any training manuals or materials or
15  similar items that Harleysville uses to train new
16  claim employees?
17    A.  Aside from the property manual?  Not that I'm
18  aware of.
19    Q.  In 2004 if Harleysville had hired a new person
20  to the claims department, were there any instructions
21  or classes or anything like that that the new employee
22  would take?
23    A.  Not that I'm aware of, no.
24    Q.  Is it true that the claims department employees

29

1  at times send certified mail to an insured?
2    A.  Yes.  That happens on occasion, yeah.
3    Q.  Why does that happen on occasion?
4    A.  It would be specific to that particular claim
5  and circumstance.  If for whatever reason the person
6  wanted to send something certified mail, they could.
7    Q.  Does the claims department ever utilize a proof
8  of mailing or other affidavit type thing that would
9  allow it to prove that something was mailed?
10    A.  Not that I'm aware of, short of sending
11  something certified mail or through carrier for hire
12  such as UPS or FedEx.
13    Q.  In which case you would get a receipt?
14    A.  Correct.
15    Q.  Referring to page 1, just to confirm, all of
16  the entries that have DRIDDLE on them are yours?
17    A.  That is correct.
18    Q.  Do you know what the group of letters JSULLIV,
19  do you know who that is?
20    A.  On the first page?
21    Q.  Yes, sir.
22    A.  6-22-2004 at 23:52 and 41 seconds?  Is that
23  what you're asking?
24    Q.  Yes.

8 (Pages 26 to 29)

Drexel v. Harleysville Insurance Co.
Carey Daniel Riddle

30

1    A.  I believe that would be the I.D. of the person
2  that entered that note and her name would be Julie
3  Sullivan.
4    Q.  How about the note on August 16th at 14:49
5  which is at the bottom of page 205?
6    A.  That's KFAIN?  I'm not familiar with that name.
7       My assumption from reading the note is
8  that that is an employee in our call center in
9  Pennsylvania.
10   Q.  The letters immediately after the name portion,
11 what do those represent?
12   A.  The TOKF?
13   Q.  Yes, sir.
14   A.  I do not know.
15   Q.  Do you know what the GEN stands for?
16   A.  Yes.  When you enter a remark in the claim
17 system, you can choose the category to call that
18 remark.  GEN stands for general.
19   Q.  I believe you were testifying earlier that it
20 is the insured's contract or agreement with the
21 contractor to make repairs to a property.  Is that
22 right?
23   A.  It's their option to do so, yes.  We were
24 not -- Harleysville will not contract with anyone to

31

1  repair someone else's property.
2    Q.  But they agree to pay for it.  Is that right?
3    A.  Yes, if the claim is handled and a price is
4  found and a check is cut to pay for those damages.
5    Q.  Do you find that Harleysville's insureds in
6  general always understand that concept, that it's them
7  who is actually hiring the contractor?
8    A.  Yes.  That would be part of the process, to
9  explain to them that it's their property and we will
10 pay you for the cost of the repairs.
11   Q.  Am I correct that it's Harleysville's duty to
12 explain that to its insured?
13   A.  It would be normal procedure to explain that to
14 the insured.
15   Q.  And it would have been normal procedure to
16 explain that to Mr. Drexel in this case?
17   A.  Yes.
18   Q.  Are you able to tell whether that relationship
19 or knowledge was explained to Mr. Drexel?
20   A.  I can only refer to the log notes and I don't
21 see an entry that covers that conversation, no.
22   Q.  Do you understand how that might be confusing
23 to an insured?
24   A.  I don't know if that conversation was had or

32

1  not.  I don't know.
2    Q.  Do you understand though that relationship
3  between Harleysville, an independent adjuster, the
4  contractor and the insured could be confusing to an
5  insured?
6    A.  I understand that if he is not, he or she is
7  not told how the process works that that could be
8  confusing, yes.
9    Q.  And that's why you, in fact, explain it to
10 them?
11   A.  That would be the point.
12   Q.  That's what your best practices is?
13   A.  I'm not sure if that's a best practice or not.
14 That's why it would be common procedure to do so.
15   Q.  I didn't mean to use that phrase.
16       That's why it's Harleysville's common
17 procedure to explain it to the insured, because it can
18 be confusing?
19   A.  Yes.
20   Q.  Is it common practice to send anything in
21 writing to the insured regarding that issue?
22   A.  I don't know of any procedure that requires
23 that, no.
24   Q.  Is it a common practice to do so?

33

1    A.  It is a common practice to send, to have a
2  conversation with the insured and/or send a letter
3  upon payment explaining that we're sending you this
4  money.  But I don't know that it's common practice to
5  specifically say that in writing to the insured.
6    Q.  Do you know when the repairs to Mr. Drexel's
7  property actually began in this case?
8    A.  I have no idea.
9    Q.  Are you able to tell from H-1 at all?
10   A.  Give me a minute and --
11   Q.  Take your time.
12   A.  -- I will look.  (Reviewing document).
13       I do not see any notes in here that would
14 give that information.
15   Q.  You were present during Ms. Clodfelter's
16 deposition.  Is that correct?
17   A.  I was.
18   Q.  To your knowledge, are there any documents that
19 I discussed with Ms. Clodfelter that might show when
20 the repairs began to Mr. Drexel's property?
21   A.  Not to my knowledge, but I wasn't looking at
22 every document that you showed her.
23   Q.  I understand.
24       I'm going to show you H-5.  Can you

9  (Pages 30 to 33)

Drexel v. Harleysville Insurance Co.
Carey Daniel Riddle

34

1  identify that document, please?
2  A.  My guess from looking at the log notes is that
3  Brooke's name shows up in there somewhere.  I'm
4  assuming that's an underwriting employee of
5  Harleysville.  I don't know that for a fact.
6      And it looks like she's sending an e-mail
7  to somebody named Marc Good, who from looking at the
8  log notes that matches the name of the agent on this
9  policy.
10  Q.  And the date of Ms. Beauman's e-mail is June
11  29th, 2004?
12  A.  Correct.
13  Q.  Reading that e-mail, doesn't it look like some
14  of Harleysville's employees were aware that payment
15  had not been received as early as late June 2004?
16  A.  Well, I can infer from this e-mail that payment
17  had not been received at the time that she wrote this
18  e-mail to her knowledge.
19  Q.  And you believe that Ms. Beauman is a
20  Harleysville employee?
21  A.  I don't know that for a fact.  I'm assuming --
22  there's a log note in here somewhere that references a
23  person named Brooke, so I'm assuming that those may be
24  the same Brooke.

35

1  Q.  Can you tell me what note you're looking at?
2  A.  Give me a minute.
3      MR. CASARINO:  I think it's in September.
4  A.  (Reviewing document).
5      MR. CASARINO:  I'm sorry.  It's 8-13.
6  A.  Yes.  Ms. Clodfelter entered a remark on 8-13
7  that states she called underwriting to see if they
8  were going to reinstate and spoke with Brooke.
9  Q.  Could you look at the note on 8-16 at 16:39?
10  That's the next page.
11  A.  Okay.
12  Q.  Does that note shed any light on who Mr. Good
13  might be?
14  A.  It states that the agent's name is Marc Good.
15  Q.  What does the term "agent" mean to you in this
16  context?
17  A.  In this context it would mean that he is an
18  independent insurance agent who sells insurance for
19  different companies, one of which being Harleysville
20  Insurance.
21  Q.  And, thus, not a direct employee of
22  Harleysville?
23  A.  That would be correct.
24  Q.  They receive commissions for placing policies?

36

1  A.  That's how I understand it works, yes.
2  Q.  Are you aware within Harleysville's claims and
3  underwriting computer systems where a person would go
4  to find out whether a policy was in non-pay status or
5  non-payment status?
6  A.  I am not.  From the claims side on that first
7  screen in the underwriting system in the bottom left
8  corner it will say active or something other than
9  active, canceled, non-renewed, whatever, but that's
10  the extent of where we would know to look.
11  Q.  Will the phrase non-pay or non-payment or
12  something similar to that appear in that section of
13  the screen?
14  A.  I honestly don't know the answer to that
15  question.
16  Q.  As far as you know, if a policy is placed into
17  non-payment status would a claims representative have
18  knowledge of that?
19  A.  I'm not sure what non-payment status means.
20  Q.  You don't have any understanding what that
21  means?
22  A.  I can only guess.
23  Q.  If Harleysville had not received a timely
24  premium payment would claims adjusters have access to

37

1  that information through either the claims or
2  underwriting computer systems?
3  A.  No.
4  Q.  I'm going to show you what's been marked as H-7
5  and if you can identify that document.
6  A.  I cannot.  It appears to be an underwriting
7  document.
8  Q.  Have you ever seen a document like that?
9  A.  I may have at some point in my career seen
10  something similar to this, some sort of underwriting
11  document.
12  Q.  Do you know what the purpose of this document
13  is?
14  A.  I can only tell you what it says.  There are
15  different boxes.  They have checked one that says,
16  "The policy has expired.  Our renewal offer was not
17  taken.  If the policy is subject to audit, the premium
18  may be adjusted based on policy audit provisions."
19  Q.  Are you able to tell when that document was
20  issued by Harleysville?
21  A.  At the bottom of the page it says Mail Date
22  07-07-2004 and then it says Issue Date 07-06-2004.
23  Q.  Are you able to tell from where within
24  Harleysville this document is produced?

10  (Pages 34 to 37)

Drexel v. Harleysville Insurance Co.
Carey Daniel Riddle

38

1    A. It appears that there's a return address in the
2  upper right corner that says Harleysville,
3  Pennsylvania.
4    Q. Do you know who Bob Southard is?
5      It's not that document.
6    A. I believe Mr. Southard is an employee of the
7  underwriting department in Harleysville. I don't know
8  what his specific title is.
9      My assumption from Ms. Clodfelter's
10 deposition is that he is an underwriting manager.
11   Q. Why do you make that assumption? What facts do
12 you base it on?
13   A. Because there's a log entry in the claim notes
14 where she was asking the underwriting manager to send
15 e-mail confirmation of the policy not being in effect
16 and you produced an e-mail from Bob Southard to her
17 stating that.
18   Q. I'm going to show you what's been marked as
19 H-15.
20     Is that the e-mail that you're referring
21 to?
22   A. It is, yes. He may be something other than a
23 manager. I don't know. He appears to be an employee
24 of the underwriting department.

39

1    Q. I'm going to show you H-6.
2      Are you able to identify that document?
3    A. No. This is not something that would be
4  familiar to me.
5    Q. Does it appear to be an underwriting document?
6    A. That would be my guess, yes.
7    Q. Why do you make that guess?
8    A. It's labeled Request For Cancellation/
9  Termination Notice. That sounds like an underwriting
10 type of deal and the signature at the bottom says
11 underwriter's signature.
12   Q. If you could please turn to H-1, 8-13 at 13:35.
13   A. Okay.
14   Q. Can you explain to me what that notation means?
15   A. Yes. Ms. Clodfelter was asking permission to
16 pay Mr. Drexel and the total amount of the check that
17 she was asking to pay was over her monetary authority
18 limit, so she asked me for that permission and I
19 granted it.
20   Q. On August 13th, 2004 what was the extent of
21 your authority?
22   A. To my best recollection, it would have been
23 100,000.
24   Q. And what happens if you need authority to pay a

40

1  claim above 100,000?
2    A. Then I would have to request it from my unit
3  manager.
4    Q. Is that someone at Nashville or someone at the
5  home office?
6    A. Nashville.
7    Q. Do you know what the level authority is before
8  it's sent to the home office?
9    A. I believe the claims office authority, the
10 Nashville office authority is 350,000.
11   Q. And do you believe that was the case in the
12 summer of 2004 as well?
13   A. I can't be certain, but I don't have any reason
14 to believe otherwise.
15   Q. You don't recall it changing since then?
16   A. No.
17   Q. If you could look at your note from August 13th
18 at 14:18 and explain that to me, I would appreciate
19 it.
20   A. It appears to be a note from me to Sherry
21 asking her to or explaining to her that it looks like
22 per the e-mail she received that there's an issue with
23 the policy not being in effect and that she needed to
24 look into that and she also needed to not send the

41

1  check.
2    Q. But the phrase you use is "this policy may be
3  canceled." Is that correct?
4    A. That's what it says, yes. In the claims -- as
5  a claims person, the details of why the policy is not
6  in effect would not really concern us. We would
7  only -- it either is or isn't, so we may use cancel as
8  a generic term to cover whatever we're being told.
9    Q. You're following underwriting instructions?
10   A. Yes.
11   Q. I'm going to show you H-13.
12   A. Okay.
13   Q. Do you have any recollection of these e-mails
14 from when they actually occurred?
15   A. I do not.
16   Q. If you look at the middle of the first page,
17 it's an e-mail from Amber Staton to Sherry Clodfelter.
18 It says, "Do you want me to put the claim into No
19 Coverage?" And the phrase "No Coverage" is
20 capitalized.
21     Does that have a specific meaning to it,
22 that phrase?
23   A. Specifically what that means, I'm not really
24 sure about. I assume that it puts it into a status

11 (Pages 38 to 41)

Drexel v. Harleysville Insurance Co.
Carey Daniel Riddle

42

1    where it would be unable for anybody to send a check
2    on that claim. That's an assumption. I'm not sure
3    why she's asking that question. It sounds like a
4    processing question.
5        Q.   On page 2 there's an e-mail from you to
6    Ms. Clodfelter at 2:25 p.m.
7        A.   Okay.
8        Q.   Can you explain what you're instructing
9    Ms. Clodfelter to do in that e-mail?
10       A.   Yes. I was instructing her to stop the check
11   that she had entered into the computer system and to
12   review the coverage to determine what was going on.
13       Q.   When you sent that e-mail, what was your
14   understanding of what specifically she would do in
15   order to check the coverage?
16       A.   She would go back and look at the same
17   underwriting screen that she looked at the day the
18   claim was received to see if any of the information
19   had changed.
20       Q.   And do you believe that the information had
21   changed at that point?
22       A.   I don't know.
23       Q.   That same e-mail you used the term effective
24   date. What date are you referring to in that e-mail

43

1    by the phrase effective date?
2        A.   The effective date would mean the renewal date
3    for that policy term.
4        Q.   Which in this case was June 8, 2004?
5        A.   I believe that's correct. And I would be
6    basing that off of the original e-mail from Amber
7    Staton.
8        Q.   Amber Staton is an underwriting employee. Is
9    that correct?
10       A.   I don't know that. She is a Harleysville
11   employee. She's not a claims employee. I don't know
12   if she reports to underwriting or a processing
13   department or accounting.
14            It says her title is claims entry. Maybe
15   she does report to the claims department. I don't
16   know.
17       Q.   I'm going to show you H-14.
18            Are you able to identify this document?
19       A.   No. That's not a claims document. It looks
20   like a screen print from I'm assuming underwriting or
21   accounting or something of that nature.
22       Q.   If you look closely at the top of both pages, I
23   think I can make out the phrase "Direct Bill/
24   Account/Payment Info."

44

1        A.   That's what it looks like, yes.
2        Q.   To your knowledge, what is the direct bill/
3    account/payment info system?
4        A.   I don't know. Account/payment info sounds like
5    information related to payment of premium. I don't
6    know what the term direct bill means.
7        Q.   Is the information that is listed on H-14
8    something that claims handlers would have access to
9    during the process of adjusting a claim?
10       A.   Not to my knowledge. It may be that the screen
11   is in the underwriting coverage screens where you
12   would go to look at coverage. I don't know the answer
13   to that.
14       Q.   Are there more than one screen, are there more
15   than one screens available when you go into the
16   underwriting system?
17       A.   Yes.
18       Q.   What are the different screens that are
19   available, to your knowledge?
20       A.   There's more information than would fit on one
21   screen, so there's policy address, different locations
22   that might be on certain policy, different coverage
23   forms that might apply, different limits of coverage
24   for different types of coverage that might apply,

45

1    mortgage company information, et cetera.
2        Q.   To your knowledge, is there information
3    regarding premium receipts or payments?
4        A.   Not to my knowledge.
5        Q.   I show you H-16 and ask you to identify that
6    document.
7        A.   It appears to be a letter from Ms. Clodfelter
8    to Mr. Drexel dated September 14, 2004.
9        Q.   What did that letter inform Mr. Drexel?
10       A.   It says, "According to our records your policy
11   was canceled for non-payment of premium. The
12   effective date of cancellation was 6/8/04. Since the
13   fire loss is 6/22/04 it occurred after the
14   cancellation date we are unable to afford you coverage
15   under the policy.
16            "If you have any questions, please feel
17   free to contact me."
18       Q.   To your knowledge, did Mr. Drexel's policy have
19   any provisions requiring advanced notice of
20   cancellation?
21       A.   I don't to my knowledge know what those
22   provisions would be, but my understanding of insurance
23   policies is that most of them do have provisions
24   regarding cancellation.

12 (Pages 42 to 45)

Drexel v. Harleysville Insurance Co.
Carey Daniel Riddle

46

1    Q.  Is that an area of concern for a claims handler
2  at Harleysville?
3    A.  No.
4    Q.  That's an underwriting decision?
5    A.  Yes.
6    Q.  Have you ever been involved in a coverage
7  decision while you were at Harleysville as far as
8  whether the terms of a policy apply or don't apply to
9  a particular loss?
10   A.  Have I been involved in coverage decisions
11 based on policy language?  Yes.
12        Something to do with premiums and
13 cancellation notices?  No.
14   Q.  Ms. Clodfelter testified about an e-mail or a
15 question that was sent to PLRB.  Can you explain to me
16 what that is, PLRB?
17   A.  It's an acronym that stands for Property Loss
18 Research Bureau, which is an organization of attorneys
19 that insurance companies pay an annual fee to be a
20 member to their Web site and you have access to their
21 Web site where there is access to state statutes, case
22 law, that type of information.
23        And you can also submit questions to them
24 and the attorneys will research them and provide you

48

1    A.  Only what I see in these log notes.
2    Q.  You don't have any knowledge aside from what's
3  recorded here in H-1?
4    A.  I don't have any recollection, no.
5    Q.  Do you know what question Ms. Clodfelter was
6  asking this group?
7    A.  I do not.
8    Q.  Do you know who Vincent J. Bracco is?
9    A.  I do not.
10   Q.  Do you know what part of Harleysville customer
11 support representatives work for?
12   A.  No, I don't.  May I look at what you're --
13   Q.  Sure.  It's H-17.
14   A.  I don't know what department that title would
15 report to.  It does not sound like a claims function.
16   Q.  I'm going to show you H-18.
17        Can you identify that document?
18   A.  It's not a document that I'm familiar with, no.
19   Q.  I'm going to show you H-19.
20        Are you able to identify that document?
21   A.  It is not part of the claims system.  From the
22 title at the top of the page, I can infer that it is
23 something from the underwriting system.
24   Q.  Is this part of the system that claims

47

1  with an opinion.
2    Q.  Is it your understanding that that entity acts
3  as Harleysville's attorneys during that process?
4    A.  I don't know what the legal status would be.
5  It's my understanding that it's a group of attorneys
6  that our company, as well as most other insurance
7  companies pay a fee to be a member of their Web site
8  where we can ask those questions.
9    Q.  Does the claims department handle those fees on
10 behalf of Harleysville?
11   A.  Not that I'm aware of.  I don't know.
12   Q.  You don't know who would pay this bureau?
13   A.  I don't know.
14   Q.  Under what circumstances are claims handlers
15 instructed to ask questions of this entity?  Just
16 generally why would they do it?
17   A.  Any number of reasons.  If they have some legal
18 issue that they want to ask them to look up case law
19 on or ask them if they have run into a similar
20 situation, they can do so.  There's no instructions of
21 when and where.  It's just a resource.
22   Q.  Do you have any direct knowledge of
23 Harleysville's interaction with this group in this
24 instance, Mr. Drexel's claim?

49

1  representatives would have access to during the claims
2  handling process in 2004?
3    A.  I don't know.  It does not look familiar as a
4  type of page that I would see if I looked at that.
5    Q.  Is it possible that this is one of the other
6  screens in the underwriting system that you have
7  access to?
8    A.  I can't say for certainty it's not so, yes,
9  it's possible.
10   Q.  If you would look at the first entry marked
11 number 01 on the first page dated July 6th, 2004, are
12 you able to tell me what that entry means?
13   A.  I am not.
14   Q.  If you would look at page 198 of that document,
15 particularly the box in the middle, the first line.
16   A.  Okay.
17   Q.  Are you able to tell what the group of letters
18 CNISS means?
19   A.  According to this page, it says CNISS
20 cancellation issue.
21   Q.  And referring back to page 1, the first entry
22 it in fact says CNISS was entered on July 6th, 2004.
23 Is that correct?
24        MR. CASARINO:  Well, I think --

13  (Pages 46 to 49)

Drexel v. Harleysville Insurance Co.
Carey Daniel Riddle

50

1    A. I don't see that, no. It says -- I see where
2  it says 6-8-04 CNISS.
3    Q. If you look at the first date on the line
4  moving from left to right, there's two dates. The
5  first one --
6    A. It says 7-06-04. I don't know what that means
7  or is referring to. CNISS is over on the far right
8  after a date labeled 6-08-04.
9    Q. But it looks like some kind of CNISS notice was
10  issued on either July 6th or June 8th, 2004. Is that
11  correct?
12    A. I don't know that. I can't tell from this what
13  that says.
14    Q. Can I see the documents that you have, please?
15    A. Sure.
16    Q. I'm going to show you H-7.
17    A. Okay.
18    Q. Are you able to tell when that document was
19  issued by Harleysville?
20    A. I can tell that at the bottom of the document
21  it says mail date 07-07-2004 and under that it says
22  issued date 07-06-2004.
23    Q. Those would be the dates this document was
24  issued and sent to the addressee?

51

1    A. I can only assume that's what that means.
2  That's what it says, yes.
3    Q. Based on that document, doesn't it appear that
4  representatives of Harleysville were taking the
5  position the policy had expired as early as July 6,
6  2004?
7    A. It would appear that if this was issued on
8  July 6, 2004 and they checked the box saying this
9  policy has expired, that's what they're telling you,
10  yes, that's what they're telling whoever they sent
11  this to.
12    Q. But no one at or within Harleysville's claim
13  department was aware of that until August 13, 2004.
14  Is that correct?
15    A. That's correct.
16    Q. Do you have any idea why that is?
17    A. It's not information we would have access to
18  unless somebody from underwriting told us.
19    Q. Give me one minute and I think I'm done.
20      I believe you testified that you have no
21  knowledge and are not able to tell from the documents
22  we have talked about today when the repairs to
23  Mr. Drexel's property began?
24    A. That's correct.

52

1      MR. BESTE: That's all I have.
2  BY MR. CASARINO:
3    Q. You were referred to H-5, which is an e-mail
4  from Brooke Beauman, who I believe is someone in
5  underwriting, to Marc Good, who I think you now
6  understand was the agent of Mr. Drexel. If I read
7  that, and see if you read it the same way, it appears
8  to be a last-ditch effort on the part of underwriting
9  to get Mr. Drexel to pay his premium by June 30, 2004.
10      MR. BESTE: Objection.
11    Q. Does it not?
12    A. That's what it appears to be to me, yes.
13    Q. If he does not pay it by June 30, '04, the
14  policy will not be reinstated?
15      MR. BESTE: Objection.
16    A. That would be my inference, yes.
17      MR. CASARINO: I have nothing else.
18  BY MR. BESTE:
19    Q. H-5, the document that you were just being
20  shown, to your knowledge was Mr. Drexel made aware of
21  the information in these e-mails or the e-mails or the
22  fact that the policy was, the premium was late?
23    A. I would have no knowledge of that. That would
24  be a question for somebody in underwriting.

53

1    Q. But looking at this e-mail, it does not appear
2  that Mr. Drexel was made aware of that fact?
3    A. This is an e-mail to the agent so, no,
4  Mr. Drexel was not party to this e-mail.
5      MR. BESTE: Okay. That's all I have.
6      MR. CASARINO: We'll read.
7      (Deposition concluded at 2:55 p.m.)
8      I N D E X
9  DEPONENT: CAREY DANIEL RIDDLE          PAGE
10    Examination by Mr. Beste          2
      Examination by Mr. Casarino          52
11    Examination by Mr. Beste          52
12
13    E X H I B I T S
14
  H DEPOSITION EXHIBITS          MARKED
15  20 Five-page document captioned "Adjuster
      Remarks For Claim SO-530739"          11
16
17  21 Document Bates stamp numbered P000263-
      265          23
18
19  ERRATA SHEET/DEPONENT'S SIGNATURE          PAGE 54
20  CERTIFICATE OF REPORTER          PAGE 55
21
22
23
24

14  (Pages 50 to 53)

Drexel v. Harleysville Insurance Co.
Carey Daniel Riddle



54

1
2
3        REPLACE THIS PAGE
4        WITH THE ERRATA SHEET
5        AFTER IT HAS BEEN
6        COMPLETED AND SIGNED
7        BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

55

1    State of Delaware  )
                        )
2    New Castle County  )
3
4           CERTIFICATE OF REPORTER
5
6        I, Kurt A. Fetzer, Registered Diplomate
     Reporter and Notary Public, do hereby certify that
     there came before me on Thursday, August 30, 2007, the
7    deponent herein, CAREY DANIEL RIDDLE, who was duly
     sworn by me and thereafter examined by counsel for the
8    respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
9    in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.
11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17       Kurt A. Fetzer, RDR, CRR
         Certification No. 100-RPR
18       (Expires January 31, 2008)
19
     DATED:
20
21
22
23
24

15  (Pages 54 to 55)

Drexel v. Harleysville Insurance Co.

56

| A | | | | |
|---|---|---|---|---|
| **able** 31:18 33:9 37:19,23 39:2 43:18 48:20 49:12,17 50:18 51:21 | **affect** 27:24 **affidavit** 29:8 **afford** 45:14 **afternoon** 2:7 **age** 2:24 **agent** 9:15 13:22 16:14 34:8 35:15,18 52:6 53:3 | **4:14** **area** 46:1 **aside** 9:7 10:4 11:10,16 16:12 22:9 23:5 28:3 28:17 48:2 **asked** 6:24 11:19 12:2 13:6 | **authority** 5:14 5:18,20 6:1,18 7:5 8:16 24:19 24:21,22,24 25:7,8,17 39:17,21,24 40:7,9,10 **authorize** 25:12 | 19:14 20:12 30:1,19 34:19 38:6 40:9,11 40:14 42:20 43:5 51:20 52:4 **best** 22:19 23:3,7 28:5 32:12,13 39:22 |
| **acceptable** 9:17 **access** 16:5,14 16:16,22,23 17:2,3,4 20:7,8 20:10 22:10,15 23:11,20 28:6 36:24 44:8 46:20,21 49:1 49:7 51:17 | **agent's** 35:14 **ago** 12:14,16 **agree** 31:2 **agreed** 8:2 24:14 **agreement** 25:5 25:13,15,22 26:4 30:20 | 19:11 22:22 25:10 39:18 55:8 **asking** 2:17,21 17:18 29:23 38:14 39:15,17 40:21 42:3 48:6 | **Authorized** 25:20 **auto** 4:11,12 **available** 11:20 44:15,19 **Avenue** 1:10,15 52:5,9,11 **aware** 10:7 | **Beste** 1:14 2:6,8 2:11 11:9 23:14,18 52:1 52:10,15,18 53:5,10,11 **bill** 43:23 44:2,6 **birth** 2:24 3:3 **bit** 4:22 |
| **accessible** 18:22 **accounting** 10:8 43:13,21 **account/paym...** 43:24 44:3,4 **accurate** 18:14 **acronym** 46:17 **action** 1:5 24:11 **active** 6:6 36:8,9 **acts** 15:20 47:2 | **ahead** 26:19 **airplane** 11:13 **airport** 11:14 **allow** 29:9 **Amber** 41:17 43:6,8 **amount** 25:6,18 39:16 **and/or** 33:2 | **aspect** 13:3 **assess** 24:12 26:6 **assigned** 14:17 24:6,11 **assignment** 24:5 24:9 **assignments** 23:12 | 12:17 15:7,10 21:19 22:1,3 23:4 27:16 28:9,18,23 29:10 34:14 36:2 47:11 51:13 52:20 53:2 | **blank** 24:10 **Bob** 38:4,16 **bodily** 4:21 **books** 22:13 28:10 **bottom** 30:5 36:7 37:21 39:10 50:20 |
| **actuarial** 9:8 **actuary** 10:4 **add** 16:2 **added** 19:12 **address** 38:1 44:21 | **annual** 46:19 **answer** 36:14 44:12 **answers** 55:8 **anybody** 27:22 42:1 | **assist** 22:11 **assume** 2:20 8:24 10:12 16:8 18:13 25:21 41:24 51:1 | B | **box** 49:15 51:8 **boxes** 37:15 **Bracco** 48:8 **brief** 11:15 **briefly** 12:4 |
| **addressee** 50:24 **adjust** 23:24 **adjusted** 27:4 37:18 **adjuster** 3:4,16 4:12,15 26:2 26:14,20 28:7 32:3 53:14 | **apologize** 13:6 **appear** 21:9 24:18 36:12 39:5 51:3,7 53:1 **APPEARANC...** 1:13 | **assuming** 34:4 34:21,23 43:20 **assumption** 21:4 21:15 30:7 38:9,11 42:2 **attempt** 24:13 | **B** 53:12 **back** 17:17 42:16 49:21 **Bad** 9:2 19:19 **Bank** 27:7 **base** 38:12 **based** 37:18 | **Brooke** 34:23,24 35:8 52:4 **Brooke's** 34:3 **brought** 11:3 **bureau** 46:18 47:12 |
| **adjusters** 15:12 16:15 23:13,24 . 36:24 **adjusting** 13:3 16:14 24:20 44:9 | **appears** 14:24 23:22 37:6 38:1,23 40:20 45:7 52:7,12 **application** 9:15 **apply** 44:23,24 46:8,8 | **attention** 13:20 **attorney** 55:13 **attorneys** 46:18 46:24 47:3,5 **attorney's** 15:9 **audit** 37:17,18 **August** 1:11 | 46:11 51:3 **basing** 43:6 **basis** 19:24 **Bates** 53:16 **bear** 17:13 **Beauman** 34:19 52:4 **Beauman's** | **business** 9:18 14:5 |
| **advanced** 45:19 | **appreciate** 40:18 **approximately** | 3:24 30:4 39:20 40:17 51:13 55:6 | 34:10 **began** 4:11 33:7 33:20 51:23 **beginning** 1:11 **behalf** 47:10 **believe** 7:2 9:8 14:13 19:1,3 | C |
| | | | | **call** 13:23 14:24 15:1,3 16:5 18:5 19:24 30:8,17 **called** 19:11 35:7 **calling** 13:23 |

Drexel v. Harleysville Insurance Co.

57

cancel 41:7
canceled 8:12
    36:9 41:3
    45:11
cancellation
    12:10 39:8
    45:12,14,20,24
    46:13 49:20
capitalized
    41:20
captioned 53:14
car 11:14
career 37:9
Carey 1:9 2:1
    3:2 53:9 55:7
carrier 29:11
Casarino 1:17
    1:17 6:13
    10:20 11:11
    35:3,5 49:24
    52:2,17 53:6
    53:10
case 3:13 10:2
    11:10,22 12:8
    14:6,11 24:3
    24:17,20 25:10
    29:13 31:16
    33:7 40:11
    43:4 46:21
    47:18
Castle 55:2
category 30:17
cause 27:18,21
center 13:23
    15:1,3 30:8
certain 40:13
    44:22
certainty 49:8
CERTIFICATE
    53:19 55:4
Certification
    55:17
certified 29:1,6
    29:11
certify 55:6,11
    55:13
cetera 15:16

45:1
change 4:13
    18:22 19:7
changed 42:19
    42:21
changing 40:15
charge 5:12
check 8:4 12:11
    17:17 21:23
    22:5 25:9
    26:15,17,18,22
    26:24 31:4
    39:16 41:1
    42:1,10,15
checked 7:21
    20:24 37:15
    51:8
checking 17:20
    17:21
checks 13:9
choice 8:3 24:14
choose 30:17
CHRISTMAN
    1:17
Christopher
    3:17
circumstance
    29:5
circumstances
    47:14
Civil 1:5
claim 3:5,8 5:15
    6:3,7,10,24
    7:10,13,22 8:1
    10:21,23 12:3
    12:11,13,17,21
    12:23 13:4,15
    13:19,23 14:9
    14:17 15:8,11
    15:19 16:14,15
    17:7,9 19:22
    20:6 21:22
    22:6,8,10,15
    23:9 24:1,7,20
    25:3 27:4,9
    28:16 29:4
    30:16 31:3

38:13 40:1
41:18 42:2,18
44:9 47:24
51:12 53:15
claims 3:4 4:16
    4:17 5:1,5,6,8
    5:9,12 7:17,20
    7:23 8:14,16
    8:19 9:7 10:4
    10:14 11:23
    13:9,18 14:1,2
    15:20,22 16:1
    16:10,12,13,19
    16:22 17:2,13
    17:19 18:23
    19:17,20 20:8
    20:14,16,18
    21:21 22:14,17
    23:6,9 26:14
    27:11,22 28:4
    28:7,20,24
    29:7 36:2,6,17
    36:24 37:1
    40:9 41:4,5
    43:11,14,15,19
    44:8 46:1 47:9
    47:14 48:15,21
    48:24 49:1
classes 28:21
clerical 14:3
Clodfelter 1:20
    3:10 11:12,16
    14:12,18 17:19
    20:5,23 25:5
    25:17 27:6,21
    33:19 35:6
    39:15 41:17
    42:6,9 45:7
    46:14 48:5
Clodfelter's
    20:20 33:15
    38:9
closed 4:18
closely 8:24
    43:22
clue 19:4
CNISS 49:18,19

49:22 50:2,7,9
college 4:1,4
comes 15:11
    17:7
commissions
    35:24
common 32:14
    32:16,20,24
    33:1,4
comp 4:21
companies 35:19
    46:19 47:7
company 3:23
    3:23 4:2,6,10
    9:17 16:17
    27:2,3,8,10,17
    27:19 28:9,13
    45:1 47:6
company's
    27:24
COMPLETED
    54:6
completely 26:8
computer 14:1
    15:14,21,22
    22:9 23:6 28:4
    36:3 37:2
    42:11 55:9
computer-aided
    55:9
concept 31:6
concern 41:6
    46:1
concluded 53:7
confirm 14:16
    29:15
confirmation
    38:15
confusing 31:22
    32:4,8,18
connection
    10:15
consultant 7:3
contact 15:18
    22:24 45:17
contain 28:11
context 35:16,17

contract 26:3
    30:20,24
contractor 8:2
    24:15 25:15,23
    26:3,11,16
    30:21 31:7
    32:4
contractual 15:8
control 9:9,10
    9:13 10:5 16:6
conversation
    31:21,24 33:2
conversations
    13:1
copy 23:19
corner 23:21
    36:8 38:2
correct 3:11 9:5
    13:14 14:19
    18:13 20:11
    21:10,11 29:14
    29:17 31:11
    33:16 34:12
    35:23 41:3
    43:5,9 49:23
    50:11 51:14,15
    51:24 55:11
correspondence
    27:19
cost 25:15 26:7
    28:11 31:10
counsel 55:7,13
County 55:2
couple 4:16
course 24:10
COURT 1:1
cover 41:8
coverage 7:21
    7:24 15:15
    17:7 18:11,12
    18:14 20:17
    21:2,10,12,15
    21:16 27:7
    41:19,19 42:12
    42:15 44:11,12
    44:22,23,24
    45:14 46:6,10

Drexel v. Harleysville Insurance Co.

58

covers 31:21
CRR 55:17
current 6:2 9:18
  9:20 11:17
currently 3:4,16
  5:14 6:10
customer 48:10
cut 12:11 31:4

_____ D _____
D 53:8
daily 19:24
damage 4:12
damages 8:2
  24:12 26:7
  31:4
Daniel 1:9 2:1
  3:2 53:9 55:7
date 2:24 3:2 8:7
  17:22 21:13,19
  21:23 34:10
  37:21,22 42:24
  42:24 43:1,2,2
  45:12,14 50:3
  50:8,21,22
dated 45:8 49:11
  55:19
dates 11:19 21:1
  21:10 22:20
  50:4,23
day 19:2 42:17
deal 13:11 39:10
dealing 6:12
dealings 9:12
decision 7:15
  25:1,2,7 46:4,7
decisions 6:22
  8:17 24:23
  46:10
Defendant 1:8
  1:19
Delaware 1:2,10
  1:11,15,15,18
  1:23 55:1
department 5:7
  8:16,19,22 9:4
  9:8,9,11,14

10:1,8,10 16:6
  16:10 18:23
  19:7 27:12,22
  28:20,24 29:7
  38:7,24 43:13
  43:15 47:9
  48:14 51:13
departments 9:6
department's
  15:21
depends 19:22
deponent 2:2
  53:9 54:7 55:7
  55:8
deposed 11:19
deposition 1:9
  2:13,16 10:19
  10:21 11:7,11
  23:16 33:16
  38:10 53:7,13
depositions 6:14
depreciation
  25:19
details 41:5
determine 9:16
  42:12
different 3:7
  35:19 37:15
  44:18,21,22,23
  44:24
differently
  20:13 27:9
Diplomate 1:12
  55:5
direct 35:21
  43:23 44:2,6
  47:22
direction 55:10
directly 26:16
discovery 6:14
discuss 10:21
  11:10,22 15:19
discussed 21:7
  22:10 33:19
discussion 11:21
discussions
  11:15

disposal 28:8
distinction 8:11
DISTRICT 1:1
  1:2
document 20:16
  23:20 24:10
  33:12,22 34:1
  35:4 37:5,7,8
  37:11,12,19,24
  38:5 39:2,5
  43:18,19 45:6
  48:17,18,20
  49:14 50:18,20
  50:23 51:3
  52:19 53:14,16
documents
  10:22 13:3
  33:18 50:14
  51:21
doing 4:15,20
drawing 8:11
Drexel 1:4 2:12
  15:2,7 31:16
  31:19 39:16
  45:8,9 52:6,9
  52:20 53:2,4
Drexel's 3:5 6:7
  6:10 7:10 8:3
  10:1 33:6,20
  45:18 47:24
  51:23
DRIDDLE
  29:16
drywall 28:12
duly 2:3 55:7
Duncan 14:7,13
  14:16
duty 31:11

_____ E _____
E 53:8,12
earlier 30:19
early 34:15 51:5
effect 7:22 8:5,7
  8:10,15 12:8
  17:21 21:13,16
  22:20,23 38:15

40:23 41:6
effective 17:14
  20:17 21:1,10
  21:23 42:23
  43:1,2 45:12
effectiveness
  17:6
effort 52:8
either 8:15
  10:12 37:1
  41:7 50:10
  55:13
electronically
  14:2,4
else's 31:1
employee 15:1,3
  22:3 28:21
  30:8 34:4,20
  35:21 38:6,23
  43:8,11,11
employees 20:8
  28:16,24 34:14
encompassed
  4:22
endorsement
  19:11
enter 13:24 18:4
  19:15 20:10
  30:16
entered 14:24
  30:2 35:6
  42:11 49:22
entering 20:9
entity 47:2,15
entries 21:18
  29:16
entry 14:16,20
  14:21 27:5
  31:21 38:13
  43:14 49:10,12
  49:21
ERRATA 53:18
  54:4
ESQ 1:14,17
essentially 3:12
estimate 24:13
  25:4

et 15:16 45:1
event 55:14
events 12:20
everybody 20:10
exactly 6:9
examination 2:5
  53:10,10,11
  55:12
examined 2:3
  55:7
example 19:23
  20:4
exclusively
  26:16
Exhibit 11:7
  23:16
EXHIBITS
  53:13
experience 19:6
expired 7:12 8:9
  37:16 51:5,9
Expires 55:18
expiring 8:12
explain 5:6 9:10
  13:16 14:20
  31:9,12,13,16
  32:9,17 39:14
  40:18 42:8
  46:15
explained 31:19
explaining 33:3
  40:21
explicit 24:21
extended 19:2
extent 27:15
  36:10 39:20
e-mail 16:16,19
  19:13 23:5
  28:3 34:6,10
  34:13,16,18
  38:15,16,20
  40:22 41:17
  42:5,9,13,23
  42:24 43:6
  46:14 52:3
  53:1,3,4
e-mails 41:13

Drexel v. Harleysville Insurance Co.

59

52:21,21

**F**

fact 32:9 34:5,21
  49:22 52:22
  53:2
facts 38:11
Fair 2:22,23
familiar 30:6
  39:4 48:18
  49:3
far 7:20 16:17
  24:20 36:16
  46:7 50:7
Federal 27:7
Federated 4:7
  4:11
FedEx 29:12
fee 46:19 47:7
feel 45:16
fees 15:9 47:9
Fetzer 1:11,22
  55:5,17
field 4:15
file 3:7,9 5:9 6:4
  6:6,11 10:23
  11:17 14:10
  17:8,12
files 6:22 7:6
filled 3:10
final 24:23,24
  25:2
financial 27:14
find 22:22 31:5
  36:4
fire 45:13
first 2:2 4:20,23
  7:3,5 14:16,21
  15:13 22:17
  29:20 36:6
  41:16 49:10,11
  49:15,21 50:3
  50:5
fit 5:7 44:20
Five-page 53:14
flew 11:12
Floor 1:11,15

following 41:9
follows 2:4
foregoing 55:11
forms 15:15
  44:23
forward 14:4
forwarded
  14:10
found 31:4
free 45:17
frequently 18:18
  19:18,21
function 48:15
functions 20:13
Furlow 1:10,14
further 55:11,13

**G**

GEN 30:15,18
general 6:4
  30:18 31:6
generally 47:16
generated 15:23
generic 41:8
give 24:19 33:10
  33:14 35:2
  51:19
given 24:22 55:8
  55:11
go 5:15 7:7 9:14
  9:17 17:17
  36:3 42:16
  44:12,15
goes 7:21 18:8
going 6:14 12:24
  26:18,19 33:24
  35:8 37:4
  38:18 39:1
  41:11 42:12
  43:17 48:16,19
  50:16
Good 2:7 34:7
  35:12,14 52:5
graduated 4:1
Grant 7:2
granted 39:19
group 29:18

47:5,23 48:6
  49:17
guess 9:22,22
  16:4 34:2
  36:22 39:6,7

**H**

H 11:7 23:16
  53:12,13
hand 14:15
handle 47:9
handled 13:8
  27:9 31:3
handler 3:7,9
  6:4,6,12 11:18
  12:15 14:10
  15:20 17:2,8
  20:16 21:21
  22:10,14 23:9
  46:1
handlers 5:9
  44:8 47:14
handler's 17:12
handles 10:10
handling 12:18
  13:18 49:2
happen 29:3
happened 12:23
happens 29:2
  39:24
Harleysville 1:7
  3:22 4:4,24 7:9
  7:14 8:19 9:3,7
  10:5 13:8,13
  13:17 15:11
  16:13 17:6
  22:4 23:23
  24:6,16,19
  26:3,24 27:16
  27:18 28:15,19
  30:24 32:3
  34:5,20 35:19
  35:22 36:23
  37:20,24 38:2
  38:7 43:10
  46:2,7 47:10
  48:10 50:19

51:4
Harleysville's
  26:6 31:5,11
  32:16 34:14
  36:2 47:3,23
  51:12
hierarchy 5:6
hire 29:11
hired 23:24
  24:16 28:19
hires 26:10
hiring 31:7
hits 20:10
hold 5:2,4
home 5:21,24
  6:16,19,23 7:4
  13:12 22:24
  40:5,8
honestly 36:14
house 7:20 8:5
  8:14
H-1 14:15,21
  20:2,19 33:9
  39:12 48:3
H-13 41:11
H-14 43:17 44:7
H-15 38:19
H-16 45:5
H-17 48:13
H-18 48:16
H-19 48:19
H-20 11:4
H-21 23:15
H-5 33:24 52:3
  52:19
H-6 39:1
H-7 37:4 50:16

**I**

idea 18:20 33:8
  51:16
identification
  11:8 23:17
identify 34:1
  37:5 39:2
  43:18 45:5
  48:17,20

III 1:14
immediately
  20:9 30:10
include 18:10,11
  27:2,12
independent
  12:12 23:12,24
  26:2 32:3
  35:18
infer 34:16
  48:22
inference 52:16
info 43:24 44:3,4
inform 45:9
information
  14:1 16:2,2,7
  18:1,4,16,22
  19:8,15,18,21
  21:4,17 22:5
  27:7 28:11
  33:14 37:1
  42:18,20 44:5
  44:7,20 45:1,2
  46:22 51:17
  52:21
informed 11:18
initial 21:22
  22:5 23:23
initially 7:22
  22:1
injury 4:21
inputted 15:23
inspect 9:20
  24:11
instance 47:24
instances 19:10
instructed 18:15
  26:23 47:15
instructing 42:8
  42:10
instructions
  24:9 28:20
  41:9 47:20
insurance 1:7
  3:23 4:2,6,7,11
  15:16 24:17
  25:23 35:18,18

Drexel v. Harleysville Insurance Co.

60

35:20 45:22
46:19 47:6
**insured** 9:20
13:22 25:21
26:2,7,12,17
26:21,22,23
27:20 29:1
31:12,14,23
32:4,5,17,21
33:2,5
**insureds** 31:5
**insured's** 24:14
26:14 30:20
**insurer's** 9:21
**interaction**
47:23
**interest** 27:10,14
27:17,24
**interested** 55:14
**Internet** 16:16
23:5 28:3
**investigate** 9:14
**investigated** 8:1
**invoices** 28:1
**involved** 7:4
46:6,10
**issue** 6:12 10:2
12:9 32:21
37:22 40:22
47:18 49:20
**issued** 26:22
37:20 50:10,19
50:22,24 51:7
**issuing** 8:3 26:15
26:19
**items** 28:15
**I.D** 30:1

**J**

**J** 48:8
**January** 55:18
**job** 26:6
**jointly** 26:23
**JSULLIV** 29:18
**Julie** 30:2
**July** 49:11,22
50:10 51:5,8

**June** 13:16
14:15,22 20:4
20:5,21 21:19
27:3,6 34:10
34:15 43:4
50:10 52:9,13

**K**

**K** 1:14 15:3
**Katzenstein**
1:10,14
**KFAIN** 30:6
**kind** 6:17 50:9
**King** 1:18,23
**know** 2:18,20
7:18 8:15 9:12
10:9,10 11:4
13:9,9 16:9
17:16 18:2,18
19:5,17 22:19
29:18,19 30:14
30:15 31:24
32:1,22 33:4,6
34:5,21 36:10
36:14,16 37:12
38:4,7,23 40:7
42:22 43:10,11
43:16 44:4,6
44:12 45:21
47:4,11,12,13
48:5,8,10,14
49:3 50:6,12
**knowledge** 9:24
10:3,15 16:21
16:24 18:21
27:23 28:2
31:19 33:18,21
34:18 36:18
44:2,10,19
45:2,4,18,21
47:22 48:2
51:21 52:20,23
**Kurt** 1:11 55:5
55:17

**L**

**labeled** 39:8

50:8
**language** 46:11
**last-ditch** 52:8
**late** 34:15 52:22
**law** 1:10 46:22
47:18
**Layne** 1:4 2:12
**left** 3:15 24:9
36:7 50:4
**left-hand** 23:21
**legal** 47:4,17
**length** 19:16
**letter** 33:2 45:7
45:9
**letters** 29:18
30:10 49:17
**let's** 11:4 24:8
**level** 5:21 7:4
40:7
**levels** 5:13
**light** 35:12
**limit** 7:7 39:18
**limits** 15:16
44:23
**line** 14:5 49:15
50:3
**listed** 27:6,7
44:7
**litigated** 7:6
**litigation** 5:22
5:23 6:11,22
12:17
**little** 4:22
**LLP** 1:10
**locations** 44:21
**log** 10:23 15:23
19:22 20:1,18
25:14 27:5
31:20 34:2,8
34:22 38:13
48:1
**Logan** 3:17
11:17,24
**Logan's** 12:16
**logistically**
13:16
**long** 3:22 18:21

20:6
**look** 10:22 15:13
27:5 33:12
34:13 35:9
36:10 40:17,24
41:16 42:16
43:22 44:12
47:18 48:12
49:3,10,14
50:3
**looked** 21:16
42:17 49:4
**looking** 13:3
19:23 33:21
34:2,7 35:1
53:1
**looks** 24:3 34:6
40:21 43:19
44:1 50:9
**loss** 8:7 9:9,10
9:13 10:2,5
17:22 21:13,19
21:24 24:12
45:13 46:9,17

**M**

**mail** 20:1 29:1,6
29:11 37:21
50:21
**mailed** 13:10,12
29:9
**mailing** 29:8
**main** 16:18
**major** 9:6 10:5
**manager** 5:10
38:10,14,23
40:3
**manual** 22:16,17
22:19 23:2,3,7
23:7 28:5,5,17
**manuals** 22:13
28:10,10,14
**Marc** 34:7 35:14
52:5
**marked** 11:7
23:14,16 37:4
38:18 49:10

53:13
**matches** 34:8
**material** 4:12
**materials** 22:9
28:14
**matter** 2:12
**matters** 27:11
**mean** 4:19 8:13
12:14 19:1,4
24:22 32:15
35:15,17 43:2
**meaning** 41:21
**means** 13:23
23:23 36:19,21
39:14 41:23
44:6 49:12,18
50:6 51:1
**member** 46:20
47:7
**memory** 12:3,23
**met** 10:20
**middle** 41:16
49:15
**minute** 33:10
35:2 51:19
**monetary** 7:7
39:17
**money** 26:8 33:4
**morning** 10:20
11:3
**mortgage** 27:2,3
27:8,10,16,19
27:23 45:1
**move** 2:16
**moving** 50:4
**multi-line** 4:15
4:19
**Mutual** 4:7

**N**

**N** 53:8
**name** 2:7,9,11
2:24 30:2,6,10
34:3,8 35:14
**named** 34:7,23
**Nashville** 3:18
3:20 4:9 14:3

Drexel v. Harleysville Insurance Co.

61

40:4,6,10
nature 43:21
need 5:15 39:24
needed 40:23,24
new 28:15,19,21
55:2
non-pay 36:4,11
non-payment
12:9 36:5,11
36:17,19 45:11
non-renewed
36:9
normal 24:10
26:20 27:1
31:13,15
North 1:18
Notary 1:12
55:6
notation 39:14
note 14:24 20:1
20:5,9,9,20,23
21:3,9,12 30:2
30:4,7 34:22
35:1,9,12
40:17,20
noted 21:17
notes 10:23
12:22 14:8
15:23 19:22
20:7,18 21:6
25:14 31:20
33:13 34:2,8
38:13 48:1
55:9
notice 1:10 39:9
45:19 50:9
notices 27:18
46:13
notified 8:4
23:24
number 2:17 8:2
47:17 49:11
numbered 53:16

**O**
oath 2:3
Objection 52:10

52:15
obligation 27:12
obtain 24:13
Obviously 16:15
occasion 29:2,3
occurred 41:14
45:13
Ocwen 27:7
offer 37:16
office 4:8,18
5:12,21,24
6:16,19,23 7:4
13:12 14:2
23:1 40:5,8,9
40:10
offices 1:10
offshoot 10:13
Okay 2:19 3:16
24:6 35:11
39:13 41:12
42:7 49:16
50:17 53:5
old 3:2
once 5:23 19:15
ones 11:1
opinion 47:1
opposed 4:20
option 30:23
order 42:15
organization
46:18
original 43:6
originally 3:14
overall 6:18
overseeing 6:23
oversight 6:4
owns 26:13

──────────
**P**
P 1:17
page 29:15,20
30:5 35:10
37:21 41:16
42:5 48:22
49:4,11,14,19
49:21 53:9,18
53:19 54:3

pages 43:22
paint 28:12
Parker 7:2
parlance 16:1
part 9:22 23:20
31:8 48:10,21
48:24 52:8
particular 29:4
46:9
particularly
49:15
parties 55:8
party 4:20 7:5
22:17 53:4
55:13
Pause 9:1
pay 7:10,11,13
8:8,10 25:18
25:20 26:7
31:2,4,10
39:16,17,24
46:19 47:7,12
52:9,13
payable 26:15
payment 10:10
10:11 13:7
25:3 26:21
27:13 33:3
34:14,16 36:24
44:5
payments 45:3
Pennsylvania
13:13,24 30:9
38:3
performed
20:24
period 19:2
periods 17:15
permission 25:9
25:10 26:15
39:15,18
person 7:4 14:3
14:17 26:12
28:19 29:5
30:1 34:23
36:3 41:5
perspective 9:21

17:19
pertains 13:18
phone 15:1
19:24
photos 24:12
phrase 32:15
36:11 41:2,19
41:22 43:1,23
piece 19:24
27:13
place 23:8 28:5
placed 36:16
places 9:18
placing 35:24
plaintiff 1:5,16
2:12
please 2:18
23:15 34:1
39:12 45:16
50:14
PLRB 46:15,16
point 22:21
32:11 37:9
42:21
policies 22:13
35:24 45:23
policy 7:12,16
8:5,7,9,10,12
8:12 9:16 15:8
15:15 17:14,21
18:4 21:23
34:9 36:4,16
37:16,17,18
38:15 40:23
41:2,5 43:3
44:21,22 45:10
45:15,18 46:8
46:11 51:5,9
52:14,22
policyholder
15:18
policyholders
9:18
portal 23:12
portion 30:10
position 4:10,23
5:2,4 51:5

possible 49:5,9
possibly 15:9
potential 9:14
25:16
Powell 24:6,16
24:19 25:4,14
Powell's 24:3
practice 32:13
32:20,24 33:1
33:4
practices 22:19
23:3,7 28:5
32:12
premises 9:21
premium 7:12
8:9 10:11 12:9
28:1 36:24
37:17 44:5
45:3,11 52:9
52:22
premiums 46:12
prepare 10:19
present 1:20
33:15
president 5:11
previously 3:10
price 24:14 31:3
pricing 28:11
primary 5:9 6:4
6:6,11 11:17
12:15 15:12
17:5,8
print 43:20
printed 13:10
printer 55:9
prior 10:1 21:18
26:15
probably 13:11
problems 9:21
procedure 17:16
26:20 27:1
31:13,15 32:14
32:17,22
procedures
22:17
process 8:3
10:11 31:8

Drexel v. Harleysville Insurance Co.

32:7 44:9 47:3
49:2
**processed** 17:14
27:9
**processes** 10:17
**processing** 10:11
10:16 13:7,8
16:8 18:3
21:22 22:5,8
22:15 23:9
42:4 43:12
**produced** 11:2
37:24 38:16
**pronouncing** 2:9
**proof** 29:7
**property** 4:12
4:20 7:3,5 10:1
14:6 22:16,17
23:2,7 26:4,5
26:13 27:13,17
27:24 28:4,17
30:21 31:1,9
33:7,20 46:17
51:23
**prove** 29:9
**provide** 46:24
**provisions** 37:18
45:19,22,23
**Public** 1:12 55:6
**purpose** 37:12
**pursuant** 1:10
**put** 9:18 20:1
26:24 41:18
**puts** 41:24
**p.m** 1:11 42:6
53:7
**P000263** 53:16

---

**Q**

**question** 2:21
9:2 19:13,19
22:12 23:1
36:15 42:3,4
46:15 48:5
52:24
**questions** 2:17
2:18 8:14

45:16 46:23
47:8,15 55:8

---

**R**

**RDR** 55:17
**reached** 25:13
25:14,22
**read** 16:4 52:6,7
53:6
**reading** 30:7
34:13
**really** 41:6,23
**reason** 19:1,3,14
20:12 27:11
29:5 40:13
**reasons** 47:17
**recall** 40:15
**receipt** 7:22 17:9
29:13
**receipts** 45:3
**receive** 23:12
35:24
**received** 20:1
34:15,17 36:23
40:22 42:18
**recollection** 3:14
12:2,12,19
19:6 39:22
41:13 48:4
**record** 3:1 11:6
**recorded** 21:6
48:3
**records** 45:10
**recover** 15:9,9
**recoverable**
25:18
**refer** 16:10
23:21 31:20
**references** 21:9
34:22
**referred** 14:8,11
22:18 52:3
**referring** 11:1
20:2,20 29:15
38:20 42:24
49:21 50:7
**refresh** 12:3

**regarding** 10:16
18:21 21:1
32:21 45:3,24
**regional** 5:11
**Registered** 1:12
55:5
**reinstate** 35:8
**reinstated** 52:14
**related** 44:5
**relationship**
31:18 32:2
**relative** 55:13
**relies** 17:24
**rely** 18:15
**remark** 30:16,18
35:6
**Remarks** 53:15
**remember** 12:6
12:24 13:3
**remittance**
10:11,16 13:7
**renewal** 7:12
37:16 43:2
**rental** 11:14
**repair** 24:13
26:4,4 31:1
**repairs** 25:16
26:8 30:21
31:10 33:6,20
51:22
**REPLACE** 54:3
**report** 5:9,11
13:23 25:5
43:15 48:15
**Reporter** 1:12
53:19 55:4,6
**reports** 5:10
43:12
**represent** 2:11
30:11
**representative**
22:4 36:17
**representatives**
16:22 48:11
49:1 51:4
**request** 39:8
40:2

**requested** 25:17
**required** 21:21
22:4
**requirement**
22:2
**requires** 32:22
**requiring** 45:19
**research** 46:18
46:24
**resolution** 6:19
**resolving** 5:14
**resource** 47:21
**resources** 23:8
28:7
**respect** 6:3,9
12:20 19:20
20:14 24:7
**respective** 55:8
**response** 19:14
**responsibilities**
6:2 15:12
18:10
**responsibility**
6:21 9:23
15:13,18 17:5
17:9,12 20:24
**responsible**
17:20
**return** 38:1
**review** 42:12
**reviewing** 12:22
33:12 35:4
**Riddle** 1:9 2:1,7
2:10,11 3:2
53:9 55:7
**right** 2:9 7:1
18:12 30:22
31:2 38:2 50:4
50:7
**risks** 9:15
**Rob** 2:7,11
**ROBERT** 1:14
**rode** 11:13
**role** 3:9 13:17
**Roughly** 12:7
**run** 47:19

**S**

**S** 53:12
**safety** 9:19
**saying** 51:8
**says** 37:14,15,21
37:22 38:2
39:10 41:4,18
43:14 45:10
49:19,22 50:1
50:2,6,13,21
50:21 51:2
**scene** 23:11,20
28:6
**scheduling** 6:13
6:17
**screen** 7:24 14:9
21:16 36:7,13
42:17 43:20
44:10,14,21
**screens** 44:11,15
44:18 49:6
**seconds** 29:22
**section** 36:12
**see** 12:22 14:8
15:14,24 18:4
20:18 21:11
24:8,21 26:18
31:21 33:13
35:7 42:18
48:1 49:4 50:1
50:1,14 52:7
**seeing** 19:8
**seen** 14:9 37:8,9
**sells** 35:18
**seminars** 9:19
**send** 14:2 23:12
25:9 27:18
29:1,6 32:20
33:1,2 38:14
40:24 42:1
**sending** 26:17
29:10 33:3
34:6
**sends** 9:15
**Senior** 5:1
**sent** 10:1 24:5

Drexel v. Harleysville Insurance Co.

63

25:4 28:1 40:8
42:13 46:15
50:24 51:10
**separate** 10:7
13:11 15:24
**September** 35:3
45:8
**serious** 19:16
**SHALK** 1:17
**shed** 35:12
**sheet** 28:12 54:4
**SHEET/DEP...**
53:18
**Sherry** 1:20
40:20 41:17
**short** 29:10
**show** 19:16
33:19,24 37:4
38:18 39:1
41:11 43:17
45:5 48:16,19
50:16
**showed** 33:22
**shown** 21:16
52:20
**shows** 7:24 34:3
**side** 7:17,20 8:4
8:14 15:24
36:6
**signature** 39:10
39:11 53:18
**SIGNED** 54:6
**similar** 28:15
36:12 37:10
47:19
**sir** 14:23 20:22
29:21 30:13
**site** 46:20,21
47:7
**sitting** 13:2
**situation** 47:20
**Slonake** 15:3
**Smith** 1:10,14
**somebody** 7:7
13:24 22:24
34:7 51:18
52:24

**sorry** 6:24 14:17
19:18 23:19
35:5
**sort** 7:6 37:10
**sound** 48:15
**sounds** 39:9 42:3
44:4
**Southard** 38:4,6
38:16
**SO-530739**
53:15
**speak** 7:17 26:21
**speaking** 19:7
**specialist** 5:1
14:10
**specialists** 5:8
**specialist's**
15:17
**specific** 12:19,24
19:13 28:9
29:4 38:8
41:21
**specifically** 7:15
15:10 21:14
25:12 33:5
41:23 42:14
**specifics** 12:6
**spoke** 35:8
**stamp** 53:16
**stands** 30:15,18
46:17
**Start** 13:20
**state** 2:24 46:21
55:1
**states** 1:1 17:16
35:7,14
**static** 16:3,4
**stating** 38:17
**Staton** 41:17
43:7,8
**status** 36:4,5,17
36:19 41:24
47:4
**statutes** 46:21
**Stenotype** 55:9
**step** 16:9
**STEPHEN** 1:17

**stop** 42:10
**Street** 1:18,23
**structure** 9:6
10:6
**stuff** 6:17
**subject** 37:17
**submit** 46:23
**subsequent**
21:22
**substance** 11:22
**successful** 15:7
**suit** 55:14
**Suite** 1:18
**Sullivan** 30:3
**summer** 12:20
13:15 40:12
**supervising** 3:5
**supervisor** 3:8
4:17 5:5,10
12:16 14:4
17:2,13,17
**supervisors** 14:7
**support** 48:11
**sure** 7:6,18 11:5
11:15 12:14
19:10 22:12,24
32:13 36:19
41:24 42:2
48:13 50:15
**sworn** 2:3 55:7
**system** 10:16
14:1 15:14,21
15:22,24 16:11
16:12,13,16
18:1,3,3,6,7,11
18:19 19:9,15
19:17,20 20:7
20:13,14,18
21:1,5 23:5,11
23:21 24:2
28:3,6 30:17
36:7 42:11
44:3,16 48:21
48:23,24 49:6
**systems** 16:12
16:17,18,21
17:1 22:9 23:6

28:4 36:3 37:2

———————
**T**
**T** 53:12
**take** 16:2 20:6
24:12 28:22
33:11
**taken** 1:9 2:13
6:19 37:17
55:8
**takes** 18:22
19:16
**talked** 51:22
**technically** 18:2
**tell** 12:5 21:18
31:18 33:9
35:1 37:14,19
37:23 49:12,17
50:12,18,20
51:21
**telling** 51:9,10
**tells** 18:7 20:23
**term** 35:15 41:8
42:23 43:3
44:6
**Termination**
39:9
**terms** 46:8
**testified** 2:4
46:14 51:20
**testifying** 30:19
**testimony** 55:11
**thing** 6:15 9:19
28:12 29:8
**things** 10:8
**think** 6:24 7:4
13:6 14:13
15:4 23:10
35:3 43:23
49:24 51:19
52:5
**three** 12:14,15
**Thursday** 1:11
55:6
**time** 7:23 9:15
12:10 14:7
17:14 19:2,16

21:21 22:18
23:10 25:19
33:11 34:17
**timely** 36:23
**times** 29:1
**title** 4:24 7:2
38:8 43:14
48:14,22
**today** 3:6 10:19
11:11 13:2
51:22
**TOKF** 30:12
**told** 32:7 41:8
51:18
**top** 23:21 43:22
48:22
**total** 39:16
**Tower** 24:16
25:23
**train** 28:15
**training** 28:14
**transcribed** 55:9
**transcript** 55:11
**transcription**
55:9
**transferred** 3:12
3:15 5:23
**true** 28:24 55:11
**trying** 12:10
**turn** 39:12
**two** 4:14 14:7
50:4
**type** 6:12,14
8:13 9:19
28:12 29:8
39:10 46:22
49:4
**types** 44:24

———————
**U**
**ultimate** 6:1,21
**unable** 42:1
45:14
**understand** 2:18
2:21 7:19
22:12 31:6,22
32:2,6 33:23

36:1 52:6
**understanding**
7:9,11,14,18
7:21 8:6,8 9:13
26:1,10 36:20
42:14 45:22
47:2,5
**underwriter's**
39:11
**underwriting**
7:23 8:4,13,22
9:3,7 10:4,12
10:13 15:14,20
16:6,11,13,19
17:24 18:3,5,7
18:18 19:7,11
20:13 21:1,5
23:6 28:4 34:4
35:7 36:3,7
37:2,6,10 38:7
38:10,14,24
39:5,9 41:9
42:17 43:8,12
43:20 44:11,16
46:4 48:23
49:6 51:18
52:5,8,24
**unit** 5:10 40:2
**UNITED** 1:1
**updated** 18:19
19:18,21,23
**upper** 38:2
**UPS** 29:12
**use** 32:15 41:2,7
55:9
**users** 20:6
**uses** 28:15
**usually** 19:12
**utilize** 29:7

---
**V**
**v** 1:6
**vague** 12:14,23
**vendors** 24:2
**verify** 17:6,9
**verifying** 17:13
18:10,12

**vice** 5:11
**Vincent** 48:8

---
**W**
**want** 7:18 14:15
16:5 41:18
47:18
**wanted** 29:6
**wasn't** 33:21
**way** 25:24 52:7
**Web** 46:20,21
47:7
**We'll** 53:6
**we're** 3:5 19:23
33:3 41:8
**whatsoever** 28:2
**WILCOX** 1:22
**Wilmington**
1:11,15,18,23
**witness** 3:13
55:12
**work** 4:8,21
6:13 8:20,24
26:11 48:11
**worked** 4:2
**working** 3:22
**works** 32:7 36:1
**wouldn't** 19:4
**write** 24:13
**writing** 21:3
32:21 33:5
**wrong** 26:19
**wrote** 34:17
**www.wilfet.com**
1:24

---
**X**
**X** 53:8,12

---
**Y**
**yeah** 15:6 29:2
**year** 4:17
**years** 3:2 4:14
4:16 12:14,16
22:19
**yesterday** 11:13

---
**$**
**$10,762.56** 25:18
**$49,877.20** 25:16

---
**0**
**01** 49:11
**04** 52:13
**05-428(JJF)** 1:6
**07-06-2004**
37:22 50:22
**07-07-2004**
37:22 50:21

---
**1**
**1** 29:15 49:21
**1:35** 1:11
**10th** 1:10,15
**10-19-71** 3:3
**10:50** 14:22
**100,000** 39:23
40:1
**100-RPR** 55:17
**11** 53:15
**11:45** 20:21 27:6
**11:45:35** 20:5
**12:46** 14:16
**13** 51:13
**13th** 39:20 40:17
**13:35** 39:12
**1330** 1:23
**14** 45:8
**14:18** 40:18
**14:49** 30:4
**16th** 30:4
**16:39** 35:9
**198** 49:14
**19801** 1:18,23
**19899** 1:15

---
**2**
**2** 42:5 53:10
**2:25** 42:6
**2:55** 53:7
**20** 11:7 53:14
**200** 1:18
**2001** 3:24
**2004** 12:20

13:15 16:17,23
16:24 17:10
20:4 21:19
22:8,15 23:8
23:10 27:3,6
27:17 28:8,19
34:11,15 39:20
40:12 43:4
45:8 49:2,11
49:22 50:10
51:6,8,13 52:9
**2007** 1:11 55:6
**2008** 55:18
**205** 30:5
**21** 23:16 53:16
**22nd** 14:15,22
21:19
**23** 27:6 53:17
**23rd** 20:5,21
**23:52** 29:22
**265** 53:17
**29th** 34:11

---
**3**
**30** 1:11 52:9,13
55:6
**302** 1:23
**31** 55:18
**35** 3:2
**350,000** 40:10

---
**4**
**41** 29:22

---
**5**
**52** 53:10,11
**54** 53:18
**55** 53:19

---
**6**
**6** 51:5,8
**6th** 49:11,22
50:10
**6-08-04** 50:8
**6-22-2004** 29:22
**6-8-04** 50:2
**6/22/04** 45:13

**6/8/04** 45:12
**655-0477** 1:23

---
**7**
**7-06-04** 50:6

---
**8**
**8** 43:4
**8th** 50:10
**8-13** 35:5,6
39:12
**8-16** 35:9
**800** 1:10,15,18