**EXHIBIT G**



**WILCOX & FETZER LTD.**

RKB
SEP 20 2007

## In the Matter Of:

# Drexel

## v.

# Harleysville Insurance Co.

### C.A. # 05-428 (JJF)

---

## Transcript of:

## Theodore Gregg Parker

## September 11, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Drexel v. Harleysville Insurance Co.

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


LAYNE DREXEL,                          )
                                       )
            Plaintiff,                 )
                                       ) Civil Action
v.                                     ) No. 05-428(JJF)
                                       )
HARLEYSVILLE INSURANCE CO.,            )
                                       )
            Defendant.                 )


          Deposition of Harleysville Insurance Company
taken pursuant to Federal Rule of Civil Procedure
30(b)(6) through its designee THEODORE GREGG PARKER at
the law offices of Smith, Katzenstein & Furlow LLP,
800 Delaware Avenue, 10th Floor, Wilmington, Delaware,
beginning at 10:15 a.m., on Tuesday, September 11,
2007, before Kurt A. Fetzer, Registered Diplomate
Reporter and Notary Public.

APPEARANCES:

       ROBERT K. BESTE, III, ESQ.
       SMITH KATZENSTEIN & FURLOW
         800 Delaware Avenue - 10th Floor
         Wilmington, Delaware  19899
         For the Plaintiff

       STEPHEN P. CASARINO, ESQ.
       CASARINO CHRISTMAN & SHALK
         800 North King Street - Suite 200
         Wilmington, Delaware  19801
         For the Defendant


                   WILCOX & FETZER
       1330 King Street -  Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

Drexel v. Harleysville Insurance Co.

**2**

1            THEODORE GREGG PARKER,
2      the deponent herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5            EXAMINATION
6    BY MR. BESTE:
7      Q.  Good morning, Mr. Parker.
8      A.  Good morning.
9      Q.  My name is Rob Beste.  I represent Layne
10   Drexel, Harleysville's insured in this matter.
11         Can you state your name, age and date of
12   birth for the record?
13     A.  Yes.  My name is Theodore Gregg Parker.  I'm
14   56, I believe.  My date of birth is 11-23-51.
15     Q.  Can you tell me what your position with
16   Harleysville is?
17     A.  I'm a home office property consultant.
18     Q.  What does that title require you to do, that
19   position?
20     A.  I've got several responsibilities.  I oversee
21   large loss claim handling.  I oversee the vendor
22   management program.  I organize and direct catastrophe
23   responses.  I conduct training as requested.
24     Q.  Under which of those classifications does this

**3**

1    case fall?
2      A.  This would be more of a large loss or a complex
3    loss.
4      Q.  How do you define those terms, large or complex
5    loss?
6      A.  A large loss is anything a hundred thousand
7    dollars or over.  A complex loss would be something
8    that has a number of factors that would cause the home
9    office interest or involvement, such as a coverage
10   dispute, an arson case or something that the branch
11   just may request technical assistance on.
12     Q.  Can you explain to me what you mean by the
13   phrase "home office"?
14     A.  Yes.  Harleysville has a home office complex in
15   Harleysville, Pennsylvania.  The home office is the
16   central location for some administrative and claim
17   functions.  It also has underwriting and marketing
18   functions there as well.
19     Q.  Are you part of that function or are you
20   separate from it?
21     A.  No.  I'm a home office employee.
22     Q.  Do you have overall authority with respect to
23   this claim and this lawsuit or does that reside with
24   someone else?

**4**

1            MR. CASARINO:  I'm not sure what you mean
2    by "authority."
3      Q.  Authority if we were to settle or to make a
4    decision on Harleysville's behalf.  Is that your
5    authority or someone else's?
6      A.  This particular claim would probably be
7    resolved or authorized by a claim committee.
8      Q.  Someone you report to, a committee you report
9    to?
10     A.  I would be a member of the committee.
11     Q.  Who else would comprise that committee?
12     A.  Frank Rotella is my -- I report directly to
13   him.  He is the property material damage director for
14   Harleysville.  We have also a litigation manager that
15   may be present in a committee setting.
16     Q.  Are you aware if the plaintiff is successful on
17   certain aspects of his claim that he can collect his
18   attorney's fees?
19     A.  Yes.
20     Q.  How long have you been an employee of
21   Harleysville?
22     A.  Ten years.
23     Q.  Beginning approximately when?
24     A.  June 23rd, plus or minus, '97.

**5**

1      Q.  Can you give me a brief history of the
2    positions you've held at Harleysville since you
3    started in June of '97?
4      A.  Yes.  I was interviewing for two jobs at the
5    same time with Harleysville.  I was interested in the
6    position that I currently have.  At the time it was a
7    general adjuster's position.
8            And while I was interviewing for that, I
9    was offered a job as a claim rep in the Charlotte
10   office.  I accepted that position with the
11   understanding that it wouldn't preclude my
12   consideration for the general adjuster's position.
13           And so I was a property claim rep for
14   three weeks before I got the job as a general
15   adjuster.
16     Q.  So you were in Charlotte for three weeks and
17   then you came to where?
18     A.  I'm still in Charlotte.
19     Q.  You're still in Charlotte?
20     A.  I telecommute from Charlotte.
21         MR. BESTE:  Off the record.
22         (Discussion off the record.)
23         MR. BESTE:  Now, just for the record,
24   there have been two prior depositions in this case

2 (Pages 2 to 5)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

**6**

1  and exhibits have already been marked, so I'm going to
2  be handing you some documents. They will be marked
3  according to my convoluted numbering system. You can
4  ignore the numbers and just focus on the documents.
5       If I could have this marked as H-23,
6  please.
7       (H Deposition Exhibit No. 23 was marked
8  for identification.)
9  BY MR. BESTE:
10      Q.  Are you able to identify this document?
11      A.  It's a notice of deposition.
12      Q.  Have you ever seen that before?
13      A.  Yes.
14      Q.  Do you recall when you have seen that document
15  prior to this morning?
16      A.  I don't recall prior to this morning exactly
17  when I saw it.
18      Q.  Do you understand that this is a request from
19  my office that Harleysville provide a representative
20  to testify on certain subjects?
21      A.  Yes.
22      Q.  And you see in H-23 there are a number of
23  subjects listed beginning with number 1 on page 1 and
24  going through number 9? If you could please briefly

**7**

1  review those topics and I want an understanding of
2  what topics on that list you're able to testify and
3  are prepared to testify to today.
4       A.  Okay.
5       Q.  Please take your time.
6       A.  Yes.
7       Q.  We can go through them one by one. You can
8  read them all at once, any way you prefer, just to
9  make sure we're clear.
10          MR. CASARINO:  Just to make sure we're
11  clear, he might be able to testify about a lot of
12  them, but with regard to whether he's speaking on
13  behalf of the company, that's really what I guess
14  you're asking him.
15          MR. BESTE:  It is. And perhaps we can
16  stipulate to it if you have a position on that for me.
17          MR. CASARINO:  No. I just mentioned he's
18  here on behalf of claims. He's not here on behalf of
19  the procedures regarding termination. There's another
20  person coming today.
21          MR. BESTE:  Right. I'm trying to get an
22  idea of what capacity he's --
23          MR. CASARINO:  I understand. But he may
24  know something about it, but he's not speaking on

**8**

1  behalf of the company.
2  BY MR. BESTE:
3       Q.  If you could look through the list and maybe
4  we'll go through them one by one and if you will tell
5  me whether you're capable and your attorney can
6  confirm whether you're here to speak for the company
7  on those topics.
8       A.  We can do that one by one.
9       Q.  All right. Start with 1.
10      A.  I would --
11      Q.  The standing question for each one is whether
12  you're here to testify regarding the topic listed.
13  Okay?
14      A.  Okay. To my understanding I'm here to testify
15  as far as claims procedures and that would be my area
16  of expertise.
17          So as to number 1, "policies and
18  procedures with respect to coverage termination and
19  notice thereof to its insured," that's not something
20  that would be strictly a claims matter. That would be
21  something that would be handled by others.
22          Number 2, "policies and procedures with
23  respect to acceptance and processing of premium
24  payments from insureds, including late premium

**9**

1  payments." That's something that would be handled by
2  outside of the claims department, so I would not --
3       Q.  Do you know what department handles that, what
4  the title of the department is?
5       A.  You know, I really don't. My assumption would
6  be it would be a subset of underwriting where they
7  would have billing and processing, but how exactly
8  they're organized I couldn't tell you.
9       Q.  How about 3?
10      A.  "Policies and procedures on the effective
11  cancellation date selected by Harleysville when
12  cancelling property insurance." The claims department
13  doesn't deal with canceling property insurance, so
14  that's not something that I would testify to.
15          Number 4, "Harleysville's policies and
16  procedures with respect to adequate justifications for
17  the cancellation of insurance policies, including the
18  type at issue in this suit and retroactive
19  cancellations after claims have been made on a
20  policy."
21          The claims department does sometimes
22  address justifications for cancellation of insurance
23  policies, so there are some types or scenarios where
24  it would be a claims determination.

3  (Pages 6 to 9)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

10

1    Q.  Are you able to explain to me the difference
2  between when it would be a claims -- I'm sorry.
3         Are you able to tell me what the
4  difference between when the claims department would be
5  involved and when the claims department would not be
6  involved in that regard?
7    A.  Yes.  I think I could do that for you.
8    Q.  Give it a shot.
9    A.  Okay.  If during the investigation of a claim
10  we establish that there has been fraud or
11  misrepresentation in the presentation of a claim, that
12  would be something that we would be the instigator of
13  a cancellation process.
14    Q.  By "we" you mean the claims department?
15    A.  The claims department, that's right.
16    Q.  Is there any of that, the fraud element,
17  involved in this claim from your perspective?
18    A.  Yes, I think there is, but in this instance
19  we're really not talking about a cancellation.  But I
20  think that there is an element of fraud in this case.
21    Q.  Can you explain why you think there's an
22  element of fraud in this case?
23    A.  Yes, I think I can.
24         We have a situation where we had offered

11

1  an extension of coverage or a continuation of coverage
2  in exchange for payment of premium within a certain
3  time period.  It has been alleged that payment was
4  made timely and that Harleysville had mishandled the
5  check that was issued to assure continued coverage.
6         An investigation of the claim has
7  determined that it's more likely than not that the
8  check was issued well after the end of the period
9  where coverage was offered, so the fraudulent aspect
10  in my opinion would be the inducement or the
11  falsification of dates, records and testimony to
12  induce us to provide coverage.
13    Q.  You said dates, records and testimony.
14         Can you explain to me what specific dates,
15  records and testimony were falsified in this case in
16  your opinion?
17    A.  Well, in my opinion, the date of the issuance
18  of a check, I believe we can show that that check was
19  backdated to a time well within the period where we
20  would have accepted it to extend coverage.
21    Q.  Anything else aside from the backdating issue?
22    A.  I believe it was alleged -- and I'm trying to
23  recall exactly where and how.
24         I believe the insured alleged that the

12

1  check was issued timely and that Harleysville had
2  mishandled the check thereby causing him not to have
3  coverage.
4    Q.  What do you mean you mishandled the check?
5  What is your understanding of that assertion at least
6  as you see it?
7    A.  My understanding was that it was alleged that
8  the check was written on the date that appears on the
9  check as the issued date; it was sent to Harleysville
10  to pay the premium for the policy and that we lost or
11  mishandled the check and it was not applied to the
12  account which would have created coverage.  And that's
13  really not the case.
14    Q.  Where did you develop that understanding of the
15  accusations of the case from?  Can you explain to me
16  where it came from?
17    A.  Not exactly, no, I can't.  I don't know if it
18  was in the pleadings.  I believe it was, but I don't
19  know for sure.  I would have to review the documents
20  to see.
21    Q.  What involvement does the claims department
22  have in processing premium payments as they come in
23  from insureds?
24    A.  None.

13

1    Q.  And so you're not capable of testifying
2  regarding what Harleysville employees believed when
3  they received the premium payment in issue here?
4    A.  I have no knowledge of what employees even got
5  the payment.
6    Q.  And do you have any knowledge of the policies
7  or procedures or job requirements of the employees who
8  do process premium payments for Harleysville?
9    A.  No.  I have no knowledge of that.
10    Q.  So your understanding that some type of fraud
11  caused Harleysville to misapply the check is not based
12  on your understanding of how payments are processed by
13  Harleysville?
14    A.  I didn't say that Harleysville had misapplied
15  the check.
16    Q.  You said that was the allegation.
17    A.  That was the allegation.
18    Q.  Right.
19    A.  So what was the question again?  I'm sorry.
20    Q.  Well, let's just move on from that question.
21  It was not a good question.
22         All right.  How about topic 4 on H-23, are
23  you here to testify regarding that topic?
24    A.  Just to the extent we just discussed.

4 (Pages 10 to 13)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

14

1    Q.  I'm sorry.  I'm sorry.
2         Topic 5?
3    A.  "Harleysville's policies and procedures
4   regarding claims notes and notations, including
5   methods of recording and reading claims notices."
6   Yes, I'm prepared to testify about that.
7    Q.  Have you reviewed Harleysville's adjusters'
8   notes in this matter in preparation for the deposition
9   today?
10   A.  Yes, I have.
11   Q.  What other documents have you reviewed in
12  preparing for today?
13   A.  I reviewed the property claims manual that was
14  in effect at the time of the loss.
15   Q.  Anything else?
16   A.  That's it.
17   Q.  Did you participate in any meetings in
18  preparation for today?
19   A.  No.
20   Q.  You didn't meet with any other Harleysville
21  employees or representatives regarding your testimony
22  today?
23   A.  No.
24   Q.  Are you here to testify regarding topic number

15

1   6?
2    A.  "Harleysville's denial of the Claim and
3   cancellation of the Policy at issue."  I can testify
4   as to our denial of the claim, but I was not involved
5   in the non-renewal of the policy.
6    Q.  As you understand this claim or the policy
7   expiration, what department or group at Harleysville
8   had final authority regarding whether this claim would
9   be paid at the time the decision was made to deny it?
10   A.  I can tell you that it was not claims.  But
11  since I'm not crystal clear on the structure between
12  underwriting and processing, I really can't tell you
13  exactly which of those or even if they're separate how
14  that works, but the policy period was not set by the
15  claims department.
16   Q.  So when the claims department denied the claim
17  in this case, it was doing so based solely on the
18  instructions of some other representatives of
19  employees outside of the claims department?
20   A.  Correct.
21   Q.  Just following orders?
22   A.  Just following the information we were provided
23  with, yes.
24   Q.  How about topic 7?

16

1    A.  "The history of the Claim at issue including
2   all direction and communications with third parties or
3   plaintiff."  I can testify as to the history of the
4   claim.
5    Q.  Are you able to testify regarding
6   communications with third parties and plaintiff
7   arising from the claims department?
8    A.  That is recorded I can testify to.
9    Q.  And you have no separate knowledge or memory of
10  the claims handling process in this case aside from
11  what you know from the documents?  Is that accurate?
12   A.  That's accurate.  I've had no communication
13  with any third parties or plaintiff other than today
14  with you.
15   Q.  Do you know when you first became aware of this
16  claim?
17   A.  Not precisely.
18   Q.  Can you tell me less precisely?  I'm just
19  looking for an estimate.
20        Were you involved before the claim was
21  denied, to your recollection?
22   A.  No, I don't believe I was.  The amount of the
23  claim would suggest that I wasn't.  It didn't appear
24  to be one that would exceed $100,000 and that's

17

1   ordinarily when I get notice of a claim.
2    Q.  To your knowledge, was this claim already in
3   litigation when you became aware of it?
4    A.  I think it might have been litigation that
5   brought it to my attention.
6    Q.  Are you here to testify regarding topic number
7   8?
8    A.  "All payments made associated with this claim,
9   whether withdrawn or not."  I can testify to any
10  payments made.
11   Q.  Does the claims department directly issue
12  payments on claims or policies?
13   A.  Yes.
14   Q.  My understanding before you said that was that
15  they directed the home office to issue checks.  Is
16  that how it works?
17   A.  That's one way that it works.
18   Q.  The claims department can also issue checks
19  independently of the home office?
20   A.  Correct.
21   Q.  Can you give me a brief understanding of the
22  difference between when the claims department can and
23  cannot send checks separate and apart from the home
24  office?

5  (Pages 14 to 17)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

**18**

1    A.  Yes.  If there's -- all the branches have the
2  ability to issue manual checks that would be prepared
3  either by the claim rep.  They could type it.  They
4  can fill it out with a pen.  And usually when a manual
5  check is necessary is there's a crucial time element
6  involved.
7         I carry manual checks with me when I go to
8  large losses and routinely issue them on site.
9    Q.  Are you able to testify regarding topic number
10  9?
11    A.  "Harleysville's policy as to the number of
12  cancellation notices required to be sent and the
13  effective date of that cancellation for the type of
14  policy at issue."
15         That does not appear to be a claim
16  department function.  I wouldn't know anything much
17  about that.
18    Q.  I'm going to try to keep these exhibits
19  organized, but feel free to refer to any of them that
20  you feel is necessary.
21         I think we have established what you can
22  testify about today.  Can you give me an understanding
23  of Harleysville's corporate structure or hierarchy in
24  a very general sense as far as the distinction between

**19**

1  claims and underwriting, what's your understanding of
2  the whole umbrella, if you will?
3    A.  How the insurance company itself is organized?
4    Q.  Yes, sir.
5    A.  I can give you my rudimentary understanding of
6  how it's organized.
7         It is specialized to some degree as any
8  large organization would be.  The claims department
9  handles the investigation and payment of legitimate
10  claims.
11         Underwriting reviews risks that are
12  submitted to it for consideration and assigns a
13  premium for that risk if it's acceptable and works
14  with the agents to establish the existence of a
15  policy.
16         Marketing would be the department that
17  solicits or encourages the agents to write insurance
18  with Harleysville.  Those are the three large,
19  familiar functions of an insurance company, but there
20  is an administrative aspect to any insurance company
21  and I don't know that there is a separate
22  administrative department.  Probably that would be a
23  subdepartment within each large component.  Claims
24  would have its own administrative staff I would

**20**

1  assume.
2    Q.  Is there any type of structure at the top of
3  the organization, a management division or department
4  or anything like that that oversees all of the various
5  departments?
6         Is there any formal structure there?
7    A.  Yes.
8    Q.  Can you explain that to me briefly?
9    A.  I'll explain my understanding of it.
10    Q.  Sure.  That's all I can ask.
11    A.  I believe we have a CEO, president, vice
12  president and a board that handles the direction the
13  company goes in.
14    Q.  And does that group oversee the different
15  departments directly, to your knowledge?
16    A.  I would imagine the CEO would be the one that
17  is responsible to the board for the oversight of each
18  claims operation or each functional operation.
19    Q.  What is your understanding of who at
20  Harleysville processes premium payments as they come
21  in from an insured and where that occurs?
22    A.  I have no direct knowledge of it.
23    Q.  Do you know where it occurs?
24    A.  My assumption would be it occurs in the home

**21**

1  office.  I haven't seen a bill, so I don't even know
2  what the return address is.
3    Q.  In the summer of 2004 are you familiar with the
4  responsibilities that the claims department of
5  Harleysville had with respect to handling and
6  processing a claim as it came in?
7    A.  Yes.
8    Q.  Can you explain to me who gets the initial
9  report of a claim and what their responsibilities are?
10    A.  I believe I can.
11         A claim report can either come in directly
12  from a customer or it can come in from the agency.
13  The report would come into our central processing unit
14  in Harleysville and a contact would be made with the
15  insured at that point.  Depending on the severity and
16  complexity of the claim, a decision is made as to
17  whether that claim is retained in the central
18  processing unit or whether it's assigned to one of our
19  claim service centers.
20    Q.  And it eventually gets to a claim adjuster?
21    A.  Yes.  We have claims adjusters in the CCU,
22  which is our central claims unit.  They primarily
23  handle claims that are relatively short-lived and
24  minor claims, mostly homeowner claims, and so they

6 (Pages 18 to 21)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

22

1  retain those that are essentially less severe.
2      Q.  Do you know whether this claim was assigned to
3  an adjuster when it eventually came in?
4      A.  I believe it was.
5      Q.  Do you know who that person was?
6      A.  I believe it was Sherry Clodfelter.
7      Q.  Can you explain to me what Ms. Clodfelter's
8  responsibilities were in a general sense when she
9  first processed this claim in the summer of 2004?
10     A.  Well, yes.  Upon receipt of the claim, she's
11  responsible for making contact with the insured, for
12  investigating the claim, including her discussions
13  with the insured, securing any official documents that
14  may be required such as a fire report.  And her
15  investigation would include establishing the amount of
16  damage to the property, which she could do by either
17  assigning an approved contractor or an independent
18  adjuster to the case.
19     Q.  Why was an independent adjuster assigned in
20  this case?
21     A.  I believe an independent adjuster was assigned
22  because of the amount of damage that was described to
23  Ms. Clodfelter.
24     Q.  It was above a certain threshold?

23

1      A.  Yes.  Ordinarily, we would send an approved
2  contractor, we have an approved contractor program,
3  out on losses of $5,000 or less.  This was reported to
4  exceed that, so she assigned an independent adjuster.
5      Q.  Was Ms. Clodfelter required by Harleysville
6  when she processed this claim to verify that coverage
7  was in place?
8      A.  Yes.
9      Q.  And how was she required to go about doing
10  that?
11     A.  Well, the policy information is available on
12  our computer.  She probably received the claim having
13  already been set up with one suffix opened.  That
14  function is handled in the central claims unit.  So
15  when she receives the assignment to complete the
16  handling of the claim she would confirm that the
17  policy was in effect and the loss occurred within the
18  effective dates.
19     Q.  Can you explain to me practically how she would
20  verify that coverage was in effect when she first
21  received this claim?
22     A.  Well, as a practical matter since the claim had
23  already been assigned a claim number, so it was locked
24  in, and if the central claims unit had opened one

24

1  suffix, which is their usual procedure, you know, open
2  a building suffix at a standard reserve pending
3  investigation, Sherry would be able to type in the
4  claim number into the system.  And the screen that
5  would come up would show the policy, the policy
6  number, the claim number, the effective dates and that
7  the policy was active.
8      Q.  So she accesses some type of computer database
9  to verify that the policy is effective on the date of
10  loss?
11     A.  It's not really a database.  It's our claims
12  system.  It's a CICS is how we designate that claims
13  system.
14     Q.  Is that an acronym?
15     A.  I bet it is, but I don't know what it stands
16  for.
17     Q.  Are the claims adjusters able to alter or
18  change the data in that system?
19     A.  The data as far as coverage or as far as --
20     Q.  The effective dates of coverage?
21     A.  No.  They can inquire as to different policy
22  periods, but they do not have the ability to change
23  effective dates.
24     Q.  Who does it within Harleysville, to your

25

1  knowledge?
2      A.  I don't know who would change effective dates.
3      Q.  Do you know who controls the information that's
4  in that system?
5      A.  No.
6      Q.  Is it underwriting?
7      A.  Underwriting I believe would be where a lot of
8  the information would originate, but I don't know if
9  underwriting is directly charged with maintaining that
10  information or whether that is another subdepartment
11  of underwriting.
12     Q.  Another subdepartment of underwriting?
13     A.  Yeah.  I don't know how underwriting is
14  organized, but that would be one of their functions,
15  would be to provide us with coverage information so we
16  can handle claims.  It's like that would be separate
17  from, you know, billing and receiving payment for
18  bills.
19         That's also a logical function of
20  maintaining coverage, but I wouldn't know exactly how
21  that is organized and who they would report to.
22     Q.  To your knowledge, do any groups within
23  Harleysville, aside from underwriting, have the
24  ability to control the coverage information that we're

7  (Pages 22 to 25)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

26

1   discussing?
2      A.  No.  I can't think of anyone else that could
3   address coverage.
4      Q.  I'm going to hand you what previously has been
5   marked as H-1.  I ask if you can identify that
6   document.
7         MR. BESTE:  Do you have copies of these?
8   I have copies if you need them.
9         MR. CASARINO:  I have copies from the last
10  deposition.  I don't need them, no.
11     A.  These appear to be adjuster log notes from our
12  claim information system, the CICS system.
13     Q.  Are you able to tell me when Harleysville first
14  processed this claim?
15     A.  I can tell you the first log note is dated
16  6-22-04.
17     Q.  Looking at H-1, are you able to tell me who at
18  Harleysville confirmed when the claim initially came
19  in that coverage was in place on the date of the loss?
20     A.  (Reviewing document)  It appears that the
21  original individual that took the claim in the central
22  claims unit may have locked it in as something that's
23  covered, but it doesn't, the note doesn't say anything
24  about that aspect.

27

1         The next note is from a supervisor that
2   does mention that or requests that Sherry check the
3   coverage of the building and scheduled personal
4   property.
5      Q.  Can you tell me who made that note you're
6   referring to?  I believe you're referring to the note
7   at 12:46 on the 22nd of June.
8      A.  Yes.  That's John Duncan.  He's a supervisor.
9         The claim would come into the central
10  claims unit or the central claims unit would get it
11  and the original claim handler determined apparently
12  that this was something that needed to go to the
13  claims service center.  So it was electronically
14  transmitted to the claim service center.
15        The supervisors get those assignments and
16  then they assign them to claim reps.  John Duncan made
17  the assignment to Sherry Clodfelter.
18     Q.  Did Ms. Clodfelter, looking at these notes, did
19  she verify that coverage was in place on the date of
20  loss when the claim first came in?
21     A.  It appears that she did according to the note
22  on 6-23 at 11:45.  Let's see.  1172 is our designation
23  for a short initial report.  She put it right on the
24  adjuster log notes, which is perfectly acceptable.

28

1         And the first few lines deal directly with
2   coverage.
3      Q.  So on June 23, 2004 did Ms. Clodfelter verify
4   that there was coverage in place as of the date of
5   loss?
6      A.  Yes.
7      Q.  Looking at those adjuster notes, H-1, are you
8   able to tell me when the claims department first
9   became aware there was an issue regarding the payment,
10  the premium payment in this case?
11     A.  I believe I can.
12        It appears that we were made aware that
13  there was a problem on 8-13-04.  Ms. Clodfelter had
14  requested a check and the note of 8-13-04 at 14:18 for
15  Mr. Riddle says that this policy may be canceled prior
16  to the effective date.
17     Q.  Can you explain to me what that means, this
18  policy can be canceled prior to the effective date?
19        MR. CASARINO:  He didn't say, "can."  He
20  said, "may be."
21        MR. BESTE:  Okay.
22  BY MR. BESTE:
23     Q.  Explain to me what that note means.
24     A.  What that note means is that policy periods run

29

1   from the effective date or the inception date to the
2   end date, and the inception date is the effective date
3   of the policy.  On a renewal the effective date is
4   essentially the first day after the end of the last
5   policy period so that it runs concurrently without a
6   lapse, you know, so it runs consecutively.
7         So this appears to be a situation where
8   the underwriter or whoever handles claims billing and
9   payment had anticipated a payment for the renewal
10  policy that they did not receive, so the policy
11  terminated as of the end of the previous policy
12  period.
13     Q.  When you say the policy terminated, why do you
14  use the word "terminated"?  Does that have some
15  special meaning?
16     A.  It means it ended.
17     Q.  What caused it to end?
18     A.  The policy period that the insured had provided
19  payment for was over.  The policy is written for
20  specific perils and for a specific time period and
21  this time period had ended.
22     Q.  Between the time Ms. Clodfelter verified
23  coverage on June 23rd, 2004 and the notes we're
24  discussing on August 13, 2004, is it accurate to say

8 (Pages 26 to 29)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

30

1  that the claims department believed during that entire
2  period that the policy was in place on the date of
3  loss?
4      A.  Yes.
5      Q.  And August 13th, 2004 was the first time any
6  employee of Harleysville's claim department became
7  aware that there was an issue with Mr. Drexel's
8  premium payment in this case?
9      A.  Yes.
10     Q.  So Ms. Clodfelter complied with her
11 responsibility to verify coverage was in effect on the
12 date of the loss when she first processed this claim,
13 correct?
14     A.  That's correct.
15     Q.  Does Harleysville require its claims handlers
16 to check that information, in other words, whether a
17 policy was in place on the date of loss, at any time
18 subsequent to the initial processing of the claim?
19     A.  No, they don't.
20     Q.  So from a claims department perspective, once
21 that information is verified, that the coverage is in
22 place at the beginning of the claim, they will process
23 and pay the claim unless they're told otherwise by
24 some other function of Harleysville.  Is that correct?

31

1      A.  That's correct.
2      Q.  And that was the case in the summer of 2004
3  when this claim was processed?
4      A.  Yes.
5      Q.  Is that still the case today?
6      A.  Yes.
7      Q.  You mentioned a few minutes ago the term
8  "suffix."
9          Can you explain to me from a claims
10 perspective what significance that has?
11     A.  Yes.  I think I can.  We call each aspect of a
12 claim a suffix.  Other names for it are features or --
13 I'm sorry.  I'm drawing a blank what else they're
14 called.
15     Q.  I'm sorry.  I didn't mean to interrupt you.
16         You're referring to distinct financial
17 parts of the claim.  Is that correct?
18     A.  Yes.  Each -- the policy that we have here has
19 limits and each limit would describe a suffix.  The
20 building has a limit of X and so we would open, if
21 there's damage to the building we would open a suffix
22 which is like that feature, building feature with the
23 appropriate reserve.
24         If it has contents coverage, that would be

32

1  an additional part of the claim with a separate limit
2  and we would open a suffix to address any contents
3  damage.
4          If there's a time element coverage, we
5  would have opened another suffix to address that
6  different aspect of the claim.
7      Q.  So looking at H-1 again, the very first entry
8  starts with the numbers SO-530739.
9          Is 530739 the claim number in this case?
10     A.  Yes, including the SO.  You would need that for
11 it to come up.
12     Q.  What does the SO stand for?
13     A.  The SO describes a claim that would be assigned
14 to the southeast claim service center.
15     Q.  Are you able to tell me what different suffixes
16 were created with respect to Mr. Drexel's claim in
17 this case?
18     A.  Not from what I have in front of me, I don't
19 believe.
20         Now, she does describe what coverage he
21 has, but this isn't really a print of a reserve screen
22 that would show me what she had established.  She
23 describes, for instance, in her note of 6-23 at 11:45
24 the C-1172 designation which she describes building

33

1  $225,000 replacement cost with 100 percent
2  co-insurance.  So she's describing the coverage
3  available, but it does not mention what reserve she
4  had assigned to it.
5          So I don't think that she would have
6  assigned the whole 225,000 or I would have received a
7  notice of that.
8      Q.  When Ms. Clodfelter was processing this claim
9  in June of 2004, can you tell me all of the computer
10 systems, separate screens or different computer
11 distinctions Ms. Clodfelter had access to?
12     A.  As of 2004?
13     Q.  Yes, sir.
14     A.  I believe I could, I could take a shot at it.
15         There's been some changes in claims and
16 procedures, but I can tell you what essentially she
17 had for tools at the time.
18     Q.  Okay.
19     A.  Do you want these laid out generally, what
20 system she has?
21     Q.  Yes.
22     A.  Okay.  She had access to --
23     Q.  Let's start with this adjuster remarks system.
24     A.  Okay.  This is part of the CICS.  CICS is

9  (Pages 30 to 33)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

34

1    basically a claim information system. It also has
2    capabilities to look at policy provisions and issued
3    dates and coverages that she could review to establish
4    the amount of the policy that was written.
5        Q. In other words, she can pull up dec. sheets and
6    forms and that type of thing?
7        A. She can't pull up a dec. sheet in CICS. She
8    can pull up the basic information that is put in the
9    machine, but it's just not put in a dec. sheet format
10   and it's not like an image of the dec. sheet.
11           At that time she probably did have access,
12   may or may not have had access but I believe at that
13   time we did have imaging capability so that she could
14   have looked at an image that would be the dec. sheet.
15       Q. In other words, she would be able to look at
16   certain documents relative or relevant to the claim?
17       A. Correct, relative to the claim and relative to
18   the policy.
19       Q. You were talking about the suffix or limits
20   screen a few minutes ago.
21           Can you explain that to me?
22       A. Yes. There's basically a summary screen, claim
23   summary screen. If you entered this claim number into
24   the CICS and just hit enter, claim information, it

35

1    would come up with a summary of that claim as far as
2    the information in it. That would give you the policy
3    number, the date of loss, the date it was reported.
4        Q. Would it detail any suffixes created for a
5    claim?
6        A. It would. The first page of it would give you
7    I believe up to three suffixes and you would be able
8    to tell from that what suffix was created, what the
9    reserve was and what the payments had been made on
10   that suffix.
11       Q. Okay. Aside from adjuster notes, document
12   imaging and the summary screen, what other elements to
13   the CICS system would Ms. Clodfelter have had access
14   to in June of 2004?
15       A. Well, the claim information system has several
16   different ways that it can present requested
17   information, but she would have -- if she had
18   requested it, she could request a reserve history.
19   She could request a payment history.
20           Of course, there's the log note feature
21   that she could add to or just review.
22       Q. You said payment history?
23       A. Yes.
24       Q. What do you mean by that? Premium payments?

36

1        A. No. No. This would be claim payments.
2        Q. Claim payments?
3        A. Claim payments, so payments that had been made
4    for indemnity payments or for expense payments.
5        Q. So we have discussed within the CICS system
6    adjuster notes, imaging, summary screen, reserve
7    history, payment history?
8        A. Yes. Now, imaging is not within the CICS
9    system. That would be a separate system that she
10   would have to enter.
11       Q. So aside from adjuster notes, summary screen,
12   reserve history, payment history, what other elements
13   to the CICS system would Ms. Clodfelter have had
14   access to in 2004?
15       A. Did I mention the policy history? Is that one
16   of the features that you mentioned?
17       Q. It is not. Can you explain that to me?
18       A. Yes. In the claims function we basically hit
19   the items that we had talked about. She can also
20   enter a policy number and bring up the policy
21   information, history, the locations that are covered,
22   the mailing address, all the typical underwriting
23   functions.
24       Q. How about premium processing payment dates,

37

1    would that be in that system?
2        A. I don't know. I don't remember. I don't
3    recall seeing specific payment information in there,
4    but the amount of the premium is in there.
5        Q. As far as you know, are there any other
6    elements of the CICS system that we have not
7    discussed?
8        A. I can't think of any relevant to this claim.
9        Q. Regardless of whether they're relevant to this
10   claim, are there any other elements of the CICS system
11   that we have not discussed?
12       A. Yes.
13       Q. Can you please describe them for me as well?
14       A. Unfortunately not since I don't use them. I
15   mean, it is used by other elements of the company.
16   What I use and what I assume that other claim reps use
17   are the claim features and the policy information
18   features.
19           There are other options that you can use
20   or maybe not. I mean, I don't know if they're even
21   authorized to go in those places, but there are other
22   selections that you could make to go other places. I
23   just don't go there because it's not relevant to my
24   job.

10 (Pages 34 to 37)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

38

1   Q. So other than --
2   A. But there are other features available. I just
3   can't recall them since I don't use them.
4   Q. So other than adjuster notes, summary screen,
5   reserve history, payment history and policy history,
6   are you familiar with any other elements of the CICS
7   system?
8   A. That's what I'm familiar with.
9   Q. So in 2004 Ms. Clodfelter had access to the
10  CICS system, the imaging system for Harleysville's
11  documents that we discussed, correct?
12  A. I believe so.
13  Q. Are there any other computer programs or
14  databases that Ms. Clodfelter had access to in June
15  2004 and afterwards as she processed this claim?
16  A. Well, sure. She had access to the normal
17  office suite of the Microsoft Office software, so she
18  had spreadsheets and Excel and word processing and the
19  typical Microsoft Office suite of applications.
20      I believe in 2004 we had started using
21  SceneAccess, which is a way of assigning claims and
22  communicating on claims. I believe that was rolled
23  out in 2004. It was a new event for us and I believe
24  that had started in 2004.

39

1       So SceneAccess is a way of sending
2   assignments to vendors that were on SceneAccess.
3   Q. Anything else that Ms. Clodfelter would have
4   had access to?
5   A. No, I don't believe so.
6   Q. Can you explain to me what paper resources
7   Ms. Clodfelter would have had access to? Specifically
8   I'm referring to policies, procedures, manuals, that
9   type of thing.
10  A. Most of our procedure manuals are electronic
11  and have been for some time, so unless she printed one
12  she wouldn't have any paper access to manuals.
13      She has, you know, access to building
14  estimating guides and that type of thing. She has
15  probably her own set of policy forms which are also
16  maintained company-wide electronically, but people
17  print them for convenience. She may have had that
18  available to her.
19  Q. Now, when you say that she had access to
20  certain manuals or policies electronically, is that a
21  computer program, is that another database that she
22  would have had access to?
23  A. It's not necessarily a database, but it's an
24  application that she would have access to.

40

1   Q. It's a computer program?
2   A. Yes. It's just we would establish, for
3   instance, the property claim manual and it's
4   maintained by home office employees, but all claim
5   employees can access it.
6   Q. As Ms. Clodfelter was adjusting or processing
7   this claim in 2004, are there any step-by-step
8   instructions that she would have needed to follow in
9   processing the claim?
10  A. No. Ms. Clodfelter, she's an experienced
11  adjuster so any instructions she gets, for instance,
12  from Mr. Duncan he doesn't break down in the detail
13  you would need to for a trainee, that you need to call
14  the insured, you need to take a statement, you need
15  to, you know, the basic nuts and bolts of a claim
16  handler that you would have to break it down for a
17  trainee. Ms. Clodfelter didn't require that.
18  Q. In the summer of 2004 how would Harleysville
19  have explained to a new claims handler the nuts and
20  bolts of processing a claim? Are there any documents
21  or materials that would have been provided to a new
22  employee?
23  A. Well, the property claim manual would be one.
24  Resources that they would use? Essentially they would

41

1   get more detailed instruction from their supervisor as
2   to exactly what they needed to do.
3   Q. Does the claims department have any process or
4   procedure as far as proving that something was mailed
5   to an insured?
6   A. Does the claims department have any procedure
7   to prove that things were mailed to an insured?
8   Q. Let me ask it this way: Under what
9   circumstances is a claims employee required to
10  document that something was mailed to an insured or
11  someone else and how would they do that?
12  A. There's various ways to document that a
13  document or anything else was mailed.
14      You can put a note in a file. You can
15  keep a copy of the correspondence. You can send it
16  certified, any number of ways.
17  Q. Are there any specific circumstances that would
18  require a claims employee to do certain of those
19  methods versus other methods or is it just general?
20  A. I think the more serious, a document might
21  be -- it might be more, it might be more prudent to
22  use certified mail as opposed to regular mail, but
23  it's not really necessary.
24  Q. Are those decisions left to the discretion of

11 (Pages 38 to 41)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

---

42

1  the claims employee primarily responsible for handling
2  the claim?
3      A.  Unless directed otherwise.
4      Q.  Are you familiar with all of the different
5  people who were involved in this claim aside from
6  Harleysville, people or entities?
7      A.  I'm not sure who "all" is, so there might be
8  people that I'm not aware of and I wouldn't be aware
9  of.
10     Q.  Harleysville hired an independent adjuster in
11 this claim.  Is that right?
12     A.  That's correct.
13     Q.  Do you know who that was?
14     A.  I believe it was George Tower.
15     Q.  If I told you his name was George Powell --
16     A.  Powell with Tower.
17     Q.  -- with Tower Insurance, would that --
18     A.  That would work.
19     Q.  Did Harleysville work frequently with
20 Mr. Powell in 2004?
21     A.  I believe so.
22     Q.  And Harleysville hired Mr. Powell to be the
23 independent adjuster with respect to this claim?
24     A.  That's correct.

---

43

1      Q.  Can you tell me what specific duties Mr. Powell
2  was given with respect to this claim?
3      A.  I believe he was hired to do the investigation
4  necessary at the site and to establish the amount of
5  damage.
6      Q.  And what was his role in establishing the
7  amount of damage in this claim?
8      A.  His role as the independent adjuster
9  establishing the damage?
10     Q.  Yes, sir.
11     A.  That is his role.
12     Q.  How does he go about doing it?
13     A.  He could prepare his own estimate using
14 commercially available software and with a loss this
15 size we would probably request that his estimate be
16 agreed to by a contractor.
17     Q.  Agreed to by whom?
18     A.  A contractor.
19     Q.  Is it required that the insured agree to the
20 repairs to the property, if necessary?
21     A.  I think that would be the best scenario, would
22 be for everyone to agree as to the scope and price.
23 There are times when disagreements occur.
24         So is it a requirement that the insured

---

44

1  agree?  No.
2      Q.  Harleysville can deal directly with the
3  contractor without the insured's consent?  Is that
4  fair?
5      A.  Deal with the contractor in some ways, yes.  We
6  can contact contractors, we can ask the opinion of
7  contractors and in some scenarios we can employ
8  contractors.
9      Q.  And in some scenarios you can employ
10 contractors without the insured's consent or not?
11     A.  We can employ a contractor without the
12 insured's consent to do things that do not require the
13 insured's consent.
14     Q.  Can you explain to me when an insured's consent
15 is and is not required?
16     A.  I would think an insured's consent would be
17 required as a practical matter any time that you are
18 doing work on his property.
19     Q.  Did Harleysville secure Mr. Drexel's consent to
20 have work done on his property in this case?
21     A.  Reconstructive work?
22     Q.  Yes, sir.
23     A.  I haven't seen anything that says that, so my
24 answer would have to be not based on the information

---

45

1  I've been provided.
2      Q.  But you understand that there was
3  reconstructive work completed on Mr. Drexel's
4  property?
5      A.  I don't have any knowledge of that, no.
6      Q.  You don't know that repair work was done to
7  Mr. Drexel's property?
8      A.  I don't know if he's repaired it or not.
9      Q.  Can you tell me what authority Mr. Powell had
10 in this claim?
11     A.  He had authority to make contact with the
12 insured and discuss the claim with the insured.  He
13 had the authority to contact contractors and negotiate
14 an agreement of scope and price to repair the damage.
15     Q.  He had the authority to negotiate directly with
16 the contractor?
17     A.  Yes.
18     Q.  Does he have, did he have authority to hire the
19 contractor?
20         MR. CASARINO:  To do what?
21         MR. BESTE:  To make repairs to the
22 property.
23     A.  No, he did not.  He had authority to discuss
24 the cost of that repair.

---

12  (Pages 42 to 45)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

46

1    Q.  Who has the authority to agree to repairs with
2  the contractor?
3    A.  I'm not sure exactly what you're asking.
4    Q.  I just asked you if Mr. Powell had the
5  authority to hire the contractor to do the repair work
6  and you said no, right?
7    A.  That I recall and I just said no.
8    Q.  Who does have that authority to hire the
9  contractor to do the repair work?
10    A.  The insured.
11    Q.  What about Harleysville?
12    A.  Only if we exercise that option under the
13  contract, which we have never done in my ten years
14  with the company.
15    Q.  You have never directly hired a contractor?
16    A.  And taken control of the repair of an insured's
17  structure from the insured?
18    Q.  Yes.
19    A.  No.
20    Q.  So Mr. Drexel should have been the one to hire
21  the contractor in this case if repairs were done to
22  his property?
23    A.  He should be the one that hires a contractor to
24  work on his property, correct.

47

1    Q.  So as a general matter an insured has the final
2  authority to hire a contractor with respect to repairs
3  to property?  Is that what your testimony is?
4    A.  That's my testimony in all except a rare
5  circumstance where the insurance company does have the
6  option to directly repair property.
7    Q.  But to your knowledge, that circumstance was
8  not present in this case?
9    A.  We did not exercise that option.
10    Q.  Can you explain to me what Harleysville's role
11  is with respect to that hiring of a contractor by the
12  insured?
13        MR. CASARINO:  In this case?
14        MR. BESTE:  In this case, yes.
15    A.  If that is contained in these notes, I can find
16  it, but I don't have any direct knowledge of
17  Harleysville's involvement in hiring the insured's --
18  of who the insured hired.  I don't know who the
19  insured hired.
20    Q.  The process is, as I understand it,
21  Harleysville hired an independent adjuster in this
22  case?
23    A.  Correct.
24    Q.  And the practice would be for the independent

48

1  adjuster to interact with the contractor and reach an
2  agreed price.  Is that right?
3    A.  Correct.  Ordinarily the contractor that the
4  insured would choose.
5    Q.  But Harleysville in a typical claim writes the
6  check to the contractor.  Is that right?
7    A.  We write the check to the insured.
8    Q.  So am I correct that your testimony is that the
9  only contractual relationship formed is between the
10  insured and the contractor?
11    A.  No.  There's a contractual relationship between
12  the insured and the insurer.
13    Q.  I'm sorry.  With respect to the agreement to
14  repair the property, is your testimony that the only
15  two parties involved in that agreement are the insured
16  and the contractor?
17    A.  No.
18    Q.  Who else is involved in that agreement?
19    A.  Ordinarily the insurer is involved in
20  establishing what's to be repaired and the cost of
21  that repair.
22    Q.  Does Harleysville authorize the insured to
23  agree and hire the contractor?
24    A.  No.

49

1    Q.  But obviously if the insured intends to have
2  Harleysville pay for the repairs, he has to get
3  Harleysville's approval first?
4    A.  Correct.
5    Q.  Prior to the independent adjuster, the insured
6  and the contractor reaching an agreed price for
7  repairs with respect to a claim, should any repairs
8  occur prior to that point?
9    A.  I think that would have to be case sensitive as
10  to what is prudent in each case.  There's just too
11  many variables for it to be a general statement.
12    Q.  Did Ms. Clodfelter in 2004 have authority to
13  allow repairs to begin prior to an agreement on the
14  price as to the repairs of the property?
15    A.  Did she have authority to allow repairs to
16  begin?
17    Q.  Yes.
18    A.  Yes.
19    Q.  But you have no knowledge regarding when the
20  repairs did or did not begin in this case?
21    A.  No, I don't.
22    Q.  George Powell, can you explain to me the
23  relationship between Harleysville and George Powell?
24    A.  He is a vendor, an independent adjuster that we

13  (Pages 46 to 49)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

---

**50**

1  would hire.
2  Q. In this case Mr. Powell was hired to adjust
3  this claim, correct?
4  A. To adjust I believe the building damage, yes.
5  Q. Was Mr. Powell or Tower Insurance an employee
6  of Harleysville?
7  A. They're a vendor that we used, not an employee.
8  Q. Are they an agent of Harleysville when dealing
9  with the insured and the contractor?
10  MR. CASARINO: I object. That calls for a
11  legal conclusion.
12  You can answer.
13  A. I would think that they are an agent, yeah.
14  They're acting within their authority representing us.
15  Q. They are, in effect, Harleysville's agent with
16  respect to processing the property damage?
17  A. That's my understanding.
18  Q. And they represent Harleysville in that regard?
19  A. That's correct.
20  Q. And in this case Mr. Powell represented
21  Harleysville with respect to the property damage in
22  this case?
23  A. That's correct.
24  Q. In 2004 were Harleysville's claims handlers

---

**51**

1  such as Ms. Clodfelter required to explain to an
2  insured the specific nature of the relationship
3  between the insured, the contractor, the independent
4  adjuster and Harleysville?
5  A. I believe that they are required to tell them
6  who they have hired and what their function is.
7  To what extent that detail you would have
8  to explain that to an insured I think is also case
9  sensitive. The claim rep would answer any questions
10  that were asked about that relationship.
11  Q. In 2004 was there any requirement that
12  Ms. Clodfelter explain to Mr. Drexel specifically that
13  it was his agreement or contract with the contractor
14  who was going to do the repairs to the property and
15  not Harleysville's contract or agreement?
16  A. Would you ask that again?
17  Q. In 2004 was Ms. Clodfelter in the process of
18  adjusting this claim required to explain to Mr. Drexel
19  that it was Mr. Drexel who was hiring the contractor
20  and not Harleysville?
21  A. I don't think that there was any requirement
22  that she do that, but it's a common occurrence.
23  Q. It's a common occurrence that that's explained
24  to the insured?

---

**52**

1  A. That's correct.
2  Q. Is it your opinion that the relationship could
3  be confusing from an insured's perspective as a very
4  general matter?
5  A. From an insured's perspective you can confuse
6  anything.
7  Q. Do you have any reason to believe that
8  Ms. Clodfelter or any other Harleysville employees
9  explained to Mr. Drexel that it was him hiring the
10  contractor as opposed to Harleysville?
11  A. I would, I would expect that at some point that
12  that was discussed, but I don't have any documentation
13  of it.
14  Q. And why would you expect that it was discussed?
15  A. Because it's a question that routinely surfaces
16  when you're dealing with an insured. It doesn't in
17  every case. Some insureds are more sophisticated and
18  knowledgeable and have more claims experience and don't
19  ask the questions that a less-experienced insured may.
20  But based on my experience dealing with
21  insureds over the last 30 years, it's a routine
22  question that they ask who they should hire.
23  Q. Is it a routine occurrence for an insured to be
24  confused regarding the relationship between and among

---

**53**

1  Harleysville, the contractor and the insured with
2  respect to who is hiring who?
3  A. I'd say that it would be reasonable to assume
4  that at some point confusion may have existed, but
5  that's confusion that's easily dispelled with a
6  question.
7  Q. And in 2004 Harleysville did not have any
8  requirements that would have required a claims handler
9  or employee to inform the insured of the nature of the
10  relationship in writing?
11  A. No. We had no requirement that they do that.
12  Q. Bear with me for one second, please.
13  I'm going to show you what has been marked
14  as H-5. I apologize, but I'm going to have to show it
15  to you in the deposition transcript.
16  A. That's all right.
17  Q. Who is Brooke Beauman, if you know?
18  A. I don't know.
19  Q. Who is Marc Good, if you know?
20  A. I don't know.
21  Q. Are you able to tell whether H-5 pertains to
22  Mr. Drexel's claim in this case?
23  A. In the subject line it refers to Layne Drexel
24  and a policy number.

---

14 (Pages 50 to 53)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

54

1     Q.  Is that Harleysville's policy number in this
2   claim?
3     A.  That's our format.
4         I don't see the policy number repeated on
5   this document, so I assume it's correct.
6     Q.  Okay.  That's all.
7         I'm going to hand you H-7.  Are you able
8   to identify that document?
9     A.  It looks like a confirmation of termination.
10    Q.  Is that a document generated by Harleysville?
11    A.  It's got our address on it, so I would say yes.
12        MR. CASARINO:  Just so you know, the lady
13   coming in later today is the one who signed it.
14   BY MR. BESTE:
15    Q.  Do you know who at Harleysville or what
16   department would have generated this document?
17    A.  I know it wasn't claims.
18    Q.  Do you have any knowledge regarding what led to
19   or resulted from this document, what events?
20    A.  Yes.
21    Q.  What led to this document being issued by
22   Harleysville?
23    A.  Failure of the insured to pay the premium.
24    Q.  And what was the impact of that failure to pay

55

1   the premium?
2     A.  The policy terminated.
3     Q.  Are you able to tell when this was issued?
4         MR. CASARINO:  What is "this"?
5         MR. BESTE:  H-7.
6         MR. CASARINO:  Okay.
7     A.  It's got an issued date listed of 7-6-2004 and
8   a mail date of 7-7-2004.
9     Q.  To your knowledge, was the claims department
10   aware or notified of this termination?
11    A.  We were notified.
12    Q.  How can you tell you were notified?
13    A.  From the log note on 8-13, that was our
14   notification.
15    Q.  So the claims department did not receive notice
16   of this termination or whatever event was occurring as
17   reflected in H-7 until August 13th?
18    A.  That's correct.
19    Q.  And this was issued in early July of 2004?
20    A.  Yes.  It appears to be.
21    Q.  Can you explain to me why the claims department
22   did not receive notice that the policy was terminated
23   in early July?
24    A.  No, I can't.

56

1     Q.  I'm going to show you what's been marked as
2   H-10 and ask you if you can identify this document.
3     A.  (Reviewing document)  This appears to be
4   Mr. Powell's final report.
5     Q.  Final report to whom?
6     A.  Sherry Clodfelter.
7     Q.  And does this final report indicate that
8   Mr. Powell and the contractor had reached an agreed
9   price with respect to the repairs to Mr. Drexel's
10   property?
11    A.  Yes.
12    Q.  Is H-10 essentially Mr. Powell's request to
13   Ms. Clodfelter that the contractor be given authority
14   to begin work?
15    A.  According to his note here, he says the repairs
16   are underway, so I would guess not.
17    Q.  So the repairs appear to have been underway
18   on --
19    A.  That's what it says in his note on the second
20   page, page 2.
21    Q.  Was it essentially a request for payment then?
22    A.  It doesn't specifically request payment, but
23   after the amount of damage is established then that
24   would be the next step.

57

1     Q.  Are you able to tell whether anyone at
2   Harleysville received this document and what actions
3   they took after receiving it?
4     A.  (Pause)
5     Q.  You might want to look at H-1.
6     A.  Well, I can tell just from the date on it that
7   that seemed to spark a request for a check.  I'm just
8   looking for a date stamp or something else on this
9   showing this is a document we received, but I don't
10   have any reason to think that we didn't receive this
11   because that coincides with the time that a check was
12   requested.
13    Q.  Can you tell me who requested the check?
14    A.  Yes.  Sherry Clodfelter.
15    Q.  Did Ms. Clodfelter authorize the work to
16   Mr. Drexel's property?
17    A.  I wouldn't think so.
18    Q.  Did she agree to the price for the repair work?
19    A.  Yes.
20    Q.  Did she agree to pay for the repair work?
21    A.  She attempted to pay for the repair work.
22    Q.  Did she agree to pay for the repair work?
23    A.  It doesn't look like it.  Apparently, she
24   attempted to talk to the insured and left him a voice

15  (Pages 54 to 57)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

---

58

1   mail. And there's no note further of any discussion
2   with the insured prior to requesting the check for the
3   agreed amount of the estimate.
4       Q.   Did Ms. Clodfelter secure Mr. Drexel's consent
5   to move ahead with the repairs to his property?
6       A.   I don't believe that she did move ahead with
7   the repairs to his property.
8       Q.   But she issued a check. Isn't that right?
9       A.   She attempted to.
10      Q.   And it was stopped by someone else at a later
11  point?
12      A.   That's right. She may have stopped it herself.
13      Q.   But at some point she authorized the check to
14  be sent out to pay the claim?
15      A.   Correct.
16      Q.   Did she reach an agreement with the contractor
17  regarding those repairs?
18      A.   It appears that Mr. Powell reached an agreement
19  with the contractor on the scope and amount of repair
20  and this payment is based on that agreement or this
21  attempted payment.
22      Q.   I'm going to show you what's been marked as
23  H-13.
24          Let me know if you need to take a break or

---

59

1   anything.
2       A.   I'm okay.
3       Q.   Are you able to identify this document?
4       A.   It appears to be an e-mail to Ms. Clodfelter
5   from Amber Staton.
6       Q.   Do you know who Amber Staton is?
7       A.   No.
8       Q.   If you look at the first e-mail on page 2, the
9   first e-mail in the chain, that's an e-mail from
10  Ms. Staton to Sherry Clodfelter, correct?
11      A.   Yes.
12      Q.   And it pertains to Mr. Drexel's claim?
13      A.   Yes.
14      Q.   The first sentence says, "I" I think it's
15  "received suffix 02 to coverage verify."
16          Do you understand what that sentence
17  means, what she meant by that?
18      A.   I can guess what it means.
19      Q.   Okay. Try to tell me to the best you can what
20  that sentence means.
21      A.   I'm not sure how Amber gets her work. Things
22  appear on her desk. But apparently she received
23  something that would cause her to verify coverage for
24  suffix 2, which would be unscheduled, usually it's

---

60

1   unscheduled personal property unless there is no
2   coverage for that. But it is --
3       Q.   And by "unscheduled" you mean not separately
4   listed in the policy?
5       A.   Contents typically is a more generic way of
6   describing unscheduled personal property.
7       Q.   Do you know what the suffix 02 specifically
8   pertained to?
9       A.   Not from what I have here.
10      Q.   What else did --
11      A.   I can tell you that according to her note she
12  doesn't describe any contents coverage at that
13  location but does describe business interruption
14  coverage, so it's more likely that it would be a
15  request to establish a reserve on business
16  interruption coverage.
17      Q.   And business interruption coverage under this
18  policy would have included lost rent?
19      A.   Well, unless it is excluded, yes. There are
20  ways to purchase business interruption coverage
21  excluding it or limiting it to lost rent.
22      Q.   According to this August 11th e-mail from
23  Ms. Staton, and I'm going to read you exactly what the
24  e-mail says, Mr. Drexel's, quote, policy was canceled

---

61

1   effective June 8th, '04 for non-payment of premium."
2           Is that right?
3           MR. CASARINO: Is what right? Is that
4   what it says?
5           MR. BESTE: Yes.
6   BY MR. BESTE:
7       Q.   Is that what it says?
8       A.   Where are you?
9       Q.   The last e-mail.
10      A.   You might have paraphrased it.
11          MR. CASARINO: Let me say that I object to
12  this as being beyond the scope of the purpose of his
13  deposition.
14          He can certainly answer it for other
15  purposes.
16      A.   What it says is "I noticed on direct bill it
17  shows that the policy was canceled effective 6-8-04
18  for non-payment of premium and the date of loss is
19  6-22-04. Shouldn't this claim be no coverage?"
20      Q.   Does the phrase "no coverage" have some
21  specific meaning? It's capitalized in the e-mail.
22      A.   Yes, it does. You can open a claim for
23  investigation when there is no coverage indicated in
24  the event of a dispute or something like that. Where

---

16 (Pages 58 to 61)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

**62**

1    our claim system shows that coverage does not exist,
2    we can still open a claim for the purpose of
3    investigating that, but you would open it as a no
4    coverage claim until, unless and until the coverage is
5    accepted.
6        Q.   And once a claim is classified as no coverage,
7    is it accurate to say that no payments will be made
8    with respect to that claim until that no coverage
9    status has been changed by someone at Harleysville?
10    A.   Correct.
11    Q.   What steps should have Ms. Clodfelter taken
12    upon receiving the e-mail, this e-mail?
13    A.   I think she should have contacted the sender
14    and determined what additional information she may
15    have regarding a coverage problem.
16    Q.   Now, this e-mail was sent by Ms. Staton on
17    August 11th, isn't that true, according to the e-mail?
18    A.   Yes.  August 11, 2004.
19    Q.   Can you explain to me why Ms. Clodfelter would
20    have issued a check two days later on August 13th in
21    light of this e-mail?
22    A.   I don't have any knowledge of why she didn't.
23    It appears that she didn't act on it until August
24    13th.

**63**

1        Q.   Does the claims department have authority or
2    the ability to put a claim into no coverage?
3        A.   I believe they can.  But they work in concert
4    with home office claims entry to do it but, yes, I
5    think they do have the ability to put it in as no
6    coverage.
7        Q.   If you look on the first page, there's an
8    August 17th e-mail from Amber Staton to Sherry
9    Clodfelter, and I'm paraphrasing.  It asks Sherry
10    whether Amber Staton should put the claim into no
11    coverage.
12        Do you know why Amber would have been
13    making that request?
14    A.   I guess she needed to plan -- it's a guess
15    since I don't really understand fully Amber's
16    function.  But should the claim require additional
17    investigation and no coverage is indicated, then that
18    would be a way to keep the claim file essentially
19    opened under a no coverage without having an
20    outstanding reserve on it.
21    Q.   Referring back to the last e-mail on page 2,
22    Ms. Staton refers to the phrase direct bill, which is
23    capitalized.
24    A.   Yes.

**64**

1    Q.   Can you explain what direct bill is?
2    A.   It doesn't have anything to do with the claims
3    department, but I can tell you what direct bill means
4    to me.
5    Q.   Okay.  Please tell me.
6    A.   Direct bill is when we send an invoice directly
7    to the insured as opposed to having the agent submit
8    an invoice to the insured.  So we would send an
9    invoice for the policy premium and the insured would
10    send the payment directly back to the company for
11    processing as opposed to using the agent as an
12    intermediary.
13    Q.   Do you know whether Mr. Drexel's policy was
14    directly billed to him or whether it was done through
15    an agent?
16    A.   I don't have any knowledge of that, other than
17    Amber's mentioning that she noted direct bill so I
18    would assume since she's talking about this claim and
19    this policy that it would be on direct bill.
20        That would be my only indication of it.
21    Q.   Do the claims adjusters have access to a direct
22    bill system or database?
23    A.   No.  No.
24        Well, I take that back.  Let me think

**65**

1    about it.
2        I don't know.  I've never -- there are
3    some features of CICS that I told you that I'm not
4    familiar with and it's possible that that's one of
5    them, but I never used it.
6    Q.   Do you know directly whether Ms. Clodfelter had
7    access to the direct bill system or database in 2004?
8    A.   I don't know.
9    Q.   I'm going to hand you what's been marked as
10    H-14.
11        Are you able to identify this document?
12    A.   No.  It appears to be generated using the CICS
13    system just looking at the font layout of the
14    characters at the top.
15    Q.   Would this document have been something that
16    Ms. Clodfelter had access to when she was processing
17    this claim?
18    A.   I don't know.  I can't tell what screen this
19    came off of.  This is not something that would be
20    included in the claims system.
21    Q.   Is this a direct bill printout or screen shot?
22    A.   I don't know.
23    Q.   On page 1 a little above the middle there's a
24    phrase there that says, "non-pay count 2."

17  (Pages 62 to 65)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

66

1      Do you see that?
2           MR. CASARINO: I don't.
3  A. I don't.
4           MR. CASARINO: What are you talking about?
5  A. If you would just point it out and help me out
6  there.
7  Q. (Indicating)
8  A. Okay. I see it.
9  Q. Do you know what that phrase means?
10 A. I have no idea.
11 Q. Are you able to explain any of this document to
12 me, either page, what the notations mean, what the
13 dates mean, things like that?
14 A. I don't have any direct knowledge of it. I can
15 tell you what it means to me.
16 Q. Do you understand what the notations on the
17 second page listed under the heading type mean?
18 A. I don't know what those notations mean. I
19 don't know what a C554-3 is, although I think I may
20 have seen one pass by.
21 Q. You're referring to H-7?
22 A. This is a C554, the confirmation of
23 termination.
24 Q. You're referring to H-7?

67

1  A. That's correct.
2      So that's what your notation at the top
3  with the date 7-6-04 would indicate, I assume, is that
4  document.
5  Q. Do you know who Bob Southard is, Robert
6  Southard?
7  A. I think I do, yes.
8  Q. Who is he?
9  A. He is -- if I'm not mistaken, Bob Southard is
10 some type of underwriting manager or vice president in
11 the southeast. I believe he's in Atlanta.
12     I hope I haven't gotten him confused with
13 somebody who is a vice president in Atlanta.
14 Q. I won't tell him if you did.
15 A. Yes, you will.
16 Q. I promise I will not.
17     I'm going to hand you what's been marked
18 as H-16 and ask you if you can identify this document.
19 A. (Reviewing document) This appears to be a
20 denial of coverage.
21 Q. And this was sent by Ms. Clodfelter to
22 Mr. Drexel on September 14th?
23 A. That's what it says.
24 Q. And can you tell me what the purpose of this

68

1  letter is or was?
2  A. To advise him that we would not be extending
3  coverage for the damage from the fire of 6-22.
4  Q. Did Ms. Clodfelter inform Mr. Drexel that the
5  policy was canceled for non-payment of premium?
6  A. This letter advises him.
7  Q. To your knowledge, is that what happened in
8  this case?
9  A. What's that?
10 Q. That the policy was canceled for non-payment of
11 premium?
12 A. Well, that's not what happened. The policy was
13 terminated, not canceled.
14 Q. What is your understanding of the impact of
15 that distinction in this case?
16 A. When a policy is terminated, it just ends, it's
17 just over.
18     Cancellation to me suggests that a policy
19 is interrupted during the policy period.
20 Q. Are you familiar with any provisions in
21 Mr. Drexel's policy that distinction would be
22 relevant to?
23 A. Yes.
24 Q. What provision is that?

69

1  A. Well, I believe there are -- I believe the
2  conditions section of the policy addresses how we
3  would have to give notice for cancellation of the
4  policy.
5  Q. Does the claims department of Harleysville have
6  authority in determining how to comply with policy
7  provisions when a policy is being canceled or
8  terminated?
9  A. Not really. The claims department doesn't
10 directly cancel a policy.
11 Q. Who does?
12 A. I would assume that that would be an
13 underwriting function.
14 Q. Do you know where Ms. Clodfelter got the
15 information upon which you based this letter?
16 A. The obvious assumption based on what I have
17 been handed would be from Ms. Staton or from any
18 conversation she might have had with an underwriter.
19 Q. Do you know where she got the, quote, effective
20 date of cancellation, unquote, June 8th, 2004?
21     Do you know where she got that information
22 from?
23 A. I'm sorry. I was looking elsewhere. Would you
24 mind restating that?

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

70

1    Q.  Ms. Clodfelter's letter of September 14th
2  indicates the effective date of the cancellation is
3  June 8th, 2004, correct?
4    A.  Yes.
5    Q.  Do you know where she got that date from?
6    A.  The one place would be Exhibit H-13, the first
7  e-mail in the string from Amber Staton says that the
8  policy was canceled effective 6-8-04.  There's
9  probably other places that she could go to verify
10  that.
11        If that information had been updated on
12  the CICS system, she could go there to verify it as
13  well.
14    Q.  Is that where she would get Harleysville's
15  official cancellation date, the CICS system?
16    A.  That's certainly one place that she could go to
17  get it, yes.
18    Q.  What would be the ultimate authority that
19  Ms. Clodfelter would have looked to regarding when the
20  effective date of cancellation was?
21        MR. CASARINO:  That she did look to or
22  would have looked to?  I'm not sure I understand your
23  question.  That she might have looked to?
24    A.  Where might she go?

71

1    Q.  When Ms. Clodfelter was adjusting this claim in
2  August of 2004 and she needed to determine what the
3  effective date of cancellation was, where would she
4  look to have absolute confirmation of what the date
5  was?
6    A.  She would go to an underwriter.
7    Q.  So she would need to ask the underwriting
8  department what Harleysville' official effective date
9  of cancellation was?
10    A.  Yes.
11    Q.  And the claims department has no authority to
12  establish that date?
13    A.  No, we don't.
14    Q.  I'm going to hand you what's been marked as
15  H-19 and ask if you can identify that document.
16    A.  It appears to be a document generated by CICS
17  using one of the features that I don't use, so I can't
18  tell you exactly what this is.
19    Q.  How can you tell this comes from the CICS
20  system?
21    A.  Because it's got a pretty distinctive,
22  primitive font and the functions down below and the
23  prompts, whether there is like more to it or what
24  function keys to hit to go to different locations,

72

1  that's all consistent with our system.
2    Q.  Would Ms. Clodfelter have had access to the
3  information reflected in H-19 when she was processing
4  this claim?
5    A.  I don't think so.
6    Q.  Why not?  I thought you said this was part of
7  the CICS system.
8    A.  It is.  But I don't think we have access to all
9  parts of the CICS system.  Part of the beauty of any
10  large organization is you have certain permissions to
11  go to different places and there's some that the
12  computer won't take you to.
13        For instance, I couldn't go into human
14  resources and look at everybody else's performance
15  reviews.  Information is limited to a need to know.
16    Q.  So your testimony is that none of the claims
17  employees would have had access to the information
18  reflected in H-19 as this claim was adjusted?
19    A.  My testimony is I don't know if they would or
20  not.  I have never used it.  I have never used this
21  function that would generate this screen.  So I don't
22  know where it's located and, therefore, wouldn't know
23  who would have access to what because certainly not
24  all claims employees have the same permissions.

73

1        I have permissions to go places some other
2  claims employees don't.
3    Q.  So you have no knowledge regarding whether
4  Ms. Clodfelter would have had access to the
5  information shown in H-19 while she was adjusting this
6  claim?
7    A.  She would not, in my opinion she would not have
8  had any reason to generate such a document.
9    Q.  Well, my question is whether she had access to
10  the information whether she could have generated the
11  document if she wanted to for some reason?
12    A.  And my answer is I don't know if she had access
13  or not.  I don't keep the permissions.
14    Q.  Ms. Clodfelter's supervisor was Danny Riddle in
15  the summer of 2004.  Is that correct?
16    A.  I don't know for sure.  I can see in the claim
17  notes that she received the initial assignment
18  information from John Duncan, who is the other
19  property supervisor, but then Mr. Riddle is also in
20  here.  I don't know if she changed from one to another
21  or whether Mr. Duncan was covering for Danny during a
22  vacation.
23        I really don't know.
24    Q.  Do you know whether Mr. Riddle would have had

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

74

1  access to the information reflected in Exhibit H-19 in
2  the summer of 2004?
3      A.  No, I don't know if he would or not.
4      Q.  Do you know whether Mr. Duncan would have had
5  access to the information shown on Exhibit H-19?
6      A.  I don't know.
7      Q.  Are you able to identify the handwriting on the
8  first page?
9      A.  No.  It's not mine.  I can read it.
10     Q.  I've probably got about fifteen minutes left.
11  Do you want to take a short break?
12         MR. CASARINO:  Yes.
13     A.  We can do that.
14         (A brief recess was taken.)
15         MR. BESTE:  I'm going to ask that this
16  document be marked as H-24.
17         MR. CASARINO:  What is it?
18         MR. BESTE:  This is the best practices
19  manual.
20         (H Deposition Exhibit No. 24 was marked
21  for identification.)
22  BY MR. BESTE:
23     Q.  I'm going to hand you what's been marked as
24  H-24 and ask if you can identify that document.

75

1      A.  It appears to be our best practices claims
2  handling manual, a printed copy of it.
3      Q.  On the cover page it says May 2004 Edition.
4         Does that mean it was effective May 2004?
5      A.  I would assume it was, yes.
6      Q.  So this policy, I'm sorry, this manual would
7  have been in place at the time of Mr. Drexel's claim?
8      A.  That's correct.
9      Q.  Can you explain to me what this is from a
10  claims employee perspective?  Is this instructions?
11  Is this a reference guide?  What is it?
12     A.  It is -- it's a reference guide.  It
13  establishes procedures and time frames for completing
14  tasks.
15     Q.  Is it something that the claims employees are
16  required to follow or is it more of a looser guideline
17  for them?
18     A.  Well, it's a procedure that they're instructed
19  to follow and should the majority of the time.
20     Q.  The pages are not numbered.
21         MR. CASARINO:  Because it's a computer
22  screen.
23     Q.  If you could turn to the page, counting the
24  cover, page 8.

76

1      A.  What does yours look like?
2      Q.  I think one more page.
3         At the top it says Best Practices Claims
4  Manual, CCU Claims and on the right side it says under
5  Topic CCU Property Claims Handling.
6         MR. CASARINO:  I'm not sure I got the
7  right one.  Let's see it for a second.
8      A.  There (indicating)?  Telephone Loss Reports?
9      Q.  Yes.
10     A.  Okay.
11         MR. CASARINO:  Okay.
12     Q.  Can you tell me whether this page applied to
13  Mr. Drexel's claim?
14     A.  I would assume it did, yes.
15     Q.  Does this page and the page that follows
16  basically detail what Ms. Clodfelter's
17  responsibilities were at the time she was processing
18  Mr. Drexel's claim?
19     A.  Not exactly.  His loss came in initially to the
20  CCU, which is who -- this individual, K. Slonake, I
21  would assume would be a CCU employee in the initial
22  action unit, the central claims unit. It is
23  essentially a telephone small claims unit, but they do
24  get the first reports and establish the amount of

77

1  damage so they know whether it's a large or small loss
2  and whether they retain it or not isn't clear until
3  they talk to somebody.  So they do make the first
4  contacts.
5         So, yes, they would have called him and
6  there's some guidelines for how to make a telephone
7  call.
8      Q.  But this would not have applied to
9  Ms. Clodfelter; it would only have applied to this
10  CCU?
11     A.  Well, this addresses the CCU property claims
12  handling, so it's specific to them.  That doesn't mean
13  that similar claims handling practices wouldn't apply
14  to Ms. Clodfelter, but this is specifically directed
15  to the CCU and Ms. Clodfelter is a member of the CSC,
16  southeast claims service center.
17     Q.  While looking through Exhibit 24 as a whole,
18  can you tell me what pages or topics would have
19  applied to Ms. Clodfelter and Mr. Riddle when they
20  were adjusting Mr. Drexel's claim?
21     A.  You want me to go page by page?
22     Q.  Maybe you can explain to me how I would look
23  through this and determine whether any of this applied
24  to Ms. Clodfelter when she was adjusting Mr. Drexel's

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

78

1  claim.
2      A.  I would look for things that addressed CSC
3  handling, property claim handling in a similar fashion
4  to the CCU.  That would probably be at the top of the
5  page.  I would look for anything that specifically
6  related to property claims, first party property.
7      Q.  Why don't we try it this way?  If you look at
8  page 3, there appears to be an index.
9      A.  Okay.
10     Q.  Do you see that?
11     A.  Yes, I do.
12     Q.  Can you go through by chapter and explain to me
13  whether these specific chapters listed apply to CSC
14  employees such as Ms. Clodfelter at the time of this
15  claim?
16     A.  Okay.  Chapter 2 would apply to her.
17  Specifically, you have CSC property claims handling
18  and a document number there for that.
19     Q.  You're referring to HA090298?
20     A.  Correct.
21         Recorded statement guidelines would apply
22  to her, HA090291.
23     Q.  As far as chapter 2 goes, there are a number of
24  entries after the CSC property claims handling entry.

79

1      A.  Yes.
2      Q.  All of the remaining things in chapter 2 after
3  that deal with either worker's compensation or
4  recorded statements.  Isn't that correct?
5      A.  That's what it looks like, yes.
6      Q.  There was no statement taken from Mr. Drexel in
7  this case, to your knowledge?
8      A.  I haven't seen one.
9      Q.  Now, chapter 3 --
10     A.  That doesn't mean one hasn't been taken.  I
11  just haven't seen one.
12     Q.  For the record, I don't think one has.
13         How about chapter 3, does any of that
14  apply to Ms. Clodfelter when she was adjusting this
15  claim?
16     A.  CSC diary procedures and that's specifically
17  material damage and property requirements by CSC.
18  She's in the southeast CSC, so the one that would
19  specifically apply to her would be HA090312.
20     Q.  All right.  Going back to chapter 2, the CSC
21  property claims handling part of that chapter, are you
22  able to locate that within H-24?  And I think it's
23  about there (indicating) to make it easier for you.
24     A.  "About there"?  That doesn't help me.

80

1      Q.  Approximately twenty pages in.
2      A.  CSC claims?
3         MR. CASARINO:  No.  A few pages in.  Keep
4  going.  Recorded statements.
5         It's before that.
6         That may be it.
7      Q.  I think that's it.
8         So just for the record, the top of that
9  page says Best Practices Claims Manual, CSC Claims,
10  Topic Property Claims Handling.
11     A.  Correct.
12     Q.  Would this document spell out and explain what
13  Ms. Clodfelter's general responsibilities were in
14  processing Mr. Drexel's claim?
15     A.  Yes.
16     Q.  And under the heading Coverage Verification,
17  this required Ms. Clodfelter to verify that coverage
18  was in place as of the date of the loss.  Is that
19  correct?
20     A.  Yes.  That's correct.
21     Q.  If you look under the heading CSC Contact,
22  there's some wording that says, "During initial
23  contact with insured."
24         Do you see that?

81

1      A.  Mm-hmm.  Yes.
2      Q.  Can you explain to me what that paragraph would
3  have required Ms. Clodfelter to do when processing
4  Mr. Drexel's claim?
5      A.  Essentially it would require her to explain the
6  process in general terms, especially what the coverage
7  affords to the insured and what her approach to
8  establishing or completing the investigation and
9  establishing the damage, what that was going to entail
10  so the insured would know what to expect.
11     Q.  Okay.  It says, does it not, "the claim process
12  must be explained in detail"?
13     A.  Yes.
14     Q.  Are you able to tell from H-1, the adjuster
15  notes, whether Ms. Clodfelter complied with this
16  paragraph when she initially processed this claim?
17     A.  She doesn't document in here what I would
18  call detail her conversation with the insured.
19     Q.  The paragraph that we're referring to required
20  Ms. Clodfelter to explain to Mr. Drexel the
21  relationship between Harleysville, Tower Insurance,
22  the contractor and Mr. Drexel?
23         MR. CASARINO:  It says, "During initial
24  contact."  You're asking at that time?

21  (Pages 78 to 81)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

82

1    MR. BESTE: Yes.
2    MR. CASARINO: All right.
3    A.  Well, what this says is that the claim process
4  must be explained in detail.  Now, we understand that
5  detail is a relative term and the person that drives
6  the degree of detail in these cases is the insured
7  because the claim rep understands this stuff.  So how
8  far down you break it down to an individual is
9  strictly driven by the questions asked by the insured
10  in my experience.
11    Q.  But doesn't this paragraph place an affirmative
12  requirement, if you will, on the claims adjuster to
13  explain the claims process to the insured in detail?
14    A.  That's what it says.  And that's correct.  I
15  mean, the insured -- or the claim rep has the
16  responsibility to make contact with the insured and
17  not only secure information as to what occurred but to
18  discuss the claim process with the insured so they
19  understand what she needs and how she's going to go
20  about getting it.
21    Now, the degree of detail is pretty much
22  driven by the insured.  Some insureds know exactly
23  what to expect and some don't know what to expect, so
24  you get either no questions or you get a copious

83

1  amount of questions.  It's driven by the insured.
2    You don't -- it's been my experience that
3  when you're on a phone with someone you don't
4  necessarily burden someone that doesn't have an
5  interest in the minutiae of how you're going
6  to do your job.  They'll ask you what they're
7  concerned about.
8    Now, it's the claims rep's responsibility
9  to initiate that conversation and be sure the insured
10  has an opportunity to ask questions based on her
11  summary of what she plans to do.
12    Q.  At this stage of the process as reflected in
13  this paragraph, is it the claims handler's
14  responsibility to explain to the insured the nature of
15  the insured's relationship with a contractor who would
16  do work to repair a property?
17    A.  If that question was asked, yes.
18    Q.  So if the insured did not ask about the
19  specifics of that relationship, it would not be
20  explained to the insured?
21    A.  It may be or may not be, but it certainly would
22  be had the question been asked.
23    Q.  Does the claims handler have an affirmative
24  obligation to explain that relationship or to ensure

84

1  that the insured understands the relationship at this
2  stage of the process?
3    A.  I don't know that I understand what you said
4  about an affirmative obligation.
5    How did you phrase that?
6    Q.  The question is basically whether the claims
7  handler has an affirmative obligation to make sure at
8  this stage, the initial contact stage, that the
9  insured understands the expected relationship between
10  the insured and the contractor?
11    A.  I don't think this says anything like that.
12  This says that the claim process must be explained in
13  detail.  It doesn't say anything about relationships.
14    So if that question had been raised at
15  this point like, for instance, in the normal course,
16  we need to establish the damage or the amount of
17  damage to your building and if the insured asks well,
18  how do you propose to do it, which of course is a
19  normal question, what's your plan, in this instance
20  they may say that they're hiring an independent
21  adjuster to establish the amount of damage and they're
22  going to ask them to reach an agreed value with a
23  contractor.
24    And that would just lead to other

85

1  questions:  Are you going to hire a contractor?  Am I
2  going to hire a contractor?  Do you have a contractor
3  in mind?  There isn't, there isn't any single set or
4  claim handling procedure.  It would be a booklet that
5  you would have to send to each person that would
6  entail or cover all situations.  That's really
7  burdensome to most insureds.  They just would prefer
8  to have their questions answered.
9    So that essentially is what this is for,
10  is to establish that contact so their questions can be
11  answered.
12    MR. BESTE:  I'm going to ask that this
13  next document be marked as H-25, and this is the
14  property claim manual.
15    MR. CASARINO:  Dated May 2005.
16    (H Deposition Exhibit No. 25 was marked
17  for identification.)
18  BY MR. BESTE:
19    Q.  Are you able to identify H-25?
20    A.  This is the Harleysville property claim manual,
21  a print of it.  It exists in electronic format.  May
22  2005 edition.
23    Q.  So effective May 2005 claims employees would
24  have access to this by a computer system?

22 (Pages 82 to 85)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

86

1    A.  Correct.
2    Q.  So this document did not take effect until May
3  of 2005.  Is that correct, as far as you can tell?
4    A.  That would be the last time it was revised,
5  that's correct.
6        MR. CASARINO:  It was effective at the
7  time.  If you look inside, you will see the updates,
8  the first page.
9  BY MR. BESTE:
10    Q.  So this is, in essence, a list of a collection
11  of documents which are updated at various times as
12  reflected on the index?
13    A.  Correct.
14    Q.  How did this specific document come to be
15  produced?  Did you print this personally?
16    A.  No.
17    Q.  Do you know who did?
18    A.  No.
19    Q.  Could you turn to page 23, please?
20    A.  Certainly.
21    Q.  The third paragraph references PLRB.  Could you
22  explain to me what PLRB is?
23    A.  PLRB stands for Property Loss Research Bureau.
24  It is supported by membership of a group of insurers

87

1  to provide a common resource for training materials,
2  monitoring storm activity.  There's a variety of
3  functions.
4    Q.  Would claims employees have access to this
5  bureau?
6    A.  I believe so, yes.  I'm not sure that all
7  claims employees have access, but certainly some claim
8  employees do.
9    Q.  So this was, in essence, a resource available
10  to some claims employees?
11    A.  Correct.
12    Q.  And was that the case in the summer of 2004?
13    A.  Yes.
14    Q.  Can you give me a general understanding of why
15  claims employees would utilize this resource or under
16  what circumstances they would?
17    A.  A variety of reasons.  For instance, PLRB sends
18  mass e-mailings for updates for weather events that
19  happen throughout the country.  I'll be on that list.
20  So if a storm impacted one of our policy centers where
21  we have a lot of business, then I would be aware that
22  a weather event had happened prior to the claims even
23  being reported so we could react more proactively to
24  it.

88

1        They also have training modules online
2  that a claim employee might access so they would have
3  a better understanding of whatever was being discussed
4  in the training module.  It could be construction.  It
5  could be types of policies.  It could be any number of
6  topics that are on their system.
7        They also have a library of coverage
8  issues and questions that arise and they have
9  organized it so that you can tell essentially what the
10  issues are in making a coverage determination in some
11  instances and what venues have gone this way and what
12  have gone that way, so it could be a pretty
13  comprehensive discussions about different issues.
14    Q.  By "venues" you mean jurisdictions?
15    A.  Correct.
16    Q.  Does PLRB provide Harleysville claims employees
17  with legal advice?
18    A.  No.  They supply us with information on legal
19  issues, but they do not provide us a legal opinion.
20  We don't hire them as we would a coverage attorney.
21    Q.  Under any circumstances?
22    A.  I don't think they -- I don't think you can.  I
23  think they're independent of that.
24    Q.  And so PLRB does not function as Harleysville's

89

1  attorneys as far as you know?
2    A.  No, they do not.
3    Q.  Are you aware that Ms. Clodfelter reached out
4  to PLRB with respect to Mr. Drexel's claim?
5    A.  No.  I wouldn't be surprised.
6    Q.  Why wouldn't you be surprised?  Is there some
7  particular aspect of this claim that makes you answer
8  it that way?
9    A.  Yes.  This is -- this isn't your typical claim,
10  so I'm sure she would have questions.
11    Q.  I mean, is there any particular aspect of the
12  claim that you're referring to when you say that?
13    A.  Yes.  It started out when she first was
14  assigned the claim that it had, that there was
15  coverage afforded and later information determined
16  that that coverage did not exist, so that's unusual
17  and that unusual situation has caused questions.
18    Q.  Do you have an understanding of what types of
19  questions Ms. Clodfelter could have been asking on
20  that issue?
21    A.  She could have been asking any number of
22  things.  I have no way of knowing what she was asking.
23    Q.  And you don't have any direct knowledge of the
24  specific questions Ms. Clodfelter may have sent or

23  (Pages 86 to 89)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

90

1  asked of the PLRB?
2      A.  I didn't know she had until you mentioned it.
3      Q.  If you refer to H-1 again, please.  There's a
4  note on September 3rd, '04 at 11:18.  I would
5  generally just ask you to review that note and any
6  other notes there and tell me if you can explain why
7  Ms. Clodfelter was reaching out to the PLRB in this
8  case.
9      A.  "I sent PLRB a question on 8/19 regarding this
10  claim.  I had not heard anything as of this date.  I
11  e-mailed PLRB and they advised they were working on
12  the answer and would get back with me either today or
13  Tuesday."
14          She did not mention what her question was.
15      Q.  Are you able to tell from anywhere else in H-1
16  what her question to PLRB was?
17      A.  She doesn't describe her question in these
18  notes that I see.  If I'm missing it, you can point it
19  out.
20      Q.  No.  For the record, I don't think you're
21  missing anything.  As far as I can tell, there's no
22  indication in there what question she was asking.
23          If you had to answer that question,
24  specifically what question she was asking PLRB, where

91

1  would you look or what documents would you try to get?
2      A.  Well, it mentions that she e-mailed them.  So
3  if she retained a copy of the e-mail, that might
4  detail exactly what her question is.
5      Q.  Should Ms. Clodfelter have retained a copy of
6  her e-mail to PLRB?
7      A.  She doesn't have to, no.
8      Q.  That's not something that she should have put
9  into the claims file?
10      A.  It's optional.  It's a question, you know, so
11  if she has a question, if she was changing or
12  modifying her handling of the claim based on
13  information that was generated by an answer from PLRB,
14  we would expect that to be in there so we would
15  understand what she was doing and why.
16      Q.  Do you know whether PLRB keeps any records
17  regarding questions from claims handlers such as
18  Ms. Clodfelter?
19      A.  I don't know what PLRB's procedures are
20  regarding retention of questions, no.
21      Q.  Could you please turn to page 54 and tell me
22  whether you can identify that page or document?
23      A.  Chapter 4, Property Vendors, Independent
24  Adjuster Standards.

92

1      MR. CASARINO:  But that did not go into
2  effect until after this loss.  I just want to make an
3  objection to your inquiries about it.
4      Q.  This topic, if you will, went into effect on
5  May 15, 2005.  Is that correct, as far as you can
6  tell?
7      A.  That's what it says in the index.
8      Q.  And it also says it on page 3 of the topic.  Is
9  that correct?
10      A.  There is a date.  It coincides with the date on
11  the index.
12      Q.  Do you have any knowledge regarding what
13  changes may have been made to this particular topic in
14  the May 15th, 2005 revisions?
15      A.  Not without comparing that to the other
16  document.
17      Q.  If you look at page 55, the second page of that
18  topic, the second dot, could you explain that
19  paragraph to me on page 55?
20      A.  I can't see if there's a dot under -- yes.  The
21  second dot is "You do not have authority"?
22      Q.  Yes.
23          Can you explain in essence what that
24  paragraph means?

93

1      A.  Yes.  It means the independent adjuster does
2  not have the authority to hire a contractor without
3  approval of the handling adjuster.  That's what it
4  says.
5      Q.  Does that paragraph accurately represent the
6  same relationship in the summer of 2004?
7      A.  Yes.
8      Q.  Do you understand the question?
9      A.  Yes, I do.
10      Q.  In other words, although this was updated --
11      A.  Does this describe a change in our procedure?
12  In 2004 they did not have authority to engage the
13  services of a contractor either.
14      MR. CASARINO:  There's a section on this
15  on the one that was in effect.  Why don't you ask him
16  about that?
17      MR. BESTE:  I'm asking about this one.
18      MR. CASARINO:  Well, I object to this one.
19      MR. BESTE:  That's fine.
20  BY MR. BESTE:
21      Q.  The description offered in that paragraph that
22  we're discussing was effective, if you will, at the
23  time this claim was being adjusted?
24      A.  It's my understanding it was or something

24 (Pages 90 to 93)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

94

1  very very -- the procedure that it's trying to
2  describe here is that an independent adjuster does not
3  have the authority to engage the services that a
4  contractor may charge us for, in other words, incur
5  additional expense without securing approval of the
6  personnel that would be paying for that expense.
7      Q.  In other words, Harleysville?
8      A.  Correct.
9      Q.  Doesn't the converse of that also mean that
10 with the approval of the claims handler, the
11 independent adjuster had authority to engage the
12 services of a contractor?
13     A.  If the handling adjuster authorizes that
14 authority, then they would have that authority.
15     Q.  And that was the case in 2004?
16     A.  As far as I know, yes.  I mean, I don't see why
17 it wouldn't be.  This is not, this is not a change in
18 the way the claims have been handled for ten years at
19 Harleysville in my experience.
20     Q.  So at the time this claim was adjusted
21 Ms. Clodfelter would have had authority to authorize
22 an independent adjuster to engage a contractor?
23     A.  Yes.
24     Q.  Did Ms. Clodfelter authorize Mr. Powell or

95

1  Tower Insurance to engage a contractor in this case at
2  any time?
3          MR. CASARINO:  To do what?
4          MR. BESTE:  Anything.
5          MR. CASARINO:  I thought that's been asked
6  and answered already.
7      A.  I don't know if she did or not.  Is that in the
8  notes somewhere?
9          She had, I know that she had asked that
10 Mr. Powell's estimate be agreed to by a contractor.
11 That does not necessarily mean that they have engaged
12 the services of a contractor.
13     Q.  But are you able to tell whether Ms. Clodfelter
14 authorized Mr. Powell or Tower Insurance to engage the
15 contractor to complete the repairs on Mr. Drexel's
16 property here?
17     A.  No, she did not engage the services of a
18 contractor to complete a repair.  That would be
19 something that's beyond her scope or authority.
20     Q.  I thought we just established that
21 Ms. Clodfelter had the authority to authorize the
22 independent adjuster to engage a contractor?
23     A.  Correct.
24     Q.  Did Ms. Clodfelter in this case authorize Tower

96

1  Insurance or George Powell, the independent adjuster,
2  to engage a contractor?
3      A.  I don't know.  I don't think so.
4      Q.  Well, what is Harleysville's official position
5  on that?
6      A.  Whether they engaged a contractor or not?
7      Q.  Whether Mr. Powell or Tower Insurance was
8  authorized by Harleysville to engage a contractor.
9      A.  I haven't seen any documentation of that
10 authorization.  It's not absolutely necessary that it
11 be written for it to be authorized.
12         If Sherry verbally told Mr. Powell that he
13 was authorized to engage a contractor, then he's
14 authorized, but it would be hard for me to know that.
15     Q.  You speak for Harleysville regarding this
16 claim, correct?
17     A.  That's correct.
18     Q.  Is your testimony that you don't know and are
19 unable to tell me whether Ms. Clodfelter authorized
20 George Powell or Tower Insurance to engage the
21 services of a contractor in this case?
22         MR. CASARINO:  Here's where I'm confused.
23 Let me object here.  You keep asking to engage a
24 contractor but you don't say for what.

97

1          It's already been established earlier that
2  I thought he said that he hired him to get an agreed
3  price, but you keep jumping around from agreed price
4  to doing the work.
5          Are you asking him to do the work or to
6  get an agreed price?
7          MR. BESTE:  Could you read back the
8  question, please?
9          MR. CASARINO:  That's all I'm asking you.
10         (The reporter read back the last
11 question.)
12 BY MR. BESTE:
13     Q.  There's an objection to that question.
14         MR. CASARINO:  I just want you to
15 elaborate.  To do what?
16     Q.  You can answer.
17     A.  The answer is he did not have authority to
18 engage a contractor to effect any repair whatsoever.
19     Q.  How do you know that?
20     A.  Because that authority would have to arise from
21 the insured.
22     Q.  I thought that we established that
23 Ms. Clodfelter had the power to authorize Tower
24 Insurance, the independent adjuster, to engage the

25  (Pages 94 to 97)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

98

1  services of a contractor to repair the property?
2      A.  She has that theoretical authority to directly
3  repair an insured's property should we choose to
4  notify the insured that we are exercising that option.
5          We did not exercise that option. So any
6  engagement of a contractor for the purpose of
7  repairing the property had to originate from the
8  insured.
9      Q.  I'm going to show you page 55 of H-25 again.
10  Well, you have it in front of you.
11         If you look at the second paragraph on
12  that page, can you explain to me where it details your
13  testimony that the authority has to come from the
14  insured as opposed to the handling adjuster?
15     A.  What this paragraph addresses is the
16  circumstance where an independent adjuster does not
17  have the expertise or experience to complete an
18  estimate on his own, so he would have to hire a
19  contractor to complete that estimate to establish the
20  amount of damage.
21         For example, in any building, if the
22  building were hit, should you have extensive
23  electrical damage to your system the independent
24  adjuster almost certainly does not have the technical

99

1  ability to complete an electrical estimate that would
2  accurately reflect the damage.  You would have to hire
3  an electrician to establish the amount of the
4  electrical damage.  He does not have the authority to
5  hire that electrician without the approval of the
6  handling adjuster.
7      Q.  So with the approval of the handling adjuster,
8  the independent adjuster has that authority to hire
9  contractors to do work?
10     A.  To establish the work that needs to be done and
11  the pricing of that work.  That's the work that they
12  would be hired to complete, not directly effecting a
13  repair on an insured's property.  That's the next
14  step.
15         After we reach an agreement as to what
16  needs to be done and how much it should cost, the
17  insured gets to hire either that contractor or his own
18  to effect the work.
19     Q.  Am I correct that your testimony is that the
20  claims handler has authority to engage the services of
21  a contractor only to estimate the damage as opposed to
22  actually completing the work?
23         MR. CASARINO:  He's answered this question
24  several times.  I have an objection.

100

1          MR. BESTE:  Your objection is noted.
2      A.  Ordinarily, that's correct.
3      Q.  How is that intricacy explained to either the
4  independent adjuster or the insured?
5      A.  Ordinarily you don't have to explain it to the
6  independent adjuster.  They understand it.
7          The insured may or may not understand it
8  and you explain it to the insured simply by letting
9  them know that it is the insured's property and it is
10  his decision who he uses to repair the property or how
11  the property is repaired.  What we do as an insurer is
12  establish what needs to be done and what it should
13  cost.
14     Q.  Are there any contracts or documents that spell
15  out Harleysville's relationship with Mr. Powell or
16  Tower Insurance with respect to this claim?
17     A.  Aside from -- I don't know that this document
18  was in effect at that time.  There may have been --
19  this may be a replacement to a previous document that
20  may have applied.  I don't know if this document would
21  have been included in our property manual, but it may
22  have been just a general restatement of a previous
23  document.
24     Q.  What I'm asking you though is:  Are there any

101

1  documents or materials which we could refer to where
2  the specific relationship between Harleysville and
3  Tower Insurance was spelled out in writing with
4  respect to this claim?
5      A.  No.
6      Q.  With respect to this claim, how would
7  Mr. Powell have known the extent of his authority
8  without such a document?
9      A.  This isn't the first claim that Mr. Powell has
10  done for us.  He has the advantage of the experience
11  with us.  He knows what his authority level is or
12  isn't.
13     Q.  So Harleysville, in essence, was relying on
14  Mr. Powell's experience in this case with respect to
15  the scope of his authority?
16     A.  Harleysville relied on Mr. Powell's
17  understanding of his authority with Harleysville.
18     Q.  To your knowledge, is that understanding or
19  scope of authority spelled out in any document or
20  claims notes or other materials in this case?
21     A.  Not specific to this case.  There are
22  general -- this property manual that we're talking
23  about, Exhibit 25, is not specific to this case.
24     Q.  Forget about the property manual.

26 (Pages 98 to 101)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

102

1    Are there any documents or materials or
2    claims notes, anything that spells out the scope of
3    Mr. Powell's authority with respect to this claim?
4    A.  No.
5    Q.  Does Harleysville have any type of contract
6    with Mr. Powell or Tower Insurance that is actually
7    written?
8    A.  No.
9        MR. CASARINO:  You're well beyond fifteen
10   minutes, by the way.
11       MR. BESTE:  Tell me about it.
12       Can I have this marked as H-26, please?
13       (H Deposition Exhibit No. 26 was marked
14   for identification.)
15   BY MR. BESTE:
16   Q.  Are you able to identify the document marked as
17   Exhibit H-26?
18   A.  I can read the heading on it, but I have never
19   seen it before.
20   Q.  To your knowledge, does this document or the
21   information contained therein have any impact on the
22   claims handling in this case?
23   A.  I'll have to read it and see.
24   Q.  Maybe we can avoid that.

104

1    That might have been where I picked it up.
2    Q.  This is a letter from Tower Insurance, George
3    Powell.  Is that correct?
4    A.  Yes.  It appears to be.
5    Q.  And Tower Insurance and George Powell were the
6    independent adjuster on this claim retained by
7    Harleysville.  Is that correct?
8    A.  He's the independent adjuster we hired, yes.
9    Q.  If you review the final paragraph on the first
10   page, it appears that Tower Insurance was encouraging
11   Mr. Drexel to begin repairs to the property.
12       Tell me if I'm misreading that paragraph.
13   A.  That's what it says:  "Certainly Mr. Drexel is
14   encouraged to begin repair activity for this fire that
15   occurred over one month ago."
16   Q.  When you read that sentence, did Mr. Powell
17   have authority to encourage Mr. Drexel to make the
18   repairs?
19       MR. CASARINO:  I object to that question.
20   A.  I believe he had authority to do that, yes,
21   essentially releasing any interest we may have in the
22   scene so he can begin repairs.  Yes, I think that
23   confirms that we're not going to be sending more
24   experts, we're not going to have -- we're not worried

103

1        Let me ask you this way:  Have you ever
2    seen this document before?
3    A.  No.
4    Q.  Have you ever seen any similar documents?
5    A.  I've seen other documents.  What's a similar
6    document?
7    Q.  Does the title Corporate Direct Bill Criteria
8    mean anything to you as a claims representative for
9    Harleysville?
10   A.  Not as claims representative.  It appears to be
11   just what it says, criteria apparently for
12   establishing a direct bill relationship.
13   Q.  I'm going to show you one more document.  This
14   is part of H-8 and it's marked at the bottom DR 0432.
15   It's a two-page letter.
16       My first question is whether you have ever
17   seen that document before?
18   A.  (Reviewing document)  I think I have seen this
19   or a copy of it.
20   Q.  Is there anything specific that you remember
21   about it?
22   A.  Just that he had received the scope copy of the
23   estimate without the pricing and I'm not certain if
24   that language was also included in one of his reports.

105

1    about spoilation issues, that he can instigate
2    repairs.
3        And he goes on to say that "We do not have
4    an agreed price for repairs or response to our
5    questions.  We cannot recommend at this time that an
6    advance be issued."  That's basically confirming that
7    he's encouraged to begin repair, but he'll do that at
8    his expense.
9    Q.  Where does it say at his expense?
10   A.  Well, if we don't recommend at this time that
11   an advance be issued, whose expense would it be at?
12   Q.  Well, an advance would be issued before the
13   work was done, right?
14   A.  That would be an advance.
15   Q.  On August 1, 2004 did Tower Insurance have
16   authority from Harleysville to authorize the repairs
17   to start on Mr. Drexel's property?
18   A.  No.
19   Q.  As of August 1st, 2004 had Harleysville agreed
20   to pay for the repairs to Mr. Drexel's property if the
21   authority was received to begin with the repairs?
22   A.  What?  I'm sorry?
23       MR. CASARINO:  I don't understand your
24   question.

27  (Pages 102 to 105)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

---

**106**

1  BY MR. BESTE:
2  Q.  As of August 1st, 2004 had Harleysville agreed
3  to pay for the repairs to Mr. Drexel's property?
4  A.  I don't believe so.
5  Q.  But it's true, however, that Harleysville's
6  independent adjuster was encouraging the contractor,
7  Booth Associates, Booth Insurance Restorations to
8  begin the repairs as reflected in this letter?
9  A.  That's correct.
10  MR. BESTE:  That's all I have.
11  BY MR. CASARINO:
12  Q.  Take a look at H-10 for a moment, which would
13  be the final report from Tower Insurance.  Look at the
14  first page of the letter that was sent.
15  Under Enclosures it says, "Confirmation
16  from insured's contractor agreeing to the estimate."
17  Is the insured's contractor Booth Construction?
18  A.  If that's the contractor he reached the
19  agreement with, I would have to say yes.
20  Q.  And under Activities it says, "We have
21  confirmed an agreed repair price with the insured's
22  contractor G. S. Booth Construction."
23  Do you see that?
24  A.  I do.

**107**

1  Q.  And when referring to insured's contractor,
2  you're referring to the contractor retained by the
3  insured, Mr. Drexel?
4  A.  That's correct.
5  Q.  Do you know from the documents that you have
6  seen if Mrs. Clodfelter was working on August the
7  11th, 2004 or August the 12th, 2004?
8  A.  (Pause.)
9  Q.  If you take a look at H-1, for instance, see if
10  there's any notations for those two dates.
11  A.  There's a notation on 8-10 and the next one
12  from her is on 8-13.
13  Q.  So that doesn't help us one way or the other?
14  A.  No.  I don't know if she was working or not.
15  Q.  In the log note of June 22 at 23:52, if I can
16  read it, it says, "ack letter sent to insured."
17  Is that acknowledgment letter?
18  A.  That's right.
19  Q.  Is that a form letter of some sort?
20  A.  It's a system-generated form letter advising
21  the insured who their claim rep is.
22  Q.  Does it do more than that, than just advise who
23  the claim rep is?
24  A.  It may, but it's -- that's the main function I

**108**

1  would assign to it.
2  Q.  The PLRB, do you know if the PLRB has attorneys
3  on staff?
4  A.  Yes, they do.
5  Q.  And do you know if you can ask them for legal
6  opinions concerning your claim or a claim?
7  A.  Not for -- they do not represent us.  We
8  couldn't get a legal opinion, but we could get their
9  opinion.
10  Q.  Okay.  Take a look at the log notes beginning
11  on September 14, 2004.  There's a log note from
12  Mr. Riddle dated September 14, '04.  The time is
13  14:12.
14  Do you see that?
15  A.  Yes, I see it.
16  Q.  And of course it says, "Now that U/W."  Is that
17  underwriting?
18  A.  Yes.
19  Q.  "Has provided their official position that this
20  policy was not in effect on the date of loss and will
21  not be reinstated, I believe it is time to send a
22  formal letter to the insured explaining no coverage is
23  available."
24  Now, this is a note prepared by

**109**

1  Mr. Riddle?
2  A.  Yes.
3  Q.  Does he mention anything about cancellation?
4  A.  No.
5  Q.  And do you believe that was his instruction to
6  Ms. Clodfelter to send the letter?
7  A.  Yes.
8  Q.  And there's a letter that was generated
9  apparently September 15 that's been referred to
10  earlier that used the word cancellation?
11  A.  Sherry used the word cancellation, yes.
12  Q.  Take a look at Exhibit 8, which is I think
13  it's -- let me show it to you this way.
14  A.  I got it here.
15  Q.  We can look at DR 0370.  This is the letter
16  from I believe Tower from Mr. Powell to Sherry dated
17  July 30, 2004.
18  Under Investigation it says the insured
19  has contracted with Booth Insurance Restorations to
20  effect repairs, does it not?
21  A.  That's what it says.
22  Q.  Down in the third paragraph, "We have asked the
23  insured's contractor to review our estimates and to
24  contact our office so that we can read through the

28  (Pages 106 to 109)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

110

1   differences and to reach an agreed price." Is that
2   correct?
3       A. Yes. That's correct.
4       Q. It appears then that the insured's contractor
5   and Mr. Powell may have had a differences of opinion
6   as to what the cost of the repairs would be?
7       A. I'm sure they did.
8           MR. CASARINO: I nothing further.
9   BY MR. BESTE:
10      Q. Who did you say Robert Southard was?
11      A. I believe he is a high-level manager in the
12  southeast underwriting organization.
13          MR. CASARINO: He's in underwriting, Rob.
14  I can tell you that.
15  BY MR. BESTE:
16      Q. I'm going to refer you --
17      A. I believe his position changed from 2004 to
18  present day.
19      Q. Do you know what his position was in 2004?
20      A. No.
21      Q. I'm going to refer you to Ms. Clodfelter's
22  claim note from August 13th at 15:36.
23      A. Okay.
24      Q. And this is in H-1 again.

111

1           Isn't it correct based on this note that
2   Ms. Clodfelter asked underwriting for an e-mail
3   confirming that the policy has been canceled?
4       A. Well, it's not clear what -- she's asking for
5   an e-mail confirmation. It's not clear from the
6   language if it's requesting confirmation of the
7   cancellation or whether that they would not reinstate.
8       Q. But she is asking for underwriting's official
9   position on the status of the policy, in essence?
10      A. Essentially she's looking for some solid
11  confirmation before she denies this claim that there's
12  no coverage.
13      Q. And that would come from the underwriting
14  department?
15      A. That's correct.
16      Q. And looking back at the note on 9-14-2004,
17  there's two notes from Clodfelter and Riddle. Does it
18  not appear that by 9-14 they had an official position
19  from underwriting on the status of Mr. Drexel's
20  policy?
21      A. It says in the note on 9-14 that they received
22  the e-mail on 8-13.
23      Q. Does it say who the e-mail came from?
24      A. No, it doesn't. It just says from

112

1   underwriting.
2       Q. So as you read that note, Ms. Clodfelter and
3   Mr. Riddle had received underwriting's official
4   position in an e-mail dated August 13th?
5       A. Yes.
6       Q. I'm going to show you what's been marked as
7   H-15 and ask you if you can identify that e-mail dated
8   August 13th.
9       A. Yes. It's an e-mail from Bob Southard to
10  Robert Southard confirming that the policy was
11  canceled for non-payment and we have no intention of
12  reinstating coverage; no payment has been received
13  since the cancellation notice was mailed to the
14  insured.
15      Q. Based on the notes we were just discussing,
16  does this e-mail appear to be underwriting's official
17  position on the status of this policy as of August
18  13th?
19          MR. CASARINO: I object.
20      A. That's what I would take it as.
21          MR. CASARINO: Underwriting's position is
22  up to underwriting, not to him. His understanding is
23  one thing.
24          I object to your attempting to get him to

113

1   say what somebody else's authority is, their position
2   is.
3   BY MR. BESTE:
4       Q. I believe I asked you whether this e-mail
5   appeared to be underwriting's official position and
6   instruction to the claims department as referenced in
7   the notes by Mr. Clodfelter and Mr. Riddle.
8       A. I would accept it as that.
9           MR. BESTE: Thank you. That's all I have.
10          MR. CASARINO: Okay. We'll waive it.
11          (Deposition concluded at 1:50 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

29 (Pages 110 to 113)

Drexel v. Harleysville Insurance Co.
Theodore Gregg Parker

114

INDEX

DEPONENT: THEODORE GREGG PARKER          PAGE
Examination by Mr. Beste          2
Examination by Mr. Casarino          106
Examination by Mr. Beste          110

EXHIBITS

H DEPOSITION EXHIBITS                    MARKED

23 Re-Notice of Deposition                6

24 Multipage document captioned "Harleysville
   Best Practices Claims Handling Manual May
   2004 Edition"                         74

25 Multipage document captioned "Harleysville
   Property Claim Handling Manual May
   2005 Edition"                         85

26 Seven-page document captioned "Corporate
   Direct Bill Criteria"          102

CERTIFICATE OF REPORTER               PAGE 115

115

State of Delaware  )
                   )
New Castle County  )

CERTIFICATE OF REPORTER

I, Kurt A. Fetzer, Registered Diplomate
Reporter and Notary Public, do hereby certify that
there came before me on Tuesday, September 11, 2007,
the deponent herein, THEODORE GREGG PARKER, who was
duly sworn  by me and thereafter examined by
counsel for the respective parties; that the questions
asked of said deponent and the answers given were
taken down by me in Stenotype notes and thereafter
transcribed by use of computer-aided transcription and
computer printer under my direction.

I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

I further certify that reading and signing of
the deposition were waived by the deponent and
counsel.

I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

Kurt A. Fetzer, RDR, CRR
Certification No. 100-RPR
(Expires January 31, 2008)

DATED:

30 (Pages 114 to 115)

Drexel v. Harleysville Insurance Co.

**A**

**ability** 18:2
  24:22 25:24
  63:2,5 99:1
**able** 6:10 7:2,11
  10:1,3 16:5
  18:9 24:3,17
  26:13,17 28:8
  32:15 34:15
  35:7 53:21
  54:7 55:3 57:1
  59:3 65:11
  66:11 74:7
  79:22 81:14
  85:19 90:15
  95:13 102:16
**absolute** 71:4
**absolutely** 96:10
**accept** 113:8
**acceptable** 19:13
  27:24
**acceptance** 8:23
**accepted** 5:10
  11:20 62:5
**access** 33:11,22
  34:11,12 35:13
  36:14 38:9,14
  38:16 39:4,7
  39:12,13,19,22
  39:24 40:5
  64:21 65:7,16
  72:2,8,17,23
  73:4,9,12 74:1
  74:5 85:24
  87:4,7 88:2
**accesses** 24:8
**account** 12:12
**accurate** 16:11
  16:12 29:24
  62:7
**accurately** 93:5
  99:2
**accusations**
  12:15
**ack** 107:16
**acknowledgm...**

107:17
**acronym** 24:14
**act** 62:23
**acting** 50:14
**action** 1:5 76:22
**actions** 57:2
**active** 24:7
**Activities** 106:20
**activity** 87:2
  104:14
**add** 35:21
**additional** 32:1
  62:14 63:16
  94:5
**address** 9:22
  21:2 26:3 32:2
  32:5 36:22
  54:11
**addressed** 78:2
**addresses** 69:2
  77:11 98:15
**adequate** 9:16
**adjust** 50:2,4
**adjusted** 72:18
  93:23 94:20
**adjuster** 5:15
  21:20 22:3,18
  22:19,21 23:4
  26:11 27:24
  28:7 33:23
  35:11 36:6,11
  38:4 40:11
  42:10,23 43:8
  47:21 48:11
  49:5,24 51:4
  81:14 82:12
  84:21 91:24
  93:1,3 94:2,11
  94:13,22 95:22
  96:1 97:24
  98:14,16,24
  99:6,7,8 100:4
  100:6 104:6,8
  106:6
**adjusters** 14:7
  21:21 24:17
  64:21

**adjuster's** 5:7,12
  13:17
**adjusting** 40:6
  51:18 71:1
  73:5 77:20,24
  79:14
**administrative**
  3:16 19:20,22
  19:24
**advance** 105:6
  105:11,12,14
**advantage**
  101:10
**advice** 88:17
**advise** 68:2
  107:22
**advised** 90:11
**advises** 68:6
**advising** 107:20
**affirmative**
  82:11 83:23
  84:4,7
**afforded** 89:15
**affords** 81:7
**age** 2:11
**agency** 21:12
**agent** 50:8,13,15
  64:7,11,15
**agents** 19:14,17
**ago** 31:7 34:20
  104:15
**agree** 43:19,22
  44:1 46:1
  48:23 57:18,20
  57:22
**agreed** 43:16,17
  48:2 49:6 56:8
  58:3 84:22
  95:10 97:2,3,6
  105:4,19 106:2
  106:21 110:1
**agreeing** 106:16
**agreement** 45:14
  48:13,15,18
  49:13 51:13,15
  58:16,18,20
  99:15 106:19
**ahead** 58:5,6

**allegation** 13:16
  13:17
**alleged** 11:3,22
  11:24 12:7
**allow** 49:13,15
**alter** 24:17
**Amber** 59:5,6,21
  63:8,10,12
  70:7
**Amber's** 63:15
  64:17
**amount** 16:22
  22:15,22 34:4
  37:4 43:4,7
  56:23 58:3,19
  76:24 83:1
  84:16,21 98:20
  99:3
**answer** 44:24
  50:12 51:9
  61:14 73:12
  89:7 90:12,23
  91:13 97:16,17
**answered** 85:8
  85:11 95:6
  99:23
**answers** 115:7
**anticipated** 29:9
**apart** 17:23
**apologize** 53:14
**apparently**
  27:11 57:23
  59:22 103:11
  109:9
**appear** 16:23
  18:15 26:11
  56:17 59:22
  111:18 112:16
**APPEARANC...**
  1:14
**appeared** 113:5
**appears** 12:8
  26:20 27:21
  28:12 29:7
  55:20 56:3
  58:18 59:4
  62:23 65:12

67:19 71:16
  75:1 78:8
  103:10 104:4
  104:10 110:4
**application**
  39:24
**applications**
  38:19
**applied** 12:11
  76:12 77:8,9
  77:19,23
  100:20
**apply** 77:13
  78:13,16,21
  79:14,19
**approach** 81:7
**appropriate**
  31:23
**approval** 49:3
  93:3 94:5,10
  99:5,7
**approved** 22:17
  23:1,2
**approximately**
  4:23 80:1
**area** 8:15
**arising** 16:7
**arson** 3:10
**aside** 11:21
  16:10 25:23
  35:11 36:11
  42:5 100:17
**asked** 46:4 51:10
  82:9 83:17,22
  90:1 95:5,9
  109:22 111:2
  113:4 115:7
**asking** 7:14 46:3
  81:24 89:19,21
  89:22 90:22,24
  93:17 96:23
  97:5,9 100:24
  111:4,8
**asks** 63:9 84:17
**aspect** 11:9
  19:20 26:24
  31:11 32:6

Drexel v. Harleysville Insurance Co.

117

89:7,11
**aspects** 4:17
**assertion** 12:5
**assign** 27:16
  108:1
**assigned** 21:18
  22:2,19,21
  23:4,23 32:13
  33:4,6 89:14
**assigning** 22:17
  38:21
**assignment**
  23:15 27:17
  73:17
**assignments**
  27:15 39:2
**assigns** 19:12
**assistance** 3:11
**associated** 17:8
**Associates** 106:7
**assume** 20:1
  37:16 53:3
  54:5 64:18
  67:3 69:12
  75:5 76:14,21
**assumption** 9:5
  20:24 69:16
**assure** 11:5
**Atlanta** 67:11,13
**attempted** 57:21
  57:24 58:9,21
**attempting**
  112:24
**attention** 17:5
**attorney** 8:5
  88:20 115:14
**attorneys** 89:1
  108:2
**attorney's** 4:18
**August** 29:24
  30:5 55:17
  60:22 62:17,18
  62:20,23 63:8
  71:2 105:15,19
  106:2 107:6,7
  110:22 112:4,8
  112:17

**authority** 3:22
  4:2,3,5 15:8
  45:9,11,13,15
  45:18,23 46:1
  46:5,8 47:2
  49:12,15 50:14
  56:13 63:1
  69:6 70:18
  71:11 92:21
  93:2,12 94:3
  94:11,14,14,21
  95:19,21 97:17
  97:20 98:2,13
  99:4,8,20
  101:7,11,15,17
  101:19 102:3
  104:17,20
  105:16,21
  113:1
**authorization**
  96:10
**authorize** 48:22
  57:15 94:21,24
  95:21,24 97:23
  105:16
**authorized** 4:7
  37:21 58:13
  95:14 96:8,11
  96:13,14,19
**authorizes** 94:13
**available** 23:11
  33:3 38:2
  39:18 43:14
  87:9 108:23
**Avenue** 1:12,16
**avoid** 102:24
**aware** 4:16
  16:15 17:3
  28:9,12 30:7
  42:8,8 55:10
  87:21 89:3
**a.m** 1:12

———————
        **B**
———————
**B** 114:5
**back** 63:21
  64:10,24 79:20

90:12 97:7,10
  111:16
**backdated** 11:19
**backdating**
  11:21
**based** 13:11
  15:17 44:24
  52:20 58:20
  69:15,16 83:10
  91:12 111:1
  112:15
**basic** 34:8 40:15
**basically** 34:1,22
  36:18 76:16
  84:6 105:6
**Bear** 53:12
**Beauman** 53:17
**beauty** 72:9
**beginning** 1:12
  4:23 6:23
  30:22 108:10
**behalf** 4:4 7:13
  7:18,18 8:1
**believe** 2:14
  11:18,22,24
  12:18 16:22
  20:11 21:10
  22:4,6,21 25:7
  27:6 28:11
  32:19 33:14
  34:12 35:7
  38:12,20,22,23
  39:5 42:14,21
  43:3 50:4 51:5
  52:7 58:6 63:3
  67:11 69:1,1
  87:6 104:20
  106:4 108:21
  109:5,16
  110:11,17
  113:4
**believed** 13:2
  30:1
**best** 43:21 59:19
  74:18 75:1
  76:3 80:9
  114:9

**Beste** 1:15 2:6,9
  5:21,23 6:9
  7:15,21 8:2
  26:7 28:21,22
  45:21 47:14
  54:14 55:5
  61:5,6 74:15
  74:18,22 82:1
  85:12,18 86:9
  93:17,19,20
  95:4 97:7,12
  100:1 102:11
  102:15 106:1
  106:10 110:9
  110:15 113:3,9
  114:3,4
**bet** 24:15
**better** 88:3
**beyond** 61:12
  95:19 102:9
**bill** 21:1 61:16
  63:22 64:1,3,6
  64:17,19,22
  65:7,21 103:7
  103:12 114:13
**billed** 64:14
**billing** 9:7 25:17
  29:8
**bills** 25:18
**birth** 2:12,14
**blank** 31:13
**board** 20:12,17
**Bob** 67:5,9
  112:9
**bolts** 40:15,20
**booklet** 85:4
**Booth** 106:7,7
  106:17,22
  109:19
**bottom** 103:14
**branch** 3:10
**branches** 18:1
**break** 40:12,16
  58:24 74:11
  82:8
**brief** 5:1 17:21
  74:14

**briefly** 6:24 20:8
**bring** 36:20
**Brooke** 53:17
**brought** 17:5
**building** 24:2
  27:3 31:20,21
  31:22 32:24
  39:13 50:4
  84:17 98:21,22
**burden** 83:4
**burdensome**
  85:7
**bureau** 86:23
  87:5
**business** 60:13
  60:15,17,20
  87:21

———————
        **C**
———————
**call** 31:11 40:13
  77:7 81:18
**called** 31:14
  77:5
**calls** 50:10
**cancel** 69:10
**canceled** 28:15
  28:18 60:24
  61:17 68:5,10
  68:13 69:7
  70:8 111:3
  112:11
**canceling** 9:13
**cancellation**
  9:11,17,22
  10:13,19 15:3
  18:12,13 68:18
  69:3,20 70:2
  70:15,20 71:3
  71:9 109:3,10
  109:11 111:7
  112:13
**cancellations**
  9:19
**cancelling** 9:12
**capabilities** 34:2
**capability** 34:13
**capable** 8:5 13:1

Drexel v. Harleysville Insurance Co.

capacity 7:22
capitalized
61:21 63:23
captioned 114:8
114:10,12
carry 18:7
Casarino 1:18
1:19 4:1 7:10
7:17,23 26:9
28:19 45:20
47:13 50:10
54:12 55:4,6
61:3,11 66:2,4
70:21 74:12,17
75:21 76:6,11
80:3 81:23
82:2 85:15
86:6 92:1
93:14,18 95:3
95:5 96:22
97:9,14 99:23
102:9 104:19
105:23 106:11
110:8,13
112:19,21
113:10 114:3
case 3:1,10 5:24
10:20,22 11:15
12:13,15 15:17
16:10 22:18,20
28:10 30:8
31:2,5 32:9,17
44:20 46:21
47:8,13,14,22
49:9,10,20
50:2,20,22
51:8 52:17
53:22 68:8,15
79:7 87:12
90:8 94:15
95:1,24 96:21
101:14,20,21
101:23 102:22
cases 82:6
Castle 115:2
catastrophe 2:22
cause 3:8 59:23

caused 13:11
29:17 89:17
causing 12:2
CCU 21:21 76:4
76:5,20,21
77:10,11,15
78:4
center 27:13,14
32:14 77:16
centers 21:19
87:20
central 3:16
21:13,17,22
23:14,24 26:21
27:9,10 76:22
CEO 20:11,16
certain 4:17
6:20 11:2
22:24 34:16
39:20 41:18
72:10 103:23
certainly 61:14
70:16 72:23
83:21 86:20
87:7 98:24
104:13
CERTIFICATE
114:14 115:3
Certification
115:19
certified 41:16
41:22
certify 115:5,10
115:12,14
chain 59:9
change 24:18,22
25:2 93:11
94:17
changed 62:9
73:20 110:17
changes 33:15
92:13
changing 91:11
chapter 78:12
78:16,23 79:2
79:9,13,20,21
91:23

chapters 78:13
characters 65:14
charge 94:4
charged 25:9
Charlotte 5:9,16
5:18,19,20
check 11:5,8,18
11:18 12:1,2,4
12:8,9,11
13:11,15 18:5
27:2 28:14
30:16 48:6,7
57:7,11,13
58:2,8,13
62:20
checks 17:15,18
17:23 18:2,7
choose 48:4 98:3
CHRISTMAN
1:19
CICS 24:12
26:12 33:24,24
34:7,24 35:13
36:5,8,13 37:6
37:10 38:6,10
65:3,12 70:12
70:15 71:16,19
72:7,9
circumstance
47:5,7 98:16
circumstances
41:9,17 87:16
88:21
Civil 1:5,10
claim 2:21 3:16
3:23 4:6,7,17
5:9,13 10:9,11
10:17 11:6
15:2,4,6,8,16
16:1,4,16,20
16:23 17:1,2,8
18:3,15 21:6,9
21:11,16,17,19
21:20 22:2,9
22:10,12 23:6
23:12,16,21,22
23:23 24:4,6

26:12,14,18,21
27:9,11,14,16
27:20 30:6,12
30:18,22,23
31:3,12,17
32:1,6,9,13,14
32:16 33:8
34:1,16,17,22
34:23,24 35:1
35:5,15 36:1,2
36:3 37:8,10
37:16,17 38:15
40:3,4,7,9,15
40:20,23 42:2
42:5,11,23
43:2,7 45:10
45:12 48:5
49:7 50:3 51:9
51:18 53:22
54:2 58:14
59:12 61:19,22
62:1,2,4,6,8
63:2,10,16,18
64:18 65:17
71:1 72:4,18
73:6,16 75:7
76:13,18 77:20
78:1,3,15
79:15 80:14
81:4,11,16
82:3,7,15,18
84:12 85:4,14
85:20 87:7
88:2 89:4,7,9
89:12,14 90:10
91:12 93:23
94:20 96:16
100:16 101:4,6
101:9 102:3
104:6 107:21
107:23 108:6,6
110:22 111:11
114:11
claims 7:18 8:15
8:20 9:2,12,19
9:21,24 10:2,4
10:5,14,15

12:21 14:4,5
14:13 15:10,15
15:16,19 16:7
16:10 17:11,12
17:18,22 19:1
19:8,10,23
20:18 21:4,21
21:22,23,24,24
23:14,24 24:11
24:12,17 25:16
26:22 27:10,10
27:13 28:8
29:8 30:1,15
30:20 31:9
33:15 36:18
38:21,22 40:19
41:3,6,9,18
42:1 50:24
52:18 53:8
54:17 55:9,15
55:21 63:1,4
64:2,21 65:20
69:5,9 71:11
72:16,24 73:2
75:1,10,15
76:3,4,5,22,23
77:11,13,16
78:6,17,24
79:21 80:2,9,9
80:10 82:12,13
83:8,13,23
84:6 85:23
87:4,7,10,15
87:22 88:16
91:9,17 94:10
94:18 99:20
101:20 102:2
102:22 103:8
103:10 113:6
114:9
classifications
2:24
classified 62:6
clear 7:9,11
15:11 77:2
111:4,5
Clodfelter 22:6

Drexel v. Harleysville Insurance Co.

119

| | | | | |
|---|---|---|---|---|
| 22:23 23:5 | committee 4:7,8 | 115:8 | contacted 62:13 | 39:17 |
| 27:17,18 28:3 | 4:10,11,15 | concerned 83:7 | contacts 77:4 | conversation |
| 28:13 29:22 | common 51:22 | concerning | contained 47:15 | 69:18 81:18 |
| 30:10 33:8,11 | 51:23 87:1 | 108:6 | 102:21 | 83:9 |
| 35:13 36:13 | communicating | concert 63:3 | contents 31:24 | converse 94:9 |
| 38:9,14 39:3,7 | 38:22 | concluded | 32:2 60:5,12 | convoluted 6:3 |
| 40:6,10,17 | communication | 113:11 | continuation | copies 26:7,8,9 |
| 49:12 51:1,12 | 16:12 | conclusion | 11:1 | copious 82:24 |
| 51:17 52:8 | communicatio... | 50:11 | continued 11:5 | copy 41:15 75:2 |
| 56:6,13 57:14 | 16:2,6 | concurrently | contract 46:13 | 91:3,5 103:19 |
| 57:15 58:4 | company 1:10 | 29:5 | 51:13,15 102:5 | 103:22 |
| 59:4,10 62:11 | 7:13 8:1,6 19:3 | conditions 69:2 | contracted | corporate 18:23 |
| 62:19 63:9 | 19:19,20 20:13 | conduct 2:23 | 109:19 | 103:7 114:12 |
| 65:6,16 67:21 | 37:15 46:14 | confirm 8:6 | contractor 22:17 | correct 15:20 |
| 68:4 69:14 | 47:5 64:10 | 23:16 | 23:2,2 43:16 | 17:20 30:13,14 |
| 70:19 71:1 | company-wide | confirmation | 43:18 44:3,5 | 30:24 31:1,17 |
| 72:2 73:4 77:9 | 39:16 | 54:9 66:22 | 44:11 45:16,19 | 34:17 38:11 |
| 77:14,15,19,24 | comparing | 71:4 106:15 | 46:2,5,9,15,21 | 42:12,24 46:24 |
| 78:14 79:14 | 92:15 | 111:5,6,11 | 46:23 47:2,11 | 47:23 48:3,8 |
| 80:17 81:3,15 | compensation | confirmed 26:18 | 48:1,3,6,10,16 | 49:4 50:3,19 |
| 81:20 89:3,19 | 79:3 | 106:21 | 48:23 49:6 | 50:23 52:1 |
| 89:24 90:7 | complete 23:15 | confirming | 50:9 51:3,13 | 54:5 55:18 |
| 91:5,18 94:21 | 95:15,18 98:17 | 105:6 111:3 | 51:19 52:10 | 58:15 59:10 |
| 94:24 95:13,21 | 98:19 99:1,12 | 112:10 | 53:1 56:8,13 | 62:10 67:1 |
| 95:24 96:19 | completed 45:3 | confirms 104:23 | 58:16,19 81:22 | 70:3 73:15 |
| 97:23 107:6 | completing | confuse 52:5 | 83:15 84:10,23 | 75:8 78:20 |
| 109:6 111:2,17 | 75:13 81:8 | confused 52:24 | 85:1,2,2 93:2 | 79:4 80:11,19 |
| 112:2 113:7 | 99:22 | 67:12 96:22 | 93:13 94:4,12 | 80:20 82:14 |
| Clodfelter's 22:7 | complex 3:2,4,7 | confusing 52:3 | 94:22 95:1,10 | 86:1,3,5,13 |
| 70:1 73:14 | 3:14 | confusion 53:4,5 | 95:12,15,18,22 | 87:11 88:15 |
| 76:16 80:13 | complexity | consecutively | 96:2,6,8,13,21 | 92:5,9 94:8 |
| 110:21 | 21:16 | 29:6 | 96:24 97:18 | 95:23 96:16,17 |
| coincides 57:11 | complied 30:10 | consent 44:3,10 | 98:1,6,19 | 99:19 100:2 |
| 92:10 | 81:15 | 44:12,13,14,16 | 99:17,21 106:6 | 104:3,7 106:9 |
| collect 4:17 | comply 69:6 | 44:19 58:4 | 106:16,17,18 | 107:4 110:2,3 |
| collection 86:10 | component | consideration | 106:22 107:1,2 | 111:1,15 |
| come 12:22 | 19:23 | 5:12 19:12 | 109:23 110:4 | 115:10 |
| 20:20 21:11,12 | comprehensive | consistent 72:1 | contractors 44:6 | correspondence |
| 21:13 24:5 | 88:13 | construction | 44:7,8,10 | 41:15 |
| 27:9 32:11 | comprise 4:11 | 88:4 106:17,22 | 45:13 99:9 | cost 33:1 45:24 |
| 35:1 86:14 | computer 23:12 | consultant 2:17 | contracts 100:14 | 48:20 99:16 |
| 98:13 111:13 | 24:8 33:9,10 | contact 21:14 | contractual 48:9 | 100:13 110:6 |
| comes 71:19 | 38:13 39:21 | 22:11 44:6 | 48:11 | counsel 115:7,13 |
| coming 7:20 | 40:1 72:12 | 45:11,13 80:21 | control 25:24 | 115:14 |
| 54:13 | 75:21 85:24 | 80:23 81:24 | 46:16 | count 65:24 |
| commercially | 115:9 | 82:16 84:8 | controls 25:3 | counting 75:23 |
| 43:14 | computer-aided | 85:10 109:24 | convenience | country 87:19 |

Drexel v. Harleysville Insurance Co.

120

**County** 115:2
**course** 35:20
 84:15,18
 108:16
**COURT** 1:1
**cover** 75:3,24
 85:6
**coverage** 3:9
 8:18 11:1,1,5,9
 11:12,20 12:3
 12:12 23:6,20
 24:19,20 25:15
 25:20,24 26:3
 26:19 27:3,19
 28:2,4 29:23
 30:11,21 31:24
 32:4,20 33:2
 59:15,23 60:2
 60:12,14,16,17
 60:20 61:19,20
 61:23 62:1,4,4
 62:6,8,15 63:2
 63:6,11,17,19
 67:20 68:3
 80:16,17 81:6
 88:7,10,20
 89:15,16
 108:22 111:12
 112:12
**coverages** 34:3
**covered** 26:23
 36:21
**covering** 73:21
**co-insurance**
 33:2
**created** 12:12
 32:16 35:4,8
**criteria** 103:7,11
 114:13
**CRR** 115:18
**crucial** 18:5
**crystal** 15:11
**CSC** 77:15 78:2
 78:13,17,24
 79:16,17,18,20
 80:2,9,21
**currently** 5:6

**customer** 21:12
**C-1172** 32:24
**C554** 66:22
**C554-3** 66:19

**D**
**D** 114:1
**damage** 4:13
 22:16,22 31:21
 32:3 43:5,7,9
 45:14 50:4,16
 50:21 56:23
 68:3 77:1
 79:17 81:9
 84:16,17,21
 98:20,23 99:2
 99:4,21
**Danny** 73:14,21
**data** 24:18,19
**database** 24:8
 24:11 39:21,23
 64:22 65:7
**databases** 38:14
**date** 2:11,14
 9:11 11:17
 12:8,9 18:13
 24:9 26:19
 27:19 28:4,16
 28:18 29:1,1,2
 29:2,2,3 30:2
 30:12,17 35:3
 35:3 55:7,8
 57:6,8 61:18
 67:3 69:20
 70:2,5,15,20
 71:3,4,8,12
 80:18 90:10
 92:10,10
 108:20
**dated** 26:15
 85:15 108:12
 109:16 112:4,7
 115:22
**dates** 11:11,13
 11:14 23:18
 24:6,20,23
 25:2 34:3

 36:24 66:13
 107:10
**day** 29:4 110:18
**days** 62:20
**deal** 9:13 28:1
 44:2,5 79:3
**dealing** 50:8
 52:16,20
**dec** 34:5,7,9,10
 34:14
**decision** 4:4 15:9
 21:16 100:10
**decisions** 41:24
**Defendant** 1:8
 1:20
**define** 3:4
**degree** 19:7 82:6
 82:21
**Delaware** 1:2,12
 1:12,16,17,20
 1:23 115:1
**denial** 15:2,4
 67:20
**denied** 15:16
 16:21
**denies** 111:11
**deny** 15:9
**department** 9:2
 9:3,4,12,21
 10:4,5,14,15
 12:21 15:7,15
 15:16,19 16:7
 17:11,18,22
 18:16 19:8,16
 19:22 20:3
 21:4 28:8 30:1
 30:6,20 41:3,6
 54:16 55:9,15
 55:21 63:1
 64:3 69:5,9
 71:8,11 111:14
 113:6
**departments**
 20:5,15
**Depending**
 21:15
**deponent** 2:2

 114:2 115:6,7
 115:12
**deposition** 1:10
 6:7,11 14:8
 26:10 53:15
 61:13 74:20
 85:16 102:13
 113:11 114:6,7
 115:12
**depositions** 5:24
**describe** 31:19
 32:20 37:13
 60:12,13 90:17
 93:11 94:2
**described** 22:22
**describes** 32:13
 32:23,24
**describing** 33:2
 60:6
**description**
 93:21
**designate** 24:12
**designation**
 27:22 32:24
**designee** 1:11
**desk** 59:22
**detail** 35:4 40:12
 51:7 76:16
 81:12,18 82:4
 82:5,6,13,21
 84:13 91:4
**detailed** 41:1
**details** 98:12
**determination**
 9:24 88:10
**determine** 71:2
 77:23
**determined** 11:7
 27:11 62:14
 89:15
**determining**
 69:6
**develop** 12:14
**diary** 79:16
**difference** 10:1
 10:4 17:22
**differences**

 110:1,5
**different** 20:14
 24:21 32:6,15
 33:10 35:16
 42:4 71:24
 72:11 88:13
**Diplomate** 1:13
 115:4
**direct** 2:22
 20:22 47:16
 61:16 63:22
 64:1,3,6,17,19
 64:21 65:7,21
 66:14 89:23
 103:7,12
 114:13
**directed** 17:15
 42:3 77:14
**direction** 16:2
 20:12 115:9
**directly** 4:12
 17:11 20:15
 21:11 25:9
 28:1 44:2
 45:15 46:15
 47:6 64:6,10
 64:14 65:6
 69:10 98:2
 99:12
**director** 4:13
**disagreements**
 43:23
**discretion** 41:24
**discuss** 45:12,23
 82:18
**discussed** 13:24
 36:5 37:7,11
 38:11 52:12,14
 88:3
**discussing** 26:1
 29:24 93:22
 112:15
**discussion** 5:22
 58:1
**discussions**
 22:12 88:13
**dispelled** 53:5

Drexel v. Harleysville Insurance Co.

121

**dispute** 3:10
  61:24
**distinct** 31:16
**distinction**
  18:24 68:15,21
**distinctions**
  33:11
**distinctive** 71:21
**DISTRICT** 1:1
  1:2
**division** 20:3
**document** 6:10
  6:14 26:6,20
  35:11 41:10,12
  41:13,20 54:5
  54:8,10,16,19
  54:21 56:2,3
  57:2,9 59:3
  65:11,15 66:11
  67:4,18,19
  71:15,16 73:8
  73:11 74:16,24
  78:18 80:12
  81:17 85:13
  86:2,14 91:22
  92:16 100:17
  100:19,20,23
  101:8,19
  102:16,20
  103:2,6,13,17
  103:18 114:8
  114:10,12
**documentation**
  52:12 96:9
**documents** 6:2,4
  12:19 14:11
  16:11 22:13
  34:16 38:11
  40:20 86:11
  91:1 100:14
  101:1 102:1
  103:4,5 107:5
**doing** 15:17 23:9
  43:12 44:18
  91:15 97:4
**dollars** 3:7
**dot** 92:18,20,21

**DR** 103:14
  109:15
**drawing** 31:13
**Drexel** 1:4 2:10
  46:20 51:12,18
  51:19 52:9
  53:23 67:22
  68:4 79:6
  81:20,22
  104:11,13,17
  107:3
**Drexel's** 30:7
  32:16 44:19
  45:3,7 53:22
  56:9 57:16
  58:4 59:12
  60:24 64:13
  68:21 75:7
  76:13,18 77:20
  77:24 80:14
  81:4 89:4
  95:15 105:17
  105:20 106:3
  111:19
**driven** 82:9,22
  83:1
**drives** 82:5
**duly** 2:3 115:6
**Duncan** 27:8,16
  40:12 73:18,21
  74:4
**duties** 43:1

---

**E**

**E** 114:1,5
**earlier** 97:1
  109:10
**early** 55:19,23
**easier** 79:23
**easily** 53:5
**edition** 75:3
  85:22 114:9,11
**effect** 14:14
  23:17,20 30:11
  50:15 86:2
  92:2,4 93:15
  97:18 99:18

100:18 108:20
  109:20
**effecting** 99:12
**effective** 9:10
  18:13 23:18
  24:6,9,20,23
  25:2 28:16,18
  29:1,2,3 61:1
  61:17 69:19
  70:2,8,20 71:3
  71:8 75:4
  85:23 86:6
  93:22
**either** 18:3
  21:11 22:16
  66:12 79:3
  82:24 90:12
  93:13 99:17
  100:3 115:14
**elaborate** 97:15
**electrical** 98:23
  99:1,4
**electrician** 99:3
  99:5
**electronic** 39:10
  85:21
**electronically**
  27:13 39:16,20
**element** 10:16
  10:20,22 18:5
  32:4
**elements** 35:12
  36:12 37:6,10
  37:15 38:6
**else's** 4:5 72:14
  113:1
**employ** 44:7,9
  44:11
**employee** 3:21
  4:20 30:6
  40:22 41:9,18
  42:1 50:5,7
  53:9 75:10
  76:21 88:2
**employees** 13:2
  13:4,7 14:21
  15:19 40:4,5

52:8 72:17,24
  73:2 75:15
  78:14 85:23
  87:4,7,8,10,15
  88:16
**Enclosures**
  106:15
**encourage**
  104:17
**encouraged**
  104:14 105:7
**encourages**
  19:17
**encouraging**
  104:10 106:6
**ended** 29:16,21
**ends** 68:16
**engage** 93:12
  94:3,11,22
  95:1,14,17,22
  96:2,8,13,20
  96:23 97:18,24
  99:20
**engaged** 95:11
  96:6
**engagement**
  98:6
**ensure** 83:24
**entail** 81:9 85:6
**enter** 34:24
  36:10,20
**entered** 34:23
**entire** 30:1
**entities** 42:6
**entries** 78:24
**entry** 32:7 63:4
  78:24
**especially** 81:6
**ESQ** 1:15,18
**essence** 86:10
  87:9 92:23
  101:13 111:9
**essentially** 22:1
  29:4 33:16
  40:24 56:12,21
  63:18 76:23
  81:5 85:9 88:9

104:21 111:10
**establish** 10:10
  19:14 34:3
  40:2 43:4
  60:15 71:12
  76:24 84:16,21
  85:10 98:19
  99:3,10 100:12
**established**
  18:21 32:22
  56:23 95:20
  97:1,22
**establishes**
  75:13
**establishing**
  22:15 43:6,9
  48:20 81:8,9
  103:12
**estimate** 16:19
  43:13,15 58:3
  95:10 98:18,19
  99:1,21 103:23
  106:16
**estimates** 109:23
**estimating** 39:14
**event** 38:23
  55:16 61:24
  87:22 115:15
**events** 54:19
  87:18
**eventually** 21:20
  22:3
**everybody** 72:14
**exactly** 6:16 9:7
  11:23 12:17
  15:13 25:20
  41:2 46:3
  60:23 71:18
  76:19 82:22
  91:4
**examination** 2:5
  114:3,3,4
  115:11
**examined** 2:3
  115:6
**example** 98:21
**exceed** 16:24

Drexel v. Harleysville Insurance Co.

23:4
**Excel** 38:18
**exchange** 11:2
**excluded** 60:19
**excluding** 60:21
**exercise** 46:12
47:9 98:5
**exercising** 98:4
**Exhibit** 6:7 70:6
74:1,5,20
77:17 85:16
101:23 102:13
102:17 109:12
**exhibits** 6:1
18:18 114:6
**exist** 62:1 89:16
**existed** 53:4
**existence** 19:14
**exists** 85:21
**expect** 52:11,14
81:10 82:23,23
91:14
**expected** 84:9
**expense** 36:4
94:5,6 105:8,9
105:11
**experience**
52:18,20 82:10
83:2 94:19
98:17 101:10
101:14
**experienced**
40:10
**expertise** 8:16
98:17
**experts** 104:24
**expiration** 15:7
**Expires** 115:20
**explain** 3:12
10:1,21 11:14
12:15 20:8,9
21:8 22:7
23:19 28:17,23
31:9 34:21
36:17 39:6
44:14 47:10
49:22 51:1,8

51:12,18 55:21
62:19 64:1
66:11 75:9
77:22 78:12
80:12 81:2,5
81:20 82:13
83:14,24 86:22
90:6 92:18,23
98:12 100:5,8
**explained** 40:19
51:23 52:9
81:12 82:4
83:20 84:12
100:3
**explaining**
108:22
**extend** 11:20
**extending** 68:2
**extension** 11:1
**extensive** 98:22
**extent** 13:24
51:7 101:7
**e-mail** 59:4,8,9,9
60:22,24 61:9
61:21 62:12,12
62:16,17,21
63:8,21 70:7
91:3,6 111:2,5
111:22,23
112:4,7,9,16
113:4
**e-mailed** 90:11
91:2
**e-mailings** 87:18

**F**
**factors** 3:8
**failure** 54:23,24
**fair** 44:4
**fall** 3:1
**falsification**
11:11
**falsified** 11:15
**familiar** 19:19
21:3 38:6,8
42:4 65:4
68:20

**far** 8:15 18:24
24:19,19 35:1
37:5 41:4
78:23 82:8
86:3 89:1
90:21 92:5
94:16
**fashion** 78:3
**feature** 31:22,22
35:20
**features** 31:12
36:16 37:17,18
38:2 65:3
71:17
**Federal** 1:10
**feel** 18:19,20
**fees** 4:18
**Fetzer** 1:13,22
115:4,18
**fifteen** 74:10
102:9
**file** 41:14 63:18
91:9
**fill** 18:4
**final** 15:8 47:1
56:4,5,7 104:9
106:13
**financial** 31:16
**find** 47:15
**fine** 93:19
**fire** 22:14 68:3
104:14
**first** 2:2 16:15
22:9 23:20
26:13,15 27:20
28:1,8 29:4
30:5,12 32:7
35:6 49:3 59:8
59:9,14 63:7
70:6 74:8
76:24 77:3
78:6 86:8
89:13 101:9
103:16 104:9
106:14
**Floor** 1:12,16
**focus** 6:4

**follow** 40:8
75:16,19
**following** 15:21
15:22
**follows** 2:4
76:15
**font** 65:13 71:22
**foregoing**
115:10
**Forget** 101:24
**form** 107:19,20
**formal** 20:6
108:22
**format** 34:9 54:3
85:21
**formed** 48:9
**forms** 34:6
39:15
**frames** 75:13
**Frank** 4:12
**fraud** 10:10,16
10:20,22 13:10
**fraudulent** 11:9
**free** 18:19
**frequently** 42:19
**front** 32:18
98:10
**fully** 63:15
**function** 3:19
18:16 23:14
25:19 30:24
36:18 51:6
63:16 69:13
71:24 72:21
88:24 107:24
**functional** 20:18
**functions** 3:17
3:18 19:19
25:14 36:23
71:22 87:3
**Furlow** 1:11,16
**further** 58:1
110:8 115:10
115:12,14

**G**
**G** 106:22

**general** 5:7,12
5:14 18:24
22:8 41:19
47:1 49:11
52:4 80:13
81:6 87:14
100:22 101:22
**generally** 33:19
90:5
**generate** 72:21
73:8
**generated** 54:10
54:16 65:12
71:16 73:10
91:13 109:8
**generic** 60:5
**George** 42:14,15
49:22,23 96:1
96:20 104:2,5
**getting** 82:20
**give** 5:1 10:8
17:21 18:22
19:5 35:2,6
69:3 87:14
**given** 43:2 56:13
115:7,10
**go** 7:7 8:4 18:7
23:9 27:12
37:21,22,23
43:12 70:9,12
70:16,24 71:6
71:24 72:11,13
73:1 77:21
78:12 82:19
92:1
**goes** 20:13 78:23
105:3
**going** 6:1,24
18:18 26:4
51:14 53:13,14
54:7 56:1
58:22 60:23
65:9 67:17
71:14 74:15,23
79:20 80:4
81:9 82:19
83:5 84:22

Drexel v. Harleysville Insurance Co.

123

85:1,2,12 98:9
103:13 104:23
104:24 110:16
110:21 112:6
**good** 2:7,8 13:21
53:19
**gotten** 67:12
**Gregg** 1:11 2:1
2:13 114:2
115:6
**group** 15:7
20:14 86:24
**groups** 25:22
**guess** 7:13 56:16
59:18 63:14,14
**guide** 75:11,12
**guideline** 75:16
**guidelines** 77:6
78:21
**guides** 39:14

**H**

**H** 6:7 74:20
85:16 102:13
114:5,6
**hand** 26:4 54:7
65:9 67:17
71:14 74:23
**handed** 69:17
**handing** 6:2
**handle** 21:23
25:16
**handled** 8:21 9:1
23:14 94:18
**handler** 27:11
40:16,19 53:8
83:23 84:7
94:10 99:20
**handlers** 30:15
50:24 91:17
**handler's** 83:13
**handles** 9:3 19:9
20:12 29:8
**handling** 2:21
16:10 21:5
23:16 42:1
75:2 76:5

77:12,13 78:3
78:3,17,24
79:21 80:10
85:4 91:12
93:3 94:13
98:14 99:6,7
102:22 114:9
114:11
**handwriting**
74:7
**happen** 87:19
**happened** 86:7
68:12 87:22
**hard** 96:14
**Harleysville** 1:7
1:10 2:16 3:14
3:15 4:14,21
5:2,5 6:19 9:11
11:4 12:1,9
13:2,8,11,13
13:14 14:20
15:7 19:18
20:20 21:5,14
23:5 24:24
25:23 26:13,18
30:15,24 40:18
42:6,10,19,22
44:2,19 46:11
47:21 48:5,22
49:2,23 50:6,8
50:18,21 51:4
51:20 52:8,10
53:1,7 54:10
54:15,22 57:2
62:9 69:5 71:8
81:21 85:20
88:16 94:7,19
96:8,15 101:2
101:13,16,17
102:5 103:9
104:7 105:16
105:19 106:2
114:8,10
**Harleysville's**
2:10 4:4 9:15
14:3,7 15:2
18:11,23 30:6

38:10 47:10,17
49:3 50:15,24
51:15 54:1
70:14 88:24
96:4 100:15
106:5
**HA090291** 78:22
**HA090298** 78:19
**HA090312** 79:19
**heading** 66:17
80:16,21
102:18
**heard** 90:10
**held** 5:2
**help** 66:5 79:24
107:13
**he'll** 105:7
**hierarchy** 18:23
**high-level**
110:11
**hire** 45:18 46:5,8
46:20 47:2
48:23 50:1
52:22 85:1,2
88:20 93:2
98:18 99:2,5,8
99:17
**hired** 42:10,22
43:3 46:15
47:18,19,21
50:2 51:6 97:2
99:12 104:8
**hires** 46:23
**hiring** 47:11,17
51:19 52:9
53:2 84:20
**history** 5:1 16:1
16:3 35:18,19
35:22 36:7,7
36:12,12,15,21
38:5,5,5
**hit** 34:24 36:18
71:24 98:22
**home** 2:17 3:8
3:13,14,15,21
17:15,19,23
20:24 40:4

63:4
**homeowner**
21:24
**hope** 67:12
**human** 72:13
**hundred** 3:6
**H-1** 26:5,17 28:7
32:7 57:5
81:14 90:3,15
107:9 110:24
**H-10** 56:2,12
106:12
**H-13** 58:23 70:6
**H-14** 65:10
**H-15** 112:7
**H-16** 67:18
**H-19** 71:15 72:3
72:18 73:5
74:1,5
**H-23** 6:5,22
13:22
**H-24** 74:16,24
79:22
**H-25** 85:13,19
98:9
**H-26** 102:12,17
**H-5** 53:14,21
**H-7** 54:7 55:5,17
66:21,24
**H-8** 103:14

**I**

**idea** 7:22 66:10
**identification**
6:8 74:21
85:17 102:14
**identify** 6:10
26:5 54:8 56:2
59:3 65:11
67:18 71:15
74:7,24 85:19
91:22 102:16
112:7
**ignore** 6:4
**III** 1:15
**image** 34:10,14
**imagine** 20:16

**imaging** 34:13
35:12 36:6,8
38:10
**impact** 54:24
68:14 102:21
**impacted** 87:20
**inception** 29:1,2
**include** 22:15
**included** 60:18
65:20 100:21
103:24
**including** 8:24
9:17 14:4 16:1
22:12 32:10
**incur** 94:4
**indemnity** 36:4
**independent**
22:17,19,21
23:4 42:10,23
43:8 47:21,24
49:5,24 51:3
84:20 88:23
91:23 93:1
94:2,11,22
95:22 96:1
97:24 98:16,23
99:8 100:4,6
104:6,8 106:6
**independently**
17:19
**index** 78:8 86:12
92:7,11
**indicate** 56:7
67:3
**indicated** 61:23
63:17
**indicates** 70:2
**indicating** 66:7
76:8 79:23
**indication** 64:20
90:22
**individual** 26:21
76:20 82:8
**induce** 11:12
**inducement**
11:10
**inform** 53:9 68:4

Drexel v. Harleysville Insurance Co.

124

**information**
15:22 23:11
25:3,8,10,15
25:24 26:12
30:16,21 34:1
34:8,24 35:2
35:15,17 36:21
37:3,17 44:24
62:14 69:15,21
70:11 72:3,15
72:17 73:5,10
73:18 74:1,5
82:17 88:18
89:15 91:13
102:21
**initial** 21:8
27:23 30:18
73:17 76:21
80:22 81:23
84:8
**initially** 26:18
76:19 81:16
**initiate** 83:9
**inquire** 24:21
**inquiries** 92:3
**inside** 86:7
**instance** 10:18
32:23 40:3,11
72:13 84:15,19
87:17 107:9
**instances** 88:11
**instigate** 105:1
**instigator** 10:12
**instructed** 75:18
**instruction** 41:1
109:5 113:6
**instructions**
15:18 40:8,11
75:10
**insurance** 1:7,10
9:12,13,17,22
19:3,17,19,20
42:17 47:5
50:5 81:21
95:1,14 96:1,7
96:20 97:24
100:16 101:3

102:6 104:2,5
104:10 105:15
106:7,13
109:19
**insured** 2:10
8:19 11:24
20:21 21:15
22:11,13 29:18
40:14 41:5,7
41:10 43:19,24
45:12,12 46:10
46:17 47:1,12
47:18,19 48:4
48:7,10,12,15
48:22 49:1,5
50:9 51:2,3,8
51:24 52:16,19
52:23 53:1,9
54:23 57:24
58:2 64:7,8,9
80:23 81:7,10
81:18 82:6,9
82:13,15,16,18
82:22 83:1,9
83:14,18,20
84:1,9,10,17
97:21 98:4,8
98:14 99:17
100:4,7,8
107:3,16,21
108:22 109:18
112:14
**insureds** 8:24
12:23 52:17,21
82:22 85:7
**insured's** 44:3
44:10,12,13,14
44:16 46:16
47:17 52:3,5
83:15 98:3
99:13 100:9
106:16,17,21
107:1 109:23
110:4
**insurer** 48:12,19
100:11
**insurers** 86:24

**intends** 49:1
**intention** 112:11
**interact** 48:1
**interest** 3:9 83:5
104:21
**interested** 5:5
115:15
**intermediary**
64:12
**interrupt** 31:15
**interrupted**
68:19
**interruption**
60:13,16,17,20
**interviewing** 5:4
5:8
**intricacy** 100:3
**investigating**
22:12 62:3
**investigation**
10:9 11:6 19:9
22:15 24:3
43:3 61:23
63:17 81:8
109:18
**invoice** 64:6,8,9
**involved** 10:5,6
10:17 15:4
16:20 18:6
42:5 48:15,18
48:19
**involvement** 3:9
12:21 47:17
**issuance** 11:17
**issue** 9:18 11:21
13:3 15:3 16:1
17:11,15,18
18:2,8,14 28:9
30:7 89:20
**issued** 11:5,8
12:1,9 34:2
54:21 55:3,7
55:19 58:8
62:20 105:6,11
105:12
**issues** 88:8,10,13
88:19 105:1

**items** 36:19

——— **J** ———
**January** 115:20
**job** 5:9,14 13:7
37:24 83:6
**jobs** 5:4
**John** 27:8,16
73:18
**July** 55:19,23
109:17
**jumping** 97:3
**June** 4:24 5:3
27:7 28:3
29:23 33:9
35:14 38:14
61:1 69:20
70:3 107:15
**jurisdictions**
88:14
**justifications**
9:16,22

——— **K** ———
**K** 1:15 76:20
**Katzenstein**
1:11,16
**keep** 18:18
41:15 63:18
73:13 80:3
96:23 97:3
**keeps** 91:16
**keys** 71:24
**King** 1:19,23
**know** 7:24 9:3,5
12:17,19 16:11
16:15 18:16
19:21 20:23
21:1 22:2,5
24:1,15 25:2,3
25:8,13,17,20
29:6 37:2,5,20
39:13 40:15
42:13 45:6,8
47:18 53:17,18
53:19,20 54:12
54:15,17 58:24

59:6 60:7
63:12 64:13
65:2,6,8,18,22
66:9,18,19
67:5 69:14,19
69:21 70:5
72:15,19,22,22
73:12,16,20,23
73:24 74:3,4,6
77:1 81:10
82:22,23 84:3
86:17 89:1
90:2 91:10,16
91:19 94:16
95:7,9 96:3,14
96:18 97:19
100:9,17,20
107:5,14 108:2
108:5 110:19
**knowing** 89:22
**knowledge** 13:4
13:6,9 16:9
17:2 20:15,22
25:1,22 45:5
47:7,16 49:19
54:18 55:9
62:22 64:16
66:14 68:7
73:3 79:7
89:23 92:12
101:18 102:20
**knowledgeable**
52:18
**known** 101:7
**knows** 101:11
**Kurt** 1:13 115:4
115:18

——— **L** ———
**lady** 54:12
**laid** 33:19
**language** 103:24
111:6
**lapse** 29:6
**large** 2:21 3:2,4
3:6 18:8 19:8
19:18,23 72:10

Drexel v. Harleysville Insurance Co.

125

| | | | | |
|---|---|---|---|---|
| 77:1 | **locate** 79:22 | 60:21 | 79:17 | **mind** 69:24 85:3 |
| **late** 8:24 | **located** 72:22 | **lot** 7:11 25:7 | **materials** 40:21 | **mine** 74:9 |
| **law** 1:11 | **location** 3:16 | 87:21 | 87:1 101:1,20 | **minor** 21:24 |
| **lawsuit** 3:23 | 60:13 | _____ | 102:1 | **minus** 4:24 |
| **Layne** 1:4 2:9 | **locations** 36:21 | **M** | **matter** 2:10 8:20 | **minutes** 31:7 |
| 53:23 | 71:24 | **machine** 34:9 | 14:8 23:22 | 34:20 74:10 |
| **layout** 65:13 | **locked** 23:23 | **mail** 41:22,22 | 44:17 47:1 | 102:10 |
| **lead** 84:24 | 26:22 | 55:8 58:1 | 52:4 | **minutiae** 83:5 |
| **led** 54:18,21 | **log** 26:11,15 | **mailed** 41:4,7,10 | **mean** 3:12 4:1 | **misapplied** |
| **left** 41:24 57:24 | 27:24 35:20 | 41:13 112:13 | 10:14 12:4 | 13:14 |
| 74:10 | 55:13 107:15 | **mailing** 36:22 | 31:15 35:24 | **misapply** 13:11 |
| **legal** 50:11 | 108:10,11 | **main** 107:24 | 37:15,20 60:3 | **mishandled** 11:4 |
| 88:17,18,19 | **logical** 25:19 | **maintained** | 66:12,13,17,18 | 12:2,4,11 |
| 108:5,8 | **long** 4:20 | 39:16 40:4 | 75:4 77:12 | **misreading** |
| **legitimate** 19:9 | **look** 8:3 34:2,15 | **maintaining** | 79:10 82:15 | 104:12 |
| **less-experienced** | 57:5,23 59:8 | 25:9,20 | 88:14 89:11 | **misrepresenta...** |
| 52:19 | 63:7 70:21 | **majority** 75:19 | 94:9,16 95:11 | 10:11 |
| **letter** 68:1,6 | 71:4 72:14 | **making** 22:11 | 103:8 | **missing** 90:18,21 |
| 69:15 70:1 | 76:1 77:22 | 63:13 88:10 | **meaning** 29:15 | **mistaken** 67:9 |
| 103:15 104:2 | 78:2,5,7 80:21 | **management** | 61:21 | **Mm-hmm** 81:1 |
| 106:8,14 | 86:7 91:1 | 2:22 20:3 | **means** 28:17,23 | **modifying** 91:12 |
| 107:16,17,19 | 92:17 98:11 | **manager** 4:14 | 28:24 29:16 | **module** 88:4 |
| 107:20 108:22 | 106:12,13 | 67:10 110:11 | 59:17,18,20 | **modules** 88:1 |
| 109:6,8,15 | 107:9 108:10 | **manual** 14:13 | 64:3 66:9,15 | **moment** 106:12 |
| **letting** 100:8 | 109:12,15 | 18:2,4,7 40:3 | 92:24 93:1 | **monitoring** 87:2 |
| **let's** 13:20 27:22 | **looked** 34:14 | 40:23 74:19 | **meant** 59:17 | **month** 104:15 |
| 33:23 76:7 | 70:19,22,23 | 75:2,6 76:4 | **meet** 14:20 | **morning** 2:7,8 |
| **level** 101:11 | **looking** 16:19 | 80:9 85:14,20 | **meetings** 14:17 | 6:15,16 |
| **library** 88:7 | 26:17 27:18 | 100:21 101:22 | **member** 4:10 | **move** 13:20 58:5 |
| **light** 62:21 | 28:7 32:7 57:8 | 101:24 114:9 | 77:15 | 58:6 |
| **limit** 31:19,20 | 65:13 69:23 | 114:11 | **membership** | **Multipage** 114:8 |
| 32:1 | 77:17 111:10 | **manuals** 39:8,10 | 86:24 | 114:10 |
| **limited** 72:15 | 111:16 | 39:12,20 | **memory** 16:9 | _____ |
| **limiting** 60:21 | **looks** 54:9 79:5 | **Marc** 53:19 | **mention** 27:2 | **N** |
| **limits** 31:19 | **looser** 75:16 | **marked** 6:1,2,5 | 33:3 36:15 | **N** 114:1 |
| 34:19 | **loss** 2:21 3:2,3,5 | 6:7 26:5 53:13 | 90:14 109:3 | **name** 2:9,11,13 |
| **line** 53:23 | 3:6,7 14:14 | 56:1 58:22 | **mentioned** 7:17 | 42:15 |
| **lines** 28:1 | 23:17 24:10 | 65:9 67:17 | 31:7 36:16 | **names** 31:12 |
| **list** 7:2 8:3 86:10 | 26:19 27:20 | 71:14 74:16,20 | 90:2 | **nature** 51:2 53:9 |
| 87:19 | 28:5 30:3,12 | 74:23 85:13,16 | **mentioning** | 83:14 |
| **listed** 6:23 8:12 | 30:17 35:3 | 102:12,13,16 | 64:17 | **necessarily** |
| 55:7 60:4 | 43:14 61:18 | 103:14 112:6 | **mentions** 91:2 | 39:23 83:4 |
| 66:17 78:13 | 76:8,19 77:1 | 114:6 | **methods** 14:5 | 95:11 |
| **litigation** 4:14 | 80:18 86:23 | **marketing** 3:17 | 41:19,19 | **necessary** 18:5 |
| 17:3,4 | 92:2 108:20 | 19:16 | **Microsoft** 38:17 | 18:20 41:23 |
| **little** 65:23 | **losses** 18:8 23:3 | **mass** 87:18 | 38:19 | 43:4,20 96:10 |
| **LLP** 1:11 | **lost** 12:10 60:18 | **material** 4:13 | **middle** 65:23 | **need** 26:8,10 |

Drexel v. Harleysville Insurance Co.

32:10 40:13,13
40:14,14 58:24
71:7 72:15
84:16
**needed** 27:12
40:8 41:2
63:14 71:2
**needs** 82:19
99:10,16
100:12
**negotiate** 45:13
45:15
**never** 46:13,15
65:2,5 72:20
72:20 102:18
**new** 38:23 40:19
40:21 115:2
**non-pay** 65:24
**non-payment**
61:1,18 68:5
68:10 112:11
**non-renewal**
15:5
**normal** 38:16
84:15,19
**North** 1:19
**Notary** 1:13
115:5
**notation** 67:2
107:11
**notations** 14:4
66:12,16,18
107:10
**note** 26:15,23
27:1,5,6,21
28:14,23,24
32:23 35:20
41:14 55:13
56:15,19 58:1
60:11 90:4,5
107:15 108:11
108:24 110:22
111:1,16,21
112:2
**noted** 64:17
100:1
**notes** 14:4,8

26:11 27:18,24
28:7 29:23
35:11 36:6,11
38:4 47:15
73:17 81:15
90:6,18 95:8
101:20 102:2
108:10 111:17
112:15 113:7
115:8
**notice** 6:11 8:19
17:1 33:7
55:15,22 69:3
112:13
**noticed** 61:16
**notices** 14:5
18:12
**notification**
55:14
**notified** 55:10
55:11,12
**notify** 98:4
**number** 3:8 6:22
6:23,24 8:17
8:22 9:15
14:24 17:6
18:9,11 23:23
24:4,6,6 32:9
34:23 35:3
36:20 41:16
53:24 54:1,4
78:18,23 88:5
89:21
**numbered** 75:20
**numbering** 6:3
**numbers** 6:4
32:8
**nuts** 40:15,19

_____
**O**
_____
**oath** 2:3
**object** 50:10
61:11 93:18
96:23 104:19
112:19,24
**objection** 92:3
97:13 99:24

100:1
**obligation** 83:24
84:4,7
**obvious** 69:16
**obviously** 49:1
**occur** 43:23 49:8
**occurred** 23:17
82:17 104:15
**occurrence**
51:22,23 52:23
**occurring** 55:16
**occurs** 20:21,23
20:24
**offered** 5:9
10:24 11:9
93:21
**office** 2:17 3:9
3:13,14,15,21
5:10 6:19
17:15,19,24
21:1 38:17,17
38:19 40:4
63:4 109:24
**offices** 1:11
**official** 22:13
70:15 71:8
96:4 108:19
111:8,18 112:3
112:16 113:5
**okay** 7:4 8:13,14
10:9 28:21
33:18,22,24
35:11 54:6
55:6 59:2,19
64:5 66:8
76:10,11 78:9
78:16 81:11
108:10 110:23
113:10
**once** 7:8 30:20
62:6
**online** 88:1
**open** 24:1 31:20
31:21 32:2
61:22 62:2,3
**opened** 23:13,24
32:5 63:19

**operation** 20:18
20:18
**opinion** 11:10,16
11:17 44:6
52:2 73:7
88:19 108:8,9
110:5
**opinions** 108:6
**opportunity**
83:10
**opposed** 41:22
52:10 64:7,11
98:14 99:21
**option** 46:12
47:6,9 98:4,5
**optional** 91:10
**options** 37:19
**orders** 15:21
**ordinarily** 17:1
23:1 48:3,19
100:2,5
**organization**
19:8 20:3
72:10 110:12
**organize** 2:22
**organized** 9:8
18:19 19:3,6
25:14,21 88:9
**original** 26:21
27:11
**originate** 25:8
98:7
**outside** 9:2
15:19
**outstanding**
63:20
**overall** 3:22
**oversee** 2:20,21
20:14
**oversees** 20:4
**oversight** 20:17

_____
**P**
_____
**P** 1:18
**page** 6:23 35:6
56:20,20 59:8
63:7,21 65:23

66:12,17 74:8
75:3,23,24
76:2,12,15,15
77:21,21 78:5
78:8 80:9 86:8
86:19 91:21,22
92:8,17,17,19
98:9,12 104:10
106:14 114:2
114:14
**pages** 75:20
77:18 80:1,3
**paid** 15:9
**paper** 39:6,12
**paragraph** 81:2
81:16,19 82:11
83:13 86:21
92:19,24 93:5
93:21 98:11,15
104:9,12
109:22
**paraphrased**
61:10
**paraphrasing**
63:9
**Parker** 1:11 2:1
2:7,13 114:2
115:6
**part** 3:19 32:1
33:24 72:6,9
79:21 103:14
**participate**
14:17
**particular** 4:6
89:7,11 92:13
**parties** 16:2,6,13
48:15 115:7
**parts** 31:17 72:9
**party** 78:6
115:14
**pass** 66:20
**Pause** 57:4
107:8
**pay** 12:10 30:23
49:2 54:23,24
57:20,21,22
58:14 105:20

Drexel v. Harleysville Insurance Co.

127

| | | | | |
|---|---|---|---|---|
| 106:3 | pertained 60:8 | 19:15 23:11,17 | practical 23:22 | 110:1 |
| paying 94:6 | pertains 53:21 | 24:5,5,7,9,21 | 44:17 | pricing 99:11 |
| payment 11:2,3 | 59:12 | 28:15,18,24 | practically | 103:23 |
| 13:3,5 19:9 | phone 83:3 | 29:3,5,10,10 | 23:19 | primarily 21:22 |
| 25:17 28:9,10 | phrase 3:13 | 29:11,13,18,19 | practice 47:24 | 42:1 |
| 29:9,9,19 30:8 | 61:20 63:22 | 30:2,17 31:18 | practices 74:18 | primitive 71:22 |
| 35:19,22 36:7 | 65:24 66:9 | 34:2,4,18 35:2 | 75:1 76:3 | print 32:21 |
| 36:12,24 37:3 | 84:5 | 36:15,20,20 | 77:13 80:9 | 39:17 85:21 |
| 38:5 56:21,22 | picked 104:1 | 37:17 38:5 | 114:9 | 86:15 |
| 58:20,21 64:10 | place 23:7 26:19 | 39:15 53:24 | precisely 16:17 | printed 39:11 |
| 112:12 | 27:19 28:4 | 54:1,4 55:2,22 | 16:18 | 75:2 |
| payments 8:24 | 30:2,17,22 | 60:4,18,24 | preclude 5:11 | printer 115:9 |
| 9:1 12:22 13:8 | 70:6,16 75:7 | 61:17 64:9,13 | prefer 7:8 85:7 | printout 65:21 |
| 13:12 17:8,10 | 80:18 82:11 | 64:19 68:5,10 | premium 8:23 | prior 5:24 6:15 |
| 17:12 20:20 | places 37:21,22 | 68:12,16,18,19 | 8:24 11:2 | 6:16 28:15,18 |
| 35:9,24 36:1,2 | 70:9 72:11 | 68:21 69:2,4,6 | 12:10,22 13:3 | 49:5,8,13 58:2 |
| 36:3,3,4,4 62:7 | 73:1 | 69:7,10 70:8 | 13:8 19:13 | 87:22 |
| pen 18:4 | plaintiff 1:5,17 | 75:6 87:20 | 20:20 28:10 | proactively |
| pending 24:2 | 4:16 16:3,6,13 | 108:20 111:3,9 | 30:8 35:24 | 87:23 |
| Pennsylvania | plan 63:14 84:19 | 111:20 112:10 | 36:24 37:4 | probably 4:6 |
| 3:15 | plans 83:11 | 112:17 | 54:23 55:1 | 19:22 23:12 |
| people 39:16 | pleadings 12:18 | position 2:15,19 | 61:1,18 64:9 | 34:11 39:15 |
| 42:5,6,8 | please 6:6,24 7:5 | 5:6,7,10,12 | 68:5,11 | 43:15 70:9 |
| percent 33:1 | 37:13 53:12 | 7:16 96:4 | preparation | 74:10 78:4 |
| perfectly 27:24 | 64:5 86:19 | 108:19 110:17 | 14:8,18 | problem 28:13 |
| performance | 90:3 91:21 | 110:19 111:9 | prepare 43:13 | 62:15 |
| 72:14 | 97:8 102:12 | 111:18 112:4 | prepared 7:3 | procedure 1:10 |
| perils 29:20 | PLRB 86:21,22 | 112:17,21 | 14:6 18:2 | 24:1 39:10 |
| period 11:3,8,19 | 86:23 87:17 | 113:1,5 | 108:24 | 41:4,6 75:18 |
| 15:14 29:5,12 | 88:16,24 89:4 | positions 5:2 | preparing 14:12 | 85:4 93:11 |
| 29:18,20,21 | 90:1,7,9,11,16 | possible 65:4 | present 4:15 | 94:1 |
| 30:2 68:19 | 90:24 91:6,13 | Powell 42:15,16 | 35:16 47:8 | procedures 7:19 |
| periods 24:22 | 91:16 108:2,2 | 42:20,22 43:1 | 110:18 | 8:15,18,22 |
| 28:24 | PLRB's 91:19 | 45:9 46:4 | presentation | 9:10,16 13:7 |
| permissions | plus 4:24 | 49:22,23 50:2 | 10:11 | 14:3 33:16 |
| 72:10,24 73:1 | point 21:15 49:8 | 50:5,20 56:8 | president 20:11 | 39:8 75:13 |
| 73:13 | 52:11 53:4 | 58:18 94:24 | 20:12 67:10,13 | 79:16 91:19 |
| person 7:20 22:5 | 58:11,13 66:5 | 95:14 96:1,7 | pretty 71:21 | process 10:13 |
| 82:5 85:5 | 84:15 90:18 | 96:12,20 | 82:21 88:12 | 13:8 16:10 |
| personal 27:3 | policies 8:17,22 | 100:15 101:7,9 | previous 29:11 | 30:22 41:3 |
| 60:1,6 | 9:10,15,17,23 | 102:6 104:3,5 | 100:19,22 | 47:20 51:17 |
| personally 86:15 | 13:6 14:3 | 104:16 109:16 | previously 26:4 | 81:6,11 82:3 |
| personnel 94:6 | 17:12 39:8,20 | 110:5 | price 43:22 | 82:13,18 83:12 |
| perspective | 88:5 | Powell's 56:4,12 | 45:14 48:2 | 84:2,12 |
| 10:17 30:20 | policy 9:20 | 95:10 101:14 | 49:6,14 56:9 | processed 13:12 |
| 31:10 52:3,5 | 12:10 15:3,5,6 | 101:16 102:3 | 57:18 97:3,3,6 | 22:9 23:6 |
| 75:10 | 15:14 18:11,14 | power 97:23 | 105:4 106:21 | 26:14 30:12 |

Drexel v. Harleysville Insurance Co.

128

31:3 38:15
81:16
**processes** 20:20
**processing** 8:23
9:7 12:22
15:12 21:6,13
21:18 30:18
33:8 36:24
38:18 40:6,9
40:20 50:16
64:11 65:16
72:3 76:17
80:14 81:3
**produced** 86:15
**program** 2:22
23:2 39:21
40:1
**programs** 38:13
**promise** 67:16
**prompts** 71:23
**property** 2:17
4:13 5:13 9:12
9:13 14:13
22:16 27:4
40:3,23 43:20
44:18,20 45:4
45:7,22 46:22
46:24 47:3,6
48:14 49:14
50:16,21 51:14
56:10 57:16
58:5,7 60:1,6
73:19 76:5
77:11 78:3,6,6
78:17,24 79:17
79:21 80:10
83:16 85:14,20
86:23 91:23
95:16 98:1,3,7
99:13 100:9,10
100:11,21
101:22,24
104:11 105:17
105:20 106:3
114:11
**propose** 84:18
**prove** 41:7

**provide** 6:19
11:12 25:15
87:1 88:16,19
**provided** 15:22
29:18 40:21
45:1 108:19
**proving** 41:4
**provision** 68:24
**provisions** 34:2
68:20 69:7
**prudent** 41:21
49:10
**Public** 1:13
115:5
**pull** 34:5,7,8
**purchase** 60:20
**purpose** 61:12
62:2 67:24
98:6
**purposes** 61:15
**pursuant** 1:10
**put** 27:23 34:8,9
41:14 63:2,5
63:10 91:8
**p.m** 113:11

— **Q** —
**question** 8:11
13:19,20,21
52:15,22 53:6
70:23 73:9
83:17,22 84:6
84:14,19 90:9
90:14,16,17,22
90:23,24 91:4
91:10,11 93:8
97:8,11,13
99:23 103:16
104:19 105:24
**questions** 51:9
52:19 82:9,24
83:1,10 85:1,8
85:10 88:8
89:10,17,19,24
91:17,20 105:5
115:7
**quote** 60:24

69:19

— **R** —
**raised** 84:14
**rare** 47:4
**RDR** 115:18
**reach** 48:1 58:16
84:22 99:15
110:1
**reached** 56:8
58:18 89:3
106:18
**reaching** 49:6
90:7
**react** 87:23
**read** 7:8 60:23
74:9 97:7,10
102:18,23
104:16 107:16
109:24 112:2
**reading** 14:5
115:12
**really** 7:13 9:5
10:19 12:13
15:12 24:11
32:21 41:23
63:15 69:9
73:23 85:6
**reason** 52:7
57:10 73:8,11
**reasonable** 53:3
**reasons** 87:17
**recall** 6:14,16
11:23 37:3
38:3 46:7
**receipt** 22:10
**receive** 29:10
55:15,22 57:10
**received** 13:3
23:12,21 33:6
57:2,9 59:15
59:22 73:17
103:22 105:21
111:21 112:3
112:12
**receives** 23:15
**receiving** 25:17

57:3 62:12
**recess** 74:14
**recollection**
16:21
**recommend**
105:5,10
**reconstructive**
44:21 45:3
**record** 2:12 5:21
5:22,23 79:12
80:8 90:20
**recorded** 16:8
78:21 79:4
80:4
**recording** 14:5
**records** 11:11,13
11:15 91:16
**refer** 18:19 90:3
101:1 110:16
110:21
**reference** 75:11
75:12
**referenced**
113:6
**references** 86:21
**referred** 109:9
**referring** 27:6,6
31:16 39:8
63:21 66:21,24
78:19 81:19
89:12 107:1,2
**refers** 53:23
63:22
**reflect** 99:2
**reflected** 55:17
72:3,18 74:1
83:12 86:12
106:8
**regard** 7:12 10:6
50:18
**regarding** 7:19
8:12 13:2,23
14:4,21,24
15:8 16:5 17:6
18:9 28:9
49:19 52:24
54:18 58:17

62:15 70:19
73:3 90:9
91:17,20 92:12
96:15
**Regardless** 37:9
**Registered** 1:13
115:4
**regular** 41:22
**reinstate** 111:7
**reinstated**
108:21
**reinstating**
112:12
**related** 78:6
**relationship**
48:9,11 49:23
51:2,10 52:2
52:24 53:10
81:21 83:15,19
83:24 84:1,9
93:6 100:15
101:2 103:12
**relationships**
84:13
**relative** 34:16,17
34:17 82:5
115:14
**relatively** 21:23
**releasing** 104:21
**relevant** 34:16
37:8,9,23
68:22
**relied** 101:16
**relying** 101:13
**remaining** 79:2
**remarks** 33:23
**remember** 37:2
103:20
**renewal** 29:3,9
**rent** 60:18,21
**rep** 5:9,13 18:3
51:9 82:7,15
107:21,23
**repair** 45:6,14
45:24 46:5,9
46:16 47:6
48:14,21 57:18

Drexel v. Harleysville Insurance Co.

129

57:20,21,22
58:19 83:16
95:18 97:18
98:1,3 99:13
100:10 104:14
105:7 106:21
repaired 45:8
48:20 100:11
repairing 98:7
repairs 43:20
45:21 46:1,21
47:2 49:2,7,7
49:13,14,15,20
51:14 56:9,15
56:17 58:5,7
58:17 95:15
104:11,18,22
105:2,4,16,20
105:21 106:3,8
109:20 110:6
repeated 54:4
replacement
33:1 100:19
report 4:8,8,12
21:9,11,13
22:14 25:21
27:23 56:4,5,7
106:13
reported 23:3
35:3 87:23
reporter 1:13
97:10 114:14
115:3,5
reports 76:8,24
103:24
represent 2:9
50:18 93:5
108:7
representative
6:19 103:8,10
representatives
14:21 15:18
represented
50:20
representing
50:14
reps 27:16 37:16

rep's 83:8
request 3:11
6:18 35:18,19
43:15 56:12,21
56:22 57:7
60:15 63:13
requested 2:23
28:14 35:16,18
57:12,13
requesting 58:2
111:6
requests 27:2
require 2:18
30:15 40:17
41:18 44:12
63:16 81:5
required 18:12
22:14 23:5,9
41:9 43:19
44:15,17 51:1
51:5,18 53:8
75:16 80:17
81:3,19
requirement
43:24 51:11,21
53:11 82:12
requirements
13:7 53:8
79:17
Research 86:23
reserve 24:2
31:23 32:21
33:3 35:9,18
36:6,12 38:5
60:15 63:20
reside 3:23
resolved 4:7
resource 87:1,9
87:15
resources 39:6
40:24 72:14
respect 3:22
8:18,23 9:16
21:5 32:16
42:23 43:2
47:2,11 48:13
49:7 50:16,21

53:2 56:9 62:8
89:4 100:16
101:4,6,14
102:3
respective 115:7
response 105:4
responses 2:23
responsibilities
2:20 21:4,9
22:8 76:17
80:13
responsibility
30:11 82:16
83:8,14
responsible
20:17 22:11
42:1
restatement
100:22
restating 69:24
Restorations
106:7 109:19
resulted 54:19
retain 22:1 77:2
retained 21:17
91:3,5 104:6
107:2
retention 91:20
retroactive 9:18
return 21:2
review 7:1 12:19
34:3 35:21
90:5 104:9
109:23
reviewed 14:7
14:11,13
Reviewing 26:20
56:3 67:19
103:18
reviews 19:11
72:15
revised 86:4
revisions 92:14
Re-Notice 114:7
Riddle 28:15
73:14,19,24
77:19 108:12

109:1 111:17
112:3 113:7
right 7:21 8:9
10:15 13:18,22
27:23 42:11
46:6 48:2,6
53:16 58:8,12
61:2,3 76:4,7
79:20 82:2
105:13 107:18
risk 19:13
risks 19:11
Rob 2:9 110:13
Robert 1:15
67:5 110:10
112:10
role 43:6,8,11
47:10
rolled 38:22
Rotella 4:12
routine 52:21,23
routinely 18:8
52:15
rudimentary
19:5
Rule 1:10
run 28:24
runs 29:5,6

S

S 106:22 114:5
saw 6:17
says 28:15 44:23
56:15,19 59:14
60:24 61:4,7
61:16 65:24
67:23 70:7
75:3 76:3,4
80:9,22 81:11
81:23 82:3,14
84:11,12 92:7
92:8 93:4
103:11 104:13
106:15,20
107:16 108:16
109:18,21
111:21,24

scenario 43:21
scenarios 9:23
44:7,9
scene 104:22
SceneAccess
38:21 39:1,2
scheduled 27:3
scope 43:22
45:14 58:19
61:12 95:19
101:15,19
102:2 103:22
screen 24:4
32:21 34:20,22
34:23 35:12
36:6,11 38:4
65:18,21 72:21
75:22
screens 33:10
second 53:12
56:19 66:17
76:7 92:17,18
92:21 98:11
section 69:2
93:14
secure 44:19
58:4 82:17
securing 22:13
94:5
see 6:22 12:6,20
27:22 54:4
66:1,8 73:16
76:7 78:10
80:24 86:7
90:18 92:20
94:16 102:23
106:23 107:9
108:14,15
seeing 37:3
seen 6:12,14
21:1 44:23
66:20 79:8,11
96:9 102:19
103:2,4,5,17
103:18 107:6
selected 9:11
selections 37:22

Drexel v. Harleysville Insurance Co.

130

| | | | | |
|---|---|---|---|---|
| send 17:23 23:1 | 34:14 | 77:3 113:1 | stand 32:12 | submit 64:7 |
| 41:15 64:6,8 | sheets 34:5 | sophisticated | standard 24:2 | submitted 19:12 |
| 64:10 85:5 | Sherry 22:6 24:3 | 52:17 | Standards 91:24 | subsequent |
| 108:21 109:6 | 27:2,17 56:6 | sorry 10:2 13:19 | standing 8:11 | 30:18 |
| sender 62:13 | 57:14 59:10 | 14:1,1 31:13 | stands 24:15 | subset 9:6 |
| sending 39:1 | 63:8,9 96:12 | 31:15 48:13 | 86:23 | successful 4:16 |
| 104:23 | 109:11,16 | 69:23 75:6 | start 8:9 33:23 | suffix 23:13 24:1 |
| sends 87:17 | short 27:23 | 105:22 | 105:17 | 24:2 31:8,12 |
| sense 18:24 22:8 | 74:11 | sort 107:19 | started 5:3 | 31:19,21 32:2 |
| sensitive 49:9 | short-lived | Southard 67:5,6 | 38:20,24 89:13 | 32:5 34:19 |
| 51:9 | 21:23 | 67:9 110:10 | starts 32:8 | 35:8,10 59:15 |
| sent 12:9 18:12 | shot 10:8 33:14 | 112:9,10 | state 2:11 115:1 | 59:24 60:7 |
| 58:14 62:16 | 65:21 | southeast 32:14 | statement 40:14 | suffixes 32:15 |
| 67:21 89:24 | show 11:18 24:5 | 67:11 77:16 | 49:11 78:21 | 35:4,7 |
| 90:9 106:15 | 32:22 53:13,14 | 79:18 110:12 | 79:6 | suggest 16:23 |
| 107:16 | 56:1 58:22 | SO-530739 32:8 | statements 79:4 | suggests 68:18 |
| sentence 59:14 | 98:9 103:13 | spark 57:7 | 80:4 | suit 9:18 115:15 |
| 59:16,20 | 109:13 112:6 | speak 8:6 96:15 | STATES 1:1 | suite 1:19 38:17 |
| 104:16 | showing 57:9 | speaking 7:12 | Staton 59:5,6,10 | 38:19 |
| separate 3:20 | shown 73:5 74:5 | 7:24 | 60:23 62:16 | summary 34:22 |
| 15:13 16:9 | shows 61:17 | special 29:15 | 63:8,10,22 | 34:23 35:1,12 |
| 17:23 19:21 | 62:1 | specialized 19:7 | 69:17 70:7 | 36:6,11 38:4 |
| 25:16 32:1 | side 76:4 | specific 11:14 | status 62:9 | 83:11 |
| 33:10 36:9 | signed 54:13 | 29:20,20 37:3 | 111:9,19 | summer 21:3 |
| separately 60:3 | significance | 41:17 43:1 | 112:17 | 22:9 31:2 |
| September 1:12 | 31:10 | 51:2 61:21 | Stenotype 115:8 | 40:18 73:15 |
| 67:22 70:1 | signing 115:12 | 77:12 78:13 | step 56:24 99:14 | 74:2 87:12 |
| 90:4 108:11,12 | similar 77:13 | 86:14 89:24 | STEPHEN 1:18 | 93:6 |
| 109:9 115:5 | 78:3 103:4,5 | 101:2,21,23 | steps 62:11 | supervisor 27:1 |
| serious 41:20 | simply 100:8 | 103:20 | step-by-step | 27:8 41:1 |
| service 21:19 | single 85:3 | specifically 39:7 | 40:7 | 73:14,19 |
| 27:13,14 32:14 | sir 19:4 33:13 | 51:12 56:22 | stipulate 7:16 | supervisors |
| 77:16 | 43:10 44:22 | 60:7 77:14 | stopped 58:10 | 27:15 |
| services 93:13 | site 18:8 43:4 | 78:5,17 79:16 | 58:12 | supply 88:18 |
| 94:3,12 95:12 | situation 10:24 | 79:19 90:24 | storm 87:2,20 | supported 86:24 |
| 95:17 96:21 | 29:7 89:17 | specifics 83:19 | Street 1:19,23 | sure 4:1 7:9,10 |
| 98:1 99:20 | situations 85:6 | spell 80:12 | strictly 8:20 | 12:19 20:10 |
| set 15:14 23:13 | size 43:15 | 100:14 | 82:9 | 38:16 42:7 |
| 39:15 85:3 | Slonake 76:20 | spelled 101:3,19 | string 70:7 | 46:3 59:21 |
| setting 4:15 | small 76:23 77:1 | spells 102:2 | structure 15:11 | 70:22 73:16 |
| settle 4:3 | Smith 1:11,16 | spoilation 105:1 | 18:23 20:2,6 | 76:6 83:9 84:7 |
| Seven-page | software 38:17 | spreadsheets | 46:17 | 87:6 89:10 |
| 114:12 | 43:14 | 38:18 | stuff 82:7 | 110:7 |
| severe 22:1 | solely 15:17 | staff 19:24 108:3 | subdepartment | surfaces 52:15 |
| severity 21:15 | solicits 19:17 | stage 83:12 84:2 | 19:23 25:10,12 | surprised 89:5,6 |
| SHALK 1:19 | solid 111:10 | 84:8,8 | subject 53:23 | sworn 2:3 115:6 |
| sheet 34:7,9,10 | somebody 67:13 | stamp 57:8 | subjects 6:20,23 | system 6:3 24:4 |

Drexel v. Harleysville Insurance Co.

131

| | | | | |
|---|---|---|---|---|
| 24:12,13,18 | 53:21 55:3,12 | 66:13 78:2 | 86:11 99:24 | 11:22 94:1 |
| 25:4 26:12,12 | 57:1,6,13 | 79:2 83:5 | **title** 2:18 9:4 | **Tuesday** 1:12 |
| 33:20,23 34:1 | 59:19 60:11 | 89:22 | 103:7 | 90:13 115:5 |
| 35:13,15 36:5 | 64:3,5 65:18 | **think** 10:7,18,20 | **today** 7:3,20 | **turn** 75:23 86:19 |
| 36:9,9,13 37:1 | 66:15 67:14,24 | 10:21,23 17:4 | 14:9,12,18,22 | 91:21 |
| 37:6,10 38:7 | 71:18,19 76:12 | 18:21 26:2 | 16:13 18:22 | **twenty** 80:1 |
| 38:10,10 62:1 | 77:18 81:14 | 31:11 33:5 | 31:5 54:13 | **two** 5:4,24 48:15 |
| 64:22 65:7,13 | 86:3 88:9 90:6 | 37:8 41:20 | 90:12 | 62:20 107:10 |
| 65:20 70:12,15 | 90:15,21 91:21 | 43:21 44:16 | **told** 10:23 42:15 | 111:17 |
| 71:20 72:1,7,9 | 92:6 95:13 | 49:9 50:13 | 65:3 96:12 | **two-page** 103:15 |
| 85:24 88:6 | 96:19 102:11 | 51:8,21 57:10 | **tools** 33:17 | **type** 9:18 13:10 |
| 98:23 | 104:12 110:14 | 57:17 59:14 | **top** 20:2 65:14 | 18:3,13 20:2 |
| **systems** 33:10 | **ten** 4:22 46:13 | 62:13 63:5 | 67:2 76:3 78:4 | 24:3,8 34:6 |
| **system-genera...** | 94:18 | 64:24 66:19 | 80:8 | 39:9,14 66:17 |
| 107:20 | **term** 31:7 82:5 | 67:7 72:5,8 | **topic** 8:12 13:22 | 67:10 102:5 |
| | **terminated** | 76:2 79:12,22 | 13:23 14:2,24 | **types** 9:23 88:5 |
| _____ | 29:11,13,14 | 80:7 84:11 | 15:24 17:6 | 89:18 |
| **T** | 55:2,22 68:13 | 88:22,22,23 | 18:9 76:5 | **typical** 36:22 |
| **T** 114:5 | 68:16 69:8 | 90:20 96:3 | 80:10 92:4,8 | 38:19 48:5 |
| **take** 7:5 33:14 | **termination** | 103:18 104:22 | 92:13,18 | 89:9 |
| 40:14 58:24 | 7:19 8:18 54:9 | 109:12 | **topics** 7:1,2 8:7 | **typically** 60:5 |
| 64:24 72:12 | 55:10,16 66:23 | **third** 16:2,6,13 | 77:18 88:6 | |
| 74:11 86:2 | **terms** 3:4 81:6 | 86:21 109:22 | **Tower** 42:14,16 | _____ |
| 106:12 107:9 | **testified** 2:4 | **thought** 72:6 | 42:17 50:5 | **U** |
| 108:10 109:12 | **testify** 6:20 7:2,3 | 95:5,20 97:2 | 81:21 95:1,14 | **ultimate** 70:18 |
| 112:20 | 7:11 8:12,14 | 97:22 | 95:24 96:7,20 | **umbrella** 19:2 |
| **taken** 1:10 46:16 | 9:14 13:23 | **thousand** 3:6 | 97:23 100:16 | **unable** 96:19 |
| 62:11 74:14 | 14:6,24 15:3 | **three** 5:14,16 | 101:3 102:6 | **understand** 6:18 |
| 79:6,10 115:8 | 16:3,5,8 17:6,9 | 19:18 35:7 | 104:2,5,10 | 7:23 15:6 45:2 |
| **talk** 57:24 77:3 | 18:9,22 | **threshold** 22:24 | 105:15 106:13 | 47:20 59:16 |
| **talked** 36:19 | **testifying** 13:1 | **time** 5:5,6 7:5 | 109:16 | 63:15 66:16 |
| **talking** 10:19 | **testimony** 11:11 | 11:3,19 14:14 | **trainee** 40:13,17 | 70:22 82:4,19 |
| 34:19 64:18 | 11:13,15 14:21 | 15:9 18:5 | **training** 2:23 | 84:3 91:15 |
| 66:4 101:22 | 47:3,4 48:8,14 | 29:20,21,22 | 87:1 88:1,4 | 93:8 100:6,7 |
| **tasks** 75:14 | 72:16,19 96:18 | 30:5,17 32:4 | **transcribed** | 105:23 |
| **technical** 3:11 | 98:13 99:19 | 33:17 34:11,13 | 115:8 | **understanding** |
| 98:24 | 115:10 | 39:11 44:17 | **transcript** 53:15 | 5:11 7:1 8:14 |
| **telecommute** | **Thank** 113:9 | 57:11 75:7,13 | 115:10 | 12:5,7,14 |
| 5:20 | **Theodore** 1:11 | 75:19 76:17 | **transcription** | 13:10,12 17:14 |
| **telephone** 76:8 | 2:1,13 114:2 | 78:14 81:24 | 115:8 | 17:21 18:22 |
| 76:23 77:6 | 115:6 | 86:4,7 93:23 | **transmitted** | 19:1,5 20:9,19 |
| **tell** 2:15 8:4 9:8 | **theoretical** 98:2 | 94:20 95:2 | 27:14 | 50:17 68:14 |
| 10:3 15:10,12 | **thereof** 8:19 | 100:18 105:5 | **true** 62:17 106:5 | 87:14 88:3 |
| 16:18 26:13,15 | **thing** 34:6 39:9 | 105:10 108:12 | 115:10 | 89:18 93:24 |
| 26:17 27:5 | 39:14 112:23 | 108:21 | **try** 18:18 59:19 | 101:17,18 |
| 28:8 32:15 | **things** 41:7 | **timely** 11:4 12:1 | 78:7 91:1 | 112:22 |
| 33:9,16 35:8 | 44:12 59:21 | **times** 43:23 | **trying** 7:21 | **understands** |
| 43:1 45:9 51:5 | | | | 82:7 84:1,9 |

Drexel v. Harleysville Insurance Co.

132

| | | | | |
|---|---|---|---|---|
| **underway** 56:16 56:17 | **v** 1:6 | 60:20 | **write** 19:17 48:7 | **11:18** 90:4 |
| **underwriter** 29:8 69:18 71:6 | **vacation** 73:22 | **weather** 87:18 87:22 | **writes** 48:5 | **11:45** 27:22 32:23 |
| | **value** 84:22 | **weeks** 5:14,16 | **writing** 53:10 101:3 | **110** 114:4 |
| **underwriting** 3:17 9:6 15:12 19:1,11 25:6,7 25:9,11,12,13 25:23 36:22 67:10 69:13 71:7 108:17 110:12,13 111:2,13,19 112:1,22 | **variables** 49:11 | **went** 92:4 | **written** 12:8 29:19 34:4 96:11 102:7 | **115** 114:14 |
| | **variety** 87:2,17 | **we'll** 8:4 113:10 | | **1172** 27:22 |
| | **various** 20:4 41:12 86:11 | **we're** 7:9,10 10:19 25:24 29:23 81:19 93:22 101:22 104:23,24,24 | **www.wilfet.com** 1:24 | **12th** 107:7 |
| | **vendor** 2:21 49:24 50:7 | | | **12:46** 27:7 |
| | **vendors** 39:2 91:23 | | **X** | **13** 29:24 |
| | | **whatsoever** 97:18 | X 31:20 114:1,5 | **13th** 30:5 55:17 62:20,24 110:22 112:4,8 112:18 |
| | **venues** 88:11,14 | **WILCOX** 1:22 | **Y** | |
| | **verbally** 96:12 | **Wilmington** 1:12,17,20,23 | **yeah** 25:13 50:13 | **1330** 1:23 |
| **underwriting's** 111:8 112:3,16 112:21 113:5 | **Verification** 80:16 | **withdrawn** 17:9 | **years** 4:22 46:13 52:21 94:18 | **14** 108:11,12 |
| | **verified** 29:22 30:21 | **witness** 115:11 | | **14th** 67:22 70:1 |
| **Unfortunately** 37:14 | **verify** 23:6,20 24:9 27:19 28:3 30:11 59:15,23 70:9 70:12 80:17 | **word** 29:14 38:18 109:10 109:11 | **$** | **14:12** 108:13 |
| | | | **$100,000** 16:24 | **14:18** 28:14 |
| **unit** 21:13,18,22 23:14,24 26:22 27:10,10 76:22 76:22,23 | | **wording** 80:22 | **$225,000** 33:1 | **15** 92:5 109:9 |
| | | **words** 30:16 34:5,15 93:10 94:4,7 | **$5,000** 23:3 | **15th** 92:14 |
| | **versus** 41:19 | | | **15:36** 110:22 |
| | **vice** 20:11 67:10 67:13 | **work** 42:18,19 44:18,20,21 45:3,6 46:5,9 46:24 56:14 57:15,18,20,21 57:22 59:21 63:3 83:16 97:4,5 99:9,10 99:11,11,18,22 105:13 | **0** | **17th** 63:8 |
| **UNITED** 1:1 | **voice** 57:24 | | **02** 59:15 60:7 | **19801** 1:20,23 |
| **unquote** 69:20 | | | **0370** 109:15 | **19899** 1:17 |
| **unscheduled** 59:24 60:1,3,6 | **W** | | **04** 61:1 90:4 108:12 | **2** |
| **unusual** 89:16 89:17 | **waive** 113:10 | | **0432** 103:14 | **2** 8:22 56:20 59:8,24 63:21 65:24 78:16,23 79:2,20 114:3 |
| | **waived** 115:12 | | **05-428(JJF)** 1:6 | |
| **updated** 70:11 86:11 93:10 | **want** 7:1 33:19 57:5 74:11 77:21 92:2 97:14 | **worker's** 79:3 | | **200** 1:19 |
| | | **working** 90:11 107:6,14 | **1** | **2004** 21:3 22:9 28:23 29:23,24 30:5 31:2 33:9 33:12 35:14 36:14 38:9,15 38:20,23,24 40:7,18 42:20 49:12 50:24 51:11,17 53:7 55:19 62:18 65:7 69:20 70:3 71:2 73:15 74:2 75:3,4 87:12 93:6,12 94:15 105:15,19 |
| **updates** 86:7 87:18 | | | **1** 6:23,23 8:9,17 65:23 105:15 | |
| **use** 29:14 37:14 37:16,16,19 38:3 40:24 41:22 71:17 115:8 | **wanted** 73:11 | **works** 15:14 17:16,17 19:13 | **1st** 105:19 106:2 | |
| | **wasn't** 16:23 54:17 | **worried** 104:24 | **1:50** 113:11 | |
| | **way** 7:8 17:17 38:21 39:1 41:8 60:5 63:18 78:7 88:11,12 89:8 89:22 94:18 102:10 103:1 107:13 109:13 | **wouldn't** 5:11 18:16 25:20 39:12 42:8 57:17 72:22 77:13 89:5,6 94:17 | **10th** 1:12,16 | |
| **uses** 100:10 | | | **10:15** 1:12 | |
| **usual** 24:1 | | | **100** 33:1 | |
| **usually** 18:4 59:24 | | | **100-RPR** 115:19 | |
| **utilize** 87:15 | | | **102** 114:13 | |
| **U/W** 108:16 | | | **106** 114:3 | |
| **V** | **ways** 35:16 41:12,16 44:5 | | **11** 1:12 62:18 115:5 | |
| | | | **11th** 60:22 62:17 107:7 | |
| | | | **11-23-51** 2:14 | |

Drexel v. Harleysville Insurance Co.

133

| | |
|---|---|
| 106:2 107:7,7<br>108:11 109:17<br>110:17,19<br>114:9<br>**2005** 85:15,22,23<br>86:3 92:5,14<br>114:11<br>**2007** 1:13 115:5<br>**2008** 115:20<br>**22** 107:15<br>**22nd** 27:7<br>**225,000** 33:6<br>**23** 6:7 28:3<br>86:19 114:7<br>**23rd** 4:24 29:23<br>**23:52** 107:15<br>**24** 74:20 77:17<br>114:8<br>**25** 85:16 101:23<br>114:10<br>**26** 102:13<br>114:12 | 61:19<br>**6-23** 27:22 32:23<br>**6-8-04** 61:17<br>70:8<br>**655-0477** 1:23<br><br>**7**<br>**7** 15:24<br>**7-6-04** 67:3<br>**7-6-2004** 55:7<br>**7-7-2004** 55:8<br>**74** 114:9<br><br>**8**<br>**8** 17:7 75:24<br>109:12<br>**8th** 61:1 69:20<br>70:3<br>**8-10** 107:11<br>**8-13** 55:13<br>107:12 111:22<br>**8-13-04** 28:13,14<br>**8/19** 90:9<br>**800** 1:12,16,19<br>**85** 114:11 |
| **3**<br>**3** 9:9 78:8 79:9<br>79:13 92:8<br>**3rd** 90:4<br>**30** 52:21 109:17<br>**30(b)(6)** 1:11<br>**302** 1:23<br>**31** 115:20 | **9**<br>**9** 6:24 18:10<br>**9-14** 111:18,21<br>**9-14-2004**<br>111:16<br>**97** 4:24 5:3 |
| **4**<br>**4** 9:15 13:22<br>91:23 | |
| **5**<br>**5** 14:2<br>**530739** 32:9<br>**54** 91:21<br>**55** 92:17,19 98:9<br>**56** 2:14 | |
| **6**<br>**6** 15:1 114:7<br>**6-22** 68:3<br>**6-22-04** 26:16 | |