# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LAYNE DREXEL,                    )        COPY
                                )
            Plaintiff,          )
                                )
                                )
  v.                            )
                                )   C.A. No.
                                )   05-428 JJF
                                )
                                )         R K B
HARLEYSVILLE INSURANCE CO.      )      AUG 3 1 2007
                                )
            Defendant.          )


        Deposition of LAYNE DREXEL, taken
pursuant to notice at the law offices of CASARINO,
CHRISTMAN & SHALK, 800 North King Street, Suite
200, Wilmington, Delaware, beginning at 10:10
a.m., on Wednesday, August 15, 2007, before Karen
McCloskey, Professional Reporter and Notary
Public.

APPEARANCES:

            ROBERT K. BESTE, ESQ.
            SMITH, KATZENSTEIN & FURLOW, LLP
               800 Delaware Avenue, 7th Floor
               Wilmington, Delaware  19899
               for the Plaintiff

            STEPHEN P. CASARINO, ESQ.
            CASARINO, CHRISTMAN & SHALK
               800 North King Street, Suite 200
               Wilmington, Delaware  19899
               for the Defendant


ALSO PRESENT:

            Christopher Logan - Harleysville

1                    LAYNE DREXEL,

2              the deponent herein, having first

3              been duly sworn on oath, was

4              examined and testified as follows:

5    BY MR. CASARINO:

6        Q.    Sir, could you state your name for the

7    record and home address, please?

8        A.    Layne Drexel.  1910 Old Capital Trail,

9    Newark, Delaware 19711.

10       Q.    How long have you lived there, sir?

11       A.    About 25 years.

12       Q.    How old are you, sir?

13       A.    Fifty-four.

14       Q.    Are you married?

15       A.    No.

16       Q.    Have you ever been married?

17       A.    No.

18       Q.    What is your education?

19       A.    I have a master's degree plus 45 credits

20   education.

21       Q.    Are you employed?

22       A.    Yes.

23       Q.    Where do you work?

24       A.    Christiana High School.

Layne Drexel

1      Q.    What do you do there?

2      A.    Teach.

3      Q.    What do you teach?

4      A.    Math.

5      Q.    How long have you taught math at

6  Christiana High School?

7      A.    About 25 years.  Maybe a couple more than

8  that.

9      Q.    In addition to teaching do you have any

10  other jobs?

11      A.    I officiate basketball at Christiana and

12  other places, high school basketball.

13      Q.    Do you have any investment properties?

14      A.    Yes.

15      Q.    Can you tell me what they are, please?

16      A.    I own a condo at Birch Pointe.

17      Q.    Where is Birch Pointe?

18      A.    In Pike Creek Valley.  I have a three

19  unit apartment building house that was converted

20  into apartments in Wilmington.  My original house

21  when I moved to Delaware on Paper Mill Road

22  outside Newark.

23      Q.    What about 1740 West 4th Street?

24      A.    I sold that.

Layne Drexel

```
 1        Q.    When did you sell that?

 2        A.    About two or three years ago.

 3        Q.    What is the address of the condo in Birch

 4   Pointe?

 5        A.    540 Diana Drive.

 6        Q.    Is it rented at the present time?

 7        A.    Yes.

 8        Q.    And what insurance company insures that

 9   condo?

10        A.    It's a homeowner's condo.  I'm not sure

11   who it is.

12        Q.    So the person who rents it has his own

13   insurance?

14        A.    Has renter's insurance.

15        Q.    In addition to that does the condo have a

16   policy?

17        A.    Yes. I pay a condo fee. That is part of

18   the condo fee.

19        Q.    When did you purchase that condo?

20        A.    Probably about 17 to 20 years ago.

21        Q.    You mentioned a three unit apartment in

22   Wilmington?

23        A.    Yes.

24        Q.    Where that is located?
```

Layne Drexel
5

1    A.    704 North Franklin Street.

2    Q.    When did you purchase that unit?

3    A.    Also some 17 or 20 years ago.

4    Q.    Do you have insurance on it?

5    A.    Yes.

6    Q.    With what company?

7    A.    I don't remember.

8    Q.    Is it Harleysville?

9    A.    No, I don't think so.  I believe it's

10   maybe Nationwide.

11   Q.    You mentioned a property on Paper Mill

12   Road?

13   A.    Yes.

14   Q.    And when did you purchase that property?

15   A.    1980.

16   Q.    What is that address?

17   A.    354 Paper Mill Road.

18   Q.    Do you have insurance on that property?

19   A.    Yes.

20   Q.    With what company?

21   A.    Nationwide.

22   Q.    Have you ever had the unit in Wilmington

23   at 704 North Franklin or the property on Paper

24   Mill Road insured by Harleysville?

1    A.    I don't believe so.

2    Q.    What address do you use so people can pay

3  their rent, for instance, and get mail relating to

4  those properties?

5    A.    My house, 1910 Old Capitol Trail.

6    Q.    Let me ask you about the property at 1740

7  West 4th Street.  When did you purchase that

8  property?

9    A.    That was probably about 20 years ago.

10    Q.    What is located there or what was located

11  there?

12    A.    A liquor store and two apartments above

13  the liquor store.  And there was a single room

14  efficiency behind the liquor store on the first

15  floor.

16    Q.    And through the years have they been

17  rented?

18    A.    Yes.

19    Q.    On the day of the fire in June of 2004,

20  were all the units in that building rented?

21    A.    Yes.

22    Q.    How long had you been insuring that

23  property through Harleysville Insurance Company?

24    A.    I don't remember.

Layne Drexel

```
 1        Q.    Did you have any other insurance

 2   companies insuring it besides Harleysville?

 3        A.    Yes.

 4        Q.    Do you remember what they were?

 5        A.    I believe one was Nationwide and I don't

 6   remember others.

 7        Q.    Do you recall when you first started to

 8   insure it through Harleysville?

 9        A.    No.

10        Q.    I assume it had been a few years before

11   the fire?

12        A.    Yes.

13        Q.    Was all of your correspondence with

14   Harleysville sent to you at your home address?

15        A.    I got notices from S.T. Good Insurance

16   Company.

17        Q.    Did they go to your home address?

18        A.    Yes.

19        Q.    On Old Capital Trail?

20        A.    Yes.

21        Q.    Did you ever receive any documentation

22   from Harleysville relating to those properties?

23        A.    I don't think so.

24        Q.    Copies of policies, things of that
```

Layne Drexel

```
 1  nature?

 2      A.   I believe my correspondence came from

 3  S.T. Good.

 4      Q.   But it would go to you at that property?

 5      A.   Yes.

 6      Q.   What about previous notices, would they

 7  be sent to you from Harleysville directly or also

 8  be sent to you from Good?

 9      A.   I think they were sent to the mortgage

10  company.

11      Q.   Were any previous notices sent to you

12  directly?

13      A.   From S.T. Good, yes.

14      Q.   And even though they were sent to you

15  from S.T. Good would they have Harleysville on the

16  letters?

17      A.   I don't recall.

18              MR. CASARINO:   Let's go off the

19  record for a moment.

20              (Whereupon, a discussion was held

21       off the record.)

22  BY MR. CASARINO:

23      Q.   Mr. Drexel, I will hand you a copy of a

24  letter that has been supplied to us through the
```

Layne Drexel

 1   discovery process to the Insurance Commissioner's

 2   office of the State of Delaware.  Under it appears

 3   to have your signature on it.  And it is dated

 4   August 25, 2004.  Can you identify that as a

 5   letter that you wrote to the Insurance

 6   Commissioner?

 7        A.   Yes.

 8                  MR. CASARINO:   Let's have this

 9   marked.

10                  (Whereupon, Exhibit Drexel 1 was

11   marked for identification.)

12   BY MR. CASARINO:

13        Q.   I would like to go over that letter with

14   you.  In the third paragraph you indicate that you

15   received an insurance policy from S.T. Good; is

16   that correct?

17        A.   Yes.

18        Q.   And did that insurance policy that you

19   received have a premium invoice attached to it?

20        A.   Yes.

21        Q.   Do you recall getting that invoice?

22        A.   Yes.

23        Q.   I am going to show you a document of a

24   premium invoice.  Is that a copy of the invoice

Layne Drexel

```
 1   you received?
 2       A.   No.
 3       Q.   Did you receive something different than
 4   that?
 5       A.   Yes.
 6       Q.   Have you ever received that document that
 7   is in front of you?
 8       A.   No.
 9       Q.   Your testimony is you never received it?
10       A.   Correct.
11       Q.   Let me show you a photocopy of another
12   document that says commercial package policy.  Did
13   you ever receive a document --
14            MR. BESTE:   Are you going to mark
15   these as exhibits for future reference?  You have
16   showed him that March 26th invoice and I don't --
17   I would like to have it marked.  It's only going
18   to get a little hairy and I would like to have
19   them marked for identification.  I would like to
20   know what document we're talking about.
21   BY MR. CASARINO:
22       Q.   Is this a copy of the document that you
23   received?
24       A.   I don't recall.
```

Layne Drexel

```
 1              MR. CASARINO:   Why don't we mark
 2   that as the next exhibit and mark the premium
 3   invoice as the next exhibit.
 4              (Whereupon, Exhibit Drexel 2 and 3
 5   was marked for identification.)
 6   BY MR. CASARINO:
 7      Q.   Mr. Drexel, the document in front of you
 8   is marked as Exhibit 2.  And you're saying right
 9   now you cannot state one way or the other if you
10   received that document; is that correct?
11              MR. BESTE:   Objection.  You can
12   answer.  I think that mischaracterizes his
13   testimony.
14   BY MR. CASARINO:
15      Q.   I thought you said you could not tell us
16   one way or the other whether you received that
17   document; is that correct?
18      A.   That's correct.  I recognize part of
19   this.  I don't know if it's from this particular
20   document.  I remember receiving from S.T. Good
21   just a paragraph stating that insurance had been
22   written effective.
23      Q.   Do you keep your insurance documents in a
24   separate file?
```

Layne Drexel

```
 1      A.    Some yes, some no.

 2      Q.    What type of things did you keep in your

 3   file?

 4      A.    For the property I just had various parts

 5   for each unit for tax purposes, expenses.  For the

 6   general property just correspondences from the

 7   mortgage company.  Some mortgage statements.

 8      Q.    Did you have a folder that you kept these

 9   documents in?

10      A.    I have a folder for the individual

11   properties, yes.  For the individual units.

12      Q.    For each individual unit you would have

13   had a folder; is that correct?

14      A.    Yes.

15      Q.    What about a general insurance policy,

16   would you have kept that in a separate folder?

17      A.    Some I did and some I did not.

18      Q.    Do you still have those folders?

19      A.    I don't know.

20      Q.    You sold the property two or three years

21   ago?

22      A.    Yes.

23      Q.    Have you looked for the folders since

24   this litigation began?
```

Layne Drexel

1    A.    I have looked for any documentation that

2  I have relevant to this.  I don't know that it's

3  in a folder.  I looked through the documentation I

4  have.

5    Q.    If any insurance policy would have come

6  to you related to your policy where would you have

7  kept those policies?

8                  MR. BESTE:    Objection.

9  BY MR. CASARINO:

10   Q.    Where would you?

11   A.    In one of several places.

12   Q.    So there would have been several places

13  you could look to see if you still have the

14  information that came to you related to --

15   A.    Several places I did look.

16   Q.    Have you gotten all the documentation

17  that you can find relating to insurance coverages?

18   A.    I have gotten all that I could find.

19   Q.    Where did you have them?  Why do you have

20  them?

21   A.    Some of the things that I thought were

22  relevant or related to this individual property I

23  have given to Rob.

24   Q.    How about the things you thought were not

Layne Drexel

```
 1   relevant, where do you have those?
 2       A.   Just things for the given properties.
 3       Q.   If I requested production of those
 4   folders you would still have them and provide
 5   them?
 6       A.   For the individual units?
 7       Q.   Yes, individual units.
 8       A.   Yeah.  I could provide the documentation
 9   that I have.
10       Q.   Let me go back.  You said you received
11   your insurance policy from them, I assume S.T.
12   Good, copy being fowarded to you on or about June
13   4 or June 7, 2004?
14       A.   Yes.
15       Q.   Did that document that you received from
16   S.T. Good state the premium?
17       A.   I'm not sure.  I believe so.
18       Q.   Do you recall if it stated the due date?
19       A.   It was with the policy and it was a cover
20   that said it had been written at a premium of I
21   believe -- it quoted a number.
22       Q.   Did it tell you when that premium was
23   due?
24       A.   It was a bill for a premium.  It was the
```

Layne Drexel

15

1  cover sheet to a policy that included at least

2  some of these documents.

3      Q.   Okay, sir.  Did you receive any

4  documentation from S.T. Good or Harleysville

5  indicating to you the due date of the premium?

6                  MR. BESTE:   Objection.

7                  THE WITNESS:   I don't remember.  I

8  don't recall.  It may have been earlier than

9  that.  I remember receiving that date a policy

10 from S.T. Good that had a cover letter that simply

11 stated -- it was just a paragraph.  It said that

12 the policy had been written at an annual premium,

13 I believe.

14 BY MR. CASARINO:

15     Q.   Did you pay that premium?

16                 MR. BESTE:   Objection.

17                 THE WITNESS:   It wasn't a bill. I

18 thought that I had paid the bill.  I thought I

19 paid the bill and that was my policy.

20 BY MR. CASARINO:

21     Q.   So if you thought you paid a bill you

22 would have had to have gotten a premium notice?

23                 MR. BESTE:   Objection.

24                 THE WITNESS:   Oxwen was the

Layne Drexel

```
 1   mortgage company and I thought they had paid the
 2   bill.
 3   BY MR. CASARINO:
 4       Q.    Now you lost me.  You said a minute ago
 5   that you thought you had paid the premium?
 6       A.    Yes.
 7       Q.    I asked if you paid the premium and you
 8   must have gotten a premium notice?
 9       A.    Yes.
10       Q.    You said you just paid a mortgage payment
11   and it was included in that?
12       A.    Well it was all in my escrow account,
13   taxes and insurance was escrowed.  The mortgage
14   company paid my taxes and insurance and whatever
15   else that they paid out of my escrow account.
16       Q.    So are you saying you assumed that the
17   mortgage company paid the premium?
18       A.    I didn't assume anything, I thought that
19   in retrospect.
20       Q.    Did you check with the mortgage company
21   after the litigation had began to see if they had
22   paid the premium?
23                   MR. BESTE:   Objection.
24                   THE WITNESS:    I tried several times
```

Layne Drexel

1  to call Ocwen and got no other response from them

2  and to be on hold for lengthy periods of time.

3  BY MR. CASARINO:

4      Q.   Let me go back.  I showed you earlier a

5  document which has been marked as Exhibit 3,

6  premium invoice. You indicated you never received

7  a copy of that?

8      A.   That's correct.

9      Q.   Let me go to the next sentence in your

10  letter.  You said you teach school.  And just

11  after school ended June 17th you went for a

12  two-week vacation to the Pocono's; is that

13  correct?

14     A.   Yes.

15     Q.   Do you recall when you left to go to the

16  Pocono's?

17     A.   It was after school ended.  I don't

18  recall.

19     Q.   You said school ended on June 17th.  Did

20  you go on June 17th?

21     A.   I don't recall.

22     Q.   I have a calender here and that would

23  have been a Thursday?

24     A.   This was several years ago.  I remember

1    we had just got back from the same place in the

2    Pocono's.

3         Q.    Where did you go in the Pocono's, sir?

4         A.    To Eagles Mere, Pennsylvania.  It's a

5    little town about 200 miles from here.

6         Q.    Do you have a place there?

7         A.    A friend who teaches a couple kids, she

8    has been friends with the mother of those kids and

9    we have gone up for probably 12 to 15 years.

10        Q.    Who owns the place?

11        A.    This particular woman's mother and her

12   name is Cowee (phonetic).

13        Q.    Can you spell that?

14        A.    I can't.  Her last name is Klotz.  And I

15   believe that's K-L-O-T-Z, but I'm not sure.

16        Q.    Is she the person that owns it?

17        A.    Yes.

18        Q.    And did you drive up to the Pocono's?

19        A.    Yes.

20        Q.    Did anyone go with you?

21        A.    I don't recall.  My girlfriend has gone

22   with me in past years.  But she often times is

23   back and forth because she is a basketball

24   official and she has to go to camp.  And this was

Layne Drexel
19

1  basketball time when the fire occurred.

2      Q.   Do you think she was there?

3      A.   She was there.

4      Q.   Do you have an address for this place?

5      A.   No, I don't have an address. It's a small

6  town and it's just called the lake house.  And if

7  you send information to Eagles Mere Pennsylvania

8  you send it to the lake house.

9      Q.   I'm trying to get a feel for when you

10  went up there.  Would it have been on a weekend?

11      A.   I don't recall.  It was three years ago.

12  Do you remember where you went on what day you

13  left to go on vacation?

14      Q.   If it were an event in my life is why I'm

15  asking you?

16      A.   The event was June 22nd, I remember that.

17  We had been there for at least one day because I

18  had gotten out and gone for a run and got back

19  from my run and there was a message from my

20  girlfriend's mother.

21      Q.   What was the message?

22      A.   Just that there had been a fire at the

23  liquor store.

24      Q.   When you got that message what did you

1   do?

2        A.    Called her.  Called my girlfriend's

3   mother to try to find out a little bit more about

4   what had happened.  She gave me the name of the

5   fire marshall, somebody to call in the fire

6   department.  I called them and they told me what

7   it was that I needed to do.

8        Q.    What were you told you needed to do?

9        A.    To clean up the property and board up.

10  The firemen had just broken out things to fight

11  the fire and clean up.  And then secure the

12  property.

13       Q.    How did you go about doing that?

14       A.    My girlfriend's father has a friend who

15  owns a shed construction company.  I was prepared

16  to come home and I was packing to come back home

17  and my girlfriend's father called and said that

18  they had it taken care of.  That they would clean

19  up what was necessary and board up the property.

20       Q.    Did you at that point contact anyone from

21  S.T. Good or Harleysville?

22       A.    Yes.

23       Q.    When was that contact made?

24       A.    Just minutes after I had spoken to my

Layne Drexel

1    girlfriend's mother and father and fire company.

2        Q.    Who did you talk to?

3        A.    The secretary I believe at S.T. Good.

4        Q.    Do you recall what you told the

5    secretary?

6        A.    That I had had a fire.

7        Q.    What instructions, if any, were given to

8    you?

9        A.    I'm not sure exactly.  I believe that she

10   told me someone would be getting in touch with

11   me.  They would investigate or go to see what

12   happened and get in touch with me.

13       Q.    Just to make sure I understand.  You

14   decided based upon your conversation with your

15   girlfriend's mother or father that you didn't have

16   to come back?

17       A.    Correct.

18       Q.    Did you speak to anyone after that from

19   S.T. Good or Harleysville Insurance Company while

20   you were still in the Pocono's?

21       A.    Spoke to George Powell.

22       Q.    Who did you understand George Powell to

23   be?

24       A.    He was an adjuster.

Layne Drexel

```
 1        Q.   And that was on the phone?

 2        A.   Yes.

 3        Q.   Can you tell me about that conversation?

 4        A.   I don't remember exactly.  I believe it

 5   was just he was going to go and see and look at my

 6   policy to see what it was that was covered.  What

 7   we should do next.

 8        Q.   Was there any follow-up call from him

 9   while you were at the Pocono's?

10        A.   I don't recall. I don't recall.  I

11   remember speaking to him again but I don't

12   remember if it was while we were still in the

13   Pocono's or back home.

14        Q.   Was it a conversation by phone or in

15   person?

16        A.   I met him once at the property.  But all

17   our other conversations were by phone.

18        Q.   When did you return from the Pocono's?

19        A.   I don't remember the exact date.  Where

20   it says two week vacation to the Pocono's it was

21   probably short of two weeks by a day or two.

22   Might have been even ten days instead of two

23   weeks.

24        Q.   Did your return from the Pocono's have
```

Layne Drexel

```
 1    anything to do with the fire at your place?

 2         A.    I was anxious to get back.  We didn't

 3    leave and come home, I believe we left before the

 4    time that we had to leave.

 5         Q.    In your letter you indicate that when you

 6    returned from the Pocono's you had a payment

 7    notice from Harleysville Insurance Company?

 8         A.    Yes.

 9         Q.    For $283?

10         A.    Yes.

11         Q.    Let me show you another document and ask

12    you to identify that?

13              MR. BESTE:   Has this been produced,

14    Mr. Casarino?

15              MR. CASARINO:   I got it as an

16    exhibit from my brief -- I assume it was used in

17    my brief.

18              MR. BESTE:   It doesn't have a bates

19    stamp --

20              MR. CASARINO:   I know it has been

21    produced.

22    BY MR. CASARINO:

23         Q.    Can you identify that, sir, is that the

24    letter that was waiting for you?
```

```
 1        A.    I don't think so.

 2              MR. CASARINO:    Let's mark that as

 3   an exhibit.

 4              (Whereupon, Exhibit Drexel 4 was

 5   marked for identification.)

 6   BY MR. CASARINO:

 7        Q.    Do you have a copy of the letter you had

 8   waiting for you from Harleysville Insurance

 9   Company?

10        A.    I sent it with the premium notice -- I

11   thought it was that and I sent it in with that

12   check.

13        Q.    Are you saying you sent it back to

14   Harleysville with the check?

15        A.    Yes.

16        Q.    You didn't keep a part of it?

17        A.    No.

18        Q.    You are under oath and you are saying

19   that is not a copy of the document you received?

20        A.    Right.

21              MR. BESTE:    Objection.

22   BY MR. CASARINO:

23        Q.    You think you received something else

24   saying you owned $283 --
```

Layne Drexel

```
 1        A.    Yes.

 2        Q.    So this would have been sometime when you

 3   got back from your vacation I think you said?

 4        A.    Yes.

 5        Q.    And when you sent your check to

 6   Harleysville did you date that check June 7th?

 7        A.    Yes.

 8        Q.    When did you issue it?  When did you

 9   write it?

10        A.    When I got back from the Pocono's.

11        Q.    Did you write it on July 1, sir?

12        A.    I believe it would have been before that.

13        Q.    Why do you believe it would have been

14   before that?

15        A.    Because it was as soon as I got back from

16   the Pocono's.

17        Q.    I thought you weren't sure when you got

18   back from the Pocono's?

19        A.    That's correct.

20        Q.    Could you have gotten back from the

21   Pocono's on July 1st?

22        A.    I believe it was before then.

23        Q.    What are you basing that on?

24        A.    Just from my memory.  Our rental time
```

Layne Drexel

1    traditionally has been ten days.

2         Q.    Did you write other checks to other

3    persons or corporations at the same time you wrote

4    the check to Harleysville?

5         A.    I don't remember.

6         Q.    Have you looked at the document that we

7    have produced from the Wilmington Savings Fund

8    Society?

9         A.    The one that I provided my checking

10   account?

11              MR. CASARINO:    Why don't we mark

12   this as Exhibit 5.

13              (Whereupon, Exhibit Drexel 5 was

14   marked for identification.)

15   BY MR. CASARINO:

16        Q.    Mr. Drexel, I'll show you a document

17   marked Drexel 5. Can you tell me if these are

18   checks that you wrote?

19        A.    Yes.

20        Q.    Look over them.  How were your checks

21   maintained, did you have a checkbook of some sort?

22        A.    Yes.

23        Q.    Is it a big book, small book, the same

24   size as the check?

Layne Drexel

1     A.    Yes, same size as the checks.

2     Q.    We know that the first one is numbered

3  4356.  It's dated July 1, 2004?

4     A.    Yes.

5     Q.    To Discover?

6     A.    Yes.

7     Q.    Did you write that check on July 1, 2004?

8     A.    I don't remember.

9     Q.    It is your signature, is it not?

10    A.    Yes.

11    Q.    Would you have put a different date on

12 there than the date you wrote it?

13    A.    Possibly.

14    Q.    Why would you have done that, sir?

15    A.    Well many bills are due on the 1st of the

16 month. I am not sure if this is when my Discover

17 bill is due.

18    Q.    So you're saying you would have written

19 the check on July 1st or dated it July 1, 2004

20 even though you wrote it at a different date?

21    A.    I may have.  That is not unusual.

22    Q.    It's not unusual to do that?

23    A.    Not for me, no.  If I have half an hour,

24 45 minutes free the end of the month I'll take my

Layne Brickel

1   bills and just write the checks for the bills.

2       Q.    You would write them all on the same

3   date?

4       A.    Sometimes, yes.

5       Q.    Take a look at the next one which is

6   number 4358?

7       A.    Yes.

8       Q.    It's also dated July 1, 2004?

9       A.    Yes.

10      Q.    It looks like to Washington Mutual?

11      A.    Yes.

12      Q.    What is Washington Mutual?

13      A.    Mortgage company.

14      Q.    And your mortgage was due on the 1st of

15  the month?

16      A.    Yes.

17      Q.    Did you write that check on July 2, 2004?

18      A.    I may have.

19      Q.    Would you have written it after July 1,

20  2004?

21      A.    I may have.  I don't recall.  I have done

22  that.

23      Q.    The next check in the list is the one to

24  Harleysville?

Layne Drexel

29

```
 1        A.    Yes.

 2        Q.    Check number 4359?

 3        A.    Yes.

 4        Q.    That is dated June 7, 2004?

 5        A.    Yes.

 6        Q.    What date did you write that check, sir?

 7        A.    I don't recall.

 8        Q.    You did not write it on June 7, 2004, did

 9   you?

10        A.    Correct.

11        Q.    It would have been around July 1st of

12   2004?

13        A.    Yes.

14              MR. BESTE:   Objection.

15   BY MR. CASARINO:

16        Q.    At that date or --

17        A.    Yes.

18        Q.    Why did you put June 7, 2004 date on it?

19        A.    The notice that I had gotten was dated I

20   believe the 8th or 10th.

21        Q.    What do you mean by that?

22        A.    The paper that I sent back to

23   Harleysville with the check for $283 had a date on

24   it of June 8th or 10th.
```

Layne Drexel

```
 1        Q.    Did that document that you received --

 2  and that was a document from Harleysville you

 3  said; correct?

 4                    MR. BESTE:   Objection.

 5                    THE WITNESS:   Yes.

 6  BY MR. CASARINO:

 7        Q.    Did that tell you that the effective date

 8  of your policy, the expiration of your policy was

 9  June 8, 2004?

10        A.    I don't recall that.  I think that it was

11  just a late notice.

12        Q.    Well it may have been a late notice but

13  didn't it tell the effective dates of your policy

14  and the termination date was June 8, 2004?

15        A.    I don't recall.

16        Q.    Isn't that why you dated it June 7th to

17  be in front of that date?

18        A.    No.

19        Q.    Why did you date it June 7th?

20        A.    Because the letter stated June 8th to

21  June 10th.

22        Q.    The letter stated what on June 8th,

23  that's what I don't understand?

24        A.    I think if we receive your payment on
```

Layne Drexel

31

```
 1    June 8th or 10th.  Obviously I wasn't here when I

 2    had gotten that.

 3         Q.   So obviously you were going to be late on

 4    your payment?

 5         A.   Yes.

 6         Q.   But you didn't get that until you had

 7    gotten back from the Pocono's you are saying?

 8         A.   Correct.

 9         Q.   So you just decided to date it back to

10    June 7, 2004?

11         A.   Yes. But I didn't think that in any way

12    affected my coverage from the property.

13         Q.   Then why did you do it?

14         A.   It stated the date on the letter much the

15    same as the stated date on the mortgage is the 1st

16    of the month.  But often times there is no penalty

17    until the 18th or 20th.  I may have written the

18    check prior to that or after that.

19         Q.   Have you ever with regard to paying a

20    mortgage written a check after the due date and

21    dated the check prior to the due date?

22         A.   Yes.

23         Q.   You did that for what reason?

24         A.   Well because sometimes I wouldn't get to
```

1  write the checks on the 1st or the 27th or 28th or

2  29th or 30th of the month.  So I would write my

3  check on the 2nd or 3rd and just date them the 1st

4  and send them.

5      Q.    Just to make the record complete, the

6  next check is number 4360?

7      A.    Yes.

8      Q.    And that is to Artesian?

9      A.    Yes.

10     Q.    And that is also dated July 1, 2004?

11     A.    Yes.

12     Q.    Do you know if you wrote that check on

13  July 1, 2004?

14     A.    No, I don't.

15     Q.    You say you may have done that before

16  that?

17     A.    Yes.

18     Q.    Is the Artesian bill due before the 1st?

19     A.    It may have been or may not have been.

20  The mortgage payments are traditionally the 1st of

21  the month.  This is a water company payment and

22  they -- I don't know what their cycle is whether

23  it is quarterly or the 1st of the month or 15th or

24  19th.  I'm not sure.

Layne Drexel

33

```
 1        Q.    Take a look at the next check.    Number

 2   4361?

 3        A.    Yes.

 4        Q.    Also dated July 1, 2004; is that correct?

 5        A.    Yes.

 6        Q.    That is to BFI?

 7        A.    Trash company.

 8        Q.    Do you know when that bill was due?

 9        A.    No.

10        Q.    Do you know if you wrote that check on

11   July 1, 2004?

12        A.    No.

13        Q.    Take a look at the next one.    The next

14   check in sequence is 4362. Is that dated July 1,

15   2004?

16        A.    Yes.

17        Q.    To the City of Newark?

18        A.    Yes.

19        Q.    What was that for?

20        A.    That was probably a water bill for the

21   Paper Mill Road property.

22        Q.    Do you know if that water bill was due on

23   July 1, 2004?

24        A.    No.
```

Layne Drexel

```
 1        Q.    Take a look at the next one.   Before I
 2  get to the next one go back to the City of Newark.
 3  Did you write that check on July 1, 2004?
 4        A.    I don't remember.
 5        Q.    The next one is Conectiv.   Number 4363;
 6  is that correct?
 7        A.    Yes.
 8        Q.    Also dated July 1, 2004?
 9        A.    Yes.
10        Q.    Did you write that check on July 1, 2004?
11        A.    I don't remember.
12        Q.    Do you know if the Conectiv bill was due
13  July 1, 2004?
14        A.    I don't remember.
15        Q.    Let's just for the sake of argument say
16  the bill was due July 1, 2004?
17        A.    Yes.
18        Q.    Why would you have dated it July 1st if
19  you didn't write the check on July 1st?
20               MR. BESTE:   Objection.
21               THE WITNESS:   Just because I had
22  written the others effective July 1st.
23  BY MR. CASARINO:
24        Q.    Did you have separate account checking
```

Layne Drexel

35

1    for the different properties that you owned?

2        A.    I did at some times.

3        Q.    Did you in 2004?

4        A.    I don't believe so.

5        Q.    So everything came out of one account?

6        A.    Yes.

7        Q.    That was the account with Wilmington

8    Savings Fund Society?

9        A.    Yes.

10        Q.    Did you have any other checking accounts

11    in 2004 at any other banks?

12        A.    Yes.  I believe I had PNC and I had

13    another with WSFS.

14        Q.    Why did you have these other accounts?

15        A.    Just because they came with the package.

16    I'm not sure.  I couldn't honestly tell you.  I

17    can't tell you what I did or didn't do on that

18    particular date at that time.

19        Q.    What did you use your PNC account for?

20        A.    Just investment account.  It was a money

21    market investment account.

22        Q.    Did you write checks on it?

23        A.    Some.

24        Q.    Why would you write checks out of that

Layne Drexel

 1  account?

 2      A.    I believe that one was $100 minimum and

 3  you could only do three a month.

 4      Q.    So why would you do it is what I'm trying

 5  to find out?

 6      A.    For maybe a major expense.  A car.  I'm

 7  trying to remember what else I bought.  I very

 8  infrequently would write checks on that account.

 9      Q.    What about the WSFS?

10      A.    That is just another one that came with

11  the money market package that Wilmington Savings

12  Fund offered.

13      Q.    Would you write checks on that account?

14      A.    Infrequently.

15      Q.    For what reason?

16      A.    Same thing.  For major expenses.  Other

17  expenses.

18      Q.    But we are clear, are we not, that it

19  would have been sometime in the end of June or 1st

20  of July that you would have written the check to

21  Harleysville even though it was dated June 7th?

22      A.    Yes.

23              MR. BESTE:    Objection.

24  BY MR. CASARINO:

Wayne Drexel

1    Q.    In your letter the last sentence says, I

2  later found out that Harleysville said they sent

3  me the notice on or about June 18th.  How did you

4  find that out, sir?

5    A.    I don't remember.  I believe it was when

6  I spoke to Harleysville and they had said they

7  sent me a notice on whatever that date was.

8    Q.    On June 18th?

9    A.    Yes.

10    Q.    So you are just going by memory on that

11  discussion you had with someone at Harleysville?

12    A.    Yes.

13    Q.    Could that have been a discussion you had

14  with someone at S.T. Good?

15    A.    I don't believe I spoke to anybody at

16  S.T. Good after that initial contact after they

17  hooked me up with George Powell.

18    Q.    Let me ask you about the next sentence.

19  I didn't really understand why I owed them the

20  money -'-

21    A.    Correct.

22    Q.    -- but I realize insurance rates do

23  increase, and figured it was an increase.  Why do

24  you say you didn't understand you owed them money?

1      A.    Because I thought I had a policy that was

2  a legitimate policy that covered that property.  I

3  thought the $283 was some kind of rider or

4  addendum or something additional.  I know that

5  having when you write a check and you get an

6  additional -- you get an additional bill because

7  of some surcharge or something else that was added

8  to the policy.

9      Q.    Was there anything in the documentation

10  that you received from Harleysville saying that?

11      A.    Saying what?

12      Q.    That there was some additional charge, an

13  addendum?

14      A.    I don't recall.

15      Q.    Didn't the document from Harleysville

16  tell you that it was the premium that you had to

17  pay?

18              MR. BESTE:    Objection.

19              THE WITNESS:    I don't recall.

20  BY MR. CASARINO:

21      Q.    You then said you sent the $283 check to

22  Harleysville and heard nothing else?

23      A.    Correct.

24              MR. CASARINO:    Let's get this one

Layne Drexel

```
 1   marked.
 2                    (Whereupon, Exhibit Drexel 6 was
 3   marked for identification.)
 4   BY MR. CASARINO:
 5       Q.    Mr. Drexel, I'm handing you a document
 6   marked Drexel 6. Do you see on the top it has
 7   checked off confirmation of termination.  It
 8   appears to be mailed on July 7, 2004, addressed to
 9   -- did you receive a copy of that, sir?
10       A.    No, I don't believe so. It looks like
11   it's addressed to S.T. Good?
12       Q.    I could be.  Did you receive a copy of it
13   is what I'm asking?
14       A.    No, I don't think so.
15       Q.    Did anyone from S.T. Good talk to you
16   about your policy terminating?
17       A.    Later on in the process when I was told
18   by Harleysville that they wouldn't pay the claim.
19   I called the S.T. Good people and I'm sure that's
20   something they talked about.  They kind of washed
21   their hands of it and said that it's pretty much
22   out of our hands.
23       Q.    Well I'm more interested in the time
24   frame of shortly after July 7, 2004.  So the
```

1   couple weeks after that did you have any

2   conversation with anyone from S.T. Good indicating

3   that your policy had terminated?

4       A.   I don't remember.  I don't think so.

5       Q.   We are deposing S.T. Good.  If you don't

6   remember that is fine.

7       A.   My conversation with George Powell and I

8   was talking less with George Powell because I was

9   dealing with his associate and they were dealing

10  with George.

11      Q.   Let's go down to the middle of that

12  paragraph in your letter. Do you have that letter

13  still in front of you?  This would be on page 3

14  where it says Harleysville told me my coverage was

15  cancelled retroactive to June 8th and they had

16  returned my check.  Do you see that?

17      A.   Yes.

18      Q.   You said you had gotten nothing from

19  Harleysville and called my bank, Wilmington

20  Savings Fund Society?

21      A.   Yes.

22      Q.   Using their electronic phone system I

23  verified that the check had in fact been posted to

24  my account?

1    A.    Yes.

2    Q.    Explain that to me?

3    A.    Pretty much that.  Harleysville told me

4  they had sent me my check back.  I hadn't gotten

5  my check back from Harleysville so I called the

6  bank to see if the check had been paid from my

7  account.  And yes, in fact it had.

8    Q.    Did they say when it had been paid?

9    A.    Pardon me.

10    Q.    Were you told when it had been paid?

11    A.    I don't remember.

12    Q.    And it goes on to say you contacted

13  someone and were told they had reissued a check to

14  you; is that correct?

15    A.    Yes.

16    Q.    Did you receive that check, sir?

17    A.    No.

18    Q.    You never got a check from Harleysville

19  for $283.80?

20    A.    Correct.

21    Q.    When did you first become aware that

22  there was an issue as to whether you had insurance

23  coverage?

24    A.    Sometime just before the 10th of August.

```
 1        Q.    How did you become aware?

 2        A.    Mark Pedrotti from Booth Associates

 3   called me and told me they were almost finished

 4   with the property, with the repairs.  And

 5   requested -- he wanted me to allow the check to go

 6   directly to Booth Associates for the repairs and

 7   not to me and to which I said fine.

 8               I believe he said that I had to call

 9   Harleysville to release the check to give my

10   permission to release the check and have the check

11   be written to them instead of to me.  I did that.

12   And I don't remember the date but I remember it

13   was just before a weekend.  And I just gave them

14   my permission to do that. Then after the weekend I

15   received a call.  I don't remember if it was from

16   Booth Associates or from Harleysville but that

17   there was some problem.

18        Q.    What were you told the problem was?

19        A.    That I wasn't being insured.

20        Q.    Are you saying that date was sometime

21   around August the 10th?

22        A.    It was after the 10th.  I think it was

23   the 12th or the 13th.

24        Q.    Have you received anything in writing
```

Layne Drexel
43

1    from Harleysville indicating that your policy had

2    terminated for nonpayment?

3        A.    Yes.

4        Q.    When did you receive it?

5        A.    I believe it was September.

6        Q.    What did you receive?

7        A.    I think just a statement that said that

8    they weren't paying the claim because my policy

9    was not in effect.

10        Q.    In the year 2004 did you ever have any

11    problems receiving mail at your home address?

12        A.    I don't think anything unusual.

13        Q.    Can you think of any time where you had a

14    problem with mail?

15        A.    I know that people have sent me things

16    that I have not gotten.  I'm sure that most

17    everybody has been sent things that they haven't

18    gotten.

19        Q.    Can you recall specifically anyone

20    telling you in 2004 that they sent you things that

21    you hadn't gotten?

22        A.    Specifically no.

23        Q.    Can you name anybody I can contact to say

24    that you --

Layne Drexel

```
 1        A.    I say no.  I sent letters to 100
 2   basketball officials and frequently six or seven
 3   don't receive their letter.
 4        Q.    I was wondering if you had any problems
 5   with things coming to your house?
 6        A.    As I said I don't know.
 7              MR. CASARINO:   Why don't we take a
 8   break.
 9              (Whereupon, a short break was
10   taken.)
11   BY MR. CASARINO:
12        Q.    Mr. Drexel, let me go back to the phone
13   call you had from George Powell.  I know I asked
14   you this but who did you understand Mr. Powell to
15   be?
16        A.    An adjuster.
17        Q.    How was it that he got in contact with
18   you?
19        A.    I believe S.T. Good contacted him.
20        Q.    And he told you that he was going to
21   adjust your loss?
22        A.    Yes.  He was going to tell me how much
23   the loss was and what the insurance would cover.
24        Q.    What did he do for you like in sequence?
```

1        A.    He went to the property and I assume that

2    he assessed the damage and however it is that they

3    do that figured out how much it would cost to

4    repair it.  And he told me that he would look to

5    see the terms of my policy and what I was entitled

6    to as far as coverage.

7        Q.    Did you give him a copy of your policy?

8        A.    No.  I believe he told me he had a copy

9    of my policy.  I know that he saw a copy of my

10   policy because he told me and I don't remember if

11   I was in the Pocono's or was back here but that's

12   one of the things I remember specifically because

13   the tenants had to move out and he said that I was

14   covered for renter loss.

15              And he knew that I was paying for

16   the person to come and clean up and secure the

17   property.  And offered to give me I believe it was

18   $10,000.  He said I can issue you a check that

19   will cover the rental loss and the amount of the

20   clean up.  And he offered some amount of money.  I

21   didn't know how much that was because I hadn't yet

22   gotten a bill from the guy that went to the

23   property and cleaned it up.

24              He estimated that it was going to be

1   vacant for about a month.  And then the liquor

2   store who was paying me rent and the tenants who

3   were paying me rent.

4        Q.    You went and looked at the property I

5   assume when you got back from the Pocono's?

6        A.    Yes.

7        Q.    You said there had been some clean up at

8   that time?

9        A.    Yes.  Ordered by the fire marshall.

10       Q.    It was someone you had contacted or

11  someone contacted on your behalf?

12       A.    It was my girlfriend's father's friend

13  who owns a shed construction company.

14       Q.    What is his name?

15       A.    I don't remember.  I can find that out.

16       Q.    So your girlfriend's father's friend?

17       A.    Yes.  And this was the guy who my

18  girlfriend's father had spoken to and teamed up

19  with.  My girlfriend's father helped also when we

20  were in the Pocono's so we wouldn't have to come

21  home.

22       Q.    Did that person in fact clean up your

23  property?

24       A.    Yes.

Layne Drexel

```
 1      Q.    What did he do?

 2      A.    From what I understand the firemen had

 3  broken into the property and I guess just pulled

 4  things apart and pulled them out on the street

 5  either to get to the fire or to get the fire out

 6  of them.  So I had to clean up the sidewalk, it's

 7  on a corner.  I had to clean up the sidewalk and

 8  then secure it so no one could enter.

 9      Q.    Did you get a bill from that person?

10      A.    I believe it was verbal.

11      Q.    Do you remember how much it was?

12      A.    No.

13      Q.    Ballpark?

14      A.    $500.

15      Q.    Where did the fire start in your

16  building, do you know or have you been told?

17      A.    I think the original fire marshall said

18  it was in one of the neon signs that the liquor

19  store owner had in the window.

20      Q.    So it would have started in the liquor

21  store?

22      A.    Yes.  I think they later amended that and

23  said that they thought it was a faulty

24  refrigeration unit.
```

Dwayne Bickel

```
 1        Q.    But in any event, it was in the liquor

 2   store where they say the fire started?

 3        A.    Yes.

 4        Q.    What damage was done to the apartment?

 5        A.    Smoke. Relatively minor as far as cost

 6   goes relatively minor.  But smoke damage and there

 7   might have been some carpet damage.

 8        Q.    Most of the damage was in the liquor

 9   store area?

10        A.    Most of the fire damage was in the liquor

11   store property.

12        Q.    Let me ask you about what other estimates

13   were obtained by you.  Before I do that let me go

14   back to George Powell.  Did he in fact give you a

15   document telling you how much it would cost to

16   repair your property?

17        A.    No.

18        Q.    You indicated he said he would give you a

19   check?

20        A.    Yes.

21        Q.    Did he do that?

22        A.    No.  We couldn't determine -- I didn't

23   know the cost of clean up and he said that he

24   estimated that it would be about a month, but he
```

Layne Drexel

```
 1    said it could be longer.  However, I was going to

 2    be out of rent for that month and did I need the

 3    money to exist.  And I just said it doesn't

 4    matter.  He said I can either pay you now or we

 5    can settle up at the end.

 6         Q.   What was the name of his company?

 7         A.   I'm not sure.  I don't know that he had a

 8    company.  I thought he worked for S.T. Good or

 9    Harleysville.

10         Q.   Why do you think that?

11         A.   Just because he was acting as their

12    representative.

13         Q.   What happened after that?

14         A.   Just somebody walking along the street

15    wouldn't all of a sudden look and say I'm going to

16    go over there and estimate the cost of the repairs

17    for that property.  So either the people from S.T.

18    Good I assumed, I don't know.  I assumed the

19    people from S.T. Good had contacted him.

20         Q.   So he was the estimate?

21         A.   Yes.

22         Q.   Did he estimate the loss, give you a

23    figure?

24         A.   I thought he was the adjuster.
```

Wayne Dickel

```
 1        Q.    Did he give you figures as to what it
 2   would cost to repair the property?
 3        A.    He never did tell me a final figure
 4   because in the interim he had recommended several
 5   companies to call.
 6        Q.    Did you call different companies?
 7        A.    Yes.
 8        Q.    Which ones did you call?
 9        A.    The one I went with was Booth
10   Associates.  I spoke to a person who was -- I
11   don't remember what he called himself, but he was
12   a person who said to me I will take care of
13   everything for a fee but that fee would come out
14   of the cost of the insurance thing.
15        Q.    You didn't hire that person?
16        A.    I didn't hire him because I wasn't
17   impressed.  I spoke to three other or two other
18   companies besides Gerry Booth and this other
19   character that I met there at the property who I
20   wasn't very happy with.
21        Q.    Booth was the person who was eventually
22   hired to correct the damage?
23        A.    Yes.
24        Q.    He was retained by you?
```

Layne Drexel

51

```
 1       A.    I met with Mark Pedrotti who represented
 2  Booth Associates.  And Mark -- I wish I could
 3  remember the title of the person that I met with.
 4  I told Mark what this guy told me and because I
 5  had never been through it and didn't know any of
 6  the ins or outs, this guy had represented himself
 7  as saying we'll take care of everything, you don't
 8  have to do anything.  It won't cost you any money
 9  and hire us.
10              And then when I spoke to Mark I
11  talked to him and said this guy said that he will
12  do that.  He said don't worry about that, we will
13  take care of everything.  I believed that Mark and
14  George Powell knew each other I assume through
15  other fire restoration.
16       Q.    Mark was someone who worked for Booth?
17       A.    Yes.
18       Q.    Do you know what his position was?
19       A.    No.
20       Q.    And did you sign an agreement with Booth?
21              MR. BESTE:   Objection.
22              THE WITNESS:   I don't remember.
23  BY MR. CASARINO:
24       Q.    I have a document here.  Let's just do
```

1    this so there is no confusion.

2                    (Whereupon, Exhibit Drexel 7 was

3    marked for identification.)

4    BY MR. CASARINO:

5         Q.    Is that your signature at the bottom?

6         A.    Yes.

7         Q.    And when did you sign that document?

8         A.    I don't remember.  It says here 7-16-04.

9         Q.    So it's dated 7-16-04?

10        A.    Yes.

11        Q.    Was that your authorization to have Booth

12   do the work?

13        A.    Yes.

14        Q.    Did you read it?

15        A.    No.

16        Q.    Just signed it without reading it?

17        A.    I thought you meant just now.

18        Q.    I mean when you signed it.

19        A.    Yes.

20        Q.    The third paragraph says I/we understand

21   that if the insurance co., for whatever reason

22   doesn't pay for the repairs accomplished, then

23   I/we will assume the responsibility for all the

24   payments to G.S. Booth Associates, Inc.  Do you

1  remember seeing that?

2      A.   Yes.

3      Q.   Did you understand if the insurance

4  company didn't pay for Booth you would?

5      A.   I don't remember having read that.  But I

6  understand I signed it.  Yes.

7      Q.   Did you authorize Booth to do the work?

8      A.   Yes.

9      Q.   What did you tell Booth to do?

10     A.   Actually Mark told me that he would deal

11  directly with George.  He said I will only contact

12  you should the need arise.

13     Q.   So who did you authorize to do the work,

14  George Powell or this guy Mark from Booth?

15     A.   George Powell was the adjuster and he was

16  the one that was going to determine ultimately how

17  much the insurance company was going to pay to

18  repair.

19     Q.   I understand that.  But no matter what

20  the insurance company was going to pay didn't you

21  want the work to be done?

22     A.   Yes.  Had the insurance company not paid

23  it I would have done the majority of the work

24  myself.  Much of the cost of repair was clean up

Layne Drexel

```
 1    and fix up what I would do to an apartment when a
 2    tenant moved out. Scrub the walls and maybe
 3    replace the carpet and paint.   Just over the years
 4    -- I'm not very good at it but I can hang drywall
 5    and do relatively menial tasks which I certainly
 6    would have done myself had the insurance company
 7    not been the people paying the bill.
 8         Q.    When was the work started?
 9         A.    I don't remember.
10         Q.    When was it completed?
11         A.    I remember just around August 12th or
12    13th Mark called me and said we're about
13    finished.   Can we have your permission to have the
14    check sent to us and that was his request of me to
15    call the insurance company and have the check sent
16    to them.
17         Q.    While the work was being performed did
18    you inspect it at all?
19         A.    I went to the property.
20         Q.    How often would you go there?
21         A.    Several times a week.
22         Q.    Let me make sure I understand what you
23    just said earlier.   If the insurance company and
24    if you had known that the insurance company wasn't
```

Layne Drexel

```
 1   going to pay this are you saying you would have
 2   done something differently, you would not have
 3   hired Booth to do the work?
 4        A.    Correct.  I may have hired them to do the
 5   things that are required by the City of Wilmington
 6   to have a permit.  But by the same token I might
 7   have gotten just a licensed electrician because
 8   there was electrical damage to do that part of
 9   it.
10             There were a couple air conditioners
11   that were ruined.  I don't know what it is that
12   Booth Associates charged for the replacement.  But
13   I know that you or I could go to Home Depot and
14   buy an air conditioner for a couple hundred
15   dollars and put it in in 15 or 20 minutes.  I know
16   they charged me $2,000 for probably $150 worth of
17   siding.
18        Q.    Let me find out what you would have done
19   differently.  You would have purchased the air
20   conditioning units yourself and I think you would
21   have saved money from doing that?
22        A.    Yes.
23        Q.    You also would have cleaned the smoke
24   damage?
```

Layne Drexel

1    A.    Yes.

2    Q.    Is that something you have done in the

3  past?

4    A.    Yes.  I have cleaned apartments.

5    Q.    You would have done the painting

6  yourself?

7    A.    Yes.

8    Q.    You wouldn't have hired someone to do

9  that?

10    A.    Correct.

11    Q.    You would have to hire an electrician?

12    A.    Yes, I know I would have. The City of

13  Wilmington requires a license for that.

14    Q.    Would you have to hire anyone else?

15    A.    If there was any structural damage I

16  would have had to probably hire somebody because

17  that has got to be inspected.

18    Q.    How about carpenter work, would you have

19  done that or hired somebody?

20    A.    I can do that.

21    Q.    You have done carpenter work?

22    A.    Yes.  That is just nailing up boards and

23  trim and miter saw, drywall that I would have

24  done.  There was extensive damage, glass windows

1   and the windows were either broken by the firemen

2   or the actual fire.  And I don't remember -- I

3   remember that was one of the stumbling blocks that

4   Booth Associates had because that was one of the

5   things that was slowing down. They were trying to

6   get somebody to replace the glass for less than

7   some astronomical figure that apparently Mark

8   Pedrotti and George Powell couldn't agree on.

9       Q.   Would you have been able to replace the

10  glass?

11      A.   Some I would have been be able to replace

12  and some I wouldn't have been able to replace.

13      Q.   How about the ceilings that were damaged,

14  could you have replaced the ceilings?

15      A.   Yes, ceiling tile.

16      Q.   You would have done that yourself?

17      A.   Yes.

18      Q.   Was there any damage to the doors?

19      A.   The front door, yes.

20      Q.   Any other doors?

21      A.   Might have been a bathroom door for a

22  little bathroom in the actual liquor store.

23      Q.   Would you have hung the doors yourself?

24      A.   Yes.

Wayne Dixel

1    Q.    That is something you can do?

2    A.    Yes.

3    Q.    Now this was about the time school had

4  started, wasn't it?

5             MR. BESTE:   Objection.

6             THE WITNESS:  No.

7  BY MR. CASARINO:

8    Q.    Before?

9    A.    Yes.

10   Q.    If you had done it yourself could you

11  have done it in the time frame that Booth did it?

12   A.    Oh, yeah.

13   Q.    You could?

14   A.    They were very slow. There were days that

15  they didn't work.

16   Q.    Was there any plaster work to be done in

17  the building?

18   A.    If plaster was damaged it would have been

19  replaced or it was replaced with drywall.

20   Q.    And you can do drywall I think you said?

21   A.    Yes.  I can do plaster also.

22   Q.    You do plaster too?

23   A.    Yes.  Not very good but I can do it.

24   Q.    What about carpet, did you have to have

Layne Drexel

```
 1   new carpet?

 2        A.    Yes.

 3        Q.    Do you install carpet too?

 4        A.    Yes.

 5        Q.    And you would have done that?

 6        A.    Yes.

 7        Q.    How about the damaged lighting fixtures?

 8        A.    Anything that was built in probably would

 9   have been in the electrical person's fix.

10   Preceding the fire there were shop lights that you

11   hang up and plug in.

12        Q.    You would have done that yourself?

13        A.    Yeah.  As long as the electrical outlets

14   are there it's just putting cup hooks in the

15   ceiling and hanging the fixtures.

16        Q.    What about the siding, any damage done to

17   the siding?

18        A.    Yes.

19        Q.    You would have done that yourself?

20        A.    Yes.

21        Q.    How about the awning, any damage done to

22   the awning?

23        A.    There is an awning outside the liquor

24   store entrance that was old to begin with that
```

1  wasn't really useful because it had holes in it.

2  But I could have replaced it if that's what you're

3  asking.

4       Q.   Yes, sir.

5       A.   Yes.  They didn't replace that.

6       Q.   Have you paid Booth for the work that was

7  done?

8       A.   I paid them about $16,000 because Gerry

9  Booth was very insistent about them being

10  completed with the job.  And he agreed that it

11  wasn't my responsibility and I agreed and he

12  agreed that when this whole thing is settled that

13  he will reimburse me that money.

14       Q.   What if the court rules against you are

15  you going to pay him the balance?

16       A.   At that point in time I don't know what

17  we will do.

18       Q.   You didn't discuss that with him?

19       A.   No.

20       Q.   Your house where you receive your mail,

21  is that a single family dwelling?

22       A.   Yes.

23       Q.   Do you have a mailbox?

24       A.   Yes.

Layne Drexel

```
 1        Q.    Where is the mailbox located?

 2        A.    End of the driveway.

 3        Q.    Has anyone else but G.S. Booth and

 4   Associates done any work on your property?

 5              MR. BESTE:    Objection.

 6              THE WITNESS:    Myself.

 7   BY MR. CASARINO:

 8        Q.    You have done work yourself as well?

 9        A.    Yes. I did some painting and clean up

10   that they hadn't done.  When they found out that

11   they weren't going to get paid they pretty much

12   stopped the work.

13        Q.    How much of the work was completed before

14   they stopped?

15        A.    85 or 90 percent.

16        Q.    Do you have a bill for Booth for the work

17   that they did?

18        A.    No.

19        Q.    What did you get from Booth determining

20   the amount of money involved?

21        A.    Nothing.

22        Q.    Nothing at all?

23        A.    No.  All the interactions were between

24   Booth Associates and George Powell.
```

1      Q.    What did you get from Powell --

2      A.    I don't believe I got anything.

3      Q.    Did you get any document indicating how

4  much it had cost to do the work on your property?

5      A.    I didn't get anything.  I believe that

6  Mark Pedrotti shared with me the paper that they

7  had that they were negotiating with George Powell.

8      Q.    What was that document?

9      A.    I think it was just a list of things to

10  be repaired or replaced.

11      Q.    Has anyone else done any work on your

12  property?

13            MR. BESTE:    Objection.

14            MR. CASARINO:    What's the

15  objection?

16            MR. BESTE:    I have no idea what

17  property you're talking about --

18            MR. CASARINO:    The property that

19  was damaged by the fire.

20            MR. BESTE:    Then leave the question

21  as it is.

22            THE WITNESS:    An independent person

23  did the window glass.

24  BY MR. CASARINO:

Layne Drexel

1      Q.    It wasn't done by Booth?

2      A.    No.

3      Q.    Did you get a bill for that?

4      A.    No.

5      Q.    Do you know if it was just a

6    subcontractor with Booth?

7      A.    No, I don't.

8      Q.    Can you think of anybody else who did

9    work on your property?

10      A.    The only other person that I can think of

11    as I mentioned earlier and I know that was a point

12    of contention between George Powell and Booth

13    Associates because Booth Associates said it was

14    going to cost this amount of money and George

15    Powell didn't agree. I thought maybe he had gotten

16    somebody to do it cheaper.

17      Q.    I understand that.  The work was done by

18    Powell, but I'm trying to find out if anyone else

19    had done the work --

20      A.    You mean had contracted to do?

21      Q.    Yeah.

22      A.    Did I pay anybody else?

23      Q.    Did you pay anybody else?

24      A.    No.

Layne Drexel

```
 1        Q.   Did you pay the person that cleaned the

 2   property for you?

 3        A.   Yes.  I had already said that.  I thought

 4   you meant for the clean up -- I mean for the fix

 5   up of the property, the repairs and replacements.

 6        Q.   Has anyone from Harleysville told you

 7   that they would pay for this loss?

 8        A.   Yes.

 9        Q.   Who?

10        A.   The girl I spoke to when I authorized

11   delivery of the check to Booth Associates.

12        Q.   Do you know who that was?

13        A.   I believe her name was Sheri.  I'm not

14   100 percent on that.

15        Q.   Sheri Klodfelter (phonetic)?

16        A.   May have been.  I don't know.

17        Q.   Was that in writing or orally?

18        A.   Over the phone.

19        Q.   Over the phone?

20        A.   Yes. As per request from Mark Pedrotti

21   who had apparently spoken to her and gotten

22   instructions from her as what to do.

23        Q.   Have you ever received anything in

24   writing from Harleysville indicating they would
```

Layne Drexel

```
 1   pay for the claim?

 2       A.   No, not that I recall.

 3                 MR. CASARINO:   Let's mark this.

 4                 (Whereupon, Exhibit Drexel 8 was

 5   marked for identification.)

 6   BY MR. CASARINO:

 7       Q.   I am showing you a letter that has a

 8   photocopy of a check on it and that is Exhibit 8.

 9   Did you see that letter?

10       A.   Yes.

11       Q.   Did you write that letter?

12       A.   Yes.

13       Q.   Why did you write it?

14       A.   This was the letter that when George was

15   pretty adamant about receiving payment and I had

16   actually owned part of a condo down in Myrtle

17   Beach.  My portion of the condo was this $16,000

18   figure.  When I got that check I signed it over to

19   George.

20       Q.   Let's back up.  You owned a condo in

21   Myrtle Beach?

22       A.   Yes.

23       Q.   When did you own that?

24       A.   Many years ago.  It was through four
```

1    teacher friends. We just got together and bought a

2    condo.  The intent was to be able to get away for

3    a couple weeks during the summer.

4        Q.   So in 2004 did you still own the condo?

5        A.   That's when we had sold it. We had sold

6    it prior to that and one of the partners was

7    really the active guy.  He was the guy that went

8    there.  I never went to the condo.  I think I

9    owned it for three or four years but never got to

10   use it simply because we never went.  And he knew

11   that I wanted out so we got out of it and that was

12   my share.

13       Q.   Can I see the letter.  And this $16,400

14   was your share of the sale of the condo?

15       A.   Yes.

16       Q.   There is also a check that is attached to

17   that dated -- I'm not sure when it's dated.  Is it

18   8-6-03?

19       A.   Yes.

20       Q.   To Harleysville Insurance Company?

21       A.   Yes.

22       Q.   What was that check for?

23       A.   Whatever MIA 812988 is.

24       Q.   Could that have been for your insurance

Layne Drexel

1    policy that was in effect in 2003, 2004?

2       A.    Yes.

3       Q.    The policy preceding the one involved in

4    this case?

5       A.    Yes.

6       Q.    This check is made payable to

7    Harleysville Insurance Company?

8       A.    Yes.

9       Q.    Did you pay it directly to Harleysville

10   Insurance Company?

11      A.    I don't remember.

12      Q.    Why would you have made that payment if

13   it would have been coming out of your mortgage for

14   instance?

15      A.    I had no mortgage at that time.

16      Q.    You had no mortgage on your property in

17   2003?

18      A.    Apparently not.  I don't know.

19      Q.    When did you mortgage your property, the

20   one involved in the fire?

21      A.    When did I get the mortgage?

22      Q.    Yes, sir.

23      A.    When I bought the property.

24      Q.    When was that?

Wayne Drexel

1    A.    About 1985.

2    Q.    So you would have had a mortgage on it in

3  2003?

4    A.    Not necessarily.  I paid it off early.  I

5  made extra principal payments.

6    Q.    Did you in fact have a mortgage on your

7  property in June of 2004?

8    A.    I don't believe so.  I'm not sure.

9    Q.    Why did you tell me earlier that you

10  thought your insurance policy would have been paid

11  through your mortgage policy?

12            MR. BESTE:   Objection.

13            THE WITNESS:   I thought that it

14  was.

15  BY MR. CASARINO:

16    Q.    If you didn't have a mortgage why would

17  you have thought that, sir?

18    A.    I didn't say I didn't have a mortgage.  I

19  said I didn't know.  You're trying to trick me.  I

20  just don't remember.

21    Q.    It's clear that you paid Harleysville for

22  your insurance policy that was effective June --

23    A.    I wrote that check to Harleysville.

24    Q.    You told me earlier you just assumed --

Layne Drexel

69

```
 1        A.    I believe I sent it to S.T. Good.

 2        Q.    You told me earlier that you assumed it

 3   had been paid because the mortgage company paid

 4   it?

 5        A.    Yes.

 6                   MR. BESTE:   Objection.

 7                   THE WITNESS:   I did because I got

 8   the documentation that said that the insurance

 9   policy was in effect and it listed the dates at a

10   premium of, and it listed the premium number which

11   I took to be it is in effect.

12   BY MR. CASARINO:

13        Q.    But when I asked you how it was paid I

14   thought you said it was paid because you pay your

15   mortgage company?

16        A.    I didn't say that.  I said that I assumed

17   that it had.  I don't know that it had.  I assumed

18   that the mortgage company had paid.

19        Q.    Can we now say for a fact that you did

20   not have a mortgage on that property in June of

21   2004?

22        A.    I can't say, no.

23        Q.    But we can find that out?

24        A.    Yes.
```

Wayne Drexel

1    Q.    What is the name of your mortgage
2  company?

3    A.    Ocwen.

4    Q.    Could you spell that?

5    A.    O-C-W-E-N.

6    Q.    Where are they located?

7    A.    I believe Florida.

8    Q.    Do you still maintain documents showing
9  payment to your mortgage company?

10    A.    It's paid off now and I got the statement
11  from the courthouse saying it was paid off.

12    Q.    Would you still have that document?

13    A.    I don't remember what they sent me.  They
14  sent me the deed.

15    Q.    They would have sent you showing
16  satisfaction of the mortgage?

17    A.    Yes, satisfaction of mortgage.

18    Q.    I would assume you kept that document?

19    A.    I sold the property and it may have gone
20  with that to the real estate people that were the
21  agents.

22    Q.    Did you pay your mortgage by check?

23    A.    Yes.

24    Q.    Would that have been from your account at

Layne Drexel
71

```
 1   Wilmington Savings Fund Society?

 2       A.   Yes, in the past several years.

 3       Q.   Would it have been due on the 1st of the

 4   month?

 5       A.   Yes.

 6       Q.   Right?

 7       A.   Yes.

 8       Q.   So if you were still paying to Ocwen

 9   Mortgage Company there should have been a check

10   written to it in July 1, 2004?

11                 MR. BESTE:   Objection.

12                 THE WITNESS:   Yes.  But as I have

13   stated I don't remember whether I had a mortgage

14   at that time.  Obviously looking at them

15   apparently I did not.

16   BY MR. CASARINO:

17       Q.   To whom did you sell your property?

18       A.   The owner of the liquor store.  His last

19   name is Patel.

20       Q.   What's his first name?

21       A.   I'm not sure.

22       Q.   What was the date you sold it to him?

23       A.   I'm not sure.  About two years ago.

24       Q.   Were you paid in cash?
```

Layne Drexel

1    A.    No.

2    Q.    Are you holding the mortgage?

3    A.    No.

4    Q.    How were you paid?

5    A.    Check.

6    Q.    You were paid by Patel.  Do you know if

7  he has a mortgage on the property?

8    A.    I don't know.

9    Q.    These conversations that you had by phone

10  between George Powell and yourself, were they on a

11  hard line or cell phone?

12    A.    I don't remember.  I believe I had both

13  his numbers.

14    Q.    Did you have a cell phone at the time?

15    A.    Yes.

16    Q.    Did you use your cell phone on a regular

17  basis to make phone calls?

18    A.    Long distance calls, yes.  Probably from

19  the Pocono's.

20    Q.    And what is your cell phone number and

21  provider, sir?

22    A.    It's Verizon.  I'm not sure then.  It is

23  now Verizon.

24    Q.    Same number as you had before?

Layne Drexel

73

```
 1        A.    No.

 2        Q.    What was your number back in 2004?

 3        A.    I don't remember.

 4        Q.    You can get it I take it?

 5        A.    If Verizon has it, yes.

 6        Q.    What is your cell phone number now?

 7        A.    545-3999.

 8        Q.    When did you get that cell phone number?

 9        A.    Couple years. I'm not sure. They weren't

10   as popular then as they are now.  I didn't use it

11   then as extensively as I use it now.

12               MR. CASARINO:   Let's take a three

13   minute break.

14               (Whereupon, a short break was

15   taken.)

16   BY MR. CASARINO:

17        Q.    The figure of $16,000 that you agreed to

18   pay Booth, how did that figure come up; why that

19   figure?

20        A.    Just a check that I had received that I

21   signed and gave it to Gerry Booth.

22        Q.    So you're saying when you received the

23   proceeds from the sale of the condo that was the

24   amount?
```

Layne Drexel

1      A.    Yes.

2      Q.    So that's why you used that figure?

3      A.    Yes.

4      Q.    Did you ever receive any estimate from

5  George Powell or Booth or anyone associated with

6  Booth as to what it would cost to repair your

7  property?

8      A.    In writing?

9      Q.    Yes, sir.

10     A.    I don't believe so. I knew what figures

11  they were talking about.

12     Q.    So you had an oral estimate of some sort?

13     A.    I knew that it was someplace in the

14  vicinity of $50,000.

15     Q.    Who told you that?

16     A.    I don't remember if it was George or Mark

17  and it came up when they were discussing.  I don't

18  think they agreed.

19     Q.    In your complaint you indicate that Tower

20  Services, Tower Insurance and Services, Inc., was

21  the one who notified you that George Powell would

22  be adjusting your claim.  Who was Tower Insurance

23  Services?

24     A.    I guess they employed George Powell.

Layne Drexel
75

```
1        Q.    Then on paragraph 13 you said on multiple

2   occasions Tower Services assured and advised Layne

3   Drexel that Harleysville would assume and pay off

4   all costs associated with the repair and

5   restoration of the insured premises. Including of

6   payment of certain other compensations such as

7   lost rental revenue covered under the term of the

8   commercial policy due to the loss from the fire.

9             When you're saying on mulitple

10  occasions can you tell me how many times anyone

11  from Tower Services made those assurances to you?

12       A.    Exactly how many times, no.

13       Q.    Would the persons from Tower Services and

14  George Powell, is that who you're talking about?

15       A.    Yes.  I had forgotten that George Powell

16  was Tower Services.

17       Q.    Okay.  Paragraph 14 you said that on

18  information believed Tower Services as directed

19  and authorized by Harleysville retained, hired and

20  instructed Booth Insurance Restorations to make

21  necessary repairs to the insured premises.  Why

22  did you say that, I thought you said earlier that

23  you are the one that hired Booth?

24             MR. BESTE:    Objection.    I'm going
```

Layne Drexel

1  to stop this.  To the extent that you're asking

2  him to reveal attorney/client privilege as to the

3  basis of the allegations in the complaint, I'm

4  instructing him not to answer.

5           You're free to ask him regarding the

6  facts behind any allegation.  But I'm instructing

7  him not to answer that question as it currently

8  stands.

9           MR. CASARINO:   And the reason is

10 why?

11          MR. BESTE:    Attorney/client

12 privilege.

13          MR. CASARINO:   There is

14 attorney/client privilege here.  All right if

15 that's what you're saying.

16          MR. BESTE:   Your free to ask him

17 about the facts surrounding that allegation.

18          MR. CASARINO:   I'm not going to ask

19 him anything nor do I intend to about any

20 conversations or anything dealing with

21 attorney/client privilege.  This is a statement in

22 the complaint that says Tower Services hired Booth

23 Insurance Restoration.

24          MR. BESTE:   You asked him why that

Layne Drexel

77

 1  particular allegation was made and that calls for

 2  attorney/client privilege response.

 3              MR. CASARINO:   Okay.  I'll go along

 4  with that.

 5  BY MR. CASARINO:

 6      Q.   In your complaint on paragraph 17 you

 7  said on or about August 9th Booth Restorations and

 8  Tower Services reached an agreement whereby Booth

 9  Restoration would repair the premises for

10  $49,877.20.  Where did you come up with that

11  figure?

12      A.   That was a figure that Booth Associates

13  and George Powell had agreed upon.

14      Q.   And you remembered that, that's a pretty

15  detailed figure.  You don't remember any

16  documentation having that figure on it?

17      A.   I remember Mark Pedrotti say that that

18  was the number.

19      Q.   And you wrote it down?

20              MR. BESTE:   Objection.

21              MR. CASARINO:   What's your

22  objection to that?

23              MR. BESTE:   First of all, he has

24  not testified that that figure in that paragraph

Layne Drexel

78

```
 1   in the complaint came from anywhere. And you're

 2   asking him questions about conversations that have

 3   nothing to do with that paragraph. We obviously

 4   had access to documentation when that complaint

 5   was written.

 6          MR. CASARINO:   I'm not asking him

 7   that.  I asked him earlier if he received any

 8   documentation and I thought he said no.  He had an

 9   estimate of around 50,000 in writing or orally.

10   And I'm just wondering if he had gotten any

11   written document of any sort indicating that Booth

12   and Tower reached an agreement to repair it for

13   $49,877.20.

14          MR. BESTE:   Then ask him that

15   question.

16          MR. CASARINO:   I did.

17          MR. BESTE:   That's not what you

18   asked him.

19          MR. CASARINO:   I asked him if he

20   had a document and he said no.

21          THE WITNESS:   I don't have a piece

22   of paper that says that number on it.  Correct.  I

23   know that's the number that they arrived at.  It

24   was confirmed by Booth Associates.
```

BY MR. CASARINO:

Q.    How do you know that?

A.    My conversations with Gerry Booth and Mark Pedrotti.

Q.    I think you said you had tenants on the property?

A.    Yes.

Q.    How long were they out of the property?

A.    Forever.  They moved. They vacated the property.

Q.    When did they vacate it?

A.    Immediately after the fire.

Q.    When the property was repaired did you get new tenants?

A.    I don't remember.  That was not too long before the sale and it might have been vacant at the time of the sale.

Q.    Do you have documents relating to the sale?

A.    Yes.

        MR. CASARINO:    Okay, sir.  I have nothing else.

        MR. BESTE:    We'll read.

1                              *  *  *

2              (Deposition concluded at 12:19 p.m.)

3                              *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

<pre>
1                        I N D E X

2    DEPONENT:   LAYNE DREXEL                    PAGE

3        Examination by Mr. Casarino              2

4

5

6                      E X H I B I T S

7    Drexel 1                              9
8    Drexel 2 & 3                          11
     Drexel 4                              24
9    Drexel 5                              26
     Drexel 6                              39
10   Drexel 7                              52
     Drexel 8                              65
11

12

13

14

     ERRATA SHEET/DEPONENT'S SIGNATURE         PAGE 82
15

16

17

18   CERTIFICATE OF REPORTER                    PAGE 83

19

20

21

22

23

24
</pre>

1
2
3
4
5          REPLACE THIS PAGE
6
           WITH THE ERRATA SHEET
7
8          AFTER IT HAS BEEN
9
           COMPLETED AND SIGNED
10
11         BY THE DEPONENT.
12
13
14
15
16
17
18
19
20
21
22
23
24

```
 1  State of Delaware   )
                        )
 2  New Castle County   )

 3

 4              CERTIFICATE OF REPORTER

 5
            I, Karen McCloskey, Professional
 6  Reporter and Notary Public, do hereby certify that
    there came before me on the 15th day of August,
 7  2007, the deponent herein, LAYNE DREXEL, who was
    duly sworn by me and thereafter examined by
 8  counsel for the respective parties; that the
    questions asked of said deponent and the answers
 9  given were taken down by me in Stenotype notes and
    thereafter transcribed by use of computer-aided
10  transcription and computer printer under my
    direction.
11
            I further certify that the foregoing is
12  a true and correct transcript of the testimony
    given at said examination of said witness.
13
            I further certify that I am not counsel,
14  attorney, or relative of either party, or
    otherwise interested in the event of this suit.
15

16

17                    _____
                          Karen McCloskey
18                        Cert. #183-PS

19
    DATED:  August 28, 2007
20

21

22

23

24
```