**EXHIBIT L**



**WILCOX & FETZER LTD.**



In the Matter Of:

# Drexel

## v.

# Harleysville Insurance Co.

## C.A. # 05-428 (JJF)

---

## Transcript of:

## Mildred D. Alderfer

## September 11, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Drexel v. Harleysville Insurance Co.

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LAYNE DREXEL,                    )
                                 )
            Plaintiff,           )
                                 ) Civil Action
v.                               ) No. 05-428(JJF)
                                 )
HARLEYSVILLE INSURANCE CO.,      )
                                 )
            Defendant.           )


          Deposition of Harleysville Insurance Company
taken pursuant to Federal Rule of Civil Procedure
30(b)(6) through its designee MILDRED D. ALDERFER at
the law offices of Smith, Katzenstein & Furlow LLP,
800 Delaware Avenue, 10th Floor, Wilmington, Delaware,
beginning at 2:40 p.m. on Tuesday, September 11, 2007,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.

APPEARANCES:

          ROBERT K. BESTE, III, ESQ.
          SMITH KATZENSTEIN & FURLOW
            800 Delaware Avenue - 10th Floor
            Wilmington, Delaware  19899
            For the Plaintiff

          STEPHEN P. CASARINO, ESQ.
          CASARINO CHRISTMAN & SHALK
            800 North King Street - Suite 200
            Wilmington, Delaware  19801
            For the Defendant


                  WILCOX & FETZER
      1330 King Street -  Wilmington, Delaware 19801
                   (302) 655-0477
                   www.wilfet.com

Drexel v. Harleysville Insurance Co.

2

1          MILDRED D. ALDERFER,
2      the deponent herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5              EXAMINATION
6   BY MR. BESTE:
7      Q.  Could you state your name and date of birth for
8   the record, please?
9      A.  Mildred Alderfer.  July 26, '49.
10     Q.  How long have you been an employee of
11  Harleysville Insurance Company?
12     A.  40 years.
13     Q.  Do you know approximately when you started?
14     A.  July 31, '67.
15     Q.  What position do you currently hold with
16  Harleysville?
17     A.  I'm a manager in the policy support services
18  area.
19     Q.  Is that part of underwriting?
20     A.  No.
21     Q.  That's separate from underwriting?
22     A.  Correct.
23     Q.  What's the name of it?
24     A.  Policy support services.

4

1      A.  The criteria that was set up in the system that
2   if a payment is late the policy would cancel was part
3   of our responsibility.
4          For consideration for reinstatement on
5   late payment is not our responsibility, but the
6   initial notices that went out for non-payment of
7   premium would have been from work that we're
8   responsible for.
9      Q.  What part of Harleysville would be responsible
10  for reinstatement?
11     A.  It would be underwriting.
12     Q.  Are you here today to testify on behalf of the
13  underwriting parts of Harleysville?
14     A.  No.
15     Q.  Just the policy support services part?
16     A.  That's correct.
17         MR. BESTE:  Will Ms. Staton be testifying
18  on behalf of the company with respect to underwriting?
19         MR. CASARINO:  No.
20         MR. BESTE:  So we don't have an
21  underwriting person to testify today?
22         MR. CASARINO:  No.  Because when we looked
23  at your notice of deposition, these are not
24  underwriting.  They're basically policy, they're

3

1      Q.  What does policy support services do?
2      A.  We have two areas of responsibility.  We handle
3   the direct bill premium payments.  There's a
4   remittance processing unit and an output distribution
5   unit.
6          We also handle the work when it comes off
7   the computer and mail it out.
8      Q.  Say, for example, if a claims agent wanted a
9   check mailed, your office would mail the physical
10  check?
11     A.  We do mail claims checks, yes.
12     Q.  Is the policy support services part of
13  Harleysville the division of the company that made the
14  decision in this case that this claim should not be
15  paid?
16     A.  We're not part of the claims department.  The
17  claims department is a different department, but in
18  the services area our system is set up that policies
19  will terminate or cancel for non-payment of premium,
20  so we do get involved from that aspect.
21     Q.  Was the policy support services part of
22  Harleysville responsible for the decision in this case
23  that this policy ceased to exist at a certain point or
24  whatever word we use for it?

5

1   basically policy support services.  Nothing in there
2   is underwriting as far as I can tell.
3          MR. BESTE:  So your position is that the
4   30(b)(6) deposition notice does not call for any
5   testimony from underwriting employees?
6          MR. CASARINO:  No.  That's my
7   understanding.  Originally I thought it was because
8   everybody seemed to think underwriting, but this is
9   really not underwriting.  It's all dealing with policy
10  support.
11         MR. BESTE:  Okay.
12  BY MR. BESTE:
13     Q.  I'm going to show you what's been marked as
14  H-23.  I think you already have a copy of that.
15         MR. CASARINO:  That's that one there
16  (indicating).
17     Q.  Have you seen this document before?
18     A.  Yes.
19     Q.  Can you tell me when you have seen it?
20     A.  Well, I saw it today, but I also saw it prior
21  to today.  I think it was in my file and I know I
22  started the file back in May.  I'm not sure when I had
23  this put in the file.
24         I don't recall specifically when I got

2  (Pages 2 to 5)

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

**6**

1  this particular notice.
2      Q.  Do you know when you first became aware of this
3  claim or lawsuit?
4      A.  I was asked to pull some things together early
5  spring.
6      Q.  Of 2007?
7      A.  Mm-hmm.  Yes.
8      Q.  By "some things together," you mean various
9  things that were part of your repertoire --
10     A.  Correct.
11     Q.  -- or area?
12     A.  Mm-hmm.
13     Q.  Why don't I go through the topics listed on
14  that deposition notice?  Let's go through them one by
15  one.
16         Did you have any meetings separate and
17  apart from meetings with any attorneys --
18     A.  No.
19     Q.  -- regarding today's deposition?
20     A.  No.
21     Q.  One rule as we go forward.  It would be a lot
22  easier for the court reporter to take down testimony
23  if you try to let me finish the questions.  And I tend
24  to hesitate a lot, so I know it can be confusing, but

**7**

1  it just makes it easier.  It's the most broken rule,
2  so don't worry about it.
3         You didn't have any meetings with
4  management employees or other employees of
5  Harleysville regarding your testimony today?
6      A.  No, I did not.
7      Q.  You met with Mr. Casarino immediately before
8  the deposition today.  Is that right?
9      A.  Yes.
10     Q.  Did you meet with him at any other time?
11     A.  I did not meet with him.  I had a telephone
12  conversation with him.
13     Q.  Did you have any telephone conversation with
14  other employees of Harleysville regarding this
15  deposition?
16     A.  No.
17     Q.  All right.  Let's start with topic number 1 on
18  H-23.
19         Can you tell me whether you're authorized
20  to speak on that subject?
21     A.  With respect to coverage termination for
22  non-payment of premium, yes.
23     Q.  How about the second topic?
24     A.  Again, with the payment collection, yes.

**8**

1      Q.  Third topic?
2      A.  With respect to, again, non-payment of premium
3  or non-payment -- canceling for non-payment of
4  premium, yes.
5      Q.  How about the fourth topic?
6      A.  Yes, again for non-payment of premium.
7      Q.  How about the fifth topic?
8      A.  Claims?  No, I would not get involved with
9  that.
10     Q.  How about the sixth topic?
11     A.  No.
12     Q.  The seventh topic?
13     A.  No.
14     Q.  The eighth topic?
15     A.  No.
16     Q.  And finally the ninth topic?
17     A.  Yes.
18     Q.  All right.  In your current position, do you
19  have any employees under your supervision?
20     A.  Yes.
21     Q.  How many employees do you supervise?
22     A.  I have five people that report to me directly
23  and two of them are supervisors who have an additional
24  22 employees reporting to them.

**9**

1      Q.  Who are the two supervisors that work for you?
2      A.  Joanne Brooks and Linda Ebright.
3      Q.  And who do you report to?
4      A.  Steve Crone.
5      Q.  Steve Crone is your supervisor?
6      A.  He's my manager, yes.
7      Q.  Do you know what his title is?
8      A.  Assistant vice president of agency and field
9  services.  It's just changed, but I think that's what
10  it is.
11     Q.  What position did you hold in 2004?
12     A.  Services manager position that I hold now.
13     Q.  How long have you held that position?
14     A.  About 25 years.
15     Q.  Can you give me a general description of your
16  primary responsibilities?
17     A.  Responsibilities would be overseeing the
18  remittance processing unit and output distribution
19  units, as well as I have business analysis
20  responsibilities for our corporate direct bill system
21  and our Documerge or output system that generates the
22  output that's handled in the output distribution unit.
23     Q.  You said Documerge?
24     A.  Yes.

3  (Pages 6 to 9)

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

---

10

1    Q.  What's that?
2    A.  That's a system that's used to print the style
3  of paper, the style of form content that we print out.
4  It's a system.
5    Q.  The policy support services, is it a division?
6  Is it a section?  What is it?  What is it called?
7    A.  It's a department within the services division.
8    Q.  So the policy support services division is
9  where you work?
10    A.  Correct.
11    Q.  What involvement -- how about I refer to it as
12  the policy support division?  Is that fair?
13    A.  Sure.
14    Q.  What involvement does the policy support
15  division have with interpreting policy provisions?
16    A.  We would be responsible for those provisions
17  that are associated with collecting premium and
18  canceling for non-payment of premium.
19        We would not have responsibility for
20  coverages associated with a policy and that type of
21  thing.
22    Q.  But when we're talking about premium receipts,
23  your department has the final say regarding how a
24  particular policy provision applies to that aspect of

---

11

1  a claim?
2    A.  No.  We do not get involved with any type of
3  coverage verification for claims.
4    Q.  Well, there are provisions in Harleysville's
5  policy that deal with the impact of late premium
6  payments.  Is that correct?
7    A.  Correct.  Yes.
8    Q.  Does your division have final authority with
9  respect to the application of those provisions?
10    A.  We have provisions set up or procedures set up
11  that we follow under strict guidelines.  Anything over
12  and above that, we have to have underwriting approval
13  for us to handle beyond the specific guidelines that
14  are set up for us.
15    Q.  What guidelines do you have access to or to
16  guide your work?
17    A.  It's guidelines that tell us we can accept a
18  premium payment provided it is received by a due date
19  or an extended due date.
20    Q.  Does that have a title?  Is that a document?
21    A.  It's in our corporate direct bill procedure
22  guideline.
23    Q.  Corporate direct bill procedure guideline?
24    A.  I think it's actually called corporate direct

---

12

1  bill criteria.
2    Q.  Now, do you know whether that's the same
3  document that's been produced in this litigation?
4    A.  Yes.  Yes.
5        MR. CASARINO:  It may even have been the
6  last document that was marked.
7    Q.  I'm going to show you H-26.  Is that what
8  you're referring to?
9    A.  Yes.
10    Q.  Are there any other written policies or
11  procedures or manuals or anything like that that you
12  refer to in carrying out your duties for Harleysville?
13    A.  Not that I refer to, no.
14    Q.  Is H-26 a fair representation of the direct
15  bill criteria in effect in 2004?
16    A.  Yes.
17    Q.  Even though it has a date of May 2006 below it?
18    A.  Actually, this is the agent's document.
19  There's also one that was internal which is dated
20  March of 2005.  We did not have a copy from 2004, but
21  our procedures had not changed.
22        MR. CASARINO:  Are these two documents
23  different?
24        THE WITNESS:  This (indicating) is the

---

13

1  agent document.  It's very similar.  There's a little
2  bit more info in the internal one that we didn't have
3  in the agent's document.
4        MR. BESTE:  Can we mark this one?
5        MR. CASARINO:  Yes.  I thought that was
6  the one I sent over to you in the last couple of days.
7        MR. BESTE:  I thought this (indicating)
8  was the one that you sent me.
9        MR. CASARINO:  I don't think so.  I think
10  you got this one before, but in any event --
11        MR. BESTE:  Well, let's mark that as H-27.
12        MR. CASARINO:  I would appreciate a copy
13  of it so I can have a copy.
14        (H Deposition Exhibit No. 27 was marked
15  for identification.)
16  BY MR. BESTE:
17    Q.  I've marked Exhibit H-27.  This is the
18  corporate direct bill criteria that establishes
19  essentially how you should do your job?
20    A.  How we should do our job, a lot of which it is
21  automated, but it's the processes that we do
22  associated with the automated system.
23    Q.  In 2004 where was the remittance processing
24  part of Harleysville located?

---

4  (Pages 10 to 13)

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

14

1    A.  In Harleysville, Pennsylvania, where it is now.
2    Q.  And any employees handling premium payments
3  from an insured would fall in your department?
4    A.  That's correct.
5    Q.  Can you explain to me practically the task of
6  Harleysville employees who actually receive the
7  premium payment envelopes from an insured?
8    A.  Mm-hmm.  The premium payments come into our
9  department.  They're opened on Opex opening equipment.
10  They're run through NCR remittance processing
11  equipment which captures an image of the stub and the
12  check.
13        If the payment comes in with a scannable
14  stub, the data is captured from the stub.  It is run
15  into our billing system that evening and if the master
16  is active, the payment is applied.
17        If the master is not active or can't be
18  matched for one reason, it could be an incorrect
19  policy number, it could be paid in full, any of those
20  type of situations, that comes out on a report for us
21  to look at the following day to determine what we need
22  to do with that payment.
23    Q.  What do you mean by "master"?
24    A.  Billing master.  It's an electronic view that

15

1  we have of our activity that occurs on a direct bill
2  policy.
3    Q.  So am I correct that if the computer system
4  doesn't flag a particular payment that comes in it's
5  sent off to the bank and deposited?
6    A.  The payments are processed, are opened and run
7  through the NCR equipment and deposited to the bank
8  the same day.
9        The payment activity is then run into our
10  billing system in the overnight cycle and that's where
11  they're then applied or they go into suspense if they
12  can't be applied to be researched the following day.
13    Q.  Does that mean in all circumstances the checks
14  are deposited and then if there's an issue you deal
15  with that the next day?
16    A.  That's correct.
17    Q.  So there's no mechanism to stop a check from
18  being cashed or deposited by Harleysville prior to
19  some type of analysis by a Harleysville employee?
20    A.  That's correct.  All checks are deposited
21  first.
22    Q.  And your department gets a report every morning
23  on any issues that arose with respect to the prior
24  day's payment processing?

16

1    A.  That's correct.
2    Q.  Do you know what happened when your department
3  received the premium payment at issue in this case?
4    A.  Yes.
5    Q.  Can you explain to me what happened?
6    A.  We received a premium payment.  It came in with
7  a scannable document.  It was opened and run through
8  our equipment just like I explained.  The following
9  morning it showed up on a report for us because the
10  policy was terminated.
11        The remittance processor would have looked
12  at the billing master to see if there were any
13  messages there from the underwriter authorizing
14  reinstatement.  If there were no messages there, and
15  in this case there were not, the payment was returned
16  to the insured and reinstatement was denied because
17  the payment was late.
18    Q.  Do you know when Mr. Drexel's premium in this
19  case was received by Harleysville?
20    A.  Yes.  It was received on July 13th.  That's the
21  date it was imaged.
22    Q.  And how do you know that?
23    A.  Because of the date that it shows up in our
24  image file.

17

1    Q.  And you undertook some effort to verify that
2  fact before you came for a deposition today?
3    A.  Yes.
4    Q.  After that event occurred, does your department
5  retain any authority with respect to policy
6  reinstatement?
7    A.  No.
8    Q.  That, in fact, resides with the underwriting
9  department?
10    A.  That's correct.
11    Q.  Does Harleysville have an official position
12  regarding what happened to Mr. Drexel's policy at the
13  point that this premium payment was received by
14  Harleysville?
15        MR. CASARINO:  I'm not sure I understand
16  your question.  What do you mean by does it have an
17  official position?
18    A.  I don't understand.
19    Q.  Harleysville's received Mr. Drexel's premium
20  payment in July of 2004, correct?
21    A.  Correct.
22    Q.  What then happened to Mr. Drexel's policy?
23    A.  His policy was canceled and it remained
24  canceled because the payment was late.  So the

5  (Pages 14 to 17)

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

18

1  policy -- I should say it's actually terminated. The
2  policy expired. The renewal was not accepted.
3     Q.  Can you explain to me the difference between
4  the terms termination, cancellation and expiration?
5     A.  When we issue a renewal policy we ask for
6  premium by the due date of that renewal term. If the
7  premium is not received, we send out an expiration
8  notice. If payment is not received, the policy
9  terminates or expires as of the expiration date of
10  that prior term.
11         When you use the term cancellation, that's
12  midterm, somebody falls short in payments throughout
13  the policy term, that becomes a cancellation. But in
14  this case it's a termination because no payment was
15  received on the renewal.
16     Q.  And that is Harleysville's analysis with
17  respect to Mr. Drexel's claim?
18     A.  That's correct.
19     Q.  So what you just said applies equally to
20  Mr. Drexel's policy in this case?
21     A.  Correct.
22     Q.  Are those differences between cancellation,
23  expiration and termination set forth in Mr. Drexel's
24  policy of insurance?

19

1     A.  I would not be able to answer that without
2  looking into the policy content, and I do not do that.
3     Q.  So you have no knowledge of whether the
4  distinctions that you've drawn between policy
5  cancellation and expiration are set forth in
6  Mr. Drexel's policy?
7     A.  When you refer to Mr. Drexel's policy, I'm not
8  quite sure what you're referring to. I do know that
9  the renewal policy has a message on it that says the
10  policy will continue if payment is received by the
11  expiration date, so that is mentioned in there.
12     Q.  In where?
13     A.  On the policy declarations page.
14     Q.  And that is sent to the insured by your
15  division?
16     A.  We issue a copy of that for both the insured
17  and the agent, yes.
18     Q.  Have you reviewed the document that was sent
19  out to Mr. Drexel in this case?
20     A.  I did look at the dec. page, yes.
21     Q.  I'm going to hand you what's been marked as --
22  I don't think I marked the policy yet, did I?
23         MR. CASARINO:  No.
24         MR. BESTE:  I'm going to have this marked

20

1  as Exhibit 28, please.
2         (H Deposition Exhibit No. 28 was marked
3  for identification.)
4  BY MR. BESTE:
5     Q.  Are you able to identify this document?
6     A.  Yes.
7     Q.  What is it?
8     A.  It is the dec. or declaration page for the
9  commercial package policy.
10     Q.  You're referring to the second page?
11     A.  Yes.
12     Q.  Is this the document that you were referring
13  to?
14     A.  Yes. It's a multipage document so, yes, it is.
15  This is page 1.
16     Q.  And by looking at the first page of H-28, are
17  you able to identify the package as a whole?
18     A.  Yes.
19     Q.  It appears to be Mr. Drexel's policy at issue
20  in this case?
21     A.  I think this is actually a certified policy.
22  And when a renewal policy is issued, the only forms
23  that are issued with the policy are anything that has
24  been changed or has a new expiration date. He would

21

1  not receive a complete package like this at every
2  renewal.
3     Q.  Is the certified policy that you're looking at,
4  is that generated by your department as far as you
5  know?
6     A.  It could be.
7     Q.  You can't tell?
8     A.  I can't tell. There's no name on here that
9  really lets me know who did it.
10         I do know that in our output distribution
11  unit there are times that we do put policies together,
12  but from here I can't tell if this is one that we did
13  or not.
14     Q.  If I asked you to locate in that policy where
15  the distinctions between expiration, termination and
16  cancellation are or are not spelled out, would you be
17  able to do that?
18     A.  I would be able to show you the message I was
19  referring to on the declarations page.
20     Q.  But beyond that, you couldn't?
21     A.  I would have to have someone go through it.
22         No, that's not something that I would do.
23     Q.  And you don't have any expertise in reading the
24  policy language in that regard?

6 (Pages 18 to 21)

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

22

1    A.  No, I would not.
2    Q.  What language were you referring to?
3    A.  I was referring to this message right here
4    (indicating) which says the renewal insuring
5    agreement.
6    Q.  And that's on page 472?
7    A.  Page 2 of the declaration page.
8    Q.  Okay.  During the course of processing
9    payments, does your department have any discretion
10   whatsoever as to how late premium payments are handled
11   by Harleysville?
12   A.  No.  Our guidelines are given to us by the
13   underwriting department.
14   Q.  And you report facts to underwriting and the
15   decisions regarding those facts are made exclusively
16   by the underwriting department?
17   A.  They're made by the underwriting department,
18   yes.
19   Q.  Were any notices generated in this case after
20   your department generated the premium payment at
21   issue?
22   A.  After we generated the premium payment at
23   issue?
24   Q.  I'm sorry.

23

1          Were any notices sent to Mr. Drexel by
2    your department after the premium payment at issue was
3    processed by your department?
4    A.  When we processed that late payment, yes, we
5    did send a reinstatement denied letter.
6    Q.  Have you seen that letter recently?
7    A.  Yes.
8    Q.  And it was sent to Mr. Drexel?
9    A.  That's correct.
10         MR. BESTE:  Do you know where that
11   document is, Steve?
12         MR. CASARINO:  I think it's in that
13   package.  It might be the last document there.
14         Is this (indicating) what you're referring
15   to?
16         THE WITNESS:  Yes.
17         MR. BESTE:  Which letter you just sent us,
18   Steve?  This is the letter of September 7th?  Is that
19   right?
20         THE WITNESS:  I think that's the one, yes.
21   I think that's the one it's in.  I think it's right
22   before this (indicating).
23         MR. CASARINO:  I'm not sure.  Probably.
24         THE WITNESS:  Right there (indicating).

24

1          MR. CASARINO:  Yes.
2          MR. BESTE:  I'm going to have this entire
3    letter and its contents marked as H-29.
4          MR. CASARINO:  The entire package?
5          MR. BESTE:  Yes.  It might make it easier
6    to go through.
7          MR. CASARINO:  That includes the guideline
8    too, right?
9          MR. BESTE:  I believe it did, yes.
10         (H Deposition Exhibit No. 29 was marked
11   for identification.)
12   BY MR. BESTE:
13   Q.  Now I'm showing you what's been marked as H-29.
14         And you're referring to page 11 of 14 from
15   the fax line, correct?
16   A.  Correct.  Yes.
17   Q.  If you could explain to me what this letter is.
18   A.  This letter is advising the insured that the
19   policy has not been reinstated and there is no
20   coverage.
21   Q.  And once this letter was generated by your
22   department, your department no longer had any
23   authority to change the status of this policy?
24   A.  That's correct.

25

1    Q.  And this letter informs Mr. Drexel that the
2    policy was canceled?
3    A.  That the policy has expired, it was terminated.
4          Mr. Drexel also got a termination notice
5    from us advising him that the policy had terminated.
6    This was a follow-up after that termination notice
7    advising him that we could not reinstate.
8    Q.  This letter uses the word cancellation though,
9    does it not?
10   A.  Yes, it does.
11   Q.  Was there another letter sent to Mr. Drexel
12   indicating something aside from cancellation had
13   occurred?
14   A.  These were the notices he would have received
15   advising him of notice of policy expiration.
16   Q.  And you're referring to page 4 of this exhibit?
17   A.  Correct.
18   Q.  H-29.
19         Is this notice of policy expiration
20   generated by your department?
21   A.  It's generated by our automated system.
22   Q.  Without human input?
23   A.  Correct.
24   Q.  Can you tell when this was generated?

7  (Pages 22 to 25)

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

26

1    A.  This was generated on June 14th of '04 with a
2    mailing date of June 15th, '04.
3    Q.  And how can you verify that this letter was
4    sent to Mr. Drexel?
5    A.  We mailed this type of notice through our
6    Gunther automated inserting equipment.  We have a log
7    in that equipment that shows us the documents that
8    have been mailed on a particular day.  And we do have
9    the log for this showing that it was mailed on the
10   15th.
11   Q.  Does your system notify Harleysville's claims
12   employees of this event?
13   A.  No.  Not specifically, no.
14   Q.  Who at Harleysville does your department notify
15   when an event such as this occurs?
16   A.  This is generated by our automated system.  Our
17   automated system at that point goes into an expiration
18   status.  Anybody looking at the billing master can see
19   that there's an expiration notice out on that policy.
20   Q.  Who has access to the billing master?
21   A.  All employees in the company have access to
22   inquiry.  Not all have access to entry but they all
23   have access to inquiry.
24   Q.  So any Harleysville employee could have

27

1    ascertained as early as June 14th, 2004 that the
2    policy had expired?
3    A.  Yes.
4    Q.  But your department does not take any
5    affirmative steps to ensure the claims part of
6    Harleysville is aware of such an event?
7    A.  It happens automatically in the system.  The
8    system updates the billing master and again anybody
9    who has access can see that.  We do not send out any
10   kind of notification separate from what's updated in
11   the billing system.
12   Q.  Are there any safeguards or procedures that
13   prevent a claim from being paid or adjusted after an
14   event of expiration or termination?
15   A.  Since I don't work in the claims area, I cannot
16   answer that.
17   Q.  From your perspective though, your department
18   does not take any affirmative steps to prevent payment
19   of a claim after an event such expiration or
20   termination occurs?
21   A.  Correct.
22   Q.  And that was the case in 2004?
23   A.  Correct.
24   Q.  And it's the case today?

28

1    A.  Correct.
2    Q.  Do you think that should be changed?
3        MR. CASARINO:  Objection.
4    A.  I wouldn't have the authority to say that.
5    Q.  All right.  This is page 6 of 14 in the same
6    exhibit.  This is your signature at the bottom?
7    A.  Printed by the computer.
8    Q.  You don't have to sign hundreds of these every
9    day?
10   A.  No, I don't.  Thank goodness.
11   Q.  This is titled Confirmation of Termination?
12   A.  Correct.
13   Q.  Correct?
14   A.  Mm-hmm.
15   Q.  And this was issued by your department on July
16   7th.  Is that correct?
17   A.  It actually was issued on the 6th, again by the
18   automated system generated automatically.  No one had
19   to initiate it.  It was issued on the 6th and it was
20   mailed on the 7th.
21   Q.  How can you prove or show that it was mailed?
22   A.  We have no postal returns.  This particular
23   document I do not have a Gunther inserter log because
24   at that time it was not 2D bar coded to run through

29

1    the equipment because some of these notices are
2    handled with proof of mail and others are not, so back
3    in 2004 these were mailed manually.  They were put in
4    envelopes and mailed manually.
5    Q.  So you cannot point me to any proof of mailing
6    with respect to the notices sent to Mr. Drexel in this
7    case?
8    A.  Correct.
9    Q.  Can you explain to me why your department
10   issued both the June 14th notice of policy expiration
11   and the July 6th confirmation of termination?
12   A.  The expiration notice is a courtesy notice
13   reminding the insured that their payment is late.  If
14   they pay by what we're giving a grace period or an
15   extended due date, coverage will be continued without
16   lapse.
17       When you get to the extended due date,
18   plus a grace period if payment still is not received,
19   we send a notice confirming that the policy has
20   terminated and there is no coverage as of the
21   expiration date of the policy.
22   Q.  Looking at the June 14th notice of expiration,
23   can you tell me what the grace period was?
24   A.  We gave him an extended due date of June 30th.

8 (Pages 26 to 29)

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

30

1    Q.  I thought you said there was --
2    A.  In addition to that, we have a five-day grace
3  period before we truly confirm for those insureds who
4  might mail very close to that date to give mail time
5  and process time for us to handle that payment.
6    Q.  And that's why this confirmation of termination
7  was mailed on July 6th?
8    A.  That's correct.
9    Q.  Now, the July 6th confirmation of termination
10  does not appear to be a computer-generated document in
11  its entirety.  Is that correct?
12    A.  No.  That is computer-generated.
13    Q.  So the fact that the third box is checked and
14  it looks like the type is different than the type of
15  the rest of the document does not mean it was not
16  generated by a computer?
17    A.  That's correct.  This notice is used for
18  different types of cancellations and terminations and
19  depending upon the type that it is, there's a special
20  message that is put in here.  This (indicating) is all
21  preprinted information or canned information that
22  shows on every notice.
23        This is specific to the condition but,
24  again, because this matches this (indicating), it's

31

1  all the same print by the computer.
2    Q.  Can you tell me what page 7 of H-29 shows?
3    A.  This is a screen print from our inquiry, direct
4  bill inquiry system and this shows the payments that
5  we have received from this particular insured.  It
6  shows the last twelve payments.
7        In this case we had only received seven
8  payments, but it shows the payment, the date it was
9  received and the amount and then if there were any
10  associated refunds.
11    Q.  Is there any question that Harleysville cashed
12  Mr. Drexel's $283 check on June 14th?
13    A.  No.  It was cashed.  It was cashed actually on
14  the 13th, applied to the billing master on the 14th.
15    Q.  This page here, in essence, represents the
16  final word on payment receipts and processing and that
17  type of thing?
18    A.  Yes.
19    Q.  And the second page is an additional part of
20  that same printout.  Is that correct?
21    A.  That's correct.
22    Q.  Now, on that second page starting from the
23  bottom, the column showing dates, am I correct that
24  that indicates when certain events occurred?

32

1    A.  That's correct.
2    Q.  So, for example, on March 14th, 2002 a renewal
3  notice was sent to Mr. Drexel?
4    A.  Correct.
5    Q.  Are you able to tell from this document when
6  the due date was for that premium?
7    A.  Yes.  The due date is right over here.  It was
8  June 8th.  Your renewal and your invoice is issued the
9  same day.
10    Q.  So, for example, the June 11, 2003 renewal
11  invoice was sent to Mr. Drexel on June 11th?
12    A.  Correct.
13    Q.  And it showed a due date of July 8th?
14    A.  Correct.
15    Q.  Now, it looks like Harleysville received
16  payment on July 10, 2003?
17    A.  Correct.
18    Q.  And that event did not lead to any policy
19  termination or cancellation?
20    A.  That's correct.  The renewal was issued late.
21  I don't know why.  But because the renewal was issued
22  late, you still give the insured 20 days to pay, so he
23  had his 20 days, plus our grace period.  That payment
24  was received on time.

33

1    Q.  So that July 10th, 2003 payment was received
2  after the due date but within the grace period?
3    A.  That's correct.
4    Q.  And the entry for June 14th, 2004 is the
5  confirmation of termination?
6    A.  That's actually the expiration notice.
7    Q.  I'm sorry.  The expiration notice?
8    A.  Yes.
9    Q.  And then the July 6th entry shows the
10  confirmation of -- I don't know what word to use with
11  you -- the confirmation of termination?
12    A.  Correct.
13    Q.  And what is the entry marked C554-3?
14    A.  That's actually the form number.  You don't
15  have it printed on here.
16        Oh, yes, we do.  Over here.  Sorry.  C54
17  is the actual form number.
18    Q.  So the two entries, the topmost entries for
19  July 6th represent an event, the cancellation and the
20  notice sent out to Mr. Drexel?
21    A.  Correct.
22    Q.  Can you identify page 9 of H-29?
23    A.  This is the stub that Mr. Drexel sent in with
24  his payment.  It's the stub from the expiration

9  (Pages 30 to 33)

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

34

1  notice.
2       Here you can see that it issued on the
3  14th, was mailed on the 15th. It's the bottom portion
4  of the expiration notice that we had sent to him.
5  Q.  And page 10 represents Mr. Drexel's check?
6  A.  That's correct.
7  Q.  If you could kind of remind me what page 11 is.
8  A.  That's our notice denying reinstatement which
9  we sent out when we returned his payment.
10  Q.  Now, the June 14th notice is titled a notice
11  policy expiration. The July 6th notice is titled
12  confirmation of termination, but yet in this page 11
13  it just says, and I'll quote it, "This policy is
14  canceled and will not be reinstated."
15       Can you tell me why the word "canceled" is
16  used in that document?
17  A.  This is a document that's used for all
18  situations where we're denying reinstatement and we do
19  not change the wording on here to fit the various
20  situations.
21       And I think your insureds probably
22  understand canceled as well as terminated or expired,
23  but it's a notice that's used in all those situations.
24  Q.  Mr. Drexel's policy was not in any type of

35

1  electronic payment situation, was it?
2  A.  No, it was not.
3  Q.  You were receiving paper checks from
4  Mr. Drexel?
5  A.  Yes.
6  Q.  Can you tell me whether that's the case for the
7  entire life of the policy?
8  A.  That we received checks?
9  Q.  Yes.
10  A.  Yes, we did.
11  Q.  Was there a point in time when Mr. Drexel's
12  premium was being paid out of an escrow account
13  associated with the mortgage as far as you know?
14  A.  Not that I'm aware of. I did not go back to
15  2002 to look at that. Not that I'm aware of.
16  Q.  During the time period when a policy is being
17  paid out of an escrow account associated with a
18  mortgage, how does that change who Harleysville gives
19  notice to of policy events?
20  A.  If there's another payer on the policy, they
21  would get copies of all associated invoices, notices
22  of expiration, confirmation. They would receive all
23  the same notices that the insured receives.
24  Q.  Are there any circumstances where notices would

36

1  be sent to the mortgage company or escrow agent and
2  not the insured?
3  A.  No.
4  Q.  Now I'm going to ask you a question about the
5  tolerance section of the corporate direct criteria.
6  I'm sorry. I think I'm going to have to show you
7  H-27.
8       I take that back. H-26. It's page 3 of 7
9  on H-26. There's a section labeled Tolerances.
10  Within that section there's a paragraph entitled
11  Reinstatement.
12       Can you explain to me what that paragraph
13  states?
14  A.  When we issue an invoice, the insured is billed
15  for an amount of premium and also for installment
16  fees. There are times when a payment is late, but it
17  crosses in the mail with our expiration notice or
18  non-pay notice and we will reinstate the policy with a
19  payment if it's short just the fee amount.
20  Q.  In other words, the installment fee amount?
21  A.  That's correct.
22  Q.  Does your department have any discretion
23  otherwise or is that what it is instructed to do?
24  A.  That's actually in the automated system. The

37

1  system will automatically reinstate if the payment is
2  on time and it's within the premium, less the fee
3  amount. That's logic that's built into the system.
4  Q.  And the employees of your department don't have
5  the ability or authority to change that aspect of the
6  system?
7  A.  That's correct.
8  Q.  If you look further down on that page, it's the
9  last sentence. Can you explain that? It says, "If
10  renewal is issued late, multiple installments may be
11  due at initial due date."
12       Can you explain what that sentence means?
13  A.  We always give our insureds 20 days to pay
14  their premium. If the policy -- and your first
15  installment is due on the renewal effective date. If
16  you're, say, on a nine pay or ten pay, your second
17  installment is due the second month, the third
18  installment the third month.
19       If your renewal is issued late and you're
20  already into the first month, in order to give a
21  20-day due date you may have to bill for two
22  installments due initially or three depending on how
23  late your renewal is issued.
24  Q.  Does your department actually issue premium

10  (Pages 34 to 37)

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

38

1    invoices to the insured?
2    A.  It's all within the automated system.  It's all
3    automated.  There's logic built into the system.
4    Q.  Who controls the logic with respect to language
5    on premium invoices sent to insureds?
6    A.  That would be my area along with underwriting
7    and our law department.
8    Q.  Are there many different forms that can go out
9    to an insured when you send a premium payment or is
10   there one master form that Harleysville sends out to
11   all homeowner's policies in a given year?
12        Do you understand what I'm asking you?
13   A.  The invoice is the same for all insureds.  Now,
14   your renewal invoice might have a different message on
15   it than your interim invoice would have, but it's all
16   on the same form.
17   Q.  But all of the interim renewal notices or
18   renewal notices or premium invoices would be the same
19   collectively?
20   A.  Correct.  All printed on the same form.
21   Q.  How frequently does Harleysville, in particular
22   your department, change the content of those forms?
23   A.  Not often at all.
24   Q.  And you do take part in that process when it

39

1    occurs?
2    A.  Yes.
3    Q.  If you could turn to page 5 of H-26.
4        Can you explain to me the language
5    regarding Notice of Cancellation for Non Payment of
6    Premium section?
7    A.  We again have built within our automated system
8    a cancellation process for mid-term cancellations
9    where our system checks for policy equity and looks at
10   the premium that has been paid and for the amount of
11   time that we have provided coverage for that premium
12   payment.
13        Whenever we get into state required number
14   of days and equity, we will send out a midterm notice
15   of cancellation for non-payment of premium giving
16   state required number of days notice and again a
17   five-day grace period.
18   Q.  Can you explain to me the difference between
19   what happened to Mr. Drexel's policy and a
20   cancellation for non-payment of premium?
21   A.  A cancellation for non-payment of premium
22   occurs in the middle of a policy term.  It's midterm.
23        Mr. Drexel's was at the beginning of his
24   policy term.  He had not accepted the renewal.

40

1    Q.  So the cancellation for non-payment of premium
2    can only occur during the course of an active policy
3    period as opposed to a renewal date?
4    A.  That's correct.
5    Q.  Are you aware of any language in Mr. Drexel's
6    policy that delineates that distinction?
7    A.  I would not be aware of that, no.
8    Q.  And who at Harleysville would be able to
9    testify regarding such language or provisions?
10   A.  That would have to be the underwriting
11   department.
12   Q.  Does your department have any discretion
13   whatsoever in identifying a particular event as either
14   an expiration or a cancellation for non-payment of
15   premium?
16   A.  Again, that's all within the automated system.
17   There's logic built into the system for when a policy
18   will expire versus non-pay.
19   Q.  Aside from adjustments to the system's logic,
20   there is no human input?
21   A.  That's correct.
22   Q.  How frequently do you adjust the logic of the
23   system?  Is it just as needed?
24   A.  Correct.

41

1    Q.  Can you tell me roughly how frequently that is
2    needed?
3    A.  It's infrequent and it depends on when we get
4    new guidelines from various states, rules, regulations
5    change, number of days notice change, wording for
6    forms require a change.  We might go in and make those
7    changes, but that's again all associated with the
8    non-pay, the legal notice of non-pay, notice of
9    cancellation for non-payment of premium.
10   Q.  Is Harleysville required to give notice of
11   expiration or cancellation prior to the effective date
12   of a policy's cancellation or expiration?
13   A.  You're required to give notice for a
14   cancellation for non-payment of premium.
15        There is no requirement that I'm aware of
16   for notice of expiration.  That's a courtesy notice,
17   something that we extend to our customers.
18        MR. BESTE:  Can I have this marked as
19   Exhibit 30, please?
20        (H Deposition Exhibit No. 30 was marked
21   for identification.)
22   BY MR. BESTE:
23   Q.  Are you able to identify H-30?
24   A.  Yes.

11  (Pages 38 to 41)

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

42

1  Q.  What is it?
2  A.  It's a renewal invoice.
3  Q.  Is this the renewal invoice sent to Mr. Drexel
4  by your department on March 26th, 2004?
5  A.  This particular invoice was mailed with the
6  policy.  The agent had the agent's mail option, so the
7  invoice and the insured's copy of the policy would
8  have been delivered to the agent for him to forward to
9  the insured.
10  Q.  What steps does Harleysville take to ensure
11  that the agent fulfills his responsibility by
12  forwarding the policy materials to the insured?
13  A.  The agent is a representative of our company
14  and that's his responsibility.  If he elects the
15  mailing option, it's his responsibility to deliver it
16  to the customer.
17  Q.  Are you able to verify whether or not
18  Mr. Drexel's agent forwarded his policy materials to
19  him in March of 2004?
20  A.  I would not be able to do that, no.
21  Q.  Does your department control the actual
22  language that is placed on this premium notice?
23  A.  There again, that would be my area along with
24  our law department and underwriting.  It's an

43

1  associated effort.
2  Q.  How involved are you with the selection and
3  placement of language in premium invoices such as
4  this?
5  A.  I can make the recommendation but, again, it's
6  a group that would actually look at it and decide what
7  changes we did want to make or not make.
8  Q.  Your department makes a recommendation to legal
9  and underwriting?
10  A.  Right.  Marketing may even get involved.  It
11  just depends on what type of wording anybody has
12  recommended that we change where that's being looked
13  at.
14  Q.  If you look at page 2 of H-30, there's a
15  paragraph there entitled Late Payments.
16      Can you explain to me what that paragraph
17  means from the perspective of your department?
18  A.  Again, it's emphasizing that payment must be
19  received by the due date for continuous coverage.  If
20  not, we could be issuing notices of cancellation.
21  Q.  Why does this language speak about a notice of
22  cancellation for non-payment of premium versus a
23  notice of expiration or something to that effect?
24  A.  It's just a standard message that's on the back

44

1  of our notices.
2  Q.  But this is, in fact, a policy renewal notice,
3  is it not?
4  A.  Yes, it is.
5  Q.  So the paragraph labeled Late Payments was
6  instructing Mr. Drexel what the potential consequences
7  of him not paying this March 26th, 2004 premium
8  invoice in a timely manner?
9  A.  Correct.  It's telling him that he may not have
10  coverage if he doesn't pay on time.
11  Q.  But it's telling him that the policy may be
12  canceled for non-payment of premium.  Isn't that
13  correct?
14  A.  Right.
15  Q.  And it does not draw any distinction between
16  cancellation or expiration?
17  A.  No, it does not.
18  Q.  Again, this was a renewal premium invoice sent
19  to Mr. Drexel?
20  A.  Yes, it was.
21  Q.  I'm going to show you page 481 of H-28.
22      MR. CASARINO:  You call it page 481?  I'm
23  sorry?
24      MR. BESTE:  That's the Bates number.

45

1      MR. CASARINO:  What's the actual number?
2      Okay.
3  BY MR. BESTE:
4  Q.  Can you explain paragraph A to me, please?
5  A.  I'm not sure that I should be interpreting
6  this.  This is not my area of responsibility.
7  Q.  That would be underwriting's responsibility?
8  A.  Right.  I mean, it says the insured can request
9  cancellation of the policy.
10  Q.  Comparing that language with the late payment
11  paragraph on the March 26th, 2004 renewal notice, is
12  it fair to say that those two paragraphs appear to
13  coincide or match one another?
14  A.  Well, your paragraph A is the customer
15  requesting cancellation.
16  Q.  A2.
17  A.  Okay.  A2 is referring to midterm cancellation.
18  I don't know that it's referring to expiration, but
19  again I should not be interpreting that.  It's not my
20  area of responsibility.
21  Q.  Again, that's underwriting's responsibility?
22  A.  That's correct.
23  Q.  Are you familiar with the term non-pay status?
24  A.  Yes.

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

46

1    Q.  What does that mean to you?
2    A.  A non-pay status is when a policy is in the
3    status of non-payment.
4    Q.  And that essentially prevents a payment from
5    being issued on a claim under that policy?
6    A.  Correct.
7    Q.  Does your department control under any
8    circumstances when a policy is put into non-payment?
9    A.  That's, again, generated by the system.  You
10   send out an invoice.  You have a due date.  If it's
11   not paid on time, it goes into a non-pay status and
12   then that's all generated by the system.
13   Q.  But it's your department's system that you're
14   referring to?
15   A.  Yes.
16   Q.  So in the first instance at least it's
17   controlled by your department?
18   A.  The logic that we have in the system, yes.
19   Q.  And the only people with authority to override
20   that logic is underwriting?
21   A.  Correct.
22   Q.  Does your department's computer system control
23   the effective dates of termination and cancellation
24   and expiration as well?

47

1    A.  That's underwriting providing information for
2    us from the various insurance departments that give us
3    the state required number of days notice so, again, we
4    work along with underwriting in making sure that our
5    system has the appropriate time frames.
6    Q.  But, again, that work with underwriting is
7    built into the logic of your computer system at any
8    given time?
9    A.  That's correct.
10   Q.  There's no case-by-case interaction between
11   your department and underwriting with respect to
12   processing a particular payment?
13   A.  No.  No.  That is all in the system.
14   Q.  Going back to this, let me show you what's been
15   marked as H-6.
16       Are you able to identify that document?
17   A.  No.  It's not a document that my area works
18   with.
19   Q.  It's not a document that your area processes?
20   A.  No.
21   Q.  And you have never seen a document such as
22   this?
23   A.  No.
24   Q.  Do you know who Robert Southard or Bob Southard

48

1    is?
2    A.  I believe he works in one of our field offices.
3    Q.  Do you know in what department or division?
4    A.  No, I'm sorry, I don't.
5    Q.  Do you know whether he works for underwriting?
6    A.  I would not be positive.  He's not someone that
7    I work with regularly.
8    Q.  Do you have any involvement with notices or
9    correspondence sent by the claims department to an
10   insured?
11   A.  No, I do not.
12   Q.  I'm going to show you what's been marked as
13   Exhibit H-19.
14       Are you able to identify that document?
15   A.  That's a policy system audit trail which I
16   occasionally look at.
17   Q.  Is that something that's controlled by your
18   department?
19   A.  No, it is not.
20   Q.  Do you have access to that information?
21   A.  I can look at it on inquiry, yes.
22   Q.  Do you know who else at Harleysville has access
23   to that data?
24   A.  Anyone in the underwriting or services area

49

1    would have access to inquiry of that data if they
2    would need to.
3    Q.  Do you know who controls this information
4    reflected in H-19?
5    A.  That would have to be between underwriting and
6    the commercial lines services and IT areas.
7    Q.  And as far as you know, the employees in your
8    department did not control or change any of the
9    information shown on this document?
10   A.  No.  We do not have access to change that.  We
11   only have access to inquiry.
12   Q.  When you say that, that just means to get more
13   information about certain subjects?
14   A.  We can view the data that's there, but we
15   cannot go in and change anything.
16   Q.  As far as your department is concerned, can
17   Harleysville retroactively terminate coverage or allow
18   it to expire?
19       MR. CASARINO:  I'm not sure I understand
20   your question.
21   A.  I'm trying to think how to answer that.  I'm
22   not sure I understand that.
23   Q.  Well, in this case the renewal date was June
24   8th.  Is that correct?

13  (Pages 46 to 49)

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

50

1    A.  Yes.
2    Q.  And your department did not receive
3  Mr. Drexel's premium payment until July 13th.  Is that
4  correct?
5    A.  That's correct.
6    Q.  Can you explain to me the status of
7  Mr. Drexel's policy between those two events?
8    A.  It would have been in expiration status.
9    Q.  And what does that mean?
10    A.  That means that notice has gone out that no
11  payment has been received and we have offered an
12  extended due date.
13    Q.  And if you do not get premium payment prior to
14  the expiration of the grace period following the
15  expiration or the due date, then the policy is
16  automatically canceled?
17    A.  Correct.
18    Q.  Or terminated?
19    A.  It's terminated, right.
20      MR. BESTE:  Okay.  That's all I have.
21      MR. CASARINO:  I have a couple of
22  questions for you.
23  BY MR. CASARINO:
24    Q.  Let's deal with the premium invoice that is

51

1  marked twice.  We will look at the one that's marked
2  as H-30.
3      It has on the front due dates for partial
4  payments for the entire policy period.  Is that
5  correct?
6    A.  That's correct.
7    Q.  So this premium notice, if I'm reading it
8  correctly, tells the insured the total amount of his
9  premium, how much must be paid by June 6, '04?
10      MR. BESTE:  Objection.
11    A.  It's June 8th.
12    Q.  June 8th, '04.  And then it has a schedule of
13  when payments are made or to be made?
14    A.  Correct.
15    Q.  I notice the document behind that where it
16  talks about late payments, does that refer also to
17  these various payments that are to be made?
18      MR. BESTE:  Objection.
19      MR. CASARINO:  What's the objection?
20      MR. BESTE:  Well, I think it calls for a
21  legal conclusion about the effect of that clause.
22      MR. CASARINO:  Okay.
23  BY MR. CASARINO:
24    Q.  Is that also included?

52

1      MR. BESTE:  I'm just noting it for the
2  record.
3    A.  This message prints on the back of all invoices
4  that go out so, yes, it would be on each individual
5  invoice.
6    Q.  Now let me ask you about the notice of policy
7  expiration to make sure I understand it.
8      You said your review of the document
9  indicates that this actually went out to Mr. Drexel?
10    A.  That's correct.
11    Q.  And do we know that he got it?
12    A.  That we would not know, other than we have no
13  postal return so we have to assume that he received
14  it, yes.
15    Q.  But you also mentioned earlier that your system
16  is set up so that when a check and receipt are
17  received, they go into a system that makes a copy?
18    A.  Correct.
19    Q.  Now, you have produced as document 914 the
20  bottom portion of this document that's called notice
21  of policy expiration?
22    A.  That's correct.
23    Q.  Where did you get this?
24    A.  He sent it to us, so I guess he received it.

53

1    Q.  All right.  So, in other words, the bottom
2  portion of this notice called the notice of policy
3  expiration was sent back to Harleysville with
4  Mr. Drexel's check that's dated 6-7-04?
5    A.  That's correct.
6    Q.  So in order for you to have this in your file
7  it had to have been returned to you by Mr. Drexel?
8    A.  That's correct.
9    Q.  Are there any other types of documents that
10  would have been sent to Mr. Drexel advising him of his
11  premium that is due other than the documents that you
12  sent out?
13    A.  Not that would have been sent by Harleysville,
14  no.
15    Q.  You're saying the agent might have sent
16  something?
17    A.  He could have sent something.  That would have
18  been all Harleysville would have sent.  The agent
19  could have sent him something else.  That was all that
20  Harleysville would have sent.
21    Q.  So if Mr. Drexel testified that he received a
22  document telling him that his premium was due, it's
23  going to be one of the documents that you sent to him
24  or perhaps the premium invoice?

14  (Pages 50 to 53)

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

54

1    MR. BESTE: Objection.
2    Q. Is that correct?
3    A. Correct.
4    Q. And we know that he got the notice of policy
5    expiration because he sent the bottom portion back?
6    MR. BESTE: Objection.
7    A. Correct.
8    Q. Now let me ask you about the extended date of
9    June 30, 2004.
10    What is the reason for extending the date?
11    A. It's a reminder notice to the customer and
12    we're giving them a second opportunity to pay their
13    renewal premium.
14    Q. Now, what does your computer state between June
15    8, 2004 and June 30, 2004?
16    A. If you look at that policy on our billing
17    system, it will say that it's in expiration status.
18    Q. Expiration status?
19    A. Yes.
20    Q. I believe that there's been testimony by Sherry
21    Clodfelter that when she checked the computer it said
22    active.
23    A. She probably looked in the policy system.
24    Q. What is the policy system?

55

1    A. The policy system is your system that shows
2    your policy detail, your coverages, your premiums and
3    that type of thing. That's the policy system.
4    Then we also have a billing system. This
5    particular activity took place in the billing system.
6    Q. All right. Now let's go to the policy system.
7    The policy system is a system that an
8    agent would look at? Not an agent but an adjuster?
9    A. Adjuster would look at it. They can look at
10    either system. I do think they more regularly look at
11    the policy system because they're also looking for the
12    types of coverages associated with that policy.
13    Q. Would the policy system indicate that the
14    policy was active if they looked at it, for instance,
15    on June 22nd?
16    A. Yes.
17    Q. And when would that system be changed to
18    inactive?
19    A. July 6th when our confirmation of termination
20    was issued.
21    MR. CASARINO: I have nothing else.
22    BY MR. BESTE:
23    Q. Just to follow up on that last question, so as
24    early as July 6th, 2004 claims employees would have

56

1    been able to tell if they looked in the right place of
2    their computer system that this policy had been
3    terminated or expired or canceled?
4    A. That's correct.
5    Q. The notice of expiration that we were just
6    talking about, was this issued directly by
7    Harleysville or was this issued by an agent?
8    A. That's by Harleysville.
9    Q. And it's issued directly to the insured and the
10    agent?
11    A. Yes.
12    Q. Mr. Casarino asked you a few questions about
13    the late payments paragraph on the second page of
14    H-30. Is that correct?
15    A. Correct.
16    Q. And he asked you whether it applied to the
17    various installment dates listed on the first page.
18    Do you see anything in this document that
19    draws a distinction between the first due date of June
20    8, 2004 and any subsequent due dates listed on the
21    document?
22    A. I'm sorry. I don't understand your question.
23    Q. I believe you testified that the late payments
24    provision applies to these due dates listed on the

57

1    front page?
2    A. It prints on all invoices. So when we send an
3    invoice out for any subsequent installments on a
4    particular policy, that same message would print on
5    the back of the invoice.
6    Q. But did you testify that that paragraph applies
7    to the various dates listed here?
8    A. What I meant to say was that it prints on all
9    premium invoices. So when you send a premium invoice
10    out for any subsequent installment, that same message
11    is there.
12    Q. Do you have any reason to believe that this
13    late payment provision did not apply to the payment
14    purportedly due on June 8th, 2004?
15    A. I'm not sure I understand your question, again.
16    Sorry.
17    Q. Do you have any reason to believe that the late
18    payments paragraph on page 2 does not apply to the
19    premium due on June 8, 2004?
20    A. To me the late payment message applies to any
21    invoice that goes out that if you don't pay by the due
22    date there's going to be a consequence.
23    Q. And in this case this notice informs Mr. Drexel
24    that it would be a cancellation for non-payment of

15 (Pages 54 to 57)

Drexel v. Harleysville Insurance Co.
Mildred D. Alderfer

58

```
1    premium, correct?
2    A.  It does say that, yes.
3         MR. BESTE:  That's all I have.
4         MR. CASARINO:  We would like to waive.
5         (Deposition concluded at 4:05 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

60

```
1    State of Delaware  )
2                       )
2    New Castle County  )
3
           CERTIFICATE OF REPORTER
4
       I, Kurt A. Fetzer, Registered Diplomate
5    Reporter and Notary Public, do hereby certify that
     there came before me on Tuesday, September 11, 2007,
6    the deponent herein, MILDRED D. ALDERFER, who was duly
     sworn by me and thereafter examined by counsel for
7    the respective parties; that the questions asked of
     said deponent and the answers given were taken down by
8    me in Stenotype notes and thereafter transcribed by
     use of computer-aided transcription and computer
9    printer under my direction.
10       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
11   examination of said witness.
12       I further certify that reading and signing of
     the deposition were waived by the deponent and
13   counsel.
14       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
15   interested in the event of this suit.
16
17
18   Kurt A. Fetzer, RDR, CRR
19   Certification No. 100-RPR
20   (Expires January 31, 2008)
21
22   DATED:
23
24
```

59

```
1              INDEX
2    DEPONENT:  MILDRED D. ALDERFER        PAGE
3      Examination by Mr. Beste       2
       Examination by Mr. Casarino    50
4      Examination by Mr. Beste       55
5
            EXHIBITS
6
     H DEPOSITION EXHIBITS            MARKED
7
     27 Three-page document captioned "Corporate
8      Direct Bill Criteria March 2005"    13
9    28 Document Bates stamp numbered DR0470-
       0561                 20
10
     29 Letter to Robert K. Beste, III, Esq.
11     from Stephen P. Casarino dated
       September 7, 2007           24
12
     30 Document Bates stamp numbered DR0609-
13     0611                 41
14
     CERTIFICATE OF REPORTER        PAGE 60
15
16
17
18
19
20
21
22
23
24
```

16 (Pages 58 to 60)

Drexel v. Harleysville Insurance Co.

**A**

ability 37:5
able 19:1 20:5
  20:17 21:17,18
  32:5 40:8
  41:23 42:17,20
  47:16 48:14
  56:1
accept 11:17
accepted 18:2
  39:24
access 11:15
  26:20,21,22,23
  27:9 48:20,22
  49:1,10,11
account 35:12
  35:17
Action 1:5
active 14:16,17
  40:2 54:22
  55:14
activity 15:1,9
  55:5
actual 33:17
  42:21 45:1
addition 30:2
additional 8:23
  31:19
adjust 40:22
adjusted 27:13
adjuster 55:8,9
adjustments
  40:19
advising 24:18
  25:5,7,15
  53:10
affirmative 27:5
  27:18
agency 9:8
agent 3:8 13:1
  19:17 36:1
  42:6,8,11,13
  42:18 53:15,18
  55:8,8 56:7,10
agent's 12:18
  13:3 42:6

agreement 22:5
Alderfer 1:10
  2:1,9 59:2 60:6
allow 49:17
amount 31:9
  36:15,19,20
  37:3 39:10
  51:8
analysis 9:19
  15:19 18:16
answer 19:1
  27:16 49:21
answers 60:7
anybody 26:18
  27:8 43:11
apart 6:17
appear 30:10
  45:12
APPEARANC...
  1:14
appears 20:19
application 11:9
applied 14:16
  15:11,12 31:14
  56:16
applies 10:24
  18:19 56:24
  57:6,20
apply 57:13,18
appreciate 13:12
appropriate
  47:5
approval 11:12
approximately
  2:13
area 2:18 3:18
  6:11 27:15
  38:6 42:23
  45:6,20 47:17
  47:19 48:24
areas 3:2 49:6
arose 15:23
ascertained 27:1
aside 25:12
  40:19
asked 6:4 21:14
  56:12,16 60:7

asking 38:12
aspect 3:20
  10:24 37:5
Assistant 9:8
associated 10:17
  10:20 13:22
  31:10 35:13,17
  35:21 41:7
  43:1 55:12
assume 52:13
attorney 60:14
attorneys 6:17
audit 48:15
authority 11:8
  17:5 24:23
  28:4 37:5
  46:19
authorized 7:19
authorizing
  16:13
automated
  13:21,22 25:21
  26:6,16,17
  28:18 36:24
  38:2,3 39:7
  40:16
automatically
  27:7 28:18
  37:1 50:16
Avenue 1:11,16
aware 6:2 27:6
  35:14,15 40:5
  40:7 41:15
A2 45:16,17

**B**

B 59:5
back 5:22 29:2
  35:14 36:8
  43:24 47:14
  52:3 53:3 54:5
  57:5
bank 15:5,7
bar 28:24
basically 4:24
  5:1
Bates 44:24 59:9

59:12
beginning 1:12
  39:23
behalf 4:12,18
believe 24:9 48:2
  54:20 56:23
  57:12,17
Beste 1:15 2:6
  4:17,20 5:3,11
  5:12 13:4,7,11
  13:16 19:24
  20:4 23:10,17
  24:2,5,9,12
  41:18,22 44:24
  45:3 50:20
  51:10,18,20
  52:1 54:1,6
  55:22 58:3
  59:3,4,10
beyond 11:13
  21:20
bill 3:3 9:20
  11:21,23 12:1
  12:15 13:18
  15:1 31:4
  37:21 59:8
billed 36:14
billing 14:15,24
  15:10 16:12
  26:18,20 27:8
  27:11 31:14
  54:16 55:4,5
birth 2:7
bit 13:2
Bob 47:24
bottom 28:6
  31:23 34:3
  52:20 53:1
  54:5
box 30:13
broken 7:1
Brooks 9:2
built 37:3 38:3
  39:7 40:17
  47:7
business 9:19

**C**

call 5:4 44:22
called 10:6
  11:24 52:20
  53:2
calls 51:20
cancel 3:19 4:2
canceled 17:23
  17:24 25:2
  34:14,15,22
  44:12 50:16
  56:3
canceling 8:3
  10:18
cancellation
  18:4,11,13,22
  19:5 21:16
  25:8,12 32:19
  33:19 39:5,8
  39:15,20,21
  40:1,14 41:9
  41:11,12,14
  43:20,22 44:16
  45:9,15,17
  46:23 57:24
cancellations
  30:18 39:8
canned 30:21
captioned 59:7
captured 14:14
captures 14:11
carrying 12:12
Casarino 1:18
  1:18 4:19,22
  5:6,15 7:7 12:5
  12:22 13:5,9
  13:12 17:15
  19:23 23:12,23
  24:1,4,7 28:3
  44:22 45:1
  49:19 50:21,23
  51:19,22,23
  55:21 56:12
  58:4 59:3,11
case 3:14,22
  16:3,15,19

Drexel v. Harleysville Insurance Co.

62

18:14,20 19:19
20:20 22:19
27:22,24 29:7
31:7 35:6
49:23 57:23
**case-by-case**
47:10
**cashed** 15:18
31:11,13,13
**Castle** 60:2
**ceased** 3:23
**certain** 3:23
31:24 49:13
**CERTIFICATE**
59:14 60:3
**Certification**
60:19
**certified** 20:21
21:3
**certify** 60:5,10
60:12,14
**change** 24:23
34:19 35:18
37:5 38:22
41:5,5,6 43:12
49:8,10,15
**changed** 9:9
12:21 20:24
28:2 55:17
**changes** 41:7
43:7
**check** 3:9,10
14:12 15:17
31:12 34:5
52:16 53:4
**checked** 30:13
54:21
**checks** 3:11
15:13,20 35:3
35:8 39:9
**CHRISTMAN**
1:18
**circumstances**
15:13 35:24
46:8
**Civil** 1:5,10
**claim** 3:14 6:3

11:1 18:17
27:13,19 46:5
**claims** 3:8,11,16
3:17 8:8 11:3
26:11 27:5,15
48:9 55:24
**clause** 51:21
**Clodfelter** 54:21
**close** 30:4
**coded** 28:24
**coincide** 45:13
**collecting** 10:17
**collection** 7:24
**collectively**
38:19
**column** 31:23
**come** 14:8
**comes** 3:6 14:13
14:20 15:4
**commercial** 20:9
49:6
**company** 1:9
2:11 3:13 4:18
26:21 36:1
42:13
**Comparing**
45:10
**complete** 21:1
**computer** 3:7
15:3 28:7
30:16 31:1
46:22 47:7
54:14,21 56:2
60:8
**computer-aided**
60:8
**computer-gen...**
30:10,12
**concerned** 49:16
**concluded** 58:5
**conclusion**
51:21
**condition** 30:23
**confirm** 30:3
**confirmation**
28:11 29:11
30:6,9 33:5,10

33:11 34:12
35:22 55:19
**confirming**
29:19
**confusing** 6:24
**consequence**
57:22
**consequences**
44:6
**consideration**
4:4
**content** 10:3
19:2 38:22
**contents** 24:3
**continue** 19:10
**continued** 29:15
**continuous**
43:19
**control** 42:21
46:7,22 49:8
**controlled** 46:17
48:17
**controls** 38:4
49:3
**conversation**
7:12,13
**copies** 35:21
**copy** 5:14 12:20
13:12,13 19:16
42:7 52:17
**corporate** 9:20
11:21,23,24
13:18 36:5
59:7
**correct** 2:22
4:16 6:10
10:10 11:6,7
14:4 15:3,16
15:20 16:1
17:10,20,21
18:18,21 23:9
24:15,16,24
25:17,23 27:21
27:23 28:1,12
28:13,16 29:8
30:8,11,17
31:20,21,23

32:1,4,12,14
32:17,20 33:3
33:12,21 34:6
36:21 37:7
38:20 40:4,21
40:24 44:9,13
45:22 46:6,21
47:9 49:24
50:4,5,17 51:5
51:6,14 52:10
52:18,22 53:5
53:8 54:2,3,7
56:4,14,15
58:1 60:10
**correctly** 51:8
**correspondence**
48:9
**counsel** 60:6,13
60:14
**County** 60:2
**couple** 13:6
50:21
**course** 22:8 40:2
**court** 1:1 6:22
**courtesy** 29:12
41:16
**coverage** 7:21
11:3 24:20
29:15,20 39:11
43:19 44:10
49:17
**coverages** 10:20
55:2,12
**criteria** 4:1 12:1
12:15 13:18
36:5 59:8
**Crone** 9:4,5
**crosses** 36:17
**CRR** 60:18
**current** 8:18
**currently** 2:15
**customer** 42:16
45:14 54:11
**customers** 41:17
**cycle** 15:10
**C54** 33:16
**C554-3** 33:13

**D**

**D** 1:10 2:1 59:1
59:2 60:6
**data** 14:14 48:23
49:1,14
**date** 2:7 11:18
11:19 12:17
16:21,23 18:6
18:9 19:11
20:24 26:2
29:15,17,21,24
30:4 31:8 32:6
32:7,13 33:2
37:11,15,21
40:3 41:11
43:19 46:10
49:23 50:12,15
54:8,10 56:19
57:22
**dated** 12:19 53:4
59:11 60:22
**dates** 31:23
46:23 51:3
56:17,20,24
57:7
**day** 14:21 15:8
15:12,15 26:8
28:9 32:9
**days** 13:6 32:22
32:23 37:13
39:14,16 41:5
47:3
**day's** 15:24
**deal** 11:5 15:14
50:24
**dealing** 5:9
**dec** 19:20 20:8
**decide** 43:6
**decision** 3:14,22
**decisions** 22:15
**declaration** 20:8
22:7
**declarations**
19:13 21:19
**Defendant** 1:8
1:20

Drexel v. Harleysville Insurance Co.

63

| | | | | |
|---|---|---|---|---|
| **Delaware** 1:2,11 | **detail** 55:2 | **documents** | **effect** 12:15 | **evening** 14:15 |
| 1:11,16,16,19 | **determine** 14:21 | 12:22 26:7 | 43:23 51:21 | **event** 13:10 17:4 |
| 1:23 60:1 | **difference** 18:3 | 53:9,11,23 | **effective** 37:15 | 26:12,15 27:6 |
| **delineates** 40:6 | 39:18 | **Documerge** 9:21 | 41:11 46:23 | 27:14,19 32:18 |
| **deliver** 42:15 | **differences** | 9:23 | **effort** 17:1 43:1 | 33:19 40:13 |
| **delivered** 42:8 | 18:22 | **draw** 44:15 | **eighth** 8:14 | 60:15 |
| **denied** 16:16 | **different** 3:17 | **drawn** 19:4 | **either** 40:13 | **events** 31:24 |
| 23:5 | 12:23 30:14,18 | **draws** 56:19 | 55:10 60:14 | 35:19 50:7 |
| **denying** 34:8,18 | 38:8,14 | **Drexel** 1:4 19:19 | **electronic** 14:24 | **everybody** 5:8 |
| **department** 3:16 | **Diplomate** 1:12 | 23:1,8 25:1,4 | 35:1 | **examination** 2:5 |
| 3:17,17 10:7 | 60:4 | 25:11 26:4 | **elects** 42:14 | 59:3,3,4 60:11 |
| 10:23 14:3,9 | **direct** 3:3 9:20 | 29:6 32:3,11 | **emphasizing** | **examined** 2:3 |
| 15:22 16:2 | 11:21,23,24 | 33:20,23 35:4 | 43:18 | 60:6 |
| 17:4,9 21:4 | 12:14 13:18 | 42:3 44:6,19 | **employee** 2:10 | **example** 3:8 |
| 22:9,13,16,17 | 15:1 31:3 36:5 | 52:9 53:7,10 | 15:19 26:24 | 32:2,10 |
| 22:20 23:2,3 | 59:8 | 53:21 57:23 | **employees** 5:5 | **exclusively** |
| 24:22,22 25:20 | **direction** 60:9 | **Drexel's** 16:18 | 7:4,4,14 8:19 | 22:15 |
| 26:14 27:4,17 | **directly** 8:22 | 17:12,19,22 | 8:21,24 14:2,6 | **exhibit** 13:14,17 |
| 28:15 29:9 | 56:6,9 | 18:17,20,23 | 26:12,21 37:4 | 20:1,2 24:10 |
| 36:22 37:4,24 | **discretion** 22:9 | 19:6,7 20:19 | 49:7 55:24 | 25:16 28:6 |
| 38:7,22 40:11 | 36:22 40:12 | 31:12 34:5,24 | **ensure** 27:5 | 41:19,20 48:13 |
| 40:12 42:4,21 | **distinction** 40:6 | 35:11 39:19,23 | 42:10 | **EXHIBITS** 59:6 |
| 42:24 43:8,17 | 44:15 56:19 | 40:5 42:18 | **entire** 24:2,4 | **exist** 3:23 |
| 46:7,17 47:11 | **distinctions** 19:4 | 50:3,7 53:4 | 35:7 51:4 | **expertise** 21:23 |
| 48:3,9,18 49:8 | 21:15 | **DR0470** 59:9 | **entirety** 30:11 | **expiration** 18:4 |
| 49:16 50:2 | **distribution** 3:4 | **DR0609** 59:12 | **entitled** 36:10 | 18:7,9,23 19:5 |
| **departments** | 9:18,22 21:10 | **due** 11:18,19 | 43:15 | 19:11 20:24 |
| 47:2 | **DISTRICT** 1:1 | 18:6 29:15,17 | **entries** 33:18,18 | 21:15 25:15,19 |
| **department's** | 1:2 | 29:24 32:6,7 | **entry** 26:22 33:4 | 26:17,19 27:14 |
| 46:13,22 | **division** 3:13 | 32:13 33:2 | 33:9,13 | 27:19 29:10,12 |
| **depending** 30:19 | 10:5,7,8,12,15 | 37:11,11,15,17 | **envelopes** 14:7 | 29:21,22 33:6 |
| 37:22 | 11:8 19:15 | 37:21,22 43:19 | 29:4 | 33:7,24 34:4 |
| **depends** 41:3 | 48:3 | 46:10 50:12,15 | **equally** 18:19 | 34:11 35:22 |
| 43:11 | **document** 5:17 | 51:3 53:11,22 | **equipment** 14:9 | 36:17 40:14 |
| **deponent** 2:2 | 11:20 12:3,6 | 56:19,20,24 | 14:11 15:7 | 41:11,12,16 |
| 59:2 60:6,7,12 | 12:18 13:1,3 | 57:14,19,21 | 16:8 26:6,7 | 43:23 44:16 |
| **deposited** 15:5,7 | 16:7 19:18 | **duly** 2:3 60:6 | 29:1 | 45:18 46:24 |
| 15:14,18,20 | 20:5,12,14 | **duties** 12:12 | **equity** 39:9,14 | 50:8,14,15 |
| **deposition** 1:9 | 23:11,13 28:23 | | **escrow** 35:12,17 | 52:7,21 53:3 |
| 4:23 5:4 6:14 | 30:10,15 32:5 | ——————— | 36:1 | 54:5,17,18 |
| 6:19 7:8,15 | 34:16,17 47:16 | **E** | **Esq** 1:15,18 | 56:5 |
| 13:14 17:2 | 47:17,19,21 | **E** 59:1,5 | 59:10 | **expire** 40:18 |
| 20:2 24:10 | 48:14 49:9 | **earlier** 52:15 | **essence** 31:15 | 49:18 |
| 41:20 58:5 | 51:15 52:8,19 | **early** 6:4 27:1 | **essentially** 13:19 | **expired** 18:2 |
| 59:6 60:12 | 52:20 53:22 | 55:24 | 46:4 | 25:3 27:2 |
| **description** 9:15 | 56:18,21 59:7 | **easier** 6:22 7:1 | **establishes** | 34:22 56:3 |
| **designee** 1:10 | 59:9,12 | 24:5 | 13:18 | **expires** 18:9 |
| | | **Ebright** 9:2 | | |

Drexel v. Harleysville Insurance Co.

64

60:20
**explain** 14:5
  16:5 18:3
  24:17 29:9
  36:12 37:9,12
  39:4,18 43:16
  45:4 50:6
**explained** 16:8
**extend** 41:17
**extended** 11:19
  29:15,17,24
  50:12 54:8
**extending** 54:10

**F**
**fact** 17:2,8 30:13
  44:2
**facts** 22:14,15
**fair** 10:12 12:14
  45:12
**fall** 14:3
**falls** 18:12
**familiar** 45:23
**far** 5:2 21:4
  35:13 49:7,16
**fax** 24:15
**Federal** 1:10
**fee** 36:19,20 37:2
**fees** 36:16
**Fetzer** 1:12,22
  60:4,18
**field** 9:8 48:2
**fifth** 8:7
**file** 5:21,22,23
  16:24 53:6
**final** 10:23 11:8
  31:16
**finally** 8:16
**finish** 6:23
**first** 2:2 6:2
  15:21 20:16
  37:14,20 46:16
  56:17,19
**fit** 34:19
**five** 8:22
**five-day** 30:2
  39:17

**flag** 15:4
**Floor** 1:11,16
**follow** 11:11
  55:23
**following** 14:21
  15:12 16:8
  50:14
**follows** 2:4
**follow-up** 25:6
**foregoing** 60:10
**form** 10:3 33:14
  33:17 38:10,16
  38:20
**forms** 20:22
  38:8,22 41:6
**forth** 18:23 19:5
**forward** 6:21
  42:8
**forwarded**
  42:18
**forwarding**
  42:12
**fourth** 8:5
**frames** 47:5
**frequently** 38:21
  40:22 41:1
**front** 51:3 57:1
**fulfills** 42:11
**full** 14:19
**Furlow** 1:11,15
**further** 37:8
  60:10,12,14

**G**
**general** 9:15
**generated** 21:4
  22:19,20,22
  24:21 25:20,21
  25:24 26:1,16
  28:18 30:16
  46:9,12
**generates** 9:21
**give** 9:15 30:4
  32:22 37:13,20
  41:10,13 47:2
**given** 22:12
  38:11 47:8

60:7,10
**gives** 35:18
**giving** 29:14
  39:15 54:12
**go** 6:13,14,21
  15:11 21:21
  24:6 35:14
  38:8 41:6
  49:15 52:4,17
  55:6
**goes** 26:17 46:11
  57:21
**going** 5:13 12:7
  19:21,24 24:2
  36:4,6 44:21
  47:14 48:12
  53:23 57:22
**goodness** 28:10
**grace** 29:14,18
  29:23 30:2
  32:23 33:2
  39:17 50:14
**group** 43:6
**guess** 52:24
**guide** 11:16
**guideline** 11:22
  11:23 24:7
**guidelines** 11:11
  11:13,15,17
  22:12 41:4
**Gunther** 26:6
  28:23

**H**
**H** 13:14 20:2
  24:10 41:20
  59:5,6
**hand** 19:21
**handle** 3:2,6
  11:13 30:5
**handled** 9:22
  22:10 29:2
**handling** 14:2
**happened** 16:2,5
  17:12,22 39:19
**happens** 27:7
**Harleysville** 1:7

1:9 2:11,16
3:13,22 4:9,13
7:5,14 12:12
13:24 14:1,6
15:18,19 16:19
17:11,14 22:11
26:14,24 27:6
31:11 32:15
35:18 38:10,21
40:8 41:10
42:10 48:22
49:17 53:3,13
53:18,20 56:7
56:8
**Harleysville's**
  11:4 17:19
  18:16 26:11
**held** 9:13
**hesitate** 6:24
**hold** 2:15 9:11
  9:12
**homeowner's**
  38:11
**human** 25:22
  40:20
**hundreds** 28:8
**H-19** 48:13 49:4
**H-23** 5:14 7:18
**H-26** 12:7,14
  36:8,9 39:3
**H-27** 13:11,17
  36:7
**H-28** 20:16
  44:21
**H-29** 24:3,13
  25:18 31:2
  33:22
**H-30** 41:23
  43:14 51:2
  56:14
**H-6** 47:15

**I**
**identification**
  13:15 20:3
  24:11 41:21
**identify** 20:5,17

33:22 41:23
  47:16 48:14
**identifying**
  40:13
**III** 1:15 59:10
**image** 14:11
  16:24
**imaged** 16:21
**immediately** 7:7
**impact** 11:5
**inactive** 55:18
**included** 51:24
**includes** 24:7
**incorrect** 14:18
**indicate** 55:13
**indicates** 31:24
  52:9
**indicating** 5:16
  12:24 13:7
  22:4 23:14,22
  23:24 25:12
  30:20,24
**individual** 52:4
**info** 13:2
**information**
  30:21,21 47:1
  48:20 49:3,9
  49:13
**informs** 25:1
  57:23
**infrequent** 41:3
**initial** 4:6 37:11
**initially** 37:22
**initiate** 28:19
**input** 25:22
  40:20
**inquiry** 26:22,23
  31:3,4 48:21
  49:1,11
**inserter** 28:23
**inserting** 26:6
**installment**
  36:15,20 37:15
  37:17,18 56:17
  57:10
**installments**
  37:10,22 57:3

Drexel v. Harleysville Insurance Co.

instance 46:16
55:14
instructed 36:23
instructing 44:6
insurance 1:7,9
2:11 18:24
47:2
insured 14:3,7
16:16 19:14,16
24:18 29:13
31:5 32:22
35:23 36:2,14
38:1,9 42:9,12
45:8 48:10
51:8 56:9
insureds 30:3
34:21 37:13
38:5,13
insured's 42:7
insuring 22:4
interaction
47:10
interested 60:15
interim 38:15,17
internal 12:19
13:2
interpreting
10:15 45:5,19
invoice 32:8,11
36:14 38:13,14
38:15 42:2,3,5
42:7 44:8,18
46:10 50:24
52:5 53:24
57:3,5,9,21
invoices 35:21
38:1,5,18 43:3
52:3 57:2,9
involved 3:20
8:8 11:2 43:2
43:10
involvement
10:11,14 48:8
issue 15:14 16:3
18:5 19:16
20:19 22:21,23
23:2 36:14

37:24
issued 20:22,23
28:15,17,19
29:10 32:8,20
32:21 34:2
37:10,19,23
46:5 55:20
56:6,7,9
issues 15:23
issuing 43:20

___

**J**

January 60:20
Joanne 9:2
job 13:19,20
July 2:9,14
16:20 17:20
28:15 29:11
30:7,9 32:13
32:16 33:1,9
33:19 34:11
50:3 55:19,24
June 26:1,2 27:1
29:10,22,24
31:12 32:8,10
32:11 33:4
34:10 49:23
51:9,11,12
54:9,14,15
55:15 56:19
57:14,19

___

**K**

K 1:15 59:10
Katzenstein
1:11,15
kind 27:10 34:7
King 1:19,23
know 2:13 5:21
6:2,24 9:7 12:2
16:2,18,22
19:8 21:5,9,10
23:10 32:21
33:10 35:13
45:18 47:24
48:3,5,22 49:3
49:7 52:11,12

54:4
knowledge 19:3
Kurt 1:12 60:4
60:18

___

**L**

labeled 36:9
44:5
language 21:24
22:2 38:4 39:4
40:5,9 42:22
43:3,21 45:10
lapse 29:16
late 4:2,5 11:5
16:17 17:24
22:10 23:4
29:13 32:20,22
36:16 37:10,19
37:23 43:15
44:5 45:10
51:16 56:13,23
57:13,17,20
law 1:11 38:7
42:24
lawsuit 6:3
LAYNE 1:4
lead 32:18
legal 41:8 43:8
51:21
letter 23:5,6,17
23:18 24:3,17
24:18,21 25:1
25:8,11 26:3
59:10
let's 6:14 7:17
13:11 50:24
55:6
life 35:7
Linda 9:2
line 24:15
lines 49:6
listed 6:13 56:17
56:20,24 57:7
litigation 12:3
little 13:1
LLP 1:11
locate 21:14

located 13:24
log 26:6,9 28:23
logic 37:3 38:3,4
40:17,19,22
46:18,20 47:7
long 2:10 9:13
longer 24:22
look 14:21 19:20
35:15 37:8
43:6,14 48:16
48:21 51:1
54:16 55:8,9,9
55:10
looked 4:22
16:11 43:12
54:23 55:14
56:1
looking 19:2
20:16 21:3
26:18 29:22
55:11
looks 30:14
32:15 39:9
lot 6:21,24 13:20

___

**M**

mail 3:7,9,11
29:2 30:4,4
36:17 42:6
mailed 3:9 26:5
26:8,9 28:20
28:21 29:3,4
30:7 34:3 42:5
mailing 26:2
29:5 42:15
making 47:4
management 7:4
manager 2:17
9:6,12
manner 44:8
manually 29:3,4
manuals 12:11
March 12:20
32:2 42:4,19
44:7 45:11
59:8
mark 13:4,11

marked 5:13
12:6 13:14,17
19:21,22,24
20:2 24:3,10
24:13 33:13
41:18,20 47:15
48:12 51:1,1
59:6
**Marketing**
43:10
master 14:15,17
14:23,24 16:12
26:18,20 27:8
31:14 38:10
match 45:13
matched 14:18
matches 30:24
materials 42:12
42:18
mean 6:8 14:23
15:13 17:16
30:15 45:8
46:1 50:9
means 37:12
43:17 49:12
50:10
meant 57:8
mechanism
15:17
meet 7:10,11
meetings 6:16
6:17 7:3
mentioned 19:11
52:15
message 19:9
21:18 22:3
30:20 38:14
43:24 52:3
57:4,10,20
messages 16:13
16:14
met 7:7
middle 39:22
midterm 18:12
39:14,22 45:17
mid-term 39:8
Mildred 1:10

Drexel v. Harleysville Insurance Co.

66

2:1,9 59:2 60:6
**Mm-hmm** 6:7
6:12 14:8
28:14
**month** 37:17,18
37:20
**morning** 15:22
16:9
**mortgage** 35:13
35:18 36:1
**multipage** 20:14
**multiple** 37:10

**N**

**N** 59:1
**name** 2:7,23
21:8
**NCR** 14:10 15:7
**need** 14:21 49:2
**needed** 40:23
41:2
**never** 47:21
**new** 20:24 41:4
60:2
**nine** 37:16
**ninth** 8:16
**Non** 39:5
**non-pay** 36:18
40:18 41:8,8
45:23 46:2,11
**non-payment**
3:19 4:6 7:22
8:2,3,3,6 10:18
39:15,20,21
40:1,14 41:9
41:14 43:22
44:12 46:3,8
57:24
**North** 1:19
**Notary** 1:13
60:5
**notes** 60:8
**notice** 4:23 5:4
6:1,14 18:8
25:4,6,15,19
26:5,19 29:10
29:12,12,19,22

30:17,22 32:3
33:6,7,20 34:1
34:4,8,10,10
34:11,23 35:19
36:17,18 39:5
39:14,16 41:5
41:8,8,10,13
41:16,16 42:22
43:21,23 44:2
45:11 47:3
50:10 51:7,15
52:6,20 53:2,2
54:4,11 56:5
57:23
**notices** 4:6 22:19
23:1 25:14
29:1,6 35:21
35:23,24 38:17
38:18 43:20
44:1 48:8
**notification**
27:10
**notify** 26:11,14
**noting** 52:1
**number** 7:17
14:19 33:14,17
39:13,16 41:5
44:24 45:1
47:3
**numbered** 59:9
59:12

**O**

**oath** 2:3
**objection** 28:3
51:10,18,19
54:1,6
**occasionally**
48:16
**occur** 40:2
**occurred** 17:4
25:13 31:24
**occurs** 15:1
26:15 27:20
39:1,22
**offered** 50:11
**office** 3:9

**offices** 1:11 48:2
**official** 17:11,17
**Oh** 33:16
**Okay** 5:11 22:8
45:2,17 50:20
51:22
**once** 24:21
**opened** 14:9
15:6 16:7
**opening** 14:9
**Opex** 14:9
**opportunity**
54:12
**opposed** 40:3
**option** 42:6,15
**order** 37:20 53:6
**Originally** 5:7
**output** 3:4 9:18
9:21,22,22
21:10
**overnight** 15:10
**override** 46:19
**overseeing** 9:17

**P**

**P** 1:18 59:11
**package** 20:9,17
21:1 23:13
24:4
**page** 19:13,20
20:8,10,15,16
21:19 22:6,7,7
24:14 25:16
28:5 31:2,15
31:19,22 33:22
34:5,7,12 36:8
37:8 39:3
43:14 44:21,22
56:13,17 57:1
57:18 59:2,14
**paid** 3:15 14:19
27:13 35:12,17
39:10 46:11
51:9
**paper** 10:3 35:3
**paragraph**
36:10,12 43:15

43:16 44:5
45:4,11,14
56:13 57:6,18
**paragraphs**
45:12
**part** 2:19 3:12
3:16,21 4:2,9
4:15 6:9 13:24
27:5 31:19
38:24
**partial** 51:3
**particular** 6:1
10:24 15:4
26:8 28:22
31:5 38:21
40:13 42:5
47:12 55:5
57:4
**parties** 60:7
**parts** 4:13
**party** 60:14
**pay** 29:14 32:22
37:13,16,16
44:10 54:12
57:21
**payer** 35:20
**paying** 44:7
**payment** 4:2,5
7:24 11:18
14:7,13,16,22
15:4,9,24 16:3
16:6,15,17
17:13,20,24
18:8,14 19:10
22:20,22 23:2
23:4 27:18
29:13,18 30:5
31:8,16 32:16
32:23 33:1,24
34:9 35:1
36:16,19 37:1
38:9 39:5,12
43:18 45:10
46:4 47:12
50:3,11,13
57:13,13,20
**payments** 3:3

11:6 14:2,8
15:6 18:12
22:9,10 31:4,6
31:8 43:15
44:5 51:4,13
51:16,17 56:13
56:23 57:18
**Pennsylvania**
14:1
**people** 8:22
46:19
**period** 29:14,18
29:23 30:3
32:23 33:2
35:16 39:17
40:3 50:14
51:4
**person** 4:21
**perspective**
27:17 43:17
**physical** 3:9
**place** 55:5 56:1
**placed** 42:22
**placement** 43:3
**Plaintiff** 1:5,17
**please** 2:8 20:1
41:19 45:4
**plus** 29:18 32:23
**point** 3:23 17:13
26:17 29:5
35:11
**policies** 3:18
12:10 21:11
38:11
**policy** 2:17,24
3:1,12,21,23
4:2,15,24 5:1,9
10:5,8,12,14
10:15,20,24
11:5 14:19
15:2 16:10
17:5,12,22,23
18:1,2,5,8,13
18:20,24 19:2
19:4,6,7,9,10
19:13,22 20:9
20:19,21,22,23

Drexel v. Harleysville Insurance Co.

67

21:3,14,24
24:19,23 25:2
25:3,5,15,19
26:19 27:2
29:10,19,21
32:18 34:11,13
34:24 35:7,16
35:19,20 36:18
37:14 39:9,19
39:22,24 40:2
40:6,17 42:6,7
42:12,18 44:2
44:11 45:9
46:2,5,8 48:15
50:7,15 51:4
52:6,21 53:2
54:4,16,23,24
55:1,2,3,6,7,11
55:12,13,14
56:2 57:4
**policy's** 41:12
**portion** 34:3
52:20 53:2
54:5
**position** 2:15 5:3
8:18 9:11,12
9:13 17:11,17
**positive** 48:6
**postal** 28:22
52:13
**potential** 44:6
**practically** 14:5
**premium** 3:3,19
4:7 7:22 8:2,4
8:6 10:17,18
10:22 11:5,18
14:2,7,8 16:3,6
16:18 17:13,19
18:6,7 22:10
22:20,22 23:2
32:6 35:12
36:15 37:2,14
37:24 38:5,9
38:18 39:6,10
39:11,15,20,21
40:1,15 41:9
41:14 42:22

43:3,22 44:7
44:12,18 50:3
50:13,24 51:7
51:9 53:11,22
53:24 54:13
57:9,9,19 58:1
**premiums** 55:2
**preprinted**
30:21
**president** 9:8
**prevent** 27:13
27:18
**prevents** 46:4
**primary** 9:16
**print** 10:2,3 31:1
31:3 57:4
**printed** 28:7
33:15 38:20
**printer** 60:9
**printout** 31:20
**prints** 52:3 57:2
57:8
**prior** 5:20 15:18
15:23 18:10
41:11 50:13
**probably** 23:23
34:21 54:23
**procedure** 1:10
11:21,23
**procedures**
11:10 12:11,21
27:12
**process** 30:5
38:24 39:8
**processed** 15:6
23:3,4
**processes** 13:21
47:19
**processing** 3:4
9:18 13:23
14:10 15:24
22:8 31:16
47:12
**processor** 16:11
**produced** 12:3
52:19
**proof** 29:2,5

**prove** 28:21
**provided** 11:18
39:11
**providing** 47:1
**provision** 10:24
56:24 57:13
**provisions** 10:15
10:16 11:4,9
11:10 40:9
**Public** 1:13 60:5
**pull** 6:4
**purportedly**
57:14
**pursuant** 1:10
**put** 5:23 21:11
29:3 30:20
46:8
**p.m** 1:12 58:5

---

**Q**

**question** 17:16
31:11 36:4
49:20 55:23
56:22 57:15
**questions** 6:23
50:22 56:12
60:7
**quite** 19:8
**quote** 34:13

---

**R**

**RDR** 60:18
**reading** 21:23
51:7 60:12
**really** 5:9 21:9
**reason** 14:18
54:10 57:12,17
**recall** 5:24
**receipt** 52:16
**receipts** 10:22
31:16
**receive** 14:6
21:1 35:22
50:2
**received** 11:18
16:3,6,19,20
17:13,19 18:7

18:8,15 19:10
25:14 29:18
31:5,7,9 32:15
32:24 33:1
35:8 43:19
50:11 52:13,17
52:24 53:21
**receives** 35:23
**receiving** 35:3
**recommendati...**
43:5,8
**recommended**
43:12
**record** 2:8 52:2
**refer** 10:11
12:12,13 19:7
51:16
**referring** 12:8
19:8 20:10,12
21:19 22:2,3
23:14 24:14
25:16 45:17,18
46:14
**reflected** 49:4
**refunds** 31:10
**regard** 21:24
**regarding** 6:19
7:5,14 10:23
17:12 22:15
39:5 40:9
**Registered** 1:12
60:4
**regularly** 48:7
55:10
**regulations** 41:4
**reinstate** 25:7
36:18 37:1
**reinstated** 24:19
34:14
**reinstatement**
4:4,10 16:14
16:16 17:6
23:5 34:8,18
36:11
**relative** 60:14
**remained** 17:23
**remind** 34:7

**reminder** 54:11
**reminding** 29:13
**remittance** 3:4
9:18 13:23
14:10 16:11
**renewal** 18:2,5,6
18:15 19:9
20:22 21:2
22:4 32:2,8,10
32:20,21 37:10
37:15,19,23
38:14,17,18
39:24 40:3
42:2,3 44:2,18
45:11 49:23
54:13
**repertoire** 6:9
**report** 8:22 9:3
14:20 15:22
16:9 22:14
**reporter** 1:12
6:22 59:14
60:3,5
**reporting** 8:24
**represent** 33:19
**representation**
12:14
**representative**
42:13
**represents** 31:15
34:5
**request** 45:8
**requesting** 45:15
**require** 41:6
**required** 39:13
39:16 41:10,13
47:3
**requirement**
41:15
**researched**
15:12
**resides** 17:8
**respect** 4:18
7:21 8:2 11:9
15:23 17:5
18:17 29:6
38:4 47:11

Drexel v. Harleysville Insurance Co.

68

respective 60:7
responsibilities
  9:16,17,20
responsibility
  3:2 4:3,5 10:19
  42:11,14,15
  45:6,7,20,21
responsible 3:22
  4:8,9 10:16
rest 30:15
retain 17:5
retroactively
  49:17
return 52:13
returned 16:15
  34:9 53:7
returns 28:22
review 52:8
reviewed 19:18
right 7:8,17 8:18
  22:3 23:19,21
  23:24 24:8
  28:5 32:7
  43:10 44:14
  45:8 50:19
  53:1 55:6 56:1
Robert 1:15
  47:24 59:10
roughly 41:1
rule 1:10 6:21
  7:1
rules 41:4
run 14:10,14
  15:6,9 16:7
  28:24

**S**

S 59:5
safeguards
  27:12
saw 5:20,20
saying 53:15
says 19:9 22:4
  34:13 37:9
  45:8
scannable 14:13
  16:7

schedule 51:12
screen 31:3
second 7:23
  20:10 31:19,22
  37:16,17 54:12
  56:13
section 10:6 36:5
  36:9,10 39:6
see 16:12 26:18
  27:9 34:2
  56:18
seen 5:17,19
  23:6 47:21
selection 43:2
send 18:7 23:5
  27:9 29:19
  38:9 39:14
  46:10 57:2,9
sends 38:10
sent 13:6,8 15:5
  19:14,18 23:1
  23:8,17 25:11
  26:4 29:6 32:3
  32:11 33:20,23
  34:4,9 36:1
  38:5 42:3
  44:18 48:9
  52:24 53:3,10
  53:12,13,15,17
  53:18,19,20,23
  54:5
sentence 37:9,12
separate 2:21
  6:16 27:10
September 1:12
  23:18 59:11
  60:5
services 2:17,24
  3:1,12,18,21
  4:15 5:1 9:9,12
  10:5,7,8 48:24
  49:6
set 3:18 4:1
  11:10,10,14
  18:23 19:5
  52:16
seven 31:7

seventh 8:12
SHALK 1:18
Sherry 54:20
short 18:12
  36:19
show 5:13 12:7
  21:18 28:21
  36:6 44:21
  47:14 48:12
showed 16:9
  32:13
showing 24:13
  26:9 31:23
shown 49:9
shows 16:23
  26:7 30:22
  31:2,4,6,8 33:9
  55:1
sign 28:8
signature 28:6
signing 60:12
similar 13:1
situation 35:1
situations 14:20
  34:18,20,23
sixth 8:10
Smith 1:11,15
somebody 18:12
sorry 22:24 33:7
  33:16 36:6
  44:23 48:4
  56:22 57:16
Southard 47:24
  47:24
speak 7:20 43:21
special 30:19
specific 11:13
  30:23
specifically 5:24
  26:13
spelled 21:16
spring 6:5
stamp 59:9,12
standard 43:24
start 7:17
started 2:13
  5:22

starting 31:22
state 2:7 39:13
  39:16 47:3
  54:14 60:1
states 1:1 36:13
  41:4
Staton 4:17
status 24:23
  26:18 45:23
  46:2,3,11 50:6
  50:8 54:17,18
Stenotype 60:8
Stephen 1:18
  59:11
steps 27:5,18
  42:10
Steve 9:4,5
  23:11,18
stop 15:17
Street 1:19,23
strict 11:11
stub 14:11,14,14
  33:23,24
style 10:2,3
subject 7:20
subjects 49:13
subsequent
  56:20 57:3,10
suit 60:15
Suite 1:19
supervise 8:21
supervision 8:19
supervisor 9:5
supervisors 8:23
  9:1
support 2:17,24
  3:1,12,21 4:15
  5:1,10 10:5,8
  10:12,14
sure 5:22 10:13
  17:15 19:8
  23:23 45:5
  47:4 49:19,22
  52:7 57:15
suspense 15:11
sworn 2:3 60:6
system 3:18 4:1

  9:20,21 10:2,4
  13:22 14:15
  15:3,10 25:21
  26:11,16,17
  27:7,8,11
  28:18 31:4
  36:24 37:1,3,6
  38:2,3 39:7,9
  40:16,17,23
  46:9,12,13,18
  46:22 47:5,7
  47:13 48:15
  52:15,17 54:17
  54:23,24 55:1
  55:1,3,4,5,6,7
  55:7,10,11,13
  55:17 56:2
system's 40:19

**T**

T 59:5
take 6:22 27:4
  27:18 36:8
  38:24 42:10
taken 1:10 60:7
talking 10:22
  56:6
talks 51:16
task 14:5
telephone 7:11
  7:13
tell 5:2,19 7:19
  11:17 21:7,8
  21:12 25:24
  29:23 31:2
  32:5 34:15
  35:6 41:1 56:1
telling 44:9,11
  53:22
tells 51:8
ten 37:16
tend 6:23
term 18:6,10,11
  18:13 39:22,24
  45:23
terminate 3:19
  49:17

Drexel v. Harleysville Insurance Co.

69

| | | U | W | 04 26:1,2 51:9 |
|---|---|---|---|---|
| **terminated** | 39:11 44:10 | | | 51:12 |
| 16:10 18:1 | 46:11 47:5,8 | **understand** | **waive** 58:4 | **05-428(JJF)** 1:6 |
| 25:3,5 29:20 | **timely** 44:8 | 17:15,18 34:22 | **waived** 60:12 | **0561** 59:9 |
| 34:22 50:18,19 | **times** 21:11 | 38:12 49:19,22 | **want** 43:7 | **0611** 59:13 |
| 56:3 | 36:16 | 52:7 56:22 | **wanted** 3:8 | |
| **terminates** 18:9 | **title** 9:7 11:20 | 57:15 | **went** 4:6 52:9 | **1** |
| **termination** | **titled** 28:11 | **understanding** | **we're** 3:16 4:7 | |
| 7:21 18:4,14 | 34:10,11 | 5:7 | 10:22 29:14 | **1** 7:17 20:15 |
| 18:23 21:15 | **today** 4:12,21 | **undertook** 17:1 | 34:18 54:12 | **10** 32:16 34:5 |
| 25:4,6 27:14 | 5:20,21 7:5,8 | **underwriter** | **whatsoever** | **10th** 1:11,16 |
| 27:20 28:11 | 17:2 27:24 | 16:13 | 22:10 40:13 | 33:1 |
| 29:11 30:6,9 | **today's** 6:19 | **underwriting** | **WILCOX** 1:22 | **100-RPR** 60:19 |
| 32:19 33:5,11 | **tolerance** 36:5 | 2:19,21 4:11 | **Wilmington** | **11** 1:12 24:14 |
| 34:12 46:23 | **Tolerances** 36:9 | 4:13,18,21,24 | 1:11,16,19,23 | 32:10 34:7,12 |
| 55:19 | **topic** 7:17,23 8:1 | 5:2,5,8,9 11:12 | **witness** 12:24 | 60:5 |
| **terminations** | 8:5,7,10,12,14 | 17:8 22:13,14 | 23:16,20,24 | **11th** 32:11 |
| 30:18 | 8:16 | 22:16,17 38:6 | 60:11 | **13** 59:8 |
| **terms** 18:4 | **topics** 6:13 | 40:10 42:24 | **word** 3:24 25:8 | **13th** 16:20 31:14 |
| **testified** 2:4 | **topmost** 33:18 | 43:9 46:20 | 31:16 33:10 | 50:3 |
| 53:21 56:23 | **total** 51:8 | 47:1,4,6,11 | 34:15 | **1330** 1:23 |
| **testify** 4:12,21 | **trail** 48:15 | 48:5,24 49:5 | **wording** 34:19 | **14** 24:14 28:5 |
| 40:9 57:6 | **transcribed** 60:8 | **underwriting's** | 41:5 43:11 | **14th** 26:1 27:1 |
| **testifying** 4:17 | **transcript** 60:10 | 45:7,21 | **words** 36:20 | 29:10,22 31:12 |
| **testimony** 5:5 | **transcription** | **unit** 3:4,5 9:18 | 53:1 | 31:14 32:2 |
| 6:22 7:5 54:20 | 60:8 | 9:22 21:11 | **work** 3:6 4:7 9:1 | 33:4 34:3,10 |
| 60:10 | **true** 60:10 | **UNITED** 1:1 | 10:9 11:16 | **15th** 26:2,10 |
| **Thank** 28:10 | **truly** 30:3 | **units** 9:19 | 27:15 47:4,6 | 34:3 |
| **thing** 10:21 | **try** 6:23 | **updated** 27:10 | 48:7 | **19801** 1:19,23 |
| 31:17 55:3 | **trying** 49:21 | **updates** 27:8 | **works** 47:17 | **19899** 1:16 |
| **things** 6:4,8,9 | **Tuesday** 1:12 | **use** 3:24 18:11 | 48:2,5 | |
| **think** 5:8,14,21 | 60:5 | 33:10 60:8 | **worry** 7:2 | **2** |
| 9:9 11:24 13:9 | **turn** 39:3 | **uses** 25:8 | **wouldn't** 28:4 | |
| 13:9 19:22 | **twelve** 31:6 | | **written** 12:10 | **2** 22:7 43:14 |
| 20:21 23:12,20 | **twice** 51:1 | **V** | **www.wilfet.com** | 57:18 59:3 |
| 23:21,21 28:2 | **two** 3:2 8:23 9:1 | | 1:24 | **2D** 28:24 |
| 34:21 36:6 | 12:22 33:18 | **v** 1:6 | | **2:40** 1:12 |
| 49:21 51:20 | 37:21 45:12 | **various** 6:8 | **X** | **20** 32:22,23 |
| 55:10 | 50:7 | 34:19 41:4 | | 37:13 59:9 |
| **third** 8:1 30:13 | **type** 10:20 11:2 | 47:2 51:17 | **X** 59:1,5 | **20-day** 37:21 |
| 37:17,18 | 14:20 15:19 | 56:17 57:7 | | **200** 1:19 |
| **thought** 5:7 13:5 | 26:5 30:14,14 | **verification** 11:3 | **Y** | **2002** 32:2 35:15 |
| 13:7 30:1 | 30:19 31:17 | **verify** 17:1 26:3 | | **2003** 32:10,16 |
| **three** 37:22 | 34:24 43:11 | 42:17 | **year** 38:11 | 33:1 |
| **Three-page** 59:7 | 55:3 | **versus** 40:18 | **years** 2:12 9:14 | **2004** 9:11 12:15 |
| **time** 7:10 28:24 | **types** 30:18 53:9 | 43:22 | | 12:20 13:23 |
| 30:4,5 32:24 | 55:12 | **vice** 9:8 | **$** | 17:20 27:1,22 |
| 35:11,16 37:2 | | **view** 14:24 49:14 | **$283** 31:12 | 29:3 33:4 42:4 |
| | | | | 42:19 44:7 |
| | | | **0** | |

Drexel v. Harleysville Insurance Co.

70

45:11 54:9,15
54:15 55:24
56:20 57:14,19
**2005** 12:20 59:8
**2006** 12:17
**2007** 1:12 6:6
59:11 60:5
**2008** 60:20
**22** 8:24
**22nd** 55:15
**24** 59:11
**25** 9:14
**26** 2:9
**26th** 42:4 44:7
45:11
**27** 13:14 59:7
**28** 20:1,2 59:9
**29** 24:10 59:10

—————
**3**
**3** 36:8
**30** 41:19,20 54:9
54:15 59:12
**30th** 29:24
**30(b)(6)** 1:10 5:4
**302** 1:23
**31** 2:14 60:20

—————
**4**
**4** 25:16
**4:05** 58:5
**40** 2:12
**41** 59:13
**472** 22:6
**481** 44:21,22
**49** 2:9

—————
**5**
**5** 39:3
**50** 59:3
**55** 59:4

—————
**6**
**6** 28:5 51:9
**6th** 28:17,19
29:11 30:7,9
33:9,19 34:11

55:19,24
**6-7-04** 53:4
**60** 59:14
**655-0477** 1:23
**67** 2:14

—————
**7**
**7** 31:2 36:8
59:11
**7th** 23:18 28:16
28:20

—————
**8**
**8** 54:15 56:20
57:19
**8th** 32:8,13
49:24 51:11,12
57:14
**800** 1:11,16,19

—————
**9**
**9** 33:22
**914** 52:19